Stephen R. Stern, Esq. (SRS-5665)
Mark W. Geisler, Esq. (MG7261)
HOFFINGER STERN & ROSS, LLP
150 East 58th Street, 19th Floor
New York, New York 10155
Tel:    (212) 421-4000
Fax:    (212) 750-1259

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,            :

                                Plaintiffs,         :    07CV11586 (LAK)(GWG)
            -against-                                :
                                                         AFFIDAVIT OF
MOSES STERN, aka MARK STERN, JOSHUA SAFRIN,  :           STEPHEN R. STERN
FIRST REPUBLIC GROUP REALTY, LLC,                    :   IN OPPOSITION TO
EPHRAIM FRENKEL,                                         MOTION TO COMPEL
LAND TITLE ASSOCIATES ESCROW,               :            JONES LANG LASALLE
                                                         TO PRODUCE
                                Defendants.     :         DOCUMENTS
------------------------------------------------------------------------X
JOSHUA SAFRIN,

                        Defendant/Third Party-Crossclaim-
                        Counterclaim Plaintiff,
            -against-

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS, LLC, and FIRST REPUBLIC
GROUP CORP.,
                        Third Party Defendants,
            -and-

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and
LAND TITLE ASSOCIATES ESCROW,

                            Defendants/Crossclaim Defendants,
            -and-

AMUSEMENT INDUSTRY, INC. dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.
                        Plaintiffs/Counterclaim Defendants.
------------------------------------------------------------------------X

State of New York    )
                     )  ss.:
County of New York   )

Stephen R. Stern, being duly sworn, deposes and says:

1.      I am a partner in Hoffinger Stern & Ross LLP, counsel for defendants Mark Stern ("Stern"), First Republic Group Realty LLC ("First Republic LLC"), Ephraim Frenkel, and Land Title Associates Escrow, and counsel for third party defendant First Republic Group Corp.. Kaye Scholer LLP is co-counsel for defendants Stern and First Republic LLC.  As such, I am fully familiar with the facts stated herein.  I submit this Affidavit in opposition to plaintiffs' motion to compel nonparty Jones Lang Lasalle ("JLL") to produce documents.

2.      At JLL's request, we agreed to prepare a response to plaintiffs' subpoena, remove privileged documents from production and prepare a privilege log.  Thus, on April 30, 2008, we provided JLL's written response and objections.   On May 7, 2008, two discs containing documents were produced – including documents which defendants believe plaintiffs have no right to, including rent rolls and income statements regarding properties.  No privilege log was prepared in connection therewith because we had not found any privileged documents among the documents produced at that time.   Thereafter, on June 4, 2008, we provided additional documents from the files of a JLL paralegal, accompanied by a privilege log.   Currently, we continue to review additional materials from JLL for production.

3.      Plaintiffs seemingly intentionally disregard and fail to keep in mind the breadth of their subpoena, which relates to eleven separate properties in the southeastern United States and files from numerous JLL employees – no small task.  In good faith, we have produced and will continue to produce JLL's documents on an ongoing basis.  Notably, the first production was made prior to the execution of the confidentiality stipulation, although made subject to it.  There

has been no intentional delay or evasiveness, and plaintiffs' misplaced accusations are baseless. Further, it must be noted plaintiffs have not been totally forthcoming with respect to the facts surrounding their production which did not result in motions to compel by our clients.

4.      Putting aside the foregoing, it bears noting the case at bar essentially involves plaintiff Amusement Industry, Inc.'s ("Amusement") alleged advancement of $13 million on behalf of First Republic LLC in connection with the latter's acquisition of 11 shopping malls in the southeastern region of the United States, and what terms or conditions, if any, applied to said advance.  JLL is a *post-closing* property manager for the properties.  JLL's management function *has nothing to do with plaintiff's alleged advancement of $13 million* to First Republic, LLC or what terms purportedly govern the alleged advance.   Nevertheless, in a shotgun discovery approach, plaintiffs issued dozens of subpoenas, seeking all types of information from numerous nonparties, seeking information that has absolutely nothing to do with the focus of the action.

5.      We note the focus of the action will involve additional facts, such as wrongful acts undertaken to interfere with the business relations of defendants Mark Stern and First Republic LLC, as set forth in Stern's and First Republic LLC's Answer and Cross-Claims Against Third Party Defendants Steven Alevy and Bankers Capital Realty Advisors LLC (copy annexed as Exhibit A), and a complaint filed in New York State Supreme Court against Allen Alevy, Allen P. Sragow, Robert Friedman and Avery Egert is annexed hereto as Exhibit B.

6.      Notably, plaintiffs are hardly in a position to criticize the timing of production of documents or privilege logs.  Indeed, plaintiffs have granted themselves extensions in responding to discovery demands served on them or other parties whom plaintiffs' counsel represents (see, e.g, letter from plaintiffs' counsel, dated May 23, 2008, providing certain documents, advising of a future supplemental production and thanking counsel for their patience, annexed hereto as

Exhibit C, and an email of June 11th advising of anticipated production by a certain date "barring unforeseen technical circumstances" annexed as Exhibit D). Of course, we have not accused plaintiffs' counsel of being obstructionist, or of refusing to provide documents, or of being evasive. It is simply – as plaintiffs apparently recognize and take full advantage of for themselves – a time-consuming task to respond to the document subpoenas. Given the liberties plaintiffs have taken in the timing of their production, it ill-serves them to make baseless accusations and the within motion.

7.    With respect to plaintiffs' inquiry, only privileged documents were withheld from the previous productions; no responsive and non-privileged documents were withheld. As to future productions, we will advise whether responsive and non-privileged documents are being withheld, and <u>request plaintiffs' counsel do the same</u> with respect to their clients' productions. Indeed, for example, the responses prepared by plaintiffs' counsel on behalf of Bankers Capital Realty Advisors LLC contained various objections, concluding with "Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action" (Bankers Capital Realty Advisors LLC's Responses and Objections to Non-Party Subpoena, Exh E). To the extent the JLL responses contained similar language plaintiffs are, yet again, hardly in a position to criticize the JLL response.

8.Just as plaintiffs have produced documents on a continuing basis, so has JLL. We will continue to do so. It is respectfully submitted plaintiffs' motion should be denied.

Sworn to before me this
11th day of June, 2008

_____
Notary Public

_____
Stephen R. Stern

MARK W. GEISLER
Notary Public, State of New York
No. 02GE4833871
Qualified in Westchester County
Commission Expires December 31, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                      Plaintiffs,

    - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN,
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSHUA SAFRIN,

          Defendant/Third Party-Crossclaim-
               Counterclaim-Plaintiff,

    - against -

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC GROUP
CORP.,

          Third Party Defendants,

    - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND
TITLE ASSOCIATES ESCROW,

          Defendants/Crossclaim Defendants,

    - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.

         Plaintiffs/Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 07 Civ. 11586 (LAK) (GWG)
(ECF)

 

**DEFENDANTS STERN AND FIRST REPUBLIC'S ANSWER TO AND CROSS-CLAIMS AGAINST
THIRD PARTY DEFENDANTS STEVEN ALEVY AND BANKERS CAPITAL REALTY ADVISORS LLC**

Defendants Mark Stern ("Stern") and First Republic Realty Group LLC ("First Republic"), by and through their undersigned attorneys, as and for their answer to the cross-claims of third-party defendants Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy dated June 6, 2008 and as and for their cross-claims against Bankers Capital and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

1.      Stern and First Republic do not respond to the allegations set forth in the Counterclaims of Third-Party Defendant Steven Alevy d/b/a Bankers Capital because those counterclaims are asserted against Third-Party Plaintiff Joshua Safrin ("Safrin").

2.      The allegations of paragraph 1 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 1, except admit that Third-Party Defendant Bankers Capital purports to base jurisdiction of its cross-claims under 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

3.      The allegations of paragraph 2 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 2, except admit that Third-Party Defendant Bankers Capital purports to base venue on 28 U.S.C. § 1391(a)(2).

4.      Deny the allegations of paragraph 3, except admit that in or about May 2007, Steven Alevy, on behalf of Bankers Capital solicited Stern and First Republic to engage them to secure financing for First Republic's acquisition of a portfolio of properties from Colonial Realty Limited Partnership ("Colonial").

5.      Deny the allegations of paragraph 4.

6.      Deny the allegations of paragraph 5.

7.      Deny the allegations of paragraph 6, except admit that no fee has been paid to Bankers Capital by either Stern or First Republic.

8.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

9.      Deny the allegations of paragraph 8.

10.      Deny the allegations of paragraph 9.

11.      Deny the allegations of paragraph 10.

12.      Deny the allegation of paragraph 11.

13.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

14.      Deny the allegations of paragraph 13.

15.      Deny the allegations of paragraph 14.

16.      Deny the allegations of paragraph 15.

17.      Deny the allegations of paragraph 16, except admit that neither First Republic nor Stern has paid Bankers Capital any fee.

18.      Deny the allegations of paragraph 17

19.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

20.      Deny the allegations of paragraph 19.

21.      Deny the allegations of paragraph 20.

22.      Deny the allegations of paragraph 21.

23.      Deny the allegations of paragraph 22.

24.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

25.     Deny the allegations of paragraph 25.

26.     Deny the allegations of paragraph 26.

27.     Deny the allegations of paragraph 27.

28.     Deny the allegations of paragraph 28.

29.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

30.     Deny the allegations of paragraph 30, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

31.     Deny the allegations of paragraph 31.

32.     Deny the allegations of paragraph 32.

33.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

34.     Deny the allegations of paragraph 34, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

35.     Deny the allegations of paragraph 35.

36.     Deny the allegations of paragraph 36.

### FIRST AFFIRMATIVE DEFENSE

37.     Third-Party Defendant Bankers Capital has failed to state claims upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

38.     Third-Party Defendant Bankers Capital's claims are barred in whole or in

part because it failed to mitigate its alleged damages.

### THIRD AFFIRMATIVE DEFENSE

39.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, by the doctrines of laches, waiver and estoppel.

### FOURTH AFFIRMATIVE DEFENSE

40.    Third-Party Defendant Bankers Capital's claims are barred, by reason of its fraud, misconduct and/or unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

41.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it waived his right to claim damages by its own acts and omissions.

### SIXTH AFFIRMATIVE DEFENSE

42.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it was negligent and/or failed to exercise reasonable care.

### SEVENTH AFFIRMATIVE DEFENSE

43.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it ratified the alleged wrongful conduct for which it seeks recovery.

### EIGHTH AFFIRMATIVE DEFENSE

44.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part because it is a dissolved corporation and it is not licensed as a mortgage broker in New York.

### NINTH AFFIRMATIVE DEFENSE

45.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because any harm it suffered is the result of its own contributory negligence.

Doc #31654203.WPD                                    4

## RESERVATION OF RIGHTS

46.    Stern and First Republic expressly reserve the right to amend and/or supplement their answer and affirmative defenses as appropriate as discovery proceeds.

## CROSS-CLAIMS AGAINST BANKERS CAPITAL AND STEVEN ALEVY

Defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by and through their undersigned attorneys, as and for their cross-claims against Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over Stern's and First Republic's cross-claims pursuant to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the action.

2.    Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to these claims occurred herein.

## PARTIES

3.    Defendant Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

4.    Defendant First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York.  First Republic owns and manages the Properties.

5.    Third-Party Defendant Steven Alevy is a resident of the State of New York.  Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.

6.     Third-Party Defendant Bankers Capital is a dissolved California limited liability company whose principal place of business is in New York, New York.  Although Bankers Capital is dissolved, its principals improperly represent that it is an existing limited liability company.  Bankers Capital touts itself as being experienced in arranging mortgages and refinancing for real estate investors.  Bankers Capital was originally formed in California and previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.

7.     Non-party Allen Alevy is a resident of the State of California.

8.     Non-party Robert Friedman is a resident of the State of New York and is a Managing Director of Bankers Capital.

9.     Non-party Allen Sragow is a resident of the State of California.  Sragow is the son-in-law of Allen Alevy, the brother-in-law of Steven Alevy and is principally involved with and performs legal services for the Alevy family and various entities owned by the Alevy family.  Allen Sragow also serves as a director of certain companies owned by the Alevy family.

