UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMUSEMENT INDUSTRY, INC., dba WESTLAND :
INDUSTRIES; PRACTICAL FINANCE CO., INC., :
                                   :   No. 07 Civ. 11586 (LAK) (GWG)
                   Plaintiffs,   :   (ECF)
                                     :

       - against -                         :
                                     :

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN, :
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM :
FRENKEL, LAND TITLE ASSOCIATES ESCROW, :
                                     :
                   Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSHUA SAFRIN,                         :
                                     :
          Defendant/Third Party-Crossclaim-   :
                Counterclaim-Plaintiff,   :
                                     :

       - against -                         :
                                     :

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN :
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL :
REALTY ADVISORS LLC, and FIRST REPUBLIC GROUP :
CORP.,                                       :
                                     :
              Third Party Defendants,   :
                                     :

       - and -                            :
                                     :

MOSES STERN, aka MARK STERN, FIRST REPUBLIC :
GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND :
TITLE ASSOCIATES ESCROW,                  :
                                     :
          Defendants/Crossclaim Defendants,   :
                                     :

       - and -                            :
                                     :

AMUSEMENT INDUSTRY, INC., dba WESTLAND :
INDUSTRIES, PRACTICAL FINANCE CO., INC.      :
                                     :
          Plaintiffs/Counterclaim Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF STEPHEN R. STERN IN SUPPORT OF DEFENDANTS' MOTION TO
DISQUALIFY PLAINTIFFS' CALIFORNIA CO-COUNSEL SRAGOW & SRAGOW**

STEPHEN R. STERN, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the law of the United States of America as follows:

1.     I am over 18 years of age and am (i) a partner of the law firm of Hoffinger Stern & Ross LLP, (ii) a member of the bar of the State of New York, and (iii) a member of this Court.

2.     My law firm is co-counsel to defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic") and counsel to defendants Ephraim Frenkel and Land Title Associates Escrow (collectively, "Defendants").  I submit this declaration in support of Defendants' motion to disqualify plaintiffs' California co-counsel Sragow & Sragow.  Sragow & Sragow, along with the firm of Sills Cummis & Gross serves as counsel for plaintiffs/counterclaim-defendants and for third party defendants Bankers Capital Realty Advisors LLC and Steven Alevy.

3.     Annexed hereto as Exhibit A is a copy of the complaint filed by Stern and First Republic against Allen P. Sragow, Allen Alevy, Robert Friedman and Avery Egert in the Supreme Court of the State of New York, County of New York on June 11, 2008.

4.     Annexed hereto as Exhibit B is a collection of emails demonstrating Mr. Sragow's involvement (i) with respect to the pivotal issue of whether the parties entered into a binding agreement regarding the financing; (ii) in connection with the release of the escrowed funds; and (iii) in the fraudulent scheme to wrest control of the Properties from Stern and First Republic and place them in the hands of the Alevy family and related affiliates.

5.     Annexed hereto as Exhibit C is a copy of the amended initial disclosures provided by plaintiffs in this action.

6.      Annexed hereto as Exhibit D is a copy of Defendants Stern and First Republic's Answer to and Cross-Claims Against Third Party Defendants Steven Alevy and Bankers Capital Realty Advisors LLC.

7.      For the reasons set forth herein and in the accompanying memorandum of law, the law firm of Sragow & Sragow should be disqualified as co-counsel for the plaintiffs/counterclaim defendants and for third party defendants Steven Alevy and Bankers Capital Realty Advisors LLC.

8.      I declare under penalty of perjury that the foregoing is true and correct. Executed on June 11, 2008

s/Stephen R. Stern
Stephen R. Stern

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK STERN and FIRST REPUBLIC GROUP   :
REALTY LLC,   :
  :   Index No. _____
      Plaintiffs,   :
  :   **COMPLAINT**
   -against-   :
  :
ALLEN ALEVY, ALLEN P. SRAGOW,   :
ROBERT FRIEDMAN, and AVERY EGERT,   :
  :
      Defendants.   :
  :
  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    Plaintiffs Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by their attorneys Kaye Scholer LLP and Hoffinger Stern & Ross LLP, bring this complaint against defendants Allen Alevy, Allen P. Sragow, Robert Friedman (collectively referred to as the "Defendants") and Avery Egert on knowledge as to themselves and otherwise upon information and belief, and allege as follows:

## NATURE OF THE ACTION

    1.  This is an action for fraud, breach of fiduciary duty, tortious interference with contract and prospective business relations and misappropriation of trade secrets. Beginning in or about May 2007, Defendants, acting in concert, orchestrated a fraudulent scheme to sabotage First Republic's acquisition of 11 shopping center malls in the Southeast region of the United States (collectively, the "Properties") to enable Allen Alevy and his family, rather than First Republic, to acquire the Properties. When those wrongful efforts failed, Defendants improperly sought to wrest control of the Properties from First Republic and to interfere with First Republic's ability to operate

the Properties and to obtain refinancing for the Properties, each and all of which have injured and damaged plaintiffs, the value of the Properties, and Stern's interest in First Republic.

## PARTIES

2.     Plaintiff Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

3.     Plaintiff First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York.  First Republic owns and manages the Properties.

4.     Defendant Allen Alevy is a resident of the State of California.

5.     Non-Party Steven Alevy is a resident of the State of New York.  Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.   Steven Alevy is a third-party defendant in the pending federal action entitled Amusement Industry, Inc. v. Moses Stern et al., No. 07 Civ. 11586 (S.D.N.Y.) (LAK).  Because Steven Alevy dba Bankers Capital has asserted claims against Stern and First Republic in the federal action, Stern and First Republic will be asserting claims against Steven Alevy in the pending federal action.

6.     Non-Party Bankers Capital is a dissolved California limited liability company whose principal place of business is in New York, New York.  Although Bankers Capital is dissolved, its principals improperly represent that it is an existing limited liability company. Bankers Capital touts itself as being experienced in arranging mortgages and refinancing for real estate investors.  Bankers Capital was originally formed in California and previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.  Because Steven Alevy dba Bankers Capital has asserted claims against Stern and First Republic in Amusement Industry, Inc. v. Moses

Stern et al., No. 07 Civ. 11586 (S.D.N.Y.) (LAK), Stern and First Republic will be asserting claims against Bankers Capital in the pending federal action.

7.      Defendant Robert Friedman is a resident of the State of New York and is a Managing Director of Bankers Capital.

8.      Defendant Allen P. Sragow is a resident of the State of California and a member of the law firm of Sragow & Sragow. Sragow is the son-in-law of Allen Alevy, the brother-in-law of Steven Alevy and is principally involved with and performs legal services for the Alevy family and various entities owned by the Alevy family. Allen Sragow also serves as a director of certain companies owned by the Alevy family.

9.      Defendant Avery Egert ("Egert") is a resident of the State of New York. Egert is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin"). The Sovereign Group owns and manages various real estate properties in the United States. At all relevant times, Egert had apparent and actual authority to enter into various transactions on behalf of Safrin, including the transactions with respect to the Properties. Safrin and Egert hold a minority interest in First Republic through their ownership of JSAE Colonial LLC.

## JURISDICTION AND VENUE

10.      The Court has personal jurisdiction over Avery Egert and Robert Friedman as each of these defendants maintain offices, reside and systematically and continuously do business in New York, and many of the wrongful acts that form the basis of this Complaint occurred and caused injury in New York. This Court has personal jurisdiction over defendants Allen Alevy and Allen Sragow pursuant to CPLR 302 in that each of these individuals either (i) transacted business within New York State or (ii) committed tortious acts outside of New York State that caused injury to plaintiffs in New York and Allen Alevy and Allen Sragow either (a) regularly do or solicit

business in the State of New York and/or (b) expected or should have reasonably expected that their tortious acts would have consequences in New York State and derive substantial revenue from interstate or international commerce. This Court also has personal jurisdiction over Allan Alevy because he, directly or indirectly, owns, uses or possesses property in New York State.

11.    Venue lies in this county pursuant to CPLR §§ 503 and 509.

## FACTUAL BACKGROUND

### The Contract to Purchase the Properties

12.    After lengthy negotiations and discussions, effective as of April 20, 2007, First Republic Group Corp. ("First Republic Corp."), the predecessor-in-interest to First Republic, entered into a written contract of sale with Colonial Realty Limited Partnership ("Colonial"), to acquire ten shopping center malls in the Southeast region of the United States for a purchase price of $128 million (the "Contract"). Under the terms of the Contract, First Republic Corp. paid Colonial a $1 million non-refundable deposit, with the balance of the purchase price due at closing. The closing was scheduled to occur no later than June 15, 2007.

13.    After the Contract was executed, First Republic Group Corp. assigned its right, title and interest under the Contract to First Republic.

14.    Pursuant to several written amendments to the Contract, (a) in exchange for an additional $2 million non-refundable deposit, the closing date was extended first to June 29, 2007 and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh property was added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First Republic, reducing the purchase price by that amount. Thus, after execution of the several amendments, the total purchase price for the Properties was approximately $129 million.

15.     In addition to paying Colonial the $129 million purchase price at the closing, First Republic was also obligated: (a) to pay certain closing costs for the transaction and (b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant improvements, deferred maintenance, and environmental claims as provided for in agreements subsequently made with First Republic's senior lender.

**Plaintiffs Seek Financing for the Transaction**

16.     At the same time that plaintiffs were negotiating to acquire the Properties from Colonial, Stern, on behalf of First Republic, was also working with a number of mortgage brokers, but not Defendants, to secure financing for the acquisition and related expenses.

17.     On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer at Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy in numerous other transactions. Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist plaintiffs in securing financing for the acquisition of the Properties.

18.     Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

19.     Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well. Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition.

Plaintiffs agreed to retain Steven Alevy and Bankers Capital as First Republic's non-exclusive broker to obtain financing for the acquisition of the Properties.

20.    As plaintiffs' mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for plaintiffs, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

21.    Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and plaintiffs' efforts to obtain financing for the transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract, materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a statement of his net worth, personal and corporate financial statements and information about his prior business and litigation experiences.

22.    At all times during the relationship, Stern emphasized to Steven Alevy and Robert Friedman that time was of the essence because the contract of sale required the closing to occur no later than June 15, 2007.

**Defendants' Fraudulent Scheme to Wrest Control of the Properties from Plaintiffs**

23.    Within a week after being introduced to Steven Alevy and Robert Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already contacted some highly relevant lenders," that they believed they could obtain significantly more financing than what was being discussed with J.P. Morgan Chase and that they were processing the information to obtain the financing for the Colonial transaction.

24.    Unbeknownst to plaintiffs, Steven Alevy and Robert Friedman were not working to obtain financing for First Republic's transaction with Colonial. Rather, acting in concert

with Allen Alevy and Allen Sragow, they orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that Defendants could purchase the Properties.

25.    Instead of working to obtain financing for First Republic's acquisition of the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he would not pursue financing opportunities on behalf of First Republic with other brokers. Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain financing for the purchase. In reality, Steven Alevy and others conspired with Steven Alevy's father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

26.    Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for the benefit of the Alevy family and related affiliates. Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

27.    On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

28.    During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations. Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

29.    At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction. Steven Alevy and Robert Friedman told

Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

30.    Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction. In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

31.    When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007. No concrete bids, quotes or term sheets were presented to plaintiffs by Steven Alevy and Robert Friedman by on or about May 28, 2007.

32.    Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction. Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

33.    As part of their scheme to sabotage Stern's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused prospective lenders to form a bad and incorrect impression of Stern and First Republic. These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an

agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

34.    At this same time, in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves.  Unbeknownst to plaintiffs, Steven Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary information provided to them by plaintiffs about the transaction and Stern to Allen Alevy and Allen Sragow who used such information to formulate their own offer to acquire the Properties.

35.    On June 13, 2007, although Steven Alevy and Robert Friedman represented that they were arranging meetings with potential lenders to finance the transaction, Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (*i.e.,* Stern) to purchase the Properties.  At that time, plaintiffs had neither heard of nor spoken with Allen Alevy, and Steven Alevy had never mentioned to plaintiffs that he or his family was intending to become Stern's 50% partner in connection with the acquisition of the Properties.  At no time, did plaintiffs ever meet with, correspond with or communicate with Allen Alevy.

36.    In June 2007, while Steven Alevy and Robert Friedman were still feigning their pursuit of financing opportunities for plaintiffs, they were instead meeting with lenders to secure financing for Allen Alevy and his related entities to acquire the Properties.  During this same time, unbeknownst to plaintiffs, Steven Alevy met with Petra Capital, a lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the Properties.  Steven Alevy gave Petra Capital copies of personal financial statements for Allen Alevy and told them he was putting together a deal for himself and his father and never said that he had been retained by plaintiffs to act as their broker.

37.     In the beginning of June, Stern was introduced to Avery Egert, the President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5 million of equity and co-sponsor the transaction in exchange for a minority interest in the entity that would own the Properties.  At all relevant times, Egert had the authority to act on Safrin's behalf.  However, as discussed below, Safrin now claims that his signature on various transaction documents was forged and that he never authorized his involvement in the Colonial transaction.  Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital had previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert. In fact, unbeknownst to plaintiffs, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

38.     Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders.  None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

39.     In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Defendants stepped up their efforts to implement their plan to take over the Properties.  Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction.  As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to plaintiffs, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the

Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

40.     Still unaware of the efforts by Defendants to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any proposal made by Steven Alevy for "Long Beach" financing. At the same time, Stern redoubled his own efforts to obtain financing from other sources. Through another mortgage broker, Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine financing for the transaction in the total amount of approximately $131 million and was able to close the loan with Citigroup less than two weeks later.

41.     Plaintiffs were also seeking to obtain additional financing to cover required closing costs and escrow deposits that would need to be made to complete the transaction. By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion of the amount necessary to close the transaction. Under that arrangement, Colonial would agree to take back a $14 million note from First Republic that was secured by an irrevocable letter of credit from a third party with the other essential terms of the financing arrangement in place. Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First Republic as a non-refundable deposit on the transaction.

42.     Stern told Steven Alevy that he had received a commitment from Citigroup to provide the senior and mezzanine financing for the transaction and that the seller had agreed to finance the remaining portion of the transaction. Stern provided a copy of the Citigroup commitment letter to Steven Alevy. Upon learning these facts, Steven Alevy attempted to persuade Stern that First Republic should forego the opportunity to obtain financing from Citigroup because Bankers Capital could obtain greater financing and at a lower interest then what Citigroup was proposing.

Steven Alevy also told Stern that First Republic should reject the financing offer by the seller and should instead use Steven Alevy and his family to finance the remaining portion of the financing. On at least two occasions, Steven Alevy attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

43.    On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan. Citigroup agreed that, notwithstanding a six month lockout period in the loan agreements for refinancing, First Republic would be permitted to refinance the mezzanine portion of the loan during the first 60 days after closing. Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

44.    Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern had been able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

45.    Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet. Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller. To that end, Steven

Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return. The financing proposal was intended to keep the Alevys' foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their offer, leaving plaintiffs with the impossible choice of either walking away from the transaction and losing their nonrefundable $3 million deposit/obligation or acceding to unreasonable conditions that Allan Alevy and Allen Sragow unilaterally imposed upon them.

46.    Plaintiffs did not agree to accept Steven Alevy's proposal on June 29. Nonetheless, in order to induce Stern and First Republic into accepting their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused an Allen Alevy affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the Colonial transaction.

47.    Believing that Steven Alevy had worked tirelessly for months trying to find financing for First Republic's transaction and induced by Steven Alevy's repeated promises of doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured to close the Colonial transaction and did not attempt to finalize the seller financing that was in place. To further induce Stern to enter into the transaction with the Alevy family, on or about July 2, Steven Alevy told Stern that with the money that the two of them would make together, they would be able to donate significant funds to charity and send children to study in Jewish institutions in Israel.

48.    On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which was non-binding and subject to certain conditions, none of which was ever fulfilled. The Letter of Understanding states that "Westland Industries," an entity that plaintiffs had never heard of, which

was controlled by Steven Alevy's family, would provide $13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a monthly basis. The Letter of Understanding further states that the "Parties agree to work in good faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100% of the equity and voting interest . . . shall be held in escrow for the benefit of Westland." In addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall be brought to Stephen Friedman, Esq. for resolution." Stephen Friedman had only been working with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy family for fifteen years. At this time, Steven Friedman was also serving as the Alevy family's attorney on a transaction involving a project in New York. Finally, the Letter of Understanding contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open until the close of business on June 29th – four days before the offer had actually been transmitted to First Republic. In the beginning of July 2007, Stern, then believing that he would be able to obtain financing from the Alevy family and related affiliates, informed Colonial that First Republic no longer needed to obtain seller financing.

49.    Michael Libraty, an attorney at Allen Sragow's law firm who also maintains an email address at one of Allen Alevy's company servers, acting at Allen Sragow's direction, then sent Stern's counsel drafts of a proposed partnership agreement to sign. Consistent with everything Stern had advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those partnership agreements because Stern was not looking to take on a financial partner for the transaction.

50.    On July 3, 2007, Colonial threatened to terminate the Contract. That same day, Stern informed Steven Alevy of Colonial's position and Steven Alevy, in breach of his fiduciary

duties to plaintiffs, but in furtherance of the fraudulent scheme, passed this information to Allen Alevy and Allen Sragow who schemed how best to take advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

51.    On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: <u>We are not extending our commitment</u>." In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

52.    As a sophisticated real estate businessman, Allen Alevy did not want his proposed financing to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

53.    Then, on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that First Republic needed further funds to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing. These were the same financials that Steven Alevy had requested in May and which he had been purportedly using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to plaintiffs.

54. Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, that Stern did not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to Allan Alevy and related affiliates if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and plaintiffs never agreed to the conditions that Allen Alevy and Allen Sragow sought to impose on them.

55. On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow. Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction.

56. The next day, on July 13, Steven Alevy confirmed his oral instructions in writing. However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of plaintiffs, including the demand that First Republic assign its interest in the Properties to a new entity established by the Alevy family. Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not agree to provide First Republic with financing or release the funds in escrow unless all of their demands were met.

57. On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all

of their demands were met. Because the escrowed funds had already been used to close the Colonial

transaction, there was no way to retrieve the released funds. Plaintiffs did not and would not agree

to Allen Alevy and Allen Sragow's demands.

58.     Allen Sragow then sent a letter to Land Title and First Republic's counsel,

Stephen Friedman, restating that the escrowed funds were released without receiving the

authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not

finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon

conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify

the disbursement" if First Republic and Stern would "execute" new documents, including a

reassignment agreement, mutual release and other "modified" agreements. Plaintiffs did not agree

to Allen Sragow's proposal and did not execute those documents.

**Defendants Interfere With Plaintiffs' Operation**
**of the Properties and Attempts to Refinance**

59.     As described above, Citigroup had agreed to waive the lock-out period for the

first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan.

Subsequent to First Republic's closing with Colonial, plaintiffs immediately looked to secure

refinancing so that they could take out Allen Alevy and his related affiliates and return the funds that

Allen Alevy and Allen Sragow contended had been mistakenly released to plaintiffs by the escrow

agent notwithstanding the clear and explicit approval for the release given by Steven Alevy.

60.     Shortly after the July 12, 2007 closing, Stern met with Steven Friedman and

Steven Alevy. Steven Alevy was aware that Citigroup had agreed to waive the lock-out period for

the first sixty days after closing so that First Republic could refinance the mezzanine portion of its

loan and was interested in working as plaintiffs' broker to obtain that refinancing. Steven Alevy told

Stern that he was the only son in his family, that his father considered him to be the black sheep of the family and that his father put him in charge of family operations in New York. Steven Alevy asked Stern for forgiveness and apologized for the way that he and his family treated Stern during the transaction. Steven Alevy told Stern that the road to hell is often paved with good intentions and that while his intentions were good, he failed to represent him properly as plaintiffs' broker. Steven Alevy told Stern that he would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to help plaintiffs refinance the Properties.

61.    Based on Steven Alevy's promises and assurances, Plaintiffs once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist plaintiffs in obtaining financing and refinancing of the Properties so that the $13 million advanced to First Republic per Steven Alevy's instructions could be repaid. As part of their supposed effort to obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman represented that they were in the process of preparing a "79 page book," which they would use to persuade lenders to refinance the Properties.

62.    In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing. In response to Steven Alevy's requests and relying upon their brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, plaintiffs provided them with additional sensitive, confidential and proprietary information about the Properties.

63.    Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent plaintiffs from obtain refinancing in furtherance of Defendants' scheme to obtain control over the Properties.

64.    Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for plaintiffs solely as plaintiffs' broker, Stern sent them all of the information that he had received concerning the Properties. However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow. For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on. Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe? I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants, to property managers and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties. For example, sometime in late July 2007 or August 2007, unbeknownst to plaintiffs, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the

property managers of the two malls that they were the new owners of the malls. After plaintiffs were

notified of these intrusions, Greenspan and his associates were removed from the malls.

66.     Defendants also wrongfully accused plaintiffs of "stealing" the $13 million

that they verbally authorized for release, later confirmed in writing, and publicized that accusation

to the business and lending community, making it impossible for plaintiffs to refinance the

Properties. For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's

counsel, the Seller's CFO and another high ranking officer of the Seller and told them that plaintiffs

had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the

Properties.

67.     Defendants subsequently caused the companies that advanced the $13 million

to First Republic to sue plaintiffs in federal court in New York claiming, among other things,

ownership of the Properties and accusing plaintiffs of stealing their money and other falsehoods.

68.     Finally, in two states where the filing of a lawsuit is not a necessary condition

precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, Allen

Alevy and Allen Sragow caused the entities that advanced the $13 million to First Republic to

improperly file lis pendens on the Properties in an attempt to cause First Republic and Stern to

default on their loans and guaranties and prevent plaintiffs from refinancing. As a result of their

efforts, Citigroup has asserted to Plaintiffs that the filing of such lis pendens is an event of default

under the loans and has accelerated the entire amount of the loans. Citigroup has also informed

Stern that it has the right to demand payment from him of the Guaranteed Recourse Obligations of

the Borrower under the guaranty.

* * *

69.    In sum, as a result of Defendants' fraudulent scheme, First Republic was (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii) prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties.  Additionally, Citigroup has asserted that First Republic is in default of its loans.  Defendants' tortious conduct has damaged the value of the Properties and Stern's interest in First Republic. Defendants are liable for all such damages.

**Safrin's Claim that Egert Was Unauthorized to Enter into the Transaction**

70.    In the federal lawsuit brought by Allen Alevy-owned affiliates Amusement Industry Inc, dba Westland Industries and Practical Finance Co., Inc. against Stern, Safrin and others, Safrin claims that he never provided any authorization to anyone to enter the transaction with Colonial and that his signatures on the loan and guaranty documents were forged.

71.    Stern and Stern's attorney, Stephen Friedman, dealt with Egert in connection with Safrin's investment in the Colonial transaction.

72.    Egert, the President and co-founder of Safrin's company, The Sovereign Group, represented, on a number of occasions, that he was authorized to enter into the transaction on behalf of his father-in-law Safrin.

73.    In early June 2007, Stern and Friedman met with Egert at Friedman's office in Manhattan and Egert agreed that Safrin would serve as co-sponsor and provide financing for the Colonial transaction.  At that time, Egert represented that he was authorized to enter into the transaction on behalf of Safrin and The Sovereign Group.

74.    Egert provided signatures from Safrin that were needed in connection with the Citigroup loan and Colonial transaction documents.  In forwarding those documents to Steven

Friedman, Egert represented that he had obtained Safrin's signatures and was authorized to enter into the transaction on Safrin's behalf.

75.    In the event that Egert's representations to plaintiffs were false and Stern and First Republic are found to be liable to the plaintiffs in the federal action, Egert is liable to Stern for contribution and/or indemnification for fraudulently misrepresenting that he was authorized to enter into the transactions on behalf of Safrin.

### AS AND FOR A FIRST CAUSE OF ACTION

#### For Fraud Against Friedman, Alevy and Sragow

76.    Plaintiffs repeat and reallege paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.    Robert Friedman and Steven Alevy jointly and severally repeatedly represented to plaintiffs that they were actively working to obtain financing for plaintiffs' transaction with Colonial. Robert Friedman and Steven Alevy failed to disclose that they were working on behalf of Allen Alevy and Allen Sragow to sabotage First Republic's purchase of the Properties so that Allen Alevy and related affiliates could purchase the Properties.

78.    Robert Friedman and Steven Alevy's false representations of fact and concealment of material facts induced plaintiffs to, among other things, employ them as their mortgage brokers, appoint them as their exclusive brokers for a number of lenders with whom they were previously seeking financing, provide them with confidential and proprietary information, cease negotiating with lenders and other brokers with respect to the Colonial transaction and the post-closing refinancing of the transaction, and enter into negotiations with the Alevy family and related affiliates to finance a portion of the Colonial transaction.

79.     In late June and July 2007, after Steven Friedman, on behalf of plaintiffs, entered into discussions with Allen Alevy and Allen Sragow to provide financing for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been receiving plaintiffs' confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from the plaintiffs.

80.     After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed the fact that they continued to receive plaintiffs' confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from the plaintiffs.  As part of their fraudulent plan, these defendants falsely represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to tenants of the Properties that they and companies that they controlled were the owners of the Properties.

81.     Allen Alevy's and Allen Sragow's concealment of material facts induced plaintiffs to, among other things, cease negotiating with other potential lending sources, including the seller, with respect to the Colonial transaction, and enter into negotiations with those defendants to finance the Colonial transaction.  Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced plaintiffs to, among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

82.     Plaintiffs reasonably relied to their detriment on the truthfulness of these Defendants' representations.  Defendants knew or should have known that plaintiffs would rely on their representations when they made them.  Had plaintiffs known that these Defendants were acting fraudulently to sabotage plaintiffs' purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

83.     Defendants' misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging plaintiffs' Colonial transaction and were made with complete or reckless disregard as to their truthfulness.

84.     Defendants acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements they made to plaintiffs.

85.     As a direct and proximate result of the fraudulent acts of Defendants described above, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

86.     Defendants' actions described above were willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and were in conscious disregard of plaintiffs' rights.  Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty Against Robert Friedman

87.     Plaintiffs repeat and reallege paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.     As plaintiffs' mortgage broker, Robert Friedman owed fiduciary duties to plaintiffs, including an undivided fiduciary duty of loyalty, the duty to work for plaintiffs' interests, the duty not to provide plaintiffs' confidential and proprietary information to others without

plaintiffs' permission, the duty to avoid conflicts of interest and the duty to perform his work in a competent manner.

89.     Robert Friedman breached his fiduciary duties to plaintiffs by, among other things, providing plaintiffs' confidential and proprietary information to Allen Alevy and Allen Sragow without plaintiffs' permission, failing to assist and, in fact, trying to sabotage plaintiffs' efforts to obtain financing and refinancing and by inducing plaintiffs to enter into a transaction with the Alevy family and related affiliates.

90.     In breaching his fiduciary duties to plaintiffs, Robert Friedman acted adversely to the interests of plaintiffs and for his own personal interests and those of the other Defendants.

91.     As a direct and proximate result of Robert Friedman's breaches of fiduciary duty described above, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Robert Friedman

92.     Plaintiffs repeat and reallege paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     Plaintiffs on the one hand and Robert Friedman, Steven Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007.  Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated to attempt in good

faith to obtain financing on plaintiffs' behalf in connection with the Colonial transaction and to protect plaintiffs' confidential and proprietary information that they received as plaintiffs' broker.

94.    Robert Friedman materially breached the contractual obligations by, among other things, (a) failing to try to obtain financing and refinancing on plaintiffs' behalf in connection with the Colonial transaction, (b) meeting with lenders to obtain financing for the Colonial transaction on behalf of the Alevy family and related affiliates, and (c) providing plaintiffs' confidential and proprietary to Allen Alevy and Allen Sragow without plaintiffs' permission.

95.    Plaintiffs substantially performed their obligations under the brokerage agreement with Robert Friedman, Steven Alevy and Bankers Capital.

96.    As a direct and proximate result of Robert Friedman's breaches of contract, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Friedman's breaches of contract.

### AS AND FOR A FOURTH CAUSE OF ACTION

**For Aiding and Abetting Fraud Against Allen Alevy and Allen Sragow**

97.    Plaintiffs repeat and reallege paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98.    Allen Alevy and Allen Sragow knew that Steven Alevy, Robert Friedman and Bankers Capital had committed fraud by, among other things, repeatedly misrepresenting to plaintiffs that they were actively working to obtain financing for plaintiffs' transaction with Colonial when,

in fact, they were working with Allen Alevy and Allen Sragow to sabotage plaintiffs' attempt to secure financing for the Properties so that the Alevy family and related affiliates could acquire the Properties in their own right.

99.    Allen Alevy and Allen Sragow aided and abetted the fraud committed by Steven Alevy, Robert Friedman and Bankers Capital by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy and Robert Friedman had misappropriated confidential and proprietary information belonging to plaintiffs and passed that information onto Allen Alevy and Allen Sragow, which those defendants used in connection with their attempt to wrest control of the Properties from plaintiffs. Allen Sragow also caused to be prepared numerous legal documents relating to the proposed financing that, had they been agreed to by plaintiffs, would have resulted in the Alevy family and related affiliates owning the Properties if plaintiffs did not repay the financing that was advanced to them.

100.    Allen Alevy's and Allen Sragow's aiding and abetting of Steven Alevy and Robert Friedman's fraud proximately caused damages to plaintiffs in that, absent their aiding and abetting the fraud, plaintiffs would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related affiliates to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

101.    By reason of Allen Alevy's and Allen Sragow's aiding and abetting of the fraud committed by Steven Alevy, Robert Friedman and Bankers Capital, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the

27

$13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

102.    Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND  FOR A FIFTH CAUSE OF ACTION

### Against Allen Alevy and Allen Sragow for Aiding and Abetting Breach of Fiduciary Duty

103.    Plaintiffs repeat and reallege paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    Allen Alevy and Allen Sragow knew that Steven Alevy, Robert Friedman and Bankers Capital were breaching their fiduciary duties to plaintiffs by, among other things, providing plaintiffs' confidential and proprietary information to them without plaintiffs' permission, failing to assist and, in fact, trying to sabotage plaintiffs' efforts to obtain financing and refinancing and by inducing plaintiffs to enter into a transaction with Allen Alevy and his related entities.

105.    Allen Alevy and Allen Sragow aided and abetted the breaches of fiduciary duty committed by Steven Alevy, Robert Friedman and Bankers Capital by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to plaintiffs and passed

that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from plaintiffs. Allen Sragow also caused to be prepared numerous legal documents relating to the proposed financing that, had they been agreed to by plaintiffs, would have resulted in the Alevy family and related affiliates owning the Properties if plaintiffs did not repay the financing that was advanced to them.

106.    Allen Alevy's and Allen Sragow's aiding and abetting of the breaches of fiduciary duties committed by Steven Alevy and Allen Sragow caused damages to plaintiffs in that, absent their aiding and abetting the breach of such fiduciary duties, plaintiffs would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related affiliates to finance the Colonial transaction and would not have engaged Steven Alevy, Robert Friedman and Bankers Capital secure refinancing for the Colonial transaction.

107.    By reason of Allen Alevy's and Allen Sragow's aiding and abetting of the breaches of fiduciary duties committed by Steven Alevy and Robert Friedman, plaintiffs seek: (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

108.    Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### For Misappropriation of Plaintiffs' Trade Secrets Against Sragow, Alevy and Friedman

109.    Plaintiffs repeat and reallege paragraphs 1 through 108 of this Complaint as if fully set forth herein.

110.    Plaintiffs' proprietary and confidential information concerning the Properties constitutes trade secrets under New York common law.

111.    Defendants conspired and did in fact misappropriate plaintiffs' proprietary and confidential information by lying to plaintiffs about their intended use of that information. The actions of Defendants constitute improper, willful and malicious "misappropriation" of trade secrets under New York common law.

112.    As a direct consequence of the improper, willful and malicious misappropriation of trade secrets by Defendants, plaintiffs have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

113.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### For Tortious Interference With Prospective Business Relations Against

### Allen Sragow, Allen Alevy and Robert Friedman

114.    Plaintiffs repeat and reallege paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    Pursuant to its contract with Colonial, First Republic became the lawful and legal owner of the Properties, and, as the lawful owner of the Properties, was entitled to exploit its economic interest in those Properties free from interference by any other third parties.

116.    Defendants were at all times aware that, following the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

117.    Notwithstanding their knowledge that First Republic was the lawful owner of the Properties, Defendants have intentionally and tortiously interfered with First Republic's ownership of those properties and Stern's interest in First Republic by, among other things, claiming directly or causing other individuals under their control to claim to the Seller, tenants and the Property Manager of the Properties that they are the lawful and legal owner of the properties.

118.    Defendants' intentional and willful interference has caused and induced prospective lenders to deny financing to plaintiffs in connection with the Properties, has caused tenants to cancel their leases and has caused Citigroup to assert that plaintiffs are in default of the loan agreements and guaranty agreements and accelerate the loans.

119.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

120.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

121.    Moreover, as a direct and proximate result of the foregoing, plaintiffs are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendants are enjoined from contacting the Seller, prospective lenders, tenants

and the Property Manager of the Properties and interfering with plaintiffs' lawful ownership and management of the Properties.

## AS AND FOR A EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract Against Allen Alevy and Allen Sragow

122.    Plaintiffs repeat and reallege paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.    Plaintiffs on the one hand and Steven Alevy, Robert Friedman and Bankers Capital on the other hand entered into a brokerage agreement in May 2007.  Pursuant to that agreement, Steven Alevy, Robert Friedman and Bankers Capital were obligated to attempt in good faith to obtain financing and refinancing on plaintiffs' behalf in connection with the Colonial transaction and to protect plaintiffs' confidential and proprietary information that they received as plaintiffs' broker.

124.    Allen Alevy and Allen Sragow were, at all times aware, of plaintiffs' contractual relations with Steven Alevy, Robert Friedman and Bankers Capital.

125.    Allen Alevy and Allen Sragow tortiously interfered with and induced Steven Alevy, Robert Friedman and Bankers Capital to breach that brokerage agreement by, among other things, (i) instructing Steven Alevy, Robert Friedman and Bankers Capital to provide them with confidential and proprietary information belonging to plaintiffs, (ii) persuading Steven Alevy, Robert Friedman and Bankers Capital to sabotage plaintiffs' attempts to obtain financing for the acquisition of the Properties and refinancing thereafter, and (iii) persuading Steven Alevy, Robert Friedman and Bankers Capital to act on their behalf in connection with prospective financing for the acquisition of the Properties.

126.    As a result of Allen Alevy and Allen Sragow's tortious interference with plaintiffs' contract and inducement of Steven Alevy, Robert Friedman and Bankers Capital to breach that contract, plaintiffs seek: ( i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts.

