KAVANAGH MALONEY & OSNATO LLP
Attorneys for Third Party Defendants
  Buchanan Ingersoll & Rooney, PC and
  Stephen Friedman
415 Madison Avenue
New York, N.Y. 10017
212-207-8400
  James J. Maloney
  David F. Bayne
  Meredith D. Belkin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.

                    Plaintiffs,

              -against-

MOSES STERN, aka MARK STERN; JOSHUA
SAFRIN, FIRST REPUBLIC GROUP REALTY

LLC, EPHRAIM FRENKEL, LAND TITLE
ASSOCIATES ESCROW,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOSHUA SAFRIN,

              Defendant/Third Party-Crossclaim-
              Counterclaim-Plaintiff,

              -against-

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC
GROUP CORP.,

                    Third Party Defendants,

              -and-

[ECF]

No. 07 Civ. 11586 (LAK)(GWG)

**NOTICE OF MOTION BY THIRD
PARTY DEFENDANTS BUCHANAN,
INGERSOLL & ROONEY, PC AND
STEPHEN FRIEDMAN TO DISMISS
COUNT V OF BANKERS CAPITAL
REALTY ADVISORS LLC AND
STEVEN ALEVY'S CROSS CLAIMS**

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and
LAND TITLE ASSOCIATES ESCROW,

                    Defendants/Crossclaim Defendants,

        -and-

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.,

                    Plaintiffs/Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PLEASE TAKE NOTICE that upon the Amended Third Party Complaint (Containing Crossclaims and Counterclaims), dated May 29, 2008, and Exhibit A thereto (without exhibits) attached hereto as Exhibit 1, the Third Party Defendants Bankers Capital Realty Advisors LLC's and Steven Alevy's Answer to the Amended Third Party Complaint of Defendant Safrin, Counterclaims Against Safrin, and Cross Claims Against Stern, First Republic, Frenkel, Land Title, Stephen Friedman and Buchanan Ingersoll & Rooney ("Cross-Claims") dated June 6, 2008 attached hereto as Exhibit 2, the Memorandum of Law, dated June 27, 2008, submitted herewith, and upon all the prior pleadings and proceedings had herein, Third Party Defendants Buchanan Ingersoll & Rooney, PC and Stephen Friedman, by their undersigned counsel, will move this Court before the Honorable Gabriel W. Gorenstein at the United States Courthouse, 500 Pearl Street, New York, New York for an Order pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) dismissing Count V of the Cross-Claims for failure to state a claim upon which relief, together with such other and further relief as this Court deems just and proper.

2

PLEASE TAKE FURTHER NOTICE that, answering papers, if any, shall be served in accordance with Rule 6.1(b) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: New York, N.Y.
     June 27, 2008

KAVANAGH MALONEY & OSNATO LLP

By _James J. Maloney_
     James J. Maloney
Attorneys for Third Party Defendants Buchanan
   Ingersoll & Rooney, PC and Stephen Friedman
415 Madison Avenue
New York, N.Y. 10017
212-207-8400

TO:

FLEMMING ZULACK WILLIAMSON ZAUDERER, LLP
Jonathan D. Lupkin, Esq.
Jean Marie Hackett, Esq.
One Liberty Plaza
New York, NY 10006-1404
Attorneys for Defendant/Third Party-Crossclaim-Counterclaim-
   Plaintiff Joshua Safrin
212-412-9500

SILLS CUMMIS & GROSS, P.C.
Philip R. White, Esq.
Marc D. Youngelson, Esq.
One Rockefeller Plaza
New York, NY 10020
212-643-7000

-and-

3

SRAGOW & SRAGOW
Allen P. Sragow, Esq.
6665 Long Beach Blvd., Suite B-22
Long Beach, California 90805
310-639-0782
Attorneys for Plaintiffs/Counterclaim Defendants
 and Third Party Defendants Steven Alevy and Bankers
 Capital Realty Advisors, LLC

HOFFINGER STERN & ROSS, LLP
Stephen R. Stern, Esq.
150 East 58th Street- 19th Fl.
New York, NY 10155
212-421-4000
Attorneys for Defendants/Cross Claim Defendants Moses Stern,
  First Republic Group Realty, LLC, Ephraim Frenkel, Land Title
 Associates Escrow and Third arty Defendant First Republic
 Group Corp.

                -and-

KAYE SCHOLER LLP
Michael A. Lynn, Esq.
Arthur E. Brown, Esq.
425 Park Avenue
New York, NY 10022
212-836-8000
Attorneys for Defendants/Cross Claim Defendants Moses Stern,
  First Republic Group Realty, LLC, Ephraim Frenkel, Land Title
 Associates Escrow and Third Party Defendant First Republic
 Group Corp.

4

Jonathan D. Lupkin, Esq. (JL-0792)
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                    Plaintiffs,

   - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN;
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                Defendants.

-------------------------------------------------------------------- X

JOSHUA SAFRIN,

          Defendant/Third Party-Crossclaim-
               Counterclaim-Plaintiff,

   - against –

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC
GROUP CORP.,

          Third Party Defendants,

   - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and
LAND TITLE ASSOCIATES ESCROW,

           Defendants/Crossclaim Defendants,

   - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.,

          Plaintiffs/Counterclaim Defendants.

-------------------------------------------------------------------- X

**JURY TRIAL DEMANDED**

No. 07 Civ. 11586 (LAK)(GWG)

(ECF)

**AMENDED THIRD PARTY
COMPLAINT
(CONTAINING
CROSSCLAIMS AND
COUNTERCLAIMS)**

Defendant/Third Party-Counterclaim-Crossclaim-Plaintiff Joshua Safrin ("Safrin") by his attorneys, for his third party complaint against third party defendants Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First Republic Group Corp. (hereinafter collectively referred to as the "Third Party Defendants"), crossclaims against Moses Stern, aka Mark Stern, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow (referred to collectively, together with the Third Party Defendants, as "Defendants"), and counterclaims against Amusement Industry, Inc., dba Westland Industries ("Amusement"), and Practical Finance Co., Inc. (collectively, "Plaintiffs"), alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     On December 27, 2007, Plaintiffs commenced an action in this Court against Safrin, Mark Stern ("Stern"), Ephraim Frenkel ("Frenkel"), First Republic Group Realty LLC ("First Republic LLC") and Land Title Associates Escrow ("Land Escrow"). (the "Main Action") (A copy of the summons and complaint (the "Complaint") is attached as Exhibit A.)

2.     Although the Complaint names Safrin, a well-respected name in the real estate industry, as a defendant, Safrin was unaware of any of the transactions at issue in the Main Action until shortly before being served with process.  Plaintiffs, who allege a series of transactions and negotiations in connection with a large real estate transaction, premise their entire case against Safrin on the claim that he participated in these transactions and negotiations through Friedman, who purportedly acted for and spoke as Safrin's attorney and agent.

3.     Safrin was unaware that Friedman represented to Plaintiffs that he (Friedman) was Safrin's agent or attorney, did not authorize Friedman to make any such representations, and had no knowledge of any of the representations or actions described in the Complaint that were purportedly undertaken by Friedman on his behalf.  As set forth more fully below, Friedman,

2

together with the other Defendants, was an integral part of a conspiracy to misappropriate

Safrin's identity (i.e., his name, stellar reputation in the real estate industry, and financial

wherewithal) in order to secure financing for the purchase of a portfolio of real estate located

throughout the Southeastern United States.

## PARTIES

4.     Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff Joshua Safrin is an

individual and citizen of the State of New York, residing at 50 Riverside Drive, Apt. 2A, New

York, New York, 10024.

5.     Third Party Defendant Stephen Friedman ("Friedman") is an individual and citizen

of the State of New York. Upon information and belief, Friedman is an attorney with and

shareholder in the law firm Buchanan Ingersoll & Rooney, P.C. ("BIR"). Upon information and

belief, Friedman was acting, at all times mentioned herein, in his capacity as an attorney and

shareholder of BIR.

6.     Third Party Defendant Buchanan Ingersoll & Rooney, P.C. is a professional

corporation organized under the laws of Pennsylvania, which maintains offices for the practice of

law at 620 Eighth Avenue, 23rd Floor, New York, NY 10018-1669. Upon information and

belief, Friedman practices out of BIR's New York office.

7.     Third-party Defendant Steven Alevy ("Alevy") is an individual and citizen of the

State of New York, residing at 275 West 96th St, New York, New York, 10025. Upon

information and belief, Alevy is Managing Director of Bankers Capital Realty Advisors LLC,

and is the son of Allen Alevy, the sole shareholder of plaintiff Amusement Industry, Inc.

8.     Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital")

was and is a limited liability company with its principal place of business at 575 Madison

Avenue, 10th floor, New York, NY 10022. Upon information and belief, Alevy was acting, at

3

all times mentioned herein, in his capacity as an employee and Managing Director of Bankers Capital.

9.      Upon information and belief, Third Party Defendant First Republic Group Corp. ("First Republic Corp.") is a corporation organized under the law of New York, with its principal place of business at 241 Fifth Avenue, Suite 302, New York, New York 10016. Upon information and belief, First Republic Corp. was, at all times mentioned herein, solely owned and controlled by defendant Moses Stern.

10.     Upon information and belief, Plaintiff/Counterclaim-Defendant Amusement Industry, Inc., dba Westland Industries, is a corporation organized under the laws of the State of California with its principal place of business at 6665 Long Beach Blvd., Long Beach, California, 90805

11.     Upon information and belief, Plaintiff/Counterclaim Defendant Practical Finance Co., Inc. ("Practical Finance"), is a corporation organized under the laws of the State of California with its principal place of business at 6665 Long Beach Blvd., Long Beach, California, 90805.

12.     Upon information and belief, Defendant/Crossclaim Defendant Moses aka Mark Stern is an individual and citizen of the State of New York residing at 39 Remsen Avenue, Monsey, New York 10952.

13.     Upon information and belief, Defendant/Crossclaim Defendant Ephraim Frenkel is an individual and citizen of the State of New York.

14.     Upon information and belief, Defendant/Crossclaim Defendant First Republic Group Realty LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York County in the State of New York.

15.     Upon information and belief, at all times mentioned herein, Defendant/Crossclaim Defendant Land Title Associates Escrow was and is a limited liability company organized under

4

the laws of the State of New York with its principal place of business at 1979 Marcus Avenue, Suite 210, Lake Success, New York 11042, operating under the name "Land Title Associates."

## SUBJECT MATTER JURISDICTION AND VENUE

16.    This Court has jurisdiction over Safrin's claims pursuant to Fed. R. Civ. P. 13(a), (g), 14(a), 28 U.S.C. §§1367 and 2201, and pursuant to the Court's subject matter jurisdiction over the Main Action.

17.    This Court has personal jurisdiction over the Third Party Defendants, pursuant to CPLR 301 and 302, by virtue of the fact that they reside in, transact, do or conduct business in New York and because they committed tortious acts within New York and tortious acts without New York causing injury to persons within New York.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because all of the Third Party Defendants reside in this judicial district and because a substantial number of the events or omissions giving rise to the claim occurred in this judicial district.

## BACKGROUND

**The Underlying Complaint**

19.    In the Complaint, Plaintiffs allege a series of transactions, the details of which follow herein. The following allegations are made on information and belief. The bases for Safrin's belief are, largely, the allegations in the Complaint itself.

20.    According to the Complaint, First Republic Group Corp. purchased from non-party Colonial Realty Limited Partnership ("Colonial Realty") a certain real estate portfolio consisting of shopping centers located in the Southeastern United States (the "Property Portfolio"). At some point, First Republic Corp. assigned its interest in the Property Portfolio to First Republic LLC.

5

**The Citigroup Loan Documents**

21.    Plaintiffs allege that Stern and Safrin obtained financing for the purchase of the Property Portfolio by executing two loan agreements with Citigroup Global Markets Realty Corp. ("Citigroup") on behalf of various purchasing entities.  First Republic LLC executed a loan agreement with Citigroup for $111,150,000.00 and FRGR Managing Member LLC, a constituent member of the First Republic LLC ownership structure, executed a Mezzanine Loan Agreement with Citigroup for $15,000,000.00.  Both loan agreements are dated as of July 11, 2007, and define "Guarantor" to include Safrin.

22.    The purported signatures of Safrin on these documents are forgeries, as confirmed by a highly reputable handwriting expert with 40 years of experience in the field.  (Exhibit B hereto.)

**Plaintiffs' Investment**

23.    Plaintiffs allege that because the Citigroup loan was insufficient to enable First Republic LLC to purchase the Property Portfolio, Safrin, among others, approached mortgage broker Alevy, of Bankers Capital, and Friedman, for the purpose of obtaining the additional necessary financing.

24.    Safrin never made any such approach.

25.    According to the Complaint, on June 29, 2007, Alevy and Friedman presented an investment opportunity to Amusement, purportedly on behalf of Safrin and others, to raise funds sufficient to complete the Property Portfolio Purchase.

26.    Safrin never authorized Alevy or Friedman to present any opportunity to Amusement.

27.    Plaintiffs allege that Friedman "represented" among others, Safrin, in purported "communications and dealings with [P]laintiffs."  Plaintiffs also allege that Friedman owed a separate fiduciary duty to Amusement because he had previously represented Amusement, as

6

well as its sole shareholder, Allen Alevy, and his son, Steven Alevy, in various legal matters. Plaintiffs contend that "as a result" of this previous representation by Friedman, "Friedman led Plaintiffs to believe that he had full authority to speak on behalf of . . . Safrin."

28.    Safrin never retained or otherwise authorized Friedman to speak or act on his behalf in connection with the transactions described in the Complaint.

**The June 29, 2007 "Letter of Intent"**

29.    According to the Complaint, the investment opportunity presented by Friedman and Alevy in June, 2007, purportedly on behalf of Safrin and others, resulted in a "written Letter of Intent" drafted by Alevy, signed by Stern on behalf of First Republic Corp. and dated June 29, 2007. Although the document is referred to as a "Letter of Intent" in the Complaint, the document itself is characterized as a Letter of Understanding (hereafter "LOI"). (Complaint, Ex. 2.) The LOI identifies as its parties First Republic Corp. and Westland Industries, the name under which Amusement does business. (Id.)

30.    Safrin was not a party to the LOI. (Complaint, Ex. 2).

31.    Plaintiffs allege that on July 2, 2007, Alevy e-mailed the so-called "Letter of Intent" to Friedman and Stern.

32.    According to the Complaint, on June 29, 2007, the same day Stern signed the LOI on behalf of First Republic Corp., Amusement wired $13,000,000.00 into the Land Escrow account. Plaintiffs assert that as a result of this wire transfer, a contract formed among Amusement and Safrin, among others, having the terms of the LOI.

33.    Safrin never entered into any such contract.

34.    Plaintiffs allege that on or after July 2, 2007, Safrin and Stern obtained a reduction of the purchase price of the property portfolio "by about $4.47 million dollars."

35.    Safrin never obtained any such reduction because he had no involvement with either the purchase or the financing of the Property Portfolio.

7

**Plaintiffs' Subsequent Negotiations With Friedman**

36.    Plaintiffs allege that on June 29, 2007 and during the seven-day period that followed, Amusement and First Republic Corp. had agreed to work in good faith "to finalize [their] agreements." During that time period, Amusement drafted and forwarded three partnership agreements to Friedman for Safrin, among others, to sign in order "to complete a transaction." (Complaint, Ex. 3)

37.    None of these draft agreements called for Safrin's signature.

38.    According to the Complaint, after the seven day period passed without agreements being "finalized," Amusement continued to negotiate through Friedman.

39.    According to the Complaint, on July 6, 2007, Plaintiffs, through Friedman: (a) suggested a new Property Portfolio ownership structure; (b) inquired as to whether its $13,000,000.00 contribution to the purchase should be a loan to Stern or to the entity that would be the owner of the Property Portfolio; (c) notified Safrin, among others, that the seven-day period had expired; and (d) noted that there should be about $4,000,000.00 in reserve after the closing. Plaintiffs also instructed Friedman not to authorize the release of the $13,000,000.00 held in escrow.

40.    Safrin was unaware of these negotiations and communications.

41.    Plaintiffs allege that on July 6, 2007, counsel for Amusement also wrote to Friedman, stating that if the transaction had materially changed from the draft partnership agreements and the LOI (agreements to which only Amusement and First Republic Corp. are parties), then the wired $13 million should be returned.

42.    Safrin was unaware of this communication.

43.    On July 9, 2007, according to the Complaint, Amusement asked Friedman, in writing, for a copy of the Citigroup loan documents that provided for the majority of the

financing for the Property Portfolio purchase. Friedman did not provide the documents, but responded that same day, in writing, that First Republic LLC was now the purchasing entity.

44.    Safrin was unaware of this representation.

45.    During the flurry of back-and-forth communications alleged to have occurred on July 9, 2007 through Friedman, purportedly on behalf of Safrin and others, Friedman promised, in writing, that formal documentation of Amusement's interest in the Property Portfolio was recognized and would be completed as necessary after closing once First Republic LLC owned the property portfolio.

46.    Safrin was unaware that any of these representations were being made on his behalf.

47.    According to the Complaint, Amusement then instructed Friedman, for a second time, not to authorize release of the $13 million in escrow. Amusement also instructed Land Escrow and Frenkel not to release Amusement's funds without written authorization of Sragow & Sragow, one of two firms acting as counsel of record to Plaintiffs in the Main Action.

48.    Safrin was unaware that Amusement's money, or indeed anyone's money, was being held in escrow in connection with the Property Portfolio's purchase or financing.

49.    Plaintiffs allege that on July 11, 2007, Friedman provided documents to Amusement, including a Promissory Note for $13,000,000.00 signed by Stern in his individual capacity, an Escrow Agreement, and Agreements, purportedly signed by Stern and Safrin (Complaint, Exs. 5 and 6), assigning their respective LLC membership interests in First Republic LLC and the underlying LLC ownership structure, and eleven grant deeds constituting the Property Portfolio, all of which were signed by Stern on behalf of First Republic LLC and notarized on July 12, 2007 (Complaint, Ex. 1) (these documents are collectively referred to herein as the "Escrow Documents").

9

50.    Safrin's signature on the "Agreement" that purportedly assigns his LLC interests ("Assignment Agreement") is a forgery, as confirmed by a highly reputable handwriting expert with 40 years of experience in the field. (Exhibit B hereto.)  Moreover, Safrin's forged signature, as it appears in the document, is not witnessed, as required by the form itself.

**The July 11, 2007 Counter Offer**

51.    According to the Complaint, on July 11, 2007, Amusement communicated to Safrin, among others, in writing "through Friedman" a "counter offer" because it disagreed with the characterization of the transaction among the parties reflected in the Escrow Documents, including that the money from Amusement was a loan.  Amusement declared that there would be no loan.  Rather, the $13,000,000.00 would be treated as a direct investment with a preferred right to return of this investment within 45 days.  In addition, the repayment right would be increased to $15,000,000.00 because of the $4,000,000.00 remaining in reserve after closing. Amusement also demanded conveyance to Amusement of 100% of the Property Portfolio by deeding all eleven properties to Amusement, together with the conveyance of the LLC membership interests, and noted that Stern and Safrin would have a limited option to repurchase the grant deeds and a 50% ownership interest by providing "the partnership agreement" (presumably an executed copy of the document attached to the Complaint as Ex. 3) within a period of 45 days.

52.    Safrin was unaware of these communications.

53.    According to the Complaint, Friedman responded, telling Amusement that it "should not worry as Amusement now owned the whole thing," and the following day, provided a $15,000,000.00 promissory note signed by Stern in his individual capacity.  (Compl. Ex. 7.)

54.    Safrin was unaware of Friedman's representation and never authorized Friedman to make it.

10

55.   Plaintiffs allege that on July 12, 2007, Frenkel and Land Escrow "took and used" the $13,000,000.00 in escrow based on verbal and written instructions from Alevy, without notice or authorization from Amusement.

**Safrin Had No Involvement In The Transactions Alleged In The Complaint**

56.   Safrin had no involvement with any of the transactions alleged in the Complaint.

57.   Safrin had no knowledge regarding the Property Portfolio until shortly before being served with process.

58.   Safrin had no knowledge regarding any of the "contracts" alleged in the Complaint until shortly before being served with process.

59.   Safrin has no knowledge regarding any of the LLCs alleged in the Complaint, including First Republic LLC, and had never heard of any of them until he was named in this lawsuit.

60.   Safrin never met nor spoke with Stern.

61.   Safrin never met nor communicated with the Plaintiffs.

62.   Safrin did not sign, nor direct anyone else to sign on his behalf, any of the following: (a) the Citigroup loan documents; (b) the Assignment Agreement purportedly assigning his LLC interests to Amusement; or (c) the operating agreements of JSAE Colonial LLC and FRGR Holdings LLC.  The purported signatures of "Joshua Safrin" on these documents are forged.

63.   Safrin:  (a) did not engage or retain Friedman; and (b) never asked Friedman to represent him, or to speak, act or function on his behalf in connection with any of the transactions alleged in the Complaint.

64.   Until shortly before he was served with the Complaint, Safrin was unaware: (a) that Friedman made any of the alleged representations described in the foregoing paragraphs to Plaintiffs, including the representation that he (Friedman) represented and had authority to speak

11

on behalf of Safrin; and (b) that Friedman engaged in any of the conduct purportedly undertaken on his behalf in connection with the transactions alleged in the Complaint.

65.    Safrin did not authorize Friedman to make any of the representations ascribed to him in the Complaint, or engage in any of the conduct described therein.

66.    Safrin did not ratify any of the representations made or actions purportedly undertaken by Friedman on Safrin's behalf in connection with the transactions alleged in the Complaint.

<u>Count I</u>

**(Indemnification and Contribution – Against All Defendants)**

67.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

68.    Safrin denies any wrongdoing or fault.  To the extent that he may be found liable to Plaintiffs for damages, however, such damages were caused, in whole or in part, by the wrongful conduct of one or more of the Defendants.

69.    By reason of the foregoing, to the extent that Safrin is found liable to Plaintiffs for the wrongful conduct alleged in the Complaint, Safrin is entitled to indemnity and/or contribution from one or more of the Defendants.

<u>Count II</u>

**(Declaratory Judgment Against Defendants and Plaintiffs/Counterclaim Defendants)**

70.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

71.    A live, actual and justiciable controversy exists between the parties concerning whether a principal-agent or attorney-client relationship existed between Safrin, on the one hand, and Friedman/BIR, on the other, such that Friedman/BIR had authority to act on Safrin's behalf in connection with the transactions alleged in the Complaint.

12

72.    Safrin contends that he never engaged, retained or authorized Friedman or BIR to act on his behalf as his agents or attorneys in connection with the transactions alleged in the Complaint and that Friedman/BIR had no authority, whether actual or apparent, to act on his (Safrin's) behalf in connection with the transactions alleged in the Complaint.

73.    By reason of the forgoing, Safrin is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that (a) no attorney-client or other principal-agency relationship existed between Safrin and Friedman/BIR in connection with the transactions alleged in the Complaint; (b) Friedman/BIR had no authority, whether actual or apparent, to act on Safrin's behalf in connection with the transactions alleged in the Complaint; and (c) Safrin did not ratify any of the representations or conduct allegedly made or undertaken on his behalf by Friedman/BIR in connection with the transactions alleged in the Complaint.

## Count III

**(Implied Indemnification – Implied Contractual Indemnity, Against Friedman and BIR)**

74.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

75.    Safrin is not at fault and denies liability for the tortious conduct alleged in the Complaint.  If Friedman/BIR are determined to have been Safrin's agents or attorneys, then Friedman/BIR exceeded their actual authority in connection with the conduct and representations purportedly undertaken on Safrin's behalf.

76.    If Friedman/BIR are determined to have been Safrin's agents or attorneys, with some authority to make representations to act towards, or make representations to, Plaintiffs or others on his behalf in connection with the transactions alleged in the Complaint, then : (a) Safrin transferred any duties owed to the Plaintiffs and others by implied agreement with

13

Friedman/BIR; (b) Friedman/BIR agreed to assume responsibility for those duties in connection with the transactions alleged in the Complaint, and (c) Friedman/BIR breached these duties.

77.    By reason of the foregoing, and to the extent that Safrin is found liable to Plaintiffs for the wrongful conduct alleged in the Complaint, then Safrin is entitled to indemnification from Friedman and BIR.

### Count IV

### (Breach of Duty As Agent/Attorney – Against Friedman and BIR)

78.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 74 through 77 as if fully set forth herein.

79.    Safrin denies any liability for or wrongdoing in connection with the transactions alleged in the Complaint.

80.    If it is determined that Friedman/BIR were acting, in any way, as Safrin's agents or attorneys, then Friedman/BIR owed certain duties to Safrin as his principal, including, but not limited to:

   a.   The duty of loyalty;

   b.   The duty of obedience;

   c.   The duty of reasonable care;

   d.   The fiduciary duty to act for the principal's benefit in all matters connected with the agency relationship;

   e.   The duty to take action only within the scope of the agent's actual authority; and

   f.   The duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal.