10.     Non-party Avery Egert ("Egert") is a resident of the State of New York. Egert is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin").  The Sovereign Group owns and manages various real estate properties in the United States.  At all relevant times, Egert had apparent and actual authority to enter into various transactions on behalf of Safrin, including the transactions with respect to the Properties.  Safrin and Egert hold a minority interest in First Republic through their ownership of JSAE Colonial LLC.

## FACTUAL BACKGROUND

### The Contract to Purchase the Properties

11.     After lengthy negotiations and discussions, effective as of April 20, 2007, First Republic Group Corp. ("First Republic Corp."), the predecessor in interest to First

Republic, entered into a written contract of sale with Colonial Realty Limited Partnership ("Colonial"), to acquire ten shopping center malls in the Southeast region of the United States for a purchase price of $128 million (the "Contract"). Under the terms of the Contract, First Republic Corp. paid Colonial a $1 million non-refundable deposit, with the balance of the purchase price due at closing. The closing was scheduled to occur no later than June 15, 2007.

12.    After the Contract was executed, First Republic Group Corp. assigned its right, title and interest under the Contract to First Republic.

13.    Pursuant to several written amendments to the Contract, (a) in exchange for an additional $2 million non-refundable deposit, the closing date was extended first to June 29, 2007 and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh property was added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First Republic, reducing the purchase price by that amount. Thus, after execution of the several amendments, the total purchase price for the Properties was approximately $129 million.

14.    In addition to paying Colonial the $129 million purchase price at the closing, First Republic was also obligated to pay: (a) certain closing costs for the transaction and (b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant improvements, deferred maintenance, and environmental claims as provided for in agreements subsequently made with First Republic's senior lender.

**Stern and First Republic Seek Financing for the Transaction**

15.    At the same time that Stern and First Republic were negotiating to acquire the Properties from Colonial, they were also working with a number of mortgage brokers, but not Steven Alevy or Bankers Capital, to secure financing for the acquisition and related expenses.

16.     On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer for Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy and the Alevy family in numerous other transactions.  Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist Stern and First Republic in securing financing for the acquisition of the Properties.

17.     Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

18.     Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well.  Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition.  First Republic agreed to retain Steven Alevy and Bankers Capital as its non-exclusive broker to obtain financing for the acquisition of the Properties.

19.     As First Republic's mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for First Republic, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

20.     Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and Stern and First Republic's efforts to obtain financing for the

transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract, materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a statement of his net worth, personal and corporate financial statements and information about his prior business and litigation experiences.

21.    At all times during the relationship, Stern emphasized to Steven Alevy and Robert Friedman that time was of the essence because the contract of sale required the closing to occur no later than June 15, 2007.

**The Fraudulent Scheme to Wrest Control of the Properties from First Republic and Stern**

22.    Within a week after being introduced to Steven Alevy and Robert Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already contacted some highly relevant lenders," that they believed they could obtain significantly more financing than what was being discussed with J.P. Morgan Chase and that they were processing the information to obtain the financing for the Colonial transaction.

23.    Unbeknownst to Stern and First Republic, Steven Alevy and Robert Friedman were not working to obtain financing for First Republic's transaction with Colonial. Rather, acting in concert with Allen Alevy and Allen Sragow, they orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that the Alevy family and related affiliates could purchase the Properties.

24.    Instead of working to obtain financing for First Republic's acquisition of the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he would not pursue financing opportunities, on behalf of First Republic, with other brokers. Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain financing for the purchase.  In reality, Steven Alevy and others conspired with Steven Alevy's

father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

25.    Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for themselves.  Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

26.    On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

27.    During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations.  Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

28.    At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction.  Steven Alevy and Robert Friedman told Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

29.    Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction.  In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman

interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

30.     When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007. No concrete bids, quotes or term sheets were presented to Stern or First Republic by Steven Alevy and Robert Friedman by on or about May 28, 2007.

31.     Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction. Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

32.     As part of their scheme to sabotage Stern and First Republic's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused prospective lenders to form a bad and incorrect impression of Stern and First Republic. These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

33.     At this same time in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves. Unbeknownst to Stern and First Republic, Steven

Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary information provided to them by Stern and First Republic about the transaction and Stern to Allen Alevy and Allen Sragow who used such information to formulate their own offer to acquire the Properties.

34.      On June 13, 2007, although Steven Alevy and Robert Friedman represented that they were arranging meetings with potential lenders to finance the transaction, Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (*i.e.,* Stern) to purchase the Properties.  At that time, Stern had neither heard of nor spoken with Allen Alevy, and Steven Alevy had never mentioned to Stern that he was intending to become Stern's 50% partner in connection with the acquisition of the Properties.  At no time, did Stern or First Republic ever meet with, correspond with or communicate with Allen Alevy.

35.      In June 2007, while Steven Alevy and Robert Friedman were still feigning their pursuit of financing opportunities for First Republic, they were instead meeting with lenders to secure financing for Allen Alevy and his related entities to acquire the Properties.  During this same time, unbeknownst to Stern and First Republic, Steven Alevy met with Petra Capital, a lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the Properties.  Steven Alevy gave Petra Capital copies of personal financial statements for Allen Alevy and told them he was putting together a deal for himself and his father and never said that he had been retained by Stern and First Republic to act as their broker.

36.      In the beginning of June, Stern was introduced to Avery Egert, the President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5 million of equity and co-sponsor the transaction in exchange for a minority interest in the entity that would own the Properties.  At all relevant times, Egert had the authority to act on Safrin's

behalf.  Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert.  In fact, unbeknownst to Stern and First Republic, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

37.    Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders.  None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

38.    In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Steven Alevy, Allen Alevy and Allen Sragow stepped up their efforts to implement their plan to take over the Properties.  Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction.  As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to Stern and First Republic, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

39.    Still unaware of the efforts by the Alevys, Robert Friedman and Allen Sragow to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any

proposal made by Steven Alevy for "Long Beach" financing. At the same time, Stern redoubled

his own efforts to obtain financing from other sources. Through another mortgage broker,

Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment

from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine

financing for the transaction in the total amount of approximately $131 million and was able to

close the loan with Citigroup less than two weeks later.

40.    Stern and First Republic were also seeking to obtain additional financing

to cover required closing costs and escrow deposits that would need to be made to complete the

transaction. By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion

of the amount necessary to close the transaction. Under that arrangement, Colonial would agree

to take back a $14 million note from First Republic that was secured by an irrevocable letter of

credit from a third party with the other essential terms of the financing arrangement in place.

Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First

Republic as a non-refundable deposit on the transaction.

41.    Stern told Steven Alevy that he had received a commitment from

Citigroup to provide the senior and mezzanine financing for the transaction and that the seller

had agreed to finance the remaining portion of the transaction. Stern provided a copy of the

Citigroup commitment letter to Steven Alevy. Upon learning these facts, Steven Alevy

attempted to persuade Stern that First Republic should forego the opportunity to obtain financing

from Citigroup because Bankers Capital could obtain greater financing and at a lower interest

then what Citigroup was proposing. Steven Alevy also told Stern that First Republic should

reject the financing offer by the seller and should instead use Steven Alevy and his family to

finance the remaining portion of the financing. On at least two occasions, Steven Alevy

attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

42.     On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan. Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

43.     Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern was able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

44.     Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet. Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller. To that end, Steven Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return. The financing proposal was intended to keep their foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their

offer, leaving Stern and First Republic with the impossible choice of either walking away from the

transaction and losing their nonrefundable $3 million deposit/obligation or acceding to

unreasonable conditions that the Alevys and Allen Sragow unilaterally imposed upon them.

45.     Stern and First Republic did not agree to accept the proposal made by

Steven Alevy on June 29. Nonetheless, in order to induce Stern and First Republic into accepting

their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused

an Allen Alevy-affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the

Colonial transaction.

46.     Believing that Steven Alevy had worked tirelessly for months trying to find

financing for First Republic's transaction and induced by Steven Alevy's repeated promises of

doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work

with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured

to close the Colonial transaction and did not attempt to finalize the seller financing that was in

place. To further induce Stern to enter into the transaction with the Alevy family, on or about July

2, Steven Alevy told Stern that with the money that the two of them would make together, they

would be able to donate significant funds to charity and send children to study in Jewish

institutions in Israel.

47.     On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which

was non-binding and subject to certain conditions, none of which was ever fulfilled. The Letter of

Understanding states that "Westland Industries," an entity that neither Stern nor First Republic

had ever heard of, and which was controlled by Steven Alevy's family, would provide

$13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a

monthly basis. The Letter of Understanding further states that the "Parties agree to work in good

faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100% of the equity and voting interest . . . shall be held in escrow for the benefit of Westland." In addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall be brought to Stephen Friedman, Esq. for resolution." Steven Friedman had only been working with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy family for fifteen years. At this time, Steven Friedman was also serving as the Alevy family's attorney on a transaction involving a project in New York. Finally, the Letter of Understanding contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open until the close of business on June 29th – four days before the offer had actually been transmitted to First Republic. In early July 2007, Stern, then believing he would be able to obtain financing from the Alevy family and related affiliates, informed Colonial that First Republic no longer needed to obtain seller financing.

48.     Michael Libraty, an attorney at Sragow's firm who also maintains an email address at one of Allen Alevy's company servers, acting at Sragow's direction, then sent Stern's counsel drafts of a proposed partnership agreement to sign. Consistent with everything Stern had advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those partnership agreements because Stern was not looking to take on a financial partner for the transaction.

49.     On July 3, 2007, Colonial threatened to terminate the Contract. Stern informed Steven Alevy of Colonial's position and, that same day, Steven Alevy, in breach of his fiduciary duties to Stern and First Republic, but in furtherance of the fraudulent scheme, passed this information to Allan Alevy, Allen Sragow and others who schemed how best to take

advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

50.     On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: We are not extending our commitment." In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

51.     As a sophisticated real estate businessman, Allen Alevy did not want the transaction to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

52.     Then, on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that further funds were needed to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing. These were the same financials that Steven Alevy had requested in May and which he had been purportedly using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to Stern and First Republic.

53.     Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, Stern did

not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to them or entities controlled by them if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and neither Stern nor First Republic ever agreed to the conditions that the Allen Alevy and Allen Sragow sought to impose.

54.    On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow. Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction. Bankers Capital assisted Stern and First Republic in preparing the sources and uses documentation for the Colonial transaction, was provided with numerous drafts of the closing statements for the Colonial transaction, and was well aware as to whom the proceeds of the Citigroup loans and the $13 million advanced by the Alevy family were distributed.

55.    The next day, on July 13, Steven Alevy confirmed his oral instructions in writing. However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of Stern and First Republic, including the demand that they sign an assignment of the Properties from First Republic to a new entity established by the Allen Alevy and Allen Sragow. Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not enter into the agreement with Stern and First Republic or release the funds in escrow unless all of their demands were met.

56.    On July 16, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the

agreements they were demanding, they did not agree to the release of the $13 million. Sragow added that if the funds were released, they should be retrieved until all of their demands were met.

57.     On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all of their demands were met. Because the escrowed funds had already been used to close the Colonial transaction, there was no way to retrieve the released funds. Stern and First Republic did not and would not agree to Allen Alevy and Allen Sragow's demands.

58.     Allen Sragow then sent a letter to Land Title and First Republic's counsel, Stephen Friedman, restating that the escrowed funds were released without receiving the authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify the disbursement" if First Republic and Stern would "execute" new documents, including a reassignment agreement, mutual release and other "modified" agreements. Stern and First Republic did not agree to Allen Sragow's proposal and did not execute those documents.

**The Alevys and Allen Sragow Interfere With First Republic's**
**Operation of the Properties and Attempts to Refinance**

59.     As described above, Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan. Subsequent to the closing with Colonial, Stern and First Republic immediately looked to secure refinancing so that they could take out the financing provided by the Alevy family and

return the funds that Allen Alevy and Allen Sragow contended had been mistakenly released to First Republic by the escrow agent notwithstanding the clear and explicit approval for the release given by Steven Alevy.