127.    Allen Alevy and Allen Sragow's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A NINTH CAUSE OF ACTION

### For Tortious Interference With Contract Against Allen Alevy,

### Allen Sragow and Robert Friedman

128.    Plaintiffs repeat and reallege paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.    First Republic and Citigroup entered into loan agreements and in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties.  In addition, Stern provided Citigroup with a guaranty of recourse obligations of the borrower.

130.    Defendants were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations of the borrower.

131.    Defendants tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things, causing entities that advanced $13 million to plaintiffs to improperly file lis pendens against the Properties, which has caused Citigroup to assert that an event of default has occurred under the loan agreements and that it has the right to demand payment from Stern of the Guaranteed Recourse Obligations of the Borrower under the guaranty.

132.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

133.    Defendants' conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of plaintiffs' rights. Plaintiffs are therefore entitled to an award of punitive and exemplary damages.

134.    Moreover, as a direct and proximate result of the foregoing, plaintiffs are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendants are enjoined from interfering with plaintiffs' relationship with Citigroup.

## AS AND FOR A TENTH CAUSE OF ACTION

### For Contribution/Indemnity Against Avery Egert

135.    Plaintiffs repeat and reallege paragraphs 1 through 75 of this Complaint as if fully set forth herein.

136.    Plaintiffs plead this cause of action in the alternative in the event that the plaintiffs in the federal lawsuit obtain a judgment against Stern and First Republic and Egert is found

not to have been authorized to enter into, on behalf of Safrin, the Citigroup loans or any other agreements executed in connection with First Republic's acquisition or financing of the Properties.

137.    Egert represented to plaintiffs that he was authorized to enter into, on behalf of Safrin, the Citigroup loans and any other agreements to be executed in connection with First Republic's acquisition or financing of the Properties.

138.    In the event that Egert's representations to plaintiffs were false and Stern and First Republic are found to be liable to the plaintiffs in the federal action, Egert is liable to Stern for contribution and/or indemnity for fraudulently misrepresenting that he was authorized to enter into the transactions on behalf of Safrin.

## AS AND FOR A ELEVENTH CAUSE OF ACTION

### Against Allen Alevy, Allen Sragow and Robert Friedman For Declaratory Relief

139.    Plaintiffs repeat and reallege paragraphs 1 through 134 of this Complaint as if fully set forth herein.

140.    An actual, justiciable controversy exists between plaintiffs and Defendants within the meaning of CPLR 3001.

141.    A dispute exists between plaintiffs and Defendants as to whether those parties entered into an agreement in connection with the Colonial transaction.

142.    Plaintiffs contend that they were either fraudulently induced to accept $13 million of financing from Allen Alevy and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from them.

143.    Defendants contend that the $13 million of financing provided by them was either an equity contribution to the entity owning the Properties or that it was a loan which, if not

repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

144.    Plaintiffs seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from defendants or that no binding agreement was entered into with Defendants and that they be permitted to rescind any transaction and return the $13 million, without interest, to defendants.

**WHEREFORE,** Plaintiffs demands judgment as follows:

(a)    on the first cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, plus punitive damages, together with prejudgment interest and costs;

(b)    on the second cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, together with prejudgment interest and costs;.

(c)    on the third cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to

refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Friedman's breaches of contract, together with prejudgment interest and costs;

(d)    on the fourth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts; plus punitive damages, together with prejudgment interest and costs;

(e)    on the fifth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts; plus punitive damages, together with prejudgment interest and costs;

(f)    on the sixth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, together with punitive damages, prejudgment interest and costs, and an injunction preventing defendants from contacting and interfering the Seller, with prospective lenders, the tenants and Property Manager of the Properties;

(g)    on the seventh cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing defendants from contacting the Seller, tenants and the Property Manager of the Properties and interfering with plaintiffs' ownership and management of the Properties;

(h)    on the eighth cause of action, (i) rescission of any agreement that plaintiffs may have entered into with Defendants with respect to the $13 million of funds advanced to plaintiffs; (ii) compensatory damages in an amount to be proven at trial arising from plaintiffs' inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by Defendants' tortious acts, plus punitive damages, together with prejudgment interest and costs.

(i)    on the ninth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing defendants from interfering with plaintiffs' relationship with Citigroup;

(j)    on the tenth cause of action, in the event that Stern and First Republic are found liable to the plaintiffs in the federal court action and it is determined that Egert is found not to have been authorized to enter into, on behalf of Safrin, the Citigroup loans or any other agreements executed in connection with First Republic's acquisition or financing of the Properties, contribution from Egert for any such amounts;

(k)    on the eleventh cause of action, a declaration that plaintiffs were either fraudulently induced to accept $13 million of financing from defendants or that no binding agreement was entered into with Defendants and that plaintiffs be permitted to rescind any transaction and return the $13 million, without interest, to defendants.

(l)     awarding to each of the plaintiffs pre-and post-judgment interest, the costs and disbursements of this action, and attorneys' fees as authorized by law; and

(m)     granting to each of the plaintiffs such other and further relief as the Court may deem to be just and proper.

Dated:   New York, New York
         June 11, 2008

KAYE SCHOLER LLP

By: _____

Arthur Brown
Michael Lynn
Efrem Schwalb

425 Park Avenue
New York, New York  10022
(212) 836-8000

HOFFINGER STERN & ROSS, LLP

By: _____

Stephen R. Stern

150 East 58th Street, 19th Floor
New York, New York 10155
(212) 421-4000

*Attorneys for Plaintiffs*

# EXHIBIT B

## Michael Libraty

**From:**    Michael Libraty
**Sent:**    Tuesday, July 03, 2007 4:56 PM
**To:**    'salevy@bankersllc.com'
**Cc:**    'Friedman, Stephen'
**Subject:** I am working partial day tomorrow. I will have draft LLC operating agreement re: Southeast

I hope to email you draft LLC operating agreement.

My agreements are based on Cal. law.  Will partner of Westland (First Republic Group?) have a problem with that?  Hey, it's no worse than New York.

Sure, the LLC will have to be qualified to do intrastate business in the states where the shopping centers are located, but same as if the LLC were a New York LLC.

Have a good holiday, and talk to you soon.

- Michael

8/22/2007

AI000175

## CERTIFICATE OF RESOLUTION

The undersigned, Mark Stern, hereby certifies:

That he is the sole member, manager and holds all of the limited liability company interests in and to MS COLONIAL LLC, a Delaware limited liability company (the "Company One");

That Joshua Safrin is the sole member, manager and holds all of the limited liability company interests in and to JSAE COLONIAL LLC, a Delaware limited liability company (the "Company Two");

That Company One is one of two members of, and holds seventy-five percent (75%) of the limited liability company interests in and to, FRGR HOLDINGS LLC, a Delaware limited liability company ("Holdings");

That Company Two is one of two members of, and holds twenty-five percent (25%) of the limited liability company interests in and to, Holdings;

That Holdings is the sole member and holds all of the limited liability company interests in and to FRGR MANAGING MEMBER LLC, a Delaware limited liability company ("Managing Member");

That Managing Member is the sole member and holds all of the limited liability company interests in and to FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("REALTY LLC"), and that the following resolution was duly adopted by REALTY LLC at the duly constituted meeting on _____, 2007, and is still in full force and effect and has not been amended.

RESOLVED, that REALTY LLC shall sign and deliver Grant Deeds in the following properties:

1.    Lakeshore Mall;
2.    Decatur Mall;
3.    Staunton Mall;
4.    Mayberry Mall;
5.    Colonial Promenade;
6.    Montgomery North;
7.    Britt David;
8.    McGehee;
9.    Bellwood;
10.   Olde Towne; and
11.   Quaker Village,

AI000176

to CBA Industries, Inc. located at 6665 Long Beach Blvd., Long Beach, California 90805, or its assignee, as collateral to secure the undersigned's performance on that Promissory Note of _____, 2007 to Amusement Industry, Inc., or its assignee.

I hereby certify that the following is true and correct.

Dated: _____, 2007

FIRST REPUBLIC GROUP REALTY LLC,
a Delaware limited liability company

By: Its Sole Member
FRGR MANAGING MEMBER LLC,
a Delaware limited liability company

By: Its Sole Member
FRGR HOLDINGS LLC, a Delaware
limited liability company

By: Its Co-Member
MS COLONIAL LLC, a Delaware
limited liability company

_____
By: Its Sole Member and Manager,
MARK STERN

## Michael Libraty

**From:** Michael Libraty
**Sent:** Wednesday, July 04, 2007 10:42 AM
**To:** 'Friedman, Stephen'
**Cc:** salevy@bankersllc.com
**Subject:** LLC Operating Agreement for Your Review

Here is my draft. Allen Alevy looks forward to us talking about this later today.

Stephen, you go ahead and prepare the purchase agreement with Seller to put the membership interests, or whatever ownership interests in entities Seller has, into this new California LLC we will create. But we'd like to see the purchase agreement over here in California, so please provide for our review when drafted.

I don't know if Westland will remain as our underlying entity. I also don't know what name for the new LLC you want. All this can easily change in the agreement.

- Michael Libraty

2/22/2008

Purchasers Closing Statement

| | | | Credits to Seller | Credits to Purchaser |
|---|---|---|---|---|
| Seller: | | Colonial Realty Limited Partnership | | |
| Purchaser: | | First Republic Group, LLC | | |
| Property: | | Colonial Properties | | |
| Closing Date: | | July 2, 2007 | | |
| Funding Date | | July 2, 2007 | | |
| | | | | |
| | | | Credits to Seller | Credits to Purchaser |
| Purchase Price | | | $133,500,000.00 | |
| Downpayment | | | | $1,000,000.00 |
| Adjustments | | | | $884,247.90 |
| | | | | |
| | Total | | $133,500,000.00 | $1,884,247.90 |
| | TOTAL DUE SELLER | | $131,615,752.10 | |
| | | | | |
| Disbursements to Seller | | | | |
| Mortgage Proceeds | | | | $128,476,811.11 |
| Additional Funds | | | | $3,138,940.99 |
| | TOTAL | | $131,615,752.10 | $131,615,752.10 |
| | | | | |
| | | Additional Disbursements | | |
| Title Fees | | | | $635,513.50 |
| | Alabama Title Company  (Montgomery) | | $57,763.00 | |
| | Alabama Title Company (Montgomery North) | | $41,933.00 | |
| | Alabama Title Company (Bellwood) | | $21,986.00 | |
| | Alabama Title Company (McGehee) | | $17,425.00 | |
| | Alabama Title Company (Decatur) | | $102,925.00 | |
| | Alabama Title Company (Old Towne) | | $8,973.00 | |
| | Buckhead Title and Abstract Co, Inc. (Britt David) | | $36,356.75 | |
| | Calloway Title And Escrow LLC (Lakeshore) | | $127,945.75 | |
| | Chicago Title Insurance Company (Mayberry) | | $19,629.00 | |
| | Chicago Title Insurance Company (Quaker Village) | | $31,979.00 | |
| | Chicago Title Insurance Company (Staunton) | | $168,598.00 | |
| Survey Fees | | | | $101,459.34 |
| | Goodwin Mills and Cawood (McGehee, Bellwood, Olde Town, M | | $48,000.00 | |
| | Teramark (Britt David) | | $9,290.00 | |
| | BWA (Quaker Village) | | $3,910.00 | |
| | ARCADIS (Lake Shore) | | $18,000.00 | |
| | Matern & Craig (Staunton) | | $14,730.00 | |
| | Pugh Wright and Associates (Decatur) | | $7,529.34 | |
| Bank Required Fees | | | | $8,202,946.18 |
| Appraisal Fee | Integra Krauser & Cirz | | $86,700.00 | |
| Insurance Review | Moran Consulting Services, Inc. | | $975.00 | |
| Property Condition | LandAm | | $44,800.00 | |
| O&M Reports | LandAm | | $2,400.00 | |
| Lender Legal Fees | Latham & Watkins | | $277,500.00 | |
| Public Record searches | ChoicePoint Services | | $1,350.96 | |
| Third Party Review Fee | Hillmann Consulting | | $10,100.00 | |
| Lease Abstract Services | LeaseProbe | | $16,125.00 | |
| Mortgage Broker | Northmarq Capital | | $975,000.00 | |
| Appraisal Fee - Land Value | Integra Krauser & Cirz | | $15,250.00 | |
| Zoning Reports | PZR | Contingency | $7,001.80 | |
| Insurance Premium | All Risk Brokerage, Inc | | $340,719.00 | |
| Underwriting Services | Helix | | $88,538.42 | |
| Environmental Reserve | Wachovia | | $1,100,000.00 | |
| Capital Expenditures Reserve | Wachovia | | $3,000,000.00 | |
| RE Tax Escrow | Wachovia | | $1,236,486.00 | |
| Interest Reserve | Wachovia | | $1,000,000.00 | |
| | | | | |
| Additional Acquistion Fees | | | | $16,245,935.00 |
| | Carruthers & Roth | | $5,250.00 | |
| | Young Conaway Stargatt & Taylor | | $15,000.00 | |
| | Odin Feldman Pittleman | | $6,800.00 | |
| | Young Conaway Stargatt & Taylor | | $15,000.00 | |
| | Cavazos Hendricks & Poirot, PC | | $12,000.00 | |
| | Cavazos Hendricks & Poirot, PC | | $12,000.00 | |
| | Buchanen Ingersol | | $50,000.00 | |

Stem Colonial

AI000220

Purchasers Closing Statement

| | | | |
|---|---|---|---|
| | Herrick Feinstein | $200,000.00 | |
| | Mary Stark | $1,000.00 | |
| | Frank Dwyer | $1,000.00 | |
| | NRAI Entity Services LLC | $2,500.00 | |
| | Rate Cap | $156,000.00 | |
| | Burr Forman | $5,750.00 | |
| | Parker Hudson Rainer | $12,400.00 | |
| | Prudential Douglas Elliman (Broker) | $8,677,500.00 | |
| | Integra | $9,735.00 | |
| | Bruce Minsky, Esq. | $934,500.00 | |
| | GMAC IPG (Leasing Broker) | $2,325,000.00 | |
| | ACE Capital Group (Investment Banker) | $934,500.00 | |
| | Hoffinger Stern & Ross | $150,000.00 | |
| | Eisenpress and Reiss, Esq. | $50,000.00 | |
| | Roman Associates, LTD | $2,670,000.00 | |
| | | | |
| | TOTAL | | $25,185,854.02 |
| | | | |
| | | | |
| | | | |
| Total Borrower Contribution/Add'l Acquisition Costs | | | |
| | To Seller | | $3,138,940.99 |
| | Other Costs (See Above) | | $25,185,854.02 |
| | TOTAL | | $28,324,795.01 |
| | | | |
| | Total Acquisition Costs | | $156,801,606.12 |
| | First Republic Group Realty, LLC | | |
| | | | |
| | | | |
| | By: | | |

Stern Colonial

AI000221

## Michael Libraty

| | |
|---|---|
| **From:** | Michael Libraty |
| **Sent:** | Thursday, July 05, 2007 10:23 AM |
| **To:** | 'Friedman, Stephen'; 'salevy@bankersllc.com' |
| **Cc:** | Allen Sragow |
| **Subject:** | Second Draft Operating Agreement for Southeast LLC |

**Attachments:**Southeast LLC Operating Agr FINAL #2.doc;
Second Draft is attached. There are many differences and additions compared to Draft #1.

Note the following:

1.   Company accounts and most Company bookkeeping functions will be performed here in Long Beach so we maintain control. Maybe its "our" existing bookkeeping personnel to start, and maybe the Company ultimately hires a person to handle Company books, the Agreement does not (and need not) specify. But either way, money matters are here, and mutual agreement of Members is needed for accounting matters and not just decision of First Republic. (6:1, 3.1C & 3.1D)

2.   Whoever does work for the Company is entitled to receive compensation from the Company, including the Company accountant, "supervisory employees" Steven Alevy and Mark Stern, as well as the entity which provides bookkeeping functions. (2.11, 2.12 and 3.1E)

3.   Company accountant is an important person. Hiring of this person is by mutual agreement of Members (3.3A). Agreement doesn't say it has to be someone in Long Beach, but since Company books will be in Long Beach the accountant should be.

4.   Our entity uses Company finance transaction to get its capital contribution out first. Then First Republic can do so. (2.4) There is only a debt coverage ratio (3.11) and requirement for Member agreement (3.3A) thereafter limiting Company indebtedness. If ratio is satisfied and Members agree, additional secured debt and unsecured debt can be incurred by Company.

5.   Allen Alevy is still deciding which entity will be the Member behind our $13 million.

6.   Each Member can continue with its other businesses. There is very narrow non-compete/similar business restriction. (3.2, 9.1, 9.3)

7.   Lastly, a few other nifty provisions:

   a.   A Member can replace itself with another entity controlled by same family, without having to go through sale of its interest. (2.10)

   b.   The dedicated CAM bank account and procedure. (3.10)

   c.   Stephen Friedman resolves deadlocks. (11.8)

- Michael

8/22/2007

AI000222

## Allen Sragow

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Friday, July 06, 2007 7:41 PM |
| **To:** | stephen.friedman@bipc.com |
| **Cc:** | salevy@bankerscapitalonline.com; Anna Chase |
| **Subject:** | Letter from Allen Sragow concerning Retail Portfolio |

To: Mr. Mark Stern
c/o Stephen Friedman@bipc.com

I am Allen Sragow, and am writing as counsel for Westland Industries. I am writing concerning the proposed financing and purchase of the Retail Portfolio of eleven properties in the Southeast involving Westland Industries and First Republic.