81.    If it is determined that Friedman/BIR were acting as Safrin's agents or attorneys in any respect, then Friedman/BIR breached these duties because, without Safrin's knowledge or

consent, they: (a) exceeded the scope of their authority; (b) used Safrin's name and identity and/or confidential information concerning Safrin (without his knowledge or consent) for their own purposes and material benefit and/or for the purposes and material benefit of third parties; and (c) improperly represented that they were authorized to act on Safrin's behalf to consummate the transactions alleged in the Complaint.

82.    Friedman/BIR's conduct was so outrageous as to evince a high degree of moral turpitude and show such wanton dishonesty as to imply criminal indifference to civil obligations.

83.    By reason of the foregoing, Friedman and BIR are liable to Safrin for damages, including punitive damages and the cost of defending against the Main Action, in an amount to be determined at trial.

**Count V**

**(N.Y. Civil Rights Law §§ 50, 51 – Against All Defendants)**

84.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

85.    Defendants, operating out of their places of business within the State of New York, knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC, as well as other transactional documents, including officer's certificates, and the Citigroup loan documents; (b) used Safrin's name and identity in connection with their negotiations with Plaintiffs; and (c) drafted those documents that were necessary to create LLCs in which Safrin was a purported member, director or manager. These LLCs include, but are not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

86.    Upon information and belief, Defendants used Safrin's name, without Safrin's consent, within the State of New York.

15

87. Upon information and belief, Friedman/BIR also improperly used Safrin's name to mislead the New York-based attorneys responsible for the closing concerning the sale of the Property Portfolio into believing that Safrin was part of the transaction.

88. Safrin did not give either his oral or written consent to the use of his name in connection with any of the transactions alleged in the Complaint, and Defendants knew that no such consent had been obtained.

89. In short, Defendants misappropriated Safrin's identity and stellar reputation in the real estate industry in order to obtain the necessary financing from Citigroup as well as to entice Plaintiffs into making its $13 million investment.

90. Defendants engaged in this conduct in order to make a profit and develop business for the benefit of Defendants and/or others.

91. By reason of the foregoing, Defendants violated N.Y. Civil Rights Law §§ 50 and 51.

92. Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

93. By reason of the foregoing the Defendants are liable to Safrin for damages, including punitive damages and reasonable attorney's fees, sustained by reason of their use of Safrin's name, in an amount to be determined at trial.

### Count VI

**(Violation of California Common Law Right Of Privacy/ Commercial Misappropriation – Against All Defendants)**

94. Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

95.    Defendants, operating out of their places of business within the State of New York, knowingly utilized Safrin's name on various transaction-related documents and transmitted these documents to Plaintiffs in California. Defendants also used Safrin's name and identity in connection with their negotiations with Plaintiffs.

96.    Upon information and belief, Friedman, BIR and Stern used Safrin's name and identity without his oral or written authorization in order to intentionally cause Amusement and its counsel to believe that Safrin was part of the transaction.

97.    On information and belief, most of the negotiations with Plaintiffs occurred in telephone calls between New York and California (where Amusement is located), and via email that was transmitted between New York and California.

98.    In short, Defendants misappropriated Safrin's identity and stellar reputation in the real estate industry in order to entice Plaintiffs into making their $13 million investment, and Defendants engaged in this conduct in order to make a profit and develop business for the benefit of Defendants and/or for the benefit of other parties.

99.    Safrin did not provide Defendants with either his oral or written consent to use his name or identity in connection with any of the transactions alleged in the Complaint, and Defendants knew that no such consent had been obtained.

100.   Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

101.   By reason of the foregoing the Defendants are liable to Safrin for damages, including punitive damages and reasonable attorney's fees, sustained by reason of their use of Safrin's name, in an amount to be determined at trial.

17

## Count VII

### (Conspiracy to Violate N.Y. Civil Rights Law §§ 50, 51 – Against All Defendants)

102. Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 84 – 93 as if fully set forth herein.

103. Upon information and belief, Defendants intentionally and knowingly agreed and conspired, in violation of N.Y. Civil Rights Law §§ 50, 51, to misappropriate Safrin's identity (i.e., his name and his stellar reputation in the real estate industry) in order to secure the requisite financing for the purchase of the Property Portfolio. Defendants conspired and, in fact, engaged in this conduct for their own benefit, profit and unlawful gain.

104. In furtherance of this conspiracy, Defendants knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the Citigroup loan documents, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC and other transactional documents, including officer's certificates in connection with the transactions alleged in the Complaint; (b) used Safrin's name and identity in connection with the investment proposal presented to Plaintiffs and in their negotiations with Amusement; (c) drafted and emailed the LOI; (d) transmitted the forged Assignment Agreement to Plaintiffs; (e) improperly authorized the release of the funds in escrow; and (f) created a variety of LLCs that identify Safrin as a purported member, director or manager, including, but not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

105. Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

106. By reason of the foregoing, the Defendants are liable to Safrin for damages, including punitive damages, in an amount to be determined at trial.

18

## Count VIII

**(Conspiracy to Violate Safrin's Right To Privacy Under California Common Law –
Against All Defendants)**

107. Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 94-101 as if fully set forth herein.

108. Upon information and belief, Defendants intentionally and knowingly agreed and conspired, in violation of Safrin's right to privacy under California law, to misappropriate and use Safrin's identity (i.e., his name, his stellar reputation in the real estate industry, and financial wherewithal) in order to secure the requisite financing and entice Plaintiffs to make a $13 million investment. Defendants engaged in this conduct for their own benefit, profit and unlawful gain and the benefit, profit and unlawful gain of others.

109. In furtherance of this conspiracy, Defendants knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the Citigroup loan documents, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC, as well as, other transactional documents, including officer's certificates, in connection with the transactions alleged in the Complaint; (b) used Safrin's name and identity in connection with the investment proposal presented to Plaintiffs and in their negotiations with Plaintiffs; (c) drafted and e-mailed the LOI; (d) transmitted the forged Assignment Agreement to Plaintiffs; (e) improperly authorized the release of the funds in escrow; and (f) the creation of a variety of LLCs that identify Safrin as a purported member, director or manager, including, but not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

110. Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

111. By reason of the foregoing, the Defendants are liable to Safrin for damages, including punitive damages, in an amount to be determined at trial.

## JURY DEMAND

Safrin demands a trial by jury on all issues so triable.

WHEREFORE, Safrin demands judgment as follows:

     (a)     On Count 1, in the event that Safrin is found liable, for Safrin and against Defendants, for indemnity or contribution in an amount to be determined at trial, including reasonable attorney's fees;

     (b)     On Count 2, for Safrin and against Plaintiffs/Counterclaim Defendants and Defendants, declaring that:  (i) no attorney-client or other principal-agency relationship existed between Safrin and Friedman/BIR in connection with the transactions alleged in the Complaint; (ii) Friedman/BIR had no authority, whether actual or apparent, to act on Safrin's behalf in connection with the transactions alleged in the Complaint; and (iii) Safrin did not ratify any of the representations or conduct allegedly made or undertaken on his behalf by Friedman/BIR in connection with the transactions alleged in the Complaint;

     (c)     On Count 3, in the event that Safrin is found to have had a principal-agent relationship with Friedman/BIR, for Safrin and against Friedman and BIR, for indemnity in an amount to be determined at trial, including reasonable attorney's fees;

     (d)     On Count 4, in the event that Safrin is found to have had a principal-agent relationship with Friedman/BIR, for Safrin and against Friedman and BIR,

for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(e)    On Count 5, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(f)    On Count 6, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(g)    On Count 7, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(h)    On Count 8, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(i)    Awarding Safrin his costs and disbursements; and

(j)     Granting such other, further and different relief as the Court deems just

and proper.

Dated: New York, New York
       May 29, 2008

FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP.

By:

Jonathan D. Lupkin (JL-0792)
Jean Marie Hackett (JH-1784)

One Liberty Plaza
New York, New York  10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com
       jhackett@fzwz.com

*Attorneys for Defendant/Third Party-
Crossclaim-Counterclaim-Plaintiff Joshua
Safrin*

22

**EXHIBIT A**

**(to Third Party Complaint)**

PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel:  (212) 643-7000
Fax:  (212) 643-6500



ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210



Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AMUSEMENT INDUSTRY, INC., a
California corporation dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO.,
INC., a California corporation,

           Plaintiffs,

v.

MOSES STERN, an individual aka MARK
STERN; JOSHUA SAFRIN, an individual;
FIRST REPUBLIC GROUP REALTY LLC, a
Delaware limited liability company;
EPHRAIM FRENKEL, an individual; LAND
TITLE ASSOCIATES ESCROW, a New York
limited liability company,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

Plaintiffs AMUSEMENT INDUSTRY, INC., a California corporation, and

PRACTICAL FINANCE CO., INC., a California corporation, by and through their

attorneys, state their complaint against Defendants MOSES STERN, an individual aka

MARK STERN, JOSHUA SAFRIN, an individual, FIRST REPUBLIC GROUP REALTY

LLC, a Delaware limited liability company, EPHRAIM FRENKEL, an individual, and

LAND TITLE ASSOCIATES ESCROW, a New York limited liability company, as follows:

## INTRODUCTION AND PARTIES

1.      Plaintiff, AMUSEMENT INDUSTRY, INC., is a California corporation

doing business as WESTLAND INDUSTRIES, incorporated, duly organized and existing

under the laws of the State of California, and conducting business from its principal place of

business in Long Beach, California ("Amusement" or "Westland").

2.      Plaintiff, PRACTICAL FINANCE CO., INC., is a California corporation,

incorporated, duly organized and existing under the laws of the State of California, and

conducting business from its principal place of business in Long Beach, California

("Practical Finance"). Practical Finance is a licensed State of California finance lender.

Practical Finance is the assignee of Amusement as to promissory notes signed by Stern and

delivered to escrow for the initial benefit of Amusement.

3.      Defendant, MOSES STERN aka MARK STERN is an individual who, upon

information and belief, is a citizen of the State of New York. Stern also regularly transacts

business in New York County.

4.      Defendant, JOSHUA SAFRIN is an individual who, upon information and

belief, is a citizen of the State of New York.

5.      Defendant, FIRST REPUBLIC GROUP REALTY LLC, is a Delaware

limited liability company, formed, ]duly organized and existing under the laws of the State

2

of Delaware in June 2007, whose registered office is in the State of Delaware and whose

principal place of business is in New York County, State of New York, and whose sole

member is non-party, FRGR MANAGING MEMBER LLC. Upon information and belief,

FIRST REPUBLIC GROUP REALTY LLC is a citizen of the State of New York, in that all

of its members are citizens of New York.

6.      Non-party, First Republic Group, Corp. is a corporation registered to do

business in New York, with its principal place of business in New York. Upon information

and belief, First Republic Group, Corp., is and at all times relevant to this action was, solely

owned and controlled by Moses Stern aka Mark Stern.

7.      Non-party, Colonial Realty Limited Partnership is a Delaware limited

partnership, with its principal place of business in Delaware.

8.      Non-party, Stephen Friedman ("Friedman") is a State of New York licensed

attorney at the New York City office of law firm, BUCHANAN, INGERSOLL & ROONEY

PC.

9.      In June 2007, non-party, MS Colonial LLC was formed as a Delaware

limited liability company, with Stern as its sole member. Upon information and belief, MS

Colonial LLC is a citizen of the State of New York, in that its member is a citizen of the

State of New York.

10.     In June 2007, non-party, JSAE Colonial LLC was formed as a Delaware

limited liability company, with Safrin and Avery Egert as its members. Upon information

and belief, Avery Egert is a citizen of the State of New York. Upon information and belief,

JSAE Colonial LLC is a citizen of the State of New York, in that all of its members are

citizens of the State of New York.

11.    In June 2007, non-party, FRGR HOLDINGS LLC was formed as a Delaware limited liability company, with MS Colonial LLC and JSAE Colonial LLC as its members. Upon information and belief, FRGR HOLDINGS LLC is a citizen of the State of New York, in that all of its members are citizens of the State of New York.

12.    In June 2007, non-party, FRGR MANAGING MEMBER LLC was formed as a Delaware limited liability company, with FRGR HOLDINGS LLC, as its sole member. Upon information and belief, FRGR MANAGING MEMBER LLC is a citizen of the State of New York, in that its member is a citizen of the State of New York.

13.    Defendant, EPHRAIM FRENKEL, is an individual who, upon information and belief, is a citizen of the State of New York and the sole owner and sole member of Land Title Associates Escrow.

14.    Defendant, LAND TITLE ASSOCIATES ESCROW, is a limited liability company, duly organized and existing under the laws of the State of New York, whose registered office is in the State of New York and whose principal place of business is in Nassau County, the State of New York. Upon information and belief, LAND TITLE ASSOCIATES ESCROW is a citizen of the State of New York, in that its member is a citizen of the State of New York.

15.    Plaintiffs allege that at all relevant times herein, defendants, and each of them, were the agents, servants and employees of their co-defendants and in doing the things hereinafter mentioned, were acting in the scope of their authority as such agents, servants and employees with the permission and consent of their co-defendants.

16.    Defendant, MOSES STERN aka MARK STERN, an individual, is hereinafter referred to as "Stern."

4

17.    Defendant, JOSHUA SAFRIN, an individual is hereinafter referred to as "Safrin."

18.    Defendant, FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company is hereinafter referred to as "First Republic LLC."

19.    Defendant, EPHRAIM FRENKEL, an individual, is hereinafter referred to as "Frenkel."

20.    Defendant, LAND TITLE ASSOCIATES ESCROW, a limited liability company, is hereinafter referred to as "Land Escrow."

## JURISDICTION AND VENUE

21.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.    Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(1), in that at least one defendant resides in this district and all defendants reside in New York.

23.    Venue also is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district.

## STATEMENT OF FACTS

24.    On or about April 20, 2007, First Republic Group, Corp., as buyer, entered into a written contract to purchase from Colonial Realty Limited Partnership, as seller, numerous shopping centers in the southeastern United States. This contract was subsequently amended and assigned, to among other things, change the buyer to First Republic LLC, change the price for the property portfolio being purchased and change the shopping centers being purchased within the property portfolio. First Republic LLC's

5

purchase of the property portfolio closed on about July 12, 2007, so that First Republic LLC

became owner of the eleven properties, having the following legal descriptions, on that date

(the "property portfolio" or the "eleven portfolio properties") (copies of the legal

descriptions described below also are attached as exhibits to the grant deeds in **Exhibit 1**):

      a.    QUAKER VILLAGE [Retail Property: 5605 W. Friendly Avenue, Greensboro, North Carolina 27410 (Guilford County)]

      i.    <u>Tract 1</u>: Beginning at a point on the southern margin of West Friendly Avenue (88 Foot right-of-way), said point being located South 78 deg. 55 min. 56 sec. East 206.15 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence continuing with the southern margin of West Friendly Avenue South 78 deg. 55 min, 56 sec. East 290.82 feet to an existing railroad spike, the northwest corner of the Jackson Talbert property as recorded in Deed Book 5558, Page 1470 in the Office of the Register of Deeds of Guilford County, North Carolina; thence with Talbert's line the following bearings and distances, South 11 deg. 12 min, 49 sec. West, 111.49 feet to an "X" in the concrete, and South 79 deg. 14 min. 19 sec. east 129.81 feet to an existing iron pipe on the western margin of Dolly Madison Road; thence with the western margin of Dolly Madison road the following bearings and distances, South 10 deg. 34 min. 17 sec. West,161.08 feet to a point; South 09 deg 33 min. 51 sec. West 37.38 feet to a point; North 79 deg. 52 min. 52 sec. West, 4.87 feet to a point; South 10 deg. 07 min. 28 sec. West 70.00 feet to a point; along a curve to the right having a radius of 1,281.37 feet, a chord bearing and distance of South 16 deg. 03 min. 08 sec. West, 264.67 feet to a point; and South 21 deg. 50 min. 56 sec. West, 42.34 feet to an existing iron pipe, the northeast corner of Madison Properties as recorded in Plat Book 91, Page 148, thence with Madison Properties the following bearings and distances, North 77 deg. 57 min. 25 sec. West, 178.64 Feet to an existing nail; and South 12 deg. 06 min 55 sec. West, 125.07 feet to an existing Iron pipe in the line of R.H. Foreman as recorded in Deed Book 3224, Page 342; thence with Foreman's line North 87 deg. 25 min. 10 sec. West 128.75 feet to an existing iron pipe, the eastern boundary of the K.C. Properties, LLC property as recorded in Deed Book 1828, Page 6.26, thence with the line of K.C. Properties, LLC North 05 deg. 54 min. 55 sec. East, 1.92 feet to an existing Iron pipe thence North 03 deg. 54 min. 33 sec. East 255.87 feet to an existing iron; thence North 86 deg. 25 min. 55 sec. West 180.36 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 403.01 feet to a point; thence North 89 deg. 26 min. 15 sec. East, 182.95 feet to a point; and North 10 deg. 55 min. 44 sec. East, 178.99 feet to the POINT OF BEGINNING, and containing 7.948 acres, more or less.

      ii.    <u>Tract 2-A:</u> BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being located South 78 deg. 55 min. 36 sec. East, 115.20 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 55 min. 56 sec. East, 70.24 feet to a point; thence South 03 deg. 55 min. 55 sec. West 180.55 feet to a point; thence South 89 deg. 26 min. 15 sec. West, 182.22 feet to a point on the

6

eastern margin of Milner Drive thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 67.74 feet to a point; thence South 78 deg. 55 min. 55 sec. East, 100.00 feet to a point; thence North 08 deg. 55 min. 10 sec. East, 148.85 feet to the POINT OF BEGINNING, and containing 0.407 acres, more or less.

     iii.    Tract 2B:  BEGINNING at a point on the southern margin of West Friendly Avenue, (88-foot right-of-way), said point being located South 78 deg. 53 min. 36 sec. East, 185.44 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 55 min. 36 sec. East, 22.71 feet to a point; thence South 10 deg. 55 min. 44 sec. West, 178.99 feet to a point; thence South 89 deg. 26 min. 15 sec. West, 0.75 feet to a point; and North 03 deg. 55 min. 55 sec. East, 180.55 feet to the POINT OF BEGINNING, and containing 0.048 acres, more or less.

     iv.    Tract 3:  BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being on existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin on West Friendly Avenue South 78 deg. 55 min. 56 sec East, 113.20 feet to a point; thence South 08 deg. 55 min. 10. sec. West, 148.85 foot to a point; thence North 78 deg. 55 min. 35 sec. West, 100.00 feet to a point on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 150.00 feet to the POINT OF BEGINNING, and containing 0.471 acres, more or less.

     v.    Tract4:  BEGINNING at a point on the eastern margin of Milner Drive, said point being an existing iron pipe located South 03 deg. 50 min. 29 sec. West, 620.75 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence South 86 deg. 25 min. 55  sec. East, 180.36 feet to an existing iron pipe; thence South 03 deg. 54 min. 33 sec. West, 115.84 feet to a point; thence North 85 deg. 09 min. 44 sec. West, 180.25 feet to a point on the eastern margin of Milner Drive, thence with the eastern margin if Milner Drive North 05 deg. 50 min. 29 sec. East, 111.95 to the POINT OF BEGINNING, and containing 0.364 acres, more or less

     vi.    Tract 5:  BEGINNING at a point on the eastern margin of Milner Drive, said point being located South 03 deg. 50 min. 29 sec. West, 752.70 feet from an existing p.k. nall at the southeast insersection of West Friendly Avenue and Milner Drive; thence leaving the eastern margin of Milner Drive South 85 deg. 09 min. 44 sec. East, 180.25 feet to a point; thence South 03 deg. 54 min. 33 sec. West, 116.10 feet to an existing iron pipe on the northern boundary of the K.C. Properties, LLC property; thence with K.C. Properties, LLC North 84 deg 05 min. 56 sec. West 145.94 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive the following bearing and distances, along a curve to the left having a radius of 60 feet, a chord bearing and distance of North 34 deg. 47 min. 43. sec. West, 54.85 feet to a new iron pipe; and North 03 deg. 50 min. 29 sec. East, 71.16 feet to the POINT OF BEGINNING, and containing 0.451 acres, more or less.

     b.    MAYBERRY [Regional Mall: Andy Griffith Parkway North, Mount Airy, North Carolina 27030 (Surry County)]

i.      Located in Mount Alry Township, Surry County, North Carolina, at the intersection of Frederick Street (SR 1634) and U.S. Hwy, 52, and described as follows:

ii.     THE POINT OF BEGINNING is an existing iron pin set on the east side of Frederick Street, the northwest corner of property owned now or formerly by Selk's Department Store of Mounty Alry, North Carolina, Incorporated (Book 287, Page 683); the N.C. Grid coordinates for this POINT OF BEGINNING are as follows: X=1523277.63 Y=1006347.02; and now proceeding from this POINT OF BEGINNING with the east side of Frederick Street N 41-21-25 W 74.50' to an existing iron pin; then 5 76-45-00 W 89.69' to a right of way monument on the east right o way margin of U.S. Hwy. 52 (northbound lane); then proceeding with this right of way margin the following three cells: N 13-15-00 W 278.06' to an existing iron pin, N 13-15-00 W 151' to a new iron pin, and N 13-15-00 W 220.10' to an iron pin set at the southwest corner of property owned now or formerly by Libby Hill Seafood Restaurant, Inc. (Book 384, Page 432); then proceeding with the line of Libby Hill N 76-45-00 E 175' to a set railroad spike and N 13-15-00 W 140' to a PX nall set in a concrete slab, a point in the line of property owned now or formerly by Mayberry Investments (Book 292, Page 367 and Book 293, Page 433); then proceeding with the line of Mayberry Investments the following three cells; N 77-21-50 E 66' to an existing iron pin, N 12-29-34 W 184.03' to an existing iron pin, and N 12-44-27 E 80.07 to an existing iron pin, a corner with Spencers, Inc. of Mount Alry (Book 330, Page 708 and Book 429, Page 330); then proceeding with the line of Spencers, Inc., of Mount Alry S. 79-40-10 E 183.32' to an existing monument and N 87-05-40 E (passing an existing monument at 385.33') 382.97' to a point in Lovills Creek; then S 10-56-00 E 329.49' to an existing monument on the bank of Lovills Creek; then with the line of James L. Hazel (Book 309, Page 886) S 09-11-00 S 572.34' to an existing iron pin; a corner with Belk's Department Store (Book 287, Page 683); then proceeding with the Belk's line the following five cells; S 76-44-40 W (passing an existing iron pin at 138.09') 141.29' to a point, N 15-45-00 W 31.90' to a point, S 74-08-20 W 209.36' to a point, S 15-55-42 S 76' to a point and S 74-23-39 W 306.41' to the aforesaid POINT OF BEGINNING, and containing 16.68 acres, more or less. This description was obtained from a plat of a survey by Relf Surveying Company dated February 23, 1987 and last revised September 22, 1989.

iii.    TOGETHER WITH nonexclusive, perpetual easements for access and parking, and easements, as such easements are described in instruments recorded in the Surry County Registry, including that certain Contract, recorded in Book 292, Page 361, Surry County Registry; that certain Cross Easement Agreement, recorded in Book 455, Page 525, Surry County Registry, and that certain Easement, recorded in Book 479, Page 773, Surry County Registry.

iv.     Tract 7: Non-exclusive easement granted in that certain instrument by and between Libby Hill Seafood Restaurant, Inc. and Mayberry Center Associates recorded in Book 474, page 773.