60.     Shortly after the July 12, 2007 closing, Stern met with Steven Friedman and Steven Alevy.  Steven Alevy was aware that Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan and was interested in working as Stern and First Republic's broker to obtain that refinancing. Steven Alevy told Stern that he was the only son in his family, that his father considered him to be the black sheep of the family and that his father put him in charge of family operations in New York.  Steven Alevy asked Stern for forgiveness and apologized for the way that he and his family treated Stern during the transaction.  Steven Alevy told Stern that the road to hell is often paved with good intentions and that while his intentions were good, he failed to represent him properly as Stern and First Republic's broker.  Steven Alevy told Stern that he would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to help Stern and First Republic  refinance the Properties.

61.     Based on Steven Alevy's promises and assurances, Stern and First Republic once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist them in obtaining financing and refinancing of the Properties so that the $13 million advanced to First Republic per Steven Alevy's instructions could be repaid.  As part of their supposed effort to obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman represented that they were in the process of preparing a "79 page book," which they would use to persuade lenders to refinance the Properties.

62.    In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing. In response and relying upon the brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, Stern and First Republic provided them with additional sensitive, confidential and proprietary information about the Properties.

63.    Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent Stern and First Republic from obtaining refinancing in furtherance of the scheme to obtain control over the Properties.

64.    Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for First Republic solely as its broker, Stern sent them all of the information that he had received concerning the Properties. However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow. For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on. Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe? I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties. For example, sometime in late July 2007 or August 2007, unbeknownst to Stern and First Republic, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the property managers of the two malls that they were the new owners of the malls. After Stern and First Republic were notified of these intrusions, Greenspan and his associates were removed from the malls.

66.    Defendants also wrongfully accused Stern and First Republic of "stealing" the $13 million that they verbally authorized for release, later confirmed in writing, and publicized that accusation to the business and lending community, making it impossible for Stern and First Republic to refinance the Properties. For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's counsel, the Seller's CFO and another high ranking officer of the Seller and told them that Stern and First Republic had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the Properties.

67.    The Alevys and Allen Sragow subsequently caused the companies that advanced the $13 million to First Republic to sue Stern and First Republic in federal court in New York claiming, among other things, ownership of the Properties and accusing Stern and First Republic of stealing their money and other falsehoods.

68.    Finally, in two states where the filing of a lawsuit is not a necessary condition precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, the Alevys and Allen Sragow caused the entities that advanced the $13 million to First Republic to improperly file lis pendens on the Properties in an attempt to cause First Republic to default on the loans and guaranties and prevent it from securing refinancing.  As a result of their efforts, Citigroup has asserted to Stern and First Republic that the filing of such lis pendens is an event of default under the loans and has accelerated the entire amount of the loans.  Citigroup has also informed Stern that it has the right to demand payment from him under the guaranty.

*    *    *

69.    In sum, as a result of the fraudulent scheme described above, Stern and First Republic were (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii)  prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties.   Additionally, Citigroup has asserted that First Republic is in default of its loans.  Defendants' tortious conduct damages the value of the Properties and Stern's interest in First Republic.  Steven Alevy and Bankers Capital are liable for all such damages.

**AS AND FOR A FIRST CAUSE OF ACTION**

**For Fraud Against Steven Alevy and Bankers Capital**

70.    Stern and First Republic repeat and reallege paragraphs 1 through 69 of this pleading as if fully set forth herein.

71.    Robert Friedman and Steven Alevy individually and on behalf of Bankers Capital repeatedly represented to Stern and First Republic that they were actively working to obtain financing for First Republic's transaction with Colonial.  Robert Friedman and Steven

Alevy failed to disclose that they were working on behalf of the Alevy family and Allen Sragow to sabotage First Republic's purchase of the Properties so that the Alevy family and related affiliates could purchase the Properties.

72.     The false representations of fact and concealment of material facts induced Stern and First Republic to, among other things, employ Robert Friedman, Steven Alevy and Bankers Capital as their mortgage brokers, appoint them as their exclusive brokers for a number of lenders with whom they were previously seeking financing, provide them with confidential and proprietary information, cease negotiating with lenders and other brokers with respect to the Colonial transaction and the post-closing refinancing of the transaction, and enter into negotiations with Allen Alevy and Allen Sragow to finance a portion of the Colonial transaction.

73.     In late June and July 2007, after Steven Friedman, on behalf of Stern and First Republic, entered into discussions with Allen Alevy and Allen Sragow regarding financing for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been receiving Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic.

74.     After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed the fact that they continued to receive Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic.  As part of their fraudulent plan, Allen Alevy and Allen Sragow directly and through other third parties under their control, falsely represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to

tenants of the Properties that they and companies that they controlled were the owners of the Properties.

75.     Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to, among other things, cease negotiating with other potential lending sources, including the seller, with respect to the Colonial transaction, and enter into negotiations with the Alevy family and related affiliates to finance the Colonial transaction. Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to, among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

76.     Stern and First Republic reasonably relied to their detriment on the truthfulness of these representations. Steven Alevy and Bankers Capital knew or should have known that Stern and First Republic would rely on their representations when made. Had Stern and First Republic known that the Steven Alevy and Bankers Capital were acting fraudulently to sabotage First Republic's purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

77.     The misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging First Republic's transaction with Colonial and were made with complete or reckless disregard as to their truthfulness.

78.     Steven Alevy and Bankers Capital acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements made to Stern and First Republic.

79.     As a direct and proximate result of the fraudulent acts described above, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial arising from First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by these tortious acts.

80.     The actions described above were willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and were in conscious disregard of Stern and First Republic's rights.  Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty Against Steven Alevy and Bankers Capital

81.     Stern and First Republic repeat and reallege paragraphs 1 through 80 of this pleading as if fully set forth herein.

82.     As First Republic's mortgage broker, Steven Alevy and Bankers Capital owed fiduciary duties to Stern and First Republic, including an undivided fiduciary duty of loyalty, the duty to work for their interests, the duty not to provide Stern and First Republic's confidential and proprietary information to others without their permission, the duty to avoid conflicts of interest and the duty to perform the work in a competent manner.

83.     Steven Alevy and Bankers Capital breached their fiduciary duties to Stern and First Republic by, among other things, providing Stern and First Republic's confidential and proprietary information to the Alevy family and Allen Sragow without Stern and First Republic's

permission, failing to assist and, in fact, trying to sabotage First Republic's efforts to obtain

financing and refinancing and by inducing Stern and First Republic to enter into a transaction

with the Alevy family and related affiliates.

84.     In breaching their fiduciary duties to Stern and First Republic, Steven

Alevy and Bankers Capital acted adversely to the interests of Stern and First Republic and for

their own personal interests and those of the Alevy family and Allen Sragow.

85.     As a direct and proximate result of Steven Alevy and Bankers Capital's

breaches of fiduciary duty described above, Stern and First Republic seek: (i) rescission of any

agreement that they may have entered into with the Alevy family and related affiliates with

respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to

be proven at trial arising from First Republic's inability to refinance the Properties and (iii)

compensatory damages in an amount to be proven at trial arising from the loss in the value of the

Properties and the loss in the value of Stern's interest in First Republic caused by their tortious

acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Bankers Capital and Steven Alevy

86.     Stern and First Republic repeat and reallege paragraphs 1 through 85 of

this pleading as if fully set forth herein.

87.     Stern and First Republic on the one hand and Robert Friedman, Steven

Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007.

Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated

to attempt in good faith to obtain financing on Stern and First Republic's behalf in connection

with the Colonial transaction and to protect Stern and First Republic's confidential and

proprietary information that they received as Stern and First Republic's broker.

88.    Bankers Capital and Steven Alevy materially breached the contractual

obligations by, among other things, (a) failing to try to obtain financing and refinancing on Stern

and First Republic's behalf in connection with the Colonial transaction, (b) meeting with lenders

to obtain financing for the Colonial transaction on behalf of the Alevy family and related

affiliates, and (c) providing Stern and First Republic's confidential and proprietary to the Allen

Alevy, Allen Sragow and others without Stern or First Republic's permission.

89.    Stern and First Republic substantially performed their obligations under

the brokerage agreement with Robert Friedman, Steven Alevy and Bankers Capital.

90.    As a direct and proximate result of Steven Alevy and Bankers Capital's

breaches of contract, Stern and First Republic seek: (i) rescission of any agreement that Stern or

First Republic may have entered into with the Alevy family or related affiliates with respect to

the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to

be proven at trial arising from Stern and First Republic's inability to refinance the Properties and

(iii) compensatory damages in an amount to be proven at trial arising from the loss in the value

of the Properties and the loss in the value of Stern's interest in First Republic caused by their

breaches of contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

### For Aiding and Abetting Fraud Against Steven Alevy and Bankers Capital

91.    Stern and First Republic repeat and reallege paragraphs 1 through 90 of

this pleading as if fully set forth herein.

92.      Steven Alevy and Bankers Capital knew that Allan Alevy, Robert Friedman and Allen Sragow had committed fraud by, among other things, failing to disclose to Stern and First Republic that, along with the Alevy family and Allen Sragow, they were all actively working to sabotage Stern and First Republic's financing for the transaction with Colonial so that the Alevy family and related affiliates could acquire the Properties in their own right.

93.      Steven Alevy and Bankers Capital aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. At the direction of Allen Alevy and Allen Sragow, Steven Alevy and Robert Friedman concealed the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy, Robert Friedman and Bankers Capital had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which those individuals used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

94.      Steven Alevy and Bankers Capital's aiding and abetting of Allen Alevy, Robert Friedman and Allen Sragow's fraud proximately caused damages to Stern and First Republic in that, absent their aiding and abetting the fraud, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not have entered into negotiations with the Alevy family to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

95.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of

the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First

Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered

into with the Alevy family and related affiliates with respect to the $13 million of funds advanced

to them; (ii) compensatory damages in an amount to be proven at trial arising from their inability

to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial

arising from the loss in the value of the Properties and the loss in the value of Stern's interest in

First Republic caused by their tortious acts.

96.     Steven Alevy and Bankers Capital's conduct was willful, knowing, and

deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern

and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND  FOR A FIFTH CAUSE OF ACTION

### Against Steven Alevy and Bankers Capital for Aiding and Abetting Breach

### of Fiduciary Duty

97.     Stern and First Republic repeat and reallege paragraphs 1 through 96 of

this pleading as if fully set forth herein.

98.     Steven Alevy and Bankers Capital knew that Allen Alevy, Robert

Friedman and Allen Sragow were breaching their fiduciary duties to Stern and First Republic by,

among other things, receiving Stern and First Republic's confidential and proprietary information

without their permission, sabotaging Stern and First Republic's efforts to obtain financing and

refinancing and by inducing Stern and First Republic to enter into a transaction with Allen Alevy

and his related entities.

99.    Steven Alevy and Bankers Capital aided and abetted the breaches of fiduciary duty committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

100.    Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow caused damages to Stern and First Republic in that, absent their aiding and abetting the breach of such fiduciary duties, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related entities to finance the Colonial transaction and would not have engaged Steven Alevy, Robert Friedman and Bankers Capital to secure refinancing for the Colonial transaction.

101.    By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to Stern and First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value

of the Properties and the loss in the value of Stern's interest in First Republic caused by their

tortious acts.

        102.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and

deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern

and First Republic are therefore entitled to an award of punitive and exemplary damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**

**For Misappropriation of Stern's and First Republic's Trade Secrets**

        103.    Stern and First Republic repeat and reallege paragraphs 1 through 102 of

this pleading as if fully set forth herein.

        104.    Stern and First Republic's proprietary and confidential information

concerning the Properties constitutes trade secrets under New York common law.

        105.    Bankers Capital and Steven Alevy conspired and did in fact

misappropriate Stern's and First Republic's proprietary and confidential information and lied to

Stern and First Republic about their intended use of that information.  The actions of Steven

Alevy and Bankers Capital constitute improper, willful and malicious "misappropriation" of

trade secrets under New York common law.

        106.    As a direct consequence of the improper, willful and malicious

misappropriation of trade secrets by Steven Alevy and Bankers Capital, Stern and First Republic

have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

        107.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and

deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### For Tortious Interference With Prospective Business Relations

108.    Stern and First Republic repeat and reallege paragraphs 1 through 107 of this pleading as if fully set forth herein.

109.    Pursuant to its contract with Colonial, First Republic became the lawful and legal owner of the Properties, and, as the lawful owner of the Properties, was entitled to exploit its economic interest in those Properties free from interference by any other third parties.