From my review of the emails and disclosures, First Republic has not worked in good faith to finalize the proposed agreements with Westland. In fact, First Republic has not responded to the draft agreements that were proposed.

In addition, it appears that the underlying purchase transaction which was to be the subject of the proposed financing, i.e., the sale of the Retail Portfolio, has fundamentally and materially changed. First, Mr. Stern has requested an additional $2.5 million to close (over the originally proposed $13,000,000). Second, from the Purchaser's Closing Statement there appears to be an additional $9 million to $16 million in disbursements that will have to be covered to close the purchase.

If we are wrong in these impressions, please let us know. Otherwise, we would appreciate it if you would send written instruction to escrow to release the $13,000,000 back to Westland.

Finally, I am aware that Mr. Alevy wrote to you on this matter, and discussed the possibility of his reconsidering new terms for a new agreement. I want to be clear that Mr. Alevy was not extending any kind of offer. To the extent that one might have interpreted his letter as an offer of new terms, any such offer is hereby rescinded.

Allen Sragow
Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

| From: | Steven Alevy |
|---|---|
| Sent: | Monday, July 09, 2007 12:18 PM |
| To: | 'Michael Libraty'; sragow@sragow.com; anna@aptsrus.com; robert@bankersllc.com; Friedman, Stephen |
| Subject: | Colonial Portfolio: Return of Executed Documents |

**From:** mstern@firstrepublicgrp.com [mailto:mstern@firstrepublicgrp.com]
**Sent:** Tuesday, July 03, 2007 6:38 PM
**To:** alevy
**Subject:** Colonial Portfolio: Return of Executed Documents

—— Original Message ——
**From:** Ephraim Frenkel
**To:** mstern@firstrepublicgrp.com
**Sent:** Tuesday, July 03, 2007 5:46 PM
**Subject:** FW: First Republic Group/Colonial Realty: Return of Executed Documents

**From:** Wayne Merchant [mailto:GWM@lsppc.com]
**Sent:** Tuesday, July 03, 2007 5:45 PM
**To:** Ephraim Frenkel
**Cc:** John Moss; Brad Siegal; R Mike Conley; Link Loegler
**Subject:** First Republic Group/Colonial Realty: Return of Executed Documents

Dear Ephraim,

Due to Buyer's default and failure to close on Friday, June 29, 2007 and as per our Escrow Instruction letter dated June 26, 2007, please return to me all executed documents signed by Colonial Realty Limited Partnership.

It was a pleasure working with you on this transaction. Please call me if you have any questions.

Sincerely,
Wayne Merchant

G. Wayne Merchant
Leitman, Siegal & Payne, P.C.
600 North 20th Street, Suite 400
Birmingham, Alabama 35203
Direct Dial: 205-986-5050
Main Office: 205-251-5900
Facsimile: 205-323-2098
Email Address: gwm@lsppc.com
Firm Web Address: www.lsppc.com

NOTICE: This e-mail message and any attachment transmitted with it contain confidential information that may be

AI000541

legally privileged.  This information is intended solely for the use of the party to whom it is addressed.  If you are not the intended recipient, you must not review, copy, use or disseminate the contents.  If you receive this e-mail in error, please immediately notify the sender by reply e-mail or by telephone and delete this message.  This notice is automatically attached to each e-mail message.

IRS circular 230 Disclosure:  To the extent this message contains tax advice, the U.S. Treasury Department requires me to inform you that any such advice, whether in the body of the message or in any attachment, is not intended or written by my firm to be used, and cannot be used by any taxpayer, for the purpose of avoiding any penalties that may be imposed under the Internal Revenue Code.  Advice from my firm relating to tax matters may not be used in promoting, marketing or recommending any entity, investment plan or arrangement to any taxpayer.

AI000542

## Michael Libraty

| | |
|---|---|
| **From:** | Michael Libraty |
| **Sent:** | Monday, July 09, 2007 7:00 PM |
| **To:** | Friedman, Stephen |
| **Cc:** | 'salevy@bankersllc.com' |
| **Subject:** | Revised Operating Agreement and Limitation Liability Agreement |

**Attachments:** Southeast LLC Operating Agr #3.doc; Non-Responsibility Agr.doc;
The limitation of liability agreement is ready.

The Operating Agreement is almost ready.  The "partnership LLC" name is changing and is being formed here tomorrow morning.

The 50% "Westland" entity controlled by Alevy family will be another California LLC, also being formed here tomorrow morning.

See new names of both entities in the limitation of liability agreement.

Final version of Operating Agreement with correct LLC placements will follow tomorrow, after I have confirmation of both LLC formations.

- Michael

8/22/2007

AI000268

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Monday, July 09, 2007 09:53 PM |
| **To:** | Friedman, Stephen |
| **CC:** | michael@aptsrus.com |
| **Subject:** | Escrow |

Stephen,

Please do not authorize release of the $13,000,000 from the Alevys in escrow without specific authorization from Allen Alevy or myself.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

AI000596

| From: | Michael Libraly |
| Sent: | Monday, July 09, 2007 09:56 PM |
| To: | Allen Sragow; Friedman, Stephen |
| Subject: | RE: loan docs |

If timing of assignment is a problem, note the purchase agreement already has seller giving First Republic right to assign the agreement to an LLC where First Republic has some control, which is exactly our situation.

But if you cannot assign the contract any longer pre-closing, there of course needs to be assignment of what First Republic picks up from seller to the new LLC one minute after closing, so an assignment agreement still needs to be drafted and signed before closing. Now there will be assignment of what First Republic gets instead of assignment of its purchase agreement rights.

The limitation of liability agreement and operating agreement, that I am emailing shortly in near final form, need to be concurrently signed prior to closing.

- Michael

**From:** Allen Sragow [mailto:sragow@sragow.com]
**Sent:** Monday, July 09, 2007 6:47 PM
**To:** Friedman, Stephen
**Cc:** Anna Chase; Michael Libraty
**Subject:** Fw: loan docs

It can take place immediately after closing. I am trying to have everything put in the new LLC owned 50/50, which was our understanding of this deal. First Republic has this right inder the purchase agreement.

----- Original Message -----
**From:** Friedman, Stephen
**To:** Allen Sragow
**Cc:** salevy@bankersllc.com
**Sent:** Monday, July 09, 2007 6:02 PM
**Subject:** RE: loan docs

Are you kidding? That is not going to happen. The deal is about to close and all the docs, opinions, org charts, etc. have been completed and signed off by the bank. It is beyond late in the game to even think about having the purchase agreement assigned. Not going to happen or even be considered.

Also, Al wanted to not be in the deal or he would have to disclose to Citibank that he is a partner and he would have to sign on the carveouts? Now, you want the purchase agreement assigned to you?

What exactly are you trying to accomplish here?

**From:** Allen Sragow [mailto:sragow@sragow.com]
**Sent:** Monday, July 09, 2007 8:54 PM
**To:** Friedman, Stephen
**Subject:** Re: loan docs

We will need an assignment agreement, assigning the purchase agreement from First Republic to the LLC we are forming (

AI001438

Westland Industries Southeast LLC, a California limited liability company). Please let me know what further detail you need, if any.

—— Original Message ——
**From:** Friedman, Stephen
**To:** Allen Sragow
**Sent:** Monday, July 09, 2007 4:04 PM
**Subject:** RE: loan docs

I do not have the docs.  I will get them from the attorneys handling the closing.

---

**From:** Allen Sragow [mailto:sragow@sragow.com]
**Sent:** Monday, July 09, 2007 7:00 PM
**To:** Friedman, Stephen
**Subject:** loan docs

Stephen,

Please email me the loan docs on the Retail Portfolio.

Thanks,

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.


TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

AI001439

| | |
|---|---|
| From: | Friedman, Stephen |
| Sent: | Monday, July 09, 2007 09:56 PM |
| To: | sragow@sragow.com |
| Cc: | Anna Chase; Michael Libraty; Allen Alevy |
| Subject: | Re: loan docs |

You will need the consent and approval of Citibank, and will need to sign the
carveouts. I understood from Al that he did not want that. Please clarify.

Stephen Friedman, Esq.
Buchanan Ingersoll _Rooney PC
One Chase Manhattan Plaza, 35th Floor
New York, New York 10005
Tel: 212.440.4439
Fax: 212.440.4401
www.bipc.com

----- Original Message -----
From: Allen Sragow <sragow@sragow.com>
To: Friedman, Stephen
Cc: Anna Chase <anna@aptsrus.com>; michael@aptsrus.com <michael@aptsrus.com>
Sent: Mon Jul 09 21:46:42 2007
Subject: Fw: loan docs

It can take place immediately after closing. I am trying to have everything put
in the new LLC owned 50/50, which was our understanding of this deal. First
Republic has this right inder the purchase agreement.

----- Original Message -----
From: Friedman, Stephen <mailto:stephen.friedman@bipc.com>
To: Allen Sragow <mailto:sragow@sragow.com>
Cc: salevy@bankersllc.com
Sent: Monday, July 09, 2007 6:02 PM
Subject: RE: loan docs

Are you kidding? That is not going to happen. The deal is about to close and
all the docs, opinions, org charts, etc. have been completed and signed off by
the bank. It is beyond late in the game to even think about having the purchase
agreement assigned. Not going to happen or even be considered.

Also, Al wanted to not be in the deal or he would have to disclose to Citibank
that he is a partner and he would have to sign on the carveouts? Now, you want
the purchase agreement assigned to you?

What exactly are you trying to accomplish here?

From: Allen Sragow [mailto:sragow@sragow.com]
Sent: Monday, July 09, 2007 8:54 PM
To: Friedman, Stephen
Subject: Re: loan docs

We will need an assignment agreement, assigning the purchase agreement from First
Republic to the LLC we are forming (
Westland Industries Southeast LLC, a California limited liability company).
Please let me know what further detail you need, if any.

----- Original Message -----
From: Friedman, Stephen <mailto:stephen.friedman@bipc.com>
To: Allen Sragow <mailto:sragow@sragow.com>
Sent: Monday, July 09, 2007 4:04 PM

AI001434

Subject: RE: loan docs

   I do not have the docs.  I will get them from the attorneys handling the
closing.

_____

   From: Allen Sragow [mailto:sragow@sragow.com]
   Sent: Monday, July 09, 2007 7:00 PM
   To: Friedman, Stephen
   Subject: loan docs


   Stephen,

   Please email me the loan docs on the Retail Portfolio.

   Thanks,

   Allen P. Sragow
   Sragow _Sragow
   6665 Long Beach Boulevard, Suite B-22
   Long Beach, CA 90805
   (310) 639-0782

   TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication
(including attachments) was not intended or written to be used, and it cannot be
used, by you for the purpose of (1) avoiding any penalty that may be imposed by
the Internal Revenue Service or (2) promoting, marketing or recommending to
another party any transaction or matter addressed herein. If you would like such
advice, please contact us.

   Above email is for intended recipient only and may be confidential and protected
by attorney/client privilege.
   If you are not the intended recipient, please advise the sender immediately.
   Unauthorized use or distribution is prohibited and may be unlawful.


TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication
(including attachments) was not intended or written to be used, and it cannot be
used, by you for the purpose of (1) avoiding any penalty that may be imposed by
the Internal Revenue Service or (2) promoting, marketing or recommending to
another party any transaction or matter addressed herein. If you would like such
advice, please contact us.

Above email is for intended recipient only and may be confidential and protected
by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.


TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication
(including attachments) was not intended or written to be used, and it cannot be
used, by you for the purpose of (1) avoiding any penalty that may be imposed by
the Internal Revenue Service or (2) promoting, marketing or recommending to
another party any transaction or matter addressed herein. If you would like such
advice, please contact us.

Above email is for intended recipient only and may be confidential and protected
by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

AI001435

## Allen Sragow

| | |
|---|---|
| **From:** | "Allen Sragow" <sragow@sragow.com> |
| **To:** | <closing@ltatitle.com> |
| **Cc:** | "Friedman, Stephen" <stephen.friedman@bipc.com>; <salevy@bankersllc.com>; <michael@aptsrus.com>; "Anna Chase" <anna@aptsrus.com> |
| **Sent:** | Tuesday, July 10, 2007 2:22 PM |
| **Subject:** | Instructions re: $13,000,000 |

To Land Title Associates:

I am writing on behalf of my clients Allen Alevy and Amusement Industry (whom I represent as California counsel), the entity that deposited a wire transfer of $13,000,000.00 to the Land Title Associates Escrow Account (ABA # 021407912, Account Number 5514007904) on about June 29, 2007.

Please do not release any of the $13,000,000.00 without written authorization from my office.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

7/10/2007

AI000154

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Tuesday, July 10, 2007 05:22 PM |
| **To:** | closing@ltatitle.com |
| **CC:** | Friedman, Stephen; salevy@bankersllc.com; michael@aptsrus.com; Anna Chase |
| **Subject:** | Instructions re: $13,000,000 |

To Land Title Associates:

I am writing on behalf of my clients Allen Alevy and Amusement Industry (whom I represent as California counsel), the entity that deposited a wire transfer of $13,000,000.00 to the Land Title Associates Escrow Account (ABA # 021407912, Account Number 5514007904) on about June 29, 2007.

Please do not release any of the $13,000,000.00 without written authorization from my office.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

AI001225

**Michael Libraty**

From:        Michael Libraty
Sent:        Wednesday, July 11, 2007 2:46 PM
To:          'Friedman, Stephen'
Cc:          'salevy@bankersllc.com'
Subject:     Here is Alevy family's revised structure for Colonial deal



Alevy Connection
to Southeast ...        Please see attachment outlining the connection.

It is no longer a loan transaction.

You will need to modify the two assignments you created.

Add in the grant deeds described in my attachment, and we're done.

- Michael Libraty

1

AI000161

## STRUCTURE OF ALEVY CONNECTION TO COLONIAL TRANSACTION

1.      There is no longer a loan.  The $13 million from Professional Business Services, Inc., a California corporation ("PBS") is a straight contribution for the benefit of Mark Stern / Joshua Safrin so that the entities they control can purchase the 11 properties from Colonial Realty.

2.      In return for this benefit provided by PBS to Stern/Safrin, Stern/Safrin shall before closing sign 11 grant deeds post-dated to date of closing from FIRST REPUBLIC GROUP REALTY LLC (we presume will be title holder of properties) to PBS;

        AND, Stern/Safrin will by Agreements (similar to ones you prepared) assign to PBS, effective so as to be concurrent with closing, all interests in the entities.

3.      Stern/Safrin have limited recourse: PBS has 45 days to receive return of $15 million for having contributed $13 million to close the purchase.  The $15 million can be paid from any source, including Stern/Safrin.

4.      If within 45 days after closing/concurrent assignment PBS gets its $15 million, then the day after funds clear PBS assigns all interests in the entities back to Stern/Safrin and returns the unrecorded grant deeds to them.

        a.      In the interim 45 days, PBS agrees not record the grant deeds or to materially or significantly alter the properties owned by the entities, i.e., to operate as shopping centers.

5.      If within 45 days after closing/concurrent assignment PBS does NOT get its $15 million, there is no assignment of anything back to Stern.  PBS owns the entities forever without recourse, right, title or interest by Stern/Safrin.

6.      Whether or not $15 million is paid to PBS within the 45 days, after the 45th day Stern/Safrin and PBS agree to enter into a mutual release of all known and unknown claims.

7.      If PBS receives $15 million in time and thus re-assigns its interests back to Stern/Safrin, and if during the 45 days of shopping center operation by PBS it put its own monies into the business for operation, the Stern/Safrin entities must thereafter reimburse PBS for those monies placed into the business, over a reasonably short period of time with 10% simple interest.

8.      If there are excess funds at Colonial Realty - FRGR LLC closing, they belong to the borrower/owner, FRGR LLC, and must be left for it as operations reserve.

9.      Any dispute is California law, California forum and attorney's fees to prevailing party.

AI000162

**Allen Sragow**

From:     Steven Alevy
Sent:     Monday, July 16, 2007 8:10 AM
To:       sragow@sragow.com
Subject:  FW: Instructions re: $13,000,000

**From:** Ephraim Frenkel [mailto:EFrenkel@ltatitle.com]
**Sent:** Friday, July 13, 2007 4:13 PM
**To:** salevy@bankersllc.com
**Subject:** RE: Instructions re: $13,000,000

Steve,
A rep from Citi is working with my bookkeeper. Wires are going to fly in minutes if not less

**From:** Steven Alevy [mailto:salevy@bankersllc.com]
**Sent:** Friday, July 13, 2007 3:57 PM
**To:** Ephraim Frenkel
**Cc:** Friedman, Stephen
**Subject:** RE: Instructions re: $13,000,000

You are hereby authorized to release $13,000,000 from escrow. The interest earned should be returned to originator.

Steven Alevy
Managing Director
Bankers Capital
575 Madison Ave, 10th Fl
New York, NY, 10022
O: 212-605-0460 ext. 6794
F: 212-605-0482

E-Mail: salevy@BankersLLC.com

**From:** Ephraim Frenkel [mailto:EFrenkel@ltatitle.com]
**Sent:** Friday, July 13, 2007 2:59 PM
**To:** Allen Sragow
**Cc:** Friedman, Stephen; salevy@bankersllc.com; michael@aptsrus.com; Anna Chase; mstern@firstrepublicgrp.com
**Subject:** RE: Instructions re: $13,000,000

Steve Alevy has verbally authorized the release of the $13,000,000 we are holding. Pursuant to your instructions, please send me written authorization to release these funds.