c.      BRITT DAVID [Retail Property: 2911 Airport Thruway, Columbus, Georgia 31906 (Muscogee County)]

i.    ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOS 35, 36, 45 AND 46, 8TH DISTRICT, MUSCOGEE COUNTY, GEORGIA AND AS MORE PARTICULARLY DESCRIBED ON EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

d.    MONTGOMERY PROMENADE NORTH [Retail Property: 2232-2430 Eastern Boulevard, Montgomery, Alabama 36117 (Montgomery County)]

i.    BEGIN AT THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF SECTION 23, T-16-N, R-18-E, MONTGOMERY COUNTY, ALABAMA; THENCE RUN N87 DEGREES 20'07" e, 783.31 FEET TO A POINT LYING ON THE WESTERLY RIGHT OF WAY, S 23 DEGREES 45"07" W, 1490.77 FEET TO A POINT LYING AT THE NORTHEAST CORNER OF U.S. POSTAL SERVICE PLAT NO. 1, AS RECORDED IN THE OFFICE OF THE JUDGE OF PROBATE, MONTGOMERY COUNTY, ALABAMA, IN PLAT BOOK 32 AT PAGE 84; THENCE LEAVE SAID RIGHT OF WAY AND RUN ALONG THE NORTH LINE OF SAID PLAT, N 66 DEGREES 29'48" W, 324.82 FEET TO A POINT; THENCE FUN ALONG THE WEST LINE OF SAID PLAT S 23 DEGREES 39'59" W, 197.83 FEET TO A POINT LYING ON THE NORTH RIGHT OF WAY OF YOUNG BARN ROAD (50' ROW); THENCE RUN ALONG SAID NORTH RIGHT OF WAY, N 66 DEGREES 06'11" W, 313.64 FEET TO A POINT LYING AT THE INTERSECTION OF THE AFOREMENTIONED NORTH RIGHT OF WAY OF YOUNG BARN ROAD AND THE EAST RIGHT OF WAY OF THE PROPOSED EXTENSION OF CENTRAL PARKWAY (50' ROW); THENCE RUN ALONG SAID PROPOSED EAST RIGHT OF WAY, N 23 DEGREES 53"49" E, 32.00 FEET TO A POINT LYING IN A CURVE; THENCE RUN ALONG SAID CURVE (CONCAVE WESTERLY, R = 312.74') AND SAID RIGHT OF WAY, A CHORD OF N 04 DEGREES 03' 01" E, 293.14 FEET TO A POINT OF REVERSE CURVATURE; THENCE RUN ALONG SAID CURVE (CONCAVE EASTERLY, R = 350.45'), AND SAID RIGHT OF WAY. A CHORD OF N 04 DEGREES 07'22" W, 327.55 FEET TO A POINT AT THE END OF SAID CURVE; THENCE CONTINUE ALONG SAID RIGHT OF WAY, N 23 DEGREES 45'07" E, 457.44 FEET TO A POINT OF CURVATURE; THENCE RUN ALONG SAID CURVE (CONCAVE WESTERLY, R = 376.87'), A CHORD OF N 10 DEGREES 26'37" E, 173.53 FEET; THENCE LEAVE SAID RIGHT OF WAY AND RUN N 87 DEGREES 07'54" E, 283.00 FEET TO THE POINT OF BEGINNING.

i.    SAID DESCRIBED PARCEL LYING AND BEING SITUATED IN THE SOUTHEAST QUARTER OF SECTION 23 AND THE SOUTHWEST QUARTER OF SECTION 24, T-16-N, R-18-E, MONTGOMERY COUNTY, ALABAMA, AND CONTINS 27.663 ACRES, MORE OR LESS.

e.    STAUNTON [Retail Property: 90 Lee-Jackson Highway, Staunton, Virginia 24401 (Augusta County)]

i.    ALL THAT CERTAIN TRACT OR PARCEL OF LAND, WITH ALL IMPROVEMENTS THEREON AND APPURTENANCES THERE UNTO BELONGING, LYING, BEING AND SITUATED IN THE COUNTY OF AUGUSTA, VIRGINIA, AND

9

THE CITY OF STAUNTON, VIRGINIA, CONTAINING 38.552 ACRES, MORE OR
LESS, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

    ii      BEGINNING AT A CONCRETE VIRGINIA DEPARTMENT OF
HIGHWAYS RIGHT-OF-WAY MONUMENT, ON NORTH RIGHT-OF-WAY LINE OF
STATE ROUTE 644 AND IN THE LILNE OF PARCEL ONE, AND THENCE; N 16
DEGREES 38'21" W 31.42 FEET TO A POINT IN THE EAST RIGHT-OF-WAY OF U.S.
ROUTE AA, CORNER TO PARCEL ONE.  THENCE WITH THE SAME N18 DEGREES
02'32" E 1488.60 FEET PASSING A CORNER COMMON TO PARCEL ONE AND
PARCEL TWO AT 1407.11 FEET TO A POINT CORNER TO PARCEL TWO AND
PARCEL THREE, 81.49 FEET FROM THE CORNER COMMON TO PARCEL ONE
AND PARCE TWO, SAID POINT BEING THE POINT OF CURVATURE OF A CURVE
CONCAVE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5673.58 FEET, A
TANGENT OF 318.10 FEET AND A CHORD LENGTH OF 635.20 FEET, BEARING N
21 DEGREES 15'05" E, THENCE CONTINUING WITH U.S. ROUTE 11, AND PARCEL
THREE THROUGH A DELTA OF 06 DEGREES 25'05" AND AN ARC OF 635.53 FEET
TO A POINT, THENCE WITH SAME N 65 DEGREES 32'23" W, 14.00 FEET TO A
POINT, SAID POINT BEING THE POINT OF CURVATURE OF A CURVE CONCAVE
TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5687.58 FEET, A TANGENT
OF 103.35 FEET AND A CHORD LENGTH 206.66 FEET BEARING N 25 DEGREES
30'05" E THENCE CONTINUING WITH SAME THROUGH A DELTA OF 02
DEGREES 04'55" AND AN ARC OF 206.67 FEET TO A PINCHED PIPE IN THE LINE
OF PARCEL THREE AND THE EAST RIGHT-OF-WAY LINE OF U.S. ROUTE 11,
THENCE CONTINUING WITH SAME N 26 DEGREES 32'32" E, 45.08 FEET TO A
PINCHED PIPE, SAID PIPE BEING A CORNER TO PARCEL THREE AND THE
LANDS OF GEORGE AND MARY J. CHRISTIAN, BY DEED RECORDED IN DEED
BOOK 530, PAGE 467, THENCE LEAVING U.S. ROUTE 11, AND WITH PARCEL
THREE AND GEORGE AND MARY J. CHRISTIAN AT S 27 DEGREES 01'03" E 97.99
FEET TO A POINT, THENCE WITH THE SAME S 22 DEGREES 10'03" E 100.00 FEET
TO A PINCHED PIPE, SAID PIPE BEING A CORNER TO THE LANDS OF GEORGE
T. AND FLORENCE S. JONES, THENCE WITH PARCEL THREE AND GEORGE T.
AND FLORENCE S. JONES S 16 DEGREES 56'03" E 100.00 FEET TO A PINCHED
PIPE, THENCE CONTINUING WITH THE SAME S 12 DEGREES 36'03" E 100.00
FEET TO A PINCHED PIPE, THENCE WITH THE SAME S 07 DEGREES 10'03" E
100.00 FEET TO A PINCHED PIPE, THENCE WITH THE SAME S 01 DEGREES 01'03"
E 100.00 FEET TO A PINCHED PIPE FOUND, THENCE WITH SAME S 04 DEGREES
03'57" W 100.00 FEET TO A PINCHED PIPE, SAID PIPE BEING A CORNER TO THE
LANDS OF JAMES A. AND AZILE W. HARRIS, S 10 DEGREES 34'57" W, 96.00 FEET
PASSING A CORNER OF PARCEL THREE AND PARCEL TWO AT 39.48 FEET TO A
POINT IN THE LINE OF PARCEL TWO, THENCE WITH PARCEL TWO AND THE
LANDS OF JAMES A. AND AZILE W. HARRIS S 16 DEGREES 18'57" W 82.10 FEET
TO A POINT, SAID POINT CORNER TO THE LANDS OF STEWART C. AND NANCY
ANN YOUNG, THENCE WITH PARCEL TWO AND STEWART C. AND NANCY ANN
YOUNG S 31 DEGREES 27'24" E, 116.20 FEET TO A PIPE, SAID PIPE CORNER TO
THE LANDS OF TIMOTHY F. AND WANDA M. SANJULE, THENCE S 28 DEGREES
10'24" E 323.57 FEET, PASSING A FENCE POST CORNER TO THE LANDS OF
TIMOTHY F. AND WANDA M. SANJULE AND THE LANDS OF HAROLD E. JR.

AND LOREE C. LANDES AND PARCEL TWO AND PARCEL ONE AT 75.00 FEET TO
A FENCE POST CORNER TO PARCEL ONE AND THE LANDS OF LANDES,
THENCE CONTINUING WITH PARCEL ONE AND THE LANDS OF HAROLD E. JR.
AND LOREE C. LANDES BY DEED RECORDED IN BOOK 1231 PAGE 507, N61
DEGREES 51'07" E, 320.J16 FEET TO A RAILROAD SPIKE IN THE CENTERLINE OF
ROUTE 635, A 30' RIGHT-OF-WAY, THENCE WITH THE CENTERLINE OF ROUTE
635, S 28 DEGREES 23'54" E 100.18 FEET TO A RAILROAD SPIKE, THENCE
LEAVING THE CENTERLINE OF ROUTE 635 AND WITH PARCEL ONE S 56
DEGREES 05'01" W 219.21 FEET TO A PIPE, CORNER TO PARCEL ONE AND THE
LANDS OF KNOPP ENTERPRISES, INC., BY DEED RECORDED IN DEED BOOK 688
PAGE 498, CONTINUING WITH SAME S 17 DEGREES 59'54" W 1357.66 FEET TO A
PIPE CORNER, THENCE WITH SAME S 51 DEGREES 41'54" W 196.47 FEET TO A
PIPE IN THE NORTH RIGHT-OF-WAY LINE OF ROUTE 644, SAID PIPE BEING THE
POINT OF CURVATURE OF A CURVE CONCAVE TO THE LEFT, SAID CURVE
HAVING A RADIUS OF 501.45 FEET, A TANGENT OF 126.19 FEET AND A CHORD
LENGTH OF 244.67 FEET BEARING N 48 DEGREES 49'18" W, THENCE WITH
ROUTE 644 AND PARCEL ONE THROUGH A DELTA OF 28 DEGREES 15'05" AND
AN ARC OF 247.25 FEET TO A POINT, CONTINUING WITH THE SAME N 62
DEGREES 56'20" W 322.48 FEET TO A POINT, CONTINUING WITH THE SAME N 27
DEGREES 03'40" E 15.00 FEET TO A CONCRETE VIRGINIA DEPARTMENT OF
HIGHWAYS MONUMENT, THENCE CONTINUING WITH SAME N 61 DEGREES
14'31" W 229.90 FEET TO THE POINT OF BEGINNING, SAID BOUNDARY
CONTINING 38.552 ACRES.

     f.     BELLWOOD [BELLWOOD SHOPPING CENTER: 2701-2787 Bell Road,
Montgomery, Alabama 36117 (Montgomery County)]

     i.     LOT D, ACCORDING TO THE MAP OF BELLWOOD SHOPPING
VILLAGE PLAT NO. 1, AS SAID MAP APPEARS OF RECORD IN THE OFFICE OF
THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN PLAT
BOOK 36, AT PAGE 218.

     g.     DECATUR MALL [Regional Mall: 1801 Beltline Road SW, Decatur,
Alabama 35601 (Morgan County)]

     i.     REAL ESTATE LOCATED WITHIN THE NE-1/4 OF SECTION 35 AND
THE NW-1/4 OF SECTION 36, IN TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR,
MORGAN COUNTY, ALABAMA, AND MORE PARTICULARLY DESCRIBED AS
FOLLOWS TO-WIT:  BEGIN AT AN IRON PIN ON THE NORTHEAST CORNER OF
SECTION 35, TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR, MORGAN
COUNTY, ALABAMA, AND RUN THENCE N 88 DEGREES 44'33" W (ALABAMA
STATE COORDINATE SYSTEM-GRID BEARING) ALONG THE NORTH
BOUNDARY OF SAID SECTION 35 A DISTANCE OF 51.51 FEET TO AN IRON PIN
AND THE TRUE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED,
SAID POINT BEING THE NORTHEAST CORNER OF PROPERTY CONVEYED TO
BRAMALEN CENTERS, INC., AND RECORDED IN THE MORGAN COUNTY
PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 653; THENCE FROM THE TRUE

POINT OF BEGINNING RUN S 01 DEGREES 15'27" W A DISTANCE OF 269.00 FEET
TO AN IRON PIN; THENCE S 88 DEGREES 44'33" E A DISTANCE OF 82.79 FEET TO
AN IRON PIN; THENCE S 62 DEGREES 15'46" E A DISTANCE OF 214.57 FEET TO AN
IRON PIN ON THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD,
S.W. (ALABAMA HIGHWAY NO. 67); THENCE ALONG THE WESTERLY RIGHT OF
WAY MARGIN OF BELTLINE ROAD, SW (ALABAMA HIGHWAY NO. 67) AND
ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 7514.44 FEET (CHORD
BEARING S 27 DEGREES 57'11" E, CHORD DISTANCE 57.11 FEET) AN ARC
DISTANCE OF 57.11 FEET TO A RAILROAD SPIKE; THENCE S 27 DEGREES 44'13"
E ALONG THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD, S.W.
(ALABAMA HIGHWAY NO. 67) A DISTANCE OF 52.89 FEET TO AN IRON PIN;
THENCE S 62 DEGREES 15'47" W A DISTANCE OF 134.00 FEET TO AN IRON PIN;
THENCE S 17 DEGREES 15'47" W A DISTANCE OF 62.22 FEET TO A RAILROAD
SPIKE; THENCE S 27 DEGREES 44'13" E A DISTANCE OF 474.09 FEET TO A
RAILROAD SPIKE; THENCE S 75 DEGREES 44'13" E A DISTANCE OF 55.15 FEET
TO AN IRON PIN; THENCE N 62 DEGREES 15'47" E A DISTANCE OF 139.00 FEET
TO AN IRON PIN ON THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE
ROAD, S.W. (ALABAMA HIGHWAY NO. 67); THENCE S 27 DEGREES 44'13" E
ALONG THIS WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD, S.W.
(ALABAMA HIGHWAY NO. 67) A DISTANCE OF 80.00 FEET TO AN IRON PIN;
THENCE S 62 DEGREES 15'47" W A DISTANCE OF 139.00 FEET TO AN IRON PIN;
THENCE S 17 DEGREES 15'47" W A DISTANCE OF 55.15 FEET TO AN IRON PIN;
THENCE S 27 DEGREES 44'13" E A DISTANCE OF 442.83 FEET TO AN IRON PIN;
THENCE S 84 DEGREES 19'43" E A DISTANCE OF 192.45 FEET TO AN IRON PIN;
THENCE S 05 DEGREES 40'17" W A DISTANCE OF 78.89 FEET TO A CROSS
CHISELED ON A CONCRETE FLUME ON THE WESTERLY RIGHT OF WAY
MARGIN OF DANVILLE ROAD, S.W., (MORGAN COUNTY HIGHWAY NO. 41);
THENCE ALONG THE WESTERLY RIGHT OF WAY MARGIN OF DANVILLE
ROAD, S.W. (MORGAN COUNTY HIGHWAY NO. 410 AND ALONG A CURVE TO
THE LEFT HAVING A RADIUS OF 2123.48 FEET (CHORD BEARING S 33 DEGREES
52'00" W, CHORD DISTANCE 598.04 FEET) A ARC DISTANCE OF 600.04 FEET TO
AN IRON PIN; THENCE S 25 DEGREES 46'17" W A DISTANCE OF 293.05 FEET TO
AN IRON PIN; THENCE N 63 DEGREES 14'03" W A DISTANCE OF 451.72 FEET TO
A CROSS CHISELED IN A CONCRETE GUTTER; THENCE ALONG A CURVE TO
THE RIGHT HAVING A RADIUS OF 350.00 FEET (CHORD BEARING N 55
DEGREES 47'05" W, CHORD DISTANCE 90.76 FEET) AN ARC DISTANCE OF 91.02
FEET TO AN IRON PIN, SAID POINT BEING THE SOUTHEAST OR EASTERNMOST
CORNER OF PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND
RECORDED IN THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1273
AT PAGE 916; THENCE S 32 DEGREES 46'46" W A DISTANCE OF 157.52 FEET TO
AN IRON PIN; THENCE S 60 DEGREES 21'46" W A DISTANCE OF 240.00 FEET TO
AN IRON PIN; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF
265.95 FEET (CHORD BEARING S 52 DEGREES 05'01" W, CHORD DISTANCE 76.59
FEET) AN ARC DISTANCE OF 76.86 FEET TO AN IRON PIN; THENCE N 27
DEGREES 44'13" W A DISTANCE OF 1146.25 FEET TO AN IRON PIN; THENCE
ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1248.51 FEET (CHORD

BEARING N 13 DEGREES 29'34" W, CHORD DISTANCE 614.41 FEET) AN ARC
DISTANCE OF 620.78 FEET TO AN IRON PIN; THENCE S 88 DEGREES 44'14" E A
DISTANCE OF 54.34 FEET TO AN IRON PIN; THENCE S 01 DEGREES 04'14" E A
DISTANCE OF 30.00 FEET TO A RAILROAD SPIKE; THENCE S 88 DEGREES 38'14"
E A DISTANCE OF 165.12 FEET TO A RAILROAD SPIKE; THENCE S 87 DEGREES
44'14" E A DISTANCE OF 210.54 FEET TO A CROSS CHISELED IN A CONCRETE
FLUME; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 818.51
FEET (CHORD BEARING N 00 DEGREES 42'26" W, CHORD DISTANCE 34.00 FEET)
AN ARC DISTANCE OF 34.00 FEET TO A CROSS CHISELED ON A CONCRETE
CURB; THENCE CONTINUE ALONG A CURVE TO THE RIGHT HAVING A RADIUS
OF 818.51 FEET (CHORD BEARING N 00 DEGREES 52'07" E, CHORD DISTANCE
11.02 FEET) AN ARC DISTANCE OF 11.02 FEET TO THE RAILROAD SPIKE;
THENCE N 01 DEGREES 15'27" E, A DISTANCE OF 644.20 FEET TO AN IRON PIN
ON THE NORTH BOUNDARY OF SAID SECTION 35; THENCE S 88 DEGREES
44'33" E ALONG THE NORTH BOUNDARY OF SAID SECTION 35 A DISTANCE OF
130.69 FEET TO A POINT, SAID POINT BEING THE SOUTHWEST CORNER OF
PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND RECORDED IN
THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 662;
THENCE CONTINUE S 88 DEGREES 44'33" E ALONG THE NORTH BOUNDARY OF
SAID SECTION 35 A DISTANCE OF 530.31 FEET TO THE TRUE POINT OF
BEGINNING,

     ii    LESS AND EXCEPT:

A TRACT DESCRIBED AS BEGIN AT IRON PIN ON THE NORTHEAST
CORNER OF SECTION 35. TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR,
MORGAN COUNTY, ALABAMA, AND RUN THENCE N 88 DEGREES 44'33" W
(ALABAMA STATE COORDINATE SYSTEM-GRID BEARING) ALONG THE NORTH
BOUNDARY OF SAID SECTION 35 A DISTANCE OF 51.51 FEET TO AN IRON PIN,
SAID POINT BEING THE NORTHEAST CORNER OF PROPERTY CONVEYED TO
BRAMALEN CENTERS, INC., AND RECORDED IN THE MORGAN COUNTY
PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 653; THENCE S 01 DEGREES
15'27" W, A DISTANCE OF 269.00 FEET TO AN IRON PIN; THENCE CONTINUE S
01 DEGREES 15'27" W, A DISTANCE OF 47.88 FEET TO AN IRON PIN AND THE
TRUE POINT OF BEGINNING OF THE EXCEPTION TRACT HEREIN DESCRIBED;
THENCE FROM THE TRUE POINT OF BEGINNING RUN S 88 DEGREES 44'28" E A
DISTANCE OF 29.04 FEET TO AN IRON PIN; THENCE ALONG A CURVE TO THE
RIGHT HAVING A RADIUS OF 132.00 FEET (CHORD BEARING S 58 DEGREES
14'15 E, CHORD DISTANCE 134.00 FEET) AN ARC DISTANCE OF 140.55 FEET TO
A RAILROAD SPIKE; THENCE S 27 DEGREES 44'03" E A DISTANCE OF 192.95
FEET TO A RAILROAD SPPIKE; THENCE S 62 DEGREES 15'47" W A DISTANCE OF
224.00 FEET TO A RAILROAD SPIKE; THENCE N 27 DEGREES 44'13" W, A
DISTANCE OF 13.83 FEET TO A RAILROAD SPIKE; THENCE S 62 DEGREES 15'47"
W A DISTANCE OF 504.50 FEET TO A RAILROAD SPIKE; THENCE N 27 DEGREES
44'13" W A DISTANCE OF 60.00 FEET TO A RAILROAD SPIKE; THEN N 62
DEGREES 15'47" E A DISTANCE OF 30.00 FEET TO A RAILROAD SPIKE; THENCE
N 17 DEGREES 15'47" E A DISTANCE OF 90.51 FEET TO A RAILROAD SPIKE;

THENCE N 27 DEGREES 44'13" W A DISTANCE OF 130.00 FEET TO A RAILROAD SPIKE; THENCE S 62 DEGREES 15'47" W A DISTANCE OF 45.50 FEET TO AN IRON PIN; THENCE N 27 DEGREES 44'13" W A DISTANCE OF 185.00 FEET TO A RAILROAD SPIKE; THENCE N. 22 DEGREES 15'47" E A DISTANCE OF 108.92 FEET TO A RAILROAD SPIKE; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 107.00 FEET (CHORD BEARING N 56 DEGREES 45'40" E, CHORD DISTANCE 121.20 FEET) AN ARC DISTANCE OF 128.85 FEET TO A RAILROAD SPIKE; THENCE S 88 DEGREES 44'28" E A DISTANCE OF 437.32 FEET TO THE TRUE POINT OF BEGINNING.

LYING AND BEING WITHIN THE NE-1/4 OF SECTION 35 AND THE NW-1/4 OF SECTION 36, BOTH WITHIN TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR, MORGAN COUNTY, ALABAMA,

iii    PARCEL II: NON-EXCLUSIVE EASEMENT ESTATES CREATED PURSUANT TO THE FOLLOWING AGREEMENTS:

1.    CROSS EASEMENT AGREEMENT BY AND BETWEEN BELTLINE-DECATUR ASSOCIATES, LTD., MERCANTILE PROPERTIES, INC. AND THE CASTNER-KNOTT DRY GOODS CO., RECORDED SEPTEMBER 19, 1979 IN BOOK 1021, PAGE 566, IN THE OFFICE OF THE JUDGE OF PROBATE OF MORGAN COUNTY, ALABAMA AND AMENDED BY THAT CERTAIN CROSS-EASEMENT AGREEMENT BY AND BETWEEN BELTLINE-DECATUR ASSOCIATES, LTD., MERCANTILE PROPERTIES, INC., THE CASTNER-KNOTT DRY GOODS CO., AND CBL DEVELOPERS, INC. DATED AUGUST 3, 1977, UNEXECUTED COPIES OF WHICH ARE RECORDED AT BOOK 1022, PAGE 500, AND AT BOOK 1022, PAGE 511, AND EXECUTED COPY BEING RECORDED AT BOOK 1022, PAGE 523, AFORESAID RECORDS.

2.    AGREEMENT OF RECIPROCAL COVENANTS AND EASEMENTS BY AND BETWEEN BELTLINE-DECATUR ASSOCIATES, LTD., AND REX RADIO AND TELEVISION, INC., RECORDED NOVEMBER 24, 1986 AT BOOK 1199, PAGE 498, AFORESAID RECORDS.

3.    OPERATING AND EASEMENT AGREEMENT BETWEEN BELTLINE MALL SHOPPING CENTER COMPANY, LTD., ARLEN REALTY, INC. AND THE CASTNER-KNOTT DRY GOODS CO. DATED EFFECTIVE MARCH 28, 1977, FILED FOR RECORD JULY 21, 1977, AND RECORDED IN BOOK 965, PAGE 800, AFORSAID RECORDS, AS AMENDED BY UNRECORDED AMENDMENT TO OPERATING AND EASEMENT AGREEMENT DATED JULY 21, 1977.

4.    EASEMENT AGREEMENT BY AND BETWEEN CENTERS, INC. AND BELTLINE DEVELOPMENT COMPANY DATED OCTOBER 6, 1988, FILED FOR RECORD OCTOBER 14, 1988 AND RECORDED IN BOOK 1273, PAGE 892, AFORESAID RECORDS.