110.    Steven Alevy and Bankers Capital were at all times aware that, following the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

111.    Notwithstanding their knowledge that First Republic was the lawful owner of the Properties, Steven Alevy and Bankers Capital intentionally and tortiously interfered with First Republic's ownership of those properties by, among other things, claiming to the Seller or causing other third parties under their control to claim, to tenants and the Property Manager of the Properties that Allen Alevy and related affiliates were the lawful and legal owner of the properties.

112.    Steven Alevy and Bankers Capital's intentional and willful interference has caused and induced prospective lenders to deny financing to Stern and First Republic in connection with the Properties, has caused  tenants to cancel their leases and has caused Citigroup to assert that First Republic is in default of the loan agreements and to inform Stern that it has the right to demand payment of the Guaranteed Recourse Obligations of Borrower from Stern.

Doc #31654203.WPD                                    34

113.    As a direct and proximate result of the foregoing, Stern and First Republic have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

114.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

115.    Moreover, as a direct and proximate result of the foregoing, Stern and First Republic are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from contacting the Seller, tenants and the Property Manager of the Properties and interfering with Stern and First Republic's lawful ownership and management of the Properties.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract

116.    Stern and First Republic repeat and reallege paragraphs 1 through 115 of this pleading as if fully set forth herein.

117.    First Republic and Citigroup entered into two loan agreements in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties.  In addition, Stern provided Citigroup with a guaranty of recourse obligations of First Republic.

118.    Steven Alevy and Bankers Capital were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations.

119.    Steven Alevy and Bankers Capital tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things,

conspiring and or aiding and abetting the actions of Allen Alevy and Allen Sragow to improperly

file lis pendens against the Properties, which has caused Citigroup to assert that the loans are in

default and inform Stern that it has the right to demand that Stern make payment of the

Guaranteed Recourse Obligations of the Borrower.

120.    As a direct and proximate result of the foregoing, Stern and First Republic

have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

121.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and

deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern

and First Republic are therefore entitled to an award of punitive and exemplary damages.

122.    Moreover, as a direct and proximate result of the foregoing, Stern and First

Republic are threatened with immediate and irreparable additional loss and damage, and will

continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from

interfering with Stern's and First Republic's relationship with Citigroup.

### AS AND FOR A NINTH CAUSE OF ACTION

#### For Declaratory Relief

123.    Stern and First Republic repeat and reallege paragraphs 1 through 122 of

this pleading as if fully set forth herein.

124.    An actual, justiciable controversy exists between Stern and First Republic

and Steven Alevy and Bankers Capital within the meaning of CPLR 3001.

125.    A dispute exists between Stern and First Republic on the one hand and

Steven Alevy and Bankers Capital on the other hand as to whether Stern and First Republic and

the Alevy family and related affiliates entered into an agreement in connection with the Colonial transaction.

126.    Stern and First Republic contend that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from the Alevy family or related affiliates.

127.    Steven Alevy and Bankers Capital contend that the $13 million of financing provided by the Alevy family and related affiliates was either an equity contribution to the entity owning the Properties or that it was a loan which, if not repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

128.    Stern and First Republic seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that no binding agreement was entered into with the Alevy family and related affiliates and that they be permitted to rescind any transaction and return the $13 million, without interest, to such individuals and/or entities.

**WHEREFORE,** Stern and First Republic demand judgment as follows:

A.    on the first cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, plus punitive damages, together with prejudgment interest and costs;

B.    on the second cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

C.    on the third cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract, together with prejudgment interest and costs;

D.    on the fourth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

E.    on the fifth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to

the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

   F.  on the sixth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, together with punitive damages, prejudgment interest and costs, and an injunction preventing Steven Alevy and Bankers Capital from contacting tenants and the Property Manager of the Properties and interfering with Stern and First Republic's ownership and management of the Properties;

   G.  on the seventh cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital from contacting and interfering with prospective lenders and tenants of First Republic;

   H.  on the eighth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital from interfering with Stern and First Republic's relationship with Citigroup;

   I.  on the ninth cause of action, a declaration that Stern and First Republic were either fraudulently induced to accept $13 million of financing from the Alevy family or related affiliates or that no binding agreement was entered into with them and that Stern and First Republic be permitted to rescind any transaction and return the $13 million, without interest, to them;

J.      awarding to Stern and First Republic pre-and post-judgment interest, the

costs and disbursements of this action, and attorneys' fees as authorized by law; and

K.      granting to each of Stern and First Republic such other and further relief as

the Court may deem to be just and proper.

Dated:   New York, New York
         June 11, 2008

                                        KAYE SCHOLER LLP

                                        By: /s/ Michael A. Lynn
                                        Arthur Brown (AB-0627)
                                        Michael Lynn (ML-6052)
                                        Efrem Schwalb (ES-5288)
                                        KAYE SCHOLER LLP
                                        425 Park Avenue
                                        New York, New York 10022
                                        Tel: (212) 836-8000
                                        Fax: (212) 836-8689
                                        Email: mlynn@kayescholer.com


                                        Stephen R. Stern (SS-5665)
                                        HOFFINGER STERN & ROSS LLP
                                        150 East 58th Street
                                        New York, New York  10155
                                        Tel: (212) 421-4000
                                        Fax: (212) 750-1259
                                        Email: srstern@hsrlaw.com

                                        *Attorneys for Mark Stern and First
                                        Republic Group Realty LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK STERN and FIRST REPUBLIC GROUP
REALTY LLC,

                           Plaintiffs,

               -against-

ALLEN ALEVY, ALLEN P. SRAGOW,
ROBERT FRIEDMAN, and AVERY EGERT,

                       Defendants.

Index No. _____

**COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by their attorneys Kaye Scholer LLP and Hoffinger Stern & Ross LLP, bring this complaint against defendants Allen Alevy, Allen P. Sragow, Robert Friedman (collectively referred to as the "Defendants") and Avery Egert on knowledge as to themselves and otherwise upon information and belief, and allege as follows:

## NATURE OF THE ACTION

1.       This is an action for fraud, breach of fiduciary duty, tortious interference with contract and prospective business relations and misappropriation of trade secrets. Beginning in or about May 2007, Defendants, acting in concert, orchestrated a fraudulent scheme to sabotage First Republic's acquisition of 11 shopping center malls in the Southeast region of the United States (collectively, the "Properties") to enable Allen Alevy and his family, rather than First Republic, to acquire the Properties. When those wrongful efforts failed, Defendants improperly sought to wrest control of the Properties from First Republic and to interfere with First Republic's ability to operate

the Properties and to obtain refinancing for the Properties, each and all of which have injured and damaged plaintiffs, the value of the Properties, and Stern's interest in First Republic.

## PARTIES

2.      Plaintiff Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

3.      Plaintiff First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York.  First Republic owns and manages the Properties.

4.      Defendant Allen Alevy is a resident of the State of California.

5.      Non-Party Steven Alevy is a resident of the State of New York. Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.   Steven Alevy is a third-party defendant in the pending federal action entitled Amusement Industry, Inc. v. Moses Stern et al., No. 07 Civ. 11586 (S.D.N.Y.) (LAK).  Because Steven Alevy dba Bankers Capital has asserted claims against Stern and First Republic in the federal action, Stern and First Republic will be asserting claims against Steven Alevy in the pending federal action.

6.      Non-Party Bankers Capital is a dissolved California limited liability company whose principal place of business is in New York, New York.  Although Bankers Capital is dissolved, its principals improperly represent that it is an existing limited liability company. Bankers Capital touts itself as being experienced in arranging mortgages and refinancing for real estate investors. Bankers Capital was originally formed in California and previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.  Because Steven Alevy dba Bankers Capital has asserted claims against Stern and First Republic in Amusement Industry, Inc. v. Moses

Stern et al., No. 07 Civ. 11586 (S.D.N.Y.) (LAK), Stern and First Republic will be asserting claims

against Bankers Capital in the pending federal action.

       7.     Defendant Robert Friedman is a resident of the State of New York and is a

Managing Director of Bankers Capital.

       8.     Defendant Allen P. Sragow is a resident of the State of California and a

member of the law firm of Sragow & Sragow. Sragow is the son-in-law of Allen Alevy, the brother-

in-law of Steven Alevy and is principally involved with and performs legal services for the Alevy

family and various entities owned by the Alevy family. Allen Sragow also serves as a director of

certain companies owned by the Alevy family.

       9.     Defendant Avery Egert ("Egert") is a resident of the State of New York. Egert

is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin"). The

Sovereign Group owns and manages various real estate properties in the United States. At all

relevant times, Egert had apparent and actual authority to enter into various transactions on behalf

of Safrin, including the transactions with respect to the Properties. Safrin and Egert hold a minority

interest in First Republic through their ownership of JSAE Colonial LLC.

### JURISDICTION AND VENUE

       10.     The Court has personal jurisdiction over Avery Egert and Robert Friedman

as each of these defendants maintain offices, reside and systematically and continuously do business

in New York, and many of the wrongful acts that form the basis of this Complaint occurred and

caused injury in New York. This Court has personal jurisdiction over defendants Allen Alevy and

Allen Sragow pursuant to CPLR 302 in that each of these individuals either (i) transacted business

within New York State or (ii) committed tortious acts outside of New York State that caused injury

to plaintiffs in New York and Allen Alevy and Allen Sragow either (a) regularly do or solicit

business in the State of New York and/or (b) expected or should have reasonably expected that their

tortious acts would have consequences in New York State and derive substantial revenue from

interstate or international commerce. This Court also has personal jurisdiction over Allan Alevy

because he, directly or indirectly, owns, uses or possesses property in New York State.

11.     Venue lies in this county pursuant to CPLR §§ 503 and 509.

## FACTUAL BACKGROUND

### The Contract to Purchase the Properties

12.     After lengthy negotiations and discussions, effective as of April 20, 2007, First

Republic Group Corp. ("First Republic Corp."), the predecessor-in-interest to First Republic, entered

into a written contract of sale with Colonial Realty Limited Partnership ("Colonial"), to acquire ten

shopping center malls in the Southeast region of the United States for a purchase price of $128

million (the "Contract"). Under the terms of the Contract, First Republic Corp. paid Colonial a $1

million non-refundable deposit, with the balance of the purchase price due at closing. The closing

was scheduled to occur no later than June 15, 2007.

13.     After the Contract was executed, First Republic Group Corp. assigned its

right, title and interest under the Contract to First Republic.

14.     Pursuant to several written amendments to the Contract, (a) in exchange for

an additional $2 million non-refundable deposit, the closing date was extended first to June 29, 2007

and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh property was

added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First Republic, reducing the

purchase price by that amount. Thus, after execution of the several amendments, the total purchase

price for the Properties was approximately $129 million.

15.     In addition to paying Colonial the $129 million purchase price at the closing, First Republic was also obligated: (a) to pay certain closing costs for the transaction and (b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant improvements, deferred maintenance, and environmental claims as provided for in agreements subsequently made with First Republic's senior lender.

**Plaintiffs Seek Financing for the Transaction**

16.     At the same time that plaintiffs were negotiating to acquire the Properties from Colonial, Stern, on behalf of First Republic, was also working with a number of mortgage brokers, but not Defendants, to secure financing for the acquisition and related expenses.

17.     On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer at Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy in numerous other transactions. Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist plaintiffs in securing financing for the acquisition of the Properties.

18.     Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

19.     Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well. Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition.

Plaintiffs agreed to retain Steven Alevy and Bankers Capital as First Republic's non-exclusive broker to obtain financing for the acquisition of the Properties.

20.     As plaintiffs' mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for plaintiffs, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

21.     Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and plaintiffs' efforts to obtain financing for the transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract, materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a statement of his net worth, personal and corporate financial statements and information about his prior business and litigation experiences.

22.     At all times during the relationship, Stern emphasized to Steven Alevy and Robert Friedman that time was of the essence because the contract of sale required the closing to occur no later than June 15, 2007.

**Defendants' Fraudulent Scheme to Wrest Control of the Properties from Plaintiffs**

23.     Within a week after being introduced to Steven Alevy and Robert Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already contacted some highly relevant lenders," that they believed they could obtain significantly more financing than what was being discussed with J.P. Morgan Chase and that they were processing the information to obtain the financing for the Colonial transaction.