**From:** Allen Sragow [mailto:sragow@sragow.com]
**Sent:** Tuesday, July 10, 2007 5:23 PM
**To:** Ephraim Frenkel
**Cc:** Friedman, Stephen; salevy@bankersllc.com; michael@aptsrus.com; Anna Chase
**Subject:** Instructions re: $13,000,000

To Land Title Associates:

I am writing on behalf of my clients Allen Alevy and Amusement Industry (whom I represent as California counsel), the entity that deposited a wire transfer of $13,000,000.00 to the Land Title Associates Escrow Account (ABA # 021407912, Account Number 5514007904) on about June 29, 2007.

Please do not release any of the $13,000,000.00 without written authorization from my office.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

2/12/2008

AI000169

# SRAGOW & SRAGOW
### LAW OFFICES
6665 LONG BEACH BOULEVARD, SUITE B22
LONG BEACH, CALIFORNIA 90805
TELEPHONE (310) 639-0782
FACSIMILE (310) 639-7210

**SENT VIA FACSIMILE ONLY**

July 16, 2007

Ephraim Frankel
Land Title Associates Escrow

Stephen Friedman
Buchanan Ingersoll & Rooney PC

     Re:    <u>Colonial Capital Realty Portfolio</u>

Dear Mr. Frankel and Mr. Friedman:

     I am counsel for Amusement Industries, Westland Industries, Professional Business Services, CBA, Inc. and Allen Alevy. I am writing concerning the $13,000,000 deposited into escrow in connection with the purchase of the Colonial Capital Realty Portfolio.

     We have been working closely with your offices during the last two weeks in an effort to close once all conditions were met. To ensure that all conditions were met before Amusement's $13,000,000 was disbursed, I instructed in writing the Land Title Associates Escrow to ensure that the money would not be disbursed without my written authorization. Mr. Allen Alevy instructed in writing Mr. Friedman to make sure that Mr. Friedman would not provide authorization without first obtaining approval from Mr. Alevy.

     We are now discovering that those funds were disbursed, on the instructions of Mr. Friedman alone, without authorization from Mr. Alevy or me. This is no mere technicality. Not all documents were executed and returned. The agreed upon conditions were not fulfilled, and the money is now in jeopardy. I found this out from Mr. Frankel. I attempted to confer with Mr. Friedman on this issue but he has not returned my calls.

     Nevertheless, in an effort to avoid unnecessary expenditure of effort and further funds, we have once again listed the elements necessary for Amusement to now ratify the disbursement. It is our understanding that the necessary parties are being assembled today to execute these documents, so with that in mind we present the list. Within the enclosed items and events list, we ask you to modify earlier documents you prepared and to prepare two new documents, a re-assignment agreement and a mutual release. Please prepare all documents and provide for our review promptly.

AI000170

Please take notice, however, that we do not waive any rights or remedies in connection with the release of funds, and indeed reserve all rights to redress what has taken place. It is our earnest hope that we will be able to resolve this problem in short order. If these documents are not signed and faxed to our office by the end of business, please contact us as soon as possible to discuss where we stand.

Very truly yours,

Allen P. Sragow

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Monday, July 16, 2007 01:01 AM |
| **To:** | Ephraim Frenkel |
| **CC:** | Friedman, Stephen; salevy@bankersllc.com; michael@aptsrus.com; Anna Chase; mstern@firstrepublicgrp.com |
| **Subject:** | Re: Instructions re: $13,000,000 |

Mr. Frankel,

While I was not in my office on Friday, I was in regular contact with my office and was kept aware of the status of the closing. As of noon California on Friday, Mr. Alevy confirmed with you and Farida of my office that documents were missing and that the funds were not authorized to be released. I am assuming then, that your email was prior to that conversation. As the hours passed on Friday, we did not receive all of the documents necessary to release, and we did not provide written authorization.

At about 1:30 PM California time, Mr. Alevy tried to call you to again let you know that even by that time the remainder of the documents were not in, and that we were not providing our authorization to release. Mr. Alevy informed me that he was unable to reach you at that time.

As soon as all of the documents are in I will let you know that we are ready to provide the written release. If, by any error that took place on Friday, the funds were released, do whatever is necessary to retrieve the funds, so that this does not become a much bigger problem than $13,000,000.

Allen Sragow

---

> ----- Original Message -----
> **From:** Ephraim Frenkel
> **To:** Allen Sragow
> **Cc:** Friedman, Stephen ; salevy@bankersllc.com ; michael@aptsrus.com ; Anna Chase ;
> mstern@firstrepublicgrp.com
> **Sent:** Friday, July 13, 2007 11:58 AM
> **Subject:** RE: Instructions re: $13,000,000
>
> Steve Alevy has verbally authorized the release of the $13,000,000 we are holding. Pursuant to your instructions, please send me written authorization to release these funds.
>
> ---
>
> **From:** Allen Sragow [mailto:sragow@sragow.com]
> **Sent:** Tuesday, July 10, 2007 5:23 PM
> **To:** Ephraim Frenkel
> **Cc:** Friedman, Stephen; salevy@bankersllc.com; michael@aptsrus.com; Anna Chase
> **Subject:** Instructions re: $13,000,000
>
> To Land Title Associates:
>
> I am writing on behalf of my clients Allen Alevy and Amusement Industry (whom I represent as California counsel), the entity that deposited a wire transfer of $13,000,000.00 to the Land Title Associates Escrow Account (ABA # 021407912, Account Number 5514007904) on about June 29, 2007.
>
> Please do not release any of the $13,000,000.00 without written authorization from my office.
>
> Allen P. Sragow
> Sragow & Sragow
> 6665 Long Beach Boulevard, Suite B-22
> Long Beach, CA 90805
> (310) 639-0782

AI001420

| | |
|---|---|
| **From:** | Friedman, Stephen |
| **Sent:** | Monday, July 16, 2007 04:10 PM |
| **To:** | Allen Sragow |
| **Subject:** | RE: Escrow |

No, I did not.  I was not involved in this part of the transaction.
Please, you ought to know better.

-----Original Message-----
From: Allen Sragow [mailto:sragow@sragow.com]
Sent: Monday, July 16, 2007 2:01 AM
To: Friedman, Stephen
Subject: Re: Escrow

We did not authorize release of any funds. Did you?


Allen

----- Original Message -----
From: "Friedman, Stephen" <stephen.friedman@bipc.com>
To: <sragow@sragow.com>
Cc: <michael@aptsrus.com>; <salevy@bankersllc.com>
Sent: Monday, July 09, 2007 6:58 PM
Subject: Re: Escrow


> Done.
>
>
> _____
> Stephen Friedman, Esq.
> Buchanan Ingersoll _Rooney PC
> One Chase Manhattan Plaza, 35th Floor
> New York, New York  10005
> Tel: 212.440.4439
> Fax: 212.440.4401
> www.bipc.com
>
> ----- Original Message -----
> From: Allen Sragow <sragow@sragow.com>
> To: Friedman, Stephen
> Cc: michael@aptsrus.com <michael@aptsrus.com>
> Sent: Mon Jul 09 21:53:05 2007
> Subject: Escrow
>
> Stephen,
>
> Please do not authorize release of the $13,000,000 from the Alevys in
> escrow without specific authorization from Allen Alevy or myself.
>
> Allen P. Sragow
> Sragow _Sragow
> 6665 Long Beach Boulevard, Suite B-22
> Long Beach, CA 90805
> (310) 639-0782
>
>
> TAX ADVICE DISCLAIMER: Any federal tax advice contained in this
> communication (including attachments) was not intended or written to
be
> used, and it cannot be used, by you for the purpose of (1) avoiding
any
> penalty that may be imposed by the Internal Revenue Service or (2)
> promoting, marketing or recommending to another party any transaction
or
> matter addressed herein. If you would like such advice, please contact

us.
>
> Above email is for intended recipient only and may be confidential and

> protected by attorney/client privilege.
> If you are not the intended recipient, please advise the sender
> immediately.
> Unauthorized use or distribution is prohibited and may be unlawful.
>
>


TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication
(including attachments) was not intended or written to be used, and it cannot be
used, by you for the purpose of (1) avoiding any penalty that may be imposed by
the Internal Revenue Service or (2) promoting, marketing or recommending to
another party any transaction or matter addressed herein. If you would like such
advice, please contact us.

Above email is for intended recipient only and may be confidential and protected
by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

AI001414

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Monday, July 16, 2007 04:42 PM |
| **To:** | Friedman, Stephen |
| **CC:** | salevy@bankersllc.com; closing@ltatitle.com; michael@aptsrus.com |
| **Subject:** | Re: Letter of today |

My apologies to Mr. Friedman. I was so informed by Ephraim Frankel. We need to get to the bottom of this.

— Original Message —
**From:** Friedman, Stephen
**To:** Allen Sragow
**Cc:** salevy@bankersllc.com ; closing@ltatitle.com
**Sent:** Monday, July 16, 2007 1:15 PM
**Subject:** RE: Letter of today

What is the source of you misguided notion that I authorized the release of the wire?  Do tell.

**From:** Allen Sragow [mailto:sragow@sragow.com]
**Sent:** Monday, July 16, 2007 4:05 PM
**To:** Friedman, Stephen; closing@ltatitle.com
**Cc:** salevy@bankersllc.com
**Subject:** Letter of today

For your convenience, a scan of the letter of today.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

AI001424

| | |
|---|---|
| **From:** | Allen Sragow |
| **Sent:** | Monday, July 16, 2007 06:13 PM |
| **To:** | Friedman, Stephen |
| **Subject:** | Re: Letter of today |

Please call me. We are anxious to understand what is going on. It is beginning to sound like the escrow company absconded with the $13,000,000. Are escrow companies licensed/bonded in New York?

—— Original Message ——
From: Friedman, Stephen
To: Allen Sragow
Cc: salevy@bankersllc.com ; closing@ltatitle.com
Sent: Monday, July 16, 2007 1:15 PM
Subject: RE: Letter of today

What is the source of you misguided notion that I authorized the release of the wire?  Do tell.

From: Allen Sragow [mailto:sragow@sragow.com]
Sent: Monday, July 16, 2007 4:05 PM
To: Friedman, Stephen; closing@ltatitle.com
Cc: salevy@bankersllc.com
Subject: Letter of today

For your convenience, a scan of the letter of today.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

AI001425

| From: | Allen Sragow |
|---|---|
| Sent: | Tuesday, July 17, 2007 01:51 PM |
| To: | closing@ltatitle.com |
| CC: | salevy@bankersllc.com; Friedman, Stephen; michael@aptsrus.com; Anna Chase |
| Subject: | First Republic Group Escrow |

Mr. Frankel,

Please provide to my office, as soon as possible, a final closing statement from the retail portfolio, or a preliminary closing statement that is up to date as of today.

Allen P. Sragow
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

AI000597

| | |
|---|---|
| **From:** | Steven Alevy |
| **Sent:** | Friday, July 27, 2007 12:02 PM |
| **To:** | stephen.friedman@bipc.com |
| **Cc:** | salevy@bankersllc.com |
| **Subject:** | FW: colonial portfolio: escrow return |

Frankel is not returning the interest income from the escrow. Could you please talk to him so that he takes care of it.

---- Original Message ----
From: "Allen Sragow" <sragow@sragow.com>
Date: 7/26/07 8:10 pm
To: "salevy@bankersllc.com" <salevy@bankersllc.com>
Subj: Georgia: escrow return
Steve,

I just heard from UBS that the leftover money has not been disbursed. What is going on?

Allen P. Sragow
Sragow _Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, CA 90805
(310) 639-0782

AI000663

**SRAGOW & SRAGOW**
LAW OFFICES
6665 LONG BEACH BOULEVARD, SUITE B22
LONG BEACH, CALIFORNIA 90805
TELEPHONE (310) 639-0782
FACSIMILE (310) 639-7210

**SENT VIA FACSIMILE ONLY** – (646) 253-1275

August 6, 2007

Ephraim Frankel
Land Title Associates Escrow

    Re:    Colonial Capital Realty Portfolio

Dear Mr. Frankel:

    I am counsel for Amusement Industry, Westland Industries, Professional Business Services, CBA, Inc. and Allen Alevy. I am writing concerning the $13,000,000 deposited into escrow in connection with the purchase of the Colonial Capital Realty Portfolio.

    I have repeatedly attempted to contact you concerning the $13,000,000 held in escrow without success. I am dumbfounded as to why your office would even retain the remaining interest on account, despite our request for its return.

    I am hereby demanding return of all monies in your possession held on behalf of Amusement Industry, Westland Industries, Professional Business Services, CBA, Inc. and Allen Alevy. If I do not receive in my office within 48 hours either the funds or an explanation why you have not released the funds, we will have no choice but to commence litigation. I remind you again that I will be requesting electronic discovery and that you must preserve all electronic and other data, even that which would be deleted in the normal course of business.

                    Very truly yours,

                    Allen P. Sragow

cc:    Stephen Friedman
        Steven Alevy

AI000314

# SRAGOW & SRAGOW
### LAW OFFICES
6665 LONG BEACH BOULEVARD, SUITE B22
LONG BEACH, CALIFORNIA 90805
TELEPHONE (310) 639-0782
FACSIMILE (310) 639-7210

**SENT VIA FACSIMILE ONLY** - (646) 253-1275

August 8, 2007

Ephraim Frankel
Land Title Associates Escrow

>       Re:    Colonial Capital Realty Portfolio

Dear Mr. Frankel:

I am following up on my letter of August 6, 2007. I am aware that you released the $13,000,000 held in escrow, as I described in my letter of July 27, 2007. It is my understanding that you still have the interest that accrued on the $13,000,000. I am asking that you return the accrued interest (which I estimate exceeds $20,000) along with your accounting describing how you calculated the amount.

Please note that neither this request nor receipt or deposit of the interest by my clients in any way waives any rights of my clients as to any party involved in this transaction, including you and your company.

Very truly yours,

Allen P. Sragow

cc:    Stephen Friedman
       Steven Alevy

**From:**              Robert Friedman
**Sent:**              Tuesday, September 11, 2007 12:58 PM
**To:**                mstern@firstrepublicgrp.com
**CC:**               'Steven Alevy'; 'Friedman, Stephen'
**Subject:**          RE: portfolio questions - follow up
**Attachments:**    att92bba.jpg; att92bba.jpg

Dear Moshe,

I'm not sure at all what you mean by "lapse of three weeks." I understood all along that you wanted to refinance and I continue to try to help you do so. We've put a lot of time into this, both for the acquisition financing and now, for the refinancing. In that regard, I anxiously continue to await the missing information (items in red below etc..). There was never any lapse on our part and we look forward to helping you in any way we can.

With regards to a refinancing, you're the client, so the timeframe was and is totally up to you. In the past you've indicated you wanted to buy out Alevy in 60 days from closing of the original financing - has that changed? The deadline to buy them out is certainly fast approaching.

Respectfully, please understand that I can't prepare a presentable book with out all the missing information. Chief among them, as indicated many times, including in the emails below, is the final closing statements on the Citibank loan -- please email or fax them to me as soon as you are ready to proceed with the refinancing.

Of course, I also can't prepare a book that says , as you wrote, "there is a couple of tenants that went dark,we signed up 6 deals one replaces basically the other" and then direct lenders to call you for further information. It simply won't work. I need the actual documents, current rent rolls, financials, current tenants etc....to prepare the book and to approach lenders.

The DD takes work on both our parts, but, for better or worse, it's an unavoidable prerequisite to having lenders fork over tens of millions of dollars.

If you want us to work on securing a refinancing, you will need to get us the basic information which we've requested many times, so we can move forward and begin getting quotes from lenders on your behalf.

Best,

Robert

———

From: Allen Sragow [mailto:sragow@sragow.com]
Sent: Monday, September 10, 2007 6:43 PM
To: Robert Friedman; michael@aptsrus.com; Anna Chase
Subject: Re: portfolio questions - follow up

Why not respond: "Timeframe? I thought you wanted to refinance out Alevy in 60 days?"

----- Original Message -----
From: Robert Friedman <mailto:robert@bankersllc.com>
To: Steven Alevy <mailto:salevy@bankersllc.com> ; michael@aptsrus.com <mailto:michael@aptsrus.com> ; Allen P. Sragow <mailto:sragow@sragow.com>
Cc: 'Steven Alevy' <mailto:salevy@bankersllc.com>
Sent: Monday, September 10, 2007 3:41 PM
Subject: FW: portfolio questions - follow up

stern's response...

———

From: mstern@firstrepublicgrp.com <mailto:mstern@firstrepublicgrp.com>
[mailto:mstern@firstrepublicgrp.com]

CONFIDENTIAL                                          FR0001608

Sent: Monday, September 10, 2007 6:35 PM
To: Robert Friedman
Cc: Friedman, Stephen
Subject: Re: portfolio questions - follow up


Robert
there isn't much more info, than I already  gave you,is there any deals being done on 2 yrs
t-bills?(so why are they doing libor deals?)there is a couple of tenants that went dark,we signed up
6 deals one replaces basically the other ,anything else call me first im here,there was a lapse of 3
weeks that I thought a book was being prepared,and.............. anyways call me give me timeframes
(which I asked you in my previous email)I don't want to go trough a new exhausting dd if it;s going
to take 2 months at which stage are you ?which banks?what terms? shana tova csiva vchatima tova
Mark Stern
President and CEO
First Republic Group
www.firstrepublicgrp.com <http://www.firstrepublicgrp.com>

----- Original Message -----
From: Robert Friedman <mailto:robert@bankersllc.com>
To: mstern@firstrepublicgrp.com <mailto:mstern@firstrepublicgrp.com>
Cc: 'Steven Alevy' <mailto:salevy@bankersllc.com> ; jon@bankersllc.com <mailto:jon@bankersllc.com> ;
'Friedman, Stephen' <mailto:stephen.friedman@bipc.com>
Sent: Monday, September 10, 2007 2:04 PM
Subject: RE: portfolio questions - follow up


Hi Moshe,

I haven't heard from at you at all - by phone or by email, so I just wanted to check-in once again
with you. The 2 year Treasury is down to 4.16%, from 4.55% last month, so the trend is in our favor
right now considering we've all been in agreement that it is critical to refinance as soon as
possible.