5.     RESERVATION OF EASEMENT BY DAN L. LAWRENCE AND NANCYE K. LAWRENCE IN THAT CERTAIN WARRANTY DEED DATED FEBRUARY 24, 1977 AND RECORDED IN BOOK 957, PAGE 378 IN THE OFFICE OF THE JUDGE OF PROBATE OF MORGAN COUNTY, ALABAMA. AMENDMENT OF SAID EASEMENT BY AND BETWEEN BELTLINE DEVELOPMENT COMPANY AND BRAMALEA CENTERS, INC. DATED JANUARY 21, 1988, RECORDED IN BOOK 1279, PAGE 276, AFORESAID RECORDS.

h.     MONTGOMERY PROMENADE [Retail Property: 2542-2786 Eastern Boulevard Montgomery, Alabama 36117 (Montgomery County)]

i     SITUATED AND LYING IN MONTGOMERY COUNTY, ALABAMA, TO-WIT: LOT A AND C, ACCORDING TO THE MAP OF MONTGOMERY, PROMENADE AS SAID MAP APPEARS OF RECORD IN THE OFFICE OF THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN PLAT BOOK 37, AT PAGES 194, AND 195.

i     MCGEHEE [Retail Property: 3459 McGehee Road, Montgomery, Alabama 36111 (Montgomery County)]

i.     PARCEL 1: LOTS F AND H ACCORDING TO THE SURVEY OF MCGEHEE PLACE SHOPPING CENTER PLAT NO. I AS RECORDED IN MAP BOOK 34 PAGE 151 IN THE PROBATE OFFICE OF MONTGOMERY COUNTY, ALABAMA.

ii.     PARCEL II: EASEMENT FOR THE BENEFIT OF PARCEL I AS CREATED BY THE GRANT OF EASEMENT DATED 2/26/88, AND RECORDED IN VOLUME 757, PAGE 367 AND AMENDED IN HLPY 936, PAGE 599 FOR THE PURPOSES DESCRIBED IN THOSE EASEMENTS OVER, UNDER AND ACROSS LOTS F AND H. SUBJECT TO THE TERMS, PROVISIONS AND CONDITIONS SET FOR IN SAID INSTRUMENT.

j.     OLD TOWN [Retail Property: 3003 McGehee Road, Montgomery, Alabama 36111 (Montgomery County)]

i.     COMMENCE AT THE NORTHEAST INTERSECTION OF CARTER HILL ROAD AND MC GEHEE ROAD AND RUN ALONG THE NORTH RIGHT OF WAY OF MC GEHEE ROAD AND RUN ALONG THE NORTH RIGHT OF WAY OF MC GEHEE ROAD, S 89 DEG. 12' E, 150 FEET TO THE POINT OF BEGINNING; THENCE FROM SAID POINT OF BEGINNING RUN N 01 DEG. 10' E, 300.0 FEET; THENCE S 89 DEG. 13' E. 463.40 FEET; THENCE S 00 DEG. 47' W, 300.0 FEET TO THE NORTH RIGHT OF WAY OF MC GEHEE ROAD, THENCE ALONG SAID RIGHT OF WAY N 89 DEG. 12' W 465.40 FEET TO THE POINT OF BEGINNING.

ii.     TOGETHER WITH THAT CERTAIN EASEMENT IN FAVOR OF ROBERT E. LOWDER, JAMES K. LOWDER, AND THOMAS H. LOWDER, THEIR SUCCESSORS AND ASSIGNS, DATED MAY 17, 1978, AND RECORDED IN THE

OFFICE OF THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN REAL PROPERTY BOOK 393, AT PAGE 554.

iii    ALSO, TOGETHER WITH THAT CERTAIN EASEMENT OF ROBERT E. LOWDER, JAMES K. LOWDER, AND THOMAS H. LOWDER, THEIR SUCCESSORS AND ASSIGNS, DATED JUNE 1, 1978, RECORDED IN SAID PROBATE OFFICE IN REAL PROPERTY BOOK 393, AT PAGE 571.

k.    LAKESHORE [Super Regional Shopping Center: 150 Pearl Nix Parkway, Gainesville, Georgia 30501 (Hall County)]

i.    ALL THAT TRACT OR PARCEL OF LAND LOCATED IN LAND LOT 164 AND 165 OF THE 9TH DISTRICT PARTIALLY IN THE CITY OF GAINESVILLE, AND IN THE 411TH GEORGIA MILITIA DISTRICT, HALL COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ii.    BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET (APPARENT 100-FOOT RIGHT-OF-WAY) AND THE WESTERN RIGHT-OF-WAY LINE OF THE WEST BYPASS (100-FOOT RIGHT-OF-WAY) AND RUNNING THENCE IN A SOUTHEASTERLY DIRECTION ALONG THE WESTERN RIGHT-OF-WAY LINE OF WEST BYPASS THE FOLLOWING COURSES AND DISTANCES; SOUTH 18 DEGREES 26 MINUTES 59" EAST A DISTANCE OF 104.55 TO A POINT; SOUTH 25 DEGREES 54 MINUTES 24 SECONDS EAST, A DISTANCE OF 44.00 FEET TO A POINT; SOUTH 18 DEGREES 49 MINUTES 17 SECONDS EAST, A DISTANCE OF 181.50 FEET TO A POINT; SOUTH 18 DEGREES 31 MINUTES 02 SECONDS EAST 1141.94 FEET TO AN IRON PIN SET, ALONG THE ARC OF A CURVE TO THE RIGHT, AN ARC DISTANCE OF 412.78 FEET TO AN IRON PIN SET (SAID CURVE HAVING A RADIUS OF 2,804.42 FEET AND A CHORD BEARING AND DISTANCE OF SOUTH 14 DEGREES 19 MINUTES 23 SECONDS EAST 412.41 FEET), AND SOUTH 10 DEGREES 05 MINUTES 23 SECONDS EAST 102.93 FEET TO AN IRON PIN FOUND; THENCE LEAVING THE WESTERN RIGHT-OF-WAY LILNE OF WEST BYPASS AND RUNNING SOUTH 83 DEGREES 31 MINUTES 46 SECONDS WEST 385.79 FEET TO AN IRON PIN FOUND; THENCE SOUTH 85 DEGREES 08 MINUTES 46 SECONDS WEST 284.80 TO AN IRON PIN FOUND; THENCE NORTH 21 DEGREES 06 MINUTES 39 SECONDS WEST 86.88 FEET TO AN IRON PIN FOUND; THENCE NORTH 29 DEGREES 37 MINUTES 21 SECONDS WEST 141.31 FEET TO AN IRON PIN FOUND; THENCE NORTH 42 DEGREES 31 MINUTES 58 SECONDS WEST 239.67 FEET TO AN IRON PIN FOUND; THENCE SOUTH 47 DEGREES 36 MINUTES 43 SECONDS WEST 193.38 FEET TO AN IRON PIN FOUND; THENCE SOUTH 53 DEGREES 03 MINUTES 17 SECONDS WEST, A DISTANCE OF 75.06 FEET TO AN IRON PIN FOUND ON THE NEW NORTHWESTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD (90 FOOT RIGHT-OF-WAY); RUNNING THENCE IN A NORTHWESTERLY DIRECTION ALONG SAID NEW NORTHEASTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD THE FOLLOWING THREE COURSES AND DISTANCES; NORTH 42 DEGREES 16 MINUTES 08 SECONDS WEST 307.70 FEET TO A POINT; NORTH 41 DEGREES 15 MINUTES 04 SECONDS

WEST 258.47 FEET TO A POINT; AND ALONG THE ARC OF A CURVE TO THE
LEFT AN ARC DISTANCE OF 303.32 TO A POINT (SAID CURVE HAVING A
RADIUS OF 2,890.79 AND A CHORD BEARING AND DISTANCE OF NORTH 44
DEGREES 15 MINUTES 26 SECONDS WEST 303.18 FEET); THENCE, LEAVING THE
NEW NORTHEASTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD AND
RUNNING NORTH 86 DEGREES 06 MINUTES 46 SECONDS EAST 47.76 FEET TO
AN IRON PIN SET; THENCE NORTH 83 DEGREES 54 MINUTES 46 SECONDS EAST
130.00 FEET TO AN IRON PIN SET; THENCE NORTH 83 DEGREES 49 MINUTES 46
SECONDS EAST 70.00 FEET TO AN IRON PIN SET; THENCE NORTH 63 DEGREES
29 MINUTES 46 SECONDS EAST 100.00 FEET TO AN IRON PIN SET; THENCE
NORTH 71 DEGREES 03 MINUTES 05 SECONDS EAST 107.18 FEET TO AN IRON
PIN FOUND; THENCE NORTH 67 DEGREES 42 MINUTES 06 SECONDS EAST
100.00 FEET TO AN IRON  PIN SET; THENCE NORTH 26 DEGREES 51 MINUTES 40
SECONDS WEST 183.39 FEET TO AN IRON PIN FOUND; THENCE SOUTH 66
DEGREES 17 MINUTES 38 SECONDS WEST A DISTANCE OF 99.49 TO A IRON PIN
FOUND, ½" REBAR; THENCE SOUTH 23 DEGREES 47 MINUTES 45 SECONDS
EAST, A DISTANCE OF 12.23 FEET TO A POINT; THENCE SOUTH 61 DEGREES 31
MINUTES 27 SECONDS WEST A DISTANCE OF 50.24 FEET TO A POINT; THENCE
SOUTH 61 DEGREES 33 MINUTES 24 SECONDS WEST A DISTANCE OF 49.36 FEET
TO AN IRON PIN FOUND, ½" REBAR; THENCE NORTH 27 DEGREES 04 MINUTES
39 SECONDS WEST, A DISTANCE OF 140.15 FEET TO A POINT ON THE
SOUTHERLY RIGHT-OF-WAY OF ARTHUR LANE (30' R/W); THENCE LEAVING
SAID SOUTHERLY R/W, NORTH 27 DEGREES 58 MINUTES 32 SECONDS WEST, A
DISTANCE OF 30.01 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY OF
ARTHUR LANE (30' R/W); THENCE ALONG THE SAID NORTHERLY R/W OF
ARTHUR LANE, SOUTH 63 DEGREES 22 MINUTES 01 SECONDS WEST, A
DISTANCE OF 48.90 FEET TO AN IRON PIN FOUND, 1" OPEN TOP PIPE; THENCE
LEAVING SAID NORTHERLY R/W, NORTH 28 DEGREES 30 MINUTES 14
SECONDS WEST, A DISTANCE OF 101.12 FEET TO AN IRON  PIN FOUND, ½"
REBAR; THENCE NORTH 63 DEGREES 33 MINUTES 46 SECONDS EAST, A
DISTANCE OF 124.54 FEET TO AN IRON PINE FOUND, ½" REBAR; THENCE
NORTH 28 DEGREES 31 MINUTES 59 SECONDS WEST, A DISTANCE OF 106.94
FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF DOROTHY DRIVE
(30' R/W); THENCE ALONG SAID SOUTHERLY R/W, NORTH 63 DEGREES 33
MINUTES 02 SECONDS EAST, A DISTANCE OF 25.35 FEET TO A POINT; THENCE
LEAVING SAID SOUTHERLY R/W OF DOROTHY DRIVE (30' R/W) NORTH 27
DEGREES 29 MINUTES 52 SECONDS WEST, A DISTANCE OF 30.12 FEET TO AN
IRON PIN FOUND, 1" CRIMP TOP PIPE ON THE NORTHERLY RIGHT-OF-WAY OF
DOROTHY DRIVE (30' R/W); THENCE LEAVING SAID NORTHERLY R/W NORTH
27 DEGREES 42 MINUTES 03 SECONDS WEST, A DISTANCE OF 196.76 FEET TO
AN IRON PIN FOUND, 5/8" REBAR; THENCE NORTH 63 DEGREES 10 MINUTES 54
SECONDS EAST, A DISTANCE OF 99.49 FEET TO A POINT; THENCE NORTH 63
DEGREES 02 MINUTES 14 SECONDS EAST 150.00 FEET TO AN IRON PIN FOUND;
THENCE SOUTH 27 DEGREES 43 MINUTES 10 SECONDS EAST 4.00 FEET TO A
POINT; THENCE NORTH 63 DEGREES 02 MINUTES 14 SECONDS EAST 50.02 FEET
TO A POINT; THENCE NORTH 71 DEGREES 52 MINUTES 14 SECONDS EAST 89.43

17

FEET TO A POINT ON THE EASTERN RIGHT-OF-WAY LINE OF THE SEGMENT OF
DOROTHY DRIVE WHICH RUNS IN A GENERALLY NORTHWEST-SOUTHEAST
DIRECTION; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE
EASTERN RIGHT-OF-WAY LINE OF DOROTHY DRIVE THE FOLLOWING TWO
COURSES AND DISTANCES:  NORTH 28 DEGREES 07 MINUTES 14 SECONDS
WEST 23.88 FEET TO AN IRON PIN SET; AND NORTH 35 DEGREES 07 MINUTES
14 SECONDS WEST 172.80 FEET TO A CONCRETE MONUMENT FOUND ON THE
SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET; THENCE IN
A NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY DIRECTION ALONG
THE SAID SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET,
THE FOLLOWING COURSES AND DISTANCES:  ALONG THE ARC OF A CURVE
TO THE RIGHT A DISTANCE OF 267.19 FEET, SAID CURVE HAVING A RADIUS
OF 1330.92 FEET AND A CHORD OF NORTH 74 DEGREES 02 MINUTES 19
SECONDS EAST 266.74 FEET, TO A POINT; THENCE SOUTH 53 DEGREES 26
MINUTES 21 SECONDS EAST, A DISTANCE OF 34.83 FEET TO A POINT; THENCE
NORTH 20 DEGREES 24 MINUTES 51 SECONDS EAST, A DISTANCE OF 28.68
FEET TO CONCRETE MONUMENT FOUND; THENCE ALONG THE ARC OF A
CURVE TO THE RIGHT A DISTANCE OF 98.61 FEET, SAID CURVE HAVING A
RADIUS OF 1330.91 FEET OF A CHORD OF NORTH 83 DEGREES 33 MINUTES 46
SECONDS EAST, 98.59 FEET, TO A POINT; THENCE SOUTH 04 DEGREES 59
MINUTES 55 SECONDS EAST, A DISTANCE OF 10.00 FEET TO A POINT; THENCE
NORTH 85 DEGREES 54 MINUTES 20 SECONDS EAST, A DISTANCE OF 9.50 FEET
TO A POINT; THENCE NORTH 04 DEGREES 35 MINUTES 55 SECONDS WEST, A
DISTANCE OF 10.00 FEET TO A POINT; THENCE ALONG THE ARC OF A CURVE
TO THE RIGHT A DISTANCE OF 177.16 FEET, SAID CURVE HAVING A RADIUS
OF 1330.92 FEET AND A CHORD OF NORTH 89 DEGREES 54 MINUTES 38
SECONDS EAST, 177.02 FEET, TO A CONCRETE MONUMENT FOUND; THENCE
SOUTH 86 DEGREES 16 MINUTES 15 SECONDS EAST, A DISTANCE OF 115.85
FEET TO A POINT; THENCE SOUTH 55 DEGREES 16 MINUTES 52 SECONDS EAST,
A DISTANCE OF 133.74 FEET TO THE POINT OF BEGINNING.

25.     Stern and Safrin obtained primary financing for their property portfolio

purchase from lender, Citigroup Global Markets Realty Corp ("Citigroup" or "Citibank").

26.     Stern and Safrin obtained financing in a two-tier structure: Stern's and

Safrin's created buying entity, First Republic LLC, executed a Loan Agreement with

Citigroup for $111,150,000.00 (one hundred and eleven million, one hundred and fifty

thousand dollars), and Stern's and Safrin's created managing entity, FRGR Managing

Member LLC, executed a Mezzanine Loan Agreement with Citigroup for $15,000,000.00

(fifteen million dollars), for a total debt upon or affecting the property portfolio of

$126,150,000.00 (one hundred twenty six million one hundred fifty thousand dollars). First Republic LLC and FRGR Managing Member LLC are hereinafter referred to collectively as the "borrowers".

27. Under the terms of both the Loan Agreement and Mezzanine Loan Agreement (the "Citibank loan agreements"), the following provisions applied:

a. Loan proceeds were distributed by Citibank only to pay obligations concerning the purchase transaction by First Republic Group Realty LLC of the property portfolio from Colonial Realty Limited Partnership, and were prohibited to be paid to any affiliate of the borrowers.

b. The borrowers agreed they had not entered into any other transaction that would interfere with the loan transactions.

c. The loans could not be refinanced / prepaid for a period of about 180 days, from funding through approximately January 10, 2008 (the "lock out period").

d. Borrowers' management and ownership structure could not be changed without the prior consent of Citibank.

e. Stern and Safrin were required to own, at all times, at least 51% of the borrowers.

f. First Republic Group Realty LLC could not transfer any part of the property portfolio without the prior consent of Citibank.

g. Events of loan default include (1) incurring new debt, (2) pledging assets to a third party, and (3) any transfer of a property within the portfolio without prior consent of Citibank.

19

28.    Stern and Safrin, in early June 2007, knew that the funds the borrowers could and would receive from Citigroup would be insufficient by itself for First Republic LLC to purchase the property portfolio. None of this was known by plaintiffs until June 29, 2007.

29.    Further, also in June 2007 Stern and Safrin either lacked sufficient personal assets, or were unwilling to place their personal assets, into First Republic LLC to enable it to consummate its purchase of the property portfolio.

30.    Therefore, Stern and Safrin in early June 2007 approached mortgage broker, Steven Alevy of Bankers Capital LLC, a New York limited liability company and Friedman, in an attempt to obtain additional funding to complete their purchase of the property portfolio.

31.    In June 2007, broker Steven Alevy and attorney Friedman presented an investment opportunity to Plaintiffs from Stern and Safrin, so that Stern and Safrin could complete their desired purchase of the property portfolio.

32.    Stern and Safrin, and later First Republic LLC, were represented by attorney Friedman in their communications and dealings with plaintiffs. Attorney Friedman previously had represented Amusement, and its agents including its shareholder and officer, Allen Alevy of Long Beach, California, and Allen Alevy's son, Steven Alevy of New York, New York, in various legal matters. As a result, Friedman led plaintiffs to believe that he had full authority to speak on behalf of Stern, Safrin and First Republic LLC concerning their purchase of the property portfolio, and upon information and belief Friedman had such authority when communication occurred with plaintiffs, and Allen Alevy.

20

33.    Attorney Friedman was a fiduciary to plaintiffs and occupied a position of
trust to plaintiffs in his communications with plaintiffs, and their agents, on behalf of Stern,
Safrin and First Republic LLC.

34.    The investment opportunity, solicitation and proposal presented from Stern
and Safrin, was:

   a.    Stern and Safrin had a profitable opportunity, which they would lose
if they could not quickly close. To close, however, they needed an additional $13
million;

   b.    This opportunity existed, through Stern's and Safrin's efforts, to
acquire the eleven portfolio properties;

   c.    The property portfolio was appraised at $190 million, was capable of
being purchased for about $131 million, leaving about $59 million in total equity
after purchase;

   d.    If Amusement, or its desired entity, contributed $13 million towards
the purchase, Amusement could participate in ownership of the property portfolio;
and

   e.    Stern and Safrin would refinance the property portfolio in 60 days (by
about September 1, 2007), so that Amusement would receive back its principal
investment from equity of the property portfolio, and retain a 50% partnership
interest.

35.    Stern's and Safrin's solicitation and proposal interested Plaintiffs, so that on
June 29, 2007 a written Letter of Intent contract and agreement ("LOI") was drafted by

Steven Alevy and signed by Stern, on behalf of the purchaser of the property portfolio, for the benefit of intended investor, Amusement, containing the following agreements:

      a.     "Westland will provide $13,000,000 for a 50% equity and voting interest in Southeast and a 12% annual preferred return payable on a monthly basis";

      b.     "7% paid current (set at 165 basis points over the 30 day LIBOR rate) and the balance will accrue if necessary";

      c.     A partnership structure would be agreed upon in seven days, and until then Westland holds 100% of the ownership in the entity formed to acquire the property portfolio; and

      d.     Once the partnership agreement is drafted, Amusement shall become a 50% owner of the entity formed to acquire the property portfolio.

A true and correct copy of the LOI is attached hereon as **Exhibit 2**.

36.     Later that day of June 29, 2007, Amusement wired $13,000,000 to Land Escrow Account #5514007904, and thus by such performance a contract formed among Amusement and the borrowers and soliciting parties, Stern and Safrin, having terms as presented in the LOI.

37.     Stern and Safrin represented through Friedman to Amusement that same day that this was the escrow being used for purchase of the property portfolio by the entity in which Amusement would have an ownership/partnership interest.

38.     On about July 2, 2007, although unknown to plaintiffs, seller Colonial Realty Limited Partnership sent notice of cancellation of its sale of the property portfolio to First Republic LLC, due to First Republic LLC's inability to procure sufficient funds to purchase the property portfolio within the time frame as required by the Colonial Realty Limited

22

Partnership - First Republic LLC contract. Upon information and belief, Stern and Safrin then convinced Colonial Realty Limited Partnership that an additional source of funds, Amusement, had just been found who wired $13 million to escrow, which could be used towards First Republic LLC's purchase of the property portfolio. Based on this representation, Colonial Realty Limited Partnership rescinded its notice of cancellation and extended for ten more days the time necessary for the sale of the property portfolio to close. Thus, Amusement's late entry into the transaction preserved First Republic LLC's ability to purchase the property portfolio, thus saving Stern and Safrin from breaches of contract and liability to both lender, Citibank with its outstanding hedge agreement, and seller, Colonial Realty Limited Partnership with its outstanding purchase and sale agreement.

39.     Unknown to plaintiffs, thereafter Stern and Safrin returned to negotiations with seller, Colonial Realty Limited Partnership, attempted to reduce the purchase price for First Republic LLC's purchase of the property portfolio, among other modifications. Unknown to Plaintiffs, Stern and Safrin were successful and thus Colonial Realty Limited Partnership agreed to reduce the property portfolio's purchase price by about $4.47 million dollars, thus reducing accordingly the amount of Amusement's funds needed by First Republic LLC to close the purchase transaction. No one notified Amusement that even less of its $13 million was now necessary for First Republic LLC to close the transaction.

40.     From these further negotiations with Stern and Safrin, Colonial Realty Limited Partnership placed a firm date of July 12, 2007 upon Stern and Safrin and their assignee, First Republic LLC, funding and closing the purchase of the property portfolio. This deadline date was not communicated to plaintiffs, but was learned by plaintiffs after July 13, 2007.

23

41.    Amusement's $13 million dollars wired to Land Escrow in the control of Frenkel, was not the escrow being used for purchase of the property portfolio by First Republic LLC from Colonial Realty Limited Partnership, but instead was a secondary creditors' escrow opened by Stern and Safrin to divert excess money from the property portfolio purchase transaction to pay off their personal debts and creditors. These facts were also not communicated to plaintiffs, but were learned by plaintiffs after July 13, 2007.

42.    During the seven day period defined by the LOI, Amusement drafted and dispatched three partnership agreements to Stern and Safrin, through Friedman, for their consideration to complete a transaction. Stern and Safrin did not execute any of the partnership agreements.

43.    Stern and Safrin nevertheless did not object to or alter the terms of the final partnership agreement drafted and dispatched by Amusement, a true and correct copy of which is attached hereon as **Exhibit 3**.

44.    On about July 6, 2007, the seven day period having passed, Amusement communicated to Stern and Safrin, through Friedman:

a.    To suggest a new property portfolio ownership structure and to inquire whether its $13 million contribution to the purchase should be a loan to Stern or to the portfolio owning entity, with Amusement's ownership interest in the portfolio owning entity continuing;

b.    To notify Stern and Safrin that the original 7 days of the LOI were expired;

24

    c.     To note that the property portfolio purchasing entity should have about $4 million dollars in reserve after closing (based on cost figures that had been provided by Stern and Safrin); and

    d.     To explicitly instruct Friedman not to authorize release of the $13 million in escrow.

45.    Also on about July 6, 2007, California counsel for Amusement wrote to Friedman stating that if the transaction between Amusement, Stern and Safrin had materially changed from the partnership agreement and LOI, then the wired $13 million should be returned. No funds were returned.

46.    On July 9, 2007, Amusement in writing asked Stern and Safrin, through Friedman, for the Citibank loan documents. They were not provided. In written response, Stern and Safrin through Friedman disclosed the existence of First Republic LLC as the entity purchaser of the property portfolio to be used by them.

47.    In further written response on July 9, 2007, Stern and Safrin refused to have the property portfolio purchase agreement assigned to a Stern - Safrin/Amusement partnership entity prior to closing of the property portfolio purchase by First Republic LLC, but agreed this could be done after such closing. Amusement was told in writing that Stern's and Safrin's purchase structure with its organizational documents had already been through the approval process with Citigroup, and a pre-close of escrow assignment of the property portfolio into an entity co-owned by Amusement would cause delay that would jeopardize the property portfolio purchase.

48.    Stern and Safrin did not disclose to plaintiffs that their promise to provide Amusement with its ownership in the property portfolio may or would violate the Stern -

Safrin purchase structure and Stern - Citigroup loan agreements. Instead, Stern and Safrin, through Friedman in writing, promised that formal documentation of Amusement's investment and ownership in the property portfolio was recognized and would be completed as necessary after closing, once Stern and Safrin, through First Republic LLC, owned the property portfolio.

49.    Amusement responded in writing to Stern and Safrin, through Friedman, that same day of July 9, 2007 that such proposal was generally acceptable, and confirmed that the partnership structure would be memorialized immediately after closing of the property portfolio purchase by First Republic LLC.