24.     Unbeknownst to plaintiffs, Steven Alevy and Robert Friedman were not working to obtain financing for First Republic's transaction with Colonial. Rather, acting in concert

with Allen Alevy and Allen Sragow, they orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that Defendants could purchase the Properties.

25.     Instead of working to obtain financing for First Republic's acquisition of the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he would not pursue financing opportunities on behalf of First Republic with other brokers. Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain financing for the purchase. In reality, Steven Alevy and others conspired with Steven Alevy's father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

26.     Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for the benefit of the Alevy family and related affiliates. Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

27.     On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

28.     During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations. Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

29.     At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction. Steven Alevy and Robert Friedman told

Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

30.    Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction. In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

31.    When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007. No concrete bids, quotes or term sheets were presented to plaintiffs by Steven Alevy and Robert Friedman by on or about May 28, 2007.

32.    Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction. Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

33.    As part of their scheme to sabotage Stern's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused prospective lenders to form a bad and incorrect impression of Stern and First Republic. These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an

agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

34.    At this same time, in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves. Unbeknownst to plaintiffs, Steven Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary information provided to them by plaintiffs about the transaction and Stern to Allen Alevy and Allen Sragow who used such information to formulate their own offer to acquire the Properties.

35.    On June 13, 2007, although Steven Alevy and Robert Friedman represented that they were arranging meetings with potential lenders to finance the transaction, Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (*i.e.,* Stern) to purchase the Properties. At that time, plaintiffs had neither heard of nor spoken with Allen Alevy, and Steven Alevy had never mentioned to plaintiffs that he or his family was intending to become Stern's 50% partner in connection with the acquisition of the Properties. At no time, did plaintiffs ever meet with, correspond with or communicate with Allen Alevy.

36.    In June 2007, while Steven Alevy and Robert Friedman were still feigning their pursuit of financing opportunities for plaintiffs, they were instead meeting with lenders to secure financing for Allen Alevy and his related entities to acquire the Properties. During this same time, unbeknownst to plaintiffs, Steven Alevy met with Petra Capital, a lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the Properties. Steven Alevy gave Petra Capital copies of personal financial statements for Allen Alevy and told them he was putting together a deal for himself and his father and never said that he had been retained by plaintiffs to act as their broker.

37.     In the beginning of June, Stern was introduced to Avery Egert, the President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5 million of equity and co-sponsor the transaction in exchange for a minority interest in the entity that would own the Properties.  At all relevant times, Egert had the authority to act on Safrin's behalf.  However, as discussed below, Safrin now claims that his signature on various transaction documents was forged and that he never authorized his involvement in the Colonial transaction.  Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital had previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert.  In fact, unbeknownst to plaintiffs, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

38.     Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders.  None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

39.     In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Defendants stepped up their efforts to implement their plan to take over the Properties.  Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction.  As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to plaintiffs, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the

Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

40.    Still unaware of the efforts by Defendants to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any proposal made by Steven Alevy for "Long Beach" financing. At the same time, Stern redoubled his own efforts to obtain financing from other sources. Through another mortgage broker, Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine financing for the transaction in the total amount of approximately $131 million and was able to close the loan with Citigroup less than two weeks later.

41.    Plaintiffs were also seeking to obtain additional financing to cover required closing costs and escrow deposits that would need to be made to complete the transaction. By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion of the amount necessary to close the transaction. Under that arrangement, Colonial would agree to take back a $14 million note from First Republic that was secured by an irrevocable letter of credit from a third party with the other essential terms of the financing arrangement in place. Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First Republic as a non-refundable deposit on the transaction.

42.    Stern told Steven Alevy that he had received a commitment from Citigroup to provide the senior and mezzanine financing for the transaction and that the seller had agreed to finance the remaining portion of the transaction. Stern provided a copy of the Citigroup commitment letter to Steven Alevy. Upon learning these facts, Steven Alevy attempted to persuade Stern that First Republic should forego the opportunity to obtain financing from Citigroup because Bankers Capital could obtain greater financing and at a lower interest then what Citigroup was proposing.

Steven Alevy also told Stern that First Republic should reject the financing offer by the seller and should instead use Steven Alevy and his family to finance the remaining portion of the financing. On at least two occasions, Steven Alevy attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

43.    On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan. Citigroup agreed that, notwithstanding a six month lockout period in the loan agreements for refinancing, First Republic would be permitted to refinance the mezzanine portion of the loan during the first 60 days after closing. Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

44.    Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern had been able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

45.    Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet. Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller. To that end, Steven

Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return. The financing proposal was intended to keep the Alevys' foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their offer, leaving plaintiffs with the impossible choice of either walking away from the transaction and losing their nonrefundable $3 million deposit/obligation or acceding to unreasonable conditions that Allan Alevy and Allen Sragow unilaterally imposed upon them.

46.    Plaintiffs did not agree to accept Steven Alevy's proposal on June 29. Nonetheless, in order to induce Stern and First Republic into accepting their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused an Allen Alevy affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the Colonial transaction.

47.    Believing that Steven Alevy had worked tirelessly for months trying to find financing for First Republic's transaction and induced by Steven Alevy's repeated promises of doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured to close the Colonial transaction and did not attempt to finalize the seller financing that was in place. To further induce Stern to enter into the transaction with the Alevy family, on or about July 2, Steven Alevy told Stern that with the money that the two of them would make together, they would be able to donate significant funds to charity and send children to study in Jewish institutions in Israel.

48.    On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which was non-binding and subject to certain conditions, none of which was ever fulfilled. The Letter of Understanding states that "Westland Industries," an entity that plaintiffs had never heard of, which

was controlled by Steven Alevy's family, would provide $13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a monthly basis. The Letter of Understanding further states that the "Parties agree to work in good faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100% of the equity and voting interest . . . shall be held in escrow for the benefit of Westland." In addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall be brought to Stephen Friedman, Esq. for resolution." Stephen Friedman had only been working with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy family for fifteen years. At this time, Steven Friedman was also serving as the Alevy family's attorney on a transaction involving a project in New York. Finally, the Letter of Understanding contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open until the close of business on June 29th – four days before the offer had actually been transmitted to First Republic. In the beginning of July 2007, Stern, then believing that he would be able to obtain financing from the Alevy family and related affiliates, informed Colonial that First Republic no longer needed to obtain seller financing.

49.    Michael Libraty, an attorney at Allen Sragow's law firm who also maintains an email address at one of Allen Alevy's company servers, acting at Allen Sragow's direction, then sent Stern's counsel drafts of a proposed partnership agreement to sign. Consistent with everything Stern had advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those partnership agreements because Stern was not looking to take on a financial partner for the transaction.

50.    On July 3, 2007, Colonial threatened to terminate the Contract. That same day, Stern informed Steven Alevy of Colonial's position and Steven Alevy, in breach of his fiduciary

duties to plaintiffs, but in furtherance of the fraudulent scheme, passed this information to Allen Alevy and Allen Sragow who schemed how best to take advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

51.     On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: We are not extending our commitment." In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

52.     As a sophisticated real estate businessman, Allen Alevy did not want his proposed financing to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

53.     Then, on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that First Republic needed further funds to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing. These were the same financials that Steven Alevy had requested in May and which he had been purportedly using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to plaintiffs.

54.     Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, that Stern did not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to Allan Alevy and related affiliates if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and plaintiffs never agreed to the conditions that Allen Alevy and Allen Sragow sought to impose on them.

55.     On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow. Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction.

56.     The next day, on July 13, Steven Alevy confirmed his oral instructions in writing. However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of plaintiffs, including the demand that First Republic assign its interest in the Properties to a new entity established by the Alevy family. Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not agree to provide First Republic with financing or release the funds in escrow unless all of their demands were met.

57.     On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all

of their demands were met. Because the escrowed funds had already been used to close the Colonial transaction, there was no way to retrieve the released funds. Plaintiffs did not and would not agree to Allen Alevy and Allen Sragow's demands.

58.    Allen Sragow then sent a letter to Land Title and First Republic's counsel, Stephen Friedman, restating that the escrowed funds were released without receiving the authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify the disbursement" if First Republic and Stern would "execute" new documents, including a reassignment agreement, mutual release and other "modified" agreements. Plaintiffs did not agree to Allen Sragow's proposal and did not execute those documents.

**Defendants Interfere With Plaintiffs' Operation
of the Properties and Attempts to Refinance**

59.    As described above, Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan. Subsequent to First Republic's closing with Colonial, plaintiffs immediately looked to secure refinancing so that they could take out Allen Alevy and his related affiliates and return the funds that Allen Alevy and Allen Sragow contended had been mistakenly released to plaintiffs by the escrow agent notwithstanding the clear and explicit approval for the release given by Steven Alevy.

60.    Shortly after the July 12, 2007 closing, Stern met with Steven Friedman and Steven Alevy. Steven Alevy was aware that Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan and was interested in working as plaintiffs' broker to obtain that refinancing. Steven Alevy told

Stern that he was the only son in his family, that his father considered him to be the black sheep of the family and that his father put him in charge of family operations in New York. Steven Alevy asked Stern for forgiveness and apologized for the way that he and his family treated Stern during the transaction. Steven Alevy told Stern that the road to hell is often paved with good intentions and that while his intentions were good, he failed to represent him properly as plaintiffs' broker. Steven Alevy told Stern that he would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to help plaintiffs refinance the Properties.

61.     Based on Steven Alevy's promises and assurances, Plaintiffs once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist plaintiffs in obtaining financing and refinancing of the Properties so that the $13 million advanced to First Republic per Steven Alevy's instructions could be repaid. As part of their supposed effort to obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman represented that they were in the process of preparing a "79 page book," which they would use to persuade lenders to refinance the Properties.

62.     In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing. In response to Steven Alevy's requests and relying upon their brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, plaintiffs provided them with additional sensitive, confidential and proprietary information about the Properties.

63.    Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent plaintiffs from obtain refinancing in furtherance of Defendants' scheme to obtain control over the Properties.

64.    Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for plaintiffs solely as plaintiffs' broker, Stern sent them all of the information that he had received concerning the Properties. However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow. For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on. Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe? I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants, to property managers and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties. For example, sometime in late July 2007 or August 2007, unbeknownst to plaintiffs, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the

property managers of the two malls that they were the new owners of the malls. After plaintiffs were notified of these intrusions, Greenspan and his associates were removed from the malls.

66.     Defendants also wrongfully accused plaintiffs of "stealing" the $13 million that they verbally authorized for release, later confirmed in writing, and publicized that accusation to the business and lending community, making it impossible for plaintiffs to refinance the Properties. For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's counsel, the Seller's CFO and another high ranking officer of the Seller and told them that plaintiffs had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the Properties.

67.     Defendants subsequently caused the companies that advanced the $13 million to First Republic to sue plaintiffs in federal court in New York claiming, among other things, ownership of the Properties and accusing plaintiffs of stealing their money and other falsehoods.

68.     Finally, in two states where the filing of a lawsuit is not a necessary condition precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, Allen Alevy and Allen Sragow caused the entities that advanced the $13 million to First Republic to improperly file lis pendens on the Properties in an attempt to cause First Republic and Stern to default on their loans and guaranties and prevent plaintiffs from refinancing. As a result of their efforts, Citigroup has asserted to Plaintiffs that the filing of such lis pendens is an event of default under the loans and has accelerated the entire amount of the loans. Citigroup has also informed Stern that it has the right to demand payment from him of the Guaranteed Recourse Obligations of the Borrower under the guaranty.

*     *     *

69.     In sum, as a result of Defendants' fraudulent scheme, First Republic was (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii) prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties. Additionally, Citigroup has asserted that First Republic is in default of its loans. Defendants' tortious conduct has damaged the value of the Properties and Stern's interest in First Republic. Defendants are liable for all such damages.

**Safrin's Claim that Egert Was Unauthorized to Enter into the Transaction**

70.     In the federal lawsuit brought by Allen Alevy-owned affiliates Amusement Industry Inc, dba Westland Industries and Practical Finance Co., Inc. against Stern, Safrin and others, Safrin claims that he never provided any authorization to anyone to enter the transaction with Colonial and that his signatures on the loan and guaranty documents were forged.

71.     Stern and Stern's attorney, Stephen Friedman, dealt with Egert in connection with Safrin's investment in the Colonial transaction.