As stated in previous emails, we need much additional information in order to get the best loan on
your behalf.

With your permission, I'd like to contact the leasing agents at Jones Lang as well as the property
managers so we can expedite getting the financial information the banks require in order for us to
secure the best possible refinancing for the deal.

Please reply ASAP.

Thanks & Shannah Tovah,

Robert
Tel: (212) 605-0460 x-6795



From: Robert Friedman [mailto:robert@bankersllc.com]
Sent: Tuesday, September 04, 2007 8:39 PM
To: 'mstern@firstrepublicgrp.com'
Cc: 'Steven Alevy'; 'jon@bankersllc.com'; 'Friedman, Stephen'
Subject: RE: portfolio questions - follow up


Hi Moshe,

Hope you (and the shopping centers!) had a good labor day weekend.

In addition to the items below in Red - we will need the following basic information - current
income/expense for each of the 11 properties.....the last version we have of for current NOI is the
attached document which only has actual numbers through February 2007. So we need to see March-July
2007 and August as soon as it's available. In addition, we really need to see current rent roll ASAP
for each of the properties in order to prepare the info package for lenders. It will be impossible
for us to move forward without that, so if you'd like us to work on the refinancing, we need this
information ASAP.

IF there's anyone you think could help us get this information, please let us know who they are ASAP

CONFIDENTIAL                                                                                  FR0001609

and we will contact.

You wrote below that  "More importantly is timing." so for the sake of timing , please do not delay
any further in sending us the items in red above and below.
You also wrote that: "What time frame are you looking at to close this?  There isn't more info.
This is very thorough.  It was used by Citi. I will try to answer this.  More importantly is
timing.  Are we talking about a week, month, ten days? Do we have any proposals?  Outlooks?  Who are
the banks?"
but it's not our timing that's the issue, and there are no projections for week o month because as
should be quite clear, 6 month info from for Citibank was good in July, but to refinance in
September, we need updated info, not too mention the final closing statements of the Citibank loan.


Looking forward to working with you on this,

Robert


――――
From: Robert Friedman [mailto:robert@bankersllc.com]
Sent: Wednesday, August 29, 2007 2:26 PM
To: 'mstern@firstrepublicgrp.com'
Cc: 'Steven Alevy'; 'jon@bankersllc.com'; 'Friedman, Stephen'
Subject: RE: portfolio questions – follow up
Importance: High


I'm sure you understand quite well that the documentation used to secure the Citibank loan is NOT
sufficient for what is needed to get refinancing.
For example, although we received some documents from you regarding the Citibank loan (1st + Mezz) a
few weeks ago, we still haven't received the Closing Statement, despite numerous requests.

A. We need to see it for ourselves ASAP.
B. As I'm sure you know,  NO lender will look at the deal seriously until they know what the sources
and uses are.


――――
From: mstern@firstrepublicgrp.com [mailto:mstern@firstrepublicgrp.com]
Sent: Tuesday, August 28, 2007 4:30 PM
To: Robert Friedman
Cc: 'Steven Alevy'; jon@bankersllc.com; 'Friedman, Stephen'
Subject: Re: portfolio questions – follow up


I will get back to you.  It was quiet on the horizon.  I have supplied with all the info which was
satisfactory.  We closed with Citi on that info.  We don't have yet updated info as we closed in the
mid of July and we are only in August.  Steve called me yesterday.  I haven't had a minute to return
his call.  I will call him later today. I really did not understand.  The silence meant that we are
not moving anywhere.  What time frame are you looking at to close this?  There isn't more info.
This is very thorough.  It was used by Citi.  I will try to answer this.  More importantly is
timing.  Are we talking about a week, month, ten days? Do we have any proposals?  Outlooks?  Who are
the banks?

----- Original Message -----
From: Robert Friedman <mailto:robert@bankersllc.com>
To: mstern@firstrepublicgrp.com <mailto:mstern@firstrepublicgrp.com>
Cc: 'Steven Alevy' <mailto:salevy@bankersllc.com> ; jon@bankersllc.com <mailto:jon@bankersllc.com> ;
'Friedman, Stephen' <mailto:stephen.friedman@bipc.com>
Sent: Tuesday, August 28, 2007 3:40 PM
Subject: RE: portfolio questions – follow up


Hi Moshe,

Haven't heard from you! Hope you're doing well.
We obviously will need the additional information in order to secure any refinancing from the banks
and there is little we can do at the moment without that information....Please review the list(s)
below in red and have whatever you can emailed to me ASAP.

In addition, of course, we'll need P&L for all the properties for July and for August (when they're ready) as well as the most current leasing updates.  I assume the JLL leasing agents as well as the individual property managers must be providing you with frequent reports of their activities

Please contact me with any questions ASAP.

Best,

Robert

Tel: (212) 605-0460 x-6795

_____

From: Robert Friedman [mailto:robert@bankersllc.com]
Sent: Thursday, August 23, 2007 4:31 PM
To: 'mstern@firstrepublicgrp.com'
Cc: 'Steven Alevy'; 'jon@bankersllc.com'; 'Friedman, Stephen'
Subject: RE: portfolio questions - follow up


Thanks for the good wishes --  zeh hayom she-kivinu lo, shoyn a langeh tzeit!
I'm also glad to hear the hurricaine down South didn't sweep you away.......

Of course, we need updated information from you ASAP to prepare the book and to make the case to the banks - so please send it to us ASAP.

That, indeed, would be my wedding gift,,,,

Looking forward,

Naftali

aka

Robert Friedman
Managing Director
Bankers Capital Realty Advisors
575 Madison Avenue, 10th Floor
New York, NY 10022

Tel: (212) 605-0460 x-6795
Email: robert@bankersllc.com <mailto:robert@bankersllc.com>
Website: www.bankersllc.com <http://www.bankersllc.com/>


_____

From: mstern@firstrepublicgrp.com [mailto:mstern@firstrepublicgrp.com]
Sent: Thursday, August 23, 2007 3:51 PM
To: Robert Friedman
Cc: 'Steven Alevy'; jon@bankersllc.com; 'Friedman, Stephen'
Subject: Re: portfolio questions - follow up


Hi Robert,

Firstly, mazel tov!  It should be a binyan adei ad until 120 healthy
and good years.

Where are we with the first loan?  I understood from Steve that he is working on 150 - 155 to take
out everything.  Any update?  Which bank?

What's happening with the 180 page book? Is that coming through? You know that time is of the
essence and Steve is going to pull some strings and favors of banks to make this happen.

Let's get this deal done - that can be my wedding gift...

Btw, can you please provide me with your address where I can send something?

CONFIDENTIAL

Thanks

----- Original Message -----
From: Robert Friedman <mailto:robert@bankersllc.com>
To: mstern@firstrepublicgrp.com <mailto:mstern@firstrepublicgrp.com>
Cc: 'Steven Alevy' <mailto:salevy@bankersllc.com> ; jon@bankersllc.com <mailto:jon@bankersllc.com> ;
'Friedman, Stephen' <mailto:stephen.friedman@bipc.com>
Sent: Thursday, August 23, 2007 12:33 PM
Subject: RE: portfolio questions - follow up


Hi Moshe,

Haven't heard from you rE: email below...just wanted to check in...please update us on leasing
etc....ASAP.

Thanks,

Robert


From: Robert Friedman [mailto:robert@bankersllc.com]
Sent: Wednesday, August 15, 2007 5:19 PM
To: 'jon@bankersllc.com' <mailto:'jon@bankersllc.com'>; 'mstern@firstrepublicgrp.com'
<mailto:'mstern@firstrepublicgrp.com'>
Cc: 'Steven Alevy'
Subject: RE: portfolio questions - follow up
Importance: High


Dear Moshe,

Hope all is well.
Please reply re: the all items below.
Now that you've had a chance to spend some time down South, post-closing,
with the property managers, JLL leasing agents etc... there must be some new leasing activity -
so please make sure to provide us with an update ASAP.

We look forward to hearing from you today,

Best,

Robert


_____
From: jon@bankersllc.com [mailto:jon@bankersllc.com]
Sent: Tuesday, August 07, 2007 4:23 PM
To: mstern@firstrepublicgrp.com
Cc: Steven Alevy; Robert Friedman
Subject: portfolio questions - follow up


Mr. Stern,

Please see the list of outstanding items that we are still looking for for the portfolio.  Still of
extreme importance is getting the executed closing statement.


1)     Please provide the final executed Citibank closing statements for the senior and mezzanine
loan.

2)     Please provide a list of all of the TENANT termination options at all of the properties.

3)     Please provide the most recent leasing update with any new leasing activity at the
properties.

CONFIDENTIAL                                                                      FR0001612

4)     Please provide a source rent roll and operating statements for Quaker Village.

5)     What is the "marketing" reimbursement for each tenant at these properties, and will it be collected going forward now that the portfolio is no longer owned by Colonial?


Additionally, I went through the Anchor / Major Tenant leases that you sent over and had the following questions.  Potential lenders are going to want most of these answers as well, so please send answers as soon as possible.


ANCHOR ISSUES

1)     Bellwood – Bruno's has terminated their lease?  Why are they on the current rent roll, and who is currently occupying their space?

2)     Decatur – please provide the executed renewal for Decatur.

3)     Decatur – please provide rider B2 of the most recentlease amendment.

4)     Lakeshore – please provide the Belk's Womens store lease.

5)     Lakeshore – please provide the JC Penney lease extension

6)     Montgomery – HH Gregg received a $1.5 million ($41/SF) TI for its space.  Rent is only $250K per annum plus % rent.  This is a very high TI amount, why was this given?

7)     Montgomery North – If Goody's has a lease renewal in its lease then why have they not ret resigned their lease? Whats the issue with this space?

8)     Olde Towne – why did Rite Aid only renew for 3 years, when the original option was for 5? What is the issue here?

9)     Staunton– When did Goody's close?  Are they no longer operating at the property? Peebles has the right to terminate if they are.


Thanks again,


Jon Feirman
Bankers Capital Realty Advisors
212-605-0460 x6796




No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.484 / Virus Database: 269.12.10/976 – Release Date: 8/27/2007 6:20 PM



No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.484 / Virus Database: 269.12.10/976 – Release Date: 8/27/2007 6:20 PM



No virus found in this outgoing message.
Checked by AVG Free Edition.

CONFIDENTIAL

Version: 7.5.484 / Virus Database: 269.12.10/976 - Release Date: 8/27/2007 6:20 PM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.13/998 - Release Date: 9/10/2007 8:48 AM


No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.485 / Virus Database: 269.13.14/999 - Release Date: 9/10/2007 5:43 PM

# EXHIBIT C

PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel: (212) 643-7000
Fax: (212) 643-6500

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMUSEMENT INDUSTRY, INC., a California corporation dba WESTLAND INDUSTRIES; PRACTICAL FINANCE CO., INC., a California corporation, | ) ) ) ) ) | CASE NO. 07 CV 11586 **PLAINTIFFS' AMENDED INITIAL DISCLOSURES** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MOSES STERN, an individual aka MARK STERN; JOSHUA SAFRIN, an individual; FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company; EPHRAIM FRENKEL, an individual; LAND TITLE ASSOCIATES ESCROW, a New York limited liability company, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| ———————————————— | ) | |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Local Civil

Rules of this Court, plaintiffs Amusement Industry, Inc. and Practical Finance Co., Inc.

(collectively, "plaintiffs"), by their undersigned counsel, hereby make the following amended

initial disclosures in the above-captioned action.  These disclosures are based on information

currently available to plaintiffs and are made without waiving any statutory or common law

privilege, including the attorney client and work product privileges, or any objection as to

relevance, materiality or admissibility of information provided herein in this action or in any

other action or proceeding.  Plaintiffs expressly reserve their right to revise, correct, supplement,

amend or clarify the disclosures set forth herein, consistent with the Federal Rules.

**A.    Individuals Likely to Have Knowledge of Discoverable Facts.**

Plaintiffs believe that the following individuals or entities are likely to have knowledge of

discoverable facts that they may use to support their claims and defenses, unless solely for

impeachment:

| **Individual/Entity** | **General Subject Matter Area of Knowledge** |
|---|---|
| Farida Baig, c/o Sragow & Sragow, counsel for Plaintiffs | Communications with E. Frenkel |
| Allen Alevy, c/o Sragow & Sragow, counsel for Plaintiffs | Generally familiar with the transaction |
| Allen Sragow, c/o Sragow & Sragow, counsel for Plaintiffs | Generally familiar with the transaction |
| Avery Egert | Generally familiar with the transaction |
| Joshua Safrin | Generally familiar with the transaction |
| Mark Stern | Generally familiar with the transaction |
| Michael Libraty, c/o Sragow & Sragow, counsel for Plaintiffs | Generally familiar with the transaction |
| Steven Alevy (Bankers Capital) | Generally familiar with the transaction |
| Fidelity National Title Insurance Co. | Generally familiar with the financing for the transaction |
| Citigroup | Generally familiar with the financing for the transaction |
| Ephraim Frankel (Land Title Associates Escrow) | Generally familiar with the escrow for the transaction |
| Land Title Associates Escrow | Generally familiar with the escrow for the transaction |
| Buchanen Ingersol & Rooney | Generally familiar with the transaction |
| Stephen Friedman (Buchanen Ingersol & Rooney) | Generally familiar with the transaction |
| Colonial Properties Trust | Generally familiar with the transaction |
| Jones Lang LaSalle | Knowledge of management of subject |

| **Individual/Entity** | **General Subject Matter Area of Knowledge** |
|---|---|
| | properties |
| Latham & Watkins | Generally familiar with the transaction |
| Leitman, Siegal & Payne | Generally familiar with the transaction |
| Marilu Garcia, c/o Sragow & Sragow, counsel for Plaintiffs | Knowledge of wiring of funds |
| Roman Associates, LTD | Knowledge of use of funds in escrow |
| Young Conaway Starrgatt & Taylor | Knowledge of use of funds in escrow |
| Vintage Insurance | Knowledge of use of funds in escrow |
| Roth Associates CPA | Knowledge of use of funds in escrow |
| Mary Stark | Knowledge of use of funds in escrow |
| Prudential Douglas Elliman | Knowledge of use of funds in escrow |
| Parker Hudson Rainer | Knowledge of use of funds in escrow |
| Odin Feldman Pittleman | Knowledge of use of funds in escrow |
| NRAI Entity Services LLC | Knowledge of use of funds in escrow |
| Carruthers & Roth | Knowledge of use of funds in escrow |
| Hoffinger Stern & Ross | Generally familiar with the transaction |
| GMAC IPG | Knowledge of use of funds in escrow |
| Frank Dwyer | Knowledge of use of funds in escrow |
| Eisenpress and Reiss, Esq. | Knowledge of use of funds in escrow |
| Chatham Financial Corporation | Knowledge of use of funds in escrow |
| Cavazos Hendricks & Poirot, PC | Knowledge of use of funds in escrow |
| Integra | Knowledge of use of funds in escrow |
| Burr Forman | Knowledge of use of funds in escrow |
| Bruce Minsky, Esq. | Knowledge of use of funds in escrow |
| All Risk Brokerage | Knowledge of use of funds in escrow |
| ACE Capital Group | Knowledge of use of funds in escrow |
| CIBC | Knowledge of Safrin signature |
| UBS Financial | Knowledge of Safrin signature |
| Herrick Feinstein | Generally familiar with the transaction |
| North Fork Bank (Capital One) | Knowledge of receipt and disbursement of escrow funds |
| Tepfer & Tepfer | Knowledge of receipt and disbursement of escrow funds |
| YAHOO, Inc. | Knowledge of Safrin signature |
| Bankers Capital | Generally familiar with the transaction |

**B.**    <u>**Documents.**</u>

Plaintiffs hereby produce the enclosed documents bearing bates numbers AI000001 – AI001524, which may be used to support plaintiffs' claims or defenses herein, unless solely for impeachment.

**C.**    <u>**Damages.**</u>

At this time, plaintiffs anticipate computing their monetary damages, assuming that monetary damages are their sole remedy, as follows:  The estimated market value of the property portfolio is approximately $190,000,000.  The estimated mortgages against the property equal approximately $130,000,000, and the equity value lost to Amusement is therefore $60,000,000.

Plaintiffs reserve the right to amend the foregoing computation as discovery proceeds.

**D.**    <u>**Insurance Agreements.**</u>

At this time, plaintiffs are unaware of any insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated:  May 9, 2008

SILLS CUMMIS & GROSS P.C.

By: _____
    Marc D. Youngelson
    One Rockefeller Plaza
    New York, NY 10020
    Telephone: (212) 643-7000
    Attorneys for plaintiffs

4

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                                  Plaintiffs,

             - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN,
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                                 Defendants.

No. 07 Civ. 11586 (LAK) (GWG)
(ECF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSHUA SAFRIN,

                   Defendant/Third Party-Crossclaim-
                      Counterclaim-Plaintiff,

             - against -

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC GROUP
CORP.,

                       Third Party Defendants,

             - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND
TITLE ASSOCIATES ESCROW,

                   Defendants/Crossclaim Defendants,

             - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.