50.    Neither Stern, Safrin or First Republic LLC denied or objected to these assertions in any subsequent reply, and thus Amusement continued to reasonably believe that Stern, Safrin and now First Republic LLC as well accepted Amusement as a partner in ownership of the property portfolio pursuant to terms previously detailed and drafted in the LOI and/or partnership agreement.

51.    Seeing that finalization of assignment of ownership documents was not moving as fast as expected, Amusement again instructed Friedman not to allow release of Amusement's $13 million from escrow. Friedman agreed. Amusement also directly instructed Land Escrow and Frenkel to not release Amusement's funds without written authorization from Sragow & Sragow.

52.    On July 11, 2007, Stern, Safrin and First Republic LLC, through Friedman, provided the following documents to Amusement, with a repetitive statement there was no time to fully document the parties' agreement prior to close of escrow:

        a.    A promissory note for $13 million signed only by Stern.

       b.      Escrow Agreement.

       c.      Assignments of Stern's and Safrin's LLC Membership Interests in First Republic LLC and the underlying LLC ownership structure.

       d.      Eleven grant deeds constituting the property portfolio signed by grantor, First Republic LLC ("grant deeds").

53.      Thereafter on July 11, 2007, Amusement communicated in writing to Stern, Safrin and First Republic LLC, through Friedman, the following counter offer:

       a.      There would be no loan. Amusement's $13 million contribution would be treated as a direct investment in the purchasing entity for the benefit of Stern and Safrin, with a preferred right to return of this investment from the benefited parties, through refinance of Citibank's loan with the property portfolio owning entity within 45 days;

       b.      Amusement's repayment right would now be increased by $2 million to $15 million, recognizing that Stern and Safrin at this point had already expressed their intent to take over $4 million from the partnership that all parties understood would be left over at closing once Amusement's $13 million was used to close;

       c.      As the partnership agreement was not being executed pre-closing, Stern and Safrin would cause a present conveyance of 100% of the property portfolio to Amusement by deeding all eleven portfolio properties to Amusement, as well causing a present conveyance of the LLC membership interests that Stern and Safrin held in the owning entity believed to reflect 100% ownership of the owning entity; and

      d.     Stern and Safrin would have limited recourse by a limited in time option period for 45 days from closing (again about September 1, 2007) to repurchase the grant deeds and their 50% ownership in the owning entity by providing the partnership agreement. Otherwise, if the repurchase option was not exercised by Stern and/or Safrin, Amusement would retain 100% of the property portfolio forever.

54.     Amusement sent its counter offer of July 11, 2007 because it disagreed with Stern's, Safrin's and First Republic LLC's characterization of the transaction among the parties reflected in defendants' version of the documents, as well as aspects of the drafting of the documents.

55.     Amusement's July 11, 2007 written communication also asked: 1) - that the assignments be changed; 2) - reminding Stern, Safrin and First Republic LLC that the $13 million contribution was no longer a loan but an investment justifying Amusement's 50% ownership interest; 3) - that there was to be 100% ownership and possession of the property portfolio, possibly lowered to 50% ownership and possession pending providing the partnership agreement; and 4) - that the provided documents did not contain a $15 million promissory note to reflect the $2 million upward adjustment as explained.

56.     Stern, Safrin and First Republic LLC, through Friedman, responded that Amusement should not worry as Amusement now owned the whole thing, and the next day July 12, 2007 provided a $15 million promissory note to Amusement signed only by Stern.

57.     Stern, Safrin and First Republic LLC did not object to Amusement's July 11, 2007 offered terms and explanations therein.

58.    Upon information and belief, and unknown to Plaintiffs, upon the instruction of Stern, Safrin and First Republic LLC, Frenkel and Land Escrow on July 12, 2007 took and used Amusement's $13 million escrowed funds without notice and without Amusement's authorization on July 12, 2007 and in violation of specific instructions given to Friedman on July 9.  Frenkel and Land Escrow transferred Amusement's funds to Stern and/or Safrin and/or First Republic LLC for their benefit.  First Republic LLC thus closed its purchase of the property portfolio from seller, Colonial Realty Limited Partnership, that same date.

59.    As a result of this taking of Amusement's funds by Stern, Safrin and First Republic LLC on July 12, 2007, after and without objection to Amusement's counter offer of July 11, 2007, a contract formed between Amusement and Stern, Safrin and First Republic LLC that within 45 days Amusement would have the partnership.

60.    Since Amusement on July 12, 2007 did not know of the taking of its escrowed funds, Amusement that day wrote to Stern, Safrin and First Republic LLC, through Friedman, addressing their positions that Amusement already owned the whole thing, that Amusement should not worry and that better documentation of the agreed upon terms among the parties was better left to be done after closing, and asked for revised documents.  Revised documents were not provided.

61.    On July 13, 2007, Friedman announced that he had executed versions of all of Stern's and Safrin's documents (the version that Amusement had already rejected), and that Amusement could authorize release of its escrowed $13 million dollars.

62.    Also on July 13, 2007, Amusement's California counsel and Allen Alevy in California were asked by Frenkel and Land Escrow to provide written authorization for

29

release of the $13 million escrowed funds, but authorization was refused for reasons previously disclosed. The provided writings from Stern and Safrin, through Friedman, were not satisfactory to Amusement as they appeared to be an attempt by Stern and Safrin to alter the terms of Amusement's offers and already agreed terms.

63.    Also on July 13, 2007, Frenkel announced that Steven Alevy had verbally authorized the release and asked Amusement's California counsel for written authorization, who refused. In the afternoon, Steven Alevy wrote to Frenkel: "You are hereby authorized to release $13,000,000 from escrow. The interest earned should be returned to originator." Frenkel and Land Escrow knew that such purported authorization from Steven Alevy could not properly authorize release of Amusement's escrowed funds because they had been specifically told otherwise in writing by Amusement.

64.    On July 15, 2007, Amusement for the first time learned of the earlier taking of Amusement's escrowed funds on July 12, 2007 from Frenkel and Land Escrow by Stern, Safrin and First Republic LLC. Thus the statements by Stern, Safrin, First Republic LLC, Frenkel and Land Escrow of July 13, 2007, as detailed above, were all a deception upon plaintiffs to conceal the fact that Amusement's escrowed funds were previously released and taken without authorization.

65.    Amusement's California counsel wrote to Frenkel and Land Escrow on July 15, 2007 that when the proper documents are provided the written authorization to release would be provided, and that if on or before the July 13, 2007 the funds were released, Frenkel and Land Escrow should retrieve them. Frenkel and Land Escrow did not respond.

66.    On July 16, 2007, Amusement's California counsel wrote to Frenkel, Land Escrow and Friedman and told them that the agreed upon terms and conditions among Stern,

30

Safrin and First Republic LLC with Amusement were not fulfilled by the documents that were previously provided. Frenkel, Land Escrow, First Republic LLC, Stern, Safrin and Friedman did not refute or object to this assertion.

67.    On July 19, 2007, Amusement's California counsel wrote to Frenkel and Land Escrow, asking them to wire the accrued interest back to Amusement. They did not do so.

68.    Amusement ended up with nothing of value after Stern, Safrin and First Republic LLC without proper authorization removed and took Amusement's escrowed $13 million from Frenkel and Land Escrow.

69.    On November 15, 2007, Amusement sent its demand to Stern, Safrin, First Republic LLC, Friedman and Steven Alevy as escrow holders that they deliver the escrowed eleven grant deeds and assignments of LLC membership interests to Amusement.

**FIRST CAUSE OF ACTION**
(DECLARATORY RELIEF AS TO OWNERSHIP OF GRANT DEEDS AND LLC
INTERESTS, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

70.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

71.    An actual controversy has arisen and now exists between Plaintiffs and Defendants, Stern, Safrin & First Republic LLC in that Plaintiffs contend, and these defendants deny, the following:

      a.    That these defendants agreed to convey to Amusement a present and immediate 100% ownership interest in the property portfolio prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

31

b.     That these defendants in fact conveyed to Amusement such a present and immediate 100% ownership interest in the property portfolio, when First Republic LLC provided Amusement, through escrow, with the grant deeds for each of the eleven properties within the property portfolio delivered on about July 11, 2007;

c.     That these defendants agreed to convey and assign to Amusement a present and immediate assignment of 100% of Stern's and Safrin's membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

d.     That these defendants in fact conveyed and assigned to Amusement such a present and immediate 100% of Stern's and Safrin's membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, when Stern and Safrin provided Amusement, through escrow, with the LLC membership assignments delivered on about July 11, 2007, so that now Amusement is the present owner of 100% of the membership interest in First Republic LLC;

e.     That in the alternative to "a." above, these defendants agreed to convey to Amusement a present and immediate 50% ownership interest in the property portfolio prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

32

f.    That in the alternative to "b." above, these defendants in fact conveyed to Amusement such a present and immediate 50% ownership interest in the property portfolio;

g.    That Amusement and these defendants agreed that Stern and/or First Republic LLC were obligated to return and pay within sixty days of July 11, 2007 the sum of $13 million to Plaintiffs, and that Stern personally guaranteed such payment by the signed $13 million promissory note of about July 11, 2007, and that payment has not been made;

h.    Amusement and these defendants agreed that Stern and/or First Republic LLC were obligated to return and pay within sixty days of July 11, 2007 the sum of $15 million to Plaintiffs, and that Stern personally guaranteed such payment by the signed $15 million promissory note of about July 12, 2007, and that payment has not been made;

i.    That in furtherance of "a.", "b.", "c." and "d." above, Amusement and these defendants agreed that following Stern's and Safrin's assignments of First Republic LLC's membership interests to Amusement delivered about July 11, 2007, and following First Republic LLC providing the eleven grant deeds to Amusement, Stern and Safrin would have a limited option period through September 10, 2007 to repurchase their 50% ownership interest in First Republic LLC from Amusement by providing to Amusement during this time a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio;

33

j.    That Stern and Safrin did not provide Amusement with a partnership agreement confirming Amusement as a 50% partner with Stern and Safrin in ownership and management of the property portfolio before September 10, 2006, and thus Stern's and Safrin's limited option period has passed unfulfilled and unexercised so that Amusement presently remains and is the owner of Stern's and Safrin's original ownership interest in First Republic LLC and/or the portfolio properties owned by First Republic LLC.

72.    Plaintiffs desire a judicial determination of the respective rights and duties of Plaintiffs and Defendants with respect to the damages and orders claimed in the complaint of Plaintiffs herein. In particular, Plaintiffs desire a declaration that Amusement owns First Republic LLC and owns the eleven portfolio properties formerly owned by First Republic LLC, and that Practical Finance as assignee is owed sums of money pursuant to promissory notes signed by Stern.

73.    A present controversy has arisen over whether the grant deeds and assignments of LLC membership interests were conveyed to Plaintiffs to provide Amusement with present ownership of real property and of LLC membership interests or were instead mortgage interests transferred to secure a loan transaction. Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights and duties with respect to personal property and real property interests provided by First Republic LLC, Stern and Safrin to Plaintiffs.

## SECOND CAUSE OF ACTION
(QUIET TITLE AS TO REAL PROPERTY, AGAINST FIRST REPUBLIC LLC)

74.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

34

75.     A true and correct copy of the eleven property portfolio grant deeds provided by First Republic LLC to Plaintiffs' escrow agent, Friedman and/or Steven Alevy, on about July 11, 2007, are attached hereto as **Exhibit 1**.

76.     On about November 15, 2007, Plaintiffs in writing requested that Defendants, including First Republic LLC, consent to release by Plaintiffs' escrow agent of the grant deeds to Plaintiffs so that Plaintiff, Amusement, could record them.  A true and correct copy of the letter request is attached hereto as **Exhibit 4** and is incorporated herein by reference. Defendants, including First Republic LLC, refused to agree to Amusement's recordation of the grant deeds.

77.     Defendants have taken the position that the property portfolio grant deeds provided by First Republic LLC created mortgage instruments, not actual transfers of ownership of the eleven properties to Amusement.

78.     As a proximate result of this refusal of Defendants, Amusement has not been able to clear title to the eleven properties that constitute the property portfolio and that are currently record titled to First Republic LLC.

79.     Based on facts alleged above, First Republic LLC presently and immediately conveyed to Amusement its 100% ownership interest in the property portfolio, when First Republic LLC provided Amusement, through escrow, the grant deeds for each of the eleven properties within the property portfolio delivered on about July 11, 2007.  The court should quiet title to Amusement.

### THIRD CAUSE OF ACTION
(QUIET TITLE AS TO LLC MEMBERSHIP INTERSTS, AGAINST STERN & SAFRIN)

80.     Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

81.    A true and correct copy of the two assignments of LLC membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, provided by Stern and Safrin to Plaintiffs' escrow agent, Friedman and/or Steven Alevy, on about July 11, 2007, are attached hereto as **Exhibit 5**.

82.    On about November 15, 2007, Plaintiffs in writing requested that Defendants, including Stern and Safrin, consent to the release from escrow of the assignments of LLC membership interests to Plaintiffs so that Plaintiff, Amusement, could file them in order to publicly reflect Amusement's present ownership of all LLC entities.  A true and correct copy of the letter request is attached hereto as **Exhibit 4** and is incorporated herein by reference. Defendants, including Stern and Safrin, have not responded in writing to Amusement's demand and, in so doing, have blocked the release of the assignments from escrow into Plaintiff's possession and control.

83.    As a proximate result of this refusal of Defendants, Amusement has not been able to obtain clear title to the membership interests of the aforementioned LLCs, which are currently record titled to Stern and Safrin.

84.    Based on facts alleged above, Stern and Safrin presently and immediately conveyed to Amusement their 100% ownership interest in the aforementioned LLCs, through escrow, by the assignments of LLC membership interests delivered on about July 11, 2007.  The court should quiet title to Amusement.

### FOURTH CAUSE OF ACTION
(JUDICIAL FORECLOSURE OF REAL PROPERTY, AGAINST FIRST REPUBLIC LLC)

85.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

36

86.    In the alternative to Quiet Title above, Plaintiffs are beneficiaries under the terms of the LOI, grant deeds and escrow agreement of about July 11, 2007. The escrow agreement constitutes a security agreement among Plaintiffs, Stern, Safrin and First Republic LLC.

87.    First Republic LLC was the record owner of the eleven real properties that constitute the property portfolio, at the time that First Republic LLC provided its eleven grant deeds for same to Plaintiffs by deposit into escrow as security for Stern's and First Republic LLC's performance of the LOI and the promissory notes. First Republic LLC remains the record owner of the eleven real properties of the property portfolio at this time.

88.    By the terms of the LOI and the delivered promissory notes and security agreement, Stern and First Republic LLC promised and agreed to pay Plaintiffs, or either of them, the sums of $13,000,000 and/or $15,000,000 by September 10, 2007.

89.    Stern and First Republic LLC have wholly failed, neglected and refused to make or pay, and no other person has made or paid, the unpaid balance of principal and interest of the LOI, two promissory notes and debts reflected therein, which all came due September 10, 2007. The total amount of principal thus defaulted by Stern and First Republic LLC is Thirteen Million Dollars ($13,000,000) and/or Fifteen Million Dollars ($15,000,000), plus pre-default interest and default interest thereon pursuant to the LOIs and promissory notes' terms from dates due, plus penalties, foreclosure costs and attorney's fees all in a sum to be established in accordance with proof at trial.

90.    Plaintiffs have performed all obligations on their part, if any, to be performed under the terms of the LOI, promissory notes, grant deeds and security agreement. All conditions precedent to Plaintiffs' enforcement and collection of the LOI, promissory notes

37

and the debts reflected therein, and thus all conditions precedent to Plaintiffs' foreclosure of

the grant deeds to the extent provided as security, have been satisfied and fulfilled.

Therefore, Plaintiffs which are owed all sums on the defaulted LOI and promissory notes,

are now entitled to foreclose upon the eleven real properties of the property portfolio to the

extent the eleven grant deeds were provided by First Republic LLC to Plaintiffs as security

for Stern's and First Republic LLC's performance of the LOI and promissory notes.

91.    Plaintiffs are now further entitled to seek a deficiency judgment against First

Republic LLC, in the event at the judicially ordered foreclosure sale of the eleven properties

that constitute the property portfolio, a deficiency balance will remain owed on the debt of

Stern and First Republic LLC to Plaintiffs or either of them.

92.    By virtue of the foregoing, Plaintiffs seek a decree of judicial foreclosure of

real property, and deficiency money judgment for any resulting deficiency, against First

Republic LLC.

## FIFTH CAUSE OF ACTION
(JUDICIAL FORECLOSURE OF PERSONAL PROPERTY LLC MEMBERSHIP
INTERESTS, AGAINST STERN & SAFRIN)

93.    Plaintiffs replead and reallege each and every allegation stated in the

foregoing paragraphs of this Complaint as if stated in full herein.

94.    In the alternative to Quiet Title above, Plaintiffs are beneficiaries under the

terms of the LOI, assignments of LLC membership interests and escrow agreement of about

July 11, 2007. The escrow agreement constitutes a security agreement among Plaintiffs,

Stern, Safrin and First Republic LLC.

95.    Stern and Safrin were the record owner of the assigned LLC membership

interests, at the time that Stern and Safrin provided assignments of LLC membership

interests to Plaintiffs by deposit with Plaintiffs' escrow agent, Friedman and/or Steven

38

Alevy, as security for Stern's and First Republic LLC's performance of the LOI and promissory notes. Stern and Safrin remain the record owners of the assigned LLC membership interests at this time.

96.     By the terms of the LOI and the delivered promissory notes and security agreement, Stern and First Republic LLC promised and agreed to pay Plaintiffs, or either of them, the sums of $13,000,000 and/or $15,000,000 by September 10, 2007.

97.     Stern and First Republic LLC have wholly failed, neglected and refused to make or pay, and no other person has made or paid, the unpaid balance of principal and interest of the LOI, two promissory notes and debts reflected therein, which all came due September 10, 2007. The total amount of principal thus defaulted by Stern and First Republic LLC is Thirteen Million Dollars ($13,000,000) and/or Fifteen Million Dollars ($15,000,000), plus pre-default interest and default interest thereon pursuant to the LOIs and promissory notes' terms from dates due, plus penalties, foreclosure costs and attorney's fees all in a sum to be established in accordance with proof at trial.

98.     Plaintiffs have performed all obligations on their part, if any, to be performed under the terms of the LOI, promissory notes, assignments of LLC membership interests and security agreement. All conditions precedent to Plaintiffs' enforcement and collection of the LOI, promissory notes and the debts reflected therein, and thus all conditions precedent to Plaintiffs' foreclosure of the assigned LLC membership interests to the extent provided as security, have been satisfied and fulfilled. Therefore, Plaintiffs which are owed all sums on the defaulted LOI and promissory notes, are now entitled to foreclose upon the LLC membership interests to the extent the assignments of LLC membership interests were

provided by Stern and Safrin to Plaintiffs as security for Stern's and First Republic LLC's performance of the LOI and promissory notes.

99.    Plaintiffs are now further entitled to seek a deficiency judgment against Stern and Safrin, in the event at the judicially ordered foreclosure sale of the LLC membership interests a deficiency balance will remain owed on the debt of Stern and First Republic LLC to Plaintiffs or either of them.

100.    By virtue of the foregoing, Plaintiffs seek a decree of judicial foreclosure of personal property, and deficiency money judgment for any resulting deficiency, against Stern and Safrin.

## SIXTH CAUSE OF ACTION
### (BREACH OF CONTRACT - FAILURE TO REPAY INVESTMENT, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

101.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

102.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above.

103.    One of the agreed contract terms was that, since Amusement provided a $13 million investment and contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Stern, Safrin and First Republic LLC agreed they were obligated to return this $13 million investment to Amusement, with interest until paid. This contract term was then modified to raise the repayment obligation to $15 million, as explained above.

104.    Although Amusement requested that the investment be repaid with interest in 45 days from closing of the property portfolio purchase, Stern, Safrin and First Republic

LLC requested and Amusement accepted that the investment could be repaid with interest in 60 days from closing of the property portfolio purchase. As First Republic LLC's closing with seller occurred July 12, 2007, Stern, Safrin and First Republic LLC thus were obligated to repay to Amusement its $15 million investment with interest by no later than September 10, 2007, or in the alternative should the modification not be upheld, its $13 million investment with interest by no later than September 10, 2007.

105.    The promissory notes provided by Stern for $15 million and $13 million merely memorialized and guaranteed Stern's performance of the $15 million or $13 million obligation owed by Stern, Safrin and First Republic LLC to Amusement for repayment of Amusement's $13 million investment plus the $2 million upward adjustment as described and detailed above.

106.    Defendants, Stern, Safrin and First Republic LLC, breached their agreement with Amusement on September 10, 2007 by failing to pay by that date the sum of $13 million or $15 million with interest to Amusement. To date, no partial sum has been paid.

107.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

108.    Although demand has been made for return of the investment, as upwardly adjusted per agreement, with interest, no payments have been made by or received from Stern, Safrin and First Republic LLC towards such debt, so there now remains due and owing to Amusement by Stern, Safrin and First Republic LLC the sum of $15,000,000.00, plus interest at the legal rate or higher rate per the contract, from the date of breach of September 10, 2007, or in the alternative the sum of $13,000,000.00, plus interest at the legal rate or higher rate per the contract, from the date of breach of September 10, 2007.

## SEVENTH CAUSE OF ACTION
(BREACH OF $13,000,000 PROMISSORY NOTE CONTRACT, AGAINST STERN)

109.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

110.    On about July 12, 2007 defendant, Stern executed a written Promissory Note contract wherein Stern promised to pay Amusement the sum of $13,000,000.00 principal, plus interest on the principal amount from July 12, 2007, both due on the maturity date of September 10, 2007.  Attached as **Exhibit 6** hereto, is a true and correct copy of this Promissory Note contract of July 12, 2007.

111.    This $13 million promissory note was entered into either as a memorialization and guaranty by Stern of Stern's full or partial performance of the $13 million obligation, or $15 million obligation, owed by Stern, Safrin and First Republic LLC to Amusement for repayment of Amusement's $13 million investment, plus upward adjustment, as described and detailed above, or in the alternative if Amusement did not invest but instead lent $13 million to allow Stern, Safrin and their entity, First Republic LLC, to purchase the property portfolio, then as a loan to Stern and First Republic LLC as evidenced by this $13 million promissory note signed by Stern.  Therefore in either event, Stern obligated himself, with or without others, to pay the sum of $13 million to Practical Finance as assignee.

112.    Stern breached the $13 million promissory note contract on September 10, 2007 by not making or paying this Note's principal with interest on that date as required by the terms of the written promissory note contract.  Stern has made no payment towards the promissory note contract. At this time, the outstanding balance owed by Stern to Practical

Finance as assignee pursuant to the terms of the Promissory Note contract is the sum of $13,000,000.00 principal, plus interest, plus default interest, all pursuant to the note's terms.

113.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the written Promissory Note contract.

114.    The sum of $0 has been paid, and so there now remains due and owing to Practical Finance as assignee by Stern the sum of $13,000,000.00 principal, plus interest thereon at the note rate from July 12, 2007 and at the default rate thereafter from the date of breach of September 10, 2007.

## EIGHTH CAUSE OF ACTION
(BREACH OF CONTRACT - SPECIFIC PERFORMANCE FOR 50% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

115.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

116.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, wherein it was agreed that since Amusement provided a $13 million contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Amusement was entitled to receive a 50% ownership in the property portfolio by no later than July 12, 2007.

117.    In the event that the ownership and security structure provided by Stern, Safrin and First Republic LLC to Plaintiffs does not include Amusement having a present and valid 50% ownership interest in First Republic LLC, the purchaser of the property

43

portfolio, then Amusement is entitled to receive such 50% ownership in First Republic LLC as owner of the property portfolio by court order pursuant to the aforementioned agreement.

118.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 50% ownership interest in First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so. They did not do so.

119.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract. Since these defendants have not provided Amusement with a valid 50% ownership interest in First Republic LLC to date thus breaching the contract, Amusement is entitled to specific performance of the contract against Stern, Safrin and First Republic LLC for an order providing Amusement with a 50% ownership interest in First Republic LLC as owner of the property portfolio, as plaintiffs have no adequate remedy at law.

120.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through the date plaintiff obtains its co-ownership of First Republic LLC by court order, which is lost income and profit as a result of these defendants' breach of contract.

## NINTH CAUSE OF ACTION
(BREACH OF CONTRACT - MONEY DAMAGES FOR 50% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

121.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

122.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent

terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, wherein it was agreed that since Amusement provided a $13 million contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Amusement was entitled to receive a 50% ownership in the property portfolio by no later than July 12, 2007.

123.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 50% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so.

124.    For purposes of this claim, Stern, Safrin and First Republic LLC did not provide Amusement with a 50% ownership interest in First Republic LLC, by July 12, 2007 as had been promised, and thus these defendants breached their contract with Amusement as of that date.