72.     Egert, the President and co-founder of Safrin's company, The Sovereign Group, represented, on a number of occasions, that he was authorized to enter into the transaction on behalf of his father-in-law Safrin.

73.     In early June 2007, Stern and Friedman met with Egert at Friedman's office in Manhattan and Egert agreed that Safrin would serve as co-sponsor and provide financing for the Colonial transaction. At that time, Egert represented that he was authorized to enter into the transaction on behalf of Safrin and The Sovereign Group.

74.     Egert provided signatures from Safrin that were needed in connection with the Citigroup loan and Colonial transaction documents. In forwarding those documents to Steven

Friedman, Egert represented that he had obtained Safrin's signatures and was authorized to enter into the transaction on Safrin's behalf.

75.    In the event that Egert's representations to plaintiffs were false and Stern and First Republic are found to be liable to the plaintiffs in the federal action, Egert is liable to Stern for contribution and/or indemnification for fraudulently misrepresenting that he was authorized to enter into the transactions on behalf of Safrin.

## AS AND FOR A FIRST CAUSE OF ACTION

### For Fraud Against Friedman, Alevy and Sragow

76.    Plaintiffs repeat and reallege paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.    Robert Friedman and Steven Alevy jointly and severally repeatedly represented to plaintiffs that they were actively working to obtain financing for plaintiffs' transaction with Colonial. Robert Friedman and Steven Alevy failed to disclose that they were working on behalf of Allen Alevy and Allen Sragow to sabotage First Republic's purchase of the Properties so that Allen Alevy and related affiliates could purchase the Properties.

78.    Robert Friedman and Steven Alevy's false representations of fact and concealment of material facts induced plaintiffs to, among other things, employ them as their mortgage brokers, appoint them as their exclusive brokers for a number of lenders with whom they were previously seeking financing, provide them with confidential and proprietary information, cease negotiating with lenders and other brokers with respect to the Colonial transaction and the post-closing refinancing of the transaction, and enter into negotiations with the Alevy family and related affiliates to finance a portion of the Colonial transaction.

79.    In late June and July 2007, after Steven Friedman, on behalf of plaintiffs, entered into discussions with Allen Alevy and Allen Sragow to provide financing for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been receiving plaintiffs' confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from the plaintiffs.

80.    After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed the fact that they continued to receive plaintiffs' confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from the plaintiffs. As part of their fraudulent plan, these defendants falsely represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to tenants of the Properties that they and companies that they controlled were the owners of the Properties.

81.    Allen Alevy's and Allen Sragow's concealment of material facts induced plaintiffs to, among other things, cease negotiating with other potential lending sources, including the seller, with respect to the Colonial transaction, and enter into negotiations with those defendants to finance the Colonial transaction. Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced plaintiffs to, among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

82.    Plaintiffs reasonably relied to their detriment on the truthfulness of these Defendants' representations. Defendants knew or should have known that plaintiffs would rely on their representations when they made them. Had plaintiffs known that these Defendants were acting fraudulently to sabotage plaintiffs' purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

83.    Defendants' misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging plaintiffs' Colonial transaction and were made with complete or reckless disregard as to their truthfulness.

84.    Defendants acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements they made to plaintiffs.

85.    As a direct and proximate result of the fraudulent acts of Defendants described above, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

86.    Defendants' actions described above were willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and were in conscious disregard of plaintiffs' rights.  Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

### AS AND FOR A SECOND CAUSE OF ACTION

#### For Breach of Fiduciary Duty Against Robert Friedman

87.    Plaintiffs repeat and reallege paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.    As plaintiffs' mortgage broker, Robert Friedman owed fiduciary duties to plaintiffs, including an undivided fiduciary duty of loyalty, the duty to work for plaintiffs' interests, the duty not to provide plaintiffs' confidential and proprietary information to others without

plaintiffs' permission, the duty to avoid conflicts of interest and the duty to perform his work in a competent manner.

89.     Robert Friedman breached his fiduciary duties to plaintiffs by, among other things, providing plaintiffs' confidential and proprietary information to Allen Alevy and Allen Sragow without plaintiffs' permission, failing to assist and, in fact, trying to sabotage plaintiffs' efforts to obtain financing and refinancing and by inducing plaintiffs to enter into a transaction with the Alevy family and related affiliates.

90.     In breaching his fiduciary duties to plaintiffs, Robert Friedman acted adversely to the interests of plaintiffs and for his own personal interests and those of the other Defendants.

91.     As a direct and proximate result of Robert Friedman's breaches of fiduciary duty described above, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Robert Friedman

92.     Plaintiffs repeat and reallege paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     Plaintiffs on the one hand and Robert Friedman, Steven Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007. Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated to attempt in good

faith to obtain financing on plaintiffs' behalf in connection with the Colonial transaction and to protect plaintiffs' confidential and proprietary information that they received as plaintiffs' broker.

94.    Robert Friedman materially breached the contractual obligations by, among other things, (a) failing to try to obtain financing and refinancing on plaintiffs' behalf in connection with the Colonial transaction, (b) meeting with lenders to obtain financing for the Colonial transaction on behalf of the Alevy family and related affiliates, and (c) providing plaintiffs' confidential and proprietary to Allen Alevy and Allen Sragow without plaintiffs' permission.

95.    Plaintiffs substantially performed their obligations under the brokerage agreement with Robert Friedman, Steven Alevy and Bankers Capital.

96.    As a direct and proximate result of Robert Friedman's breaches of contract, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Friedman's breaches of contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

### For Aiding and Abetting Fraud Against Allen Alevy and Allen Sragow

97.    Plaintiffs repeat and reallege paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98.    Allen Alevy and Allen Sragow knew that Steven Alevy, Robert Friedman and Bankers Capital had committed fraud by, among other things, repeatedly misrepresenting to plaintiffs that they were actively working to obtain financing for plaintiffs' transaction with Colonial when,

in fact, they were working with Allen Alevy and Allen Sragow to sabotage plaintiffs' attempt to secure financing for the Properties so that the Alevy family and related affiliates could acquire the Properties in their own right.

99.    Allen Alevy and Allen Sragow aided and abetted the fraud committed by Steven Alevy, Robert Friedman and Bankers Capital by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy and Robert Friedman had misappropriated confidential and proprietary information belonging to plaintiffs and passed that information onto Allen Alevy and Allen Sragow, which those defendants used in connection with their attempt to wrest control of the Properties from plaintiffs. Allen Sragow also caused to be prepared numerous legal documents relating to the proposed financing that, had they been agreed to by plaintiffs, would have resulted in the Alevy family and related affiliates owning the Properties if plaintiffs did not repay the financing that was advanced to them.

100.    Allen Alevy's and Allen Sragow's aiding and abetting of Steven Alevy and Robert Friedman's fraud proximately caused damages to plaintiffs in that, absent their aiding and abetting the fraud, plaintiffs would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related affiliates to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

101.    By reason of Allen Alevy's and Allen Sragow's aiding and abetting of the fraud committed by Steven Alevy, Robert Friedman and Bankers Capital, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the

$13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

102.    Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND  FOR A FIFTH CAUSE OF ACTION

### Against Allen Alevy and Allen Sragow for Aiding and Abetting Breach of Fiduciary Duty

103.    Plaintiffs repeat and reallege paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    Allen Alevy and Allen Sragow knew that Steven Alevy, Robert Friedman and Bankers Capital were breaching their fiduciary duties to plaintiffs by, among other things, providing plaintiffs' confidential and proprietary information to them without plaintiffs' permission, failing to assist and, in fact, trying to sabotage plaintiffs' efforts to obtain financing and refinancing and by inducing plaintiffs to enter into a transaction with Allen Alevy and his related entities.

105.    Allen Alevy and Allen Sragow aided and abetted the breaches of fiduciary duty committed by Steven Alevy, Robert Friedman and Bankers Capital by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to plaintiffs and passed

that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from plaintiffs. Allen Sragow also caused to be prepared numerous legal documents relating to the proposed financing that, had they been agreed to by plaintiffs, would have resulted in the Alevy family and related affiliates owning the Properties if plaintiffs did not repay the financing that was advanced to them.

106.   Allen Alevy's and Allen Sragow's aiding and abetting of the breaches of fiduciary duties committed by Steven Alevy and Allen Sragow caused damages to plaintiffs in that, absent their aiding and abetting the breach of such fiduciary duties, plaintiffs would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related affiliates to finance the Colonial transaction and would not have engaged Steven Alevy, Robert Friedman and Bankers Capital secure refinancing for the Colonial transaction.

107.   By reason of Allen Alevy's and Allen Sragow's aiding and abetting of the breaches of fiduciary duties committed by Steven Alevy and Robert Friedman, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

108.   Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### For Misappropriation of Plaintiffs' Trade Secrets Against Sragow, Alevy and Friedman

109.    Plaintiffs repeat and reallege paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    Plaintiffs' proprietary and confidential information concerning the Properties constitutes trade secrets under New York common law.

111.    Defendants conspired and did in fact misappropriate plaintiffs' proprietary and confidential information by lying to plaintiffs about their intended use of that information. The actions of Defendants constitute improper, willful and malicious "misappropriation" of trade secrets under New York common law.

112.    As a direct consequence of the improper, willful and malicious misappropriation of trade secrets by Defendants, plaintiffs have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

113.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### For Tortious Interference With Prospective Business Relations Against

### Allen Sragow, Allen Alevy and Robert Friedman

114.    Plaintiffs repeat and reallege paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    Pursuant to its contract with Colonial, First Republic became the lawful and legal owner of the Properties, and, as the lawful owner of the Properties, was entitled to exploit its economic interest in those Properties free from interference by any other third parties.

116.    Defendants were at all times aware that, following the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

117.    Notwithstanding their knowledge that First Republic was the lawful owner of the Properties, Defendants have intentionally and tortiously interfered with First Republic's ownership of those properties and Stern's interest in First Republic by, among other things, claiming directly or causing other individuals under their control to claim to the Seller, tenants and the Property Manager of the Properties that they are the lawful and legal owner of the properties.

118.    Defendants' intentional and willful interference has caused and induced prospective lenders to deny financing to plaintiffs in connection with the Properties, has caused tenants to cancel their leases and has caused Citigroup to assert that plaintiffs are in default of the loan agreements and guaranty agreements and accelerate the loans.

119.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

120.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

121.    Moreover, as a direct and proximate result of the foregoing, plaintiffs are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendants are enjoined from contacting the Seller, prospective lenders, tenants

and the Property Manager of the Properties and interfering with plaintiffs' lawful ownership and management of the Properties.

## AS AND FOR A EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract Against Allen Alevy and Allen Sragow

122.    Plaintiffs repeat and reallege paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.    Plaintiffs on the one hand and Steven Alevy, Robert Friedman and Bankers Capital on the other hand entered into a brokerage agreement in May 2007. Pursuant to that agreement, Steven Alevy, Robert Friedman and Bankers Capital were obligated to attempt in good faith to obtain financing and refinancing on plaintiffs' behalf in connection with the Colonial transaction and to protect plaintiffs' confidential and proprietary information that they received as plaintiffs' broker.

124.    Allen Alevy and Allen Sragow were, at all times aware, of plaintiffs' contractual relations with Steven Alevy, Robert Friedman and Bankers Capital.

125.    Allen Alevy and Allen Sragow tortiously interfered with and induced Steven Alevy, Robert Friedman and Bankers Capital to breach that brokerage agreement by, among other things, (i) instructing Steven Alevy, Robert Friedman and Bankers Capital to provide them with confidential and proprietary information belonging to plaintiffs, (ii) persuading Steven Alevy, Robert Friedman and Bankers Capital to sabotage plaintiffs' attempts to obtain financing for the acquisition of the Properties and refinancing thereafter, and (iii) persuading Steven Alevy, Robert Friedman and Bankers Capital to act on their behalf in connection with prospective financing for the acquisition of the Properties.

126.    As a result of Allen Alevy and Allen Sragow's tortious interference with plaintiffs' contract and inducement of Steven Alevy, Robert Friedman and Bankers Capital to breach that contract, plaintiffs seek: ( i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

127.    Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A NINTH CAUSE OF ACTION

### For Tortious Interference With Contract Against Allen Alevy,

### Allen Sragow and Robert Friedman

128.    Plaintiffs repeat and reallege paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.    First Republic and Citigroup entered into loan agreements and in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties.  In addition, Stern provided Citigroup with a guaranty of recourse obligations of the borrower.