                   Plaintiffs/Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS STERN AND FIRST REPUBLIC'S ANSWER TO AND CROSS-CLAIMS AGAINST
THIRD PARTY DEFENDANTS STEVEN ALEVY AND BANKERS CAPITAL REALTY ADVISORS LLC**

Defendants Mark Stern ("Stern") and First Republic Realty Group LLC ("First Republic"), by and through their undersigned attorneys, as and for their answer to the cross-claims of third-party defendants Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy dated June 6, 2008 and as and for their cross-claims against Bankers Capital and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

1.        Stern and First Republic do not respond to the allegations set forth in the Counterclaims of Third-Party Defendant Steven Alevy d/b/a Bankers Capital because those counterclaims are asserted against Third-Party Plaintiff Joshua Safrin ("Safrin").

2.        The allegations of paragraph 1 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 1, except admit that Third-Party Defendant Bankers Capital purports to base jurisdiction of its cross-claims under 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

3.        The allegations of paragraph 2 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 2, except admit that Third-Party Defendant Bankers Capital purports to base venue on 28 U.S.C. § 1391(a)(2).

4.        Deny the allegations of paragraph 3, except admit that in or about May 2007, Steven Alevy, on behalf of Bankers Capital solicited Stern and First Republic to engage them to secure financing for First Republic's acquisition of a portfolio of properties from Colonial Realty Limited Partnership ("Colonial").

5.        Deny the allegations of paragraph 4.

6.       Deny the allegations of paragraph 5.

7.       Deny the allegations of paragraph 6, except admit that no fee has been paid to Bankers Capital by either Stern or First Republic.

8.       Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

9.       Deny the allegations of paragraph 8.

10.      Deny the allegations of paragraph 9.

11.      Deny the allegations of paragraph 10.

12.      Deny the allegation of paragraph 11.

13.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

14.      Deny the allegations of paragraph 13.

15.      Deny the allegations of paragraph 14.

16.      Deny the allegations of paragraph 15.

17.      Deny the allegations of paragraph 16, except admit that neither First Republic nor Stern has paid Bankers Capital any fee.

18.      Deny the allegations of paragraph 17

19.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

20.      Deny the allegations of paragraph 19.

21.      Deny the allegations of paragraph 20.

22.      Deny the allegations of paragraph 21.

23.      Deny the allegations of paragraph 22.

24.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

25.     Deny the allegations of paragraph 25.

26.     Deny the allegations of paragraph 26.

27.     Deny the allegations of paragraph 27.

28.     Deny the allegations of paragraph 28.

29.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

30.     Deny the allegations of paragraph 30, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

31.     Deny the allegations of paragraph 31.

32.     Deny the allegations of paragraph 32.

33.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

34.     Deny the allegations of paragraph 34, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

35.     Deny the allegations of paragraph 35.

36.     Deny the allegations of paragraph 36.

## FIRST AFFIRMATIVE DEFENSE

37.     Third-Party Defendant Bankers Capital has failed to state claims upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

38.     Third-Party Defendant Bankers Capital's claims are barred in whole or in

part because it failed to mitigate its alleged damages.

### THIRD AFFIRMATIVE DEFENSE

39.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, by the doctrines of laches, waiver and estoppel.

### FOURTH AFFIRMATIVE DEFENSE

40.     Third-Party Defendant Bankers Capital's claims are barred, by reason of its fraud, misconduct and/or unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

41.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it waived his right to claim damages by its own acts and omissions.

### SIXTH AFFIRMATIVE DEFENSE

42.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it was negligent and/or failed to exercise reasonable care.

### SEVENTH AFFIRMATIVE DEFENSE

43.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it ratified the alleged wrongful conduct for which it seeks recovery.

### EIGHTH AFFIRMATIVE DEFENSE

44.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part because it is a dissolved corporation and it is not licensed as a mortgage broker in New York.

### NINTH AFFIRMATIVE DEFENSE

45.     Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because any harm it suffered is the result of its own contributory negligence.

## RESERVATION OF RIGHTS

46.    Stern and First Republic expressly reserve the right to amend and/or supplement their answer and affirmative defenses as appropriate as discovery proceeds.

## CROSS-CLAIMS AGAINST BANKERS CAPITAL AND STEVEN ALEVY

Defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by and through their undersigned attorneys, as and for their cross-claims against Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over Stern's and First Republic's cross-claims pursuant to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the action.

2.    Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to these claims occurred herein.

## PARTIES

3.    Defendant Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

4.    Defendant First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York.  First Republic owns and manages the Properties.

5.    Third-Party Defendant Steven Alevy is a resident of the State of New York.  Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.

6.      Third-Party Defendant Bankers Capital is a dissolved California limited

liability company whose principal place of business is in New York, New York.  Although

Bankers Capital is dissolved, its principals improperly represent that it is an existing limited

liability company.  Bankers Capital touts itself as being experienced in arranging mortgages and

refinancing for real estate investors.  Bankers Capital was originally formed in California and

previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.

7.      Non-party Allen Alevy is a resident of the State of California.

8.      Non-party Robert Friedman is a resident of the State of New York and is a

Managing Director of Bankers Capital.

9.      Non-party Allen Sragow is a resident of the State of California.  Sragow is

the son-in-law of Allen Alevy, the brother-in-law of Steven Alevy and is principally involved

with and performs legal services for the Alevy family and various entities owned by the Alevy

family.  Allen Sragow also serves as a director of certain companies owned by the Alevy family.

10.      Non-party Avery Egert ("Egert") is a resident of the State of New York.

Egert is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin").  The

Sovereign Group owns and manages various real estate properties in the United States.  At all

relevant times, Egert had apparent and actual authority to enter into various transactions on

behalf of Safrin, including the transactions with respect to the Properties.  Safrin and Egert hold a

minority interest in First Republic through their ownership of JSAE Colonial LLC.

## FACTUAL BACKGROUND

**The Contract to Purchase the Properties**

11.      After lengthy negotiations and discussions, effective as of April 20, 2007,

First Republic Group Corp. ("First Republic Corp."), the predecessor in interest to First

Republic, entered into a written contract of sale with Colonial Realty Limited Partnership

("Colonial"), to acquire ten shopping center malls in the Southeast region of the United States for

a purchase price of $128 million (the "Contract").  Under the terms of the Contract, First

Republic Corp. paid Colonial a $1 million non-refundable deposit, with the balance of the

purchase price due at closing.  The closing was scheduled to occur no later than June 15, 2007.

12.    After the Contract was executed, First Republic Group Corp. assigned its

right, title and interest under the Contract to First Republic.

13.    Pursuant to several written amendments to the Contract, (a) in exchange

for an additional $2 million non-refundable deposit, the closing date was extended first to June

29, 2007 and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh

property was added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First

Republic, reducing the purchase price by that amount.  Thus, after execution of the several

amendments, the total purchase price for the Properties was approximately $129 million.

14.    In addition to paying Colonial the $129 million purchase price at the

closing,  First Republic was also obligated to pay: (a) certain closing costs for the transaction and

(b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant

improvements, deferred maintenance, and environmental claims as provided for in agreements

subsequently made with First Republic's senior lender.

**Stern and First Republic Seek Financing for the Transaction**

15.    At the same time that Stern and First Republic were negotiating to acquire

the Properties from Colonial, they were also working with a number of mortgage brokers, but not

Steven Alevy or Bankers Capital, to secure financing for the acquisition and related expenses.

16.     On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer for Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy and the Alevy family in numerous other transactions.  Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist Stern and First Republic in securing financing for the acquisition of the Properties.

17.     Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

18.     Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well.  Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition.  First Republic agreed to retain Steven Alevy and Bankers Capital as its non-exclusive broker to obtain financing for the acquisition of the Properties.

19.     As First Republic's mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for First Republic, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

20.     Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and Stern and First Republic's efforts to obtain financing for the

transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract, materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a statement of his net worth, personal and corporate financial statements and information about his prior business and litigation experiences.

21.     At all times during the relationship, Stern emphasized to Steven Alevy and Robert Friedman that time was of the essence because the contract of sale required the closing to occur no later than June 15, 2007.

**The Fraudulent Scheme to Wrest Control of the Properties from First Republic and Stern**

22.     Within a week after being introduced to Steven Alevy and Robert Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already contacted some highly relevant lenders," that they believed they could obtain significantly more financing than what was being discussed with J.P. Morgan Chase and that they were processing the information to obtain the financing for the Colonial transaction.

23.     Unbeknownst to Stern and First Republic, Steven Alevy and Robert Friedman were not working to obtain financing for First Republic's transaction with Colonial. Rather, acting in concert with Allen Alevy and Allen Sragow, they orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that the Alevy family and related affiliates could purchase the Properties.

24.     Instead of working to obtain financing for First Republic's acquisition of the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he would not pursue financing opportunities, on behalf of First Republic, with other brokers. Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain financing for the purchase.  In reality, Steven Alevy and others conspired with Steven Alevy's

father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

25.     Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for themselves.  Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

26.     On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

27.     During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations.  Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

28.     At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction.  Steven Alevy and Robert Friedman told Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

29.     Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction.  In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman

interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

30.     When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007.  No concrete bids, quotes or term sheets were presented to Stern or First Republic by Steven Alevy and Robert Friedman by on or about May 28, 2007.

31.     Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction.  Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

32.     As part of their scheme to sabotage Stern and First Republic's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused  prospective lenders to form a bad and incorrect impression of Stern and First Republic.  These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

33.     At this same time in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves.  Unbeknownst to Stern and First Republic, Steven

Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary information provided to them by Stern and First Republic about the transaction and Stern to Allen Alevy and Allen Sragow who used such information to formulate their own offer to acquire the Properties.

34.     On June 13, 2007, although Steven Alevy and Robert Friedman represented that they were arranging meetings with potential lenders to finance the transaction, Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (*i.e.,* Stern) to purchase the Properties.  At that time, Stern had neither heard of nor spoken with Allen Alevy, and Steven Alevy had never mentioned to Stern that he was intending to become Stern's 50% partner in connection with the acquisition of the Properties.  At no time, did Stern or First Republic ever meet with, correspond with or communicate with Allen Alevy.

35.     In June 2007, while Steven Alevy and Robert Friedman were still feigning their pursuit of financing opportunities for First Republic, they were instead meeting with lenders to secure financing for Allen Alevy and his related entities to acquire the Properties.  During this same time, unbeknownst to Stern and First Republic, Steven Alevy met with Petra Capital, a lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the Properties.  Steven Alevy gave Petra Capital copies of personal financial statements for Allen Alevy and told them he was putting together a deal for himself and his father and never said that he had been retained by Stern and First Republic to act as their broker.

36.     In the beginning of June, Stern was introduced to Avery Egert, the President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5 million of equity and co-sponsor the transaction in exchange for a minority interest in the entity that would own the  Properties.  At all relevant times, Egert had the authority to act on Safrin's

behalf.  Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert.  In fact, unbeknownst to Stern and First Republic, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

37.    Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders.  None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

38.    In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Steven Alevy, Allen Alevy and Allen Sragow stepped up their efforts to implement their plan to take over the Properties.  Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction.  As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to Stern and First Republic, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

39.    Still unaware of the efforts by the Alevys, Robert Friedman and Allen Sragow to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any

proposal made by Steven Alevy for "Long Beach" financing.  At the same time, Stern redoubled

his own efforts to obtain financing from other sources.   Through another mortgage broker,

Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment

from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine

financing for the transaction in the total amount of approximately $131 million and was able to

close the loan with Citigroup less than two weeks later.

> 40.    Stern and First Republic were also seeking to obtain additional financing

to cover required closing costs and escrow deposits that would need to be made to complete the

transaction.  By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion

of the amount necessary to close the transaction.  Under that arrangement, Colonial would agree

to take back a $14 million note from First Republic that was secured by an irrevocable letter of

credit from a third party with the other essential terms of the financing arrangement in place.

Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First

Republic as a non-refundable deposit on the transaction.

> 41.    Stern told Steven Alevy that he had received a commitment from

Citigroup to provide the senior and mezzanine financing for the transaction and that the seller

had agreed to finance the remaining portion of the transaction.  Stern provided a copy of the

Citigroup commitment letter to Steven Alevy.  Upon learning these facts, Steven Alevy

attempted to persuade Stern that First Republic should forego the opportunity to obtain financing

from Citigroup because Bankers Capital could obtain greater financing and at a lower interest

then what Citigroup was proposing.  Steven Alevy also told Stern that First Republic should

reject the financing offer by the seller and should instead use Steven Alevy and his family to

finance the remaining portion of the financing.  On at least two occasions, Steven Alevy

attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

42.     On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan.  Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

43.     Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern was able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

44.     Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet.  Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller.  To that end, Steven Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return.  The financing proposal was intended to keep their foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their

offer, leaving Stern and First Republic with the impossible choice of either walking away from the

transaction and losing their nonrefundable $3 million deposit/obligation or acceding to

unreasonable  conditions that the Alevys and Allen Sragow unilaterally imposed upon them.

45.     Stern and First Republic did not agree to accept the proposal made by

Steven Alevy on June 29.  Nonetheless, in order to induce Stern and First Republic into accepting

their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused

an Allen Alevy-affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the

Colonial transaction.

46.     Believing that Steven Alevy had worked tirelessly for months trying to find

financing for First Republic's transaction and induced by Steven Alevy's repeated promises of

doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work

with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured

to close the Colonial transaction and did not attempt to finalize the seller financing that was in

place.  To further induce Stern to enter into the transaction with the Alevy family, on or about July

2, Steven Alevy told Stern that with the money that the two of them would make together, they

would be able to donate significant funds to charity and send children to study in Jewish

institutions in Israel.

47.     On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which

was non-binding and subject to certain conditions, none of which was ever fulfilled.  The Letter of

Understanding states that "Westland Industries," an entity that neither Stern nor First Republic

had ever heard of, and which was controlled by Steven Alevy's family, would provide

$13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a

monthly basis.   The Letter of Understanding further states that the "Parties agree to work in good

faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100% of the equity and voting interest . . . shall be held in escrow for the benefit of Westland."  In addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall be brought to Stephen Friedman, Esq. for resolution."  Steven Friedman  had only been working with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy family for fifteen years.  At this time, Steven Friedman was also serving as the Alevy family's attorney on a transaction involving a project in New York. Finally, the Letter of Understanding contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open until the close of business on June 29[th] – four days before the offer had actually been transmitted to First Republic.  In early July 2007, Stern, then believing he would be able to obtain financing from the Alevy family and related affiliates, informed Colonial that First Republic no longer needed to obtain seller financing.

48.    Michael Libraty, an attorney at Sragow's firm who also maintains an email address at one of Allen Alevy's company servers, acting at Sragow's direction, then sent Stern's counsel drafts of a proposed partnership agreement to sign.  Consistent with everything Stern had advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those partnership agreements because Stern was not looking to take on a financial partner for the transaction.

49.    On July 3, 2007, Colonial threatened to terminate the Contract.  Stern informed Steven Alevy of Colonial's position and, that same day, Steven Alevy, in breach of his fiduciary duties to Stern and First Republic, but in furtherance of the fraudulent scheme, passed this information to Allan Alevy, Allen Sragow and others who schemed how best to take

advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

50.    On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: <u>We are not extending our commitment</u>."  In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

51.    As a sophisticated real estate businessman, Allen Alevy did not want the transaction to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

52.    Then, on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that further funds were needed to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing.  These were the same financials that Steven Alevy had requested in May and which he had been purportedly using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to Stern and First Republic.

53.    Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, Stern did

not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to them or entities controlled by them if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and neither Stern nor First Republic ever agreed to the conditions that the Allen Alevy and Allen Sragow sought to impose.

54.    On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow.  Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction.  Bankers Capital assisted Stern and First Republic in preparing the sources and uses documentation for the Colonial transaction, was provided with numerous drafts of the closing statements for the Colonial transaction, and was well aware as to whom the proceeds of the Citigroup loans and the $13 million advanced by the Alevy family were distributed.

55.    The next day, on July 13, Steven Alevy confirmed his oral instructions in writing.  However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of Stern and First Republic, including the demand that they sign an assignment of the Properties from First Republic to a new entity established by the Allen Alevy and Allen Sragow.  Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not enter into the agreement with Stern and First Republic or release the funds in escrow unless all of their demands were met.

56.    On July 16, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the

agreements they were demanding, they did not agree to the release of the $13 million. Sragow added that if the funds were released, they should be retrieved until all of their demands were met.

57.     On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all of their demands were met. Because the escrowed funds had already been used to close the Colonial transaction, there was no way to retrieve the released funds. Stern and First Republic did not and would not agree to Allen Alevy and Allen Sragow's demands.

58.     Allen Sragow then sent a letter to Land Title and First Republic's counsel, Stephen Friedman, restating that the escrowed funds were released without receiving the authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify the disbursement" if First Republic and Stern would "execute" new documents, including a reassignment agreement, mutual release and other "modified" agreements. Stern and First Republic did not agree to Allen Sragow's proposal and did not execute those documents.

**The Alevys and Allen Sragow Interfere With First Republic's**
**Operation of the Properties and Attempts to Refinance**

59.     As described above, Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan. Subsequent to the closing with Colonial, Stern and First Republic immediately looked to secure refinancing so that they could take out the financing provided by the Alevy family and

return the funds that Allen Alevy and Allen Sragow contended had been mistakenly released to

First Republic by the escrow agent notwithstanding the clear and explicit approval for the release

given by Steven Alevy.