125.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

126.    Since these defendants have not provided Amusement with a valid 50% ownership interest in First Republic LLC to date, Amusement has been damaged and is entitled to money damages for the value of the undelivered valid 50% ownership interest in First Republic LLC, estimated to be the sum of about $30 million the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach.

127.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits

45

generated by the property portfolio owned by First Republic LLC from July 12, 2007 through judgment.

128.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## TENTH CAUSE OF ACTION
(BREACH OF $15,000,000 PROMISSORY NOTE CONTRACT, AGAINST STERN)

129.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

130.    On about July 12, 2007 Stern executed a written Promissory Note contract wherein Stern promised to pay Practical Finance (as subsequent assignee) the sum of $15,000,000.00 principal, due on the maturity date of September 10, 2007. Attached as **Exhibit 7** hereon, is a true and correct copy of this Promissory Note contract of July 12, 2007.

131.    This $15 million promissory note was entered into either as a memorialization and guaranty by Stern of Stern's performance of the $15 million obligation owed by Stern, Safrin and First Republic LLC to Amusement for payment of investment return with upward adjustment, as described and detailed above.

132.    Stern breached the $15 million promissory note contract on September 10, 2007 by not making or paying this Note's principal on that date as required by the terms of the written promissory note contract. Stern has made no payment towards the promissory note contract. At this time, the outstanding balance owed by Stern to Practical Finance (as

assignee) pursuant to the terms of the Promissory Note contract is the sum of $15,000,000.00 principal, plus default interest, all pursuant to the note's terms.

133.     Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the written Promissory Note contract.

134.     The sum of $0 has been paid, and so there now remains due and owing to Practical Finance (as assignee) by Stern the sum of $15,000,000.00 principal, plus interest thereon at the default rate from the date of breach of September 10, 2007.

## ELEVENTH CAUSE OF ACTION
### (BREACH OF CONTRACT - SPECIFIC PERFORMANCE FOR 100% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

135.     Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

136.     Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having terms of the July 11, 2007 contract as described above, that since Amusement provided a $13 million investment and contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of these defendants, Amusement would receive 100% ownership of the property portfolio by no later than July 12, 2007, with 50% ownership in the property portfolio being subject to repurchase from Amusement by Stern and Safrin if they provide to Amusement by no later than September 10, 2007 a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

137.     In the event that the ownership and security structure provided by Stern, Safrin and First Republic LLC to Plaintiffs on about July 11 - 12, 2007 did not provide

47

Amusement with a present and valid 100% ownership interest in First Republic LLC, then Amusement is entitled to receive such 100% ownership in First Republic LLC as owner of the property portfolio by court order pursuant to the aforementioned agreement.

138.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 100% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so. Further, if by September 10, 2007 Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement during this time a signed partnership agreement which confirmed Amusement would receive return of its contribution and presently be a 50% partner with Stern and Safrin in ownership and management of the property portfolio, then thereafter Amusement was entitled to retain 100% ownership of First Republic LLC.

139.    For purposes of this claim, Stern, Safrin and First Republic LLC did not provide Amusement with a valid 100% ownership of First Republic LLC by July 12, 2007 as had been promised, and thus these defendants breached their contract with Amusement as of that date. Further, Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement during this time a signed partnership agreement which confirmed Amusement would receive return of its contribution and presently be a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

140.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

48

141.    As a result of these defendants having not provided Amusement with a valid 100% ownership of First Republic LLC to date, Amusement is entitled to specific performance of the contract against Stern, Safrin and First Republic LLC for an order providing Amusement with 100% ownership of First Republic LLC, as plaintiffs have no adequate remedy at law.

142.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through the date plaintiff obtains its 100% ownership of First Republic LLC by court order, which is lost income and profit as a result of these defendants' breach of contract.

## TWELFTH CAUSE OF ACTION
(BREACH OF CONTRACT - MONEY DAMAGES FOR 100% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

143.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

144.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, that since Amusement provided a $13 million investment and contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of these defendants, Amusement would receive 100% ownership of the property portfolio by no later than July 12, 2007, with 50% ownership in the property portfolio being subject to repurchase from Amusement by Stern and Safrin if they provide to Amusement within 60 days of July 12, 2007 a signed partnership agreement which confirms Amusement will receive return of its contribution and

49

presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

145.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 100% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so.

146.    In the event 100% ownership of First Republic LLC was provided by July 12, 2007, Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement, on or before September 10, 2007, a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

147.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

148.    Since either these defendants have not provided Amusement with a valid 100% ownership of First Republic LLC to date, or a 100% ownership was timely provided but Amusement has not been provided with a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio for repurchase of a 50% ownership of First Republic LLC, Amusement is entitled to money damages for the value of the undelivered or delivered 100% ownership interest in First Republic LLC, estimated to be the sum of about $60 million the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach.

149.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through judgment.

150.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## THIRTEENTH CAUSE OF ACTION
### (BREACH OF ESCROW CONTRACT – AGAINST FRENKEL & LAND ESCROW)

151.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

152.    When Amusement wired the sum of $13 million to Land Escrow and Frenkel with written instruction that only certain persons of Amusement could authorize the release of such funds from escrow, as detailed above, a contract was formed between Land Escrow and Frenkel with Amusement having such terms.

153.    At first upon immediate wire of Amusement's funds, Friedman was a person authorized to release Amusement's funds from escrow, but these instructions were changed in writing by Amusement such that only Allen Sragow or Allen Alevy could authorize Frenkel and Land Escrow to release Amusement's funds, as detailed above.

154.    Defendants, Frenkel and Land Escrow, breached their agreement with Amusement on about July 12, 2007 by releasing Amusement's escrowed $13 million without the authorization of Allen Sragow or Allen Alevy.

51

155.    Amusement has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the escrow contract.

156.    Although demand has been made for return of the $13 million placed into escrow with interest, no sum has been returned by or received from Frenkel or Land Escrow, so there now remains due and owing to Amusement by Land Escrow and Frenkel the sum of $13,000,000.00, plus interest at the legal rate from the date of breach of July 12, 2007, plus consequential damages caused by this breach of escrow contract.

## FOURTEENTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY, AGAINST FRENKEL & LAND ESCROW)

157.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

158.    Amusement transmitted its funds to Frenkel and Land Escrow to be held for use in the property portfolio purchase transaction then pending.

159.    Frenkel and Land Escrow were given clear and multiple instructions from Amusement, and from Friedman as Amusement's agent, to not release the escrowed money without written authorization from either Allen Alevy or Allen Sragow.

160.    Frenkel and Land Escrow as escrow agents holding money had the fiduciary duty to maintain escrowed funds under the instructions provided by the party providing the funds. As an escrow agent, these defendants held Amusement's $13 million in trust to be used only as Amusement instructed. Thus these defendants owed a fiduciary duty to Amusement to only act by authorized instruction of Amusement and in Amusement's best interests.

52

161.    Frenkel and Land Escrow released to unknown persons on about July 12, 2007 Amusement's $13,000,000 held in its escrow account #5514007904, without receiving written authorization from either Allen Alevy or Allen Sragow. Thus these defendants breached their fiduciary duty owed to Amusement on July 12, 2007.

162.    In addition, upon information and belief, First Republic LLC's purchase of the property portfolio from Colonial Realty Limited Partnership closed on July 12, 2007. On that date, First Republic LLC used a portion of Amusement's $13 million dollars then in escrow to close that purchase transaction. Therefore, Frenkel and Land Escrow released at least some of Amusement's $13 million then held in escrow not only without proper written authorization from Amusement's agents, Allen Sragow or Allen Alevy, but also without notice to Amusement until July 13, 2007. Thus these defendants breached their fiduciary duty owed to Amusement on July 12, 2007.

163.    As a result of Frenkel and Land Escrow releasing Amusement's $13,000,000 from escrow on July 12, 2007 before Amusement completed memorialization of its agreements with Stern, Safrin and First Republic LLC, Amusement has suffered damages.

164.    In addition, as a result of Frenkel and Land Escrow's refusal to return the accrued interest on the escrowed $13,000,000, Amusement has been damaged in an additional sum of approximately $20,000. Amusement is entitled to punitive damages and pre-judgment interest on all sums due as a result of these defendants' breach of fiduciary duty.

165.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions

described or the wrongs alleged. Plaintiffs have demanded this information but defendants
have failed and refused to provide the same.

### FIFTEENTH CAUSE OF ACTION
(FRAUD IN THE INDUCEMENT – AGAINST STERN & SAFRIN (REGARDING NEED
FOR $13,000,000))

166.    Plaintiffs replead and reallege each and every allegation stated in the
foregoing paragraphs of this Complaint as if stated in full herein.

167.    On about June 29, 2007, when Stern and Safrin solicited Amusement's $13
million contribution to enable Stern and Safrin to complete their acquisition of the property
portfolio from seller, Colonial Realty Limited Partnership, Stern and Safrin promised by
email, through Friedman, to Allen Alevy at Amusement: 1) - that the entire $13 million
contribution was necessary for completion of the property portfolio purchase. Amusement
accepted material representation and relied upon it on June 29, 2007 when Amusement
wired its $13 million to Land Escrow and Frenkel that day.

168.    Stern's and Safrin's investment solicitation promise made to Amusement was
false and on information and belief Stern and Safrin knew it to be false when made on about
June 29, 2007, because these defendants knew that same day they did not need $13 million
in additional funds to close purchase of the property portfolio. Instead on information and
belief, these defendants knew on that same day that they only needed about $9 million in
additional funds to close purchase of the property portfolio.

169.    Thus the false investment solicitation of these defendants induced
Amusement to place into escrow on June 29, 2007, for benefit of these defendants, about $4
million more than these defendants needed to purchase the property portfolio.

170.    Upon information and belief, these defendants at closing of the property
portfolio purchase use the about $4 million excess of Amusement's contribution to pay

54

Stern's and Safrin's personal creditors included payment to the following persons and entities: Carruthers & Roth; Young Conaway Starrgatt & Taylor; Odin Feldman Pittleman; Young Conaway; Starrgatt & Taylor; Cavazos Hendricks & Poirot, PC; Buchanen Ingersol; Herrick Feinstein; Mary Stark; Frank Dwyer; NRAI Entity Services; Burr Forman; Parker Hudson Rainer; Bruce Minsky; Prudential Douglas Elliman; GAMC IPG; Ace Capital Group; Hoffinger Stern & Ross; Eisenpress and Reiss; and Roman Associates, LTD.

171.    Amusement reasonably and justifiably relied upon Stern's and Safrin's false representation of June 29, 2007 as described above.

172.    As a direct and proximate result of Stern's and Safrin's false representation, Amusement was induced to provide about $4 million more than necessary for Stern's and Safrin's acquisition of the property portfolio, so that Stern and Safrin acquired $4 million for themselves under false pretense to Amusement.  Amusement has been damaged by loss of at least $4 million, the exact sum to be proven at time of trial, plus any and all pre-judgment interest allowed by law.

173.    In making the false promises described above, Stern and Safrin acted with oppression, fraud and malice, for having used their investment solicitation in a business venture to make and profit personally from false promises targeted to harm Amusement, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

174.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged.  Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

55

## SIXTEENTH CAUSE OF ACTION
### (BREACH OF CONTRACT – AGAINST STERN & SAFRIN
### (REGARDING USE OF $13,000,000))

175.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

176.    On about June 29, 2007, when Stern and Safrin solicited Amusement's $13 million contribution to enable Stern and Safrin to complete their acquisition of the property portfolio from seller, Colonial Realty Limited Partnership, Stern and Safrin promised to Amusement: 1) - that the $13 million contribution was necessary for completion of the property portfolio, and 2) - Amusement's $13 million contribution would be entirely used for that purchase with any excess placed into the property portfolio by providing such to the owning entity.  Amusement accepted these representations when on that same day of June 29, 2007, Amusement wrote to Stern and Safrin on June 29, 2007 stating that Stern and Safrin would only need to use about $9 million of Amusement's $13 million towards acquisition of the property portfolio thus leaving about $4 million excess remaining for retention in the property portfolio purchasing entity as promised.  Thus a contract was formed on June 29, 2007 between Amusement and these defendants containing these terms originally represented by these defendants.

177.    On about July 12, 2007 Stern and Safrin breached their contract with Amusement promising to retain Amusement's excess within the property portfolio at closing, when upon First Republic LLC's acquisition of the property portfolio on July 12, 2007 by Stern's and Safrin's use of Amusement's $13 million contribution, Stern and Safrin did not retain the about $4 million excess in First Republic LLC.  Instead, Stern and Safrin took Amusement's about $4 million excess for themselves to pay their personal expenses and personal creditors, thus violating their contractual promise to Amusement.

56

178.   Upon information and belief, the portion of Amusement's contribution used to pay Stern's and Safrin's personal creditors included payment to the following persons and entities:

179.   Carruthers & Roth; Young Conaway Starrgatt & Taylor; Odin Feldman Pittleman; Young Conaway; Starrgatt & Taylor; Cavazos Hendricks & Poirot, PC; Buchanen Ingersol; Herrick Feinstein; Mary Stark; Frank Dwyer; NRAI Entity Services; Burr Forman; Parker Hudson Rainer; Bruce Minsky; Prudential Douglas Elliman; GAMC IPG; Ace Capital Group; Hoffinger Stern & Ross; Eisenpress and Reiss; and Roman Associates, LTD.

180.   As a direct and proximate result of Stern's and Safrin's breach of contract, Amusement was induced to provide about $4 million more than necessary for Stern's and Safrin's acquisition of the property portfolio, and Stern and Safrin wrongly acquired about $4 million of Amusement's funds for their personal use in contravention of their promise not to do so.  Amusement has been damaged by loss of at least $4 million, the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach of July 12, 2007.

181.   The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged.  Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

**SEVENTEENTH CAUSE OF ACTION**
(FRAUD IN THE INDUCEMENT – AGAINST STERN & SAFRIN
(REGARDING ABILITY TO REFINANCE))

182.   Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

57

183.    The terms of the loan agreements between Citibank and borrowers ("Citibank loan agreements") were known by, and were in the possession of, Stern and Safrin, but were not disclosed to, not known by and were not in the possession of plaintiffs through July 13, 2007. Thus Amusement was unaware of loan terms between Citibank and the borrowers up through Frenkel's and Land Escrow's unauthorized release of Amusement's $13 million escrowed funds.

184.    On about June 29, 2007, Stern and Safrin disclosed to Amusement by email sent that date, through Friedman, that the Citibank debt upon the property portfolio would be about $126 million and that the property portfolio had a market value of about $190 million, so that equity of about $64 million existed from which repayment to Amusement would occur.

185.    Based on these disclosed financials, to induce Amusement's $13 million contribution to Stern's and Safrin's acquisition of the property portfolio, Stern and Safrin represented by email, through Friedman, to Allen Alevy of Amusement on about June 29, 2007, and again by emails between these parties of about July 11, 2007 as detailed above, that: 1) - there would be a defined time in which Amusement would receive return of its $13 million contribution, 2) - this defined time would be 60 days from closing of the property portfolio purchase, and 3) - since Safrin and Stern lacked sufficient personal funds to repay Amusement's $13 million contribution within 60 days, repayment would occur by these defendants' removal of equity from the property portfolio through refinance of the Citibank loan within the 60 day repayment period.

186.    The promissory notes signed by Stern both contained 60 day terms from closing to reflect this promise that 60 days from closing the Citibank loan encumbering the

property portfolio would be refinanced by these defendants to obtain the funds necessary to pay Amusement.

187.    Further, Stern and Safrin performed the terms of their promise by their post-closing attempts to refinance the Citibank loan that encumbered the property portfolio after July 12, 2007.

188.    Notwithstanding these post-July 12, 2007 attempts by Stern and Safrin to pull equity out of the property portfolio in attempted repayment of Amusement, these defendants' prior material representations that return of Amusement's $13 million contribution within 60 days of closing was possible based upon payoff and refinance of the Citibank loan was false, and Stern and Safrin knew this representation to be false when made.  In fact, known to Stern and Safrin but unknown to Plaintiffs, the Citibank loan agreements in these defendants' possession precluded any payoff and refinance of the Citibank debt secured by the property portfolio within the first 180 days after July 12, 2007, and also precluded placement of additional debt upon the property portfolio, and thus precluded removal of equity from the property portfolio to repay Amusement its $13 million investment within 60 days of July 12, 2007.

189.    Stern's intent within his $13 million and $15 million promissory notes that equity from the property portfolio could be and would be procured within 60 days of July 12, 2007 to pay those notes was thus also false.

190.    Stern and Safrin had a duty to disclose to investor, Amusement, that the repayment terms offered to Amusement by these defendants were in fact at least possible and not impossible as was the case. These defendants and Amusement were to be business partners together owning and operating the property portfolio once purchased.  Thus these

59

defendants knowingly, maliciously and wrongly concealed the material fact from Plaintiffs that Citibank would not allow the refinance of the debt secured by the property portfolio for an initial 180 days from July 12, 2007, so that equity within the property portfolio could not be tapped within 60 days of July 12, 2007 as promised by Stern and Safrin.

191.    Plaintiffs reasonably and justifiably relied upon the false representation of 60 day loan refinance as the funding source to repay Amusement's $13 million investment, and to pay the promissory notes signed by Stern, as Amusement would not have provided its $13 million to Stern and Safrin for acquisition of the property portfolio unless the property portfolio, with its equity, could be tapped within a short 60 day time to return at least $13 million to Amusement.

192.    As a direct and proximate result of Stern's and Safrin's false promise and concealment, Amusement was induced to provide $13 million for a promised investment return within 60 days of closing.  With Stern's and Safrin's concealed material knowledge that 60 day refinance of the Citibank loan was impossible, Stern and Safrin could not and did not use equity from the property portfolio to repay Amusement any sum within 60 days of July 12, 2007.  Amusement has thus been damaged by the sum of at least $13 million, the exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

193.    In making the false promise with concealment described above that Amusement would see return of its investment in 60 days from equity taken from the property portfolio, Amusement was induced to provide $13 million to Stern and Safrin. Thus Stern and Safrin acted with oppression, fraud and malice, for having used their concealed knowledge to falsely promise to Amusement that it would be repaid its investment within 60 days of July 12, 2007 based on equity available from the property

portfolio. Stern and Safrin thus targeted Amusement for harm, so that these defendants would not lose their opportunity to purchase the property portfolio, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

### EIGHTEENTH CAUSE OF ACTION
(NEGLIGENT MISREPRESENTATION – AGAINST STERN & SAFRIN)
(REGARDING ABILITY TO REFINANCE)

194.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

195.    In the alternative to the 17th cause of action above, if Stern and Safrin did not know the falsity of their material representation concerning source of repayment and did not intentionally conceal from plaintiffs the fact of 180 day repayment lockout by Citibank of its debt encumbered by the property portfolio, these defendants should have known that their representation that the property portfolio would be the repayment source by refinance of the Citibank loan within 60 days of July 12, 2007, was a false promise, not possible to perform, at variance with Citibank loan agreements.

196.    Stern's and Safrin's false representation if not made knowingly was made recklessly and negligently, without due regard for the truth of the asserted ability to refinance equity out of the property portfolio in 60 days, because Stern and Safrin were parties to, and in control and possession of, the Citibank loan documents which indicated by its 180 day lockout term that a contemplated 60 day repayment period from property portfolio equity was not possible.

197.    Plaintiffs requested but did not receive the Citibank loan documents which contained the 180 day lockout term, and thus as these defendants were to be partners with Amusement in ownership and management of the property portfolio, these defendants owed a duty to Amusement to provide requested loan agreements that could impact the business

61

relationship. Had plaintiffs known of the 180 day lockout of Citibank loan refinance prior to July 12, 2007, Amusement would not have provided its $13 million to Stern and Safrin for acquisition of the property portfolio so that Amusement would have recalled its funds from Land Escrow and Frenkel. Therefore, plaintiffs reasonably and justifiably relied upon the mistaken representation of 60 day loan refinance as the funding source to repay Amusement's $13 million contribution.

198.    As a direct and proximate result of Stern's and Safrin's false promise negligently made, Amusement was induced to provide and did in fact provide its $13 million contribution to Stern and Safrin for acquisition of the property portfolio. Amusement has thus been damaged by the sum at least $13 million, the exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

### NINETEENTH CAUSE OF ACTION
(FRAUD - INDUCEMENT OF ESCROW – AGAINST STERN & SAFRIN)
(REGARDING CONSENT TO RELEASE FUNDS FROM ESCROW)

199.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

200.    Amusement wired $13 million to escrow for the benefit of Stern and Safrin, pending negotiation of and entry into a final payment and security agreement between Amusement and Stern / Safrin. Amusement's instruction to escrow to await its authorization to release its previously wired $13 million to Stern and Safrin for their use and benefit, was based upon ongoing negotiations that continued between Amusement and Stern / Safrin that as of July 12, 2007 when escrow released Amusement's funds to Stern and Safrin, and Stern and Safrin used those funds, had not led to a final payment and security agreement between Amusement and Stern / Safrin satisfactory to Amusement.

62

201.    Prior to and including July 12, 2007, various proposals and drafts of the Amusement - Stern / Safrin payment and security agreements went back and forth between the parties, but no final payment and security agreements acceptable to Amusement had been reached or provided.  Thus, Amusement reasonably did not provide its authorization, through Allen Alevy or Allen Sragow, to escrow to release Amusement's $13 million to Stern and Safrin.

202.    Notwithstanding this lack of a negotiated final payment and security agreement between Amusement and Stern / Safrin, and notwithstanding Amusement's lack of authorization to escrow to release funds to Stern and Safrin, Stern and Safrin on about July 12 and 13, 2007 without Plaintiffs' knowledge or consent, falsely misrepresented to Steven Alevy, not authorized release agent of Amusement, and to Frenkel and Land Escrow, that a final payment and security agreement between Amusement and Stern / Safrin had been reached and thus it was now permitted for Land Escrow and Frenkel to release Amusement's escrowed $13 million to Stern and Safrin.  Stern and Safrin thus concealed the truth from Land Escrow, Frenkel and Steven Alevy that in fact no final payment and security agreements acceptable to Amusement had been reached.

203.    Land Escrow and Frenkel released Amusement's $13 escrowed million on about July 12, 2007, based at least in part upon and in reliance upon Stern's and Safrin's false, material representation that a final payment and security agreement had been reached by them with Amusement.  Land Escrow and Frenkel would not have released Amusement's $13 million on July 12, 2007, to Amusement's detriment, without having received Stern's and Safrin's false representation.

204.    As a direct and proximate result of Stern's and Safrin's fraud and concealment upon Land Escrow and Frenkel, Amusement's escrowed $13 million was taken from Amusement without permission or authorization, so that a theft occurred whereby Stern and Safrin stole Amusement's escrowed funds without finalizing payment and security agreements with Amusement. Amusement has thus been damaged in the sum of at least $13 million, the exact sum to be proven at time of trial.

205.    In making the false promises described above to convince Land Escrow and Frenkel to release Amusement's $13 million to Stern and Safrin, before terms agreed by Stern and Safrin with Amusement could be memorialized in legally binding writings, Stern and Safrin acted with oppression, fraud and malice. Stern and Safrin knew that Amusement had not yet received written memorialization of agreed upon terms for Amusement's investment in the property portfolio purchase, and yet Stern and Safrin nevertheless falsely claimed to Land Escrow, Frenkel and Steven Alevy, to induce release of Amusement funds by Land Escrow and Frenkel, that Amusement had received agreements from Stern, Safrin and First Republic LLC containing agreed upon terms with Amusement. Amusement was harmed by the early and unauthorized release of its funds from Land Escrow and Frenkel wrongly induced by Stern and Safrin, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

## TWENTIETH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION - INDUCEMENT OF ESCROW -- AGAINST STERN & SAFRIN) (REGARDING CONSENT TO RELEASE FUNDS FROM ESCROW)

206.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

64

207.    In the alternative to the 19th cause of action above, if Stern and Safrin did not know the falsity of their representation concerning the finality of agreements with plaintiffs concerning escrowed funds, and did not intentionally trick Frenkel and Land Escrow to release Amusement's escrowed funds based on the fact that there did not yet exist any final agreement with plaintiffs concerning its escrowed funds, these defendants should have known that their representation to Frenkel and Land Escrow that the final agreements with plaintiffs concerning the escrowed funds was false, since no final agreements in fact had been reached and executed between plaintiffs and these defendants.

208.    Stern's and Safrin's false representation to Frenkel and Land Escrow if not made knowingly was made recklessly and negligently, without due regard for the truth of the assertion that final agreements had been reached and executed between these defendants and plaintiffs and thus the escrowed funds could be released, because these defendants' prepared and provided the agreements with plaintiffs that were provided to plaintiffs.