130.    Defendants were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations of the borrower.

131.    Defendants tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things, causing entities that advanced $13 million to plaintiffs to improperly file lis pendens against the Properties, which has caused Citigroup to assert that an event of default has occurred under the loan agreements and that it has the right to demand payment from Stern of the Guaranteed Recourse Obligations of the Borrower under the guaranty.

132.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

133.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

134.    Moreover, as a direct and proximate result of the foregoing, plaintiffs are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendants are enjoined from interfering with plaintiffs' relationship with Citigroup.

## AS AND FOR A TENTH CAUSE OF ACTION

### For Contribution/Indemnity Against Avery Egert

135.    Plaintiffs repeat and reallege paragraphs 1 through 75 of this Complaint as if fully set forth herein.

136.    Plaintiffs plead this cause of action in the alternative in the event that the plaintiffs in the federal lawsuit obtain a judgment against Stern and First Republic and Egert is found

not to have been authorized to enter into, on behalf of Safrin, the Citigroup loans or any other agreements executed in connection with First Republic's acquisition or financing of the Properties.

137.    Egert represented to plaintiffs that he was authorized to enter into, on behalf of Safrin, the Citigroup loans and any other agreements to be executed in connection with First Republic's acquisition or financing of the Properties.

138.    In the event that Egert's representations to plaintiffs were false and Stern and First Republic are found to be liable to the plaintiffs in the federal action, Egert is liable to Stern for contribution and/or indemnity for fraudulently misrepresenting that he was authorized to enter into the transactions on behalf of Safrin.

## AS AND FOR A ELEVENTH CAUSE OF ACTION

### Against Allen Alevy, Allen Sragow and Robert Friedman For Declaratory Relief

139.    Plaintiffs repeat and reallege paragraphs 1 through 134 of this Complaint as if fully set forth herein.

140.    An actual, justiciable controversy exists between plaintiffs and Defendants within the meaning of CPLR 3001.

141.    A dispute exists between plaintiffs and Defendants as to whether those parties entered into an agreement in connection with the Colonial transaction.

142.    Plaintiffs contend that they were either fraudulently induced to accept $13 million of financing from Allen Alevy and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from them.

143.    Defendants contend that the $13 million of financing provided by them was either an equity contribution to the entity owning the Properties or that it was a loan which, if not

repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

144.     Plaintiffs seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from defendants or that no binding agreement was entered into with Defendants and that they be permitted to rescind any transaction and return the $13 million, without interest, to defendants.

**WHEREFORE,** Plaintiffs demands judgment as follows:

(a)     on the first cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, plus punitive damages, together with prejudgment interest and costs;

(b)     on the second cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, together with prejudgment interest and costs;.

(c)     on the third cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to

refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Friedman's breaches of contract, together with prejudgment interest and costs;

(d)    on the fourth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts; plus punitive damages, together with prejudgment interest and costs;

(e)    on the fifth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts; plus punitive damages, together with prejudgment interest and costs;

(f)    on the sixth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, together with punitive damages, prejudgment interest and costs, and an injunction preventing defendants from contacting and interfering the Seller, with prospective lenders, the tenants and Property Manager of the Properties;

(g)    on the seventh cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing defendants from contacting the Seller, tenants and the Property Manager of the Properties and interfering with plaintiffs' ownership and management of the Properties;

        (h)    on the eighth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, plus punitive damages, together with prejudgment interest and costs.

        (i)    on the ninth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing defendants from interfering with plaintiffs' relationship with Citigroup;

        (j)    on the tenth cause of action, in the event that Stern and First Republic are found liable to the plaintiffs in the federal court action and it is determined that Egert is found not to have been authorized to enter into, on behalf of Safrin, the Citigroup loans or any other agreements executed in connection with First Republic's acquisition or financing of the Properties, contribution from Egert for any such amounts;

        (k)    on the eleventh cause of action, a declaration that plaintiffs were either fraudulently induced to accept $13 million of financing from defendants or that no binding agreement was entered into with Defendants and that plaintiffs be permitted to rescind any transaction and return the $13 million, without interest, to defendants.

(l)    awarding to each of the plaintiffs pre-and post-judgment interest, the costs and

disbursements of this action, and attorneys' fees as authorized by law; and

(m)    granting to each of the plaintiffs such other and further relief as the Court may

deem to be just and proper.

Dated:    New York, New York
          June 11, 2008


                                        KAYE SCHOLER LLP

                                        By: _____
                                            Arthur Brown
                                            Michael Lynn
                                            Efrem Schwalb

                                        425 Park Avenue
                                        New York, New York  10022
                                        (212) 836-8000

                                        HOFFINGER STERN & ROSS, LLP

                                        By: _____
                                            Stephen R. Stern

                                        150 East 58th Street, 19th Floor
                                        New York, New York 10155
                                        (212) 421-4000

                                        *Attorneys for Plaintiffs*

# SILLS CUMMIS & GROSS
A PROFESSIONAL CORPORATION

**One Rockefeller Plaza**
**New York, NY 10020**
**Tel: 212-643-7000**
**Fax: 212-643-6500**

ONE RIVERFRONT PLAZA
NEWARK, NEW JERSEY 07102-5400
TEL: 973-643-7000
FAX: 973-643-6500

MARC D. YOUNGELSON
ASSOCIATE
DIRECT DIAL: (973) 643-5279
E-MAIL: MYOUNGELSON@SILLSCUMMIS.COM

650 COLLEGE ROAD EAST
PRINCETON, NJ 08540
TEL: 609-227-4600
FAX: 609-227-4646

May 23, 2008

**Via e-mail and FedEx**

Jonathan Daniel Lupkin, Esq.
Flemming Zulack Williamson Zauderer, LLP
One Liberty Plaza
New York, NY 10006

Stephen R. Stern, Esq.
Hoffinger Stern & Ross, LLP
150 East 58th Street, 19th Floor
New York, NY 10155

Michael Lynn, Esq.
Kaye Scholer, LLP
425 Park Avenue
NY, NY 10022

Re:    Amusement Industry, Inc. v. Moses Stern, et al.

Dear Counsel:

Enclosed herewith are documents bearing Bates Nos. BC002181-BC002555, which are being produced on behalf of Bankers Capital. We will be making a supplemental Bankers Capital production next week as well.

Also enclosed herewith is A DVD containing documents bearing Bates Nos. AI16357-AI22250, which are being produced on behalf of plaintiffs. These documents comprise the remaining portion of the corrupted file noted in my May 16 letter.

Jonathan D. Lupkin, Esq.
Michael Lynn, Esq.
Stephen R. Stern, Esq.
May 23, 2008
Page 2

Again, we appreciate your patience while we address the issues that have slightly delayed these productions.

Very truly yours,

Marc D. Youngelson

Enclosures
cc:     Allen Sragow, Esq.

**Stephen R. Stern**

| | |
|---|---|
| **From:** | Marc Youngelson [myoungelson@sillscummis.com] |
| **Sent:** | Wednesday, June 11, 2008 1:35 PM |
| **To:** | Hackett, Jean Marie; mlynn@kayescholer.com; Pallen, Kimberly; Lupkin, Jonathan; Stephen R. Stern; eschwalb@kayescholer.com; davidbayne@kmollp.com |
| **Cc:** | Philip White; Allen P. Sragow |
| **Subject:** | Amusement v. Stern et al. |

Counsel:

This will confirm that we will be producing electronic documents (including e-mails) on behalf of Steven Alevy/Bankers Capital by Friday (possibly tomorrow), barring unforeseen technical issues.

Marc

Marc D. Youngelson, Esq.
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, NJ 07102
Direct Dial: (973) 643-5279
email: myoungelson@sillscummis.com

NOTICE:
The contents of this email and any attachments to it contain confidential
and/or legally privileged information from the law firm of Sills Cummis & Gross P.C.
This information is only for the use of the intended recipient. If you are not the
intended
recipient, you are hereby notified that any disclosure, copying, distribution, or the
taking
of any action in reliance on the contents of the contained information is strictly
prohibited
and that the documents should be returned to this firm immediately. In this regard, if
you
have received this email in error, please notify us by email immediately.


**Although this email and any attachments are believed to be free of any virus or other
defect that might affect any computer system into which it is received and opened, it is
the
responsibility of the recipient to ensure that it is virus free and no responsibility is
accepted by Sills Cummis & Gross P.C. for any loss or damage arising in any way
from its use.

PHILIP R. WHITE
MARC D. YOUNGELSON
**SILLS CUMMIS & GROSS P.C.**
One Rockefeller Plaza
New York, New York 10020
Tel: (212) 643-7000
Fax: (212) 643-6500

ALLEN P. SRAGOW
**SRAGOW & SRAGOW**
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210

Attorneys for Non-Party Bankers Capital
Realty Advisors LLC

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMUSEMENT INDUSTRY, INC., a California corporation dba WESTLAND INDUSTRIES; PRACTICAL FINANCE CO., INC., a California corporation, | ) ) ) ) | CASE NO. 07 CV 11586 |
| Plaintiffs, | ) ) ) ) | **BANKERS CAPITAL REALTY ADVISORS LLC'S RESPONSES AND OBJECTIONS TO NON-PARTY SUBPOENA** |
| v. | ) ) | |
| MOSES STERN, an individual aka MARK STERN; JOSHUA SAFRIN, an individual; FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company; EPHRAIM FRENKEL, an individual; LAND TITLE ASSOCIATES ESCROW, a New York limited liability company, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Non-party Bankers Capital Realty Advisors LLC ("Bankers" or "Bankers

Capital"), by its undersigned attorneys, hereby responds and objects to the Subpoena

served on it in the above-captioned action (the "Action") by defendants Moses Stern,

First Republic Group Realty LLC, Ephraim Frenkel and Land Title Associates Escrow.

Subject to and without waiver of any specific or general objections, Bankers Capital will produce non-privileged documents responsive to the requests in the Subpoena (the "Requests") as described below.

## GENERAL OBJECTIONS

1.      Bankers objects to the Requests, including the Definitions and Instructions therein, to the extent they seek to impose on Bankers obligations greater than those imposed by the Federal Rules of Civil Procedure or the Local Rules of this Court.

2.      Bankers objects to the Requests to the extent they seek documents or information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege or immunity. The inadvertent production of any such document or information shall not constitute a waiver of any such privilege or immunity, and Bankers reserves the right to demand the return of any inadvertently produced documents or information.

3.      Bankers objects to the Requests to the extent they seek documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Bankers objects to the Requests to the extent they seek documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Such documents will be produced upon the agreement and entry of an appropriate protective order.

5.      Bankers objects to the Requests to the extent they purport to seek the production of documents and information that is not within the possession and control of Bankers.

2

6.    Bankers objects to the Requests to the extent they are overly broad and unduly burdensome.

7.    Bankers objects to the Requests to the extent they are vague, ambiguous and confusing.

8.    Bankers objects to the Requests to the extent they seek documents and information equally available to defendant from sources other than Bankers, including the public domain.

9.    Bankers reserve the right to supplement or amend any or all parts of their responses herein, and to object to the admissibility or relevancy of evidence of any portion of the documents, or the information contained therein, produced in response to a particular request.

10.    By responding to any of these requests or producing any documents, Bankers does not admit to any party's characterizations of any documents, facts, theories or conclusions, nor does Bankers admit that the documents reflect any fact, characterization or conclusion or otherwise constitute admissible evidence.

11.    A response to a specific discovery request which states that Bankers will produce documents is not a representation that such documents exist or ever have existed, but instead is a representation that to the extent such documents do exist and are in the possession, custody or control of Bankers, they will be produced in accordance with the terms of Bankers' response to the specific request.

12.    Pursuant to FRCP 45(c)(2)(B), Bankers objects to bearing the costs of complying with the Subpoena, and demands that defendants reimburse him for such costs, including attorneys' fees and duplication costs.