60.    Shortly after the July 12, 2007 closing, Stern met with Steven Friedman

and Steven Alevy.  Steven Alevy was aware that Citigroup had agreed to waive the lock-out

period for the first sixty days after closing so that First Republic could refinance the mezzanine

portion of its loan and was interested in working as Stern and First Republic's broker to obtain

that refinancing. Steven Alevy told Stern that he was the only son in his family, that his father

considered him to be the black sheep of the family and that his father put him in charge of family

operations in New York.  Steven Alevy asked Stern for forgiveness and apologized for the way

that he and his family treated Stern during the transaction.  Steven Alevy told Stern that the road

to hell is often paved with good intentions and that while his intentions were good, he failed to

represent him properly as Stern and First Republic's broker.  Steven Alevy told Stern that he

would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to

help Stern and First Republic  refinance the Properties.

61.    Based on Steven Alevy's promises and assurances, Stern and First

Republic once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist them

in obtaining financing and refinancing of the Properties so that the $13 million advanced to First

Republic per Steven Alevy's instructions could be repaid.  As part of their supposed effort to

obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman

represented that they were in the process of preparing a "79 page book," which they would use to

persuade lenders to refinance the Properties.

62.     In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing.  In response and relying upon the brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, Stern and First Republic provided them with additional sensitive, confidential and proprietary information about the Properties.

63.     Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent Stern and First Republic from obtaining refinancing in furtherance of the scheme to obtain control over the Properties.

64.     Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for First Republic solely as its broker, Stern sent them all of the information that he had received concerning the Properties.  However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow.  For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on.  Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe?  I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to  obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties.  For example, sometime in late July 2007 or August 2007, unbeknownst to Stern and First Republic, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the property managers of the two malls that they were the new owners of the malls.  After Stern and First Republic were notified of these intrusions, Greenspan and his associates were removed from the malls.

66.    Defendants also wrongfully accused Stern and First Republic of "stealing" the $13 million that they verbally authorized for release, later confirmed in writing, and publicized that accusation to the business and lending community, making it impossible for Stern and First Republic to refinance the Properties.  For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's counsel, the Seller's CFO and another high ranking officer of the Seller and told them that Stern and First Republic had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the Properties.

67.    The Alevys and Allen Sragow subsequently caused the companies that advanced the $13 million to First Republic to sue Stern and First Republic in federal court in New York claiming, among other things, ownership of the Properties and accusing Stern and First Republic of stealing their money and other falsehoods.

68.     Finally, in two states where the filing of a lawsuit is not a necessary condition precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, the Alevys and Allen Sragow caused the entities that advanced the $13 million to First Republic to improperly file lis pendens on the Properties in an attempt to cause First Republic to default on the loans and guaranties and prevent it from securing refinancing.  As a result of their efforts, Citigroup has asserted to Stern and First Republic that the filing of such lis pendens is an event of default under the loans and has accelerated the entire amount of the loans.  Citigroup has also informed Stern that it has the right to demand payment from him under the guaranty.

*     *     *

69.     In sum, as a result of the fraudulent scheme described above, Stern and First Republic were (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii)  prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties.   Additionally, Citigroup has asserted that First Republic is in default of its loans.  Defendants' tortious conduct damages the value of the Properties and Stern's interest in First Republic.  Steven Alevy and Bankers Capital are liable for all such damages.

## AS AND FOR A FIRST CAUSE OF ACTION

### For Fraud Against Steven Alevy and Bankers Capital

70.     Stern and First Republic repeat and reallege paragraphs 1 through 69 of this pleading as if fully set forth herein.

71.     Robert Friedman and Steven Alevy individually and on behalf of Bankers Capital repeatedly represented to Stern and First Republic that they were actively working to obtain financing for First Republic's transaction with Colonial.  Robert Friedman and Steven

Alevy failed to disclose that they were working on behalf of the Alevy family and Allen Sragow to sabotage First Republic's purchase of the Properties so that the Alevy family and related affiliates could purchase the Properties.

72.     The false representations of fact and concealment of material facts induced Stern and First Republic to, among other things, employ Robert Friedman, Steven Alevy and Bankers Capital as their mortgage brokers, appoint them as their exclusive brokers for a number of lenders with whom they were previously seeking financing, provide them with confidential and proprietary information, cease negotiating with lenders and other brokers with respect to the Colonial transaction and the post-closing refinancing of the transaction, and enter into negotiations with Allen Alevy and Allen Sragow to finance a portion of the Colonial transaction.

73.     In late June and July 2007, after Steven Friedman, on behalf of Stern and First Republic, entered into discussions with Allen Alevy and Allen Sragow regarding financing for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been receiving Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic.

74.     After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed the fact that they continued to receive Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic.  As part of their fraudulent plan, Allen Alevy and Allen Sragow directly and through other third parties under their control, falsely represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to

tenants of the Properties that they and companies that they controlled were the owners of the Properties.

75.     Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to, among other things, cease negotiating with other potential lending sources, including the seller, with respect to the Colonial transaction, and enter into negotiations with the Alevy family and related affiliates to finance the Colonial transaction.  Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to, among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

76.     Stern and First Republic reasonably relied to their detriment on the truthfulness of these representations.  Steven Alevy and Bankers Capital knew or should have known that Stern and First Republic would rely on their representations when made.  Had Stern and First Republic known that the Steven Alevy and Bankers Capital were acting fraudulently to sabotage First Republic's purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

77.     The misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging First Republic's transaction with Colonial and were made with complete or reckless disregard as to their truthfulness.

78.     Steven Alevy and Bankers Capital acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements made to Stern and First Republic.

79.     As a direct and proximate result of the fraudulent acts described above,
Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may
have entered into with the Alevy family and related affiliates with respect to the $13 million of
funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial
arising from First Republic's inability to refinance the Properties and (iii) compensatory damages
in an amount to be proven at trial arising from the loss in the value of the Properties and the loss
in the value of Stern's interest in First Republic caused by these tortious acts.

80.     The actions described above were willful, knowing, and deliberate, and
demonstrated a complete absence of care and attention to duty and a high degree of moral
culpability, and were in conscious disregard of Stern and First Republic's rights.  Stern and First
Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty Against Steven Alevy and Bankers Capital

81.     Stern and First Republic repeat and reallege paragraphs 1 through 80 of
this pleading as if fully set forth herein.

82.     As First Republic's mortgage broker, Steven Alevy and Bankers Capital
owed fiduciary duties to Stern and First Republic, including an undivided fiduciary duty of
loyalty, the duty to work for their interests, the duty not to provide Stern and First Republic's
confidential and proprietary information to others without their permission, the duty to avoid
conflicts of interest and the duty to perform the work in a competent manner.

83.     Steven Alevy and Bankers Capital breached their fiduciary duties to Stern
and First Republic by, among other things, providing Stern and First Republic's confidential and
proprietary information to the Alevy family and Allen Sragow without Stern and First Republic's

permission, failing to assist and, in fact, trying to sabotage First Republic's efforts to obtain

financing and refinancing and by inducing Stern and First Republic to enter into a transaction

with the Alevy family and related affiliates.

84.     In breaching their fiduciary duties to Stern and First Republic, Steven

Alevy and Bankers Capital acted adversely to the interests of Stern and First Republic and for

their own personal interests and those of the Alevy family and Allen Sragow.

85.     As a direct and proximate result of Steven Alevy and Bankers Capital's

breaches of fiduciary duty described above, Stern and First Republic seek: (i) rescission of any

agreement that they may have entered into with the Alevy family and related affiliates with

respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to

be proven at trial arising from First Republic's inability to refinance the Properties and (iii)

compensatory damages in an amount to be proven at trial arising from the loss in the value of the

Properties and the loss in the value of Stern's interest in First Republic caused by their tortious

acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Bankers Capital and Steven Alevy

86.     Stern and First Republic repeat and reallege paragraphs 1 through 85 of

this pleading as if fully set forth herein.

87.     Stern and First Republic on the one hand and Robert Friedman, Steven

Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007.

Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated

to attempt in good faith to obtain financing on Stern and First Republic's behalf in connection

with the Colonial transaction and to protect Stern and First Republic's confidential and proprietary information that they received as Stern and First Republic's broker.

88.    Bankers Capital and Steven Alevy materially breached the contractual obligations by, among other things, (a) failing to try to obtain financing and refinancing on Stern and First Republic's behalf in connection with the Colonial transaction, (b) meeting with lenders to obtain financing for the Colonial transaction on behalf of the Alevy family and related affiliates, and (c) providing Stern and First Republic's confidential and proprietary to the Allen Alevy, Allen Sragow and others without Stern or First Republic's permission.

89.    Stern and First Republic substantially performed their obligations under the brokerage agreement with Robert Friedman, Steven Alevy and Bankers Capital.

90.    As a direct and proximate result of Steven Alevy and Bankers Capital's breaches of contract, Stern and First Republic seek: (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

### For Aiding and Abetting Fraud Against Steven Alevy and Bankers Capital

91.    Stern and First Republic repeat and reallege paragraphs 1 through 90 of this pleading as if fully set forth herein.

92.     Steven Alevy and Bankers Capital knew that Allan Alevy, Robert Friedman and Allen Sragow had committed fraud by, among other things, failing to disclose to Stern and First Republic that, along with the Alevy family and Allen Sragow, they were all actively working to sabotage Stern and First Republic's financing for the transaction with Colonial so that the Alevy family and related affiliates could acquire the Properties in their own right.

93.     Steven Alevy and Bankers Capital aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. At the direction of Allen Alevy and Allen Sragow, Steven Alevy and Robert Friedman concealed the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy, Robert Friedman and Bankers Capital had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which those individuals used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

94.     Steven Alevy and Bankers Capital's aiding and abetting of Allen Alevy, Robert Friedman and Allen Sragow's fraud proximately caused damages to Stern and First Republic in that, absent their aiding and abetting the fraud, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not have entered into negotiations with the Alevy family to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

95.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from their inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

96.     Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND  FOR A FIFTH CAUSE OF ACTION

### Against Steven Alevy and Bankers Capital for Aiding and Abetting Breach

### of Fiduciary Duty

97.     Stern and First Republic repeat and reallege paragraphs 1 through 96 of this pleading as if fully set forth herein.

98.     Steven Alevy and Bankers Capital knew that Allen Alevy, Robert Friedman and Allen Sragow were breaching their fiduciary duties to Stern and First Republic by, among other things, receiving Stern and First Republic's confidential and proprietary information without their permission, sabotaging Stern and First Republic's efforts to obtain financing and refinancing and by inducing Stern and First Republic to enter into a transaction with Allen Alevy and his related entities.

99.     Steven Alevy and Bankers Capital aided and abetted the breaches of fiduciary duty committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction.  Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

100.     Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow caused damages to Stern and First Republic in that, absent their aiding and abetting the breach of such fiduciary duties, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related entities to finance the Colonial transaction and would not have engaged Steven Alevy, Robert Friedman and Bankers Capital to secure refinancing for the Colonial transaction.

101.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the  breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to Stern and First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value

of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

102.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

### AS AND FOR A SIXTH CAUSE OF ACTION

**For Misappropriation of Stern's and First Republic's Trade Secrets**

103.    Stern and First Republic repeat and reallege paragraphs 1 through 102 of this pleading as if fully set forth herein.

104.    Stern and First Republic's proprietary and confidential information concerning the Properties constitutes trade secrets under New York common law.

105.    Bankers Capital and Steven Alevy conspired and did in fact misappropriate Stern's and First Republic's proprietary and confidential information and lied to Stern and First Republic about their intended use of that information.  The actions of Steven Alevy and Bankers Capital constitute improper, willful and malicious "misappropriation" of trade secrets under New York common law.

106.    As a direct consequence of the improper, willful and malicious misappropriation of trade secrets by Steven Alevy and Bankers Capital, Stern and First Republic have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

107.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern

and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### For Tortious Interference With Prospective Business Relations

108.    Stern and First Republic repeat and reallege paragraphs 1 through 107 of

this pleading as if fully set forth herein.

109.    Pursuant to its contract with Colonial, First Republic became the lawful

and legal owner of the Properties, and, as the lawful owner of the Properties, was entitled to

exploit its economic interest in those Properties free from interference by any other third parties.

110.    Steven Alevy and Bankers Capital were at all times aware that, following

the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

111.    Notwithstanding their knowledge that First Republic was the lawful owner

of the Properties, Steven Alevy and Bankers Capital intentionally and tortiously interfered with

First Republic's ownership of those properties by, among other things, claiming to the Seller or

causing other third parties under their control to claim, to tenants and the Property Manager of

the Properties that Allen Alevy and related affiliates were the lawful and legal owner of the

properties.

112.    Steven Alevy and Bankers Capital's intentional and willful interference

has caused and induced prospective lenders to deny financing to Stern and First Republic in

connection with the Properties, has caused  tenants to cancel their leases and has caused

Citigroup to assert that First Republic is in default of the loan agreements and to inform Stern

that it has the right to demand payment of the Guaranteed Recourse Obligations of Borrower

from Stern.

113.    As a direct and proximate result of the foregoing, Stern and First Republic have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

114.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights.  Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

115.    Moreover, as a direct and proximate result of the foregoing, Stern and First Republic are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from contacting the Seller, tenants and the Property Manager of the Properties and interfering with Stern and First Republic's lawful ownership and management of the Properties.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract

116.    Stern and First Republic repeat and reallege paragraphs 1 through 115 of this pleading as if fully set forth herein.

117.    First Republic and Citigroup entered into two loan agreements in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties.  In addition, Stern provided Citigroup with a guaranty of recourse obligations of First Republic.

118.    Steven Alevy and Bankers Capital were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations.

119.    Steven Alevy and Bankers Capital tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things,

conspiring and or aiding and abetting the actions of Allen Alevy and Allen Sragow to improperly

file lis pendens against the Properties, which has caused Citigroup to assert that the loans are in

default and inform Stern that it has the right to demand that Stern make payment of the

Guaranteed Recourse Obligations of the Borrower.

120.    As a direct and proximate result of the foregoing, Stern and First Republic

have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

121.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and

deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern

and First Republic are therefore entitled to an award of punitive and exemplary damages.

122.    Moreover, as a direct and proximate result of the foregoing, Stern and First

Republic are threatened with immediate and irreparable additional loss and damage, and will

continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from

interfering with Stern's and First Republic's relationship with Citigroup.

## AS AND FOR A NINTH CAUSE OF ACTION

### For Declaratory Relief

123.    Stern and First Republic repeat and reallege paragraphs 1 through 122 of

this pleading as if fully set forth herein.

124.    An actual, justiciable controversy exists between Stern and First Republic

and Steven Alevy and Bankers Capital within the meaning of CPLR 3001.

125.    A dispute exists between Stern and First Republic on the one hand and

Steven Alevy and Bankers Capital on the other hand as to whether Stern and First Republic and

the Alevy family and related affiliates entered into an agreement in connection with the Colonial transaction.

126.    Stern and First Republic contend that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from the Alevy family or related affiliates.

127.    Steven Alevy and Bankers Capital contend that the $13 million of financing provided by the Alevy family and related affiliates was either an equity contribution to the entity owning the Properties or that it was a loan which, if not repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

128.    Stern and First Republic seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that no binding agreement was entered into with the Alevy family and related affiliates and that they be permitted to rescind any transaction and return the $13 million, without interest, to such individuals and/or entities.

**WHEREFORE,** Stern and First Republic demand judgment as follows:

A.    on the first cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused  by their tortious acts, plus punitive damages, together with prejudgment interest and costs;

B.       on the second cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused  by their tortious acts,  together with prejudgment interest and costs;

C.       on the third cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused  by their breaches of contract, together with prejudgment interest and costs;

D.       on the fourth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused  by their tortious acts,  together with prejudgment interest and costs;

E.       on the fifth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to

the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

       F.     on the sixth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, together with punitive damages, prejudgment interest and costs, and an injunction preventing Steven Alevy and Bankers Capital from contacting tenants and the Property Manager of the Properties and interfering with Stern and First Republic's ownership and management of the Properties;

       G.     on the seventh cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital from contacting and interfering with prospective lenders and tenants of First Republic;

       H.     on the eighth cause of action, compensatory damages in an amount to be determined at trial but believed to exceed $65,000,000, plus punitive damages, together with prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital from interfering with Stern and First Republic's relationship with Citigroup;

       I.     on the ninth cause of action, a declaration that Stern and First Republic were either fraudulently induced to accept $13 million of financing from the Alevy family or related affiliates or that no binding agreement was entered into with them and that Stern and First Republic be permitted to rescind any transaction and return the $13 million, without interest, to them;

J.      awarding to Stern and First Republic pre-and post-judgment interest, the costs and disbursements of this action, and attorneys' fees as authorized by law; and

K.      granting to each of Stern and First Republic such other and further relief as the Court may deem to be just and proper.

Dated:   New York, New York
         June 11, 2008

KAYE SCHOLER LLP

By: /s/ Michael A. Lynn
Arthur Brown (AB-0627)
Michael Lynn (ML-6052)
Efrem Schwalb (ES-5288)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel: (212) 836-8000
Fax: (212) 836-8689
Email: mlynn@kayescholer.com


Stephen R. Stern (SS-5665)
HOFFINGER STERN & ROSS LLP
150 East 58th Street
New York, New York  10155
Tel: (212) 421-4000
Fax: (212) 750-1259
Email: srstern@hsrlaw.com

*Attorneys for Mark Stern and First Republic Group Realty LLC*