209.    Prior to and including July 12, 2007, various proposals and drafts of the Amusement - Stern / Safrin payment and security agreements went back and forth between the parties, but no final payment and security agreements acceptable to Amusement had been reached or provided.  Thus, Amusement reasonably did not provide its authorization, through Allen Alevy or Allen Sragow, to escrow to release Amusement's $13 million to Stern and Safrin, and these defendants should have recognized this lack of final agreement between the parties.

210.    Notwithstanding this lack of a negotiated final payment and security agreement between Amusement and Stern / Safrin, and notwithstanding Amusement's lack of authorization to escrow to release funds to Stern and Safrin, Stern and Safrin on about

July 12 and 13, 2007 without Plaintiffs' knowledge or consent, negligently yet falsely misrepresented to Steven Alevy, not authorized release agent of Amusement, and to Frenkel and Land Escrow, that a final payment and security agreement between Amusement and Stern / Safrin had been reached and thus it was now permitted for Land Escrow and Frenkel to release Amusement's escrowed $13 million to Stern and Safrin. Stern and Safrin thus negligently ignored the truth from Land Escrow, Frenkel and Steven Alevy that in fact no final payment and security agreements acceptable to Amusement had been reached.

211.    Land Escrow and Frenkel released Amusement's $13 escrowed million on about July 12, 2007, based at least in part upon and in reliance upon Stern's and Safrin's negligent yet false representation that a final payment and security agreement had been reached by them with Amusement. Land Escrow and Frenkel would not have released Amusement's $13 million on July 12, 2007, to Amusement's detriment, without having received Stern's and Safrin's negligent yet false representation.

212.    As a direct and proximate result of Stern's and Safrin's negligent misrepresentation to Steven Alevy, Land Escrow and Frenkel, Amusement's escrowed $13 million was taken from Amusement without permission or authorization, so that a theft occurred whereby Stern and Safrin stole Amusement's escrowed funds without finalizing payment and security agreements with Amusement. Amusement has thus been damaged in the sum of at least $13 million, the exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

## TWENTY-FIRST CAUSE OF ACTION
### (FRAUD - CONCEALMENT AND FALSE PROMISE, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)
### (REGARDING ABILITY TO TRANSFER AND/OR PLEDGE ASSETS)

213.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

214.    From about July 9, 2007 through July 13, 2007, while Stern/Safrin and Amusement were negotiating a final ownership and security agreement between them, and exchanging drafts of same, Amusement requested from Stern, Safrin, First Republic LLC and Friedman copies of the Citibank loan agreements and the LLC operating agreements for Stern's and Safrin's ownership structure of the property portfolio, in order to confirm that the ownership and security structure for Amusement proposed by Stern, Safrin and First Republic LLC was in compliance with those agreements as represented by Stern, Safrin and First Republic LLC. Neither Friedman, First Republic LLC, Stern nor Safrin provided any such requested agreements to Amusement.

215.    Instead, Stern, Safrin and First Republic LLC represented to Amusement on about July 11, 2007 that its proposed ownership and security structure for Amusement, which included the assignments of LLC membership interests signed by Stern and Safrin and grant deeds in the portfolio properties provided by First Republic LLC, sufficiently protected Amusement by providing Amusement with secured ownership of Stern's and Safrin's property portfolio ownership structure, as well as with secured ownership of the eleven properties within the property portfolio itself, in the event that Stern, Safrin and First Republic LLC defaulted on their payment and ownership obligations to Amusement due September 10, 2007, including in the event that Stern alone defaulted on his promissory note

obligations of $13 million and/or $15 million to Practical Finance (as assignee) also due September 10, 2007.

216.    Thus at the same time that Stern, Safrin and First Republic LLC concealed from Plaintiffs the Citibank loan agreements and the LLC operating agreements for Stern's and Safrin's intended ownership structure of the property portfolio, Stern, Safrin and First Republic LLC provided Plaintiffs with an ownership and security structure that violated those loan agreements and LLC operating agreements. Stern, Safrin and First Republic LLC not only never disclosed to Plaintiffs this violation of loan agreements and LLC operating agreements, but also never disclosed to Plaintiffs that these violations negatively impacted the validity of the provided assignments of LLC membership interests and grant deeds.

217.    These representations by Stern, Safrin and First Republic LLC were false, and these defendants knew them to be false when made, since the requested LLC operating agreements and Citibank loan agreements, not known to or provided to Plaintiffs but known to and in the possession of these defendants, contained various transfer restrictions which made Stern's and Safrin's assignments of LLC membership interests and First Republic LLC's grant deeds potentially if not actually invalid and void.

218.    In addition to the concealment of Stern, Safrin and First Republic LLC, these defendants affirmatively represented to Plaintiffs on about July 11, 2007, as detailed above, that the assignments of LLC membership interests and grant deeds provided to Plaintiffs were valid and enforceable, when in fact this representation was false and known to be false based on the same transfer restrictions of the LLC operating agreements in the property portfolio ownership structure and Citibank loan agreements known only to these defendants but not to Plaintiffs.

68

219.    In addition to the concealment of Stern, Safrin and First Republic LLC, these defendants affirmatively represented to Plaintiffs on about July 11, 2007, as detailed above, that the assignments of LLC membership interests signed and provided from Stern and Safrin to Amusement gave Amusement 100% ownership in First Republic LLC and its subordinate LLC members, when fact this representation was false and known to be false, because Avery Egert was a co-owner of JSAE Colonial LLC with Safrin. Since these defendants did not provide any assignment of LLC membership interests from Avery Egert, these defendants did not provide 100% ownership in JSAE Colonial LLC and upstream LLC entities as represented, even if the provided Stern and Safrin assignments of LLC membership interests were and are valid and enforceable.

220.    Plaintiffs reasonably and justifiably relied upon these concealments and false promises, by in belief of such concealment and false promises Amusement left its $13 million in escrow to enable acquisition of the property portfolio, while without such concealment and false promises Plaintiffs would have before closing learned of the probable invalidity of the ownership and security structure provided by these defendants, so that Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and suffered no monetary loss.

221.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's fraud and concealment, Plaintiffs received the equivalent of an unenforceable receipt from Stern, Safrin and First Republic LLC when these defendants took Amusement's $13 million escrowed funds for their benefit. Plaintiffs never received ownership and security agreements which would be legally valid to provide Plaintiffs with at least 50% ownership of the property portfolio plus return of Amusement's $13 million investment, as intended by

69

the parties and as promised by Stern, Safrin and First Republic LLC. Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the property portfolio not provided or received, plus $13 million not repaid, the exact sums to be proven at time of trial.

222.    Stern, Safrin and First Republic LLC intentionally concealed operational and loan documents from Plaintiffs, while at the same time they affirmatively represented to Plaintiffs that the provided ownership and security agreements were valid and enforceable to provide actual ownership and actual security in the property portfolio to Plaintiffs, and thus Stern, Safrin and First Republic LLC acted with oppression, fraud and malice to intentionally harm Plaintiffs. Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

**TWENTY-SECOND CAUSE OF ACTION**
(NEGLIGENT MISREPRESENTATION AGAINST STERN,
SAFRIN & FIRST REPUBLIC LLC)
(REGARDING ABILITY TO TRANSFER AND/OR PLEDGE ASSETS)

223.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

224.    In the alternative to the 16th cause of action above, if Stern, Safrin and First Republic LLC did not know the falsity of their representations and did not intentionally conceal that the ownership and security structure, including the assignments of LLC membership interests and grant deeds, that these defendants provided to plaintiffs failed to comply with various transfer restrictions of the LLC operating agreements and Citibank loan agreements, as alleged in the 16th cause of action above, these defendants should have known that their representation and concealment were material and false.

70

225.    These defendants' false representation and material concealment if not made knowingly was made recklessly and negligently, without due regard for the truth of the probable validity of the assignments of LLC membership interests and grant deeds provided to plaintiffs. These defendants were negligent because they were in control and possession of the Citibank loan documents and LLC operating agreements which would have indicated that the ownership and security structure provided to plaintiffs was not necessarily and probably valid and enforceable as represented by these defendants.

226.    Plaintiffs reasonably and justifiably relied upon the mistaken representation that the ownership and security structure provided to plaintiffs was necessarily and probably valid and enforceable and not at variance with the governing LLC operating agreements and Citibank loan agreements, because plaintiffs requested but did not receive the Citibank loan documents and LLC operating agreements which unknown to plaintiffs contained the transfer restrictions. Had plaintiffs known of the transfer restrictions as should have been disclosed by these defendants, Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and so would have suffered no monetary loss.

227.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's false promise and concealment negligently made, Plaintiffs received the equivalent of an unenforceable receipt from Stern, Safrin and First Republic LLC when these defendants took Amusement's $13 million escrowed funds for their benefit. Plaintiffs never received ownership and security agreements which would be legally valid to provide Plaintiffs with at least 50% ownership of the property portfolio plus return of Amusement's $13 million investment, as intended by the parties and as promised by Stern, Safrin and First Republic LLC. Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the

71

property portfolio not provided or received, plus $13 million not repaid, the exact sums to be proven at time of trial.

## TWENTY-THIRD CAUSE OF ACTION
(FRAUD - FALSE PROMISE, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)
(REGARDING DELIVERY OF PARTNERSHIP AGREEMENT)

228.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

229.    Stern, Safrin and First Republic LLC also represented to Amusement on about July 11, 2007 that even if its proposed ownership and security structure for Amusement, which included the assignments of LLC membership interests signed by Stern and Safrin and grant deeds in the portfolio properties provided by First Republic LLC, did not provide Amusement with its contractually promised 50% ownership interest in the property portfolio and secured repayment of Amusement's $13 million investment in the property portfolio plus a $2 million upward adjustment, these defendants agreed to draft and provide replacement or additional ownership and security agreements post-closing of First Republic LLC's purchase of the property portfolio, to place Amusement securely into the promised positions.

230.    After First Republic LLC's purchase of the property portfolio closed on July 12, 2007, these defendants have provided no replacement or additional ownership and security agreements of any kind concerning the property portfolio.

231.    As a result, in the event that Stern's and Safrin's assignments of LLC membership interests and First Republic LLC's grant deeds are invalid and void and/or do not provide Amusement with its contractually promised 50% ownership interest in the property portfolio and secured repayment of Amusement's $15 million investment with

72

upward adjustment, then these defendants' promise to provide Amusement with replacement or additional ownership and security agreements after July 12, 2007 was false and known by these defendants to be false.

232.    Plaintiffs reasonably and justifiably relied upon this material false promise to post-closing cure the provided ownership and security structure to match the agreement between the parties, by in belief of such false promise Amusement left its $13 million in escrow to enable acquisition of the property portfolio, while without such false promise Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and suffered no monetary loss.

233.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's fraud, Amusement left its $13 million contribution in escrow to its detriment when the money was taken without authorization on July 12, 2007.  In return, Plaintiffs have not received replacement or additional ownership and security agreements post-July 12, 2007 to place Amusement securely into the contractually promised positions.  Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the property portfolio not provided or received, plus at least $13 million not paid, the exact sums to be proven at time of trial.

234.    Stern, Safrin and First Republic LLC falsely promised to place Plaintiffs in their contractually promised positions, even if it meant doing so after First Republic LLC's purchase of the property portfolio on July 12, 2007.  These defendants have not done so, and thus Stern, Safrin and First Republic LLC acted with oppression, fraud and malice to intentionally harm Plaintiffs.  Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

73

## TWENTY-FOURTH CAUSE OF ACTION
### (CONVERSION, AGAINST STERN & SAFRIN)

235.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

236.    All of these allegations are irrelevant and too detailed.  Only need to say that Stern/Safrin obtained release of Amusement's property without authority or justification. No need for reps, agreements etc. The condition precedent to release was not a final deal – it was permission from Alevy or Sragow.  On and before July 12, 2007 when Stern and Safrin falsely represented to Steven Alevy, Frenkel and Land Escrow that a final and agreed ownership and security arrangement Plaintiffs and Stern / Safrin had been reached, Stern and Safrin made such a false representation to wrongly obtain and receive, without Plaintiffs' permission or consent, Amusement's escrowed $13 million.

237.    These defendants' representations regarding the conclusion of a final arrangement between Plaintiffs and Stern / Safrin were false, since Plaintiffs were still reviewing proposals and documents, and were in fact still negotiating with Stern / Safrin to reach a final ownership, payment and security structure that would better protect Plaintiffs' contractually agreed interests.

238.    As a direct and proximate result of Stern's and Safrin's misrepresentations, they or their chosen payee obtained Amusement's escrowed $13 million without authorization from Amusement, and thus stole Amusement's escrowed funds.

239.    Plaintiffs have made demand upon Stern and Safrin for return of the sums taken by them from Amusement being held by Frenkel and Land Escrow, but Stern and Safrin have failed and refused to return such sums.

74

240.    These defendants' acts to induce Frenkel and Land Escrow to release Amusement's $13 million without authorization were willful, wanton, malicious, and oppressive in that these defendants lied about the status of their arrangement with plaintiffs to reach and obtain Amusement's escrowed funds, knowing that Amusement lacked a final arrangement with these defendants and so Amusement justifiably would not release its escrowed funds to these defendants, thus justifying an award of punitive and exemplary damages against these defendants.

241.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged.  Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## TWENTY-FIFTH CAUSE OF ACTION
### (CONSPIRACY TO COMMIT CONVERSION AND FRAUD – AGAINST STERN, SAFRIN, FRENKEL & LAND ESCROW)

242.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

243.    Once Amusement wired its $13 million to Land Escrow and Frenkel on about June 29, 2007, Stern, Safrin, Frenkel and Land Escrow conspired and agreed, without Plaintiffs' knowledge or consent, to take Amusement's escrowed funds and provide them to Stern and Safrin, or to their chosen payee, to be used for their benefit, even if no final arrangement and structure between Stern / Safrin and Plaintiffs existed governing the use and repayment of the escrowed $13 million or governing Amusement's ownership interest in the property portfolio.

75

244. This conspiracy to defraud and to convert Amusement's escrowed funds to the detriment of Plaintiffs was in fact performed resulting in actual harm to Plaintiffs, as described and detailed in causes of action 11, 12, 15 and 18 above.

245. As a direct and proximate result of Stern's, Safrin's, Frenkel's and Land Escrow's conspiracy to commit conversion and fraud, they or their chosen payee obtained Amusement's escrowed $13 million without authorization from Amusement, and thus stole Amusement's escrowed funds.

246. Plaintiffs have made demand upon Stern, Safrin, Frenkel and Land Escrow for return of the sums taken by them from Amusement being held by Frenkel and Land Escrow, but these defendants have failed and refused to return such sums.

247. These defendants' acts to ensure that Frenkel and Land Escrow released Amusement's $13 million without authorization were willful, wanton, malicious, and oppressive in that these defendants knew the true unfinished status of Plaintiffs' arrangement with Stern and Safrin precluding them from lawfully obtaining Amusement's escrowed funds at that time. These defendants knew that Amusement lacked a final arrangement with Stern and Safrin and so justifiably Amusement would not release its escrowed funds to Stern and Safrin by July 12, 2007, thus justifying an award of punitive and exemplary damages against these defendants.

### TWENTY-SIXTH CAUSE OF ACTION
(UNJUST ENRICHMENT AGAINST STERN,
SAFRIN, FIRST REPUBLIC LLC, FRENKEL & LAND ESCROW)

248. Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

249. On July 12, 2007, Stern, Safrin, First Republic LLC, Frenkel and Land Escrow knowingly and unlawfully accessed and obtained for their benefit, without Plaintiffs'

76

knowledge or consent, Amusement's $13 million escrowed funds, even though all these

defendants were aware that no final arrangement and structure existed between Stern, Safrin

and First Republic LLC with Plaintiffs that permitted the release of any part of Amusement's

escrowed $13 million, and even though all these defendants were aware that Amusement

had not provided authorization for release of its escrowed funds.

250.    At all relevant times herein, and continuing to the present, Amusement has

and continues to have a legal and contract interest in the $13 million that it escrowed with

Frenkel and Land Escrow, which sum was improperly taken by these defendants.

251.    On or about July 12, 2007 these defendants wrongly obtained the benefit of

the escrowed $13 million.

252.    As a direct and proximate result of these defendants' wrongful conduct, have

been and continue to be unjustly enriched by the wrongful withdrawal and receipt by them

of any portion of Amusement's $13 million formerly escrowed with Frenkel and Land

Escrow, which is money that these defendants know and have been advised is not money for

their benefit, but is money escrowed pending finalization of an arrangement between

plaintiffs and Stern, Safrin and First Republic LLC which satisfies the contractually agreed

promises reached between the parties.

253.    These defendants have failed to pay or compensate plaintiffs any amount

whatsoever since the beginning of their wrongful conduct.

254.    The fair and reasonable value of plaintiffs' loss as a result of these

defendants' wrongful withdrawal is the sum of $13 million.

255.    By reason of such conduct, these defendants hold the money and other

benefits which they have received from their wrongful withdrawal as constructive trustees

for Plaintiffs. Plaintiffs are therefore entitled to a judicial declaration that these defendants are constructive trustees of Plaintiffs, so that Plaintiffs are entitled to a court order that these defendants convey all such monies and other benefits to Plaintiffs.

256.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

**TWENTY-SEVENTH CAUSE OF ACTION**
(BREACH OF FIDUCIARY DUTY AGAINST STERN,
SAFRIN AND FIRST REPUBLIC LLC)

257.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

258.    At all times herein mentions, Defendants Stern and Safrin were incorporators, officers, directors, managers, or the like of First Republic LLC.

259.    In acting as described above, Defendants Stern and Safrin did not exercise the care required of them in that they took Amusement's money without providing Amusement with any of the benefits promised to them as investors, i.e. ownership, profit, and reimbursement rights.

260.    As a direct and proximate result of these acts of Defendants Stern and Safrin, Plaintiffs have suffered damages in an amount to be determined by the trier of fact.

261.    Further, defendants acted with oppression, fraud and malice to intentionally harm Plaintiffs. Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

262.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions

described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

WHEREFORE, Plaintiffs pray for judgment against all Defendants as follows:

A.    AS TO THE FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF AS TO OWNERSHIP OF DEEDS AND LLC INTERESTS, AGAINST STERN, SAFRIN:

1.    A declaration that Amusement owns First Republic LLC and owns the eleven portfolio properties formerly owned by First Republic LLC, and that Practical Finance as assignee is owed sums of money pursuant to promissory notes signed by Stern.

B.    AS TO THE SECOND CAUSE OF ACTION FOR QUIET TITLE AS TO REAL PROPERTY, AGAINST FIRST REPUBLIC GROUP REALTY LLC:

1.    For judgment quieting Plaintiff's title to the property against Defendants;

2.    For all applicable statutory penalties; and

3.    For damages in a sum to be proven at time of trial.

C.    AS TO THE THIRD CAUSE OF ACTION FOR QUIET TITLE AS TO PERSONAL PRIOPERTY, AGAINST FIRST REPUBLIC GROUP REALTY LLC:

1.    For judgment quieting Plaintiff's title to the property against Defendants;

2.    For all applicable statutory penalties; and

3.    For damages in a sum to be proven at time of trial.

D.    AS TO THE FOURTH CAUSE OF ACTION FOR JUDICIAL FORECLOSURE OF REAL PROPERTY:

1.    Against Defendant, damages in the sum of the principal, together with interest to date of Entry of Judgment, together with such other additional sums as may be due;

2.    A decree of judicial foreclosure against the Defendant FRG Realty and a deficiency judgment against Defendant FRG Realty;

79

3.    Adjudging that Defendant FRG Realty's rights, claims, ownership, liens, titles and demands are subsequent to and subject to the lien of Plaintiffs' security rights;

4.    Adjudging that Plaintiffs' security rights be foreclosed, that the usual judgment be made for the sale of the SUBJECT REAL PROPERTY according to law, that the proceeds of the sale be applied in payment of all amounts due to Plaintiff, and that the Defendant FRG Realty and all parties and/or persons claiming through them or any of them, whether as lien claimants, judgment creditors, claimants under a junior deed of trust, purchasers, each, or otherwise, be barred and foreclosed from all rights, claims, interests or equity of redemption in the SUBJECT REAL PROPERTY and personal property and other property described in the Security Agreement and every part thereof when time for redemption has elapsed; and

5.    Permitting Plaintiffs or any parties to this action to become a purchaser at the foreclosure sale.

E.    AS TO THE FIFTH CAUSE OF ACTION FOR JUDICIAL FORECLOSURE OF PERSONAL PROPERTY:

1.    A decree of judicial foreclosure against the Defendants Stern and Safrin and a deficiency judgment against Defendants Stern and Safrin;

2.    Adjudging that Defendants Stern and Safrin's rights, claims, ownership, liens, titles and demands are subsequent to and subject to the lien of Plaintiffs' security rights;

3.    Adjudging that Plaintiffs' security rights be foreclosed, that the usual judgment be made for the sale of the SUBJECT LLC MEMBERSHIP INTERESTS according to law, that the proceeds of the sale be applied in payment of all amounts due to Plaintiffs, and that the Defendants Stern and Safrin and all parties and/or persons claiming through them or any of them, whether as lien claimants, judgment creditors, claimants under a junior deed of trust, purchasers, each, or otherwise, be barred and foreclosed from all rights, claims, interests or equity of redemption in the SUBJECT LLC MEMBERSHIP INTERESTS and every part thereof when time for redemption has elapsed; and

4.    Permitting Plaintiff or any parties to this action to become a purchaser at the foreclosure sale.

F.    AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF PROMISE TO REPAY INVESTMENT AGAINST STERN, SAFRIN AND FIRST REPUBLIC LLC:

80

1.    For damages allowed by law, the exact sum to be proven at time of trial.

G.    AS TO THE SEVENTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST MARK STERN -- $13,000,000 PROMISSORY NOTE:

1.    For damages allowed by law, the exact sum to be proven at time of trial.

H.    AS TO THE EIGHTH CAUSE OF ACTION FOR SPECIFIC PERFORMANCE OF PROMISE TO PROVIDE 50% PARTNERSHIP:

1.    For a decree ordering Defendants to transfer 100% of their interest in the entities and the subject real property to a partnership 50% owned by Plaintiffs.

I.    AS TO THE NINTH CAUSE OF ACTION FOR BREACH OF CONTRACT TO PROVIDE 50% PARTNERSHIP:

1.    For damages allowed by law, the exact sum to be proven at time of trial; and

2.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

J.    AS TO THE TENTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST MARK STERN - $15,000,000 PROMISSORY NOTE:

1.    For damages allowed by law, the exact sum to be proven at time of trial.

K.    AS TO THE ELEVENTH CAUSE OF ACTION FOR SPECIFIC PERFORMANCE OF PROMISE TO PROVIDE 100% PARTNERSHIP:

1.    For a decree ordering Defendants to transfer 100% of their interest in the entities and the subject real property to a partnership wholly owned by Plaintiffs.