3

## SPECIFIC RESPONSES AND OBJECTIONS

REQUEST NO. 1    All communications between (i) Bankers Capital or (ii) Steven Alevy and Stern.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 2    All communications between (i) Bankers Capital or (ii) Steven Alevy and First Republic LLC.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial,

financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 3    All communications between (i) Bankers Capital or (ii) Steven Alevy and Frenkel.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 4    All communications between (i) Bankers Capital or (ii) Steven Alevy and Land Escrow.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the

discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 5    All communications between (i) Bankers Capital or (ii) Steven Alevy and (a) Plaintiffs or (b) any counsel for the Plaintiffs or (c) Robert Friedman or (d) Isaac Uminer or (e) Ditmas Capital or (f) Avery Egert or (g) Safrin from January 1, 2006 through and including December 31, 2007.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 6    All communications between (i) Bankers Capital or (ii) Steven Alevy and Friedman.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 7    All communications between (i) Bankers Capital or (ii) Steven Alevy and (a) North Star Realty Finance located at 399 Park Avenue, 18th Floor, New York,  New York 10022, (b) Morgan Stanley Mortgage Capital located at 1221 Avenue of the Americas, 27th Floor, New York, New York 10020, (c) CW Capital located at 1540 Broadway, 23rd Floor, New York, New York 10036, (d) RREEF located at 280 Park Avenue, 40th Floor, New York, New York 10017-1270, (e) an entity known as PETRA or any derivation of that name located in New York, New  York, (f) any law firm or attorney including but not limited to Allen Sragow, Michael Libraty, etc., (g) Citibank or any entity affiliated or related thereto, (h) Colonial, (i) Wayne Merchant, (j) Fred Riske, (k) John Moss and (1) any respective agents, representatives, officers, directors, employees, associates, attorneys, consultants or independent contractors of any and all of the categories  set forth above (a) - (k) with respect to the (i) Property Portfolio or the (ii) Investment Opportunity or (iii) the subject matters set forth in the Complaint.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-

product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 8     All documents concerning (i) Bankers Capital or (ii) Steven Alevy and Stern.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

8

REQUEST NO. 9    All documents concerning (i) Bankers Capital or (ii) Steven Alevy and First Republic LLC.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 10    All documents concerning (i) Bankers Capital or (ii) Steven Alevy and Frenkel.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will

produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 11    All documents concerning (i) Bankers Capital or (ii) Steven Alevy and Land Escrow.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.


REQUEST NO. 12    All documents concerning (i) Bankers Capital or (ii) Steven Alevy and Safrin.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this

Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 13    All agreements entered into between (i) Steven Alevy or (ii) Bankers Capital and Stern, including all drafts thereof.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 14    All agreements entered into between (i) Steven Alevy or (ii) Bankers Capital and First Republic LLC, including all drafts thereof.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the

discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 15    All agreements entered into between (i) Steven Alevy or (ii) Bankers Capital and Frenkel, including all drafts thereof.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 16 (#1)      All agreements entered into between (i) Steven Alevy or (ii) Bankers Capital and Land Escrow, including all drafts thereof.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-

product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 16 (#2)     All communications between (i) Steven Alevy or (ii) Bankers Capital and Stern in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will

produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 17    All communications between (i) Steven Alevy or (ii) Bankers Capital and First Republic LLC in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 18    All communications between (i) Steven Alevy or (ii) Bankers Capital and Frenkel in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or   the alleged contract formed pursuant thereto; (d) the July 11th Counter

Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 19    All communications between (i) Steven Alevy or (ii) Bankers Capital and Land Escrow in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent  and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground

that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 20    All documents concerning Stern in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

16

REQUEST NO. 21    All documents concerning First Republic LLC in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.


REQUEST NO. 22    All documents concerning Frenkel in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-

product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 23    All documents concerning Land Escrow in connection with any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; (e) the Escrowed Funds and/or the Escrow Account, and (f) any subject referenced in the Complaint.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will

18

produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 24    All documents concerning Plaintiffs in connection with any of (a) - (f) of Item 23 above.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome.  Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 25    Bankers Capital's (i) Articles of Organization and all amendments thereto, (ii) Operating Agreement and all amendments thereto, (iii) Proof of Conformity with any publication requirements, (iv) all applications for authority to do business in any state other than that of its formation, and (v) approvals of any application for authority to do business in any state other than that of its formation.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither

relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad, unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 26.    All communications concerning any of the following: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; and (e) the Escrowed Funds and/or the Escrow Account.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 27    All documents concerning any of the following; (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of

Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; and (e) the Escrowed Funds and/or the Escrow Account.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 28    All documents concerning the role of Steven Alevy in connection with the transactions alleged in the Complaint, including but not limited to: (a) the Investment Opportunity; (b) the financing and purchase of the Property Portfolio; (c) the Letter of Intent and/or the alleged contract formed pursuant thereto; (d) the July 11th Counter Offer and/or the alleged contract formed pursuant thereto; and (e) the Escrowed Funds and/or the Escrow Account.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the

discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 29    All notes of communication between Bankers Capital and (a) Stern, (b) First Republic LLC, (c) Frenkel, (d) Land Escrow and (e) Plaintiffs and any other party acting on behalf of said entities.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 30    All documents concerning any remuneration received by Steven Alevy or Bankers Capital in connection with any transaction[s] relating to the purchase or financing of the Property Portfolio.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information.  Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 31    All documents concerning any sharing arrangement with any third-party of any remuneration received by Steven Alevy or Bankers Capital in connection with any transaction[s] relating to the purchase or financing of the Property Portfolio.
RESPONSE:  See Response to Request No. 30.

REQUEST NO. 32    All communications between Safrin and/or Stern and/or First Republic LLC and/or First Republic Corp., on the one hand, and Steven Alevy on the other, in connection with any transaction(s) relating to the purchase or financing of the Property Portfolio.
RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence.  Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial,

financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 33    All documents concerning the negotiation and execution of the Loan Agreement between First Republic LLC and Citibank referred to in paragraph 26 of the Complaint.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome. Subject to and without waiver of the foregoing objection or the General Objections, Bankers will produce non-privileged documents responsive to this Request as they relate to the subject matter of the Action.

REQUEST NO. 34    All documents concerning the manner in which Friedman "led Plaintiffs to believe that he had full authority to speak on behalf of Stern, Safrin and First Republic LLC concerning the purchase of the "property portfolio", and that Friedman "had such authority," as described at paragraph.32 of the Complaint.

RESPONSE: See Response to Request No. 33.

24

REQUEST NO. 35    All documents concerning the negotiation and execution of the
June 29, 2007 Letter of Intent.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 36    All documents concerning the negotiation and execution of the
June 29, 2007 Letter of Intent.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 37    All documents concerning the creation of the Escrow Account,
including, but not limited to, the escrow agreement and all drafts thereof, and any
amendments to the escrow agreement, and all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 38    All documents concerning the creation of the Escrow Account,
including, but not limited to, the escrow agreement and all drafts thereof, and any
amendments to the escrow agreement, and all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 39    All documents concerning the disbursement of funds from the
Escrow Account, including, but not limited to, all account statements, withdrawal slips,
wire transfer instructions, wire transfer confirmations and cancelled checks.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 40    All documents concerning the terms for the release of the
Escrowed Funds.

RESPONSE:  <u>See</u> Response to Request No. 33.

25

REQUEST NO. 41     All communications concerning the release of the Escrowed Funds.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 42     All documents concerning the negotiation of a reduction in the purchase price of the Property Portfolio, as described at paragraph 39 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 43     All documents and communications concerning the closing of the sale on the Property Portfolio.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 44     All documents concerning the negotiation, preparation, execution, or delivery of the documents annexed to the Complaint as Exhibits 1, 5 and 6.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 45     All documents concerning the negotiation, preparation, execution, or delivery of the November 15, 2007 letter annexed to the Complaint as Exhibit 4.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 46     All documents concerning the preparation, execution, or delivery of the $15,000,000 promissory note annexed to the Complaint as Exhibit 7.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 47     All documents concerning the negotiations culminating in the July 11th Counter Offer, described at paragraph 53 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 48     The July 11th Counter Offer, including all term sheets and drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 49     The proposed partnership agreements referenced at paragraphs 42-43 of the Complaint, including, but not limited, to all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 50.    All documents concerning the July 6, 2007 communication from Amusement described at paragraph 44 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 51     The July 6, 2007 written communication from Amusement's California counsel to Friedman, described at paragraph 45 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 52     All documents concerning Plaintiffs' request(s), described at paragraph 46 and 214 of the Complaint, for the Citibank Loan Agreements and/or LLC operating agreements, including, but not limited to, any response(s) thereto.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 53     All documents concerning the communications of July 9, 2007, described at paragraphs 47-49 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 54    All documents provided to Amusement on July 11, 2007, as described at Paragraph 52 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 55    The July 11, 2007 written communication from Amusement described at paragraph 55 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 56    All documents concerning the response to Amusement's July 11, 200[7] written communication, as described at paragraph 56 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 57    All documents provided to Amusement on July 12, 2007, as described at paragraph 56 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 58    The July 12, 2007 written communication from Amusement, as described at paragraph 60 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 59    All documents concerning the allegation in paragraph 61 of the Complaint, that "(o)n July 13, 2007, Friedman announced that he had executed versions of all of Stern's and Safrin's documents ... and that Amusement could authorize release of its escrowed $13 million dollars."

RESPONSE:  <u>See</u> Response to Request No. 33.

28

REQUEST NO. 60    All documents concerning Steven Alevy's or Bankers Capital authorization of the release of the Escrowed Funds, as described at paragraph 63 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 61    The July 15, 2007 written communication from Amusement's California counsel to Frenkel and Land Escrow, as described at paragraph 65 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 62    The July 16, 2007 written communication from Amusement's California Counsel to Frenkel, Land Escrow and Friedman, as described at paragraph 66 of the Complaint.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 63    The July 19, 2007 written communication from Amusement's California Counsel to Frenkel and Land Escrow, as described at paragraph 67 of the Complaint.

RESPONSE: <u>See</u> Response to Request No. 33.


REQUEST NO. 64    The November 15, 2007 "demand" from Amusement to "Stern, Safrin, First Republic LLC, Friedman and Steven Alevy," as described at paragraph 69 of the Complaint, including, but not limited to, all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.

REQUEST NO. 65     All documents concerning any debts owed, or payments made, to the "creditors," described at paragraph 170 of the Complaint, from January 1, 2007 to the present.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 66     The June 29, 2007 e-mail from Friedman to Allen Alevy at Amusement, described at paragraph 167 of the Complaint, including, but not limited to, all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 67     The June 29, 2007 written communication from Amusement "to Stern and Safrin," described at paragraph 176 of the Complaint, including, but not limited to, all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 68     The June 29, 2007 email(s) from Friedman to Amusement, described at Paragraph 184-185 of the Complaint, including, but not limited to, all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.


REQUEST NO. 69     A copy of any and all licenses held by Plaintiffs at any time in the past two (2) years.

RESPONSE:  Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity.  Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the

discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 70    A copy of all applications for any and all licenses held by Plaintiffs in the past two (2) years.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 71    A copy of any and all licenses held by (i) Steve Alevy or (ii) Bankers Capital at any time in the past two (2) years.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground

31

that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 72    A copy of all applications for any and all licenses held by (i) Steven Alevy or (ii) Bankers Capital in the past two (2) years.

RESPONSE: Bankers objects to this Request on the ground that it seeks documents and information protected from discovery by the attorney-client privilege, the attorney work-product doctrine or another applicable privilege and immunity. Bankers also objects to this Request on the ground that it seeks documents and information that are neither relevant to the subject matter of the Action nor reasonably calculated to lead to the discovery of admissible evidence. Bankers further objects to this Request on the ground that it seeks documents and information that contain sensitive, confidential, commercial, financial, business or proprietary business information. Bankers further objects to this Request on the ground that it is overly broad and unduly burdensome, and meant solely for the purposes of harassment.

REQUEST NO. 73    A copy of the assignment referred to in paragraph 2 of the Complaint, including all drafts thereof.

RESPONSE:  <u>See</u> Response to Request No. 33.

DATED: April 29, 2008

SILLS CUMMIS & GROSS, P.C.

By: _____

Marc D. Youngelson, Esq.
One Rockefeller Plaza
New York, NY 10020
Telephone: (212) 643-7000
Attorneys for Bankers for
purposes of responding to the
Subpoena