L.    AS TO THE TWELFTH CAUSE OF ACTION FOR BREACH OF CONTRACT TO PROVIDE 100% PARTNERSHIP:

1.    For damages allowed by law, the exact sum to be proven at time of trial; and

81

     2.      For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

M.    AS TO THE THIRTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT (ESCROW) CONTRACT AGAINST EPHRAIM FRENKEL AND LAND TITLE ASSOCIATES:

     1.      For damages allowed by law, the exact sum to be proven at time of trial.

N.    AS TO THE FOURTEENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AGAINST EPHRAIM FRANKEL AND LAND TITLE ASSOCIATES:

     1.      For damages allowed by law, the exact sum to be proven at time of trial; and

     2.      For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

O.    AS TO THE FIFTEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING NEED FOR $13M:

     1.      For damages allowed by law, the exact sum to be proven at time of trial;

     2.      For exemplary and punitive damages to be proven at time of trial;

     3.      For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting; and

     4.      As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

P.    AS TO THE SIXTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT REGARDING USE OF $13M:

     1.      For damages allowed by law, the exact sum to be proven at time of trial; and

     2.      For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

Q.   AS TO THE SEVENTEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING ABILITY TO REFINANCE:

1.   For damages allowed by law, the exact sum to be proven at time of trial;

2.   For exemplary and punitive damages to be proven at time of trial; and

3.   As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

R.   AS TO THE EIGHTEENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION REGARDING ABILITY TO REFINANCE:

1.   For damages allowed by law, the exact sum to be proven at time of trial.

S.   AS TO THE NINETEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING AMUSEMENT'S CONSENT TO RELEASE OF $13M FROM ESCROW:

1.   For damages allowed by law, the exact sum to be proven at time of trial; and

2.   For exemplary and punitive damages to be proven at time of trial.

T.   AS TO THE TWENTIETH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION REGARDING AMUSEMENT'S CONSENT TO RELEASE OF $13M FROM ESCROW:

1.   For damages allowed by law, the exact sum to be proven at time of trial.

U.   AS TO THE TWENTY FIRST CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING ABILITY TO TRANSFER OR PLEDGE ASSETS:

1.   For damages allowed by law, the exact sum to be proven at time of trial;

2.   For exemplary and punitive damages to be proven at time of trial; and

3.   As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

V.    AS TO THE TWENTY SECOND FIRST CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION REGARDING ABILITY TO TRANSFER OR PLEDGE ASSETS:

    1.    For damages allowed by law, the exact sum to be proven at time of trial.

W.    AS TO THE TWENTY THIRD CAUSE OF ACTION FOR FRAUDULENT PROMISE TO DELIVER PARTNERSHIP AGREEMENT:

    1.    For damages allowed by law, the exact sum to be proven at time of trial;

    2.    For exemplary and punitive damages to be proven at time of trial; and

    3.    As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

X.    AS TO THE TWENTY FOURTH CAUSE OF ACTION FOR CONVERSION REGARDING AMUSEMENT'S $13M:

    1.    For damages allowed by law, the exact sum to be proven at time of trial; and

    2.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

Y.    AS TO THE TWENTY FIFTH CAUSE OF ACTION FOR CONSPIRACY TO COMMIT FRAUD AND CONVERSION:

    1.    For damages allowed by law, the exact sum to be proven at time of trial;

    2.    For exemplary and punitive damages to be proven at time of trial; and

    3.    As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

Z.    AS TO THE TWENTY SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT:

    1.    For damages allowed by law, the exact sum to be proven at time of trial;

2.    For the imposition of a constructive trust on for the benefit of Plaintiffs for all sums of money deposited in escrow;

3.    For restitution of all moneys deposited in escrow by Plaintiffs;

4.    For an equitable lien on all subject matters purchased with moneys deposited in escrow by Plaintiffs;

5.    For an order requiring transferees with knowledge of the moneys deposited in escrow by Plaintiffs to make restitution; and

6.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

AA.    AS TO THE TWENTY SEVENTH CAUSE OF ACTION FOR BREACH OF FUDICIARY DUTY:

1.    For damages allowed by law, the exact sum to be proven at time of trial;

2.    For exemplary and punitive damages to be proven at time of trial;

3.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting; and

4.    As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

BB.    AS TO ALL CAUSES OF ACTION:

1.    For Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein; and

2.    For such other and further relief as the Court deems just, necessary or appropriate.

DATED:  December 27, 2007

PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel:  (212) 643-7000
Fax:  (212) 643-6500

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210

ATTORNEYS FOR PLAINTIFFS

PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel: (212) 643-7000
Fax: (212) 643-6500

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210

Attorneys for Plaintiffs and Third Party Defendants
Steven Alevy and Bankers Capital LLC


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMUSEMENT INDUSTRY, INC. (dba WESTLAND INDUSTRIES), and PRACTICAL FINANCE CO., INC., | : : : : | CASE NO. 07 Civ. 11586 (LAK) (GWG) |
| Plaintiffs, | : : | **THIRD PARTY DEFENDANTS** |
| v. | : : | **BANKERS CAPITAL** |
| | : | **REALTY ADVISORS LLC'S AND** |
| MOSES STERN (aka MARK STERN), JOSHUA SAFRIN, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND TITLE ASSOCIATES ESCROW, | : : : : : : : | **STEVEN ALEVY'S ANSWER TO THE AMENDED THIRD PARTY COMPLAINT OF DEFENDANT SAFRIN, COUNTERCLAIMS AGAINST SAFRIN, AND CROSS CLAIMS AGAINST STERN, FIRST REPUBLIC, FRENKEL, LAND TITLE,** |
| Defendants. | : : | **STEPHEN FRIEDMAN AND BUCHANAN INGERSOLL & ROONEY** |
| | : : : : | |

STEPHEN FRIEDMAN, STEVEN ALEVY,  :
BUCHANAN INGERSOLL & ROONEY,      :
P.C., BANKERS CAPITAL REALTY      :
ADVISORS LLC, and FIRST REPUBLIC  :
GROUP CORP.,                      :
                                  :
      Third Party Defendants,  :
                                  :
- and -                           :
                                  :
MOSES STERN aka MARK STERN, FIRST :
REPUBLIC GROUP REALTY LLC,        :
EPHRAIM FRENKEL, and LAND TITLE   :
ASSOCIATES ESCROW,                :
                                  :
      Defendants/Crossclaim  :
      Defendants,            :
                                  :
- and -                           :
                                  :
AMUSEMENT INDUSTRY, INC. (dba     :
WESTLAND INDUSTRIES), and         :
PRACTICAL FINANCE CO., INC.,      :
                                  :
      Plaintiffs/Counterclaim  :
      Defendants.            :
_____  :

    Third party defendants Bankers Capital Realty Advisors LLC ("Bankers Capital")

and Steven Alevy (together, "third party defendants"), by their undersigned attorneys, and as

and for their answer to the amended third party complaint of defendant Joshua Safrin

("Safrin" or "defendant") in the above-captioned action (the "Action"), hereby:

      1.      Admit the allegations in paragraph 1.

      2.      Deny the allegations in paragraph 2, and refer to the Complaint for a

statement of its terms.

      3.      Deny the allegations in paragraph 3.

4.       Admit the allegations in paragraph 4.

5.       Admit the allegations in paragraph 5.

6.       Admit the allegations in paragraph 6.

7.       Deny the allegations in paragraph 7, except admit that Steven Alevy is an individual citizen of the State of New York residing at the cited address, that Steven Alevy is a managing director of Bankers Capital, and that Steven Alevy is the son of Allen Alevy.

8.       Deny the allegations in paragraph 8, except admit that Bankers Capital operates from the cited address.

9.       Lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9, and, therefore, deny the allegations therein, except admit that third party defendant First Republic Group Corp. is a New York corporation operating out of the cited address.

10.       Admit the allegations in paragraph 10.

11.       Admit the allegations in paragraph 11.

12.       Admit the allegations in paragraph 12.

13.       Admit the allegations in paragraph 13.

14.       Admit the allegations in paragraph 14.

15.       Admit the allegations in paragraph 15.

16.       Admit the allegations in paragraph 16.

17.       Deny the allegations in paragraph 17, except admit that the Court has personal jurisdiction over the Third Party Defendants.

18.       Admit that venue is proper in this judicial district.

3

19.     Deny the allegations in paragraph 19, except admit that Safrin purports to base his allegations on those contained in the Complaint, and refer to the Complaint for a statement of its terms.

20.     Deny the allegations in paragraph 20, except admit, upon information and belief, that defendant First Republic Group Corp. purchased from Colonial Realty the Property Portfolio and that First Republic Corp. assigned its interest to First Republic LLC, and refer to the Complaint for a statement of its terms.

21.     Deny the allegations in paragraph 21, except admit that Safrin and Stern obtained primary financing for their property portfolio purchase from Citigroup, that Stern and Safrin's buying entity, First Republic LLC executed a loan agreement with Citigroup for $111,150,000, that Stern and Safrin's created managing entity, FRGR Managing Member LC, executed a Mezzanine Loan Agreement with Citigroup for $15,000, and that Safrin is a guarantor of both loans.

22.     Deny the allegations in paragraph 22.

23.     Deny the allegations in paragraph 23, except admit that in June 2007, defendants Stern and Safrin knew that the funds they would receive from Citibank would be insufficient for their portfolio purchase and that Stern and Safrin approached Steven Alevy of Bankers Capital and Friedman in an attempt to obtain additional funding, and refer to the Complaint for a statement of its terms.

24.     Deny the allegations in paragraph 24.

25.     Deny the allegations in paragraph 25, except admit that plaintiffs have alleged that, in June 2007, Steven Alevy and Friedman presented an investment opportunity to plaintiffs from Stern and Safrin, and refer to the Complaint for a statement of its terms.

26.     Deny the allegations in paragraph 26.

27.     Deny the allegations in paragraph 27, and refer to the Complaint for a statement of its terms.

28.     Deny the allegations in paragraph 28.

29.     Deny the allegations in paragraph 29, and refer to the LOI for a statement of its terms.

30.     Deny the allegations in paragraph 30, and refer to the LOI for a statement of its terms.

31.     Deny the allegations in paragraph 31, and refer to the documents identified therein for a statement of their terms.

32.     Deny the allegations in paragraph 32, except admit that on June 29, 2007, Amusement wired $13,000,000 to an escrow account held by defendant Land Title and that plaintiffs have alleged that by such performance, a contract between Amusement and, among others, Stern and Safrin, formed.

33.     Deny the allegations in paragraph 33.

34.     Admit the allegations in paragraph 34.

35.     Deny the allegations in paragraph 35.

36.     Deny the allegations in paragraph 36, and refer to the Complaint for a statement of its terms.

37.     Deny the allegations in paragraph 37, and refer to the documents identified therein for a statement of their terms.

38.     Deny the allegations in paragraph 38, and refer to the Complaint for a statement of its terms.

39.     Deny the allegations in paragraph 39, and refer to the Complaint for a statement of its terms.

40.     Deny the allegations in paragraph 40.

41.     Deny the allegations in paragraph 41, and refer to the Complaint for a statement of its terms.

42.     Deny the allegations in paragraph 42.

43.     Deny the allegations in paragraph 43, except admit that Stern and Safrin did not provide the Citibank loan documents when requested by plaintiffs, and refer to the Complaint for a statement of its terms.

44.     Deny the allegations in paragraph 44.

45.     Deny the allegations in paragraph 45, and refer to the Complaint for a statement of its terms.

46.     Deny the allegations in paragraph 46.

47.     Deny the allegations in paragraph 47, except admit that Amusement instructed Land Escrow Frenkel not to release Amusement's funds without written authorization from Sragow & Sragow, and refer to the Complaint for a statement of its terms.

48.     Deny the allegations in paragraph 48.

49.     Deny the allegations in paragraph 49, except admit that plaintiffs received certain documents executed by Stern and Safrin, and refer to the Complaint for a statement of its terms.

50.     Deny the allegations in paragraph 50.

51.     Deny the allegations in paragraph 51, and refer to the Complaint for a statement of its terms.

52.     Deny the allegations in paragraph 52.

53.     Deny the allegations in paragraph 53, except admit that plaintiffs have alleged that defendants provided a $15 million promissory note signed by Stern, and refer to the Complaint for a statement of its terms.

54.     Deny the allegations in paragraph 54.

55.     Deny the allegations in paragraph 55, except admit that plaintiffs have alleged that, on July 12, 2007, defendants took and used Amusement's $13 million without notice or authorization, and refer to the Complaint for a statement of its terms.

56.     Deny the allegations in paragraph 56.

57.     Deny the allegations in paragraph 57.

58.     Deny the allegations in paragraph 58.

59.     Deny the allegations in paragraph 59.

60.     Deny, upon information and belief, the allegations in paragraph 60.

61.     Deny the allegations in paragraph 61.

62.     Deny the allegations in paragraph 62.

63.     Deny the allegations in paragraph 63.

64.     Deny the allegations in paragraph 64.

65.     Deny the allegations in paragraph 65.

66.     Deny the allegations in paragraph 66.

## Count I

67.     Repeat their responses to the foregoing paragraphs as if fully set forth herein.

68.     Deny the allegations in paragraph 68, except admit that Safrin purports to deny any wrongdoing.

69.     Deny the allegations in paragraph 69.

## Count II

70.     Repeat their responses to the foregoing paragraphs as if fully set forth herein.

71.     Deny the allegations in paragraph 71, except admit that plaintiffs have alleged that Friedman and/or Buchanan Ingersoll were authorized to act on behalf of Safrin in connection with the transactions identified in the Complaint.

72.     Deny the allegations in paragraph 72, except admit Safrin contends that Friedman did have authority to act on Safrin's behalf.

73.     Deny the allegations in paragraph 73.

## Count III

74.     Repeat their responses to the foregoing paragraphs as if fully set forth herein.

75.     Deny the allegations in paragraph 75.

76.     Deny the allegations in paragraph 76.

77.     Deny the allegations in paragraph 77.

8

## Count IV

78.     Repeat their responses to the foregoing paragraphs as if fully set forth herein.

79.     Deny the allegations in paragraph 79, except admit that Safrin purports to deny any wrongdoing.

80.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80, and therefore deny the allegations therein.

81.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81, and therefore deny the allegations therein.

82.     Deny the allegations in paragraph 82.

83.     Deny the allegations in paragraph 83.

## Count V

84.     Repeat their responses to the foregoing paragraphs as if fully set forth herein.

85.     Deny the allegations in paragraph 85.

86.     Deny the allegations in paragraph 86.

87.     Deny the allegations in paragraph 87.

88.     Deny the allegations in paragraph 88.

89.     Deny the allegations in paragraph 89.

90.     Deny the allegations in paragraph 90.

91.     Deny the allegations in paragraph 91.

92.     Deny the allegations in paragraph 92.

93.     Deny the allegations in paragraph 93.

9

## Count VI

94.      Repeat their responses to the foregoing allegations as if fully set forth

herein.

95.      Deny the allegations in paragraph 95.

96.      Deny the allegations in paragraph 96.

97.      Deny the allegations in paragraph 97.

98.      Deny the allegations in paragraph 98.

99.      Deny the allegations in paragraph 99.

100.      Deny the allegations in paragraph 100.

101.      Deny the allegations in paragraph 101.

## Count VII

102.      Repeat their responses to the foregoing paragraphs as if fully set forth

herein.

103.      Deny the allegations in paragraph 103.

104.      Deny the allegations in paragraph 104.

105.      Deny the allegations in paragraph 105.

106.      Deny the allegations in paragraph 106.

## Count VIII

107.      Repeat their responses to the foregoing paragraphs as if fully set forth

herein.

108.      Deny the allegations in paragraph 108.

109.      Deny the allegations in paragraph 109.

110.      Deny the allegations in paragraph 110.

10

111.     Deny the allegations in paragraph 111.

## FIRST AFFIRMATIVE DEFENSE

Safrin has failed to state claims upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, because Safrin failed to mitigate his alleged damages.

## THIRD AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, by the doctrines of laches, waiver, and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, by reason of his misconduct and/or unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, because he waived his right to claim damages by his acts and omissions.

## SIXTH AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, because he failed to exercise ordinary care.

## SEVENTH AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, because he ratified the alleged wrongful conduct for which he seeks recovery.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent Safrin seeks punitive or exemplary damages against Bankers Capital, Safrin's claims are barred, in whole or in part, by the procedural and substantive due process clauses of the United States Constitution and/or the Constitution of the State of California.

## NINTH AFFIRMATIVE DEFENSE

Safrin's claims are barred, in whole or in part, because any harm he suffered is the result of his own contributory negligence.

## RESERVATION OF RIGHTS

Third party defendants expressly reserve the right to amend and/or supplement their answer and affirmative defenses as needed as discovery proceeds.

## COUNTERCLAIMS

Third party defendant Steven Alevy, d/b/a Bankers Capital ("Bankers Capital"), through their undersigned attorneys, as and for their counterclaims against defendant and third party plaintiff Joshua Safrin ("Safrin"), hereby alleges as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over Bankers Capital's counterclaims pursuant to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

2.      Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to these claims occurred herein.

### Facts

3.      In approximately May 2007, Bankers Capital was asked to arrange financing for Safrin, defendant Mark Stern ("Stern") and defendant First Republic Group

12

Realty LLC ("First Republic") for the purchase of a large portfolio of properties from Colonial Realty Limited Partnership ("Colonial," and the "Colonial transaction").

4.     In June 2007, Bankers Capital arranged for $13 million in financing from plaintiff Amusement Industry, Inc. ("Amusement") for Safrin, Stern and First Republic to use in connection with their purchase from Colonial.

5.     Safrin, Stern and First Republic promised to pay Bankers Capital a fee of $1.45 million for arranging such financing from Amusement.

6.     Safrin, Stern and First Republic have failed to pay Bankers Capital the fee it was promised.

### Count I
### (Breach of Contract)

7.     Bankers Capital repeats the foregoing allegations as if fully set forth herein.

8.     A valid, binding and enforceable contract existed between Safrin and Bankers Capital for the payment of a fee (the "Fee Agreement") for arranging financing in the Colonial transaction for Safrin, Stern and First Republic.

9.     Bankers Capital fulfilled its obligations under the Fee Agreement by, among other things, arranging $13 million in financing from Amusement.

10.    Safrin unilaterally and materially breached the Fee Agreement by, among other things, failing to make payment to Bankers Capital.

11.    As a direct result of Safrin's unilateral and material breach of the Fee Agreement, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

13

## Count II
## (Quantum Meruit)

12.        Bankers Capital repeats the foregoing allegations as if fully set forth herein.

13.        Bankers Capital rendered services to Safrin by, among other things, arranging $13 million in financing for Safrin, Stern and First Republic's use in connection with the Colonial transaction.

14.        Bankers Capital expected compensation in return for the services it rendered.

15.        The reasonable value of the services rendered by Bankers Capital to Safrin is at least $1,450,000.

16.        Safrin has failed to pay Bankers Capital the reasonable value of the services it rendered.

17.        As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count III
## (Account Stated)

18.        Bankers Capital repeats the foregoing allegations as if fully set forth herein.

19.        A debtor-creditor relationship existed between Bankers Capital and Safrin as a result of, among other things, Bankers Capital arranging $13 million in financing for Safrin, Stern and First Republic's use in connection with the Colonial transaction.

20.     Certain closing statements drafted in connection with the Colonial transaction reflect the agreement between the parties that Safrin, Stern and First Republic were indebted to Bankers Capital in the amount of $1,450,000.

21.     There was a valid, binding and enforceable agreement between Bankers Capital and Safrin, Stern and First Republic for payment of the aforementioned debt.

22.     Safrin has failed to pay Bankers Capital the debt it is owed.

23.     As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count IV
## (Promissory Estoppel)

24.     Bankers Capital repeats the foregoing allegations as if fully set forth herein.

25.     Safrin made a clear and unambiguous promise to pay Bankers Capital for arranging $13 million in financing in connection with the Colonial transaction.

26.     Bankers Capital reasonably relied on that promise of payment in arranging $13 million in financing from Amusement.

27.     Safrin has failed to honor its promise to remit payment.

28.     As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Cross-Claims

Bankers Capital, by and through its undersigned attorneys, as and for its cross-claims against defendants Stern, First Republic, defendant Ephraim Frenkel ("Frenkel"), defendant

Land Title Associates Escrow ("Land Title"), and third party defendants Steven Friedman

and Buchanan Ingersoll & Rooney (together, "Buchanan"), hereby alleges as follows:

### Jurisdiction and Venue

1.    This Court has jurisdiction over Bankers Capital's cross-claims pursuant

to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

2.    Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a

substantial part of the events or omissions giving rise to these claims occurred herein.

### Facts

3.    In approximately May 2007, Bankers Capital was asked to arrange

financing for Safrin, defendant Mark Stern ("Stern") and defendant First Republic Group

Realty LLC ("First Republic") for the purchase of a large portfolio of properties from

Colonial Realty Limited Partnership ("Colonial," and the "Colonial transaction").

4.    In June 2007, Bankers Capital arranged for $13 million in financing from

plaintiff Amusement Industry, Inc. ("Amusement") for Safrin, Stern and First Republic to

use in connection with their purchase from Colonial.

5.    Safrin, Stern and First Republic promised to pay Bankers Capital a fee of

$1.45 million for arranging such financing from Amusement.

6.    Safrin, Stern and First Republic have failed to pay Bankers Capital the fee

it was promised.

### Count I
### (Breach of Contract – against Stern and First Republic)

7.    Bankers Capital repeats the foregoing allegations as if fully set forth

herein.

8.      A valid, binding and enforceable contract existed between Stern, First Republic and Bankers Capital for the payment of a fee (the "Fee Agreement") for arranging financing in the Colonial transaction for Safrin, Stern and First Republic.

9.      Bankers Capital fulfilled its obligations under the Fee Agreement by, among other things, arranging $13 million in financing from Amusement.

10.     Stern and First Republic unilaterally and materially breached the Fee Agreement by, among other things, failing to make payment to Bankers Capital.

11.     As a direct result of Stern and First Republic's unilateral and material breach of the Fee Agreement, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count II
## <u>(Quantum Meruit – against Stern and First Republic)</u>

12.     Bankers Capital repeats the foregoing allegations as if fully set forth herein.

13.     Bankers Capital rendered services to Stern and First Republic by, among other things, arranging $13 million in financing for Safrin, Stern and First Republic's use in connection with the Colonial transaction.

14.     Bankers Capital expected compensation in return for the services it rendered.

15.     The reasonable value of the services rendered by Bankers Capital to Safrin is at least $1,450,000.

16.     Stern and First  Republic have failed to pay Bankers Capital the reasonable value of the services it rendered.

17

17.      As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count III
### (Account Stated – against Stern and First Republic)

18.      Bankers Capital repeats the foregoing allegations as if fully set forth herein.

19.      A debtor-creditor relationship existed between Bankers Capital and Stern and First Republic as a result of, among other things, Bankers Capital arranging $13 million in financing for Safrin, Stern and First Republic's use in connection with the Colonial transaction.

20.      Certain closing statements drafted in connection with the Colonial transaction reflect the agreement between the parties that Safrin, Stern and First Republic were indebted to Bankers Capital in the amount of $1,450,000.

21.      There was a valid, binding and enforceable agreement between Bankers Capital and Safrin, Stern and First Republic for payment of the aforementioned debt.

22.      Stern and First Republic have failed to pay Bankers Capital the debt it is owed.

23.      As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count IV
### (Promissory Estoppel – against Stern and First Republic)

24.      Bankers Capital repeats the foregoing allegations as if fully set forth herein.

25.     Stern and First Republic made a clear and unambiguous promise to pay Bankers Capital for arranging $13 million in financing in connection with the Colonial transaction.

26.     Bankers Capital reasonably relied on that promise of payment in arranging $13 million in financing from Amusement.

27.     Stern and First Republic have failed to honor its promise to remit payment.

28.     As a direct result of the foregoing, Bankers Capital has suffered damages in an amount to be determined by the trier of fact, but in no event less than $1,450,000.

## Count V
### (Indemnification – Against All Cross-Claim Defendants)

29.     Bankers Capital repeats the foregoing allegations as if fully set forth herein.

30.     Bankers Capital denies any wrongdoing or fault, and denies that Safrin is entitled to any of the relief he seeks in his third party complaint.

31.     Notwithstanding, if Bankers Capital is found liable to Safrin for any damages, such damages were brought about solely as a result of the primary, intentional and active recklessness, carelessness, negligence, wrongdoing, misrepresentation, fraud, and/or breach of contract by the cross claim defendants.

32.     By reason of the foregoing, to the extent Bankers Capital is found liable to Safrin for the wrongful conduct he has alleged, Bankers Capital is entitled to indemnification from the cross claim defendants.

## Count VI
### (<u>Contribution – Against All Cross Claim Defendants</u>)

33.      Bankers Capital repeats the foregoing allegations as if fully set forth herein.

34.      Bankers Capital denies any wrongdoing or fault, and denies that Safrin is entitled to any of the relief he seeks in his third party complaint.

35.      Notwithstanding, if Bankers Capital is found liable to Safrin for any damages, such damages were brought about at least in part as a result of the intentional and active recklessness, carelessness, negligence, wrongdoing, misrepresentation, fraud, and/or breach of contract by the cross claim defendants.

36.      By reason of the foregoing, to the extent Bankers Capital is found liable to Safrin for the wrongful conduct he has alleged, Bankers Capital is entitled to contribution from the cross claim defendants.

## <u>Jury Demand</u>

Bankers Capital hereby demands a jury trial on all issues so triable.

**WHEREFORE**, Bankers Capital respectfully requests entry of a judgment in its favor as follows:

A.      Dismissing Safrin's third party claims against Bankers Capital with prejudice;

B.      On Counterclaims I through IV, awarding Bankers Capital actual, compensatory, and consequential damages in an amount to be determined by the trier of fact, but in no event less than $1.45 million;

C.    On Cross-Claims I through IV, awarding Bankers Capital actual, compensatory, and consequential damages in an amount to be determined by the trier of fact, but in no event less than $1.45 million;

D.    On Cross-Claims V and VI, awarding Bankers Capital actual, compensatory, and consequential damages in an amount to be determined by the trier of fact;

E.    Awarding Bankers Capital its attorneys' fees, as well as the costs and expenses of this litigation; and

F.    Awarding Bankers Capital such other relief as this Court deems just and proper.

DATED: June 6, 2008

SILLS CUMMIS & GROSS P.C.

By: _____
      Philip R. White, Esq.
      Marc D. Youngelson, Esq.
      One Rockefeller Plaza
      New York, NY 10020
      Telephone: (212) 643-7000

      Allen P. Sragow, Esq.
      Sragow & Sragow
      6665 Long Beach Blvd., Suite B-22
      Long Beach, California 90805
      Telephone: (310) 639-0782

      Attorneys for third party defendants,
      counterclaim plaintiffs and cross claim
      plaintiffs Bankers Capital and Steven
      Alevy