Jonathan D. Lupkin, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

AMUSEMENT INDUSTRY, INC., dba WESTLAND            :
INDUSTRIES; PRACTICAL FINANCE CO., INC.,         :    No. 07 Civ. 11586 (LAK)(GWG)
                              Plaintiffs,         :
                                                  :    (ECF)
          - against -                             :
                                                  :
MOSES STERN, aka MARK STERN; JOSHUA SAFRIN,       :    **DECLARATION OF**
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM          :    **JONATHAN D. LUPKIN**
FRENKEL, LAND TITLE ASSOCIATES ESCROW,            :
                              Defendants.         :
                                                  :
------------------------------------------------------------------- X
JOSHUA SAFRIN,                                    :
                    Defendant/Third Party-Crossclaim- :
                         Counterclaim-Plaintiff,  :
          - against –                             :
                                                  :
STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN          :
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL         :
REALTY ADVISORS LLC, and FIRST REPUBLIC           :
GROUP CORP.,                                       :
                    Third Party Defendants,       :
          - and -                                 :
                                                  :
MOSES STERN, aka MARK STERN, FIRST REPUBLIC       :
GROUP REALTY LLC, EPHRAIM FRENKEL, and            :
LAND TITLE ASSOCIATES ESCROW,                     :
                                                  :
                    Defendants/Crossclaim Defendants, :
          - and -                                 :
                                                  :
AMUSEMENT INDUSTRY, INC., dba WESTLAND            :
INDUSTRIES, PRACTICAL FINANCE CO., INC.,          :
                                                  :
                    Plaintiffs/Counterclaim Defendants. :
------------------------------------------------------------------- X

JONATHAN D. LUPKIN declares, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a member of the law firm Flemming Zulack Williamson Zauderer LLP.  I submit this declaration on behalf of Defendant/Third Party Plaintiff Joshua Safrin ("Safrin") in opposition to the motion to dismiss (Docket Entry # 133) the Amended Third Party Complaint filed by Third Party Defendants Stephen Friedman and Buchanan Ingersoll & Rooney P.C.

2.    Annexed hereto as Exhibit 1 is Safrin's Amended Third Party Complaint, together with its exhibits.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on July 31, 2008.

_____
JONATHAN D. LUPKIN

# EXHIBIT 1 TO THE LUPKIN DECLARATION (*THE AMENDED THIRD PARTY COMPLAINT*)

Jonathan D. Lupkin, Esq. (JL-0792)
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                    Plaintiffs,

    - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN;
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                    Defendants.

------------------------------------------------------------------- X

JOSHUA SAFRIN,

          Defendant/Third Party-Crossclaim-
               Counterclaim-Plaintiff,

    - against –

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC
GROUP CORP.,

              Third Party Defendants,

    - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and
LAND TITLE ASSOCIATES ESCROW,

             Defendants/Crossclaim Defendants,

    - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.,

            Plaintiffs/Counterclaim Defendants.

------------------------------------------------------------------- X

**JURY TRIAL DEMANDED**

No. 07 Civ. 11586 (LAK)(GWG)

(ECF)

**AMENDED THIRD PARTY
COMPLAINT
(CONTAINING
CROSSCLAIMS AND
COUNTERCLAIMS)**

Defendant/Third Party-Counterclaim-Crossclaim-Plaintiff Joshua Safrin ("Safrin") by his attorneys, for his third party complaint against third party defendants Stephen Friedman, Steven Alevy, Buchanan Ingersoll & Rooney, P.C., Bankers Capital Realty Advisors LLC, and First Republic Group Corp. (hereinafter collectively referred to as the "Third Party Defendants"), crossclaims against Moses Stern, aka Mark Stern, First Republic Group Realty LLC, Ephraim Frenkel, Land Title Associates Escrow (referred to collectively, together with the Third Party Defendants, as "Defendants"), and counterclaims against Amusement Industry, Inc., dba Westland Industries ("Amusement"), and Practical Finance Co., Inc. (collectively, "Plaintiffs"), alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     On December 27, 2007, Plaintiffs commenced an action in this Court against Safrin, Mark Stern ("Stern"), Ephraim Frenkel ("Frenkel"), First Republic Group Realty LLC ("First Republic LLC") and Land Title Associates Escrow ("Land Escrow"). (the "Main Action") (A copy of the summons and complaint (the "Complaint") is attached as Exhibit A.)

2.     Although the Complaint names Safrin, a well-respected name in the real estate industry, as a defendant, Safrin was unaware of any of the transactions at issue in the Main Action until shortly before being served with process. Plaintiffs, who allege a series of transactions and negotiations in connection with a large real estate transaction, premise their entire case against Safrin on the claim that he participated in these transactions and negotiations through Friedman, who purportedly acted for and spoke as Safrin's attorney and agent.

3.     Safrin was unaware that Friedman represented to Plaintiffs that he (Friedman) was Safrin's agent or attorney, did not authorize Friedman to make any such representations, and had no knowledge of any of the representations or actions described in the Complaint that were purportedly undertaken by Friedman on his behalf. As set forth more fully below, Friedman,

2

together with the other Defendants, was an integral part of a conspiracy to misappropriate

Safrin's identity (i.e., his name, stellar reputation in the real estate industry, and financial

wherewithal) in order to secure financing for the purchase of a portfolio of real estate located

throughout the Southeastern United States.

## PARTIES

4.    Defendant/Third Party-Crossclaim-Counterclaim-Plaintiff Joshua Safrin is an

individual and citizen of the State of New York, residing at 50 Riverside Drive, Apt. 2A, New

York, New York, 10024.

5.    Third Party Defendant Stephen Friedman ("Friedman") is an individual and citizen

of the State of New York.  Upon information and belief, Friedman is an attorney with and

shareholder in the law firm Buchanan Ingersoll & Rooney, P.C. ("BIR").  Upon information and

belief, Friedman was acting, at all times mentioned herein, in his capacity as an attorney and

shareholder of BIR.

6.    Third Party Defendant Buchanan Ingersoll & Rooney, P.C. is a professional

corporation organized under the laws of Pennsylvania, which maintains offices for the practice of

law at 620 Eighth Avenue, 23rd Floor, New York, NY 10018-1669.  Upon information and

belief, Friedman practices out of BIR's New York office.

7.    Third-party Defendant Steven Alevy ("Alevy") is an individual and citizen of the

State of New York, residing at 275 West 96th St, New York, New York, 10025.  Upon

information and belief, Alevy is Managing Director of Bankers Capital Realty Advisors LLC,

and is the son of Allen Alevy, the sole shareholder of plaintiff Amusement Industry, Inc.

8.    Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital")

was and is a limited liability company with its principal place of business at 575 Madison

Avenue, 10th floor, New York, NY 10022.  Upon information and belief, Alevy was acting, at

3

all times mentioned herein, in his capacity as an employee and Managing Director of Bankers Capital.

9.    Upon information and belief, Third Party Defendant First Republic Group Corp. ("First Republic Corp.") is a corporation organized under the law of New York, with its principal place of business at 241 Fifth Avenue, Suite 302, New York, New York 10016. Upon information and belief, First Republic Corp. was, at all times mentioned herein, solely owned and controlled by defendant Moses Stern.

10.    Upon information and belief, Plaintiff/Counterclaim-Defendant Amusement Industry, Inc., dba Westland Industries, is a corporation organized under the laws of the State of California with its principal place of business at 6665 Long Beach Blvd., Long Beach, California, 90805

11.    Upon information and belief, Plaintiff/Counterclaim Defendant Practical Finance Co., Inc. ("Practical Finance"), is a corporation organized under the laws of the State of California with its principal place of business at 6665 Long Beach Blvd., Long Beach, California, 90805.

12.    Upon information and belief, Defendant/Crossclaim Defendant Moses aka Mark Stern is an individual and citizen of the State of New York residing at 39 Remsen Avenue, Monsey, New York  10952.

13.    Upon information and belief, Defendant/Crossclaim Defendant Ephraim Frenkel is an individual and citizen of the State of New York.

14.    Upon information and belief, Defendant/Crossclaim Defendant First Republic Group Realty LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York County in the State of New York.

15.    Upon information and belief, at all times mentioned herein, Defendant/Crossclaim Defendant Land Title Associates Escrow was and is a limited liability company organized under

4

the laws of the State of New York with its principal place of business at 1979 Marcus Avenue, Suite 210, Lake Success, New York 11042, operating under the name "Land Title Associates."

### SUBJECT MATTER JURISDICTION AND VENUE

16.    This Court has jurisdiction over Safrin's claims pursuant to Fed. R. Civ. P. 13(a), (g), 14(a), 28 U.S.C. §§1367 and 2201, and pursuant to the Court's subject matter jurisdiction over the Main Action.

17.    This Court has personal jurisdiction over the Third Party Defendants, pursuant to CPLR 301 and 302, by virtue of the fact that they reside in, transact, do or conduct business in New York and because they committed tortious acts within New York and tortious acts without New York causing injury to persons within New York.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because all of the Third Party Defendants reside in this judicial district and because a substantial number of the events or omissions giving rise to the claim occurred in this judicial district.

### BACKGROUND

**The Underlying Complaint**

19.    In the Complaint, Plaintiffs allege a series of transactions, the details of which follow herein. The following allegations are made on information and belief. The bases for Safrin's belief are, largely, the allegations in the Complaint itself.

20.    According to the Complaint, First Republic Group Corp. purchased from non-party Colonial Realty Limited Partnership ("Colonial Realty") a certain real estate portfolio consisting of shopping centers located in the Southeastern United States (the "Property Portfolio"). At some point, First Republic Corp. assigned its interest in the Property Portfolio to First Republic LLC.

5

**The Citigroup Loan Documents**

21.    Plaintiffs allege that Stern and Safrin obtained financing for the purchase of the Property Portfolio by executing two loan agreements with Citigroup Global Markets Realty Corp. ("Citigroup") on behalf of various purchasing entities. First Republic LLC executed a loan agreement with Citigroup for $111,150,000.00 and FRGR Managing Member LLC, a constituent member of the First Republic LLC ownership structure, executed a Mezzanine Loan Agreement with Citigroup for $15,000,000.00. Both loan agreements are dated as of July 11, 2007, and define "Guarantor" to include Safrin.

22.    The purported signatures of Safrin on these documents are forgeries, as confirmed by a highly reputable handwriting expert with 40 years of experience in the field. (Exhibit B hereto.)

**Plaintiffs' Investment**

23.    Plaintiffs allege that because the Citigroup loan was insufficient to enable First Republic LLC to purchase the Property Portfolio, Safrin, among others, approached mortgage broker Alevy, of Bankers Capital, and Friedman, for the purpose of obtaining the additional necessary financing.

24.    Safrin never made any such approach.

25.    According to the Complaint, on June 29, 2007, Alevy and Friedman presented an investment opportunity to Amusement, purportedly on behalf of Safrin and others, to raise funds sufficient to complete the Property Portfolio Purchase.

26.    Safrin never authorized Alevy or Friedman to present any opportunity to Amusement.

27.    Plaintiffs allege that Friedman "represented" among others, Safrin, in purported "communications and dealings with [P]laintiffs." Plaintiffs also allege that Friedman owed a separate fiduciary duty to Amusement because he had previously represented Amusement, as

6

well as its sole shareholder, Allen Alevy, and his son, Steven Alevy, in various legal matters. Plaintiffs contend that "as a result" of this previous representation by Friedman, "Friedman led Plaintiffs to believe that he had full authority to speak on behalf of . . . Safrin."

28.    Safrin never retained or otherwise authorized Friedman to speak or act on his behalf in connection with the transactions described in the Complaint.

**The June 29, 2007 "Letter of Intent"**

29.    According to the Complaint, the investment opportunity presented by Friedman and Alevy in June, 2007, purportedly on behalf of Safrin and others, resulted in a "written Letter of Intent" drafted by Alevy, signed by Stern on behalf of First Republic Corp. and dated June 29, 2007. Although the document is referred to as a "Letter of Intent" in the Complaint, the document itself is characterized as a Letter of Understanding (hereafter "LOI"). (Complaint, Ex. 2.) The LOI identifies as its parties First Republic Corp. and Westland Industries, the name under which Amusement does business. (Id.)

30.    Safrin was not a party to the LOI. (Complaint, Ex. 2).

31.    Plaintiffs allege that on July 2, 2007, Alevy e-mailed the so-called "Letter of Intent" to Friedman and Stern.

32.    According to the Complaint, on June 29, 2007, the same day Stern signed the LOI on behalf of First Republic Corp., Amusement wired $13,000,000.00 into the Land Escrow account. Plaintiffs assert that as a result of this wire transfer, a contract formed among Amusement and Safrin, among others, having the terms of the LOI.

33.    Safrin never entered into any such contract.

34.    Plaintiffs allege that on or after July 2, 2007, Safrin and Stern obtained a reduction of the purchase price of the property portfolio "by about $4.47 million dollars."

35.    Safrin never obtained any such reduction because he had no involvement with either the purchase or the financing of the Property Portfolio.

**Plaintiffs' Subsequent Negotiations With Friedman**

36.    Plaintiffs allege that on June 29, 2007 and during the seven-day period that followed, Amusement and First Republic Corp. had agreed to work in good faith "to finalize [their] agreements." During that time period, Amusement drafted and forwarded three partnership agreements to Friedman for Safrin, among others, to sign in order "to complete a transaction." (Complaint, Ex. 3)

37.    None of these draft agreements called for Safrin's signature.

38.    According to the Complaint, after the seven day period passed without agreements being "finalized," Amusement continued to negotiate through Friedman.

39.    According to the Complaint, on July 6, 2007, Plaintiffs, through Friedman: (a) suggested a new Property Portfolio ownership structure; (b) inquired as to whether its $13,000,000.00 contribution to the purchase should be a loan to Stern or to the entity that would be the owner of the Property Portfolio; (c) notified Safrin, among others, that the seven-day period had expired; and (d) noted that there should be about $4,000,000.00 in reserve after the closing. Plaintiffs also instructed Friedman not to authorize the release of the $13,000,000.00 held in escrow.

40.    Safrin was unaware of these negotiations and communications.

41.    Plaintiffs allege that on July 6, 2007, counsel for Amusement also wrote to Friedman, stating that if the transaction had materially changed from the draft partnership agreements and the LOI (agreements to which only Amusement and First Republic Corp. are parties), then the wired $13 million should be returned.

42.    Safrin was unaware of this communication.

43.    On July 9, 2007, according to the Complaint, Amusement asked Friedman, in writing, for a copy of the Citigroup loan documents that provided for the majority of the

financing for the Property Portfolio purchase. Friedman did not provide the documents, but responded that same day, in writing, that First Republic LLC was now the purchasing entity.

44.    Safrin was unaware of this representation.

45.    During the flurry of back-and-forth communications alleged to have occurred on July 9, 2007 through Friedman, purportedly on behalf of Safrin and others, Friedman promised, in writing, that formal documentation of Amusement's interest in the Property Portfolio was recognized and would be completed as necessary after closing once First Republic LLC owned the property portfolio.

46.    Safrin was unaware that any of these representations were being made on his behalf.

47.    According to the Complaint, Amusement then instructed Friedman, for a second time, not to authorize release of the $13 million in escrow. Amusement also instructed Land Escrow and Frenkel not to release Amusement's funds without written authorization of Sragow & Sragow, one of two firms acting as counsel of record to Plaintiffs in the Main Action.

48.    Safrin was unaware that Amusement's money, or indeed anyone's money, was being held in escrow in connection with the Property Portfolio's purchase or financing.

49.    Plaintiffs allege that on July 11, 2007, Friedman provided documents to Amusement, including a Promissory Note for $13,000,000.00 signed by Stern in his individual capacity, an Escrow Agreement, and Agreements, purportedly signed by Stern and Safrin (Complaint, Exs. 5 and 6), assigning their respective LLC membership interests in First Republic LLC and the underlying LLC ownership structure, and eleven grant deeds constituting the Property Portfolio, all of which were signed by Stern on behalf of First Republic LLC and notarized on July 12, 2007 (Complaint, Ex. 1) (these documents are collectively referred to herein as the "Escrow Documents").

9

50.    Safrin's signature on the "Agreement" that purportedly assigns his LLC interests ("Assignment Agreement") is a forgery, as confirmed by a highly reputable handwriting expert with 40 years of experience in the field. (Exhibit B hereto.)  Moreover, Safrin's forged signature, as it appears in the document, is not witnessed, as required by the form itself.

**The July 11, 2007 Counter Offer**

51.    According to the Complaint, on July 11, 2007, Amusement communicated to Safrin, among others, in writing "through Friedman" a "counter offer" because it disagreed with the characterization of the transaction among the parties reflected in the Escrow Documents, including that the money from Amusement was a loan.  Amusement declared that there would be no loan.  Rather, the $13,000,000.00 would be treated as a direct investment with a preferred right to return of this investment within 45 days.  In addition, the repayment right would be increased to $15,000,000.00 because of the $4,000,000.00 remaining in reserve after closing. Amusement also demanded conveyance to Amusement of 100% of the Property Portfolio by deeding all eleven properties to Amusement, together with the conveyance of the LLC membership interests, and noted that Stern and Safrin would have a limited option to repurchase the grant deeds and a 50% ownership interest by providing "the partnership agreement" (presumably an executed copy of the document attached to the Complaint as Ex. 3) within a period of 45 days.

52.    Safrin was unaware of these communications.

53.    According to the Complaint, Friedman responded, telling Amusement that it "should not worry as Amusement now owned the whole thing," and the following day, provided a $15,000,000.00 promissory note signed by Stern in his individual capacity.  (Compl. Ex. 7.)

54.    Safrin was unaware of Friedman's representation and never authorized Friedman to make it.

55.   Plaintiffs allege that on July 12, 2007, Frenkel and Land Escrow "took and used" the $13,000,000.00 in escrow based on verbal and written instructions from Alevy, without notice or authorization from Amusement.

**Safrin Had No Involvement In The Transactions Alleged In The Complaint**

56.   Safrin had no involvement with any of the transactions alleged in the Complaint.

57.   Safrin had no knowledge regarding the Property Portfolio until shortly before being served with process.

58.   Safrin had no knowledge regarding any of the "contracts" alleged in the Complaint until shortly before being served with process.

59.   Safrin has no knowledge regarding any of the LLCs alleged in the Complaint, including First Republic LLC, and had never heard of any of them until he was named in this lawsuit.

60.   Safrin never met nor spoke with Stern.

61.   Safrin never met nor communicated with the Plaintiffs.

62.   Safrin did not sign, nor direct anyone else to sign on his behalf, any of the following: (a) the Citigroup loan documents; (b) the Assignment Agreement purportedly assigning his LLC interests to Amusement; or (c) the operating agreements of JSAE Colonial LLC and FRGR Holdings LLC.  The purported signatures of "Joshua Safrin" on these documents are forged.

63.   Safrin:  (a) did not engage or retain Friedman; and (b) never asked Friedman to represent him, or to speak, act or function on his behalf in connection with any of the transactions alleged in the Complaint.

64.   Until shortly before he was served with the Complaint, Safrin was unaware: (a) that Friedman made any of the alleged representations described in the foregoing paragraphs to Plaintiffs, including the representation that he (Friedman) represented and had authority to speak

11

on behalf of Safrin; and (b) that Friedman engaged in any of the conduct purportedly undertaken on his behalf in connection with the transactions alleged in the Complaint.

65.    Safrin did not authorize Friedman to make any of the representations ascribed to him in the Complaint, or engage in any of the conduct described therein.

66.    Safrin did not ratify any of the representations made or actions purportedly undertaken by Friedman on Safrin's behalf in connection with the transactions alleged in the Complaint.

## Count I

### (Indemnification and Contribution – Against All Defendants)

67.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

68.    Safrin denies any wrongdoing or fault. To the extent that he may be found liable to Plaintiffs for damages, however, such damages were caused, in whole or in part, by the wrongful conduct of one or more of the Defendants.

69.    By reason of the foregoing, to the extent that Safrin is found liable to Plaintiffs for the wrongful conduct alleged in the Complaint, Safrin is entitled to indemnity and/or contribution from one or more of the Defendants.

## Count II

### (Declaratory Judgment Against Defendants and Plaintiffs/Counterclaim Defendants)

70.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

71.    A live, actual and justiciable controversy exists between the parties concerning whether a principal-agent or attorney-client relationship existed between Safrin, on the one hand, and Friedman/BIR, on the other, such that Friedman/BIR had authority to act on Safrin's behalf in connection with the transactions alleged in the Complaint.

72.    Safrin contends that he never engaged, retained or authorized Friedman or BIR to act on his behalf as his agents or attorneys in connection with the transactions alleged in the Complaint and that Friedman/BIR had no authority, whether actual or apparent, to act on his (Safrin's) behalf in connection with the transactions alleged in the Complaint.

73.    By reason of the forgoing, Safrin is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that (a) no attorney-client or other principal-agency relationship existed between Safrin and Friedman/BIR in connection with the transactions alleged in the Complaint; (b) Friedman/BIR had no authority, whether actual or apparent, to act on Safrin's behalf in connection with the transactions alleged in the Complaint; and (c) Safrin did not ratify any of the representations or conduct allegedly made or undertaken on his behalf by Friedman/BIR in connection with the transactions alleged in the Complaint.

### Count III

**(Implied Indemnification – Implied Contractual Indemnity, Against Friedman and BIR)**

74.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

75.    Safrin is not at fault and denies liability for the tortious conduct alleged in the Complaint. If Friedman/BIR are determined to have been Safrin's agents or attorneys, then Friedman/BIR exceeded their actual authority in connection with the conduct and representations purportedly undertaken on Safrin's behalf.

76.    If Friedman/BIR are determined to have been Safrin's agents or attorneys, with some authority to make representations to act towards, or make representations to, Plaintiffs or others on his behalf in connection with the transactions alleged in the Complaint, then : (a) Safrin transferred any duties owed to the Plaintiffs and others by implied agreement with

13

Friedman/BIR; (b) Friedman/BIR agreed to assume responsibility for those duties in connection with the transactions alleged in the Complaint, and (c) Friedman/BIR breached these duties.

77.    By reason of the foregoing, and to the extent that Safrin is found liable to Plaintiffs for the wrongful conduct alleged in the Complaint, then Safrin is entitled to indemnification from Friedman and BIR.

## Count IV

### (Breach of Duty As Agent/Attorney – Against Friedman and BIR)

78.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 74 through 77 as if fully set forth herein.

79.    Safrin denies any liability for or wrongdoing in connection with the transactions alleged in the Complaint.

80.    If it is determined that Friedman/BIR were acting, in any way, as Safrin's agents or attorneys, then Friedman/BIR owed certain duties to Safrin as his principal, including, but not limited to:

    a.    The duty of loyalty;

    b.    The duty of obedience;

    c.    The duty of reasonable care;

    d.    The fiduciary duty to act for the principal's benefit in all matters connected with the agency relationship;

    e.    The duty to take action only within the scope of the agent's actual authority; and

    f.    The duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal.

81.    If it is determined that Friedman/BIR were acting as Safrin's agents or attorneys in any respect, then Friedman/BIR breached these duties because, without Safrin's knowledge or

consent, they:  (a) exceeded the scope of their authority; (b) used Safrin's name and identity and/or confidential information concerning Safrin (without his knowledge or consent) for their own purposes and material benefit and/or for the purposes and material benefit of third parties; and (c) improperly represented that they were authorized to act on Safrin's behalf to consummate the transactions alleged in the Complaint.

82.    Friedman/BIR's conduct was so outrageous as to evince a high degree of moral turpitude and show such wanton dishonesty as to imply criminal indifference to civil obligations.

83.    By reason of the foregoing, Friedman and BIR are liable to Safrin for damages, including punitive damages and the cost of defending against the Main Action, in an amount to be determined at trial.

**Count V**

**(N.Y. Civil Rights Law §§ 50, 51 – Against All Defendants)**

84.    Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

85.    Defendants, operating out of their places of business within the State of New York, knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC, as well as other transactional documents, including officer's certificates, and the Citigroup loan documents; (b) used Safrin's name and identity in connection with their negotiations with Plaintiffs; and (c) drafted those documents that were necessary to create LLCs in which Safrin was a purported member, director or manager.  These LLCs include, but are not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

86.    Upon information and belief, Defendants used Safrin's name, without Safrin's consent, within the State of New York.

87.   Upon information and belief, Friedman/BIR also improperly used Safrin's name to mislead the New York-based attorneys responsible for the closing concerning the sale of the Property Portfolio into believing that Safrin was part of the transaction.

88.   Safrin did not give either his oral or written consent to the use of his name in connection with any of the transactions alleged in the Complaint, and Defendants knew that no such consent had been obtained.

89.   In short, Defendants misappropriated Safrin's identity and stellar reputation in the real estate industry in order to obtain the necessary financing from Citigroup as well as to entice Plaintiffs into making its $13 million investment.

90.   Defendants engaged in this conduct in order to make a profit and develop business for the benefit of Defendants and/or others.

91.   By reason of the foregoing, Defendants violated N.Y. Civil Rights Law §§ 50 and 51.

92.   Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

93.   By reason of the foregoing the Defendants are liable to Safrin for damages, including punitive damages and reasonable attorney's fees, sustained by reason of their use of Safrin's name, in an amount to be determined at trial.

## Count VI

### (Violation of California Common Law Right Of Privacy/ Commercial Misappropriation – Against All Defendants)

94.   Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 as if fully set forth herein.

16

95.     Defendants, operating out of their places of business within the State of New York, knowingly utilized Safrin's name on various transaction-related documents and transmitted these documents to Plaintiffs in California.  Defendants also used Safrin's name and identity in connection with their negotiations with Plaintiffs.

96.     Upon information and belief, Friedman, BIR and Stern used Safrin's name and identity without his oral or written authorization in order to intentionally cause Amusement and its counsel to believe that Safrin was part of the transaction.

97.     On information and belief, most of the negotiations with Plaintiffs occurred in telephone calls between New York and California (where Amusement is located), and via email that was transmitted between New York and California.

98.     In short, Defendants misappropriated Safrin's identity and stellar reputation in the real estate industry in order to entice Plaintiffs into making their $13 million investment, and Defendants engaged in this conduct in order to make a profit and develop business for the benefit of Defendants and/or for the benefit of other parties.

99.     Safrin did not provide Defendants with either his oral or written consent to use his name or identity in connection with any of the transactions alleged in the Complaint, and Defendants knew that no such consent had been obtained.

100.   Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

101.   By reason of the foregoing the Defendants are liable to Safrin for damages, including punitive damages and reasonable attorney's fees, sustained by reason of their use of Safrin's name, in an amount to be determined at trial.

## Count VII

**(Conspiracy to Violate N.Y. Civil Rights Law §§ 50, 51 – Against All Defendants)**

102.  Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 84 – 93 as if fully set forth herein.

103.  Upon information and belief, Defendants intentionally and knowingly agreed and conspired, in violation of N.Y. Civil Rights Law §§ 50, 51, to misappropriate Safrin's identity (i.e., his name and his stellar reputation in the real estate industry) in order to secure the requisite financing for the purchase of the Property Portfolio.  Defendants conspired and, in fact, engaged in this conduct for their own benefit, profit and unlawful gain.

104.  In furtherance of this conspiracy, Defendants knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the Citigroup loan documents, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC and other transactional documents, including officer's certificates in connection with the transactions alleged in the Complaint; (b) used Safrin's name and identity in connection with the investment proposal presented to Plaintiffs and in their negotiations with Amusement; (c) drafted and emailed the LOI; (d) transmitted the forged Assignment Agreement to Plaintiffs; (e) improperly authorized the release of the funds in escrow; and (f) created a variety of LLCs that identify Safrin as a purported member, director or manager, including, but not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

105.  Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

106.  By reason of the foregoing, the Defendants are liable to Safrin for damages, including punitive damages, in an amount to be determined at trial.

## Count VIII

### (Conspiracy to Violate Safrin's Right To Privacy Under California Common Law -- Against All Defendants)

107. Safrin repeats and realleges the allegations contained in paragraphs 1 through 66 and 94-101 as if fully set forth herein.

108. Upon information and belief, Defendants intentionally and knowingly agreed and conspired, in violation of Safrin's right to privacy under California law, to misappropriate and use Safrin's identity (i.e., his name, his stellar reputation in the real estate industry, and financial wherewithal) in order to secure the requisite financing and entice Plaintiffs to make a $13 million investment. Defendants engaged in this conduct for their own benefit, profit and unlawful gain and the benefit, profit and unlawful gain of others.

109. In furtherance of this conspiracy, Defendants knowingly and intentionally: (a) used Safrin's forged name on the purported Assignment Agreement, the Citigroup loan documents, the operating agreements of FRGR Holdings LLC and JSAE Colonial LLC, as well as, other transactional documents, including officer's certificates, in connection with the transactions alleged in the Complaint; (b) used Safrin's name and identity in connection with the investment proposal presented to Plaintiffs and in their negotiations with Plaintiffs; (c) drafted and e-mailed the LOI; (d) transmitted the forged Assignment Agreement to Plaintiffs; (e) improperly authorized the release of the funds in escrow; and (f) the creation of a variety of LLCs that identify Safrin as a purported member, director or manager, including, but not limited to, JSAE Colonial LLC and FRGR Holdings LLC, both of which are part of the First Republic LLC ownership structure.

110. Defendants' conduct was so outrageous as to evince a high degree of moral turpitude and shows such wanton dishonesty as to imply criminal indifference to civil obligations.

19

111. By reason of the foregoing, the Defendants are liable to Safrin for damages, including punitive damages, in an amount to be determined at trial.

### JURY DEMAND

Safrin demands a trial by jury on all issues so triable.

WHEREFORE, Safrin demands judgment as follows:

(a)    On Count 1, in the event that Safrin is found liable, for Safrin and against Defendants, for indemnity or contribution in an amount to be determined at trial, including reasonable attorney's fees;

(b)    On Count 2, for Safrin and against Plaintiffs/Counterclaim Defendants and Defendants, declaring that: (i) no attorney-client or other principal-agency relationship existed between Safrin and Friedman/BIR in connection with the transactions alleged in the Complaint; (ii) Friedman/BIR had no authority, whether actual or apparent, to act on Safrin's behalf in connection with the transactions alleged in the Complaint; and (iii) Safrin did not ratify any of the representations or conduct allegedly made or undertaken on his behalf by Friedman/BIR in connection with the transactions alleged in the Complaint;

(c)    On Count 3, in the event that Safrin is found to have had a principal-agent relationship with Friedman/BIR, for Safrin and against Friedman and BIR, for indemnity in an amount to be determined at trial, including reasonable attorney's fees;

(d)    On Count 4, in the event that Safrin is found to have had a principal-agent relationship with Friedman/BIR, for Safrin and against Friedman and BIR,

20

for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(e)     On Count 5, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(f)     On Count 6, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(g)     On Count 7, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(h)     On Count 8, for Safrin and against Defendants, for damages, including punitive damages and reasonable attorney's fees, in an amount to be determined at trial;

(i)     Awarding Safrin his costs and disbursements; and

(j)    Granting such other, further and different relief as the Court deems just

and proper.

Dated: New York, New York
       May 29, 2008

FLEMMING ZULACK WILLIAMSON
ZAUDERER LLP

By: _____

    Jonathan D. Lupkin (JL-0792)
    Jean Marie Hackett (JH-1784)

One Liberty Plaza
New York, New York  10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com
       jhackett@fzwz.com

*Attorneys for Defendant/Third Party-
Crossclaim-Counterclaim-Plaintiff Joshua
Safrin*

22

**EXHIBIT A**

**(to Third Party Complaint)**

PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel: (212) 643-7000
Fax: (212) 643-6500



ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210



Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| AMUSEMENT INDUSTRY, INC., a California corporation dba WESTLAND INDUSTRIES; PRACTICAL FINANCE CO., INC., a California corporation, | ) ) ) ) ) | **COMPLAINT** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| MOSES STERN, an individual aka MARK STERN; JOSHUA SAFRIN, an individual; FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company; EPHRAIM FRENKEL, an individual; LAND TITLE ASSOCIATES ESCROW, a New York limited liability company, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs AMUSEMENT INDUSTRY, INC., a California corporation, and

PRACTICAL FINANCE CO., INC., a California corporation, by and through their

attorneys, state their complaint against Defendants MOSES STERN, an individual aka

MARK STERN, JOSHUA SAFRIN, an individual, FIRST REPUBLIC GROUP REALTY

LLC, a Delaware limited liability company, EPHRAIM FRENKEL, an individual, and

LAND TITLE ASSOCIATES ESCROW, a New York limited liability company, as follows:

## INTRODUCTION AND PARTIES

1.      Plaintiff, AMUSEMENT INDUSTRY, INC., is a California corporation

doing business as WESTLAND INDUSTRIES, incorporated, duly organized and existing

under the laws of the State of California, and conducting business from its principal place of

business in Long Beach, California ("Amusement" or "Westland").

2.      Plaintiff, PRACTICAL FINANCE CO., INC., is a California corporation,

incorporated, duly organized and existing under the laws of the State of California, and

conducting business from its principal place of business in Long Beach, California

("Practical Finance"). Practical Finance is a licensed State of California finance lender.

Practical Finance is the assignee of Amusement as to promissory notes signed by Stern and

delivered to escrow for the initial benefit of Amusement.

3.      Defendant, MOSES STERN aka MARK STERN is an individual who, upon

information and belief, is a citizen of the State of New York. Stern also regularly transacts

business in New York County.

4.      Defendant, JOSHUA SAFRIN is an individual who, upon information and

belief, is a citizen of the State of New York.

5.      Defendant, FIRST REPUBLIC GROUP REALTY LLC, is a Delaware

limited liability company, formed, ]duly organized and existing under the laws of the State

2

of Delaware in June 2007, whose registered office is in the State of Delaware and whose

principal place of business is in New York County, State of New York, and whose sole

member is non-party, FRGR MANAGING MEMBER LLC. Upon information and belief,

FIRST REPUBLIC GROUP REALTY LLC is a citizen of the State of New York, in that all

of its members are citizens of New York.

6.    Non-party, First Republic Group, Corp. is a corporation registered to do

business in New York, with its principal place of business in New York. Upon information

and belief, First Republic Group, Corp., is and at all times relevant to this action was, solely

owned and controlled by Moses Stern aka Mark Stern.

7.    Non-party, Colonial Realty Limited Partnership is a Delaware limited

partnership, with its principal place of business in Delaware.

8.    Non-party, Stephen Friedman ("Friedman") is a State of New York licensed

attorney at the New York City office of law firm, BUCHANAN, INGERSOLL & ROONEY

PC.

9.    In June 2007, non-party, MS Colonial LLC was formed as a Delaware

limited liability company, with Stern as its sole member. Upon information and belief, MS

Colonial LLC is a citizen of the State of New York, in that its member is a citizen of the

State of New York.

10.    In June 2007, non-party, JSAE Colonial LLC was formed as a Delaware

limited liability company, with Safrin and Avery Egert as its members. Upon information

and belief, Avery Egert is a citizen of the State of New York. Upon information and belief,

JSAE Colonial LLC is a citizen of the State of New York, in that all of its members are

citizens of the State of New York.

11.     In June 2007, non-party, FRGR HOLDINGS LLC was formed as a Delaware limited liability company, with MS Colonial LLC and JSAE Colonial LLC as its members. Upon information and belief, FRGR HOLDINGS LLC is a citizen of the State of New York, in that all of its members are citizens of the State of New York.

12.     In June 2007, non-party, FRGR MANAGING MEMBER LLC was formed as a Delaware limited liability company, with FRGR HOLDINGS LLC, as its sole member. Upon information and belief, FRGR MANAGING MEMBER LLC is a citizen of the State of New York, in that its member is a citizen of the State of New York.

13.     Defendant, EPHRAIM FRENKEL, is an individual who, upon information and belief, is a citizen of the State of New York and the sole owner and sole member of Land Title Associates Escrow.

14.     Defendant, LAND TITLE ASSOCIATES ESCROW, is a limited liability company, duly organized and existing under the laws of the State of New York, whose registered office is in the State of New York and whose principal place of business is in Nassau County, the State of New York.  Upon information and belief, LAND TITLE ASSOCIATES ESCROW is a citizen of the State of New York, in that its member is a citizen of the State of New York.

15.     Plaintiffs allege that at all relevant times herein, defendants, and each of them, were the agents, servants and employees of their co-defendants and in doing the things hereinafter mentioned, were acting in the scope of their authority as such agents, servants and employees with the permission and consent of their co-defendants.

16.     Defendant, MOSES STERN aka MARK STERN, an individual, is hereinafter referred to as "Stern."

4

17.    Defendant, JOSHUA SAFRIN, an individual is hereinafter referred to as "Safrin."

18.    Defendant, FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company is hereinafter referred to as "First Republic LLC."

19.    Defendant, EPHRAIM FRENKEL, an individual, is hereinafter referred to as "Frenkel."

20.    Defendant, LAND TITLE ASSOCIATES ESCROW, a limited liability company, is hereinafter referred to as "Land Escrow."

## JURISDICTION AND VENUE

21.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.    Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(1), in that at least one defendant resides in this district and all defendants reside in New York.

23.    Venue also is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district.

## STATEMENT OF FACTS

24.    On or about April 20, 2007, First Republic Group, Corp., as buyer, entered into a written contract to purchase from Colonial Realty Limited Partnership, as seller, numerous shopping centers in the southeastern United States. This contract was subsequently amended and assigned, to among other things, change the buyer to First Republic LLC, change the price for the property portfolio being purchased and change the shopping centers being purchased within the property portfolio. First Republic LLC's

5

purchase of the property portfolio closed on about July 12, 2007, so that First Republic LLC

became owner of the eleven properties, having the following legal descriptions, on that date

(the "property portfolio" or the "eleven portfolio properties") (copies of the legal

descriptions described below also are attached as exhibits to the grant deeds in **Exhibit 1**):

a.  QUAKER VILLAGE [Retail Property: 5605 W. Friendly Avenue, Greensboro, North Carolina 27410 (Guilford County)]

i.  Tract 1: Beginning at a point on the southern margin of West Friendly Avenue (88 Foot right-of-way), said point being located South 78 deg. 55 min. 56 sec. East 206.15 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence continuing with the southern margin of West Friendly Avenue South 78 deg. 55 min, 56 sec. East 290.82 feet to an existing railroad spike, the northwest corner of the Jackson Talbert property as recorded in Deed Book 5558, Page 1470 in the Office of the Register of Deeds of Guilford County, North Carolina; thence with Talbert's line the following bearings and distances, South 11 deg. 12 min, 49 sec. West, 111.49 feet to an "X" in the concrete, and South 79 deg. 14 min. 19 sec. east 129.81 feet to an existing iron pipe on the western margin of Dolly Madison Road; thence with the western margin of Dolly Madison road the following bearings and distances, South 10 deg. 34 min. 17 sec. West,161.08 feet to a point; South 09 deg 33 min. 51 sec. West 37.38 feet to a point; North 79 deg. 52 min. 52 sec. West, 4.87 feet to a point; South 10 deg. 07 min. 28 sec. West 70.00 feet to a point; along a curve to the right having a radius of 1,281.37 feet, a chord bearing and distance of South 16 deg. 03 min. 08 sec. West, 264.67 feet to a point; and South 21 deg. 50 min. 56 sec. West, 42.34 feet to an existing iron pipe, the northeast corner of Madison Properties as recorded in Plat Book 91, Page 148, thence with Madison Properties the following bearings and distances, North 77 deg. 57 min. 25 sec. West, 178.64 Feet to an existing nail; and South 12 deg. 06 min 55 sec. West, 125.07 feet to an existing Iron pipe in the line of R.H. Foreman as recorded in Deed Book 3224, Page 342; thence with Foreman's line North 87 deg. 25 min. 10 sec. West 128.75 feet to an existing iron pipe, the eastern boundary of the K.C. Properties, LLC property as recorded in Deed Book 1828, Page 6.26, thence with the line of K.C. Properties, LLC North 05 deg. 54 min. 55 sec. East, 1.92 feet to an existing Iron pipe thence North 03 deg. 54 min. 33 sec. East 255.87 feet to an existing iron; thence North 86 deg. 25 min. 55 sec. West 180.36 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 403.01 feet to a point; thence North 89 deg. 26 min. 15 sec. East, 182.95 feet to a point; and North 10 deg. 55 min. 44 sec. East, 178.99 feet to the POINT OF BEGINNING, and containing 7.948 acres, more or less.

ii.  Tract 2-A: BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being located South 78 deg. 55 min. 36 sec. East, 115.20 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 55 min. 56 sec. East, 70.24 feet to a point; thence South 03 deg. 55 min. 55 sec. West 180.55 feet to a point; thence South 89 deg. 26 min. 15 sec. West, 182.22 feet to a point on the

eastern margin of Milner Drive thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 67.74 feet to a point; thence South 78 deg. 55 min. 55 sec. East, 100.00 feet to a point; thence North 08 deg. 55 min. 10 sec. East, 148.85 feet to the POINT OF BEGINNING, and containing 0.407 acres, more or less.

    iii.    Tract 2B:  BEGINNING at a point on the southern margin of West Friendly Avenue, (88-foot right-of-way), said point being located South 78 deg. 53 min. 36 sec. East, 185.44 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 55 min. 36 sec. East, 22.71 feet to a point; thence South 10 deg. 55 min. 44 sec. West, 178.99 feet to a point; thence South 89 deg. 26 min. 15 sec. West, 0.75 feet to a point; and North 03 deg. 55 min. 55 sec. East, 180.55 feet to the POINT OF BEGINNING, and containing 0.048 acres, more or less.

    iv.    Tract 3:  BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being on existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin on West Friendly Avenue South 78 deg. 55 min. 56 sec East, 113.20 feet to a point; thence South 08 deg. 55 min. 10. sec. West, 148.85 foot to a point; thence North 78 deg. 55 min. 35 sec. West, 100.00 feet to a point on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 29 sec. East, 150.00 feet to the POINT OF BEGINNING, and containing 0.471 acres, more or less.

    v.    Tract4:  BEGINNING at a point on the eastern margin of Milner Drive, said point being an existing iron pipe located South 03 deg. 50 min. 29 sec. West, 620.75 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence South 86 deg. 25 min. 55  sec. East, 180.36 feet to an existing iron pipe; thence South 03 deg. 54 min. 33 sec. West, 115.84 feet to a point; thence North 85 deg. 09 min. 44 sec. West, 180.25 feet to a point on the eastern margin of Milner Drive, thence with the eastern margin if Milner Drive North 05 deg. 50 min. 29 sec. East, 111.95 to the POINT OF BEGINNING, and containing 0.364 acres, more or less

    vi.    Tract 5: BEGINNING at a point on the eastern margin of Milner Drive, said point being located South 03 deg. 50 min. 29 sec. West, 752.70 feet from an existing p.k. nall at the southeast insersection of West Friendly Avenue and Milner Drive; thence leaving the eastern margin of Milner Drive South 85 deg. 09 min. 44 sec. East, 180.25 feet to a point; thence South 03 deg. 54 min. 33 sec. West, 116.10 feet to an existing iron pipe on the northern boundary of the K.C. Properties, LLC property; thence with K.C. Properties, LLC North 84 deg 05 min. 56 sec. West 145.94 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive the following bearing and distances, along a curve to the left having a radius of 60 feet, a chord bearing and distance of North 34 deg. 47 min. 43. sec. West, 54.85 feet to a new iron pipe; and North 03 deg. 50 min. 29 sec. East, 71.16 feet to the POINT OF BEGINNING, and containing 0.451 acres, more or less.

    b.    MAYBERRY [Regional Mall: Andy Griffith Parkway North, Mount Airy, North Carolina 27030 (Surry County)]

7

i.    Located in Mount Alry Township, Surry County, North Carolina, at the intersection of Frederick Street (SR 1634) and U.S. Hwy, 52, and described as follows:

ii.    THE POINT OF BEGINNING is an existing iron pin set on the east side of Frederick Street, the northwest corner of property owned now or formerly by Selk's Department Store of Mounty Alry, North Carolina, Incorporated (Book 287, Page 683); the N.C. Grid coordinates for this POINT OF BEGINNING are as follows: X=1523277.63 Y=1006347.02; and now proceeding from this POINT OF BEGINNING with the east side of Frederick Street N 41-21-25 W 74.50' to an existing iron pin; then 5 76-45-00 W 89.69' to a right of way monument on the east right o way margin of U.S. Hwy. 52 (northbound lane); then proceeding with this right of way margin the following three cells: N 13-15-00 W 278.06' to an existing iron pin, N 13-15-00 W 151' to a new iron pin, and N 13-15-00 W 220.10' to an iron pin set at the southwest corner of property owned now or formerly by Libby Hill Seafood Restaurant, Inc. (Book 384, Page 432); then proceeding with the line of Libby Hill N 76-45-00 E 175' to a set railroad spike and N 13-15-00 W 140' to a PX nall set in a concrete slab, a point in the line of property owned now or formerly by Mayberry Investments (Book 292, Page 367 and Book 293, Page 433); then proceeding with the line of Mayberry Investments the following three cells; N 77-21-50 E 66' to an existing iron pin, N 12-29-34 W 184.03' to an existing iron pin, and N 12-44-27 E 80.07 to an existing iron pin, a corner with Spencers, Inc. of Mount Alry (Book 330, Page 708 and Book 429, Page 330); then proceeding with the line of Spencers, Inc., of Mount Alry S. 79-40-10 E 183.32' to an existing monument and N 87-05-40 E (passing an existing monument at 385.33') 382.97' to a point in Lovills Creek; then S 10-56-00 E 329.49' to an existing monument on the bank of Lovills Creek; then with the line of James L. Hazel (Book 309, Page 886) S 09-11-00 S 572.34' to an existing iron pin; a corner with Belk's Department Store (Book 287, Page 683); then proceeding with the Belk's line the following five cells; S 76-44-40 W (passing an existing iron pin at 138.09') 141.29' to a point, N 15-45-00 W 31.90' to a point, S 74-08-20 W 209.36' to a point, S 15-55-42 S 76' to a point and S 74-23-39 W 306.41' to the aforesaid POINT OF BEGINNING, and containing 16.68 acres, more or less. This description was obtained from a plat of a survey by Relf Surveying Company dated February 23, 1987 and last revised September 22, 1989.

iii.    TOGETHER WITH nonexclusive, perpetual easements for access and parking, and easements, as such easements are described in instruments recorded in the Surry County Registry, including that certain Contract, recorded in Book 292, Page 361, Surry County Registry; that certain Cross Easement Agreement, recorded in Book 455, Page 525, Surry County Registry, and that certain Easement, recorded in Book 479, Page 773, Surry County Registry.

iv.    Tract 7: Non-exclusive easement granted in that certain instrument by and between Libby Hill Seafood Restaurant, Inc. and Mayberry Center Associates recorded in Book 474, page 773.

c.    BRITT DAVID [Retail Property: 2911 Airport Thruway, Columbus, Georgia 31906 (Muscogee County)]

8

i.     ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN
LAND LOS 35, 36, 45 AND 46, 8TH DISTRICT, MUSCOGEE COUNTY, GEORGIA
AND AS MORE PARTICULARLY DESCRIBED ON EXHIBIT "A" ATTACHED
HERETO AND MADE A PART HEREOF.

d.     MONTGOMERY PROMENADE NORTH [Retail Property: 2232-2430
Eastern Boulevard, Montgomery, Alabama 36117 (Montgomery County)]

i.     BEGIN AT THE SOUTHEAST CORNER OF THE NORTHEAST
QUARTER OF SECTION 23, T-16-N, R-18-E, MONTGOMERY COUNTY, ALABAMA;
THENCE RUN N87 DEGREES 20'07" e, 783.31 FEET TO A POINT LYING ON THE
WESTERLY RIGHT OF WAY, S 23 DEGREES 45"07" W, 1490.77 FEET TO A POINT
LYING AT THE NORTHEAST CORNER OF U.S. POSTAL SERVICE PLAT NO. 1, AS
RECORDED IN THE OFFICE OF THE JUDGE OF PROBATE, MONTGOMERY
COUNTY, ALABAMA, IN PLAT BOOK 32 AT PAGE 84; THENCE LEAVE SAID
RIGHT OF WAY AND RUN ALONG THE NORTH LINE OF SAID PLAT, N 66
DEGREES 29'48" W, 324.82 FEET TO A POINT; THENCE FUN ALONG THE WEST
LINE OF SAID PLAT S 23 DEGREES 39'59" W, 197.83 FEET TO A POINT LYING ON
THE NORTH RIGHT OF WAY OF YOUNG BARN ROAD (50' ROW); THENCE RUN
ALONG SAID NORTH RIGHT OF WAY, N 66 DEGREES 06'11" W, 313.64 FEET TO A
POINT LYING AT THE INTERSECTION OF THE AFOREMENTIONED NORTH
RIGHT OF WAY OF YOUNG BARN ROAD AND THE EAST RIGHT OF WAY OF
THE PROPOSED EXTENSION OF CENTRAL PARKWAY (50' ROW); THENCE RUN
ALONG SAID PROPOSED EAST RIGHT OF WAY, N 23 DEGREES 53"49" E, 32.00
FEET TO A POINT LYING IN A CURVE; THENCE RUN ALONG SAID CURVE
(CONCAVE WESTERLY, R = 312.74') AND SAID RIGHT OF WAY, A CHORD OF N
04 DEGREES 03' 01" E, 293.14 FEET TO A POINT OF REVERSE CURVATURE;
THENCE RUN ALONG SAID CURVE (CONCAVE EASTERLY, R = 350.45'), AND
SAID RIGHT OF WAY. A CHORD OF N 04 DEGREES 07'22" W, 327.55 FEET TO A
POINT AT THE END OF SAID CURVE; THENCE CONTINUE ALONG SAID RIGHT
OF WAY, N 23 DEGREES 45'07" E, 457.44 FEET TO A POINT OF CURVATURE;
THENCE RUN ALONG SAID CURVE (CONCAVE WESTERLY, R = 376.87'), A
CHORD OF N 10 DEGREES 26'37" E, 173.53 FEET; THENCE LEAVE SAID RIGHT OF
WAY AND RUN N 87 DEGREES 07'54" E, 283.00 FEET TO THE POINT OF
BEGINNING.

i.     SAID DESCRIBED PARCEL LYING AND BEING SITUATED IN THE
SOUTHEAST QUARTER OF SECTION 23 AND THE SOUTHWEST QUARTER OF
SECTION 24, T-16-N, R-18-E, MONTGOMERY COUNTY, ALABAMA, AND
CONTINS 27.663 ACRES, MORE OR LESS.

e.     STAUNTON [Retail Property: 90 Lee-Jackson Highway, Staunton, Virginia
24401 (Augusta County)]

i.     ALL THAT CERTAIN TRACT OR PARCEL OF LAND, WITH ALL
IMPROVEMENTS THEREON AND APPURTENANCES THERE UNTO BELONGING,
LYING, BEING AND SITUATED IN THE COUNTY OF AUGUSTA, VIRGINIA, AND

9

THE CITY OF STAUNTON, VIRGINIA, CONTAINING 38.552 ACRES, MORE OR
LESS, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ii     BEGINNING AT A CONCRETE VIRGINIA DEPARTMENT OF
HIGHWAYS RIGHT-OF-WAY MONUMENT, ON NORTH RIGHT-OF-WAY LINE OF
STATE ROUTE 644 AND IN THE LILNE OF PARCEL ONE, AND THENCE; N 16
DEGREES 38'21" W 31.42 FEET TO A POINT IN THE EAST RIGHT-OF-WAY OF U.S.
ROUTE AA, CORNER TO PARCEL ONE. THENCE WITH THE SAME N18 DEGREES
02'32" E 1488.60 FEET PASSING A CORNER COMMON TO PARCEL ONE AND
PARCEL TWO AT 1407.11 FEET TO A POINT CORNER TO PARCEL TWO AND
PARCEL THREE, 81.49 FEET FROM THE CORNER COMMON TO PARCEL ONE
AND PARCE TWO, SAID POINT BEING THE POINT OF CURVATURE OF A CURVE
CONCAVE TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5673.58 FEET, A
TANGENT OF 318.10 FEET AND A CHORD LENGTH OF 635.20 FEET, BEARING N
21 DEGREES 15'05" E, THENCE CONTINUING WITH U.S. ROUTE 11, AND PARCEL
THREE THROUGH A DELTA OF 06 DEGREES 25'05" AND AN ARC OF 635.53 FEET
TO A POINT, THENCE WITH SAME N 65 DEGREES 32'23" W, 14.00 FEET TO A
POINT, SAID POINT BEING THE POINT OF CURVATURE OF A CURVE CONCAVE
TO THE RIGHT, SAID CURVE HAVING A RADIUS OF 5687.58 FEET, A TANGENT
OF 103.35 FEET AND A CHORD LENGTH 206.66 FEET BEARING N 25 DEGREES
30'05" E THENCE CONTINUING WITH SAME THROUGH A DELTA OF 02
DEGREES 04'55" AND AN ARC OF 206.67 FEET TO A PINCHED PIPE IN THE LINE
OF PARCEL THREE AND THE EAST RIGHT-OF-WAY LINE OF U.S. ROUTE 11,
THENCE CONTINUING WITH SAME N 26 DEGREES 32'32" E, 45.08 FEET TO A
PINCHED PIPE, SAID PIPE BEING A CORNER TO PARCEL THREE AND THE
LANDS OF GEORGE AND MARY J. CHRISTIAN, BY DEED RECORDED IN DEED
BOOK 530, PAGE 467, THENCE LEAVING U.S. ROUTE 11, AND WITH PARCEL
THREE AND GEORGE AND MARY J. CHRISTIAN AT S 27 DEGREES 01'03" E 97.99
FEET TO A POINT, THENCE WITH THE SAME S 22 DEGREES 10'03" E 100.00 FEET
TO A PINCHED PIPE, SAID PIPE BEING A CORNER TO THE LANDS OF GEORGE
T. AND FLORENCE S. JONES, THENCE WITH PARCEL THREE AND GEORGE T.
AND FLORENCE S. JONES S 16 DEGREES 56'03" E 100.00 FEET TO A PINCHED
PIPE, THENCE CONTINUING WITH THE SAME S 12 DEGREES 36'03" E 100.00
FEET TO A PINCHED PIPE, THENCE WITH THE SAME S 07 DEGREES 10'03" E
100.00 FEET TO A PINCHED PIPE, THENCE WITH THE SAME S 01 DEGREES 01'03"
E 100.00 FEET TO A PINCHED PIPE FOUND, THENCE WITH SAME S 04 DEGREES
03'57" W 100.00 FEET TO A PINCHED PIPE, SAID PIPE BEING A CORNER TO THE
LANDS OF JAMES A. AND AZILE W. HARRIS, S 10 DEGREES 34'57" W, 96.00 FEET
PASSING A CORNER OF PARCEL THREE AND PARCEL TWO AT 39.48 FEET TO A
POINT IN THE LINE OF PARCEL TWO, THENCE WITH PARCEL TWO AND THE
LANDS OF JAMES A. AND AZILE W. HARRIS S 16 DEGREES 18'57" W 82.10 FEET
TO A POINT, SAID POINT CORNER TO THE LANDS OF STEWART C. AND NANCY
ANN YOUNG, THENCE WITH PARCEL TWO AND STEWART C. AND NANCY ANN
YOUNG S 31 DEGREES 27'24" E, 116.20 FEET TO A PIPE, SAID PIPE CORNER TO
THE LANDS OF TIMOTHY F. AND WANDA M. SANJULE, THENCE S 28 DEGREES
10'24" E 323.57 FEET, PASSING A FENCE POST CORNER TO THE LANDS OF
TIMOTHY F. AND WANDA M. SANJULE AND THE LANDS OF HAROLD E. JR.

AND LOREE C. LANDES AND PARCEL TWO AND PARCEL ONE AT 75.00 FEET TO A FENCE POST CORNER TO PARCEL ONE AND THE LANDS OF LANDES, THENCE CONTINUING WITH PARCEL ONE AND THE LANDS OF HAROLD E. JR. AND LOREE C. LANDES BY DEED RECORDED IN BOOK 1231 PAGE 507, N61 DEGREES 51'07" E, 320.J16 FEET TO A RAILROAD SPIKE IN THE CENTERLINE OF ROUTE 635, A 30' RIGHT-OF-WAY, THENCE WITH THE CENTERLINE OF ROUTE 635, S 28 DEGREES 23'54" E 100.18 FEET TO A RAILROAD SPIKE, THENCE LEAVING THE CENTERLINE OF ROUTE 635 AND WITH PARCEL ONE S 56 DEGREES 05'01" W 219.21 FEET TO A PIPE, CORNER TO PARCEL ONE AND THE LANDS OF KNOPP ENTERPRISES, INC., BY DEED RECORDED IN DEED BOOK 688 PAGE 498, CONTINUING WITH SAME S 17 DEGREES 59'54" W 1357.66 FEET TO A PIPE CORNER, THENCE WITH SAME S 51 DEGREES 41'54" W 196.47 FEET TO A PIPE IN THE NORTH RIGHT-OF-WAY LINE OF ROUTE 644, SAID PIPE BEING THE POINT OF CURVATURE OF A CURVE CONCAVE TO THE LEFT, SAID CURVE HAVING A RADIUS OF 501.45 FEET, A TANGENT OF 126.19 FEET AND A CHORD LENGTH OF 244.67 FEET BEARING N 48 DEGREES 49'18" W, THENCE WITH ROUTE 644 AND PARCEL ONE THROUGH A DELTA OF 28 DEGREES 15'05" AND AN ARC OF 247.25 FEET TO A POINT, CONTINUING WITH THE SAME N 62 DEGREES 56'20" W 322.48 FEET TO A POINT, CONTINUING WITH THE SAME N 27 DEGREES 03'40" E 15.00 FEET TO A CONCRETE VIRGINIA DEPARTMENT OF HIGHWAYS MONUMENT, THENCE CONTINUING WITH SAME N 61 DEGREES 14'31" W 229.90 FEET TO THE POINT OF BEGINNING, SAID BOUNDARY CONTINING 38.552 ACRES.

      f.     BELLWOOD [BELLWOOD SHOPPING CENTER: 2701-2787 Bell Road, Montgomery, Alabama 36117 (Montgomery County)]

      i.     LOT D, ACCORDING TO THE MAP OF BELLWOOD SHOPPING VILLAGE PLAT NO. 1, AS SAID MAP APPEARS OF RECORD IN THE OFFICE OF THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN PLAT BOOK 36, AT PAGE 218.

      g.     DECATUR MALL [Regional Mall: 1801 Beltline Road SW, Decatur, Alabama 35601 (Morgan County)]

      i.     REAL ESTATE LOCATED WITHIN THE NE-1/4 OF SECTION 35 AND THE NW-1/4 OF SECTION 36, IN TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR, MORGAN COUNTY, ALABAMA, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS TO-WIT:  BEGIN AT AN IRON PIN ON THE NORTHEAST CORNER OF SECTION 35, TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR, MORGAN COUNTY, ALABAMA, AND RUN THENCE N 88 DEGREES 44'33" W (ALABAMA STATE COORDINATE SYSTEM-GRID BEARING) ALONG THE NORTH BOUNDARY OF SAID SECTION 35 A DISTANCE OF 51.51 FEET TO AN IRON PIN AND THE TRUE POINT OF BEGINNING OF THE TRACT HEREIN DESCRIBED, SAID POINT BEING THE NORTHEAST CORNER OF PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND RECORDED IN THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 653; THENCE FROM THE TRUE

POINT OF BEGINNING RUN S 01 DEGREES 15'27" W A DISTANCE OF 269.00 FEET
TO AN IRON PIN; THENCE S 88 DEGREES 44'33" E A DISTANCE OF 82.79 FEET TO
AN IRON PIN; THENCE 62 DEGREES 15'46" E A DISTANCE OF 214.57 FEET TO AN
IRON PIN ON THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD,
S.W. (ALABAMA HIGHWAY NO. 67); THENCE ALONG THE WESTERLY RIGHT OF
WAY MARGIN OF BELTLINE ROAD, SW (ALABAMA HIGHWAY NO. 67) AND
ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 7514.44 FEET (CHORD
BEARING S 27 DEGREES 57'11" E, CHORD DISTANCE 57.11 FEET) AN ARC
DISTANCE OF 57.11 FEET TO A RAILROAD SPIKE; THENCE S 27 DEGREES 44'13"
E ALONG THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD, S.W.
(ALABAMA HIGHWAY NO. 67) A DISTANCE OF 52.89 FEET TO AN IRON PIN;
THENCE S 62 DEGREES 15'47" W A DISTANCE OF 134.00 FEET TO AN IRON PIN;
THENCE S 17 DEGREES 15'47" W A DISTANCE OF 62.22 FEET TO A RAILROAD
SPIKE; THENCE S 27 DEGREES 44'13" E A DISTANCE OF 474.09 FEET TO A
RAILROAD SPIKE; THENCE S 75 DEGREES 44'13" E A DISTANCE OF 55.15 FEET
TO AN IRON PIN; THENCE N 62 DEGREES 15'47" E A DISTANCE OF 139.00 FEET
TO AN IRON PIN ON THE WESTERLY RIGHT OF WAY MARGIN OF BELTLINE
ROAD, S.W. (ALABAMA HIGHWAY NO. 67); THENCE S 27 DEGREES 44'13" E
ALONG THIS WESTERLY RIGHT OF WAY MARGIN OF BELTLINE ROAD, S.W.
(ALABAMA HIGHWAY NO. 67) A DISTANCE OF 80.00 FEET TO AN IRON PIN;
THENCE S 62 DEGREES 15'47" W A DISTANCE OF 139.00 FEET TO AN IRON PIN;
THENCE S 17 DEGREES 15'47" W A DISTANCE OF 55.15 FEET TO AN IRON PIN;
THENCE S 27 DEGREES 44'13" E A DISTANCE OF 442.83 FEET TO AN IRON PIN;
THENCE S 84 DEGREES 19'43" E A DISTANCE OF 192.45 FEET TO AN IRON PIN;
THENCE S 05 DEGREES 40'17" W A DISTANCE OF 78.89 FEET TO A CROSS
CHISELED ON A CONCRETE FLUME ON THE WESTERLY RIGHT OF WAY
MARGIN OF DANVILLE ROAD, S.W., (MORGAN COUNTY HIGHWAY NO. 41);
THENCE ALONG THE WESTERLY RIGHT OF WAY MARGIN OF DANVILLE
ROAD, S.W. (MORGAN COUNTY HIGHWAY NO. 410 AND ALONG A CURVE TO
THE LEFT HAVING A RADIUS OF 2123.48 FEET (CHORD BEARING S 33 DEGREES
52'00" W, CHORD DISTANCE 598.04 FEET) A ARC DISTANCE OF 600.04 FEET TO
AN IRON PIN; THENCE S 25 DEGREES 46'17" W A DISTANCE OF 293.05 FEET TO
AN IRON PIN; THENCE N 63 DEGREES 14'03" W A DISTANCE OF 451.72 FEET TO
A CROSS CHISELED IN A CONCRETE GUTTER; THENCE ALONG A CURVE TO
THE RIGHT HAVING A RADIUS OF 350.00 FEET (CHORD BEARING N 55
DEGREES 47'05" W, CHORD DISTANCE 90.76 FEET) AN ARC DISTANCE OF 91.02
FEET TO AN IRON PIN, SAID POINT BEING THE SOUTHEAST OR EASTERNMOST
CORNER OF PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND
RECORDED IN THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1273
AT PAGE 916; THENCE S 32 DEGREES 46'46" W A DISTANCE OF 157.52 FEET TO
AN IRON PIN; THENCE S 60 DEGREES 21'46" W A DISTANCE OF 240.00 FEET TO
AN IRON PIN; THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF
265.95 FEET (CHORD BEARING S 52 DEGREES 05'01" W, CHORD DISTANCE 76.59
FEET) AN ARC DISTANCE OF 76.86 FEET TO AN IRON PIN; THENCE N 27
DEGREES 44'13" W A DISTANCE OF 1146.25 FEET TO AN IRON PIN; THENCE
ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1248.51 FEET (CHORD

BEARING N 13 DEGREES 29'34" W, CHORD DISTANCE 614.41 FEET) AN ARC DISTANCE OF 620.78 FEET TO AN IRON PIN; THENCE S 88 DEGREES 44'14" E A DISTANCE OF 54.34 FEET TO AN IRON PIN; THENCE S 01 DEGREES 04'14" E A DISTANCE OF 30.00 FEET TO A RAILROAD SPIKE; THENCE S 88 DEGREES 38'14" E A DISTANCE OF 165.12 FEET TO A RAILROAD SPIKE; THENCE S 87 DEGREES 44'14" E A DISTANCE OF 210.54 FEET TO A CROSS CHISELED IN A CONCRETE FLUME; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 818.51 FEET (CHORD BEARING N 00 DEGREES 42'26" W, CHORD DISTANCE 34.00 FEET) AN ARC DISTANCE OF 34.00 FEET TO A CROSS CHISELED ON A CONCRETE CURB; THENCE CONTINUE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 818.51 FEET (CHORD BEARING N 00 DEGREES 52'07" E, CHORD DISTANCE 11.02 FEET) AN ARC DISTANCE OF 11.02 FEET TO THE RAILROAD SPIKE; THENCE N 01 DEGREES 15'27" E, A DISTANCE OF 644.20 FEET TO AN IRON PIN ON THE NORTH BOUNDARY OF SAID SECTION 35; THENCE S 88 DEGREES 44'33" E ALONG THE NORTH BOUNDARY OF SAID SECTION 35 A DISTANCE OF 130.69 FEET TO A POINT, SAID POINT BEING THE SOUTHWEST CORNER OF PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND RECORDED IN THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 662; THENCE CONTINUE S 88 DEGREES 44'33" E ALONG THE NORTH BOUNDARY OF SAID SECTION 35 A DISTANCE OF 530.31 FEET TO THE TRUE POINT OF BEGINNING,

    ii    LESS AND EXCEPT:

A TRACT DESCRIBED AS BEGIN AT IRON PIN ON THE NORTHEAST CORNER OF SECTION 35. TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR, MORGAN COUNTY, ALABAMA, AND RUN THENCE N 88 DEGREES 44'33" W (ALABAMA STATE COORDINATE SYSTEM-GRID BEARING) ALONG THE NORTH BOUNDARY OF SAID SECTION 35 A DISTANCE OF 51.51 FEET TO AN IRON PIN, SAID POINT BEING THE NORTHEAST CORNER OF PROPERTY CONVEYED TO BRAMALEN CENTERS, INC., AND RECORDED IN THE MORGAN COUNTY PROBATE OFFICE IN DEED BOOK 1244 AT PAGE 653; THENCE S 01 DEGREES 15'27" W, A DISTANCE OF 269.00 FEET TO AN IRON PIN; THENCE CONTINUE S 01 DEGREES 15'27" W, A DISTANCE OF 47.88 FEET TO AN IRON PIN AND THE TRUE POINT OF BEGINNING OF THE EXCEPTION TRACT HEREIN DESCRIBED; THENCE FROM THE TRUE POINT OF BEGINNING RUN S 88 DEGREES 44'28" E A DISTANCE OF 29.04 FEET TO AN IRON PIN; THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 132.00 FEET (CHORD BEARING S 58 DEGREES 14'15 E, CHORD DISTANCE 134.00 FEET) AN ARC DISTANCE OF 140.55 FEET TO A RAILROAD SPIKE; THENCE S 27 DEGREES 44'03" E A DISTANCE OF 192.95 FEET TO A RAILROAD SPPIKE; THENCE S 62 DEGREES 15'47" W A DISTANCE OF 224.00 FEET TO A RAILROAD SPIKE; THENCE N 27 DEGREES 44'13" W, A DISTANCE OF 13.83 FEET TO A RAILROAD SPIKE; THENCE S 62 DEGREES 15'47" W A DISTANCE OF 504.50 FEET TO A RAILROAD SPIKE; THENCE N 27 DEGREES 44'13" W A DISTANCE OF 60.00 FEET TO A RAILROAD SPIKE; THEN N 62 DEGREES 15'47" E A DISTANCE OF 30.00 FEET TO A RAILROAD SPIKE; THENCE N 17 DEGREES 15'47" E A DISTANCE OF 90.51 FEET TO A RAILROAD SPIKE;

THENCE N 27 DEGREES 44'13" W A DISTANCE OF 130.00 FEET TO A RAILROAD
SPIKE; THENCE S 62 DEGREES 15'47" W A DISTANCE OF 45.50 FEET TO AN IRON
PIN; THENCE N 27 DEGREES 44'13" W A DISTANCE OF 185.00 FEET TO A
RAILROAD SPIKE; THENCE N. 22 DEGREES 15'47" E A DISTANCE OF 108.92 FEET
TO A RAILROAD SPIKE; THENCE ALONG A CURVE TO THE RIGHT HAVING A
RADIUS OF 107.00 FEET (CHORD BEARING N 56 DEGREES 45'40" E, CHORD
DISTANCE 121.20 FEET) AN ARC DISTANCE OF 128.85 FEET TO A RAILROAD
SPIKE; THENCE S 88 DEGREES 44'28" E A DISTANCE OF 437.32 FEET TO THE
TRUE POINT OF BEGINNING.

LYING AND BEING WITHIN THE NE-1/4 OF SECTION 35 AND THE NW-1/4
OF SECTION 36, BOTH WITHIN TOWNSHIP 5 SOUTH, RANGE 5 WEST, DECATUR,
MORGAN COUNTY, ALABAMA,

iii    PARCEL II: NON-EXCLUSIVE EASEMENT ESTATES CREATED
PURSUANT TO THE FOLLOWING AGREEMENTS:

1.    CROSS EASEMENT AGREEMENT BY AND BETWEEN
BELTLINE-DECATUR ASSOCIATES, LTD., MERCANTILE PROPERTIES,
INC. AND THE CASTNER-KNOTT DRY GOODS CO., RECORDED
SEPTEMBER 19, 1979 IN BOOK 1021, PAGE 566, IN THE OFFICE OF THE
JUDGE OF PROBATE OF MORGAN COUNTY, ALABAMA AND AMENDED
BY THAT CERTAIN CROSS-EASEMENT AGREEMENT BY AND BETWEEN
BELTLINE-DECATUR ASSOCIATES, LTD., MERCANTILE PROPERTIES,
INC., THE CASTNER-KNOTT DRY GOODS CO., AND CBL DEVELOPERS,
INC. DATED AUGUST 3, 1977, UNEXECUTED COPIES OF WHICH ARE
RECORDED AT BOOK 1022, PAGE 500, AND AT BOOK 1022, PAGE 511,
AND EXECUTED COPY BEING RECORDED AT BOOK 1022, PAGE 523,
AFORESAID RECORDS.

2.    AGREEMENT OF RECIPROCAL COVENANTS AND
EASEMENTS BY AND BETWEEN BELTLINE-DECATUR ASSOCIATES,
LTD., AND REX RADIO AND TELEVISION, INC., RECORDED NOVEMBER
24, 1986 AT BOOK 1199, PAGE 498, AFORESAID RECORDS.

3.    OPERATING AND EASEMENT AGREEMENT BETWEEN
BELTLINE MALL SHOPPING CENTER COMPANY, LTD., ARLEN REALTY,
INC. AND THE CASTNER-KNOTT DRY GOODS CO. DATED EFFECTIVE
MARCH 28, 1977, FILED FOR RECORD JULY 21, 1977, AND RECORDED IN
BOOK 965, PAGE 800, AFORSAID RECORDS, AS AMENDED BY
UNRECORDED AMENDMENT TO OPERATING AND EASEMENT
AGREEMENT DATED JULY 21, 1977.

4.    EASEMENT AGREEMENT BY AND BETWEEN CENTERS, INC.
AND BELTLINE DEVELOPMENT COMPANY DATED OCTOBER 6, 1988,
FILED FOR RECORD OCTOBER 14, 1988 AND RECORDED IN BOOK 1273,
PAGE 892, AFORESAID RECORDS.

5.    RESERVATION OF EASEMENT BY DAN L. LAWRENCE AND NANCYE K. LAWRENCE IN THAT CERTAIN WARRANTY DEED DATED FEBRUARY 24, 1977 AND RECORDED IN BOOK 957, PAGE 378 IN THE OFFICE OF THE JUDGE OF PROBATE OF MORGAN COUNTY, ALABAMA. AMENDMENT OF SAID EASEMENT BY AND BETWEEN BELTLINE DEVELOPMENT COMPANY AND BRAMALEA CENTERS, INC. DATED JANUARY 21, 1988, RECORDED IN BOOK 1279, PAGE 276, AFORESAID RECORDS.

h.    MONTGOMERY PROMENADE [Retail Property: 2542-2786 Eastern Boulevard Montgomery, Alabama 36117 (Montgomery County)]

i    SITUATED AND LYING IN MONTGOMERY COUNTY, ALABAMA, TO-WIT: LOT A AND C, ACCORDING TO THE MAP OF MONTGOMERY, PROMENADE AS SAID MAP APPEARS OF RECORD IN THE OFFICE OF THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN PLAT BOOK 37, AT PAGES 194, AND 195.

i    MCGEHEE [Retail Property: 3459 McGehee Road, Montgomery, Alabama 36111 (Montgomery County)]

i.    PARCEL 1: LOTS F AND H ACCORDING TO THE SURVEY OF MCGEHEE PLACE SHOPPING CENTER PLAT NO. I AS RECORDED IN MAP BOOK 34 PAGE 151 IN THE PROBATE OFFICE OF MONTGOMERY COUNTY, ALABAMA.

ii.    PARCEL II: EASEMENT FOR THE BENEFIT OF PARCEL I AS CREATED BY THE GRANT OF EASEMENT DATED 2/26/88, AND RECORDED IN VOLUME 757, PAGE 367 AND AMENDED IN HLPY 936, PAGE 599 FOR THE PURPOSES DESCRIBED IN THOSE EASEMENTS OVER, UNDER AND ACROSS LOTS F AND H. SUBJECT TO THE TERMS, PROVISIONS AND CONDITIONS SET FOR IN SAID INSTRUMENT.

j.    OLD TOWN [Retail Property: 3003 McGehee Road, Montgomery, Alabama 36111 (Montgomery County)]

i.    COMMENCE AT THE NORTHEAST INTERSECTION OF CARTER HILL ROAD AND MC GEHEE ROAD AND RUN ALONG THE NORTH RIGHT OF WAY OF MC GEHEE ROAD AND RUN ALONG THE NORTH RIGHT OF WAY OF MC GEHEE ROAD, S 89 DEG. 12' E, 150 FEET TO THE POINT OF BEGINNING; THENCE FROM SAID POINT OF BEGINNING RUN N 01 DEG. 10' E, 300.0 FEET; THENCE S 89 DEG. 13' E. 463.40 FEET; THENCE S 00 DEG. 47' W, 300.0 FEET TO THE NORTH RIGHT OF WAY OF MC GEHEE ROAD, THENCE ALONG SAID RIGHT OF WAY N 89 DEG. 12' W 465.40 FEET TO THE POINT OF BEGINNING.

ii.    TOGETHER WITH THAT CERTAIN EASEMENT IN FAVOR OF ROBERT E. LOWDER, JAMES K. LOWDER, AND THOMAS H. LOWDER, THEIR SUCCESSORS AND ASSIGNS, DATED MAY 17, 1978, AND RECORDED IN THE

OFFICE OF THE JUDGE OF PROBATE OF MONTGOMERY COUNTY, ALABAMA, IN REAL PROPERTY BOOK 393, AT PAGE 554.

iii     ALSO, TOGETHER WITH THAT CERTAIN EASEMENT OF ROBERT E. LOWDER, JAMES K. LOWDER, AND THOMAS H. LOWDER, THEIR SUCCESSORS AND ASSIGNS, DATED JUNE 1, 1978, RECORDED IN SAID PROBATE OFFICE IN REAL PROPERTY BOOK 393, AT PAGE 571.

k.     LAKESHORE [Super Regional Shopping Center: 150 Pearl Nix Parkway, Gainesville, Georgia 30501 (Hall County)]

i.     ALL THAT TRACT OR PARCEL OF LAND LOCATED IN LAND LOT 164 AND 165 OF THE 9TH DISTRICT PARTIALLY IN THE CITY OF GAINESVILLE, AND IN THE 411TH GEORGIA MILITIA DISTRICT, HALL COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ii.     BEGINNING AT THE POINT OF INTERSECTION OF THE SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET (APPARENT 100-FOOT RIGHT-OF-WAY) AND THE WESTERN RIGHT-OF-WAY LINE OF THE WEST BYPASS (100-FOOT RIGHT-OF-WAY) AND RUNNING THENCE IN A SOUTHEASTERLY DIRECTION ALONG THE WESTERN RIGHT-OF-WAY LINE OF WEST BYPASS THE FOLLOWING COURSES AND DISTANCES; SOUTH 18 DEGREES 26 MINUTES 59" EAST A DISTANCE OF 104.55 TO A POINT; SOUTH 25 DEGREES 54 MINUTES 24 SECONDS EAST, A DISTANCE OF 44.00 FEET TO A POINT; SOUTH 18 DEGREES 49 MINUTES 17 SECONDS EAST, A DISTANCE OF 181.50 FEET TO A POINT; SOUTH 18 DEGREES 31 MINUTES 02 SECONDS EAST 1141.94 FEET TO AN IRON PIN SET, ALONG THE ARC OF A CURVE TO THE RIGHT, AN ARC DISTANCE OF 412.78 FEET TO AN IRON PIN SET (SAID CURVE HAVING A RADIUS OF 2,804.42 FEET AND A CHORD BEARING AND DISTANCE OF SOUTH 14 DEGREES 19 MINUTES 23 SECONDS EAST 412.41 FEET), AND SOUTH 10 DEGREES 05 MINUTES 23 SECONDS EAST 102.93 FEET TO AN IRON PIN FOUND; THENCE LEAVING THE WESTERN RIGHT-OF-WAY LILNE OF WEST BYPASS AND RUNNING SOUTH 83 DEGREES 31 MINUTES 46 SECONDS WEST 385.79 FEET TO AN IRON PIN FOUND; THENCE SOUTH 85 DEGREES 08 MINUTES 46 SECONDS WEST 284.80 TO AN IRON PIN FOUND; THENCE NORTH 21 DEGREES 06 MINUTES 39 SECONDS WEST 86.88 FEET TO AN IRON PIN FOUND; THENCE NORTH 29 DEGREES 37 MINUTES 21 SECONDS WEST 141.31 FEET TO AN IRON PIN FOUND; THENCE NORTH 42 DEGREES 31 MINUTES 58 SECONDS WEST 239.67 FEET TO AN IRON PIN FOUND; THENCE SOUTH 47 DEGREES 36 MINUTES 43 SECONDS WEST 193.38 FEET TO AN IRON PIN FOUND; THENCE SOUTH 53 DEGREES 03 MINUTES 17 SECONDS WEST, A DISTANCE OF 75.06 FEET TO AN IRON PIN FOUND ON THE NEW NORTHWESTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD (90 FOOT RIGHT-OF-WAY); RUNNING THENCE IN A NORTHWESTERLY DIRECTION ALONG SAID NEW NORTHEASTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD THE FOLLOWING THREE COURSES AND DISTANCES; NORTH 42 DEGREES 16 MINUTES 08 SECONDS WEST 307.70 FEET TO A POINT; NORTH 41 DEGREES 15 MINUTES 04 SECONDS

16

WEST 258.47 FEET TO A POINT; AND ALONG THE ARC OF A CURVE TO THE LEFT AN ARC DISTANCE OF 303.32 TO A POINT (SAID CURVE HAVING A RADIUS OF 2,890.79 AND A CHORD BEARING AND DISTANCE OF NORTH 44 DEGREES 15 MINUTES 26 SECONDS WEST 303.18 FEET); THENCE, LEAVING THE NEW NORTHEASTERN RIGHT-OF-WAY LINE OF SHALLOWFORD ROAD AND RUNNING NORTH 86 DEGREES 06 MINUTES 46 SECONDS EAST 47.76 FEET TO AN IRON PIN SET; THENCE NORTH 83 DEGREES 54 MINUTES 46 SECONDS EAST 130.00 FEET TO AN IRON PIN SET; THENCE NORTH 83 DEGREES 49 MINUTES 46 SECONDS EAST 70.00 FEET TO AN IRON PIN SET; THENCE NORTH 63 DEGREES 29 MINUTES 46 SECONDS EAST 100.00 FEET TO AN IRON PIN SET; THENCE NORTH 71 DEGREES 03 MINUTES 05 SECONDS EAST 107.18 FEET TO AN IRON PIN FOUND; THENCE NORTH 67 DEGREES 42 MINUTES 06 SECONDS EAST 100.00 FEET TO AN IRON PIN SET; THENCE NORTH 26 DEGREES 51 MINUTES 40 SECONDS WEST 183.39 FEET TO AN IRON PIN FOUND; THENCE SOUTH 66 DEGREES 17 MINUTES 38 SECONDS WEST A DISTANCE OF 99.49 TO A IRON PIN FOUND, ½" REBAR; THENCE SOUTH 23 DEGREES 47 MINUTES 45 SECONDS EAST, A DISTANCE OF 12.23 FEET TO A POINT; THENCE SOUTH 61 DEGREES 31 MINUTES 27 SECONDS WEST A DISTANCE OF 50.24 FEET TO A POINT; THENCE SOUTH 61 DEGREES 33 MINUTES 24 SECONDS WEST A DISTANCE OF 49.36 FEET TO AN IRON PIN FOUND, ½" REBAR; THENCE NORTH 27 DEGREES 04 MINUTES 39 SECONDS WEST, A DISTANCE OF 140.15 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF ARTHUR LANE (30' R/W); THENCE LEAVING SAID SOUTHERLY R/W, NORTH 27 DEGREES 58 MINUTES 32 SECONDS WEST, A DISTANCE OF 30.01 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY OF ARTHUR LANE (30' R/W); THENCE ALONG THE SAID NORTHERLY R/W OF ARTHUR LANE, SOUTH 63 DEGREES 22 MINUTES 01 SECONDS WEST, A DISTANCE OF 48.90 FEET TO AN IRON PIN FOUND, 1" OPEN TOP PIPE; THENCE LEAVING SAID NORTHERLY R/W, NORTH 28 DEGREES 30 MINUTES 14 SECONDS WEST, A DISTANCE OF 101.12 FEET TO AN IRON PIN FOUND, ½" REBAR; THENCE NORTH 63 DEGREES 33 MINUTES 46 SECONDS EAST, A DISTANCE OF 124.54 FEET TO AN IRON PINE FOUND, ½" REBAR; THENCE NORTH 28 DEGREES 31 MINUTES 59 SECONDS WEST, A DISTANCE OF 106.94 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF DOROTHY DRIVE (30' R/W); THENCE ALONG SAID SOUTHERLY R/W, NORTH 63 DEGREES 33 MINUTES 02 SECONDS EAST, A DISTANCE OF 25.35 FEET TO A POINT; THENCE LEAVING SAID SOUTHERLY R/W OF DOROTHY DRIVE (30' R/W) NORTH 27 DEGREES 29 MINUTES 52 SECONDS WEST, A DISTANCE OF 30.12 FEET TO AN IRON PIN FOUND, 1" CRIMP TOP PIPE ON THE NORTHERLY RIGHT-OF-WAY OF DOROTHY DRIVE (30' R/W); THENCE LEAVING SAID NORTHERLY R/W NORTH 27 DEGREES 42 MINUTES 03 SECONDS WEST, A DISTANCE OF 196.76 FEET TO AN IRON PIN FOUND, 5/8" REBAR; THENCE NORTH 63 DEGREES 10 MINUTES 54 SECONDS EAST, A DISTANCE OF 99.49 FEET TO A POINT; THENCE NORTH 63 DEGREES 02 MINUTES 14 SECONDS EAST 150.00 FEET TO AN IRON PIN FOUND; THENCE SOUTH 27 DEGREES 43 MINUTES 10 SECONDS EAST 4.00 FEET TO A POINT; THENCE NORTH 63 DEGREES 02 MINUTES 14 SECONDS EAST 50.02 FEET TO A POINT; THENCE NORTH 71 DEGREES 52 MINUTES 14 SECONDS EAST 89.43

17

FEET TO A POINT ON THE EASTERN RIGHT-OF-WAY LINE OF THE SEGMENT OF DOROTHY DRIVE WHICH RUNS IN A GENERALLY NORTHWEST-SOUTHEAST DIRECTION; THENCE IN A NORTHWESTERLY DIRECTION ALONG THE EASTERN RIGHT-OF-WAY LINE OF DOROTHY DRIVE THE FOLLOWING TWO COURSES AND DISTANCES: NORTH 28 DEGREES 07 MINUTES 14 SECONDS WEST 23.88 FEET TO AN IRON PIN SET; AND NORTH 35 DEGREES 07 MINUTES 14 SECONDS WEST 172.80 FEET TO A CONCRETE MONUMENT FOUND ON THE SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET; THENCE IN A NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY DIRECTION ALONG THE SAID SOUTHERN RIGHT-OF-WAY LINE OF WEST WASHINGTON STREET, THE FOLLOWING COURSES AND DISTANCES: ALONG THE ARC OF A CURVE TO THE RIGHT A DISTANCE OF 267.19 FEET, SAID CURVE HAVING A RADIUS OF 1330.92 FEET AND A CHORD OF NORTH 74 DEGREES 02 MINUTES 19 SECONDS EAST 266.74 FEET, TO A POINT; THENCE SOUTH 53 DEGREES 26 MINUTES 21 SECONDS EAST, A DISTANCE OF 34.83 FEET TO A POINT; THENCE NORTH 20 DEGREES 24 MINUTES 51 SECONDS EAST, A DISTANCE OF 28.68 FEET TO CONCRETE MONUMENT FOUND; THENCE ALONG THE ARC OF A CURVE TO THE RIGHT A DISTANCE OF 98.61 FEET, SAID CURVE HAVING A RADIUS OF 1330.91 FEET OF A CHORD OF NORTH 83 DEGREES 33 MINUTES 46 SECONDS EAST, 98.59 FEET, TO A POINT; THENCE SOUTH 04 DEGREES 59 MINUTES 55 SECONDS EAST, A DISTANCE OF 10.00 FEET TO A POINT; THENCE NORTH 85 DEGREES 54 MINUTES 20 SECONDS EAST, A DISTANCE OF 9.50 FEET TO A POINT; THENCE NORTH 04 DEGREES 35 MINUTES 55 SECONDS WEST, A DISTANCE OF 10.00 FEET TO A POINT; THENCE ALONG THE ARC OF A CURVE TO THE RIGHT A DISTANCE OF 177.16 FEET, SAID CURVE HAVING A RADIUS OF 1330.92 FEET AND A CHORD OF NORTH 89 DEGREES 54 MINUTES 38 SECONDS EAST, 177.02 FEET, TO A CONCRETE MONUMENT FOUND; THENCE SOUTH 86 DEGREES 16 MINUTES 15 SECONDS EAST, A DISTANCE OF 115.85 FEET TO A POINT; THENCE SOUTH 55 DEGREES 16 MINUTES 52 SECONDS EAST, A DISTANCE OF 133.74 FEET TO THE POINT OF BEGINNING.

     25.     Stern and Safrin obtained primary financing for their property portfolio

purchase from lender, Citigroup Global Markets Realty Corp ("Citigroup" or "Citibank").

     26.     Stern and Safrin obtained financing in a two-tier structure: Stern's and

Safrin's created buying entity, First Republic LLC, executed a Loan Agreement with

Citigroup for $111,150,000.00 (one hundred and eleven million, one hundred and fifty

thousand dollars), and Stern's and Safrin's created managing entity, FRGR Managing

Member LLC, executed a Mezzanine Loan Agreement with Citigroup for $15,000,000.00

(fifteen million dollars), for a total debt upon or affecting the property portfolio of

$126,150,000.00 (one hundred twenty six million one hundred fifty thousand dollars). First Republic LLC and FRGR Managing Member LLC are hereinafter referred to collectively as the "borrowers".

27.    Under the terms of both the Loan Agreement and Mezzanine Loan Agreement (the "Citibank loan agreements"), the following provisions applied:

a.    Loan proceeds were distributed by Citibank only to pay obligations concerning the purchase transaction by First Republic Group Realty LLC of the property portfolio from Colonial Realty Limited Partnership, and were prohibited to be paid to any affiliate of the borrowers.

b.    The borrowers agreed they had not entered into any other transaction that would interfere with the loan transactions.

c.    The loans could not be refinanced / prepaid for a period of about 180 days, from funding through approximately January 10, 2008 (the "lock out period").

d.    Borrowers' management and ownership structure could not be changed without the prior consent of Citibank.

e.    Stern and Safrin were required to own, at all times, at least 51% of the borrowers.

f.    First Republic Group Realty LLC could not transfer any part of the property portfolio without the prior consent of Citibank.

g.    Events of loan default include (1) incurring new debt, (2) pledging assets to a third party, and (3) any transfer of a property within the portfolio without prior consent of Citibank.

28.     Stern and Safrin, in early June 2007, knew that the funds the borrowers could and would receive from Citigroup would be insufficient by itself for First Republic LLC to purchase the property portfolio. None of this was known by plaintiffs until June 29, 2007.

29.     Further, also in June 2007 Stern and Safrin either lacked sufficient personal assets, or were unwilling to place their personal assets, into First Republic LLC to enable it to consummate its purchase of the property portfolio.

30.     Therefore, Stern and Safrin in early June 2007 approached mortgage broker, Steven Alevy of Bankers Capital LLC, a New York limited liability company and Friedman, in an attempt to obtain additional funding to complete their purchase of the property portfolio.

31.     In June 2007, broker Steven Alevy and attorney Friedman presented an investment opportunity to Plaintiffs from Stern and Safrin, so that Stern and Safrin could complete their desired purchase of the property portfolio.

32.     Stern and Safrin, and later First Republic LLC, were represented by attorney Friedman in their communications and dealings with plaintiffs. Attorney Friedman previously had represented Amusement, and its agents including its shareholder and officer, Allen Alevy of Long Beach, California, and Allen Alevy's son, Steven Alevy of New York, New York, in various legal matters. As a result, Friedman led plaintiffs to believe that he had full authority to speak on behalf of Stern, Safrin and First Republic LLC concerning their purchase of the property portfolio, and upon information and belief Friedman had such authority when communication occurred with plaintiffs, and Allen Alevy.

33.    Attorney Friedman was a fiduciary to plaintiffs and occupied a position of trust to plaintiffs in his communications with plaintiffs, and their agents, on behalf of Stern, Safrin and First Republic LLC.

34.    The investment opportunity, solicitation and proposal presented from Stern and Safrin, was:

a.    Stern and Safrin had a profitable opportunity, which they would lose if they could not quickly close. To close, however, they needed an additional $13 million;

b.    This opportunity existed, through Stern's and Safrin's efforts, to acquire the eleven portfolio properties;

c.    The property portfolio was appraised at $190 million, was capable of being purchased for about $131 million, leaving about $59 million in total equity after purchase;

d.    If Amusement, or its desired entity, contributed $13 million towards the purchase, Amusement could participate in ownership of the property portfolio; and

e.    Stern and Safrin would refinance the property portfolio in 60 days (by about September 1, 2007), so that Amusement would receive back its principal investment from equity of the property portfolio, and retain a 50% partnership interest.

35.    Stern's and Safrin's solicitation and proposal interested Plaintiffs, so that on June 29, 2007 a written Letter of Intent contract and agreement ("LOI") was drafted by

Steven Alevy and signed by Stern, on behalf of the purchaser of the property portfolio, for the benefit of intended investor, Amusement, containing the following agreements:

   a. "Westland will provide $13,000,000 for a 50% equity and voting interest in Southeast and a 12% annual preferred return payable on a monthly basis";

   b. "7% paid current (set at 165 basis points over the 30 day LIBOR rate) and the balance will accrue if necessary";

   c. A partnership structure would be agreed upon in seven days, and until then Westland holds 100% of the ownership in the entity formed to acquire the property portfolio; and

   d. Once the partnership agreement is drafted, Amusement shall become a 50% owner of the entity formed to acquire the property portfolio.

A true and correct copy of the LOI is attached hereon as **Exhibit 2**.

  36. Later that day of June 29, 2007, Amusement wired $13,000,000 to Land Escrow Account #5514007904, and thus by such performance a contract formed among Amusement and the borrowers and soliciting parties, Stern and Safrin, having terms as presented in the LOI.

  37. Stern and Safrin represented through Friedman to Amusement that same day that this was the escrow being used for purchase of the property portfolio by the entity in which Amusement would have an ownership/partnership interest.

  38. On about July 2, 2007, although unknown to plaintiffs, seller Colonial Realty Limited Partnership sent notice of cancellation of its sale of the property portfolio to First Republic LLC, due to First Republic LLC's inability to procure sufficient funds to purchase the property portfolio within the time frame as required by the Colonial Realty Limited

Partnership - First Republic LLC contract. Upon information and belief, Stern and Safrin then convinced Colonial Realty Limited Partnership that an additional source of funds, Amusement, had just been found who wired $13 million to escrow, which could be used towards First Republic LLC's purchase of the property portfolio. Based on this representation, Colonial Realty Limited Partnership rescinded its notice of cancellation and extended for ten more days the time necessary for the sale of the property portfolio to close. Thus, Amusement's late entry into the transaction preserved First Republic LLC's ability to purchase the property portfolio, thus saving Stern and Safrin from breaches of contract and liability to both lender, Citibank with its outstanding hedge agreement, and seller, Colonial Realty Limited Partnership with its outstanding purchase and sale agreement.

39.    Unknown to plaintiffs, thereafter Stern and Safrin returned to negotiations with seller, Colonial Realty Limited Partnership, attempted to reduce the purchase price for First Republic LLC's purchase of the property portfolio, among other modifications. Unknown to Plaintiffs, Stern and Safrin were successful and thus Colonial Realty Limited Partnership agreed to reduce the property portfolio's purchase price by about $4.47 million dollars, thus reducing accordingly the amount of Amusement's funds needed by First Republic LLC to close the purchase transaction. No one notified Amusement that even less of its $13 million was now necessary for First Republic LLC to close the transaction.

40.    From these further negotiations with Stern and Safrin, Colonial Realty Limited Partnership placed a firm date of July 12, 2007 upon Stern and Safrin and their assignee, First Republic LLC, funding and closing the purchase of the property portfolio. This deadline date was not communicated to plaintiffs, but was learned by plaintiffs after July 13, 2007.

41.    Amusement's $13 million dollars wired to Land Escrow in the control of Frenkel, was not the escrow being used for purchase of the property portfolio by First Republic LLC from Colonial Realty Limited Partnership, but instead was a secondary creditors' escrow opened by Stern and Safrin to divert excess money from the property portfolio purchase transaction to pay off their personal debts and creditors. These facts were also not communicated to plaintiffs, but were learned by plaintiffs after July 13, 2007.

42.    During the seven day period defined by the LOI, Amusement drafted and dispatched three partnership agreements to Stern and Safrin, through Friedman, for their consideration to complete a transaction. Stern and Safrin did not execute any of the partnership agreements.

43.    Stern and Safrin nevertheless did not object to or alter the terms of the final partnership agreement drafted and dispatched by Amusement, a true and correct copy of which is attached hereon as **Exhibit 3**.

44.    On about July 6, 2007, the seven day period having passed, Amusement communicated to Stern and Safrin, through Friedman:

a.    To suggest a new property portfolio ownership structure and to inquire whether its $13 million contribution to the purchase should be a loan to Stern or to the portfolio owning entity, with Amusement's ownership interest in the portfolio owning entity continuing;

b.    To notify Stern and Safrin that the original 7 days of the LOI were expired;

24

    c.     To note that the property portfolio purchasing entity should have about $4 million dollars in reserve after closing (based on cost figures that had been provided by Stern and Safrin); and

    d.     To explicitly instruct Friedman not to authorize release of the $13 million in escrow.

45.     Also on about July 6, 2007, California counsel for Amusement wrote to Friedman stating that if the transaction between Amusement, Stern and Safrin had materially changed from the partnership agreement and LOI, then the wired $13 million should be returned. No funds were returned.

46.     On July 9, 2007, Amusement in writing asked Stern and Safrin, through Friedman, for the Citibank loan documents. They were not provided. In written response, Stern and Safrin through Friedman disclosed the existence of First Republic LLC as the entity purchaser of the property portfolio to be used by them.

47.     In further written response on July 9, 2007, Stern and Safrin refused to have the property portfolio purchase agreement assigned to a Stern - Safrin/Amusement partnership entity prior to closing of the property portfolio purchase by First Republic LLC, but agreed this could be done after such closing. Amusement was told in writing that Stern's and Safrin's purchase structure with its organizational documents had already been through the approval process with Citigroup, and a pre-close of escrow assignment of the property portfolio into an entity co-owned by Amusement would cause delay that would jeopardize the property portfolio purchase.

48.     Stern and Safrin did not disclose to plaintiffs that their promise to provide Amusement with its ownership in the property portfolio may or would violate the Stern -

Safrin purchase structure and Stern - Citigroup loan agreements. Instead, Stern and Safrin, through Friedman in writing, promised that formal documentation of Amusement's investment and ownership in the property portfolio was recognized and would be completed as necessary after closing, once Stern and Safrin, through First Republic LLC, owned the property portfolio.

49.    Amusement responded in writing to Stern and Safrin, through Friedman, that same day of July 9, 2007 that such proposal was generally acceptable, and confirmed that the partnership structure would be memorialized immediately after closing of the property portfolio purchase by First Republic LLC.

50.    Neither Stern, Safrin or First Republic LLC denied or objected to these assertions in any subsequent reply, and thus Amusement continued to reasonably believe that Stern, Safrin and now First Republic LLC as well accepted Amusement as a partner in ownership of the property portfolio pursuant to terms previously detailed and drafted in the LOI and/or partnership agreement.

51.    Seeing that finalization of assignment of ownership documents was not moving as fast as expected, Amusement again instructed Friedman not to allow release of Amusement's $13 million from escrow. Friedman agreed. Amusement also directly instructed Land Escrow and Frenkel to not release Amusement's funds without written authorization from Sragow & Sragow.

52.    On July 11, 2007, Stern, Safrin and First Republic LLC, through Friedman, provided the following documents to Amusement, with a repetitive statement there was no time to fully document the parties' agreement prior to close of escrow:

        a.    A promissory note for $13 million signed only by Stern.

      b.      Escrow Agreement.

      c.      Assignments of Stern's and Safrin's LLC Membership Interests in First Republic LLC and the underlying LLC ownership structure.

      d.      Eleven grant deeds constituting the property portfolio signed by grantor, First Republic LLC ("grant deeds").

53.      Thereafter on July 11, 2007, Amusement communicated in writing to Stern, Safrin and First Republic LLC, through Friedman, the following counter offer:

      a.      There would be no loan.  Amusement's $13 million contribution would be treated as a direct investment in the purchasing entity for the benefit of Stern and Safrin, with a preferred right to return of this investment from the benefited parties, through refinance of Citibank's loan with the property portfolio owning entity within 45 days;

      b.      Amusement's repayment right would now be increased by $2 million to $15 million, recognizing that Stern and Safrin at this point had already expressed their intent to take over $4 million from the partnership that all parties understood would be left over at closing once Amusement's $13 million was used to close;

      c.      As the partnership agreement was not being executed pre-closing, Stern and Safrin would cause a present conveyance of 100% of the property portfolio to Amusement by deeding all eleven portfolio properties to Amusement, as well causing a present conveyance of the LLC membership interests that Stern and Safrin held in the owning entity believed to reflect 100% ownership of the owning entity; and

27

d.    Stern and Safrin would have limited recourse by a limited in time option period for 45 days from closing (again about September 1, 2007) to repurchase the grant deeds and their 50% ownership in the owning entity by providing the partnership agreement. Otherwise, if the repurchase option was not exercised by Stern and/or Safrin, Amusement would retain 100% of the property portfolio forever.

54.    Amusement sent its counter offer of July 11, 2007 because it disagreed with Stern's, Safrin's and First Republic LLC's characterization of the transaction among the parties reflected in defendants' version of the documents, as well as aspects of the drafting of the documents.

55.    Amusement's July 11, 2007 written communication also asked: 1) - that the assignments be changed; 2) - reminding Stern, Safrin and First Republic LLC that the $13 million contribution was no longer a loan but an investment justifying Amusement's 50% ownership interest; 3) - that there was to be 100% ownership and possession of the property portfolio, possibly lowered to 50% ownership and possession pending providing the partnership agreement; and 4) - that the provided documents did not contain a $15 million promissory note to reflect the $2 million upward adjustment as explained.

56.    Stern, Safrin and First Republic LLC, through Friedman, responded that Amusement should not worry as Amusement now owned the whole thing, and the next day July 12, 2007 provided a $15 million promissory note to Amusement signed only by Stern.

57.    Stern, Safrin and First Republic LLC did not object to Amusement's July 11, 2007 offered terms and explanations therein.

58.    Upon information and belief, and unknown to Plaintiffs, upon the instruction of Stern, Safrin and First Republic LLC, Frenkel and Land Escrow on July 12, 2007 took and used Amusement's $13 million escrowed funds without notice and without Amusement's authorization on July 12, 2007 and in violation of specific instructions given to Friedman on July 9. Frenkel and Land Escrow transferred Amusement's funds to Stern and/or Safrin and/or First Republic LLC for their benefit. First Republic LLC thus closed its purchase of the property portfolio from seller, Colonial Realty Limited Partnership, that same date.

59.    As a result of this taking of Amusement's funds by Stern, Safrin and First Republic LLC on July 12, 2007, after and without objection to Amusement's counter offer of July 11, 2007, a contract formed between Amusement and Stern, Safrin and First Republic LLC that within 45 days Amusement would have the partnership.

60.    Since Amusement on July 12, 2007 did not know of the taking of its escrowed funds, Amusement that day wrote to Stern, Safrin and First Republic LLC, through Friedman, addressing their positions that Amusement already owned the whole thing, that Amusement should not worry and that better documentation of the agreed upon terms among the parties was better left to be done after closing, and asked for revised documents. Revised documents were not provided.

61.    On July 13, 2007, Friedman announced that he had executed versions of all of Stern's and Safrin's documents (the version that Amusement had already rejected), and that Amusement could authorize release of its escrowed $13 million dollars.

62.    Also on July 13, 2007, Amusement's California counsel and Allen Alevy in California were asked by Frenkel and Land Escrow to provide written authorization for

release of the $13 million escrowed funds, but authorization was refused for reasons previously disclosed. The provided writings from Stern and Safrin, through Friedman, were not satisfactory to Amusement as they appeared to be an attempt by Stern and Safrin to alter the terms of Amusement's offers and already agreed terms.

63.    Also on July 13, 2007, Frenkel announced that Steven Alevy had verbally authorized the release and asked Amusement's California counsel for written authorization, who refused. In the afternoon, Steven Alevy wrote to Frenkel: "You are hereby authorized to release $13,000,000 from escrow. The interest earned should be returned to originator." Frenkel and Land Escrow knew that such purported authorization from Steven Alevy could not properly authorize release of Amusement's escrowed funds because they had been specifically told otherwise in writing by Amusement.

64.    On July 15, 2007, Amusement for the first time learned of the earlier taking of Amusement's escrowed funds on July 12, 2007 from Frenkel and Land Escrow by Stern, Safrin and First Republic LLC. Thus the statements by Stern, Safrin, First Republic LLC, Frenkel and Land Escrow of July 13, 2007, as detailed above, were all a deception upon plaintiffs to conceal the fact that Amusement's escrowed funds were previously released and taken without authorization.

65.    Amusement's California counsel wrote to Frenkel and Land Escrow on July 15, 2007 that when the proper documents are provided the written authorization to release would be provided, and that if on or before the July 13, 2007 the funds were released, Frenkel and Land Escrow should retrieve them. Frenkel and Land Escrow did not respond.

66.    On July 16, 2007, Amusement's California counsel wrote to Frenkel, Land Escrow and Friedman and told them that the agreed upon terms and conditions among Stern,

Safrin and First Republic LLC with Amusement were not fulfilled by the documents that were previously provided. Frenkel, Land Escrow, First Republic LLC, Stern, Safrin and Friedman did not refute or object to this assertion.

67.    On July 19, 2007, Amusement's California counsel wrote to Frenkel and Land Escrow, asking them to wire the accrued interest back to Amusement. They did not do so.

68.    Amusement ended up with nothing of value after Stern, Safrin and First Republic LLC without proper authorization removed and took Amusement's escrowed $13 million from Frenkel and Land Escrow.

69.    On November 15, 2007, Amusement sent its demand to Stern, Safrin, First Republic LLC, Friedman and Steven Alevy as escrow holders that they deliver the escrowed eleven grant deeds and assignments of LLC membership interests to Amusement.

## FIRST CAUSE OF ACTION
(DECLARATORY RELIEF AS TO OWNERSHIP OF GRANT DEEDS AND LLC INTERESTS, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

70.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

71.    An actual controversy has arisen and now exists between Plaintiffs and Defendants, Stern, Safrin & First Republic LLC in that Plaintiffs contend, and these defendants deny, the following:

a.    That these defendants agreed to convey to Amusement a present and immediate 100% ownership interest in the property portfolio prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

31

b.    That these defendants in fact conveyed to Amusement such a present and immediate 100% ownership interest in the property portfolio, when First Republic LLC provided Amusement, through escrow, with the grant deeds for each of the eleven properties within the property portfolio delivered on about July 11, 2007;

c.    That these defendants agreed to convey and assign to Amusement a present and immediate assignment of 100% of Stern's and Safrin's membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

d.    That these defendants in fact conveyed and assigned to Amusement such a present and immediate 100% of Stern's and Safrin's membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, when Stern and Safrin provided Amusement, through escrow, with the LLC membership assignments delivered on about July 11, 2007, so that now Amusement is the present owner of 100% of the membership interest in First Republic LLC;

e.    That in the alternative to "a." above, these defendants agreed to convey to Amusement a present and immediate 50% ownership interest in the property portfolio prior to First Republic LLC's purchase of the property portfolio from seller, Colonial Realty Limited Partnership;

32

f.    That in the alternative to "b." above, these defendants in fact conveyed to Amusement such a present and immediate 50% ownership interest in the property portfolio;

g.    That Amusement and these defendants agreed that Stern and/or First Republic LLC were obligated to return and pay within sixty days of July 11, 2007 the sum of $13 million to Plaintiffs, and that Stern personally guaranteed such payment by the signed $13 million promissory note of about July 11, 2007, and that payment has not been made;

h.    Amusement and these defendants agreed that Stern and/or First Republic LLC were obligated to return and pay within sixty days of July 11, 2007 the sum of $15 million to Plaintiffs, and that Stern personally guaranteed such payment by the signed $15 million promissory note of about July 12, 2007, and that payment has not been made;

i.    That in furtherance of "a.", "b.", "c." and "d." above, Amusement and these defendants agreed that following Stern's and Safrin's assignments of First Republic LLC's membership interests to Amusement delivered about July 11, 2007, and following First Republic LLC providing the eleven grant deeds to Amusement, Stern and Safrin would have a limited option period through September 10, 2007 to repurchase their 50% ownership interest in First Republic LLC from Amusement by providing to Amusement during this time a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio;

33

      j.      That Stern and Safrin did not provide Amusement with a partnership agreement confirming Amusement as a 50% partner with Stern and Safrin in ownership and management of the property portfolio before September 10, 2006, and thus Stern's and Safrin's limited option period has passed unfulfilled and unexercised so that Amusement presently remains and is the owner of Stern's and Safrin's original ownership interest in First Republic LLC and/or the portfolio properties owned by First Republic LLC.

72.      Plaintiffs desire a judicial determination of the respective rights and duties of Plaintiffs and Defendants with respect to the damages and orders claimed in the complaint of Plaintiffs herein. In particular, Plaintiffs desire a declaration that Amusement owns First Republic LLC and owns the eleven portfolio properties formerly owned by First Republic LLC, and that Practical Finance as assignee is owed sums of money pursuant to promissory notes signed by Stern.

73.      A present controversy has arisen over whether the grant deeds and assignments of LLC membership interests were conveyed to Plaintiffs to provide Amusement with present ownership of real property and of LLC membership interests or were instead mortgage interests transferred to secure a loan transaction. Such a declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights and duties with respect to personal property and real property interests provided by First Republic LLC, Stern and Safrin to Plaintiffs.

## SECOND CAUSE OF ACTION
(QUIET TITLE AS TO REAL PROPERTY, AGAINST FIRST REPUBLIC LLC)

74.      Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

34

75.    A true and correct copy of the eleven property portfolio grant deeds provided by First Republic LLC to Plaintiffs' escrow agent, Friedman and/or Steven Alevy, on about July 11, 2007, are attached hereto as **Exhibit 1**.

76.    On about November 15, 2007, Plaintiffs in writing requested that Defendants, including First Republic LLC, consent to release by Plaintiffs' escrow agent of the grant deeds to Plaintiffs so that Plaintiff, Amusement, could record them. A true and correct copy of the letter request is attached hereto as **Exhibit 4** and is incorporated herein by reference. Defendants, including First Republic LLC, refused to agree to Amusement's recordation of the grant deeds.

77.    Defendants have taken the position that the property portfolio grant deeds provided by First Republic LLC created mortgage instruments, not actual transfers of ownership of the eleven properties to Amusement.

78.    As a proximate result of this refusal of Defendants, Amusement has not been able to clear title to the eleven properties that constitute the property portfolio and that are currently record titled to First Republic LLC.

79.    Based on facts alleged above, First Republic LLC presently and immediately conveyed to Amusement its 100% ownership interest in the property portfolio, when First Republic LLC provided Amusement, through escrow, the grant deeds for each of the eleven properties within the property portfolio delivered on about July 11, 2007. The court should quiet title to Amusement.

### THIRD CAUSE OF ACTION
(QUIET TITLE AS TO LLC MEMBERSHIP INTERSTS, AGAINST STERN & SAFRIN)

80.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

81.    A true and correct copy of the two assignments of LLC membership interests in MS Colonial LLC, JSAE Colonial LLC, FRGR HOLDINGS LLC, FRGR MANAGING MEMBER LLC and defendant, First Republic LLC, provided by Stern and Safrin to Plaintiffs' escrow agent, Friedman and/or Steven Alevy, on about July 11, 2007, are attached hereto as **Exhibit 5**.

82.    On about November 15, 2007, Plaintiffs in writing requested that Defendants, including Stern and Safrin, consent to the release from escrow of the assignments of LLC membership interests to Plaintiffs so that Plaintiff, Amusement, could file them in order to publicly reflect Amusement's present ownership of all LLC entities. A true and correct copy of the letter request is attached hereto as **Exhibit 4** and is incorporated herein by reference. Defendants, including Stern and Safrin, have not responded in writing to Amusement's demand and, in so doing, have blocked the release of the assignments from escrow into Plaintiff's possession and control.

83.    As a proximate result of this refusal of Defendants, Amusement has not been able to obtain clear title to the membership interests of the aforementioned LLCs, which are currently record titled to Stern and Safrin.

84.    Based on facts alleged above, Stern and Safrin presently and immediately conveyed to Amusement their 100% ownership interest in the aforementioned LLCs, through escrow, by the assignments of LLC membership interests delivered on about July 11, 2007. The court should quiet title to Amusement.

## FOURTH CAUSE OF ACTION
(JUDICIAL FORECLOSURE OF REAL PROPERTY, AGAINST FIRST REPUBLIC LLC)

85.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

36

86.     In the alternative to Quiet Title above, Plaintiffs are beneficiaries under the terms of the LOI, grant deeds and escrow agreement of about July 11, 2007. The escrow agreement constitutes a security agreement among Plaintiffs, Stern, Safrin and First Republic LLC.

87.     First Republic LLC was the record owner of the eleven real properties that constitute the property portfolio, at the time that First Republic LLC provided its eleven grant deeds for same to Plaintiffs by deposit into escrow as security for Stern's and First Republic LLC's performance of the LOI and the promissory notes. First Republic LLC remains the record owner of the eleven real properties of the property portfolio at this time.

88.     By the terms of the LOI and the delivered promissory notes and security agreement, Stern and First Republic LLC promised and agreed to pay Plaintiffs, or either of them, the sums of $13,000,000 and/or $15,000,000 by September 10, 2007.

89.     Stern and First Republic LLC have wholly failed, neglected and refused to make or pay, and no other person has made or paid, the unpaid balance of principal and interest of the LOI, two promissory notes and debts reflected therein, which all came due September 10, 2007. The total amount of principal thus defaulted by Stern and First Republic LLC is Thirteen Million Dollars ($13,000,000) and/or Fifteen Million Dollars ($15,000,000), plus pre-default interest and default interest thereon pursuant to the LOIs and promissory notes' terms from dates due, plus penalties, foreclosure costs and attorney's fees all in a sum to be established in accordance with proof at trial.

90.     Plaintiffs have performed all obligations on their part, if any, to be performed under the terms of the LOI, promissory notes, grant deeds and security agreement. All conditions precedent to Plaintiffs' enforcement and collection of the LOI, promissory notes

37

and the debts reflected therein, and thus all conditions precedent to Plaintiffs' foreclosure of

the grant deeds to the extent provided as security, have been satisfied and fulfilled.

Therefore, Plaintiffs which are owed all sums on the defaulted LOI and promissory notes,

are now entitled to foreclose upon the eleven real properties of the property portfolio to the

extent the eleven grant deeds were provided by First Republic LLC to Plaintiffs as security

for Stern's and First Republic LLC's performance of the LOI and promissory notes.

91.    Plaintiffs are now further entitled to seek a deficiency judgment against First

Republic LLC, in the event at the judicially ordered foreclosure sale of the eleven properties

that constitute the property portfolio, a deficiency balance will remain owed on the debt of

Stern and First Republic LLC to Plaintiffs or either of them.

92.    By virtue of the foregoing, Plaintiffs seek a decree of judicial foreclosure of

real property, and deficiency money judgment for any resulting deficiency, against First

Republic LLC.

### FIFTH CAUSE OF ACTION
(JUDICIAL FORECLOSURE OF PERSONAL PROPERTY LLC MEMBERSHIP
INTERESTS, AGAINST STERN & SAFRIN)

93.    Plaintiffs replead and reallege each and every allegation stated in the

foregoing paragraphs of this Complaint as if stated in full herein.

94.    In the alternative to Quiet Title above, Plaintiffs are beneficiaries under the

terms of the LOI, assignments of LLC membership interests and escrow agreement of about

July 11, 2007. The escrow agreement constitutes a security agreement among Plaintiffs,

Stern, Safrin and First Republic LLC.

95.    Stern and Safrin were the record owner of the assigned LLC membership

interests, at the time that Stern and Safrin provided assignments of LLC membership

interests to Plaintiffs by deposit with Plaintiffs' escrow agent, Friedman and/or Steven

Alevy, as security for Stern's and First Republic LLC's performance of the LOI and promissory notes. Stern and Safrin remain the record owners of the assigned LLC membership interests at this time.

96.     By the terms of the LOI and the delivered promissory notes and security agreement, Stern and First Republic LLC promised and agreed to pay Plaintiffs, or either of them, the sums of $13,000,000 and/or $15,000,000 by September 10, 2007.

97.     Stern and First Republic LLC have wholly failed, neglected and refused to make or pay, and no other person has made or paid, the unpaid balance of principal and interest of the LOI, two promissory notes and debts reflected therein, which all came due September 10, 2007. The total amount of principal thus defaulted by Stern and First Republic LLC is Thirteen Million Dollars ($13,000,000) and/or Fifteen Million Dollars ($15,000,000), plus pre-default interest and default interest thereon pursuant to the LOIs and promissory notes' terms from dates due, plus penalties, foreclosure costs and attorney's fees all in a sum to be established in accordance with proof at trial.

98.     Plaintiffs have performed all obligations on their part, if any, to be performed under the terms of the LOI, promissory notes, assignments of LLC membership interests and security agreement. All conditions precedent to Plaintiffs' enforcement and collection of the LOI, promissory notes and the debts reflected therein, and thus all conditions precedent to Plaintiffs' foreclosure of the assigned LLC membership interests to the extent provided as security, have been satisfied and fulfilled. Therefore, Plaintiffs which are owed all sums on the defaulted LOI and promissory notes, are now entitled to foreclose upon the LLC membership interests to the extent the assignments of LLC membership interests were

provided by Stern and Safrin to Plaintiffs as security for Stern's and First Republic LLC's performance of the LOI and promissory notes.

99.    Plaintiffs are now further entitled to seek a deficiency judgment against Stern and Safrin, in the event at the judicially ordered foreclosure sale of the LLC membership interests a deficiency balance will remain owed on the debt of Stern and First Republic LLC to Plaintiffs or either of them.

100.    By virtue of the foregoing, Plaintiffs seek a decree of judicial foreclosure of personal property, and deficiency money judgment for any resulting deficiency, against Stern and Safrin.

### SIXTH CAUSE OF ACTION
(BREACH OF CONTRACT - FAILURE TO REPAY INVESTMENT, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

101.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

102.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above.

103.    One of the agreed contract terms was that, since Amusement provided a $13 million investment and contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Stern, Safrin and First Republic LLC agreed they were obligated to return this $13 million investment to Amusement, with interest until paid. This contract term was then modified to raise the repayment obligation to $15 million, as explained above.

104.    Although Amusement requested that the investment be repaid with interest in 45 days from closing of the property portfolio purchase, Stern, Safrin and First Republic

LLC requested and Amusement accepted that the investment could be repaid with interest in 60 days from closing of the property portfolio purchase. As First Republic LLC's closing with seller occurred July 12, 2007, Stern, Safrin and First Republic LLC thus were obligated to repay to Amusement its $15 million investment with interest by no later than September 10, 2007, or in the alternative should the modification not be upheld, its $13 million investment with interest by no later than September 10, 2007.

105.    The promissory notes provided by Stern for $15 million and $13 million merely memorialized and guaranteed Stern's performance of the $15 million or $13 million obligation owed by Stern, Safrin and First Republic LLC to Amusement for repayment of Amusement's $13 million investment plus the $2 million upward adjustment as described and detailed above.

106.    Defendants, Stern, Safrin and First Republic LLC, breached their agreement with Amusement on September 10, 2007 by failing to pay by that date the sum of $13 million or $15 million with interest to Amusement. To date, no partial sum has been paid.

107.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

108.    Although demand has been made for return of the investment, as upwardly adjusted per agreement, with interest, no payments have been made by or received from Stern, Safrin and First Republic LLC towards such debt, so there now remains due and owing to Amusement by Stern, Safrin and First Republic LLC the sum of $15,000,000.00, plus interest at the legal rate or higher rate per the contract, from the date of breach of September 10, 2007, or in the alternative the sum of $13,000,000.00, plus interest at the legal rate or higher rate per the contract, from the date of breach of September 10, 2007.

## SEVENTH CAUSE OF ACTION
### (BREACH OF $13,000,000 PROMISSORY NOTE CONTRACT, AGAINST STERN)

109.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

110.    On about July 12, 2007 defendant, Stern executed a written Promissory Note contract wherein Stern promised to pay Amusement the sum of $13,000,000.00 principal, plus interest on the principal amount from July 12, 2007, both due on the maturity date of September 10, 2007.  Attached as **Exhibit 6** hereto, is a true and correct copy of this Promissory Note contract of July 12, 2007.

111.    This $13 million promissory note was entered into either as a memorialization and guaranty by Stern of Stern's full or partial performance of the $13 million obligation, or $15 million obligation, owed by Stern, Safrin and First Republic LLC to Amusement for repayment of Amusement's $13 million investment, plus upward adjustment, as described and detailed above, or in the alternative if Amusement did not invest but instead lent $13 million to allow Stern, Safrin and their entity, First Republic LLC, to purchase the property portfolio, then as a loan to Stern and First Republic LLC as evidenced by this $13 million promissory note signed by Stern.  Therefore in either event, Stern obligated himself, with or without others, to pay the sum of $13 million to Practical Finance as assignee.

112.    Stern breached the $13 million promissory note contract on September 10, 2007 by not making or paying this Note's principal with interest on that date as required by the terms of the written promissory note contract.  Stern has made no payment towards the promissory note contract. At this time, the outstanding balance owed by Stern to Practical

Finance as assignee pursuant to the terms of the Promissory Note contract is the sum of $13,000,000.00 principal, plus interest, plus default interest, all pursuant to the note's terms.

113.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the written Promissory Note contract.

114.    The sum of $0 has been paid, and so there now remains due and owing to Practical Finance as assignee by Stern the sum of $13,000,000.00 principal, plus interest thereon at the note rate from July 12, 2007 and at the default rate thereafter from the date of breach of September 10, 2007.

## EIGHTH CAUSE OF ACTION
(BREACH OF CONTRACT - SPECIFIC PERFORMANCE FOR 50% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

115.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

116.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, wherein it was agreed that since Amusement provided a $13 million contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Amusement was entitled to receive a 50% ownership in the property portfolio by no later than July 12, 2007.

117.    In the event that the ownership and security structure provided by Stern, Safrin and First Republic LLC to Plaintiffs does not include Amusement having a present and valid 50% ownership interest in First Republic LLC, the purchaser of the property

43

portfolio, then Amusement is entitled to receive such 50% ownership in First Republic LLC as owner of the property portfolio by court order pursuant to the aforementioned agreement.

118.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 50% ownership interest in First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so. They did not do so.

119.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract. Since these defendants have not provided Amusement with a valid 50% ownership interest in First Republic LLC to date thus breaching the contract, Amusement is entitled to specific performance of the contract against Stern, Safrin and First Republic LLC for an order providing Amusement with a 50% ownership interest in First Republic LLC as owner of the property portfolio, as plaintiffs have no adequate remedy at law.

120.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through the date plaintiff obtains its co-ownership of First Republic LLC by court order, which is lost income and profit as a result of these defendants' breach of contract.

## NINTH CAUSE OF ACTION
(BREACH OF CONTRACT - MONEY DAMAGES FOR 50% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

121.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

122.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent

terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, wherein it was agreed that since Amusement provided a $13 million contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of First Republic LLC, Stern and Safrin, Amusement was entitled to receive a 50% ownership in the property portfolio by no later than July 12, 2007.

123.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 50% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so.

124.    For purposes of this claim, Stern, Safrin and First Republic LLC did not provide Amusement with a 50% ownership interest in First Republic LLC, by July 12, 2007 as had been promised, and thus these defendants breached their contract with Amusement as of that date.

125.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

126.    Since these defendants have not provided Amusement with a valid 50% ownership interest in First Republic LLC to date, Amusement has been damaged and is entitled to money damages for the value of the undelivered valid 50% ownership interest in First Republic LLC, estimated to be the sum of about $30 million the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach.

127.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits

generated by the property portfolio owned by First Republic LLC from July 12, 2007 through judgment.

128.     The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged.  Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

### TENTH CAUSE OF ACTION
(BREACH OF $15,000,000 PROMISSORY NOTE CONTRACT, AGAINST STERN)

129.     Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

130.     On about July 12, 2007 Stern executed a written Promissory Note contract wherein Stern promised to pay Practical Finance (as subsequent assignee) the sum of $15,000,000.00 principal, due on the maturity date of September 10, 2007.  Attached as **Exhibit 7** hereon, is a true and correct copy of this Promissory Note contract of July 12, 2007.

131.     This $15 million promissory note was entered into either as a memorialization and guaranty by Stern of Stern's performance of the $15 million obligation owed by Stern, Safrin and First Republic LLC to Amusement for payment of investment return with upward adjustment, as described and detailed above.

132.     Stern breached the $15 million promissory note contract on September 10, 2007 by not making or paying this Note's principal on that date as required by the terms of the written promissory note contract.  Stern has made no payment towards the promissory note contract.  At this time, the outstanding balance owed by Stern to Practical Finance (as

assignee) pursuant to the terms of the Promissory Note contract is the sum of

$15,000,000.00 principal, plus default interest, all pursuant to the note's terms.

133.    Plaintiffs have performed all conditions, covenants, and promises required on

their part to be performed in accordance with the terms and conditions of the written

Promissory Note contract.

134.    The sum of $0 has been paid, and so there now remains due and owing to

Practical Finance (as assignee) by Stern the sum of $15,000,000.00 principal, plus interest

thereon at the default rate from the date of breach of September 10, 2007.

### ELEVENTH CAUSE OF ACTION
(BREACH OF CONTRACT - SPECIFIC PERFORMANCE FOR 100% OWNERSHIP OF
FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

135.    Plaintiffs replead and reallege each and every allegation stated in the

foregoing paragraphs of this Complaint as if stated in full herein.

136.    Amusement, on the one hand, entered into a contract with Stern, Safrin and

First Republic LLC, on the other hand, by no later than July 11, 2007, having terms of the

July 11, 2007 contract as described above, that since Amusement provided a $13 million

investment and contribution to enable First Republic LLC's acquisition of the property

portfolio for the benefit of these defendants, Amusement would receive 100% ownership of

the property portfolio by no later than July 12, 2007, with 50% ownership in the property

portfolio being subject to repurchase from Amusement by Stern and Safrin if they provide to

Amusement by no later than September 10, 2007 a signed partnership agreement which

confirms Amusement will receive return of its contribution and presently is a 50% partner

with Stern and Safrin in ownership and management of the property portfolio.

137.    In the event that the ownership and security structure provided by Stern,

Safrin and First Republic LLC to Plaintiffs on about July 11 - 12, 2007 did not provide

Amusement with a present and valid 100% ownership interest in First Republic LLC, then Amusement is entitled to receive such 100% ownership in First Republic LLC as owner of the property portfolio by court order pursuant to the aforementioned agreement.

138.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 100% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so. Further, if by September 10, 2007 Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement during this time a signed partnership agreement which confirmed Amusement would receive return of its contribution and presently be a 50% partner with Stern and Safrin in ownership and management of the property portfolio, then thereafter Amusement was entitled to retain 100% ownership of First Republic LLC.

139.    For purposes of this claim, Stern, Safrin and First Republic LLC did not provide Amusement with a valid 100% ownership of First Republic LLC by July 12, 2007 as had been promised, and thus these defendants breached their contract with Amusement as of that date. Further, Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement during this time a signed partnership agreement which confirmed Amusement would receive return of its contribution and presently be a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

140.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

48

141.    As a result of these defendants having not provided Amusement with a valid 100% ownership of First Republic LLC to date, Amusement is entitled to specific performance of the contract against Stern, Safrin and First Republic LLC for an order providing Amusement with 100% ownership of First Republic LLC, as plaintiffs have no adequate remedy at law.

142.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through the date plaintiff obtains its 100% ownership of First Republic LLC by court order, which is lost income and profit as a result of these defendants' breach of contract.

## TWELFTH CAUSE OF ACTION
(BREACH OF CONTRACT - MONEY DAMAGES FOR 100% OWNERSHIP OF FIRST REPUBLIC LLC, AGAINST STERN, SAFRIN & FIRST REPUBLIC LLC)

143.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

144.    Amusement, on the one hand, entered into a contract with Stern, Safrin and First Republic LLC, on the other hand, by no later than July 11, 2007, having the consistent terms of the LOI (**Exhibit 1**) and the July 11, 2007 contract as described above, that since Amusement provided a $13 million investment and contribution to enable First Republic LLC's acquisition of the property portfolio for the benefit of these defendants, Amusement would receive 100% ownership of the property portfolio by no later than July 12, 2007, with 50% ownership in the property portfolio being subject to repurchase from Amusement by Stern and Safrin if they provide to Amusement within 60 days of July 12, 2007 a signed partnership agreement which confirms Amusement will receive return of its contribution and

presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

145.    If by July 12, 2007 Stern, Safrin and First Republic LLC did not provide Amusement with a present and valid 100% ownership of First Republic LLC, then Stern, Safrin and First Republic LLC breached their aforementioned agreement with Amusement on July 12, 2007 by failing to do so.

146.    In the event 100% ownership of First Republic LLC was provided by July 12, 2007, Stern and Safrin did not repurchase from Amusement a 50% ownership of First Republic LLC by providing to Amusement, on or before September 10, 2007, a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio.

147.    Plaintiffs have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the contract.

148.    Since either these defendants have not provided Amusement with a valid 100% ownership of First Republic LLC to date, or a 100% ownership was timely provided but Amusement has not been provided with a signed partnership agreement which confirms Amusement will receive return of its contribution and presently is a 50% partner with Stern and Safrin in ownership and management of the property portfolio for repurchase of a 50% ownership of First Republic LLC, Amusement is entitled to money damages for the value of the undelivered or delivered 100% ownership interest in First Republic LLC, estimated to be the sum of about $60 million the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach.

149.    Plaintiffs are also entitled to receive consequential damages in addition to specific performance against these defendants, including for half the income and profits generated by the property portfolio owned by First Republic LLC from July 12, 2007 through judgment.

150.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## THIRTEENTH CAUSE OF ACTION
### (BREACH OF ESCROW CONTRACT – AGAINST FRENKEL & LAND ESCROW)

151.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

152.    When Amusement wired the sum of $13 million to Land Escrow and Frenkel with written instruction that only certain persons of Amusement could authorize the release of such funds from escrow, as detailed above, a contract was formed between Land Escrow and Frenkel with Amusement having such terms.

153.    At first upon immediate wire of Amusement's funds, Friedman was a person authorized to release Amusement's funds from escrow, but these instructions were changed in writing by Amusement such that only Allen Sragow or Allen Alevy could authorize Frenkel and Land Escrow to release Amusement's funds, as detailed above.

154.    Defendants, Frenkel and Land Escrow, breached their agreement with Amusement on about July 12, 2007 by releasing Amusement's escrowed $13 million without the authorization of Allen Sragow or Allen Alevy.

155.    Amusement has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the escrow contract.

156.    Although demand has been made for return of the $13 million placed into escrow with interest, no sum has been returned by or received from Frenkel or Land Escrow, so there now remains due and owing to Amusement by Land Escrow and Frenkel the sum of $13,000,000.00, plus interest at the legal rate from the date of breach of July 12, 2007, plus consequential damages caused by this breach of escrow contract.

## FOURTEENTH CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY, AGAINST FRENKEL & LAND ESCROW)

157.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

158.    Amusement transmitted its funds to Frenkel and Land Escrow to be held for use in the property portfolio purchase transaction then pending.

159.    Frenkel and Land Escrow were given clear and multiple instructions from Amusement, and from Friedman as Amusement's agent, to not release the escrowed money without written authorization from either Allen Alevy or Allen Sragow.

160.    Frenkel and Land Escrow as escrow agents holding money had the fiduciary duty to maintain escrowed funds under the instructions provided by the party providing the funds. As an escrow agent, these defendants held Amusement's $13 million in trust to be used only as Amusement instructed. Thus these defendants owed a fiduciary duty to Amusement to only act by authorized instruction of Amusement and in Amusement's best interests.

161.    Frenkel and Land Escrow released to unknown persons on about July 12, 2007 Amusement's $13,000,000 held in its escrow account #5514007904, without receiving written authorization from either Allen Alevy or Allen Sragow. Thus these defendants breached their fiduciary duty owed to Amusement on July 12, 2007.

162.    In addition, upon information and belief, First Republic LLC's purchase of the property portfolio from Colonial Realty Limited Partnership closed on July 12, 2007. On that date, First Republic LLC used a portion of Amusement's $13 million dollars then in escrow to close that purchase transaction. Therefore, Frenkel and Land Escrow released at least some of Amusement's $13 million then held in escrow not only without proper written authorization from Amusement's agents, Allen Sragow or Allen Alevy, but also without notice to Amusement until July 13, 2007. Thus these defendants breached their fiduciary duty owed to Amusement on July 12, 2007.

163.    As a result of Frenkel and Land Escrow releasing Amusement's $13,000,000 from escrow on July 12, 2007 before Amusement completed memorialization of its agreements with Stern, Safrin and First Republic LLC, Amusement has suffered damages.

164.    In addition, as a result of Frenkel and Land Escrow's refusal to return the accrued interest on the escrowed $13,000,000, Amusement has been damaged in an additional sum of approximately $20,000. Amusement is entitled to punitive damages and pre-judgment interest on all sums due as a result of these defendants' breach of fiduciary duty.

165.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions

described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

**FIFTEENTH CAUSE OF ACTION**
(FRAUD IN THE INDUCEMENT – AGAINST STERN & SAFRIN (REGARDING NEED FOR $13,000,000))

166.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

167.    On about June 29, 2007, when Stern and Safrin solicited Amusement's $13 million contribution to enable Stern and Safrin to complete their acquisition of the property portfolio from seller, Colonial Realty Limited Partnership, Stern and Safrin promised by email, through Friedman, to Allen Alevy at Amusement: 1) - that the entire $13 million contribution was necessary for completion of the property portfolio purchase. Amusement accepted material representation and relied upon it on June 29, 2007 when Amusement wired its $13 million to Land Escrow and Frenkel that day.

168.    Stern's and Safrin's investment solicitation promise made to Amusement was false and on information and belief Stern and Safrin knew it to be false when made on about June 29, 2007, because these defendants knew that same day they did not need $13 million in additional funds to close purchase of the property portfolio. Instead on information and belief, these defendants knew on that same day that they only needed about $9 million in additional funds to close purchase of the property portfolio.

169.    Thus the false investment solicitation of these defendants induced Amusement to place into escrow on June 29, 2007, for benefit of these defendants, about $4 million more than these defendants needed to purchase the property portfolio.

170.    Upon information and belief, these defendants at closing of the property portfolio purchase use the about $4 million excess of Amusement's contribution to pay

54

Stern's and Safrin's personal creditors included payment to the following persons and entities: Carruthers & Roth; Young Conaway Starrgatt & Taylor; Odin Feldman Pittleman; Young Conaway; Starrgatt & Taylor; Cavazos Hendricks & Poirot, PC; Buchanen Ingersol; Herrick Feinstein; Mary Stark; Frank Dwyer; NRAI Entity Services; Burr Forman; Parker Hudson Rainer; Bruce Minsky; Prudential Douglas Elliman; GAMC IPG; Ace Capital Group; Hoffinger Stern & Ross; Eisenpress and Reiss; and Roman Associates, LTD.

171.    Amusement reasonably and justifiably relied upon Stern's and Safrin's false representation of June 29, 2007 as described above.

172.    As a direct and proximate result of Stern's and Safrin's false representation, Amusement was induced to provide about $4 million more than necessary for Stern's and Safrin's acquisition of the property portfolio, so that Stern and Safrin acquired $4 million for themselves under false pretense to Amusement. Amusement has been damaged by loss of at least $4 million, the exact sum to be proven at time of trial, plus any and all pre-judgment interest allowed by law.

173.    In making the false promises described above, Stern and Safrin acted with oppression, fraud and malice, for having used their investment solicitation in a business venture to make and profit personally from false promises targeted to harm Amusement, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

174.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## SIXTEENTH CAUSE OF ACTION
(BREACH OF CONTRACT – AGAINST STERN & SAFRIN
(REGARDING USE OF $13,000,000))

175.   Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

176.   On about June 29, 2007, when Stern and Safrin solicited Amusement's $13 million contribution to enable Stern and Safrin to complete their acquisition of the property portfolio from seller, Colonial Realty Limited Partnership, Stern and Safrin promised to Amusement: 1) - that the $13 million contribution was necessary for completion of the property portfolio, and 2) - Amusement's $13 million contribution would be entirely used for that purchase with any excess placed into the property portfolio by providing such to the owning entity.  Amusement accepted these representations when on that same day of June 29, 2007, Amusement wrote to Stern and Safrin on June 29, 2007 stating that Stern and Safrin would only need to use about $9 million of Amusement's $13 million towards acquisition of the property portfolio thus leaving about $4 million excess remaining for retention in the property portfolio purchasing entity as promised.  Thus a contract was formed on June 29, 2007 between Amusement and these defendants containing these terms originally represented by these defendants.

177.   On about July 12, 2007 Stern and Safrin breached their contract with Amusement promising to retain Amusement's excess within the property portfolio at closing, when upon First Republic LLC's acquisition of the property portfolio on July 12, 2007 by Stern's and Safrin's use of Amusement's $13 million contribution, Stern and Safrin did not retain the about $4 million excess in First Republic LLC.  Instead, Stern and Safrin took Amusement's about $4 million excess for themselves to pay their personal expenses and personal creditors, thus violating their contractual promise to Amusement.

56

178.   Upon information and belief, the portion of Amusement's contribution used to pay Stern's and Safrin's personal creditors included payment to the following persons and entities:

179.   Carruthers & Roth; Young Conaway Starrgatt & Taylor; Odin Feldman Pittleman; Young Conaway; Starrgatt & Taylor; Cavazos Hendricks & Poirot, PC; Buchanen Ingersol; Herrick Feinstein; Mary Stark; Frank Dwyer; NRAI Entity Services; Burr Forman; Parker Hudson Rainer; Bruce Minsky; Prudential Douglas Elliman; GAMC IPG; Ace Capital Group; Hoffinger Stern & Ross; Eisenpress and Reiss; and Roman Associates, LTD.

180.   As a direct and proximate result of Stern's and Safrin's breach of contract, Amusement was induced to provide about $4 million more than necessary for Stern's and Safrin's acquisition of the property portfolio, and Stern and Safrin wrongly acquired about $4 million of Amusement's funds for their personal use in contravention of their promise not to do so.  Amusement has been damaged by loss of at least $4 million, the exact sum to be proven at time of trial, plus interest at the legal rate from the date of breach of July 12, 2007.

181.   The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged.  Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

## SEVENTEENTH CAUSE OF ACTION
### (FRAUD IN THE INDUCEMENT – AGAINST STERN & SAFRIN (REGARDING ABILITY TO REFINANCE))

182.   Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

57

183.    The terms of the loan agreements between Citibank and borrowers ("Citibank loan agreements") were known by, and were in the possession of, Stern and Safrin, but were not disclosed to, not known by and were not in the possession of plaintiffs through July 13, 2007. Thus Amusement was unaware of loan terms between Citibank and the borrowers up through Frenkel's and Land Escrow's unauthorized release of Amusement's $13 million escrowed funds.

184.    On about June 29, 2007, Stern and Safrin disclosed to Amusement by email sent that date, through Friedman, that the Citibank debt upon the property portfolio would be about $126 million and that the property portfolio had a market value of about $190 million, so that equity of about $64 million existed from which repayment to Amusement would occur.

185.    Based on these disclosed financials, to induce Amusement's $13 million contribution to Stern's and Safrin's acquisition of the property portfolio, Stern and Safrin represented by email, through Friedman, to Allen Alevy of Amusement on about June 29, 2007,  and again by emails between these parties of about July 11, 2007 as detailed above, that: 1) - there would be a defined time in which Amusement would receive return of its $13 million contribution, 2) - this defined time would be 60 days from closing of the property portfolio purchase, and 3) - since Safrin and Stern lacked sufficient personal funds to repay Amusement's $13 million contribution within 60 days, repayment would occur by these defendants' removal of equity from the property portfolio through refinance of the Citibank loan within the 60 day repayment period.

186.    The promissory notes signed by Stern both contained 60 day terms from closing to reflect this promise that 60 days from closing the Citibank loan encumbering the

property portfolio would be refinanced by these defendants to obtain the funds necessary to pay Amusement.

187.    Further, Stern and Safrin performed the terms of their promise by their post-closing attempts to refinance the Citibank loan that encumbered the property portfolio after July 12, 2007.

188.    Notwithstanding these post-July 12, 2007 attempts by Stern and Safrin to pull equity out of the property portfolio in attempted repayment of Amusement, these defendants' prior material representations that return of Amusement's $13 million contribution within 60 days of closing was possible based upon payoff and refinance of the Citibank loan was false, and Stern and Safrin knew this representation to be false when made.  In fact, known to Stern and Safrin but unknown to Plaintiffs, the Citibank loan agreements in these defendants' possession precluded any payoff and refinance of the Citibank debt secured by the property portfolio within the first 180 days after July 12, 2007, and also precluded placement of additional debt upon the property portfolio, and thus precluded removal of equity from the property portfolio to repay Amusement its $13 million investment within 60 days of July 12, 2007.

189.    Stern's intent within his $13 million and $15 million promissory notes that equity from the property portfolio could be and would be procured within 60 days of July 12, 2007 to pay those notes was thus also false.

190.    Stern and Safrin had a duty to disclose to investor, Amusement, that the repayment terms offered to Amusement by these defendants were in fact at least possible and not impossible as was the case.  These defendants and Amusement were to be business partners together owning and operating the property portfolio once purchased.  Thus these

59

defendants knowingly, maliciously and wrongly concealed the material fact from Plaintiffs

that Citibank would not allow the refinance of the debt secured by the property portfolio for

an initial 180 days from July 12, 2007, so that equity within the property portfolio could not

be tapped within 60 days of July 12, 2007 as promised by Stern and Safrin.

191.    Plaintiffs reasonably and justifiably relied upon the false representation of 60

day loan refinance as the funding source to repay Amusement's $13 million investment, and

to pay the promissory notes signed by Stern, as Amusement would not have provided its $13

million to Stern and Safrin for acquisition of the property portfolio unless the property

portfolio, with its equity, could be tapped within a short 60 day time to return at least $13

million to Amusement.

192.    As a direct and proximate result of Stern's and Safrin's false promise and

concealment, Amusement was induced to provide $13 million for a promised investment

return within 60 days of closing. With Stern's and Safrin's concealed material knowledge

that 60 day refinance of the Citibank loan was impossible, Stern and Safrin could not and

did not use equity from the property portfolio to repay Amusement any sum within 60 days

of July 12, 2007. Amusement has thus been damaged by the sum of at least $13 million, the

exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

193.    In making the false promise with concealment described above that

Amusement would see return of its investment in 60 days from equity taken from the

property portfolio, Amusement was induced to provide $13 million to Stern and Safrin.

Thus Stern and Safrin acted with oppression, fraud and malice, for having used their

concealed knowledge to falsely promise to Amusement that it would be repaid its

investment within 60 days of July 12, 2007 based on equity available from the property

portfolio. Stern and Safrin thus targeted Amusement for harm, so that these defendants would not lose their opportunity to purchase the property portfolio, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

### EIGHTEENTH CAUSE OF ACTION
(NEGLIGENT MISREPRESENTATION – AGAINST STERN & SAFRIN)
(REGARDING ABILITY TO REFINANCE)

194.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

195.    In the alternative to the 17th cause of action above, if Stern and Safrin did not know the falsity of their material representation concerning source of repayment and did not intentionally conceal from plaintiffs the fact of 180 day repayment lockout by Citibank of its debt encumbered by the property portfolio, these defendants should have known that their representation that the property portfolio would be the repayment source by refinance of the Citibank loan within 60 days of July 12, 2007, was a false promise, not possible to perform, at variance with Citibank loan agreements.

196.    Stern's and Safrin's false representation if not made knowingly was made recklessly and negligently, without due regard for the truth of the asserted ability to refinance equity out of the property portfolio in 60 days, because Stern and Safrin were parties to, and in control and possession of, the Citibank loan documents which indicated by its 180 day lockout term that a contemplated 60 day repayment period from property portfolio equity was not possible.

197.    Plaintiffs requested but did not receive the Citibank loan documents which contained the 180 day lockout term, and thus as these defendants were to be partners with Amusement in ownership and management of the property portfolio, these defendants owed a duty to Amusement to provide requested loan agreements that could impact the business

61

relationship. Had plaintiffs known of the 180 day lockout of Citibank loan refinance prior to July 12, 2007, Amusement would not have provided its $13 million to Stern and Safrin for acquisition of the property portfolio so that Amusement would have recalled its funds from Land Escrow and Frenkel. Therefore, plaintiffs reasonably and justifiably relied upon the mistaken representation of 60 day loan refinance as the funding source to repay Amusement's $13 million contribution.

198.    As a direct and proximate result of Stern's and Safrin's false promise negligently made, Amusement was induced to provide and did in fact provide its $13 million contribution to Stern and Safrin for acquisition of the property portfolio. Amusement has thus been damaged by the sum at least $13 million, the exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

## NINETEENTH CAUSE OF ACTION
### (FRAUD - INDUCEMENT OF ESCROW – AGAINST STERN & SAFRIN)
### (REGARDING CONSENT TO RELEASE FUNDS FROM ESCROW)

199.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

200.    Amusement wired $13 million to escrow for the benefit of Stern and Safrin, pending negotiation of and entry into a final payment and security agreement between Amusement and Stern / Safrin. Amusement's instruction to escrow to await its authorization to release its previously wired $13 million to Stern and Safrin for their use and benefit, was based upon ongoing negotiations that continued between Amusement and Stern / Safrin that as of July 12, 2007 when escrow released Amusement's funds to Stern and Safrin, and Stern and Safrin used those funds, had not led to a final payment and security agreement between Amusement and Stern / Safrin satisfactory to Amusement.

201.    Prior to and including July 12, 2007, various proposals and drafts of the

Amusement - Stern / Safrin payment and security agreements went back and forth between

the parties, but no final payment and security agreements acceptable to Amusement had

been reached or provided.  Thus, Amusement reasonably did not provide its authorization,

through Allen Alevy or Allen Sragow, to escrow to release Amusement's $13 million to

Stern and Safrin.

202.    Notwithstanding this lack of a negotiated final payment and security

agreement between Amusement and Stern / Safrin, and notwithstanding Amusement's lack

of authorization to escrow to release funds to Stern and Safrin, Stern and Safrin on about

July 12 and 13, 2007 without Plaintiffs' knowledge or consent, falsely misrepresented to

Steven Alevy, not authorized release agent of Amusement, and to Frenkel and Land Escrow,

that a final payment and security agreement between Amusement and Stern / Safrin had

been reached and thus it was now permitted for Land Escrow and Frenkel to release

Amusement's escrowed $13 million to Stern and Safrin.  Stern and Safrin thus concealed the

truth from Land Escrow, Frenkel and Steven Alevy that in fact no final payment and

security agreements acceptable to Amusement had been reached.

203.    Land Escrow and Frenkel released Amusement's $13 escrowed million on

about July 12, 2007, based at least in part upon and in reliance upon Stern's and Safrin's

false, material representation that a final payment and security agreement had been reached

by them with Amusement.  Land Escrow and Frenkel would not have released Amusement's

$13 million on July 12, 2007, to Amusement's detriment, without having received Stern's

and Safrin's false representation.

204.    As a direct and proximate result of Stern's and Safrin's fraud and concealment upon Land Escrow and Frenkel, Amusement's escrowed $13 million was taken from Amusement without permission or authorization, so that a theft occurred whereby Stern and Safrin stole Amusement's escrowed funds without finalizing payment and security agreements with Amusement.  Amusement has thus been damaged in the sum of at least $13 million, the exact sum to be proven at time of trial.

205.    In making the false promises described above to convince Land Escrow and Frenkel to release Amusement's $13 million to Stern and Safrin, before terms agreed by Stern and Safrin with Amusement could be memorialized in legally binding writings, Stern and Safrin acted with oppression, fraud and malice.  Stern and Safrin knew that Amusement had not yet received written memorialization of agreed upon terms for Amusement's investment in the property portfolio purchase, and yet Stern and Safrin nevertheless falsely claimed to Land Escrow, Frenkel and Steven Alevy, to induce release of Amusement funds by Land Escrow and Frenkel, that Amusement had received agreements from Stern, Safrin and First Republic LLC containing agreed upon terms with Amusement.  Amusement was harmed by the early and unauthorized release of its funds from Land Escrow and Frenkel wrongly induced by Stern and Safrin, and Amusement is therefore entitled to punitive damages in an amount to be established at time of trial.

## TWENTIETH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION - INDUCEMENT OF ESCROW -- AGAINST STERN & SAFRIN) (REGARDING CONSENT TO RELEASE FUNDS FROM ESCROW)

206.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

64

207.    In the alternative to the 19th cause of action above, if Stern and Safrin did not know the falsity of their representation concerning the finality of agreements with plaintiffs concerning escrowed funds, and did not intentionally trick Frenkel and Land Escrow to release Amusement's escrowed funds based on the fact that there did not yet exist any final agreement with plaintiffs concerning its escrowed funds, these defendants should have known that their representation to Frenkel and Land Escrow that the final agreements with plaintiffs concerning the escrowed funds was false, since no final agreements in fact had been reached and executed between plaintiffs and these defendants.

208.    Stern's and Safrin's false representation to Frenkel and Land Escrow if not made knowingly was made recklessly and negligently, without due regard for the truth of the assertion that final agreements had been reached and executed between these defendants and plaintiffs and thus the escrowed funds could be released, because these defendants' prepared and provided the agreements with plaintiffs that were provided to plaintiffs.

209.    Prior to and including July 12, 2007, various proposals and drafts of the Amusement - Stern / Safrin payment and security agreements went back and forth between the parties, but no final payment and security agreements acceptable to Amusement had been reached or provided.  Thus, Amusement reasonably did not provide its authorization, through Allen Alevy or Allen Sragow, to escrow to release Amusement's $13 million to Stern and Safrin, and these defendants should have recognized this lack of final agreement between the parties.

210.    Notwithstanding this lack of a negotiated final payment and security agreement between Amusement and Stern / Safrin, and notwithstanding Amusement's lack of authorization to escrow to release funds to Stern and Safrin, Stern and Safrin on about

July 12 and 13, 2007 without Plaintiffs' knowledge or consent, negligently yet falsely misrepresented to Steven Alevy, not authorized release agent of Amusement, and to Frenkel and Land Escrow, that a final payment and security agreement between Amusement and Stern / Safrin had been reached and thus it was now permitted for Land Escrow and Frenkel to release Amusement's escrowed $13 million to Stern and Safrin. Stern and Safrin thus negligently ignored the truth from Land Escrow, Frenkel and Steven Alevy that in fact no final payment and security agreements acceptable to Amusement had been reached.

211.    Land Escrow and Frenkel released Amusement's $13 escrowed million on about July 12, 2007, based at least in part upon and in reliance upon Stern's and Safrin's negligent yet false representation that a final payment and security agreement had been reached by them with Amusement. Land Escrow and Frenkel would not have released Amusement's $13 million on July 12, 2007, to Amusement's detriment, without having received Stern's and Safrin's negligent yet false representation.

212.    As a direct and proximate result of Stern's and Safrin's negligent misrepresentation to Steven Alevy, Land Escrow and Frenkel, Amusement's escrowed $13 million was taken from Amusement without permission or authorization, so that a theft occurred whereby Stern and Safrin stole Amusement's escrowed funds without finalizing payment and security agreements with Amusement. Amusement has thus been damaged in the sum of at least $13 million, the exact sum to be proven at time of trial, plus any and all prejudgment interest allowed by law.

## TWENTY-FIRST CAUSE OF ACTION
(FRAUD - CONCEALMENT AND FALSE PROMISE, AGAINST STERN,
SAFRIN & FIRST REPUBLIC LLC)
(REGARDING ABILITY TO TRANSFER AND/OR PLEDGE ASSETS)

213.    Plaintiffs replead and reallege each and every allegation stated in the

foregoing paragraphs of this Complaint as if stated in full herein.

214.    From about July 9, 2007 through July 13, 2007, while Stern/Safrin and

Amusement were negotiating a final ownership and security agreement between them, and

exchanging drafts of same, Amusement requested from Stern, Safrin, First Republic LLC

and Friedman copies of the Citibank loan agreements and the LLC operating agreements for

Stern's and Safrin's ownership structure of the property portfolio, in order to confirm that the

ownership and security structure for Amusement proposed by Stern, Safrin and First

Republic LLC was in compliance with those agreements as represented by Stern, Safrin and

First Republic LLC.  Neither Friedman, First Republic LLC, Stern nor Safrin provided any

such requested agreements to Amusement.

215.    Instead, Stern, Safrin and First Republic LLC represented to Amusement on

about July 11, 2007 that its proposed ownership and security structure for Amusement,

which included the assignments of LLC membership interests signed by Stern and Safrin

and grant deeds in the portfolio properties provided by First Republic LLC, sufficiently

protected Amusement by providing Amusement with secured ownership of Stern's and

Safrin's property portfolio ownership structure, as well as with secured ownership of the

eleven properties within the property portfolio itself, in the event that Stern, Safrin and First

Republic LLC defaulted on their payment and ownership obligations to Amusement due

September 10, 2007, including in the event that Stern alone defaulted on his promissory note

obligations of $13 million and/or $15 million to Practical Finance (as assignee) also due September 10, 2007.

216. Thus at the same time that Stern, Safrin and First Republic LLC concealed from Plaintiffs the Citibank loan agreements and the LLC operating agreements for Stern's and Safrin's intended ownership structure of the property portfolio, Stern, Safrin and First Republic LLC provided Plaintiffs with an ownership and security structure that violated those loan agreements and LLC operating agreements. Stern, Safrin and First Republic LLC not only never disclosed to Plaintiffs this violation of loan agreements and LLC operating agreements, but also never disclosed to Plaintiffs that these violations negatively impacted the validity of the provided assignments of LLC membership interests and grant deeds.

217. These representations by Stern, Safrin and First Republic LLC were false, and these defendants knew them to be false when made, since the requested LLC operating agreements and Citibank loan agreements, not known to or provided to Plaintiffs but known to and in the possession of these defendants, contained various transfer restrictions which made Stern's and Safrin's assignments of LLC membership interests and First Republic LLC's grant deeds potentially if not actually invalid and void.

218. In addition to the concealment of Stern, Safrin and First Republic LLC, these defendants affirmatively represented to Plaintiffs on about July 11, 2007, as detailed above, that the assignments of LLC membership interests and grant deeds provided to Plaintiffs were valid and enforceable, when in fact this representation was false and known to be false based on the same transfer restrictions of the LLC operating agreements in the property portfolio ownership structure and Citibank loan agreements known only to these defendants but not to Plaintiffs.

68

219.    In addition to the concealment of Stern, Safrin and First Republic LLC, these defendants affirmatively represented to Plaintiffs on about July 11, 2007, as detailed above, that the assignments of LLC membership interests signed and provided from Stern and Safrin to Amusement gave Amusement 100% ownership in First Republic LLC and its subordinate LLC members, when fact this representation was false and known to be false, because Avery Egert was a co-owner of JSAE Colonial LLC with Safrin. Since these defendants did not provide any assignment of LLC membership interests from Avery Egert, these defendants did not provide 100% ownership in JSAE Colonial LLC and upstream LLC entities as represented, even if the provided Stern and Safrin assignments of LLC membership interests were and are valid and enforceable.

220.    Plaintiffs reasonably and justifiably relied upon these concealments and false promises, by in belief of such concealment and false promises Amusement left its $13 million in escrow to enable acquisition of the property portfolio, while without such concealment and false promises Plaintiffs would have before closing learned of the probable invalidity of the ownership and security structure provided by these defendants, so that Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and suffered no monetary loss.

221.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's fraud and concealment, Plaintiffs received the equivalent of an unenforceable receipt from Stern, Safrin and First Republic LLC when these defendants took Amusement's $13 million escrowed funds for their benefit. Plaintiffs never received ownership and security agreements which would be legally valid to provide Plaintiffs with at least 50% ownership of the property portfolio plus return of Amusement's $13 million investment, as intended by

the parties and as promised by Stern, Safrin and First Republic LLC. Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the property portfolio not provided or received, plus $13 million not repaid, the exact sums to be proven at time of trial.

222.    Stern, Safrin and First Republic LLC intentionally concealed operational and loan documents from Plaintiffs, while at the same time they affirmatively represented to Plaintiffs that the provided ownership and security agreements were valid and enforceable to provide actual ownership and actual security in the property portfolio to Plaintiffs, and thus Stern, Safrin and First Republic LLC acted with oppression, fraud and malice to intentionally harm Plaintiffs. Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

### TWENTY-SECOND CAUSE OF ACTION
(NEGLIGENT MISREPRESENTATION AGAINST STERN,
SAFRIN & FIRST REPUBLIC LLC)
(REGARDING ABILITY TO TRANSFER AND/OR PLEDGE ASSETS)

223.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

224.    In the alternative to the 16th cause of action above, if Stern, Safrin and First Republic LLC did not know the falsity of their representations and did not intentionally conceal that the ownership and security structure, including the assignments of LLC membership interests and grant deeds, that these defendants provided to plaintiffs failed to comply with various transfer restrictions of the LLC operating agreements and Citibank loan agreements, as alleged in the 16th cause of action above, these defendants should have known that their representation and concealment were material and false.

70

225.    These defendants' false representation and material concealment if not made knowingly was made recklessly and negligently, without due regard for the truth of the probable validity of the assignments of LLC membership interests and grant deeds provided to plaintiffs.  These defendants were negligent because they were in control and possession of the Citibank loan documents and LLC operating agreements which would have indicated that the ownership and security structure provided to plaintiffs was not necessarily and probably valid and enforceable as represented by these defendants.

226.    Plaintiffs reasonably and justifiably relied upon the mistaken representation that the ownership and security structure provided to plaintiffs was necessarily and probably valid and enforceable and not at variance with the governing LLC operating agreements and Citibank loan agreements, because plaintiffs requested but did not receive the Citibank loan documents and LLC operating agreements which unknown to plaintiffs contained the transfer restrictions.  Had plaintiffs known of the transfer restrictions as should have been disclosed by these defendants, Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and so would have suffered no monetary loss.

227.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's false promise and concealment negligently made, Plaintiffs received the equivalent of an unenforceable receipt from Stern, Safrin and First Republic LLC when these defendants took Amusement's $13 million escrowed funds for their benefit.  Plaintiffs never received ownership and security agreements which would be legally valid to provide Plaintiffs with at least 50% ownership of the property portfolio plus return of Amusement's $13 million investment, as intended by the parties and as promised by Stern, Safrin and First Republic LLC.  Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the

property portfolio not provided or received, plus $13 million not repaid, the exact sums to be proven at time of trial.

## TWENTY-THIRD CAUSE OF ACTION
(FRAUD - FALSE PROMISE, AGAINST STERN,
SAFRIN & FIRST REPUBLIC LLC)
(REGARDING DELIVERY OF PARTNERSHIP AGREEMENT)

228.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

229.    Stern, Safrin and First Republic LLC also represented to Amusement on about July 11, 2007 that even if its proposed ownership and security structure for Amusement, which included the assignments of LLC membership interests signed by Stern and Safrin and grant deeds in the portfolio properties provided by First Republic LLC, did not provide Amusement with its contractually promised 50% ownership interest in the property portfolio and secured repayment of Amusement's $13 million investment in the property portfolio plus a $2 million upward adjustment, these defendants agreed to draft and provide replacement or additional ownership and security agreements post-closing of First Republic LLC's purchase of the property portfolio, to place Amusement securely into the promised positions.

230.    After First Republic LLC's purchase of the property portfolio closed on July 12, 2007, these defendants have provided no replacement or additional ownership and security agreements of any kind concerning the property portfolio.

231.    As a result, in the event that Stern's and Safrin's assignments of LLC membership interests and First Republic LLC's grant deeds are invalid and void and/or do not provide Amusement with its contractually promised 50% ownership interest in the property portfolio and secured repayment of Amusement's $15 million investment with

72

upward adjustment, then these defendants' promise to provide Amusement with replacement or additional ownership and security agreements after July 12, 2007 was false and known by these defendants to be false.

232.    Plaintiffs reasonably and justifiably relied upon this material false promise to post-closing cure the provided ownership and security structure to match the agreement between the parties, by in belief of such false promise Amusement left its $13 million in escrow to enable acquisition of the property portfolio, while without such false promise Amusement would have pulled its $13 million back from escrow prior to July 12, 2007 and suffered no monetary loss.

233.    As a direct and proximate result of Stern's, Safrin's and First Republic LLC's fraud, Amusement left its $13 million contribution in escrow to its detriment when the money was taken without authorization on July 12, 2007. In return, Plaintiffs have not received replacement or additional ownership and security agreements post-July 12, 2007 to place Amusement securely into the contractually promised positions. Plaintiffs have been damaged in a sum equal to the value of 50% ownership of the property portfolio not provided or received, plus at least $13 million not paid, the exact sums to be proven at time of trial.

234.    Stern, Safrin and First Republic LLC falsely promised to place Plaintiffs in their contractually promised positions, even if it meant doing so after First Republic LLC's purchase of the property portfolio on July 12, 2007. These defendants have not done so, and thus Stern, Safrin and First Republic LLC acted with oppression, fraud and malice to intentionally harm Plaintiffs. Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

## TWENTY-FOURTH CAUSE OF ACTION
### (CONVERSION, AGAINST STERN & SAFRIN)

235.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

236.    All of these allegations are irrelevant and too detailed. Only need to say that Stern/Safrin obtained release of Amusement's property without authority or justification. No need for reps, agreements etc. The condition precedent to release was not a final deal – it was permission from Alevy or Sragow. On and before July 12, 2007 when Stern and Safrin falsely represented to Steven Alevy, Frenkel and Land Escrow that a final and agreed ownership and security arrangement Plaintiffs and Stern / Safrin had been reached, Stern and Safrin made such a false representation to wrongly obtain and receive, without Plaintiffs' permission or consent, Amusement's escrowed $13 million.

237.    These defendants' representations regarding the conclusion of a final arrangement between Plaintiffs and Stern / Safrin were false, since Plaintiffs were still reviewing proposals and documents, and were in fact still negotiating with Stern / Safrin to reach a final ownership, payment and security structure that would better protect Plaintiffs' contractually agreed interests.

238.    As a direct and proximate result of Stern's and Safrin's misrepresentations, they or their chosen payee obtained Amusement's escrowed $13 million without authorization from Amusement, and thus stole Amusement's escrowed funds.

239.    Plaintiffs have made demand upon Stern and Safrin for return of the sums taken by them from Amusement being held by Frenkel and Land Escrow, but Stern and Safrin have failed and refused to return such sums.

74

240.    These defendants' acts to induce Frenkel and Land Escrow to release

Amusement's $13 million without authorization were willful, wanton, malicious, and

oppressive in that these defendants lied about the status of their arrangement with plaintiffs

to reach and obtain Amusement's escrowed funds, knowing that Amusement lacked a final

arrangement with these defendants and so Amusement justifiably would not release its

escrowed funds to these defendants, thus justifying an award of punitive and exemplary

damages against these defendants.

241.    The amount of money due plaintiffs from defendants is unknown and cannot

be ascertained without an accounting of the funds utilized in all aspects of the transactions

described or the wrongs alleged.  Plaintiffs have demanded this information but defendants

have failed and refused to provide the same.

### TWENTY-FIFTH CAUSE OF ACTION
(CONSPIRACY TO COMMIT CONVERSION AND FRAUD – AGAINST STERN,
SAFRIN, FRENKEL & LAND ESCROW)

242.    Plaintiffs replead and reallege each and every allegation stated in the

foregoing paragraphs of this Complaint as if stated in full herein.

243.    Once Amusement wired its $13 million to Land Escrow and Frenkel on about

June 29, 2007, Stern, Safrin, Frenkel and Land Escrow conspired and agreed, without

Plaintiffs' knowledge or consent, to take Amusement's escrowed funds and provide them to

Stern and Safrin, or to their chosen payee, to be used for their benefit, even if no final

arrangement and structure between Stern / Safrin and Plaintiffs existed governing the use

and repayment of the escrowed $13 million or governing Amusement's ownership interest in

the property portfolio.

75

244.    This conspiracy to defraud and to convert Amusement's escrowed funds to the detriment of Plaintiffs was in fact performed resulting in actual harm to Plaintiffs, as described and detailed in causes of action 11, 12, 15 and 18 above.

245.    As a direct and proximate result of Stern's, Safrin's, Frenkel's and Land Escrow's conspiracy to commit conversion and fraud, they or their chosen payee obtained Amusement's escrowed $13 million without authorization from Amusement, and thus stole Amusement's escrowed funds.

246.    Plaintiffs have made demand upon Stern, Safrin, Frenkel and Land Escrow for return of the sums taken by them from Amusement being held by Frenkel and Land Escrow, but these defendants have failed and refused to return such sums.

247.    These defendants' acts to ensure that Frenkel and Land Escrow released Amusement's $13 million without authorization were willful, wanton, malicious, and oppressive in that these defendants knew the true unfinished status of Plaintiffs' arrangement with Stern and Safrin precluding them from lawfully obtaining Amusement's escrowed funds at that time.  These defendants knew that Amusement lacked a final arrangement with Stern and Safrin and so justifiably Amusement would not release its escrowed funds to Stern and Safrin by July 12, 2007, thus justifying an award of punitive and exemplary damages against these defendants.

### TWENTY-SIXTH CAUSE OF ACTION
(UNJUST ENRICHMENT AGAINST STERN, SAFRIN, FIRST REPUBLIC LLC, FRENKEL & LAND ESCROW)

248.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

249.    On July 12, 2007, Stern, Safrin, First Republic LLC, Frenkel and Land Escrow knowingly and unlawfully accessed and obtained for their benefit, without Plaintiffs'

knowledge or consent, Amusement's $13 million escrowed funds, even though all these defendants were aware that no final arrangement and structure existed between Stern, Safrin and First Republic LLC with Plaintiffs that permitted the release of any part of Amusement's escrowed $13 million, and even though all these defendants were aware that Amusement had not provided authorization for release of its escrowed funds.

250.    At all relevant times herein, and continuing to the present, Amusement has and continues to have a legal and contract interest in the $13 million that it escrowed with Frenkel and Land Escrow, which sum was improperly taken by these defendants.

251.    On or about July 12, 2007 these defendants wrongly obtained the benefit of the escrowed $13 million.

252.    As a direct and proximate result of these defendants' wrongful conduct, have been and continue to be unjustly enriched by the wrongful withdrawal and receipt by them of any portion of Amusement's $13 million formerly escrowed with Frenkel and Land Escrow, which is money that these defendants know and have been advised is not money for their benefit, but is money escrowed pending finalization of an arrangement between plaintiffs and Stern, Safrin and First Republic LLC which satisfies the contractually agreed promises reached between the parties.

253.    These defendants have failed to pay or compensate plaintiffs any amount whatsoever since the beginning of their wrongful conduct.

254.    The fair and reasonable value of plaintiffs' loss as a result of these defendants' wrongful withdrawal is the sum of $13 million.

255.    By reason of such conduct, these defendants hold the money and other benefits which they have received from their wrongful withdrawal as constructive trustees

for Plaintiffs. Plaintiffs are therefore entitled to a judicial declaration that these defendants are constructive trustees of Plaintiffs, so that Plaintiffs are entitled to a court order that these defendants convey all such monies and other benefits to Plaintiffs.

256.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

### TWENTY-SEVENTH CAUSE OF ACTION
(BREACH OF FIDUCIARY DUTY AGAINST STERN,
SAFRIN AND FIRST REPUBLIC LLC)

257.    Plaintiffs replead and reallege each and every allegation stated in the foregoing paragraphs of this Complaint as if stated in full herein.

258.    At all times herein mentions, Defendants Stern and Safrin were incorporators, officers, directors, managers, or the like of First Republic LLC.

259.    In acting as described above, Defendants Stern and Safrin did not exercise the care required of them in that they took Amusement's money without providing Amusement with any of the benefits promised to them as investors, i.e. ownership, profit, and reimbursement rights.

260.    As a direct and proximate result of these acts of Defendants Stern and Safrin, Plaintiffs have suffered damages in an amount to be determined by the trier of fact.

261.    Further, defendants acted with oppression, fraud and malice to intentionally harm Plaintiffs. Plaintiffs are therefore entitled to punitive damages in an amount to be established at time of trial.

262.    The amount of money due plaintiffs from defendants is unknown and cannot be ascertained without an accounting of the funds utilized in all aspects of the transactions

described or the wrongs alleged. Plaintiffs have demanded this information but defendants have failed and refused to provide the same.

WHEREFORE, Plaintiffs pray for judgment against all Defendants as follows:

A.    AS TO THE FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF AS TO OWNERSHIP OF DEEDS AND LLC INTERESTS, AGAINST STERN, SAFRIN:

    1.    A declaration that Amusement owns First Republic LLC and owns the eleven portfolio properties formerly owned by First Republic LLC, and that Practical Finance as assignee is owed sums of money pursuant to promissory notes signed by Stern.

B.    AS TO THE SECOND CAUSE OF ACTION FOR QUIET TITLE AS TO REAL PROPERTY, AGAINST FIRST REPUBLIC GROUP REALTY LLC:

    1.    For judgment quieting Plaintiff's title to the property against Defendants;

    2.    For all applicable statutory penalties; and

    3.    For damages in a sum to be proven at time of trial.

C.    AS TO THE THIRD CAUSE OF ACTION FOR QUIET TITLE AS TO PERSONAL PRIOPERTY, AGAINST FIRST REPUBLIC GROUP REALTY LLC:

    1.    For judgment quieting Plaintiff's title to the property against Defendants;

    2.    For all applicable statutory penalties; and

    3.    For damages in a sum to be proven at time of trial.

D.    AS TO THE FOURTH CAUSE OF ACTION FOR JUDICIAL FORECLOSURE OF REAL PROPERTY:

    1.    Against Defendant, damages in the sum of the principal, together with interest to date of Entry of Judgment, together with such other additional sums as may be due;

    2.    A decree of judicial foreclosure against the Defendant FRG Realty and a deficiency judgment against Defendant FRG Realty;

3. Adjudging that Defendant FRG Realty's rights, claims, ownership, liens, titles and demands are subsequent to and subject to the lien of Plaintiffs' security rights;

4. Adjudging that Plaintiffs' security rights be foreclosed, that the usual judgment be made for the sale of the SUBJECT REAL PROPERTY according to law, that the proceeds of the sale be applied in payment of all amounts due to Plaintiff, and that the Defendant FRG Realty and all parties and/or persons claiming through them or any of them, whether as lien claimants, judgment creditors, claimants under a junior deed of trust, purchasers, each, or otherwise, be barred and foreclosed from all rights, claims, interests or equity of redemption in the SUBJECT REAL PROPERTY and personal property and other property described in the Security Agreement and every part thereof when time for redemption has elapsed; and

5. Permitting Plaintiffs or any parties to this action to become a purchaser at the foreclosure sale.

E. AS TO THE FIFTH CAUSE OF ACTION FOR JUDICIAL FORECLOSURE OF PERSONAL PROPERTY:

1. A decree of judicial foreclosure against the Defendants Stern and Safrin and a deficiency judgment against Defendants Stern and Safrin;

2. Adjudging that Defendants Stern and Safrin's rights, claims, ownership, liens, titles and demands are subsequent to and subject to the lien of Plaintiffs' security rights;

3. Adjudging that Plaintiffs' security rights be foreclosed, that the usual judgment be made for the sale of the SUBJECT LLC MEMBERSHIP INTERESTS according to law, that the proceeds of the sale be applied in payment of all amounts due to Plaintiffs, and that the Defendants Stern and Safrin and all parties and/or persons claiming through them or any of them, whether as lien claimants, judgment creditors, claimants under a junior deed of trust, purchasers, each, or otherwise, be barred and foreclosed from all rights, claims, interests or equity of redemption in the SUBJECT LLC MEMBERSHIP INTERESTS and every part thereof when time for redemption has elapsed; and

4. Permitting Plaintiff or any parties to this action to become a purchaser at the foreclosure sale.

F. AS TO THE SIXTH CAUSE OF ACTION FOR BREACH OF PROMISE TO REPAY INVESTMENT AGAINST STERN, SAFRIN AND FIRST REPUBLIC LLC:

80

     1.     For damages allowed by law, the exact sum to be proven at time of trial.

G.     AS TO THE SEVENTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST MARK STERN -- $13,000,000 PROMISSORY NOTE:

     1.     For damages allowed by law, the exact sum to be proven at time of trial.

H.     AS TO THE EIGHTH CAUSE OF ACTION FOR SPECIFIC PERFORMANCE OF PROMISE TO PROVIDE 50% PARTNERSHIP:

     1.     For a decree ordering Defendants to transfer 100% of their interest in the entities and the subject real property to a partnership 50% owned by Plaintiffs.

I.     AS TO THE NINTH CAUSE OF ACTION FOR BREACH OF CONTRACT TO PROVIDE 50% PARTNERSHIP:

     1.     For damages allowed by law, the exact sum to be proven at time of trial; and

     2.     For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

J.     AS TO THE TENTH CAUSE OF ACTION FOR BREACH OF CONTRACT AGAINST MARK STERN - $15,000,000 PROMISSORY NOTE:

     1.     For damages allowed by law, the exact sum to be proven at time of trial.

K.     AS TO THE ELEVENTH CAUSE OF ACTION FORSPECIFIC PERFORMANCE OF PROMISE TO PROVIDE 100% PARTNERSHIP:

     1.     For a decree ordering Defendants to transfer 100% of their interest in the entities and the subject real property to a partnership wholly owned by Plaintiffs.

L.     AS TO THE TWELFTH CAUSE OF ACTION FOR BREACH OF CONTRACT TO PROVIDE 100% PARTNERSHIP:

     1.     For damages allowed by law, the exact sum to be proven at time of trial; and

2.  For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

M.  AS TO THE THIRTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT (ESCROW) CONTRACT AGAINST EPHRAIM FRENKEL AND LAND TITLE ASSOCIATES:

1.  For damages allowed by law, the exact sum to be proven at time of trial.

N.  AS TO THE FOURTEENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY AGAINST EPHRAIM FRANKEL AND LAND TITLE ASSOCIATES:

1.  For damages allowed by law, the exact sum to be proven at time of trial; and

2.  For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

O.  AS TO THE FIFTEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING NEED FOR $13M:

1.  For damages allowed by law, the exact sum to be proven at time of trial;

2.  For exemplary and punitive damages to be proven at time of trial;

3.  For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting; and

4.  As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

P.  AS TO THE SIXTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT REGARDING USE OF $13M:

1.  For damages allowed by law, the exact sum to be proven at time of trial; and

2.  For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

Q.   AS TO THE SEVENTEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING ABILITY TO REFINANCE:

1.   For damages allowed by law, the exact sum to be proven at time of trial;

2.   For exemplary and punitive damages to be proven at time of trial; and

3.   As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

R.   AS TO THE EIGHTEENTH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION REGARDING ABILITY TO REFINANCE:

1.   For damages allowed by law, the exact sum to be proven at time of trial.

S.   AS TO THE NINETEENTH CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING AMUSEMENT'S CONSENT TO RELEASE OF $13M FROM ESCROW:

1.   For damages allowed by law, the exact sum to be proven at time of trial; and

2.   For exemplary and punitive damages to be proven at time of trial.

T.   AS TO THE TWENTIETH CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION REGARDING AMUSEMENT'S CONSENT TO RELEASE OF $13M FROM ESCROW:

1.   For damages allowed by law, the exact sum to be proven at time of trial.

U.   AS TO THE TWENTY FIRST CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION REGARDING ABILITY TO TRANSFER OR PLEDGE ASSETS:

1.   For damages allowed by law, the exact sum to be proven at time of trial;

2.   For exemplary and punitive damages to be proven at time of trial; and

3.   As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

83

V.    AS TO THE TWENTY SECOND FIRST CAUSE OF ACTION FOR
      NEGLIGENT MISREPRESENTATION REGARDING ABILITY TO
      TRANSFER OR PLEDGE ASSETS:

    1.    For damages allowed by law, the exact sum to be proven at time of
            trial.

W.    AS TO THE TWENTY THIRD CAUSE OF ACTION FOR FRAUDULENT
      PROMISE TO DELIVER PARTNERSHIP AGREEMENT:

    1.    For damages allowed by law, the exact sum to be proven at time of
            trial;

    2.    For exemplary and punitive damages to be proven at time of trial; and

    3.    As a result of the foregoing, Plaintiffs are equitably entitled to an
            order divesting defendants from management and ownership of the
            property portfolio wrongly obtained and retained by them, and vesting
            same with Plaintiffs, to the greatest extent permitted in equity.

X.    AS TO THE TWENTY FOURTH CAUSE OF ACTION FOR
      CONVERSION REGARDING AMUSEMENT'S $13M:

    1.    For damages allowed by law, the exact sum to be proven at time of
            trial; and

    2.    For an accounting between the parties and for payment to plaintiffs of
            the amounts found due and owing from defendants as a result of such
            accounting.

Y.    AS TO THE TWENTY FIFTH CAUSE OF ACTION FOR CONSPIRACY
      TO COMMIT FRAUD AND CONVERSION:

    1.    For damages allowed by law, the exact sum to be proven at time of
            trial;

    2.    For exemplary and punitive damages to be proven at time of trial; and

    3.    As a result of the foregoing, Plaintiffs are equitably entitled to an
            order divesting defendants from management and ownership of the
            property portfolio wrongly obtained and retained by them, and vesting
            same with Plaintiffs, to the greatest extent permitted in equity.

Z.    AS TO THE TWENTY SIXTH CAUSE OF ACTION FOR UNJUST
      ENRICHMENT:

    1.    For damages allowed by law, the exact sum to be proven at time of
            trial;

2.    For the imposition of a constructive trust on for the benefit of Plaintiffs for all sums of money deposited in escrow;

3.    For restitution of all moneys deposited in escrow by Plaintiffs;

4.    For an equitable lien on all subject matters purchased with moneys deposited in escrow by Plaintiffs;

5.    For an order requiring transferees with knowledge of the moneys deposited in escrow by Plaintiffs to make restitution; and

6.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting.

AA.    AS TO THE TWENTY SEVENTH CAUSE OF ACTION FOR BREACH OF FUDICIARY DUTY:

1.    For damages allowed by law, the exact sum to be proven at time of trial;

2.    For exemplary and punitive damages to be proven at time of trial;

3.    For an accounting between the parties and for payment to plaintiffs of the amounts found due and owing from defendants as a result of such accounting; and

4.    As a result of the foregoing, Plaintiffs are equitably entitled to an order divesting defendants from management and ownership of the property portfolio wrongly obtained and retained by them, and vesting same with Plaintiffs, to the greatest extent permitted in equity.

BB.    AS TO ALL CAUSES OF ACTION:

1.    For Plaintiffs' reasonable attorneys' fees and costs of suit incurred herein; and

2.   For such other and further relief as the Court deems just, necessary or appropriate.

DATED:  December 27, 2007

_____
PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel:  (212) 643-7000
Fax:  (212) 643-6500

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT "1"

### SPECIAL WARRANTY DEED
(Quaker Village)

Excise Tax:_____

Tax Parcel ID No._____ Verified by_____ County

on the ____ day of June, 2007  By:_____

Mail/Box to: Sragow & Sragow 6665 Long Beach Boulevard Suite B-22 Long Beach, California 90805
Attention: Allan P. Sragow, Esq.

This instrument was prepared by: Stephen S Friedman, Esq., Buchanan Ingersoll & Rooney, P.C., One
Chase Manhattan Plaza New York New York 10005

Brief description for the Index:  _____

THIS DEED, made this the _____ day of_____, 2007, by and between

**GRANTOR:**    FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company,
whose address is: 241 5th Avenue, Room 302, New York, NY 10016-8732
     (herein referred to collectively as **Grantor**) and

**GRANTEE:**    _____
     _____
(herein referred to collectively as **Grantee**)

        Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS
($10.00) and other good and valuable consideration paid in hand to Grantor by Grantee,
the receipt and sufficiency of which is hereby acknowledged, has GRANTED,
BARGAINED, SOLD and CONVEYED, and by these presents does GRANT,
BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in
and to that certain parcel of land located in  Guilford County, North Carolina and legally
described in **Exhibit A** attached hereto and incorporated herein by this reference,
together with all buildings, improvements and fixtures located thereon and owned by
Grantor as of the date hereof and all rights, privileges and appurtenances pertaining

thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "<u>Real Property</u>").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Guilford County, North Carolina, and all unpaid taxes and assessments, known or unknown (collectively, the "<u>Permitted Exceptions</u>").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor.  By acceptance of this Deed, Grantee specifically acknowledges that Grantee is <u>not</u> relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property.  By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

The property hereinabove described was acquired by Grantor by instrument recorded in _____ at Page _____ in the _____ County Public Registry.

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ⟨12⟩ day of _____ July _____, 2007 to be effective as of the ⟨12⟩ day of ___ July ___, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC**, a Delaware limited liability company

By: _____
        Mark Stern
        President

STATE OF NORTH CAROLINA    )

GUILFORD COUNTY    )

I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this ⟨12⟩ day of __ July __, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20⟨10⟩

## EXHIBIT A

(Tax Parcel No(s):_____ )

## Legal Description
(Quaker Village)

Tract 1

BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being located South 78 deg. 53 min. 36 sec. East, 206.15 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence continuing with the southern margin of West Friendly Avenue South 78 deg. 53 min. 36 sec. East, 290.52 feet to an existing railroad spike; the northwest corner of the Jackson Talbert property as recorded in Deed Book 3258, Page 1410 in the Office of the Register of Deeds of Guilford County, North Carolina; thence with Talbert's line the following bearings and distances: South 11 deg. 12 min. 44 sec. West, 14 45 feet to an "X" in the concrete; and South 74 deg. 14 min. 14 sec. East, 124.81 feet to an existing iron pipe on the western margin of Dolly Madison Road; thence with the western margin of Dolly Madison Road the following bearings and distances: South 10 deg. 54 min. 11 sec. West, 161.05 feet to a point; South 04 deg. 53 min. 51 sec. West, 37.38 feet to a point; North 74 deg. 32 min. 32 sec. West, 4.57 feet to a point; South 10 deg. 07 min. 18 sec. West, 70.00 feet to a point; along a curve to the right having a radius at 1,281.87 feet, a chord bearing and distance of South 15 deg. 03 min. 08 sec. West, 264.27 feet to a point; and South 21 deg. 50 min. 56 sec. West, 423.4 feet to an existing iron pipe, the northeast corner of Madison Properties as recorded in Plat Book 41, Page 145; thence with Madison Properties the following bearings and distances: North 71 deg. 57 min. 35 sec. West, 178.84 feet to an existing nail; and South 12 deg. 06 min. 33 sec. West, 128.07 feet to an existing iron pipe in the line of R.H. Foreman as recorded in Deed Book 3224, Page 342; thence with Foreman's line North 87 deg. 23 min. 10 sec. West, 128.75 feet to an existing iron pipe, the eastern boundary of the K.C. Properties, LLC property as recorded in Deed Book 1828, Page 626; thence with the line of K.C. Properties, LLC North 03 deg. 54 min. 55 sec. East, 1.12 feet to an existing iron pipe; thence North 03 deg. 54 min. 33 sec. East, 288.51 feet to an existing iron; thence North 86 deg. 23 min. 53 sec. West, 180.36 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 24 sec. East, 402.01 feet to a point; thence North 89 deg. 26 min. 15 sec. East, 102.43 feet to a point; and North 10 deg. 55 min. 44 sec. East, 118.99 feet to the POINT OF BEGINNING, and containing 7.148 acres, more or less.

Tract 2-A

BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being located South 78 deg. 53 min. 36 sec. East, 115.30 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 53 min. 36 sec. East, 10.24 feet to a point; thence South 03 deg. 53 min. 56 sec. West, 180.55 feet to a point; thence South 84 deg. 26 min. 15 sec. West, 102.22 feet to a point on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 24 sec. East, 67.74 feet to a point; thence South 78 deg. 55 min. 33 sec. East, 100.00 feet to a point ; thence North 05 deg. 53 min. 10 sec. East, 148.05 feet to the POINT OF BEGINNING, and containing 0.461 acres, more or less.

Tract 2B

BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being located South 78 deg. 53 min. 36 sec. East, 155.44 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 53 min. 36 sec. East, 22.11 feet to a point; thence South 10 deg. 55 min. 44 sec. West, 118.44 feet to a point; thence South 84 deg. 26 min. 15 sec. West, 0.75 feet to a point; and North 03 deg. 53 min. 55 sec. East, 120.55 feet to the POINT OF BEGINNING and containing 0.048 acres, more or less.

Tract 3

BEGINNING at a point on the southern margin of West Friendly Avenue (88 foot right-of-way), said point being at an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence with the southern margin of West Friendly Avenue South 78 deg. 53 min. 36 sec. East, 115.20 feet to a point; thence South 03 deg. 53 min. 10 sec. West, 148.05 feet to a point; thence North 78 deg. 55 min. 33 sec. West, 100.00 feet to a point on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive North 03 deg. 50 min. 24 sec. East, 150.00 feet to the POINT OF BEGINNING, and containing 0.364 acres, more or less.

Continued on following page

EXHIBIT A continued

Legal Description
(Quaker Village)

Tract 4

BEGINNING at a point on the eastern margin of Milner Drive, said point being an existing iron pipe located South 03 deg. 30 min. 29 sec. West, 620.75 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence South 86 deg. 21 min. 55 sec. East, 130.56 feet to an existing iron pipe; thence South 03 deg. 54 min. 55 sec. West, 118.84 feet to a point; thence North 83 deg. 04 min. 44 sec. West, 130.23 feet to a point on the eastern margin of Milner Drive; thence with the eastern margin if Milner Drive North 03 deg. 30 min. 29 sec. East, 111.43 feet to the POINT OF BEGINNING, and containing 0.411 acres, more or less

Tract B

BEGINNING at a point on the eastern margin of Milner Drive, said point being located South 03 deg. 30 min. 29 sec. West, 732.10 feet from an existing p.k. nail at the southeast intersection of West Friendly Avenue and Milner Drive; thence leaving the eastern margin of Milner Drive South 83 deg. 04 min. 44 sec. East, 130.23 feet to a point; thence South 03 deg. 54 min. 55 sec. West, 118.10 feet to an existing iron pipe on the northern boundary of the K.C. Properties, LLC property; thence with K.C. Properties, LLC North 84 deg. 05 min. 56 sec. West, 145.94 feet to an existing iron pipe on the eastern margin of Milner Drive; thence with the eastern margin of Milner Drive the following bearings and distances: along a curve to the left having a radius of 60 feet, a chord bearing and distance of North 34 deg. 47 min. 28 sec. West, 54.88 feet to a new iron pipe; and North 03 deg. 30 min. 29 sec. East, 71.16 feet to the POINT OF BEGINNING, and containing 0.451 acres, more or less.

## SPECIAL WARRANTY DEED
### (Mayberry)

Excise Tax:_____

Tax Parcel ID No._____ Verified by_____ County

on the _____ day of June, 2007·By:_____

Mail/Box to: Sragow & Sragow 6665 Long Beach Boulevard Suite B-22 Long Beach, California 90805
Attention: Allan P. Sragow, Esq.

This instrument was prepared by: Stephen S Friedman, Esq., Buchanan Ingersoll & Rooney, P.C., One
Chase Manhattan Plaza New York New York 10005

Brief description for the Index: _____

THIS DEED, made this the _____ day of_____, 2007, by and between

GRANTOR:    FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company,
whose address is: 241 5th Avenue, Room 302, New York, NY 10016-8732
   (herein referred to collectively as **Grantor**) and

GRANTEE:    _____
          _____
(herein referred to collectively as **Grantee**)

      Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS
($10.00) and other good and valuable consideration paid in hand to Grantor by Grantee,
the receipt and sufficiency of which is hereby acknowledged, has GRANTED,
BARGAINED, SOLD and CONVEYED, and by these presents does GRANT,
BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in
and to that certain parcel of land located in Guilford County, North Carolina and legally
described in **Exhibit A** attached hereto and incorporated herein by this reference,
together with all buildings, improvements and fixtures located thereon and owned by
Grantor as of the date hereof and all rights, privileges and appurtenances pertaining

thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Guilford County, North Carolina, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor.  By acceptance of this Deed, Grantee specifically acknowledges that Grantee is not relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

The property hereinabove described was acquired by Grantor by instrument recorded in _____ at Page _____ in the _____ County Public Registry.

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the 12th day of _____, 2007 to be effective as of the 12th day of _____, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC,** a Delaware limited liability company

By: _____

Mark Stern
President

STATE OF NORTH CAROLINA    )

SURRY COUNTY                        )

I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this 12 day of ___July___, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4361978
Qualified in Rockland County
Commission Expires Feb. 12, 20___ 10

## EXHIBIT A

(Tax Parcel No(s).:_____)

## Legal Description

(Mayberry)

Located in Mount Airy Township, Surry County, North Carolina, at the intersection of Frederick Street (SR 1634) and U.S. Hwy. 52;

THE POINT OF BEGINNING is an existing iron pin set on the east side of Frederick Street, the northwest corner of property owned now or formerly by Belk's Department Store of Mount Airy, North Carolina, Incorporated (Book 287, Page 683); the N.C. Grid coordinates for this POINT OF BEGINNING are as follows: X=1523777.83; Y=1061247.02; and now proceeding from this POINT OF BEGINNING with the east side of Frederick Street N 41-21-25 W 74.50' to an existing iron pin; then S 78-45-00 W 89.59' to a right of way monument on the east right of way margin of U.S. Hwy. 52 (northbound lane); then proceeding with this right of way margin the following three calls: N 13-15-00 W 278.06' to an existing iron pin, N 13-15-00 W 151' to a new iron pin, and N 13-15-00 W 270.18' to an iron pin set at the southwest corner of property owned now or formerly by Libby Hill Seafood Restaurant, Inc. (Book 384, Page 437); then proceeding with the line of Libby Hill N 76-45-00 E 175' to a set railroad spike and N 13-15-00 W 140' to a PK nail set in a concrete slab, a point in the line of property owned now or formerly by Mayberry Investments (Book 293, Page 357 and Book 293, Page 433); then proceeding with the line of Mayberry Investments the following three calls: N 77-21-50 E 65' to an existing iron pin, N 12-29-34 W 184.03' to an existing iron pin, and N 12-44-27 E 80.07' to an existing iron pin, a corner with Spencers, Inc. of Mount Airy (Book 336, Page 708 and Book 439, Page 330); then proceeding with the line of Spencers, Inc. of Mount Airy N 79-40-18 E 183.33' to an existing monument and N 87-00-40 E (passing an existing monument at 385.33') 392.97' to a point in Lovills Creek; then S 10-55-00 W 328.49' to an existing monument on the bank of Lovills Creek; then with the line of James L. Hazel (Book 309, Page 866) S 09-11-00 S 572.34' to an existing iron pin; a corner with Belk's Department Store (Book 287, Page 683); then proceeding with the Belk's line the following five calls: S 76-44-40 W (passing an existing iron pin at 138.09') 141.29' to a point, N 18-46-00 W 11.90' to a point, S 76-08-20 W 209.34' to a point, S 15-55-42 E 78' to a point and N 74-23-39 W 306.41' to the aforesaid POINT OF BEGINNING, and containing 16.68 acres, more or less. This description was obtained from a plot of a survey by Hall Surveying Company dated February 23, 1987 and last revised September 22, 1987.

TOGETHER WITH nonexclusive, perpetual easements for access and parking, and other easements, at such easements are described in instruments recorded in the Surry County Registry, including that certain Contract, recorded in Book 292, Page 361, Surry County Registry; that certain Cross Easement Agreement, recorded in Book 455, Page 523, Surry County Registry, and that certain easement, recorded in Book 2024, Page 3775, Surry County Registry.

TRACT 7

Non-exclusive easement granted in that certain instrument by and between Libby Hill Seafood Restaurant, Inc. and Mayberry Center Associates recorded in Book 474, page 773.

AFTER RECORDING RETURN TO:
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Attention: Allan P. Sragow, Esq.

## LIMITED WARRANTY DEED
### (Britt David)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by _____, a _____ ("Grantee") (the terms Grantor and Grantee to include their respective successors, legal representatives and assigns where the context requires or permits), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Muscogee County, Georgia and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Muscogee County, Georgia, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise

belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behalf of Grantee, forever, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor.    By acceptance of this Deed, Grantee specifically acknowledges that Grantee is <u>not</u> relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ___ day of _____, 2007 to be effective as of the ___ day of _____, 2007.

Signed sealed and delivered in the presence of:

**FIRST REPUBLIC GROUP REALTY LLC,** a
Delaware limited liability company

_____

_____
Print name of witness

By: _____
    Mark Stern
    President

_____

_____
Notary Public

My Commission Expires: _____

[Affix seal here]

Address:    241 5th Avenue, Room 302
            New York, NY 10016-8732
            Attention: Mark Stern

MOSHE E. MALIK
Notary Public, State of New York
No. 4951978
Qualified in Rockland County
Commission Expires Feb. 12, 20__

## EXHIBIT A

### Legal Description
(Britt David)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lots 35, 36, 45 and 46, 8th District, Muscogee County, Georgia and as more particularly described on Exhibit "A" attached hereto and made a part hereof.

AFTER RECORDING RETURN TO:                    Send Tax Notice To:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22          _____
Long Beach, CA 90805                          _____
Attention Allan P. Sragow, Esq.               _____
                                              _____

STATE OF ALABAMA

COUNTY OF MONTGOMERY

## SPECIAL WARRANTY DEED
### (Montgomery Promenade North)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by _____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Montgomery County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters unrecorded or of record in the office of the Judge of Probate of Montgomery County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically acknowledges that Grantee is <u>not</u> relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

2

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ___ day of _____, 2007 to be effective as of the ___ day of _____, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC,** a Delaware limited liability company

By: _____
          Mark Stern
          President

STATE OF ALABAMA    )

MONTGOMERY COUNTY )

    I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this ___ day of _____, 2007.

                                           
Notary Public
My Commission Expires: _____

                                 MOSHE E. MALIK
                        Notary Public, State of New York
                              No. 4961978
                      Qualified in Rockland County
                Commission Expires Feb. 12, 20 ___

3

## EXHIBIT A

### Legal Description
(Montgomery Promenade North)

BEGIN AT THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF SECTION 23, T-16~N, R-18-E, MONTGOMERY COUNTY, ALABAMA; THENCE RUN N87°20'07" E, 798.31 FEET TO A POINT LYING ON THE WESTERLY RIGHT OF WAY OF EASTERN BOULEVARD (300' ROW); THENCE RUN ALONG SAID WESTERLY RIGHT OF WAY, S 23°45'07" W, 1490.77 FEET TO A POINT LYING AT THE NORTHEAST CORNER OF U.S. POSTAL SERVICE PLAT NO. 1, AS RECORDED IN THE OFFICE OF THE JUDGE OF PROBATE, MONTGOMERY COUNTY, ALABAMA, IN PLAT BOOK 32 AT PAGE 84; THENCE LEAVE SAID RIGHT OF WAY AND RUN ALONG THE NORTH LINE OF SAID PLAT, N 66°29'48" W, 324.82 FEET TO A POINT; THENCE RUN ALONG THE WEST LINE OF SAID PLAT, S 23°39'59" W, 197.83 FEET TO A POINT LYING ON THE NORTH RIGHT OF WAY OF YOUNG BARN ROAD (50' ROW); THENCE RUN ALONG SAID NORTH RIGHT OF WAY, N 66°06'11" W, 313.64 FEET TO A POINT LYING AT THE INTERSECTION OF THE AFOREMENTIONED NORTH RIGHT OF WAY OF YOUNG BARN ROAD AND THE EAST RIGHT OF WAY OF THE PROPOSED EXTENSION OF CENTRAL PARKWAY (80' ROW); THENCE RUN ALONG SAID PROPOSED EAST RIGHT OF WAY, N 23°53'49" E, 32.00 FEET TO A POINT LYING IN A CURVE; THENCE RUN ALONG SAID CURVE (CONCAVE WESTERLY, R = 312.74')AND SAID RIGHT OF WAY, A CHORD OF N 04°03'01" E, 293.14 FEET TO A POINT OF REVERSE CURVATURE; THENCE RUN ALONG SAID CURVE (CONCAVE EASTERLY, R= 350.41'), AND SAID RIGHT OF WAY , A CHORD OF N 04°07'22" W, 327.66 FEET TO A POINT AT THE END OF SAID CURVE; THENCE CONTINUE ALONG SAID RIGHT OF WAY, N 23°45'07" E, 457.44 FEET TO A POINT OF CURVATURE; THENCE RUN ALONG SAID CURVE (CONCAVE WESTERLY, R = 376.87'), A CHORD OF N 10°26'31" E, 173.53 FEET; THENCE LEAVE SAID RIGHT OF WAY AND RUN N 87°07'54" E, 283.00 FEET TO THE POINT OF BEGINNING.

SAID DESCRIBED PARCEL LYING AND BEING SITUATED IN THE SOUTHEAST QUARTER OF SECTION 23 AND THE SOUTHWEST QUARTER OF SECTION 24, T-16~N, R-18-E, MONTGOMERY COUNTY, ALABAMA, AND CONTAINS 27.663 ACRES, MORE OR LESS.

4

AFTER RECORDING RETURN TO:          Consideration:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22     Grantee's Address:
Long Beach, CA 90805
Attention Allan P. Sragow, Esq.

_____

_____

_____


## SPECIAL WARRANTY DEED


FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by_____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in the City of Staunton, Augusta County, Virginia and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the Clerk of the Circuit Court of the City of Staunton, Virginia, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically

acknowledges that Grantee is not relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ____ day of _____, 2007 to be effective as of the ____ day of _____, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC**, a Delaware
limited liability company

By: _____
    Mark Stern
    President

STATE OF VIRGINIA          )

AUGUSTA COUNTY            )

    I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this ___ day of _____, 2007.

_____
Notary Public
My Commission Expires: _____

Notary Public, State of New York
No. 4001978
Qualified in Rockland County
Commission Expires Feb. 12, 20 ____

## EXHIBIT A

### Legal Description
(Staunton)

All that certain tract or parcel of land, with all improvements thereon and appurtenances there unto belonging, lying, being and situated in the County of Augusta, Virginia, and the City of Staunton, Virginia, containing 38.552 acres, more or less, and more particularly described as follows:

Beginning at a concrete Virginia Department of Highways Right-of-Way monument, on north Right-of-Way line of State Route 644 and in the line of Parcel One, and Thence; N16°38'21"W 31.42 feet to a point in the east Right-of-Way of U.S. Route 11, corner to Parcel One. Thence with the same N18°02'32"E 1488.60 feet passing a corner common to Parcel One and Parcel Two at 1407.11 feet to a point corner to Parcel Two and Parcel Three, 81.49 feet from the corner common to Parcel One and Parcel Two, said point being the point of curvature of a curve concave to the right, said curve having a radius of 5673.58 feet, a tangent of 318.10 feet and a chord length of 635.20 feet, bearing N21°15'05"E, thence continuing with U.S. Route 11, and Parcel Three through a delta of 06°25'05" and an arc of 635.53 feet to a point, thence with same N65°32'23"W, 14.00 feet to a point, said point being the point of curvature of a curve concave to the right, said curve having a radius of 5687.58 feet, a tangent of 103.35 feet and a chord length 206.66 feet bearing N25°30'05"E thence continuing with same through a delta of 02°04'55" and an arc of 206.67 feet to a pinched pipe in the line of Parcel Three and the east Right-of-Way line of U.S. Route 11, thence continuing with same N26°32'32"E, 45.08 feet to a pinched pipe, said pipe being a corner to Parcel Three and the lands of George and Mary J. Christian, by deed recorded in Deed Book 530, Page 467, thence leaving U.S. Route 11, and with Parcel Three and George and Mary J. Christian S27°01'03"E 97.99 feet to a point, thence with the same S22°10'03"E 100.00 feet to a pinched pipe, said pipe being a corner to the lands of George T. and Florence S. Jones, thence with Parcel Three and George T. and Florence S. Jones S16°56'03"E 100.00 feet to a pinched pipe, thence continuing with same S12°36'03"E 100.00 feet to a pinched pipe, thence with same S07°10'03"E 100.00 feet to a pinched pipe, thence with same S01°01'03"E 100.00 feet to a pinched pipe found, thence with same S04°03'57"W 100.00 feet to a pinched pipe, said pipe being a corner to the lands of James A. and Azile W. Harris, S10°34'57"W, 96.00 feet passing a corner of Parcel Three and Parcel Two at 39.48 feet to a point in the line of Parcel Two, thence with Parcel Two and the lands of James A. and Azile W. Harris S16°18'57"W 82.10 feet to a point, said point corner to the lands of Stewart C. and Nancy Ann Young, thence with Parcel Two and Stewart C. and Nancy Ann Young S31°27'24"E, 116.20 feet to a pipe, said pipe corner to the lands of Timothy F. and Wanda M. Sanjule, thence S28°10'24"E 323.57 feet, passing a fence post corner to the lands of Timothy F. and Wanda M. Sanjule and the lands of Harold E. Jr. and Loree C. Landes and Parcel Two and Parcel One at 75.00 feet to a fence post corner to Parcel One and the lands of Landes, thence continuing with Parcel One and the lands of Harold E. Jr. and Loree C. Landes by deed recorded in Deed Book 1231 Page 507, N61°51'07"E, 320.16 feet to a railroad spike in the

Continued on following page

EXHIBIT A continued

Legal Description
(Staunton)

centerline of Route 635, a 30' Right-of-Way, thence with the centerline of Route 635, S28°23'54"E 100.18 feet to a railroad spike, thence leaving the centerline of Route 635 and with Parcel One S56°05'01"W 219.21 feet to a pipe, corner to Parcel One and the lands of Knopp Enterprises, Inc., by deed recorded in Deed Book 688 Page 498, continuing with same S17°59'54"W 1357.66 feet to a pipe corner, thence with same S51°41'54"W 196.47 feet to a pipe in the north Right-of-Way line of Route 644, said pipe being the point of curvature of a curve concave to the left, said curve having a radius of 501.45 feet, a tangent of 126.19 feet and a chord length of 244.76 feet bearing N48°49'18"W, thence with Route 644 and Parcel One through a delta of 28°15'05" and an arc of 247.25 feet to a point, continuing with the same N62°56'20"W 322.48 feet to a point, continuing with the same N27°03'40"E 15.00 feet to a concrete Virginia Department of Highways monument, thence continuing with same N61°14'31"W 229.90 feet to the point of beginning, said boundary containing 38.552 acres.

AFTER RECORDING RETURN TO:                    Send Tax Notice To:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22          _____
Long Beach, CA 90805                          _____
Attention Allan P. Sragow, Esq.               _____
                                              _____

STATE OF ALABAMA

COUNTY OF MONTGOMERY

## SPECIAL WARRANTY DEED
### (Bellwood)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by_____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Montgomery County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters unrecorded or of record in the office of the Judge of Probate of Montgomery County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically acknowledges that Grantee is not relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the 12ᵗʰ day of _____ July _____, 2007 to be effective as of the 12ᵗʰ day of _____ 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC,** a Delaware limited liability company

By: _____
                Mark Stern
                President

STATE OF ALABAMA        )

JEFFERSON COUNTY        )

      I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

      Given under my hand and official seal this 12 day of July 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20 ____

## EXHIBIT A

### Legal Description
(Bellwood)

BELLWOOD SHOPPING CENTER

Lot D, according to the Map of Bellwood Shopping Village Plat No. 1, as said Map appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 36, at Page 218.

AFTER RECORDING RETURN TO:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22
Long Beach, CA 90805
Attention Allan P. Sragow, Esq.

Send Tax Notice To:

_____
_____
_____
_____

STATE OF ALABAMA

COUNTY OF MORGAN

## SPECIAL WARRANTY DEED
### (Decatur Mall)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by _____ a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Morgan County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the Judge of Probate of Morgan County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically acknowledges that Grantee is **not** relying on, does hereby disclaim and renounce any representations or warranties of any kind

or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ___ day of _____, 2007 to be effective as of the ___ day of _____, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC,** a Delaware limited liability company

By: _____
        Mark Stern
        President

STATE OF ALABAMA        )

COUNTY OF MORGAN        )

    I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this ___ day of _____, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20___

**EXHIBIT A**
**Legal Description**
(Decatur
Mall)

Real estate located within the NE-1/4 of Section 35 and the NW-1/4 of Section
36, both in Township 5 South, Range 5 West, Decatur, Morgan County, Alabama, and
more particularly described as follows to-wit: begin at an iron pin on the
northeast corner of Section 35, Township 5 South, Range 5 West, Decatur, Morgan
County, Alabama, and run thence N 88°44'33" W (Alabama State Coordinate
System-Grid Bearing) along the north boundary of said Section 35 a distance of
51.51 feet to an iron pin and the true point of beginning of the tract herein
described, said point being the northeast corner of property conveyed to Bramalea
Centers, Inc., and recorded in the Morgan County probate office in Deed Book 1244
at Page 653; thence from the true point of beginning run S 01°15'27" W  a
distance of 269.00 feet to an iron pin; thence S 88°44'33" E a distance of 82.79
feet to an iron pin; thence N 62°15'46" E a distance of 214.57 feet to an iron
pin on the westerly right of way margin of Beltline Road, S.W. (Alabama Highway
No. 67); thence along the westerly right of way margin of Beltline Road, SW
(Alabama Highway No. 67) and along a curve to the right having a radius of
7514.44 feet (chord bearing S 27°57'11" E, chord distance 57.11 feet) an arc
distance of 57.11 feet to a railroad spike; thence S 27°44'13" E along the
westerly right of way margin of Beltline Road, S.W. (Alabama Highway No. 67) a
distance of 52.89 feet to an iron pin; thence S 62°15'47"W a distance of 134.00
feet to an iron pin; thence S 17°15'47" W a distance of 62.22 feet to a railroad
spike; thence S 27°44'13" E a distance of 474.09 feet to a railroad spike; thence
S 72°44'13" E a distance of 55.15 feet to an iron pin; thence N 62°15'47" E a
distance of 139.00 feet to an iron pin on the westerly right of way margin of
Beltline Road, S.W. (Alabama Highway No. 67); thence S-27°44'13" E along the
westerly right of way margin of Beltline Road, S.W. (Alabama Highway No. 67) a
distance of 80.00 feet to an iron pin; thence S 62°15'47" W a distance of 139.00
feet to an iron pin; thence S 17°15'47" W  a distance of 55.15 feet to an iron
pin; thence S 27°44'13" E a distance of 442.83 feet to an iron pin; thence
S 84°19'43" E a distance of 192.45 feet to an iron pin; thence S 05°40'17" W a
distance of 78.89 feet to a cross chiseled on a concrete flume on the westerly
right of way margin of Danville Road, S.W. (Morgan County Highway No. 41); thence
along the westerly right of way margin of Danville Road, S.W. (Morgan County
Highway No. 41) and along a curve to the left having a radius of 2123.48 feet
(chord bearing S 33°52'00" W, chord distance 598.04 feet) an arc distance of
600.04 feet to an iron pin; thence S 25°46'17" W a distance of 293.05 feet to
an iron pin; thence N 63°14'03" W a distance of 451.72 feet to a cross chiseled

Continued on following page

EXHIBIT A continued- Legal Description (Decatur Mall)

in a concrete gutter; thence along a curve to the right having a radius of 350.00 feet (chord bearing N 55°47'05" W, chord distance 90.76 feet) an arc distance of 91.02 feet to an iron pin, said point being the Southeast or easternmost corner of property conveyed to Bramalea Centers, Inc., and recorded in the Morgan County Probate Office in Deed Book 1273 at Page 916; thence S-32°46'46" W a distance of 157.52 feet to an iron pin; thence S 60°21'46" W a distance of 240.00 feet to an iron pin; thence along a curve to the left having a radius of 265.95 feet (chord bearing S 52°05'01" W, chord distance 76.59 feet) an arc distance of 76.86 feet to an iron pin; thence N 27°44'13" W a distance of 1146.25 feet to an iron pin; thence along a curve to the right having a radius of 1248.51 feet (chord bearing N 13°29'34" W, chord distance 614.41 feet) an arc distance of 620.78 feet to an iron pin; thence S 88°44'14" E a distance of 54.34 feet to an iron pin; thence S 01°04'14" E a distance of 30.00 feet to a railroad spike; thence S 88°38'14" E a distance of 165.12 feet to a railroad spike; thence S 87°44'14" E a distance of 218.54 feet to a cross chiseled in a concrete flume; thence along a curve to the right having a radius of 818.51 feet (chord bearing N 00°42'26" W, chord distance 34.00 feet) an arc distance of 34.00 feet to a cross chiseled on a concrete curb; thence continue along a curve to the right having a radius of 818.51 feet (chord bearing N 00°52'07" E, chord distance 11.02 feet) an arc distance of 11.02 feet to a railroad spike; thence N 01°15'27" E a distance of 644.20 feet to an iron pin on the north boundary of said Section 35; thence S 88°44'33" E along the north boundary of said Section 35 a distance of 130.69 feet to a point, said point being the Southwest corner of property conveyed to Bramalea Centers, Inc., and recorded in the Morgan County Probate Office in Deed Book 1244 at Page 662; thence continue S 88°44'33" E along the north boundary of said Section 35 a distance of 530.31 feet to the true point of beginning;

LESS and EXCEPT:

A tract described as begin at an iron pin on the northeast corner of Section 35, Township 5 South, Range 5 West, Decatur, Morgan County, Alabama, and run thence N 88°44'33" W (Alabama State Coordinate System-Grid Bearing) along the north boundary of said Section 35 a distance of 51.51 feet to an iron pin, said point being the northeast corner of property conveyed to Bramalea Centers, Inc., and recorded in the Morgan County probate office in Deed Book 1244 at Page 653; thence S 01°15'27" W a distance of 269.00 feet to an iron pin; thence continue S 01°15'27" W a distance of 47.88 feet to an iron pin and the true point of beginning of the exception tract herein described; thence from the true point

Continued on following page
EXHIBIT A continued- Legal Description (Decatur Mall)

of beginning run S 88°44'20" E a distance of 29.04 feet to an iron pin; thence along a curve to the right having a radius of 132.00 feet (chord bearing S 58°14'15" E, chord distance 134.00 feet) an arc distance of 140.55 feet to a railroad spike; thence S 27°44'03" E a distance of 192.95 feet to a railroad spike; thence S 62°15'47" W a distance of 224.00 feet to a railroad spike; thence N 27°44'13" W a distance of 13.83 feet to a railroad spike; thence S 62°15'47" W a distance of 504.50 feet to a railroad spike; thence N 27°44'13" W a distance of 60.00 feet to a railroad spike; thence N 62°15'47" E a distance of 30.00 feet to a railroad spike; thence N 17°15'47" E a distance of 90.51 feet to a railroad spike; thence N 27°44'13" W a distance of 130.00 feet to a railroad spike; thence S 62°15'47" W a distance of 45.50 feet to an iron pin; thence N 27°44'13" W a distance of 185.00 feet to a railroad spike; thence along a curve to the right having a radius of 107.00 feet (chord bearing N 56°45'40" E, chord distance 121.20 feet) an arc distance of 128.85 feet to a railroad spike; thence S 88°44'28" E a distance of 437.32 feet to the true point of beginning,


Lying and being within the NE-1/4 of Section 35 and the NW-1/4 of Section 36, both within Township 5 South, Range 5 West, Decatur, Morgan County, Alabama,


Continued on following page

EXHIBIT A continued- Legal Description (Decatur Mall)

## PARCEL II

NON-EXCLUSIVE EASEMENT ESTATES created pursuant to the following agreements:

a.      Cross Easement Agreement by and between Beltline-Decatur Associates, Ltd., Mercantile Properties, Inc. and The Castner-Knott Dry Goods Co., recorded September 19, 1979 in Book 1021, Page 555, in the Office of the Judge of Probate of Morgan County, Alabama and amended by that certain Cross Easement Agreement by and between Beltline-Decatur Associates, Ltd., Mercantile Properties, Inc., The Castner-Knott Dry Goods Co., and CBL Developers, Inc. dated August 3, 1977, unexecuted copies of which are recorded at Book 1022, Page 500, and at Book 1022, Page 511, and executed copy being recorded at Book 1022, Page 523, aforesaid records.

b.      Agreement of Reciprocal Covenants and Easements by and between Beltline-Decatur Associates, Ltd., and Rex Radio and Televisions, Inc., recorded November 24, 1986 at Book 1199, Page 498, aforesaid records.

c.      Operating and Easement Agreement between Beltline Mall Shopping Center Company, Ltd., Arlen Realty, Inc. and The Castner-Knott Dry Goods Co. dated effective March 28, 1977, filed for record July 21, 1977, and recorded in Book 985, Page 800, aforesaid records, as amended by unrecorded Amendment to Operating and Easement Agreement dated July 21, 1977.

d.      Easement Agreement by and between Bramalea Centers, Inc. and Beltline Development Company dated October 6, 1988, filed for record October 14, 1988 and recorded in Book 1273, Page 892, aforesaid records.

e.      Reservation of Easement by Dan L. Lawrence and Nancye K. Lawrence in that certain warranty deed dated February 24, 1977 and recorded in Book 957, Page 378 in the Office of the Judge of Probate of Morgan County, Alabama.  Amendment of said Easement by and between Beltline Development Company and Bramalea Centers, Inc. dated January 21, 1988, recorded in Book 1279, Page 276, aforesaid records.

AFTER RECORDING RETURN TO:               Send Tax Notice To:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22
Long Beach, CA 90805
Attention Allan P. Sragow, Esq.


STATE OF ALABAMA

COUNTY OF MONTGOMERY


## SPECIAL WARRANTY DEED
### (Montgomery Promenade)


FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by_____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Montgomery County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters unrecorded or of record in the office of the Judge of Probate of Montgomery County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

rmc\cp\crlp\first republic group\mont prom\
spec war-deed  7/11/2007

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically acknowledges that Grantee is <u>not</u> relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

2

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ___ day of _____, 2007 to be effective as of the ___ day of ___ 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC**, a Delaware limited liability company

By: _____
      Mark Stern
      President

STATE OF ALABAMA        )

MONTGOMERY COUNTY )

I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this ___ day of ___, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20___

3

## EXHIBIT A

### Legal Description
(Montgomery Promenade)

SITUATED AND LYING IN MONTGOMERY COUNTY, ALABAMA, to-wit:

Lot A and C, according to the Map of Montgomery Promenade as said
Map appears of record in the Office of the Judge of Probate of
Montgomery County, Alabama, in Plat Book 37, at Pages 194, and 195.

4

AFTER RECORDING RETURN TO:                          Send Tax Notice To:
Sragow & Sragow                                     _____
6665 Long Beach Boulevard Suite B-22                _____
Long Beach, CA 90805                                _____
Attention Allan P. Sragow, Esq.                     _____


STATE OF ALABAMA

COUNTY OF MONTGOMERY


## SPECIAL WARRANTY DEED
### (McGehee)


     FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by_____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Montgomery County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

     This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the Judge of Probate of Montgomery County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

     TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part

thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor.   By acceptance of this Deed, Grantee specifically acknowledges that Grantee is <u>not</u> relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the _____ day of _____, 2007 to be effective as of the _____ day of _____, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC**, a Delaware limited liability company

By: _____
　　　Mark Stern
　　　President

STATE OF ALABAMA　　　）

MONTGOMERY COUNTY )

　　　I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

　　　Given under my hand and official seal this _____ day of _____, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20___

## EXHIBIT A

### Legal Description
(McGehee)

Parcel I:

Lots F and H according to the survey of McGehee Place Shopping Center Plat
No. I as recorded in Map Book 3½ page 151  in the Probate Office of
Montgomery County, Alabama.

Parcel II:

Easement for the benefit of Parcel I as created by the Grant of Easement
dated 2/26/88, and recorded in Volume 757, page 367 and amended in RLPY
936, page 599 for the purposes described in those easements over, under
and across Lots F and H.  Subject to the terms, provisions and conditions
set for in said instrument.

AFTER RECORDING RETURN TO:                    Send Tax Notice To:
Sragow & Sragow
6665 Long Beach Boulevard Suite B-22          _____
Long Beach, CA 90805                          _____
Attention Allan P. Sragow, Esq.               _____
                                              _____

STATE OF ALABAMA

COUNTY OF MONTGOMERY

## SPECIAL WARRANTY DEED
### (Olde Town)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by_____, a _____ ("Grantee"), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Montgomery County, Alabama and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the Judge of Probate of Montgomery County, Alabama, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and Grantor does hereby bind itself, its legal representatives, successors and assigns, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against Grantor. By acceptance of this Deed, Grantee specifically acknowledges that, Grantee is not relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor or any other Seller Parties, including, without limitation, any covenant, representation or warranty regarding or relating to (a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor and the other Seller Parties are expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the 12th day of July, 2007 to be effective as of the 12th day of July, 2007.

**GRANTOR:**

**FIRST REPUBLIC GROUP REALTY LLC**, a Delaware limited liability company

By: _____
    Mark Stern
    President

STATE OF ALABAMA        )

COUNTY OF MONTGOMERY )

I, the undersigned, a Notary Public, in and for said County, in said State, hereby certify that Mark Stern whose name as President of First Republic Group Realty LLC, a Delaware limited liability company is signed to the foregoing document, and who is known to me, acknowledged before me on this day, that, being informed of the contents thereof, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this 12 day of July, 2007.

_____
Notary Public
My Commission Expires: _____

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20 10

## EXHIBIT A

### Legal Description
(Olde Town)

Commence at the Northeast Intersection of Carter Hill Road and McGehee Road and run along the North right of way of McGehee Road and run along the North right of way of McGehee Road, S 89 deg. 12' E, 150 feet to the point of beginning; thence from said point of beginning run N 01 deg. 10'E, 300.0 feet; thence S 89 deg. 13' E. 463.40 feet; thence S 00 deg. 47' W, 300.0 feet to the North right of way of McGehee Road, thence along said right of way N 89 deg. 12' W 465.40 feet to the point of beginning.

Together with that certain easement in favor of Robert E. Lowder, James K. Lowder, and Thomas H. Lowder, their successors and assigns, dated May 17, 1978, and recorded in the Office of the Judge of Probate of Montgomery County, Alabama, in Real Property Book 393, at Page 554.

Also, together with that certain easement in favor of Robert E. Lowder, James K. Lowder, and Thomas H. Lowder, their successors and assigns, dated June 1, 1978, recorded in said Probate Office in Real Property Book 393, at Page 571.

AFTER RECORDING RETURN TO:
Sragow & Sragow
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Attention: Allan P. Sragow, Esq.

### LIMITED WARRANTY DEED
(Lakeshore)

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand to Grantor by _____, a _____ ("Grantee") (the terms Grantor and Grantee to include their respective successors, legal representatives and assigns where the context requires or permits), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Grantee all of Grantor's right, title and interest in and to that certain parcel of land located in Hall County, Georgia and legally described in **Exhibit A** attached hereto and incorporated herein by this reference, together with all buildings, improvements and fixtures located thereon and owned by Grantor as of the date hereof and all rights, privileges and appurtenances pertaining thereto including all of Grantor's right, title and interest in and to all rights-of-way, open or proposed streets, alleys, easements, strips or gores of land adjacent thereto (herein collectively called the "Real Property").

This conveyance is made by Grantor and accepted by Grantee subject to all covenants, conditions, restrictions, and other matters of record in the office of the County Recorder of Hall County, Georgia, and all unpaid taxes and assessments, known or unknown (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Real Property together with all improvements located thereon all and singular the rights and appurtenances thereto in anywise belonging, subject to the Permitted Exceptions, unto Grantee, its legal representatives, successors and assigns, and

Grantor does hereby bind itself, its legal representatives, successors and assigns, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behalf of Grantee, forever, to WARRANT and FOREVER DEFEND all and singular the Real Property unto the Grantee, its legal representatives, successors and assigns, against Grantor and every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

This Deed is made without any covenant, warranty or representation by, or recourse against, Grantor. By acceptance of this Deed, Grantee specifically acknowledges that Grantee is not relying on, does hereby disclaim and renounce any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Grantor, including, without limitation, any covenant, representation or warranty regarding or relating to ;(a) the operation of the Real Property or uses or merchantability or fitness of any portion of the Real Property for a particular purpose; or (b) the physical condition of the Real Property or the condition or safety of the Real Property or suitability of the Real Property for a particular purpose. Grantor hereby disclaims, and by its acceptance of this Deed, Grantee hereby waives and releases, any implied or statutory warranties or guaranties of fitness, merchantability or any other statutory or implied warranty or guaranty of any kind or nature regarding or relating to the Real Property. By its acceptance of this Deed, Grantee acknowledges and agrees that the provisions of this paragraph were a material factor in Grantor's agreement to convey the Real Property to Grantee, and Grantor would not have conveyed the Real Property to Grantee unless Grantor is expressly released and Grantee waives the rights as set forth in this paragraph.

If any term or provision of this Deed or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Deed or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Deed shall be valid and enforced to the fullest extent permitted by law.

[Intentionally left blank. Signature page follows.]

IN WITNESS WHEREOF, this Deed has been executed by Grantor as of the ___ day of _____, 2007 to be effective as of the ___ day of _____, 2007.

Signed sealed and delivered in the presence of:

_____

_____
Print name of witness


_____

_____
Notary Public

My Commission Expires: _____

[Affix seal here]

**FIRST REPUBLIC GROUP REALTY LLC**, a
Delaware limited liability company

By: _____
         Mark Stern
         President

Address:     241 5th Avenue, Room 302
                    New York, NY 10016-8732
                    Attention: Mark Stern

MOSHE E. MALIK
Notary Public, State of New York
No. 4961978
Qualified in Rockland County
Commission Expires Feb. 12, 20 ___

**EXHIBIT A**
**Legal Description**

ALL THAT TRACT OR PARCEL OF LAND located in Land Lot 164 and 165 of the 9th District partially in the City of Gainesville, and in the 411th Georgia Militia District, Hall County, Georgia, and being more particularly described as follows:

Beginning at the point of intersection of the southern right-of-way line of West Washington Street (apparent 100-foot right-of-way) and the western right-of-way line of the West Bypass (100-foot right- of-way ) and running THENCE in a southeasterly direction along the western right-of-way line of West Bypass the following courses and distances: South 18 degrees 26 minutes 59" East a distance of 104.55 to a point; South 25 degrees 54 minutes 24 seconds East, a distance of 44.00 feet to a point; South 18 degrees 49 minutes 17 seconds East, a distance of 181.50 feet to a point; South 18 degrees 31 minutes 02 seconds East 1141.94 feet to an iron pin set, along the arc of a curve to the right, an arc distance of 412.78 feet to an iron pin set (said curve having a radius of 2,804.42 feet and a chord bearing and distance of South 14 degrees 19 minutes 23 seconds East 412.41 feet), and South 10 degrees 06 minutes 23 seconds East 102.93 feet to an iron pin found; THENCE leaving the western right- of-way line of West Bypass and running South 83 degrees 31 minutes 46 seconds West 385.79 feet to an iron pin found; THENCE South 85 degrees 08 minutes 46 seconds West 284.80 feet an iron pin found; THENCE North 21 degrees 06 minutes 39 seconds West 86.88 feet to an iron pin found; THENCE North 29 degrees 37 minutes 21 seconds West 141.31 feet to an iron pin found; THENCE North 42 degrees 31 minutes 58 seconds West 239.67 feet to an iron pin found; THENCE South 47 degrees 36 minutes 43 seconds West 193.38 feet to an iron pin found; THENCE South 53 degrees 03 minutes 17 seconds West, a distance of 75.06 feet to an iron pin found on the new northwestern right-of-way line of Shallowford Road (90-foot right-of-way); running THENCE in a northwesterly direction along said new northeastern right-of-way line of Shallowford Road the following three courses and distances: North 42 degrees 16 minutes 08 seconds West 307.70 feet to a point; North 41 degrees 15 minutes 04 seconds West 258.47 feet to a point; and along the arc of a curve to the left an arc distance of 303.32 to a point (said curve having a radius of 2,890.79 and a chord bearing and distance of North 44 degrees 15 minutes 26 seconds West 303.18 feet); THENCE leaving the new northeastern right-of-way line of Shallowford Road and running North 86 degrees 06 minutes 46 seconds East 47.76 feet to an iron pin set; THENCE North 83 degrees 54 minutes 46 seconds East 130.00 feet to an iron pin set; THENCE North 83 degrees 49 minutes 46 seconds East 70.00 feet to an iron pin set; THENCE North 63 degrees 29 minutes 46 seconds East 100.00 feet to an iron pin set; THENCE North 71 degrees 03 minutes 05 seconds East 107.16 feet to an iron pin found; THENCE North 67 degrees 42 minutes 06 seconds East 100.00 feet to an iron pin set; THENCE North 26 degrees 51 minutes 40 seconds West 183.39 feet to an iron pin found; THENCE South 66 degrees 17 minutes 38 seconds West a distance of 99.49 to a iron pin found, 1/2" rebar; THENCE South 23 degrees 47 minutes 45 seconds East, a distance of 12.23 feet to a point; THENCE South 61 degrees 31 minutes 27 seconds West, a distance of 56.24 feet to a point; THENCE South 61 degrees 33 minutes 24 seconds West, a distance of 49.36 feet to an iron pin found, 1/2" rebar; THENCE North 27 degrees 04 minutes 39 seconds West, a distance of 140.15 feet to a point on the southerly right-of-way of Arthur Lane (30' r/w); THENCE leaving said southerly r/w, North 27 degrees 56 minutes 32 seconds West, a distance of 30.01 feet to a point on the northerly right-of-way of Arthur Lane (30' r/w); THENCE along the said northerly r/w of Arthur Lane, South 63 degrees 22 minutes 01 seconds West, a distance of 48.90 feet to an iron pin found, 1" open top pipe; THENCE leaving said northerly r/w, North 28 degrees 30 minutes 14 seconds West, a distance of 101.12 feet to an iron pin found, 1/2" rebar; THENCE North 63 degrees 33 minutes 46 seconds East, a distance of 124.54 feet to an iron pin found, 1/2" rebar;

EXHIBIT A continued

Legal Description
(Lakeshore)

THENCE North 28 degrees 31 minutes 59 seconds West, a distance of 106.94 feet
to a point on the southerly right-of-way of Dorothy Drive (30' r/w); THENCE
along said southerly r/w, North 61 degrees 33 minutes 02 seconds East, a
distance of 25.35 feet to a point; THENCE leaving said southerly r/w of Dorothy
Drive (30' r/w) North 27 degrees 29 minutes 52 seconds West, a distance of 30.12
feet to an iron pin found, 1" crimp top pipe on the northerly right-of-way of
Dorothy Drive (30' r/w); THENCE leaving said northerly r/w North 27 degrees 42
minutes 03 seconds West, a distance of 196.76 feet to an iron pin found, 5/8"
rebar; THENCE North 63 degrees 10 minutes 54 seconds East, a distance of 99.49
feet to a point; THENCE North 63 degrees 02 minutes 14 seconds East 150.00 feet
to an iron pin found; THENCE South 27 degrees 43 minutes 10 seconds East 4.00 feet
to a point; THENCE North 63 degrees 02 minutes 14 seconds East 50.02 feet to a
point; THENCE North 71 degrees 52 minutes 14 seconds East 89.43 feet to a point
on the eastern right-of-way line of the segment of Dorothy Drive which runs in a
generally northwest-southeast direction; THENCE in a northwesterly direction
along the eastern right-of-way line of Dorothy Drive the following two courses
and distances: North 28 degrees 07 minutes 14 seconds West 23.88 feet to an iron
pin set; and North 35 degrees 07 minutes 14 seconds West 172.80 feet to a
concrete monument found on the southern right-of-way line of West Washington
Street; THENCE in a northeasterly, easterly and southeasterly direction along
the said southern right-of-way line of West Washington Street the following
courses and distances:    along the arc of a curve to the right, a distance
of 267.19 feet, said curve having a radius of 1330.92 feet and a chord of North
74 degrees 02 minutes 19 seconds East, 266.74 feet, to a point; THENCE South 53
degrees 26 minutes 21 seconds East, a distance of 34.63 feet to a point; THENCE
North 20 degrees 24 minutes 51 seconds East, a distance of 28.68 feet to
concrete monument found;   THENCE along the arc of a curve to the right a
distance of 98.61 feet, said curve having a radius of 1330.91 feet and a chord
of North 83 degrees 33 minutes 46 seconds East, 98.59 feet, to a point; THENCE
South 04 degrees 59 minutes 55 seconds East, a distance of 10.00 feet to a
point; THENCE North 85 degrees 54 minutes 20 seconds East, a distance of 9.50
feet to a point; THENCE North 04 degrees 35 minutes 55 seconds West, a distance
of 10.00 feet to a point; THENCE along the arc of a curve to the right a
distance of 177.16 feet, said curve having a radius of 1330.92 feet and a chord
of North 89 degrees 54 minutes 38 seconds East, 177.02 feet, to a concrete
monument found; THENCE South 86 degrees 16 minutes 15 seconds East, a distance
of 115.85 feet to a point; THENCE South 55 degrees 16 minutes 52 minutes East, a
distance of 133.74 feet to the POINT OF BEGINNING.

# EXHIBIT "2"

**mstern@firstrepublicgrp.com**

From:       "Steven Alevy" <salevy@bankersllc.com>
To:         "'Friedman, Stephen'" <stephen.friedman@bipc.com>; <mstern@firstrepublicgrp.com>
Cc:         <salevy@bankersllc.com>
Sent:       Monday, July 02, 2007 10:34 AM
Subject:    LETTER OF UNDERSTANDING -

**Private and Confidential**
June 29, 2007
Mr. Mark Stern
President
First Republic Group

Dear Mark:

This letter will set out the terms of a proposed financing of a Retail Portfolio of eleven properties in the Southeast (Southeast). Westland Industries (Westland) the financing partner will provide $13,000,000 of capital required by First Republic Group (First Republic), the operating partner, in its purchase of Southeast from Colonial Properties on the terms provided herein:

On or before June 29, 2007 (the Closing) which date can be extended with mutual agreement of First Republic and Westland, Westland and First Republic would enter into an agreement whereby Westland will provide $13,000,000 for a 50% equity and voting interest in Southeast and a 12% annual preferred return payable on a monthly basis. 7% paid current (set at 165 basis points over the 30 day libor rate) and the balance will accrue if necessary.

Parties agree to work in good faith to finalize these agreements within 7days. Until such agreements are finalized, 100% of the equity and voting interest in Southeast shall be held in escrow for the benefit of Westland.

First Republic will be responsible for any major decisions including those relating to:
(i) Refinancing  (ii) Sale of any of the properties (iii) Operations and mgmt.

Westland will have the right to arrange for the refinancing of the $13,000,000 as soon as appropriately possible.

Any disagreements or misunderstandings shall be brought to Stephen Friedman, Esq. for resolution.

This offer is open for acceptance until the close of business June 29th, 2007.
Yours truly,

AGREED AND ACCEPTED TO THIS 29th DAY OF JUNE 2007

By: Mark Stern
First Republic Group

*We should try in good faith to execu the agreement today so we can conclude our deal today & whatever Steve Friedman feels viable to secure both parties.*

7/2/2007

# EXHIBIT "3"

# OPERATING AGREEMENT
## FOR
## WESTLAND INDUSTRIES SOUTHEAST LLC, a California LLC

## Recital

This Operating Agreement is entered into effective as of July __, 2007, among the persons who are signatories to this Agreement and shall govern the relationship among the persons as Members of Company and between Company and the persons as Members, pursuant to the Act and the Articles, as either may be amended from time to time. In consideration of their mutual promises, covenants, and agreements, the parties as signatories to this Agreement do hereby promise, covenant, and agree as follows:

## ARTICLE I
### Introductory Matters

1.1    FORMATION, REQUIRED NUMBER OF MEMBERS, TERMS AND PURPOSES

Pursuant to the Act, AMUSEMENT INDUSTRY, INC., a California corporation ("AMUSEMENT") and FIRST REPUBLIC GROUP, CORP., a New York corporation ("FIRST REPUBLIC") acknowledge and confirm they are the initial Members of the limited liability company organized under the laws of the State of California known as WESTLAND INDUSTRIES SOUTHEAST LLC whose Articles were filed, effective July __, 2007. Company shall at all times have at least two Members. Unless sooner terminated, Company shall have the term provided in the Articles.

The general purposes for the organization of Company shall be those set forth in its Articles. Company may, as provided in its Articles and the Agreement, exercise all of the powers described in Title 2.5 of Corporations Code of the State of California also known as the Beverly-Killea Limited Liability Company Act, as the Act may be amended from time to time.

1.2    REGULATION OF INTERNAL AFFAIRS BY OPERATING AGREEMENT

Consistent with the Articles and the Act, the internal affairs of Company and the conduct of its business shall be governed and regulated by the Agreement, as it shall be amended in writing by Members from time to time. The term of the Agreement shall begin on the date the Articles are filed and accepted by the Secretary of State and shall be co-terminus with the period of duration of Company provided in the Articles unless Company is earlier terminated upon its voluntary or involuntary dissolution in accordance with the Agreement.

1

1.3    LAWS GOVERNING OPERATING AGREEMENT

The Agreement is subject to, and governed by, the mandatory provisions of the Act and the Articles filed with the Secretary of State, as both may be amended from time to time. In the event of a direct conflict between the provisions of the Agreement and the mandatory provisions of the Act or the provisions of the Articles, such mandatory provisions of the Act or the Articles, as the case may be, will be controlling.

1.4    USE OF FULL LEGAL NAME OF COMPANY REQUIRED

All official business of Company shall be conducted under the name WESTLAND INDUSTRIES SOUTHEAST LLC, until such time as Members shall designate otherwise and file amendments to the Articles in accordance with the Articles and the Act. The phrase "LLC" shall always appear as part of the name of Company on all correspondence, stationery, checks, invoices and any and all documents and papers executed by Company and as otherwise required by the Act.

1.5    AUTHORITY OF MEMBER/MANAGERS

Every Member who is a Manager, who acting alone or with other Members, shall have limited and defined authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of the Company. The Company shall have at least one Manager at any one time and the initial Manager shall be FIRST REPUBLIC, so long as it remains a Member of the Company. The authority of the Manager is defined below in Subparagraphs 3.1 and 3.3.

1.6    LIMITATION ON POWER TO CONTRACT DEBTS

Except as otherwise provided in the Agreement including Subparagraph 3.11, no debt shall be contracted or liability incurred by or on behalf of Company, except provided in the Articles and the Agreement, or by mutual agreement of the Members in writing.

1.7    TITLE TO ALL PROPERTIES IN NAME OF COMPANY

Real and personal property owned or purchased by Company shall be held and owned, and conveyance made, in the name of Company. Instruments and documents providing for the acquisition, mortgage or disposition of property of Company may be executed by the Company Manager or officer.

1.8    OTHER FORMATION MATTERS

A.    Adoption of Company Seal

Members shall adopt a company seal circular in form containing the words WESTLAND INDUSTRIES SOUTHEAST LLC, together with the date of organization of Company.

2

B.    Maintenance of Company Record Book

Members shall authorize the maintenance of a Company Record Book to include the Articles, the Agreement and any amendments thereto and the minutes of meetings (or consents in lieu of meetings) of Members and other important documents of Company. The Company Record Book shall be maintained at the AMUSEMENT office in California.

C.    Establishment of Bank Accounts

Members shall authorize the establishment of one or more depository accounts for the funds of Company and designate persons authorized to draw against such accounts on behalf of Company (more specifically described elsewhere in the Agreement). The Company bank accounts shall be maintained by and through the AMUSEMENT office in California.

D.    Reimbursement of Expenses of Organization

Members may authorize Company to pay the expenses of organization and to reimburse any person advancing funds for this purpose.

1.9    DEFINITIONS OF TERMS

The terms used in the Agreement with their initial letters capitalized, shall, unless the context otherwise requires, have the meanings specified in this Paragraph 1.9, or if not defined in this Paragraph 1.9, elsewhere in the Agreement. When used in the Agreement, the following terms shall have the meanings set forth below:

A.    "Act" shall mean the Beverly-Killea Limited Liability Act as amended.

B.    "Affiliate" shall mean any individual, partnership, corporation, trust, or other entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member, the term "control," as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and , with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

C.    "Agreement" shall mean this Operating Agreement between all Members of Company regulating the affairs of Company and the conduct of its business, as originally executed and as amended or restated from time to time, and shall refer to the Agreement as a whole, unless the context otherwise requires.

D.    "Articles" shall mean the Articles of Organization for Company originally filed with the Secretary of State of California, including all amendments thereto or restatements thereof and shall mean the Articles as a whole unless the context otherwise requires.

E.    "Bankruptcy" shall mean, *(i)* the entry of a decree or order for relief by a court of

3

competent jurisdiction in any involuntary case brought against a person under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; *(ii)* the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for a person or for any substantial part of his, her, or its assets or property; *(iii)* the ordering of the winding up or liquidation of a person's affairs; *(iv)* the filing of a petition in any such involuntary bankruptcy case, which petition remains not dismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); *(v)* the commencement of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; *(vi)* the consent to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for a person or for any substantial part of his, her, or its assets or property; or *(vii)* the making by a person of any general assignment for the benefit of his, her, or its creditors.

      F.     "Capital Account" shall mean the amount of the capital interest of a Member determined in accordance with Article IV of the Agreement.

      G.    "Capital Contribution" shall mean the value of any money, property (including promissory notes or other binding obligation to contribute money or property), obligation to render services to Company as capital in that Member's capacity as a Member.

      H.    "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

      I.      "Company" shall mean **WESTLAND INDUSTRIES SOUTHEAST LLC.**

      J.      "Distribution" shall mean a transfer of money or property by Company to its Members without consideration.

      K.    "Disassociation Event" for Company shall mean with respect to any Member one or more of the following:

          i.      When the period fixed for the duration of the company expires;

          ii.     By the unanimous written agreement of all Members; or

          iii.    Upon the death, retirement, withdrawal, resignation, expulsion, bankruptcy or dissolution of a Member or occurrence of any other event which terminates his continued membership in the Company, unless the business of the Company is continued by the consent of the remaining Members (if more than one) holding a Majority-In-Interest under a power to do so stated in the Articles.

      L.     "Economic Interest" shall mean the right to share in the net profits, net losses, deductions, credit or similar items and to receive distributions from Company but such term shall

4

include neither Management and Voting Rights nor Information Rights except as provided in Act Section 17106.

    M.    "Information Rights" shall mean the right to inspect, copy or obtain information and documents concerning the affairs of Company as provided in Act Section 17106 and in Paragraphs 6.3 and 6.4 of the Agreement.

    N.    "Interest" shall mean singly or collectively as the context indicates any or all of the rights of ownership of a Membership Interest in Company including Economic Interest, Voting and Management Rights and Information Rights.

    O.    "Majority-In-Interest" shall mean more than fifty percent (50%) of the interest of Members (or class of Members as the case may be) in net profits expected for the period of remaining duration of Company and capital account balance determined under the Agreement as of the date of the relevant event as such terms are defined in Revenue Procedure 94–46, 1994–28 IRB 1 or the most recent successor pronouncement.

    P.    "Management and Voting Rights" shall mean those rights of a Member described in Article III of the Agreement as they may be limited in the Agreement, the Articles and the Act.

    Q.    "Manager" shall mean any Member of Company as authorized by the Articles and the Agreement to manage the affairs of Company.

    R.    "Member" shall mean each person (other than any person who has withdrawn, been expelled, died, retired or dissolved) who has been admitted to Company as a Member in accordance with the Articles and the Agreement.

    S.    "Membership Interest" in Company shall mean the entire ownership interest of a Member in Company at any particular time, including collectively Economic Rights, Management and Voting Rights and Information Rights of such Member as provided in the Agreement and under the Act, together with the obligations of such Member to comply with all terms and provisions of the Agreement. A Membership Interest constitutes personal property. A Member or assignee of any Economic Interest of a Member has no interest in specific property of Company.

    T.    "Officer" shall mean any person, if any, elected or appointed by the Members as an officer of Company pursuant to Paragraph 3.9.

    U.    "Percentage Interest" shall mean the percentage of a Member set forth opposite the name of such Member under the column "Member's Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of the Agreement. Percentage Interests shall be determined, unless otherwise provided herein, in accordance with the relative proportions of the Capital Accounts of Members, effective as of the first day of the Company's fiscal year but with all distributions under Paragraph 5.2 hereof to be deemed to have occurred on such day immediately prior to determination of Percentage Interest of a Member.

    V.    "Person" shall mean individuals, general partnerships, limited partnerships, other limited liability companies, corporations, trusts, estates, real estate investment trusts and any other association.

W.    "Regulations" shall mean, unless the context clearly indicates otherwise, the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Internal Revenue Code of 1986, as amended.

X.    "Return of Capital" shall mean any distribution to a Member to the extent of the positive balance in the Capital Account of the Member immediately before the distribution.

Y.    "Secretary of State" shall mean the Secretary of State of California or his or her duly appointed delegate unless another state is mentioned in the same context.

Z.    "Registered Office" shall mean the office maintained at the street address of the agent for service of process of the Company in California.

## ARTICLE II
### Members, Capital Contributions, Loans, and Withdrawals, Membership Interests, Certificates, and Responsibilities of Members

2.1    NAMES, LOANS, MEMBERSHIP INTERESTS, NET PROFITS AND NET LOSSES INTEREST, AND THEIR CAPITAL CONTRIBUTIONS

The initial Members shall be the persons executing the Agreement each of whom is admitted as a Member effective as of the beginning of the term of the Agreement. Members, their respective aggregate Capital Contributions to Company, and their respective Percentage Interests in Net Profits and Net Losses of Company, are as follows:

AMUSEMENT:    50.0% Total Interest
1.    Services towards ownership interest
2.    $13 Million Loan, which FIRST REPUBLIC agrees may be secured by AMUSEMENT against personal property and real property assets of the Company until repaid.

FIRST REPUBLIC:   50.0% Total Interest
1.    $1 Million Monetary capital contribution
2.    FIRST REPUBLIC shall have assigned or shall concurrently assign with execution of this Agreement all its rights, title and interest in the Purchase and Sale Agreement with COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership of April 20, 2007 to the Company, and such assignment goes towards ownership interest.
3.    Services towards ownership interest

2.2    FORM OF CAPITAL CONTRIBUTIONS

As provided in the Articles, Members shall make the initial Capital Contributions in the form of money, property or services rendered or to be rendered or other obligation to contribute money or property or to render services. Members may make any subsequent Capital Contributions in any type

6

of money, property (including promissory notes) and services rendered or to be rendered as may be agreed upon by all of the Members. No Member shall be required to make any Capital Contributions to Company other than the capital contributions set opposite to the name above. In order to obtain additional funds or for other business purposes, a Member may contribute additional capital to Company, but only upon the written consent of all other Members.

2.3    NO ADMISSION OF ADDITIONAL MEMBERS & NEW MEMBERS UPON SALE

Members may NOT admit to Company any person as an additional Member. Sale or transfer of a Member's Interest can only occur pursuant to the provisions stated below. If a new Member arises from the sale or transfer of a current Member's interest pursuant to the provisions stated below, the new Member must become a signatory to this Operating Agreement.

2.4    LOAN WITHDRAWAL BY AMUSEMENT AND LIMITED CAPITAL CONTRIBUTION WITHDRAWAL BY FIRST REPUBLIC

A.    AMUSEMENT has loaned $13 million to Company ("Loan"). FIRST REPUBLIC has made a $1 million Capital Contribution to Company.

B.    AMUSEMENT shall have first right to receive return of its Loan. Beginning 30 days after Company formation, AMUSEMENT may procure financing that encumbers real property assets of the Company up to the amount of its Loan as exists at the time of such finance transaction, so as to receive return of its Loan in this manner. AMUSEMENT shall pay for all costs of its finance transaction, whether or not its finance transaction proceeds to closing.

C.    After AMUSEMENT receives return of its Loan in full, FIRST REPUBLIC shall have the right to receive return of its $1 million Capital Contribution. FIRST REPUBLIC may at such time procure financing that encumbers real property assets of the Company up to $1 million, so as to receive return of its Capital Contribution in this manner. FIRST REPUBLIC shall pay for all costs of its finance transaction, whether or not its finance transaction proceeds to closing.

D.    Until FIRST REPUBLIC encumbers assets of the Company and withdraws its $1 million Capital Contribution, FIRST REPUBLIC shall earn and receive no rate of return from Company on its Capital Contribution.

E.    Until AMUSEMENT encumbers assets of the Company in order to withdraw its Loan, AMUSEMENT shall earn twelve percent (12.0%) per annum interest on its $13 million Loan from Company, starting from the date escrow closes on that Purchase and Sale Agreement between FIRST REPUBLIC and COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited

7

partnership of April 20, 2007, with interest payable by Company to AMUSEMENT monthly. If the Company is unable to pay the full amount of the monthly interest to AMUSEMENT, Company shall pay a partial amount of the monthly interest as follows: 7.0% per annum interest on its Loan. The earned but unpaid interest balance of 5.0% per annum interest remaining owed by Company to AMUSEMENT shall accrue on the books of the Company as a preferred and priority debt, which shall be paid by Company to AMUSEMENT upon Company's earliest ability to do so, in the opinion of Company's accountant.

2.5    CERTIFICATES

The Membership Interest in Company may be represented by a certificate of membership.

2.6    CANCELLATION AND REPLACEMENT OF CERTIFICATES

All certificates of membership surrendered to Company for transfer shall be canceled and no new certificates of membership shall be issued in lieu thereof until the former certificates for a like number of Membership Interests shall have been surrendered and canceled, except as herein provided with respect to lost, stolen, or destroyed certificates. Any Member claiming that his, her or its certificate of membership is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and lodge the same with a Manager of Company, accompanied by a signed application for a new certificate. Thereupon, and upon the giving of a satisfactory bond of indemnity to Company not exceeding an amount double the value of the Membership Interests as represented by such certificate (the necessity for such bond and the amount required to be determined by a Manager of Company), a new certificate may be issued of the same tenor and representing the same Percentage Interests as were represented by the certificate alleged to be lost, stolen, or destroyed.

2.7    LIMITATIONS ON LIABILITY OF MEMBERS FOR DEBTS OF COMPANY

Except as provided in California Corporations Code Section 17254 relating to distributions by Company and Section 17101(b) relating to responsibility of Members for certain unsatisfied debts or obligations of Company, no Member shall be liable under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of Company whether that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to Company. No Member shall be required to make any contribution to Company by reason of any negative balance in his, her, or its capital account, nor shall any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.8    LIABILITY OF MEMBERS TO COMPANY

A.    Liability of Members to Company

A Member is liable to Company: *(i)* for the difference between his, her, or its contribution to capital as actually made and that stated in the Articles, the Agreement, subscription

8

for contribution or other document executed by the Member as having been made by the Member; and *(ii)* for any unpaid contribution to capital which he, she or it agreed in the Articles, the Agreement or other document executed by the Member to make in the future at the time and on the conditions stated in the Articles of Organization, Operating Agreement or other document evidencing such agreement.

B.    Member as Trustee for Company

A Member holds as trustee for Company *(i)* specific property stated in the Articles of Organization, Operating Agreement or other document executed by the Member as contributed by such Member, but which was not contributed or which has been wrongfully or erroneously returned; and *(ii)* money or other property wrongfully paid or conveyed to such Member on account of his, her or its contribution.

C.    Waiver of Liability of Member

The liabilities of a Member as set out in this Paragraph 2.8 can be waived or compromised only by the consent of all Members; but a waiver or compromise shall not affect the right of a creditor of Company who extended credit or whose claim arose after the filing and before a cancellation or amendment of the Articles of Organization, to enforce the liabilities.

2.9    RIGHTS OF JUDGMENT CREDITOR OF MEMBER

On application to a court of competent jurisdiction by a judgment creditor of a Member, the court may charge the Membership Interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged the judgment creditor has only the rights of an assignee of the Membership Interest. This Paragraph 2.9 does not deprive any Member of the benefit of any exemption from legal process applicable to his interest.

2.10    NON-SALE OR NON-TRANSFER "SUCCESSOR" OF A MEMBER

If a Member is re-organized or succeeded by a new or different entity, where the family in present control of the Member remains in substantial control of the new or different successor entity, that successor entity shall take the place of the Member for all purposes without having to comply with the sale and transfer provisions stated below, and with such successor not having to sign this Operating Agreement, even as the successor is subject to all terms of this Agreement as amended.

2.11    MEMBER REMUNERATION

A Member is entitled to remuneration for acting on Company business at market rates. Persons who provide services to Company are entitled to renumeration at market rates.

2.12    PROPERTY MANAGEMENT AND REMUNERATION

The Company shall preferably operate its business without hiring outside, independent property management. The initial outside, independent property management hired by Company shall be evaluated by both Members after its first 60 days. The Members must mutually agree quarterly thereafter to maintain outside, independent property management. The Company may employ persons to conduct the property management of Company assets. The terms of employment of Company employees shall be determined by mutual agreement of the Members. AMUSEMENT representative, STEVEN ALEVY, and FIRST REPUBLIC representative, MARK STERN, shall be supervisory employees of Company who shall enter into Employer-Employee Agreements with Company setting forth the terms of their employment.

### ARTICLE III
### Management and Control of Business, Including Meetings

3.1    MANAGEMENT OF COMPANY

    A.    All day-to-day property management activities and operations of Company shall be exercised by or under the authority of and under the direction of the Manager and supervisory employees, STEVEN ALEVY and MARK STERN.

    B.    FIRST REPUBLIC shall be the Manager of the Company.

    C.    Responsibility to Safekeep Funds of Company and Consent of Members

    Both Members shall have fiduciary responsibility for the safekeeping and use of all funds and assets of Company, whether or not in his immediate possession or control. The funds of Company shall not be commingled with the funds of any other person and the Members shall not employ, or permit any other person to employ, such funds in any manner except for the benefit of Company. The monies collected by Company shall be deposited into Company bank accounts. The bank accounts of Company shall be maintained in such banking institutions in California as approved by the mutual consent and agreement of Member/Manager, FIRST REPUBLIC, and Member, AMUSEMENT. Funds withdrawals shall be made only in the regular course of Company business and as otherwise authorized in the Agreement.

    D.    Check Writing and Disbursement

    AMUSEMENT in California shall receive or be forwarded all creditor request-for-payment documentation, such as Company service provider invoices, government tax bills, insurance bills, lender statements and Company employee payroll records, if any, sufficient to permit AMUSEMENT or Company personnel at AMUSEMENT'S direction to pay the expenses of Company with Company funds. After checks to pay Company expenses are drafted by personnel of AMUSEMENT or of Company at AMUSEMENT's direction in California, the checks shall be

signed by a representative of AMUSEMENT or Company in California and forwarded to MARK STERN of FIRST REPUBLIC for his signature and disbursement to creditors, however MARK STERN may waive his signature right and permit the check to be sent directly to the creditor.

E.    Every person or entity which provides services to Company shall be entitled to receive compensation at market rates for his, her or its services, including payment of a reasonable bookkeeping fee and reimbursement of expenses by Company to AMUSEMENT for bookkeeping, receivables, payables and accounting services provided by AMUSEMENT to Company.

3.2    OTHER ACTIVITIES OF MEMBERS AND MANAGER PERMITTED

Members, including Manager, may engage in other business activities and shall be obliged to devote only as much of his time to the business of Company as shall be reasonably required in light of the purposes of Company.  Manager shall perform the duties as a Manager in good faith, in a manner it reasonably believes to be in the best interests of Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

3.3    POWERS OF MANAGER AND MEMBERS

A.    Powers

The Manager shall have all necessary powers to carry out the purposes, business, and objectives of Company, subject to the following limitations. The mutual consent and agreement of both Member/Manager, FIRST REPUBLIC, and Member, AMUSEMENT, is required: 1) - before the Company enters into contracts to employ accountants, consultants, advisors and attorneys for or on behalf of Company; 2) - before the Company lends or borrows money or issues evidence of indebtedness; 3) - before the Company brings and defends actions in law or at equity; and 4) - before the Company buys, owns, manages, sells, leases, mortgages, pledges or otherwise acquires or disposes of real property or an interest in real property.

Manager may deal with any related person, firm or corporation on terms and conditions that would be available from an independent responsible third party that is willing to perform.

Member/Manager, FIRST REPUBLIC, without mutual consent and approval of Member, AMUSEMENT, may act on behalf of Company to:

(a)    acquire and dispose of Company personal property with any Person or Entity as Manager may determine. The fact that Manager is directly or indirectly affiliated or connected with any such Person or Entity shall not prohibit a Manager from dealing with that Person or Entity;

(b)    purchase liability and other insurance to protect the property and business of Company;

11

(c)    invest any funds of Company temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(d)    execute for Company all pre-approved legal instruments and documents as necessary;

(e)    hire outside independent contractors to perform services for Company properties and to compensate them from Company funds;

(f)    sign tenant leases and related tenant documentation once negotiated and approved by representatives of both Members;

(g)    pay reimbursement from Company of all expenses of Company reasonably incurred and paid by another on behalf of Company; and

(h)    do and perform all other ministerial acts as may be necessary or appropriate to the conduct of the business of Company.

B.    Additional Limitations on Power of Manager

Manager shall not have the authority to cause Company to engage in any transaction requiring a vote of Members without first obtaining the required affirmative vote or written consent. Further, Manager shall not have authority hereunder to cause Company to engage in extraordinary transactions, which require the consent and approval of all Members, and they are:

(a)    The sale, exchange or other disposition of all, or substantially all, of Company's assets occurring as part of a single transaction or plan, shall require the affirmative vote of a majority of all Members of the Company, irrespective of proportional Interest owned.

(b)    The merger of Company with any other business, limited liability company, limited partnership or corporation, shall require the affirmative vote of a majority of all Members of the Company, irrespective of proportional Interest owned.

(c)    The change in the amount or character of Capital Contributions, or change in the character of the business of Company, shall require the affirmative vote of a majority of all Members of the Company, irrespective of proportional Interest owned.

3.4    WARRANTED RELIANCE BY MEMBER ON OTHERS

In performing its duties, Member shall be entitled to rely on information, opinions, reports, or statements of the following persons or groups unless they have knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(a)    one or more employees or other agents of Company whom the Member reasonably believes to be reliable and competent in the matters presented;

(b)    any attorney, public accountant, or other person as to matters which the Member reasonably believe to be within such person's professional or expert competence; or

(c)    a committee upon which he or she does not serve, duly designated in accordance with

a provision of the Articles or the Agreement, as to matters within its designated authority, which committee the Member reasonably believes to merit competence.

3.5    LIMITATIONS ON LIABILITY OF MEMBERS

A Member shall not be liable to Company or the other Members for any loss or damage resulting from any mistake of fact or judgment or any act or failure to act unless the mistake, act or failure to act is the result of fraud, bad faith, gross negligence or willful misconduct.

3.6    ANNUAL MEETING OF MEMBERS

The annual meeting of members shall be held for the purpose of the consideration of any business that may properly come before the meeting. The annual meeting of members may be held at such date, time and place within or without the State of California as the Members of the Company may determine from time to time.

3.7    SPECIAL MEETINGS OF MEMBERS

A.    Power to Call Special Meeting

Special meetings of members for any purpose or purposes of addressing any matters on which Members may vote unless otherwise proscribed by the Act or by the Articles, may be called by written demand of Member(s) holding at least a 25.0% Interest in the Company.

B.    Date, Time and Place of Special Meeting

Special meetings of Members for any purpose or addressing any matters on which Members may vote, unless otherwise proscribed by the Act or by the Articles, may be held at such date, time and place within the State of California as shall be stated in the notice of the meeting or in a duly executed and delivered waiver of notice, provided notice of the meeting is given not less than five (5) days nor more than thirty (30) days before the date of the meeting.

3.8    NOTICES, VOTING AND PROCEDURES AT MEETINGS OF MEMBERS

A.    Required Notification of Meetings of Members

For every meeting of members there shall be mailed written notice stating the date, time, and place of the meeting, and in the case of a special meeting of members, a description of the purpose for which the meeting is called, mailed to each Member, at such address as appears in the records of Company, such notice to be mailed at least twenty but not more than sixty days before the date of the meeting. A Member may waive notice of any meeting, before or after the date of the meeting, by delivering a signed waiver to Company for inclusion in the minutes of Company. A Member's attendance at any meeting of members, in person or by proxy *(a)* waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and *(b)* waives objection to

13

consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

B.    Record Date for Eligibility of Members to Vote at Meetings of Members

The record date for the purpose of determining the Members entitled to notice of a meeting of members, for demanding a special meeting of members, for voting, or for taking any other action shall be the fifth (5th) day prior to the date of the meeting or other action.

C.    Voting by Members at Meetings of Members

A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by Manager. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for eleven months unless otherwise expressly stated in the appointment form.

D.    Weight of Votes of Members at Meetings

At any meeting of members, each Member entitled to vote shall have one vote for each 1.0% of the Company owned. So there are 100.00 votes total available to be cast.

A matter is approved if it receives approval by at least 51 votes of the total number of 100.00 votes entitled to be cast by all Members of the Company.

E.    Telephonic Participation by Members at Meetings of Members

Any or all Members may participate in any annual or special Members' meeting by, or through the use of, any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member so participating is deemed to be present in person at the meeting of members.

F.    Appointment of Chair and Secretary for Meetings of Members

At any annual or special meeting of Members, Manager shall appoint a person to preside as chair at the meeting and a person to act as secretary of the meeting. The secretary shall prepare minutes of the meeting which shall be placed in the minute book of Company.

G.    Consent by Members in Lieu of Meetings of Members

Subject to the applicable laws of the State of California any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to Company for inclusion in the minutes.

14

3.9    OFFICERS OF COMPANY

    A.    Election of Officers at Meetings of Members

        Members may elect officers at an annual or special meeting of members. The officers of Company, if deemed necessary by the Members, shall be president, vice president, secretary, and treasurer. Only an officer of a Member may be elected president or vice-president. Each Company officer shall hold office of the term for which he or she is elected until his successor has been elected. Any individual may hold any number of offices. No officer need be a resident of the State of California or citizen of the United States.

    B.    Term, Removal and Filling of Vacancy of Officers

        The officers of Company shall hold office until their successors are chosen and qualify. Any officer may be removed at any time by the affirmative vote of Members holding 51 votes of the 100.00 total votes of all Members. Any vacancy occurring in any office of Company shall be filled by a resolution of the Members holding at least 51.0% of the Percentage Interests, provided only a person who is a Member may be elected as president or vice president.

3.10    THE DEDICATED CAM BANK ACCOUNT

        The Company shall maintain a dedicated Common Area Maintenance ("CAM") bank account, preferably interest earning, within which the Company shall each month deposit CAM charges collected from tenants and any additional monies from Company income necessary to reach the monthly CAM Lodestar

        The Company may only use the funds within the dedicated CAM bank account for capital expenditures at properties owned by the Company, such as the maintenance and replacement of parking lots, roofs, common area lighting, and heating / air conditioning systems.

        The Company shall at the start of each fiscal year calculate for each property owned by Company the average CAM charge per square foot per month then being billed to tenants at each property owned by Company, pursuant to leases that include tenant responsibility for CAM.

        The Company shall then set the monthly CAM Lodestar for each property to be used in each month of the fiscal year, which shall be the calculated average CAM charge per square foot per month at each property multiplied by the number of rentable square feet at that property.

        By the last business day of each month, the Company shall deposit funds equivalent to every property's monthly CAM Lodestar into the dedicated CAM bank account, whether the deposited funds are CAM charges collected from tenants, additional monies from Company income necessary

15

to reach the monthly CAM Lodestar for all properties, or both.

3.11    MAINTENANCE OF MINIMUM SECURED DEBT TO EQUITY RATIO

At all times the Company in the aggregate of all its properties shall maintain at least a 1.30 secured debt to equity ratio, so that at a minimum the equity in all Company properties combined must be at least 130% of the Company's total secured debt.

The Company may not incur additional secured debt if the secured debt to equity ratio is less than 1.30.

If and when the Company incurs additional secured debt, both Members must agree to incur such debt. The proceeds of such debt constitute Company funds that may not be used by Members.

## ARTICLE IV
### Capital Accounts

4.1    CAPITAL ACCOUNT FOR EACH MEMBER

Company shall maintain a separate Capital Account as defined in simplified form in Paragraph 4.2 below for each member strictly in accordance with the requirements of Code Section 704(b) and applicable regulations promulgated thereunder. The Members intend that the Capital Accounts of the Members be maintained strictly in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv), as amended from time to time. In this connection, to the extent the results determined under a literal application of this Paragraph 4.1 vary from the results that would be obtainable under the rules described in Regulations Section 1.704-1(b)(2)(iv), the rules set forth in Regulations Section 1.704-1(b)(2)(iv) shall be used and govern the maintenance of capital accounts under the Agreement.

4.2    SIMPLIFIED DESCRIPTION OF CAPITAL ACCOUNT DETERMINATION

Subject to the other paragraphs in this Agreement, "Capital Account" generally means:

The amount of money contributed by the Member to Company,
**increased (credited) by**:

(i)     The fair market value of property other than money contributed by the Member to Company as determined by the contributing Member and Company,

(ii)    The Net Profits allocated to the Member,

(iii)   The amount of any liabilities of Company assumed by Member or which are secured by property distributed to Member by Company.

16

**decreased (debited) by**:

| | | |
|---|---|---|
| (i) | The amount of capital returned to the Member, if any, |
| (ii) | The fair market value of property distributed to the Member by Company as determined by recipient Member and Company, |
| (iii) | The Member's share of expenditures of Company described in Code Section 705(a)(2)(B) (including, for this purpose, losses which are nondeductible under Code Section 267(a)(1) or Section 707(b)), |
| (iv) | The Net Losses allocated to the Member, |
| (v) | The amount of any liabilities the Member assumed by Company or secured by property contributed by Member of Company. |

4.3    CAPITAL ACCOUNT ADJUSTMENTS FOR SPECIAL EVENTS

A.    Succession to Capital Account

In the event all or a portion of a Membership Interest is transferred in accordance with the terms of the Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

B.    Assumption of Liability

An assumption of unsecured liability by Company shall be treated as a distribution of money to the Member. An assumption of the unsecured liability of Company by a Member shall be treated as a cash contribution to Company. In determining the amount of any liability for this purpose, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

C.    Adjustment for Noncash Distribution

In the event that assets of Company other than cash are distributed in kind to a Member, Capital Accounts shall be adjusted for the hypothetical "book" gain or loss that would have been realized by Company if the distributed assets had been sold for their fair market values in a cash sale (in order to reflect unrealized gain or loss).

D.    Adjustment to Fair Market Upon Transfer of Interest

Capital Accounts shall be adjusted to reflect fair market value of all properties in the event of acquisition of Membership Interest by an existing or new Member.

E.    Adjustment for Constructive Termination of Company

Capital Accounts also shall be adjusted upon the constructive termination of Company as provided under Code Section 708 in accordance with the method set forth in the

immediately preceding paragraph [as required by Regulations Section 1.704-1(b)(2)(iv)(b)].

  F.  Adjustment for Recapture of Certain Credits

    Capital Accounts shall be adjusted appropriately on account of investment tax credit and investment tax credit recapture in accordance with the principles of Code Section 48(q).

## 4.4 POWER TO MODIFY CAPITAL ACCOUNTS TO COMPLY WITH TAX REGULATIONS

  The foregoing provisions and the other provisions of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managers determine that it is necessary to modify the manner in which the Capital Accounts are computed in order to comply with such Regulations and to reflect the agreed upon allocation of the distribution of cash, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any member upon the dissolution of Company. The Members also shall make any appropriate modifications in the event unanticipated events occur that might otherwise cause the Agreement not to comply with Regulations Section 1.704-1(b).

## 4.5 MAINTENANCE OF INCOME (DRAWING) ACCOUNTS

  A separate individual income account shall be maintained for each Member. At the end of each fiscal year, each Member's share of the Net Profits and Net Losses of Company shall be credited or debited to, and his withdrawals during the fiscal year deducted from, his income account. After such amounts have been credited or debited to and deducted from the income account of a Member, any balance or deficit remaining in such account shall be transferred to or charged against the individual capital account of such Member.

## 4.6 SUCCESSION TO CAPITAL ACCOUNTS BY TRANSFEREE OF INTEREST

  In the event any interest in Company is transferred in accordance with the terms of the Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

## ARTICLE V
### Allocations of Net Profits and Net Losses and Distributions

## 5.1 ALLOCATION OF NET PROFITS AND NET LOSSES

  A. Allocation of Net Profits

    Up to 100% of the Net Profits for any fiscal year may be allocated to each Member in accordance with its Percentage Interest of LLC ownership.

18

If there exists a net profit earned by the Company for the just concluded fiscal year, then all Members must mutually agree whether or not to pay all or part of the net profit as a dividend to Members for each issued membership interest, so that each Member shall receive his dividend in proportion to the percentage of ownership each Member has in the Company.

If such agreement to distribute some or all net profit is reached, it must be made within 30 days after the net profit calculation is complete. If such an agreement is made, then the agreed portion of net profit to be distributed to Members, shall be distributed no later than 30 days after the agreement to distribute is reached.

If no such agreement to distribute some or all net profit is reached within 30 days after the net profit calculation is complete, then the disagreement is subject to be submitted to Stephen Friedman, Esq. for resolution pursuant to Subparagraph 11.8 below.

Whether an agreement to distribute is reached or a decision to distribute is made by Stephen Friedman, Esq., then the distribution to the Member shall be distributed no later than 30 days after the agreement to distribute is reached or 30 days after Stephen Friedman, Esq.'s decision to distribute is made.

Subject to any limitations described elsewhere in the Agreement including but not limited to Subparagraphs 5.1.M. and 5.1.N., the above allocation of Net Profits may be modified by subsequent agreement to conform to adjustments made to the Percentage Interest because of loans converted to Capital Contributions, any distributions of cash and any liquidating distribution. If a Member's Percentage Interest is not the same throughout a given fiscal year, the Managers shall determine the allocation of Net Profit by taking into account this varying Percentage Interest during the year but such determination shall be in conformity with the requirements of Code section 706(d) and the regulations thereunder.

"Net Profits" refers to all items of income (including all items of gain and including income exempt from tax) as properly defined for "book purposes". Net Profits shall be determined based on the value of the assets of Company as set forth on the books of Company in accordance with the principles of Regulations Section 1.704-1(b)(2)(iv)(g). Otherwise, income and loss shall be determined strictly in accordance with Federal income tax principles (including rules governing depreciation and amortization), applied hypothetically based on values of Company assets as set forth on the books of Company.

      B.     Allocation of Net Losses

19

Except as otherwise provided under the Agreement and after giving effect to the special allocations in Subparagraphs 5.1.C. through 5.1.L., Net Losses for any fiscal year shall be allocated to each Member accordance with his, her or its Percentage Interest of LLC ownership. Subject to any limitations described elsewhere in the Agreement including but not limited to Subparagraphs 5.1.M. and 5.1.N., the above allocation of Net Losses may be modified by subsequent agreement to conform to adjustments made to the Percentage Interest because of loans converted to Capital Contributions, any distributions of cash and any liquidation distributions. If a Member's Percentage Interest is not the same throughout a given fiscal year, the Managers shall determine the allocation of Net Losses to the Member by taking into account his varying Percentage Interest during the year but such determination shall be in conformity with the requirements of Code Section 706(d) and the regulations thereunder.

"Net Losses" refer to all items of loss (including deductions) as properly determined for "book purposes". Net Profits and Net Loses shall be determined based on the value of the assets of Company as set forth on the books of Company in accordance with the principles of Regulations Section 1.704-1(b)(2)(iv)(g). Otherwise, income and loss shall be determined strictly in accordance with federal income tax principles (including rules governing depreciation and amortization), applied hypothetically based on values of Company assets as set forth on the books of Company.

C.    Allocation of Company Minimum Gain

Notwithstanding any other provision of the Agreement, if there is a net decrease in Company Minimum Gain for a Company taxable year, then each Member shall be allocated items of income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, an amount equal to the greater of *(a)* the portion of such Member's share of the net decrease in Company Minimum Gain during such year that is allocable to the disposition of Company property subject to one nor more Nonrecourse Liabilities of Company and *(b)* the deficit balance in such Member's capital account at the end of such year. Such allocations shall be made before any other allocation of Company items for the year. For the purpose of this Paragraph 5.1, the balance in a Members's capital account at the end of such year shall be determined with the adjustments prescribed by Regulations Section 1.704–1T(b)(4)(iv)(e)(2). Such allocations shall be made in accordance with the provisions of Regulations Section 1.704–1T(b)(4)(iv)(e).

D.    Allocation of Member's Share of Minimum Gain

Notwithstanding any other provision of the Agreement, if there is a net decrease during a Company taxable year in the Member's Share of Minimum Gain, then any Member with a share of the Minimum Gain at the beginning of such year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to the greater of *(a)* the portion of such Member's share of the net decrease in the

Minimum Gain that is allocable to the disposition of Company property subject to such Member's Nonrecourse Debt, and *(b)* the deficit balance in such Member's capital account at the end of such year. The items of Company income and gain allocated by this Paragraph 5.1 shall not include any items of income or gain allocated pursuant to the Paragraph above. The allocations under this Paragraph 5.1 shall be made before any other allocation (except any allocations made pursuant to this Paragraph 5.1 above) of Company items for the year. For the purpose of this Paragraph 5.1, the balance in a Member's capital account at the end of such year shall be determined with the adjustments prescribed by, and the allocations hereunder shall be made in accordance with, the provisions of Regulations Section 1.704-1T(b)(4)(iv)(h)(4).

E.     Allocation of Net Profits and Gains Under Qualified Income Offset

Items of Net Profits and gain shall be specially allocated to each Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible in the event any Member unexpectedly receives any *(i)* distributions that, as of the end of such year, reasonably are expected to be made to a Member to the extent they exceed offsetting increases to such Member's capital account that reasonably are expected to occur during (or prior to) Company taxable years in which such distributions reasonably are expected to be made (other than increases pursuant to a minimum gain chargeback of the Agreement) or *(ii)* adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6). This subparagraph is intended to comply with Regulation Section 1.704-1(b)(2)(ii)(d) and should be so interpreted.

F.     Allocation of Nonrecourse Deductions

Member Nonrecourse Deductions shall be allocated to the Member, if any, that bears the economic risk of loss for the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable. If more than one Member bears the economic risk of loss for a Member Nonrecourse Debt, the Nonrecourse Deduction attributable to such Member Nonrecourse Debt shall be allocated among such Members in accordance with the ratios in which the Members share the economic risk of loss for such Nonrecourse Debt. Otherwise, Nonrecourse Deductions shall be allocated in the same manner as, and be subject to the same restrictions imposed upon Net Losses.

G.     Allocation of Income, Gains and Losses Related to Contributed Property

In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to Company for federal income tax purposes and its initial Gross Asset Value. In the event the Gross Asset Value of any Company asset is adjusted subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take

21

account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Managers in any manner that reasonably reflects the purpose and intention of the Agreement. Allocations pursuant to this Subparagraph are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any member's Capital Account or share of Net Profits, Net Losses, or other items or distributions pursuant to any other provision of the Agreement.

H.    Allocation of Gain - Loss from Sale or Other Disposition of Property not Revalued

If, in connection with the admission of an additional Member to Company or the liquidation of a Member's Interest in Company, Company property is not revalued pursuant to Regulations Section 1.704-1(b)(2)(iv)(f) and the Members' capital accounts are not adjusted accordingly, then, upon any subsequent sale or other disposition of Company property, gain or loss recognized upon the sale or other disposition shall be allocated among the Members so as to take into account the variation between the adjusted basis of such property and its fair market value as of the date the additional Member was admitted or the date the Member's Interest was liquidated, as the case may be, in the same manner as under Code Section 704(c).

I.    Allocation of Gains and Losses Related to Adjustments in Tax Basis

To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

J.    Allocation to Avoid Adjusted Capital Account Deficit

Notwithstanding any other provision of this Article, no Member shall receive an allocation of Net Losses, Net Capital Loss, Nonrecourse Deductions, or any other item of loss or deduction that would create or increase an Adjusted Capital Account Deficit of the Member. Any loss, or item thereof, that cannot be allocated to a Member as a result of the foregoing limitation shall be allocated to all Members. Any loss, or item thereof, allocated to all Members pursuant to the preceding sentence shall be taken into account in computing subsequent allocations of Net Profits or Losses or Net Capital Gain or Loss so that the net amount of any items so allocated and the profits, losses and all other items allocated to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each Member if the allocations required by the preceding

22

sentence had not been made.

K.    Allocation of Gross Income to Restore Capital Account Deficit

In the event any Member has a distribution in his Capital Account at the end of any fiscal year which is in excess of the sum of *(i)* the amount the Member is obligated to restore pursuant to any provision of the Agreement, and *(ii)* the amount the Member is deemed to be obligated to restore pursuant to the penultimate sentences of Section 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, such Member shall be specially allocated items of income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this subparagraph shall be made only if and to the extent that such Member would have a Capital Account with a deficit balance in excess of such sum after all other allocations provided for in this Paragraph 5.1 have been made as if Subparagraph 5.1E relating to allocations under a qualified income offset hereof and this subparagraph were not in the Agreement.

L.    Allocation of Capital Event Adjustments and Subsequent Effects

To the extent the Gross Value of any asset of Company is increased or decreased for a "capital event" as described in Paragraph 4.3 relating to Capital Account adjustments for special events, any resulting book gain or loss shall be allocated as required for capital account purposes and subsequent allocations of income, gain, loss or deduction with respect to such asset shall take into account any difference between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value.

M.    Allocation of Net Profits and Net Losses Consistent with Distributions

Notwithstanding any other provision of the Agreement, the Net Profits and Net Losses shall be allocated in a manner that is consistent with the requirements for distributions of cash described elsewhere in the Agreement, the requirements for distribution of assets of Company upon its dissolution and winding up strictly in accordance with capital account balances determined in accordance with these procedures described below and the requirements for the allocations to comply with applicable Regulations under Code Section 704(b).

N.    Allocation of Income, Gain, Losses, and Deductions to Comply with Regulations and
       Intentions of Members

The allocations of income, gains, losses, and deductions set forth in the Agreement are intended to comply strictly with Regulations Section 1.704-1(b), Regulations Section 1.704-1T(b)(4)(iv), and Regulations Section 1.704-2, and are intended to have "substantial economic effect" within the meaning of those Regulations. The allocations may not be consistent with the manner in which Members intend to divide Company distributions. Accordingly, Managers are

23

hereby authorized to divide allocations of Net Profits, Net Losses, and other items among Members so as to prevent the allocations from distorting the manner in which the Members intend the Company distributions to be divided among Members pursuant to this Article V. In general, Members anticipate that this will be accomplished by specially allocating other Net Profits, Net Losses, and items of income, gain, loss, and deduction among the Members so that the net amount of the allocations and such special allocations to each such Member is zero. If, for whatever reason, Managers determine that the allocation provisions of the Agreement are unlikely to be respected for federal income tax purposes, the Managers are granted the authority to amend the allocation provisions of the Agreement, to the minimum extent necessary to effect the plan of allocations and distributions provided in the Agreement. The Managers shall have the discretion to adopt and revise rules, conventions and procedures as they believe appropriate in any reasonable manner with respect to the admission of Members to reflect the Members' Interests in Company at the close of the year.

     O.     Order for Applying Allocation Provisions

The allocation provisions of this Paragraph 5.1 shall be applied in the following order from first to last:

     (i)     Allocation of company minimum gain as required by Subparagraph C;

     (ii)     Allocation of member's share of minimum gain chargeback as required by Subparagraph D;

     (iii)     Allocation of Net Profits and gains under qualified income offset as required by Subparagraph E;

     (iv)     Allocation of nonrecourse deductions as required by Subparagraph F;

     (v)     Allocation of income, gains or losses related to contributed property as required by Subparagraph G;

     (vi)     Allocation of gain and loss from sale or other disposition of property not revalued as required by Subparagraph H;

     (vii)     Allocation of Net Profits as required by Subparagraph A;

     (viii)     Allocation of Net Losses as required by Subparagraph B;

     (ix)     Allocation of gains and losses related to adjustment in tax basis as required by Subparagraph I;

     (x)     Allocations to avoid adjusted capital account deficit as required by Subparagraph J;

     (xi)     Allocation of gross income to restore capital account deficit as required by Subparagraph K;

     (xii)     Allocation of a capital account adjustments and subsequent effects as required by Subparagraph L;

     (xiii)     Allocation of Net Profits and Net Losses consistent with distributions as required by Subparagraph M;

(xiv)    Allocation of income, gains, losses and deductions to comply with regulations and intentions of Members as required by Subparagraph N.

5.2    DISTRIBUTIONS OF NET CASH FLOW BY COMPANY

Subject to any limitations found elsewhere in the Agreement and under law including the requirements of Section 17254 of the Act that the assets of Company after the distribution be in excess of all liabilities except for liabilities owed to Members for their Capital Contributions, Members acting as Managers may, but are not required to do so, distribute any Net Cash Flow as defined below among Members in accordance with their respective Percentage Interest in Net Profits, but only to those persons or entities recognized on the books of Company as Members or as assignees of interests on the day of the distribution. With respect to any fiscal period, Net Cash Flow means all cash revenues of Company during that period (including interest or other earnings on the funds of Company), less the sum of reserves for the following amounts:

(i)     All payments of principal and interest on any indebtedness of Company;

(ii)    All payments for carrying costs or operating costs incurred incident to the operation of the business of Company and in accordance with the terms of the Agreement; and

(iii)   Reasonable working capital funds for contingencies incident to the conduct of the business of Company.

5.3    ALLOCATIONS OF NET PROFITS AND LOSSES AND DISTRIBUTIONS IN RESPECT OF TRANSFERRED MEMBERSHIP INTERESTS

If any Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of Company, each item of income, gain, loss, deduction, or credit of Company for such fiscal year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon its respective Interest at the close of such day.

For the purpose of accounting convenience and simplicity, Company shall treat a transfer of, or an increase or decrease in, an Interest in Company which occurs at any time during a semi-monthly period (commencing with the semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semi-monthly period such transfer, increase or decrease actually occurs (i.e., sales and dispositions made in the first 15 days of a month will be deemed to have been made on the 16th of the month).

Notwithstanding any provision above to the contrary, gain or loss of Company realized in connection with a sale or other disposition of any of the assets of Company shall be allocated solely

25

to the parties owning Interests in Company as of the date such sale or other disposition occurs.

### 5.4    DISTRIBUTIONS OF ASSETS BY COMPANY

Distributions of assets with respect of an Interest in Company shall be made only to the Members who, according to the books and records of Company, are the holders of record of the interests in respect of which such distributions are made on the actual date of distribution. Neither Company nor any Member shall incur any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in Company which has not been approved by unanimous vote of the Members.

### 5.5    RIGHT TO DISTRIBUTIONS

No Member shall be entitled to any distribution from Company until Company actually makes the distribution. No Member shall have the right to demand that any distribution be paid in any form other than cash.

### 5.6    IMPAIRMENT OF CAPITAL AND LIMITATIONS ON DIVISION AND DISTRIBUTION OF NET PROFITS

Company may, from time to time, divide the net profits of its business and distribute the same to the Members of Company upon the basis stipulated in this Article V; provided that after distribution is made, the assets of Company are in excess of all liabilities of Company except liabilities to Members on account of their Capital Contributions after giving effect to all distributions, revaluations and allocations.

### ARTICLE VI
### Accounting, Records, and Reporting

### 6.1    ACCOUNTING DECISIONS AND RELIANCE ON OTHERS

The Members shall make all decisions as to accounting matters, except as otherwise specifically set forth herein. The Members may rely upon the advice of the independent accountants of the Company as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

### 6.2    MAINTENANCE OF BOOKS AND RECORDS AND ACCOUNTING

The Company shall cause the books and records of Company to be kept, and the financial position and results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes, under the control of AMUSEMENT. The books and records of Company shall reflect all Company transactions and shall be appropriate and adequate for

26

Company's business.

## 6.3    PROVISION OF ACCESS FOR MEMBERS TO ACCOUNTING RECORDS

The Company shall cause all books and records of Company to be maintained at the office of AMUSEMENT in California, and each Member or holder of an Economic Interest, and his duly authorized representative, shall have access to them and the right to inspect and copy them at reasonable times.

## 6.4    DELIVERY OF QUARTERLY AND ANNUAL INFORMATION TO MEMBERS

The accounting personnel used by Company shall use best efforts to deliver to each Member within 90 days after the end of each fiscal year all information necessary for the preparation of such Member's federal income tax return.  Company shall also use its best efforts to prepare, within 120 days after the end of each fiscal year, a financial report of Company for such fiscal year, containing a balance sheet as of the last day of the year then ended, an income statement for the year then ended, a statement of cash flows, and a statement of reconciliation of the Capital Accounts of Members.  A copy of this yearly financial report shall be provided to each Member.

In addition, every Member shall receive a copy of a quarterly report from the Company containing a profit and loss statement and balance sheet, prepared by the Company or the Company's accountant.

## 6.5    FEDERAL INCOME TAX ELECTIONS MADE BY ACCOUNTANT

The Company's accountant on behalf of Company may make all elections for federal income tax purposes, including but not limited to, the following:

A.    Accounting Period

Company's accountant may elect any annual accounting period permitted under the Code.

B.    Accounting Method

For financial reporting purposes, the Company's accountant may elect that the books and records of Company shall be kept according to any method of accounting applied in a consistent manner that shall reflect all transactions of Company and be appropriate and adequate for the purposes of Company.  To the extent permitted by applicable law and regulations, the Manager may elect to use an accelerated depreciation method on any depreciable unit of the assets of Company.

C.    Adjustment of Basis of Assets

In case of a transfer of all or part of the Interest of any Member, the Manager may

27

elect, pursuant to Code Sections 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of Company.

6.6    OBLIGATIONS TO REPORT ALLOCATIONS ON TAX RETURNS

Members are aware of the income tax consequences of the allocations made by Article V of the Agreement and hereby agree to be bound by the provisions of this Paragraph 6.6 in reporting their shares of Company income and loss for federal income tax purposes.

6.7    ANNUAL FILING OF LIST OF MANAGERS AND DESIGNATION OF AGENT FOR SERVICE OF PROCESS, IN CALIFORNIA AND IN STATES OF PROPERTY OWNERSHIP

The Company shall file with the Secretary of State, or equivalent outside of California, an annual or bi-annual statement on a form prescribed and enclose any required filing fee. The Company shall also qualify to conduct intrastate business in States where it owns real property.

## ARTICLE VII
### Transfer and Assignment of Interests

7.1    NO TRANSFER UNLESS BY TERMS OF THIS AGREEMENT

To accomplish the purpose of this Agreement, any transfer, sale, assignment, hypothecation, encumbrance, or alienation of any part of his Membership Interest in the Company other than according to the terms of this Agreement is void and transfers no right, title, or interest in or to those shares or any of them, to the purported transferee, buyer, assignee, pledgee, or encumbrance holder.

7.2    LEGEND ON CERTIFICATE

Each Member agrees that on the reverse of the certificate representing the Interest of the Company presently owned or hereafter acquired by that Member, the following language will be placed:

"The transfer, sale, assignment, hypothecation, encumbrance or alienation of any part of the Company's Membership Interest represented by this certificate is restricted by a Operating Agreement among all of the Members of this Company dated _____, 2007. All the terms and provisions of the Operating Agreement are hereby incorporated by reference and made a part of this certificate."

7.3    SALE OF MEMBERSHIP INTEREST

In the event any Member desires to dispose of any part of its Membership Interest in the Company, that Member shall first offer to sell that Membership Interest to the Company, by giving the Company written notice to that effect. The notice must specify the Membership Interest

percentage of the Company offered for sale and be given in the manner prescribed in paragraph 11.3.

The noticed Company shall have the first option for 30 days after service of notice to purchase the offered Membership Interest at the same price that can be obtained by the offering Member for the offered Membership Interest, or at the fair market value of the offered Membership Interest, whichever is less.

If the noticed Company fails to exercise its option, then then the offering Member shall then offer to sell the Membership Interest to be transferred/sold to all other Member(s), by giving them written notice to that effect. The notice must specify the Membership Interest percentage of the Company offered for sale and be given in the manner prescribed in paragraph 11.3.

The noticed Member(s) shall have an option for 30 days after service of notice to purchase the offered Membership Interest at the same price that can be obtained by the offering Member for the offered Membership Interest, or at the fair market value of the offered Membership Interest, whichever is less.

The parties to the proposed transaction can always agree to a value of their own.

The entire purchase price must be paid by the purchasing Company or Member(s) to the offering Member, within 60 days after the purchasing Company or Member(s) notified the offering Member of its desire to purchase the offered Membership Interest.

Each party shall be responsible for any and all taxes due on moneys received herein.

The selling Member shall transfer his purchased Membership Interest in the Company to the buying Company or Member(s), as soon as payment to the selling Member is made.

## ARTICLE VIII
### Dissolution and Winding Up

8.1    CONDITIONS OF DISSOLUTION OF COMPANY

Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(i)    The expiration of the period fixed for the duration of Company term as stated in its

29

Articles, if stated;

(ii)     A determination by the unanimous written agreement of all Members that Company shall be dissolved and wound up;

(iii)    The occurrence of a Disassociation Event and the failure of either *(a)* Company or the Remaining Members to purchase the Interest of the Former Member, or *(b)* the other Members to provide written consent for the transfer resulting in the occurrence of the Disassociation Event or *(c)* Members holding a Majority-In-Interest to provide written consent to the continuation of business of Company provided in all cases that Company will have at least two Remaining Members;

(iv)    The sale of all or substantially all of the assets of Company, unless Members holding a Majority-In-Interest consent to the continuation of business by Company; or

(v)     The entry of a decree of judicial dissolution by a court of competent jurisdiction pursuant to California Corporations Code 17351.

8.2    FILING OF STATEMENT OF INTENT TO DISSOLVE COMPANY

As soon as possible following the occurrence of any of the events specified in Paragraph 8.1, Managers on behalf of Company shall execute a Certificate of Dissolution in such form as shall be prescribed by the Secretary of State and shall file the certificate as required by the Act. Upon the filing of the Certificate of Dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business. Its separate existence shall continue until the Certificate of Cancellation of articles of organization has been filed with the Secretary of State or until a decree dissolving the company has been entered by a court of competent jurisdiction. The Managers who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by the Secretary of State, a Certificate of Cancellation of Articles of Organization upon the winding up of the affairs of Company.

8.3    WINDING UP AFFAIRS OF COMPANY

Upon the occurrence of any of the events specified in Paragraph 8.1, Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, disposing of and conveying its property, collecting and dividing its assets, satisfying the claims of its creditors and prescribing and defending actions by or against company in order to collect and discharge obligations. No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the business and affairs of Company. To the extent not inconsistent with the foregoing, all covenants and obligations in the Agreement shall continue in full force and effect until such time as the assets have been distributed and Company has terminated.

8.4    RESPONSIBILITY FOR WINDING UP AFFAIRS OF COMPANY

Managers who have not wrongly dissolved Company, or if none the Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the

liabilities of Company and its assets, shall cause its assets to be liquidated as promptly as is consistent with obtaining the fair market value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as next provided. The persons responsible for winding up the affairs of Company shall give written notice of the commencement of winding up by mail for all known creditors and claimants whose addresses appear on the records of Company.

8.5    ORDER OF PAYMENT OF LIABILITIES UPON DISSOLUTION

In settling accounts of Company after dissolution, the Managers shall settle the liabilities of Company with payments in the following order, as required by the Act:

(i)    To creditors other than Members, in the order of priority as provided by law, except those to Members of Company on account of their contributions;

(ii)    To creditors who are Members in order of priority except amounts owed to Members on account of their contributions;

(iii)    To Members of Company in respect of their share of the Net Profits and other compensation by way of income on their contributions;

(iv)    To Members for return of their contributions; and

(v)    To Members of Company in accordance with the respective positive account capital balances after giving effect to all Capital Contributions, distributions, revaluations and allocations required under this Agreement.

8.6    LIMITATIONS ON PAYMENTS MADE IN DISSOLUTION

Except as otherwise specifically provided in the Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his positive capital account balance. Managers or Members winding up the affairs of Company shall be entitled to reasonable compensation. All payments to the Members upon the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d).

## ARTICLE IX
### Non-Compete/Similar Business

9.1    As long as this agreement shall remain in force and effect and a Member holds any Membership Interest in the Company, that Member shall not begin, be employed by, consult for, or participate in, any business that competes with the Company or any of its properties.

31

9.2    [Deleted]

9.3    No Member shall allow any person or entity other than the Company to exploit business opportunities that become known to the Member, that are related to the Company's already existing business activities or intentions in the States where the Company owns property.  Business opportunities in the real property ownership and investment field that become known to any Member in States where the Company owns property must be disclosed to the Company for use and exploitation by the Company.

9.4    [Deleted]

9.5    [Deleted]

9.6    [Deleted]

9.7    [Deleted]

9.8    Should a majority of at least 51.0% of the Membership Interests of the Company authorize and approve the sale or merger of all or substantially all assets of the Company to another entity or person, then all Members within 20 days of written notice by the Company of such intended sale or merger, must sell the shares then owned in the Company for the price and upon the terms and conditions agreed by the majority of the Membership Interests of the Company.

**ARTICLE X**
**Indemnification**

10.1    INDEMNIFICATION OF MEMBERS AND MANAGERS
        To the greatest extent not inconsistent with the Act and the other laws and public policies of the State of California, Company shall indemnify against expenses and liabilities any Member or Manager or STEVEN ALEVY made a party or who was threatened to be made a party to any proceeding by Company or another because such party is or was a Member or Manager, or because of STEVEN ALEVY's services provided to Company, as a matter of right, against all liability incurred by such person in connection with any action, suit, or proceeding or any threatened, pending or complete action of suit or proceeding; whether civil, criminal, administrative, or investigative provided that it shall be determined in the specific case in accordance with procedures set forth in Paragraph 10.6 that indemnification of such person is permissible in the circumstances because the person has met the standards of conduct for indemnification set forth in Paragraph 10.5.

32

A.    EXCEPTIONS TO INDEMNIFICATION

Company shall not indemnify or defend MARK STERN or FIRST REPUBLIC GROUP, its affiliates, agents, employees, successors and assigns, for any Proceeding, Liabilities of, or claim raised or pursued by, COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership, including its affiliates, agents, employees, successors and assigns.

Company shall not indemnify or defend MARK STERN or FIRST REPUBLIC GROUP, its affiliates, agents, employees, successors and assigns, for any Proceeding, Liabilities of, or claim raised or pursued by, Creditors of COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership or any of its eleven properties purchased and sold pursuant to that Purchase and Sale Agreement between FIRST REPUBLIC and COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership of April 20, 2007, including their affiliates, agents, employees, successors and assigns, where the Creditor Claimant is known to MARK STERN or FIRST REPUBLIC, and, the claim's basis is a transaction or event prior to the execution of this Agreement.

B.    INDEMNIFICATION BY MARK STERN / FIRST REPUBLIC

MARK STERN and FIRST REPUBLIC GROUP shall indemnify, defend and hold harmless Company and AMUSEMENT, its affiliates, agents, employees, successors and assigns, for any Proceeding, Liabilities of, and claim raised or pursued by, COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership, including its affiliates, agents, employees, successors and assigns. Such indemnification includes Expenses, such as costs and attorney's fees.

MARK STERN and FIRST REPUBLIC GROUP shall indemnify, defend and hold harmless Company and AMUSEMENT, its affiliates, agents, employees, successors and assigns, for any Proceeding, Liabilities of, and claim raised or pursued by, Creditors of COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership or any of its eleven properties purchased and sold pursuant to that Purchase and Sale Agreement between FIRST REPUBLIC and COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership of April 20, 2007, including their affiliates, agents, employees, successors and assigns, where the Creditor Claimant is known to MARK STERN or FIRST REPUBLIC, and, the claim's basis is a transaction or event prior to the execution of this Agreement. Such indemnification includes Expenses, such as costs and attorney's fees.

MARK STERN and FIRST REPUBLIC GROUP shall indemnify, defend and hold harmless Company and AMUSEMENT, its affiliates, agents, employees, successors and assigns, for any Proceeding, Liabilities of, and claim raised or pursued by, any lender of MARK STERN and FIRST REPUBLIC GROUP. Such indemnification includes Expenses, such as costs and attorney's

33

fees.

    C.    NO RESPONSIBILITY FOR DEBTS OF MARK STERN / FIRST REPUBLIC

        Company and AMUSEMENT shall not be responsible in any manner to MARK STERN or FIRST REPUBLIC for debts incurred by them, including loans and financing obtained by them that allows Company and FIRST REPUPBLIC to complete performance of that Purchase and Sale Agreement between FIRST REPUBLIC and COLONIAL REALTY LIMITED PARTNERSHIP, a Delaware limited partnership of April 20, 2007.

10.2    ADVANCE UNDERTAKINGS FOR INDEMNIFICATION

        To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, Company shall pay for or reimburse the reasonable expenses incurred by a Member or Manager in connection with any such proceeding as incurred in advance of final disposition of the action, suit, or proceeding thereof if *(i)* the person furnishes Company a written affirmation of the person's good faith belief that he, she or it has met the standard of conduct for indemnification described in Paragraph 10.5, *(ii)* the person furnishes Company a written undertaking, executed personally or on such person's behalf, to repay the advance if it is ultimately determined by a court of competent jurisdiction that such person did not meet such standard of conduct and that such person is not entitled to be indemnified, and *(iii)* a determination is made in accordance with the procedures set forth in Paragraph 10.6 that based upon facts then known to those making the determination, indemnification would not be precluded under this Article X.

        The undertaking described above must be a general obligation of the person, subject to such reasonable limitations as Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. Company shall indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the person in connection with the proceeding without the requirement of a determination as set forth in Paragraph 10.6.

10.3    ADVANCEMENT OF EXPENSES

        Upon demand by a Member or Manager for indemnification or advancement of expenses incurred in defending a civil or criminal suit or proceeding, as the case may be, Company shall expeditiously determine whether the Member or Manager is entitled thereto in accordance with this Article. The indemnification and advancement of expenses provided for under this Article shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Agreement.

10.4    INDEMNIFICATION OF OTHERS

Company shall be empowered, but not be obligated, to indemnify any person who is or was an employee or agent of Company to the same extent as if such person was a Member or Manager.

10.5    STANDARDS OF CONDUCT REQUIRED FOR INDEMNIFICATION

Indemnification of a Manager or Member is permissible under Paragraph 10.1 only if *(i)* the person conducted itself in good faith, and *(ii)* the person reasonably believed that its conduct was in or at least not opposed to Company's best interest; and *(iii)* in the case of any criminal proceeding, the person had no reasonable cause to believe his, her or its conduct was unlawful. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the person did not meet the standard of conduct described in this Paragraph 10.5.

10.6    PROCEDURES TO APPROVE INDEMNIFICATION

A determination as to whether indemnification of or advancement of expenses is permissible shall be made by any one of the following procedures:

(i)    By the Members holding a Majority-In-Interest.

10.7    DESCRIBED INDEMNIFICATION RIGHTS AS NON-EXHAUSTIVE

Nothing contained in this Article shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any person who is or was a Member or Manager of Company or is or was serving at Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not.

10.8    CONSTRUCTION OF INDEMNIFICATION RIGHTS

Nothing contained in this Article shall limit the ability of Company to otherwise indemnify or advance expenses to any person. It is the intent of this Article to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Article. Indemnification shall be provided in accordance with this Article irrespective of the nature of the legal or equitable theory upon which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

10.9    DEFINITIONS FOR INDEMNIFICATION PROVISIONS

A.    "Expenses" mean all direct and indirect costs (including without limitation counsel

35

fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

B.    "Liabilities" mean the obligations (including one incurred by way of settlement) to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

C.    "Party" means a person who was, or is threatened to be made a named defendant or respondent in a proceeding.

D.    "Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

## 10.10  INSURANCE FUNDING OF INDEMNIFICATION

To the greatest extent not inconsistent with the Act and other laws and public policies of the State of California, Company may purchase and maintain insurance or other financial arrangement for the benefit of any person who is or was a Member or Manager, employee or agent, against any liability asserted against or expenses incurred by such person in any capacity or arising out of such person's service with Company, whether or not Company would have the power to indemnify such person against such liability.

## ARTICLE XI
### Miscellaneous

## 11.1  ADDITIONAL DOCUMENTS AND ACTS

Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of the Agreement and the transactions contemplated hereby.

## 11.2  AMENDMENT OR ALTERATION

This Agreement may be altered or amended in whole or in part at any time, by filing with this Agreement, a written instrument setting forth any changes signed by all of the Members.

## 11.3  NOTICES

Any and all notices or other communications required or permitted by this Agreement or by law to be served on, given to, or delivered to any party hereto by any other party to this Agreement,

36

shall be in writing and shall be deemed duly served, given, or delivered when personally delivered to the party or to an agent of the party, or in lieu of personal delivery, when 5 days have passed after the notice was deposited in the United States mail, first class postage prepaid, addressed to a Member at the address then appearing for him or her on the books and records of the Company.

11.4    BINDING ON HEIRS
This Agreement shall be binding on the parties hereto and on each of their heirs, executors, administrators, successors, and assignees.

11.5    SEVERABILITY
Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by that holding.

11.6    GOVERNING LAW
This Agreement shall be construed and governed by the laws of the State of California and any dispute as to this Agreement shall be resolved by a court in the State of California.

11.7    SOLE AND ONLY AGREEMENT
This instrument constitutes the sole and only agreement of the parties hereto respecting the sale and purchase of their Membership Interest in the Company and correctly sets forth the rights, duties, and obligations of each to the other in relation thereto as of its date. Any prior agreements, promises, negotiations, or representations concerning its subject matter not expressly set forth in this Agreement are of no force and effect.

11.8    ADMINISTRATIVE DISPUTE RESOLUTION PROCEDURE
For Company decisions and determinations herein that require the mutual agreement of all Members before the Company may proceed in one direction or another, should all Members be unable to mutually agree, the Members shall bring the disagreement to the attention of Stephen Friedman, Esq. of New York for resolution. Stephen Friedman, Esq. may request and receive reasonable information from Company or Members and then render his decision within 48 hours of the disagreement being brought to him for resolution. The decision of Stephen Friedman, Esq. on the matter of disagreement shall be adopted by the Company.

11.9    GENDER AND NUMBER IN NOUNS AND PRONOUNS
Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm or corporation may in the context require. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. Any reference to the Code, Regulations, the Act, California Statutes or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

11.10  MISCELLANEOUS PROVISIONS

No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision, whether or not similar, nor shall any one waiver constitute a continuing waiver. No waiver shall be effective or binding unless executed in writing by AMUSEMENT and FIRST REPUBLIC.

If any legal action or other proceeding is brought for the enforcement of or in any way pertaining to this Agreement, the successful or prevailing party shall be entitled to recover all reasonable attorneys' fees and costs incurred with respect thereto, in addition to any other relief to which it may be entitled.

This Agreement can be signed in counterparts. A copy or facsimile signature shall be considered as binding and valid as an original signature.

Should any provision or portion of this Agreement be held unenforceable or invalid for any reason, the remaining provisions and portions of this Agreement shall be unaffected by that holding.

**IN WITNESS WHEREOF,** all of the initial Members of WESTLAND INDUSTRIES SOUTHEAST LLC have executed the Agreement, effective the ____ day of _____, 2007.

AMUSEMENT INDUSTRY, INC.,
a California corporation

_____          Dated:_____, 2007
YANKI GREENSPAN, President

FIRST REPUBLIC GROUP, CORP.,
a New York corporation

_____          Dated:_____, 2007
MARK STERN, President

# EXHIBIT "4"

**AMUSEMENT INDUSTRY, INC.**
6665 LONG BEACH BOULEVARD
LONG BEACH, CALIFORNIA 90805
TELEPHONE (310) 639-7130
FACSIMILE (310) 639-1757

November 15, 2007

Stephen Friedman, Esq.
Buchanan Ingersoll & Rooney PC
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005

Steven Alevy
Bankers Capital
575 Madison Ave., 10th Floor
New York, NY 10022

Mark Stern
5014 16th Avenue, Suite 372
Brooklyn, NY 11204

Joshua Safrin
50 Riverside Drive, #2A
New York, NY 10024

First Republic Group
c/o Avery Egert
230 Park Avenue, Suite 460
The Helmsley Building
New York, NY 10169

Re: Documents Held In Escrow in Amusement/Stern/First Republic Transaction

Dear Msrs. Friedman, Alevy, Stern, Safrin and the First Republic Group:

Marc Stern, Joshua Safrin, and First Republic are in default under the terms of the contribution and/or loan and/or the promissory note(s), having failed to cooperate in the preparation of the partnership agreement, and failed to provide documentation of the partnership agreement, and having failed to make any payments to Amusement Industry, Inc., its assigns, agents, and associated entities ("Amusement Industry") since June 29 through July 12, 2007, and any time thereafter, despite demand therefor.

Stern is therefore in default on all obligations to Amusement Industry, Inc. and its assigns, and such default(s) has (have) continued beyond applicable grace period(s), if any. Therefore please immediately deliver the following documents being held by you to Amusement Industry, Inc. at 6665 Long Beach Boulevard, Long Beach, CA 90805 by appropriate secure and insured delivery service ("the Escrow Documents"): (1) all promissory notes and assignments of membership interests executed by Marc Stern and Joshua Safrin, and (2) all deeds to property executed by First Republic Group Realty LLC.

In making this demand, Amusement Industry does not waive any rights or remedies against any of the parties involved in this transaction, nor does Amusement Industry adopt as its exclusive remedy the delivery of the Escrow Documents, nor does Amusement Industry deem enforceable any particular documents or agreement among the parties. However, given the comprehensive defaults associated with these transactions, Amusement Industry, Inc. does assert a right to all of the Escrow Documents.

November 15, 2007
Page 2 of 2

This demand is made without prejudice to the rights of Amusement Industry to take other action, pursue other remedies, or assert other facts, claims, rights or recourse, in law or in equity.

Sincerely,

Yanki Greespan
President

# EXHIBIT "5"

## AGREEMENT

THIS AGREEMENT ("Agreement") is made as of _____ ___, 2007, by and between, **MARK STERN**, an individual ("Assignor"), and _____, a _____ ("Assignee").

### RECITALS:

WHEREAS, Assignor is the sole member and holds all of the limited liability company interests (the "Assigned LLC Interests") in and to MS COLONIAL LLC, a Delaware limited liability company (the "Company");

WHEREAS, the Company is the sole member and holds all of the limited liability company interests in and to FRGR HOLDINGS LLC, a Delaware limited liability company ("Holdings");

WHEREAS, Holdings is the sole member and holds all of the limited liability company interests in and to FRGR MANAGING MEMBER LLC, a Delaware limited liability company ("Managing Member");

WHEREAS, Managing Member is the sole member and holds all of the limited liability company interests in and to FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company; and

WHEREAS, Assignor desires to assign the Assigned LLC Interest to Assignee and Assignee desires to accept the assignment of such Assigned LLC Interest in accordance with the terms and conditions set forth herein.

### AGREEMENT:

NOW, THEREFORE, intending to be legally bound hereby, and incorporating the foregoing recitals, the parties agree as follows:

1.     Assignor hereby assigns to Assignee and Assignee hereby accepts the Assigned LLC Interests together with all other rights and interests which Assignor may have in and to the Company by virtue of the Assigned LLC Interests.

2.     Assignee hereby assumes the Assigned LLC Interests, and agrees to be bound by the terms and provisions of the Company's operating agreement relating to the Assigned LLC Interests and to perform and comply with all provisions thereof.

3.     Assignor and Assignee each represent, warrant, covenant and agree as follows:

a.     Each of Assignor and Assignee are "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended. Assignor and Assignee each has such knowledge, skill and experience in business, financial and investment matters to evaluate the merits and risks of an investment in the

Assigned LLC Interests and Exchanged LLC Interests, respectively. To the extent that Assignor or Assignee have deemed it appropriate to do so, they have retained, and relied upon, appropriate professional advice regarding the tax, legal and financial merits and consequences of the investment in the Assigned LLC Interests and Exchanged LLC Interests, respectively.

b.      The assignment of the Assigned LLC Interests from each Assignor to Assignee has been made in compliance with applicable state and federal securities laws including the Securities Act of 1933, as amended. The issuance of the Exchanged LLC Interests from Assignee to each Assignor has been made in compliance with applicable state and federal securities laws including the Securities Act of 1933, as amended.

c.      NO PARTY NOR ANY OF THEIR RESPECTIVE PRINCIPALS OR MEMBERS THEREOF WILL BE VIEWED AS PROVIDING ANY ADVICE WITH RESPECT TO ANY TAX CONSEQUENCES CONTEMPLATED TO BE AFFORDED OR RESULTING FROM THE TRANSACTIONS HEREIN.    EACH ASSIGNOR AND ASSIGNEE MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS, ATTORNEYS AND ACCOUNTANTS WITH RESPECT TO THE TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED HEREIN.

Assignor and Assignee each hereby represents, warrants and agrees that (x) each of the representations and warranties made herein shall be true, correct and complete when and as made, and (y) each of the covenants and agreements herein shall be valid, binding and enforceable obligations.

4.      This Agreement may be executed in multiple counterparts which when taken together will be deemed a fully executed Agreement. The exchange of counterparts of this Agreement among the parties by means of facsimile transmission which shall contain authentic reproductions shall constitute a valid exchange of this Agreement and shall be binding upon the parties hereto.

5.      This Agreement may not be assigned by any party without the prior written consent of the non-assigning party. This Agreement shall be binding on Assignor and Assignee and their respective heirs and permitted successors and assigns, if any.

6.      Nothing set forth in this Agreement shall confer upon any person or entity any rights, interests or remedies to or against Assignor or Assignee.

7.      All amendments of or modifications to this Agreement must be in writing signed by each party.

[Remainder of page intentionally left blank. Signature page follows.]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

ASSIGNOR:

WITNESS:

**MARK STERN**

_____

_____

ASSIGNEE:

WITNESS:

_____

By:    _____

_____

By:_____
Name:
Title:

## AGREEMENT

THIS AGREEMENT ("Agreement") is made as of _____, 2007, by and between, **JOSHUA SAFRIN**, an individual ("Assignor"), and _____, a _____ ("Assignee").

### RECITALS:

**WHEREAS**, Assignor is the sole member and holds all of the limited liability company interests (the "Assigned LLC Interests") in and to JSAE COLONIAL LLC, a Delaware limited liability company (the "Company");

**WHEREAS**, the Company is the sole member and holds all of the limited liability company interests in and to FRGR HOLDINGS LLC, a Delaware limited liability company ("Holdings");

**WHEREAS**, Holdings is the sole member and holds all of the limited liability company interests in and to FRGR MANAGING MEMBER LLC, a Delaware limited liability company ("Managing Member");

**WHEREAS**, Managing Member is the sole member and holds all of the limited liability company interests in and to FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company; and

**WHEREAS**, Assignor desires to assign the Assigned LLC Interest to Assignee and Assignee desires to accept the assignment of such Assigned LLC Interest in accordance with the terms and conditions set forth herein.

### AGREEMENT:

**NOW, THEREFORE**, intending to be legally bound hereby, and incorporating the foregoing recitals, the parties agree as follows:

1.      Assignor hereby assigns to Assignee and Assignee hereby accepts the Assigned LLC Interests together with all other rights and interests which Assignor may have in and to the Company by virtue of the Assigned LLC Interests.

2.      Assignee hereby assumes the Assigned LLC Interests, and agrees to be bound by the terms and provisions of the Company's operating agreement relating to the Assigned LLC Interests and to perform and comply with all provisions thereof.

3.      Assignor and Assignee each represent, warrant, covenant and agree as follows:

a.      Each of Assignor and Assignee are "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended. Assignor and Assignee each has such knowledge, skill and experience in business, financial and investment matters to evaluate the merits and risks of an investment in the

Assigned LLC Interests and Exchanged LLC Interests, respectively. To the extent that Assignor or Assignee have deemed it appropriate to do so, they have retained, and relied upon, appropriate professional advice regarding the tax, legal and financial merits and consequences of the investment in the Assigned LLC Interests and Exchanged LLC Interests, respectively.

b.     The assignment of the Assigned LLC Interests from each Assignor to Assignee has been made in compliance with applicable state and federal securities laws including the Securities Act of 1933, as amended. The issuance of the Exchanged LLC Interests from Assignee to each Assignor has been made in compliance with applicable state and federal securities laws including the Securities Act of 1933, as amended.

c.     **NO PARTY NOR ANY OF THEIR RESPECTIVE PRINCIPALS OR MEMBERS THEREOF WILL BE VIEWED AS PROVIDING ANY ADVICE WITH RESPECT TO ANY TAX CONSEQUENCES CONTEMPLATED TO BE AFFORDED OR RESULTING FROM THE TRANSACTIONS HEREIN. EACH ASSIGNOR AND ASSIGNEE MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS, ATTORNEYS AND ACCOUNTANTS WITH RESPECT TO THE TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED HEREIN.**

Assignor and Assignee each hereby represents, warrants and agrees that (x) each of the representations and warranties made herein shall be true, correct and complete when and as made, and (y) each of the covenants and agreements herein shall be valid, binding and enforceable obligations.

4.     This Agreement may be executed in multiple counterparts which when taken together will be deemed a fully executed Agreement. The exchange of counterparts of this Agreement among the parties by means of facsimile transmission which shall contain authentic reproductions shall constitute a valid exchange of this Agreement and shall be binding upon the parties hereto.

5.     This Agreement may not be assigned by any party without the prior written consent of the non-assigning party. This Agreement shall be binding on Assignor and Assignee and their respective heirs and permitted successors and assigns, if any.

6.     Nothing set forth in this Agreement shall confer upon any person or entity any rights, interests or remedies to or against Assignor or Assignee.

7.     All amendments of or modifications to this Agreement must be in writing signed by each party.

[Remainder of page intentionally left blank. Signature page follows.]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

WITNESS:

ASSIGNOR:

**JOSHUA SAFRIN**

_____    _____

WITNESS:

ASSIGNEE:

_____

By:    _____

_____

By:_____
Name:
Title:

# EXHIBIT "6"

**PROMISSORY NOTE**

$13,000,000.00                                                Long Beach, California
                                                             July 11, 2007

FOR VALUE RECEIVED, **MARK STERN,** an individual, having an address at 5014 16th Avenue, Suite 372, Brooklyn, New York 11204 (hereinafter called **"Maker"**), promises to pay to the order of Amusement Industries Inc., a California corporation, having an address at _____ (together with any subsequent holder hereof, called **"Payee"**) or assigns, the principal sum of THIRTEEN MILLION and No/100 Dollars ($13,000,000.00) or so much thereof as may remain unpaid from time to time (hereinafter called **"Principal Balance"**), with interest on the Principal Balance, until paid in full, at the rates per annum hereinafter specified, in coin or currency, which, at the time or times of payment, is legal tender for the payment of public and private debts in the United States of America, all in accordance with the terms hereinafter set forth. All interest payable hereunder shall be computed on the basis of a 360 day year, but shall be charged for the actual number of days principal is unpaid.

1.       Payment Location. All payments of principal and interest under this Note shall be made in lawful money of the United States of America in immediately available funds to Payee at _____ or at such other place as may be designated by Payee to Maker in writing.

2.       Payments. This Note shall be payable by Maker to Payee as follows:

(a)      Interest at the rate of eight (8%) percent per annum (the "**Loan Rate**") shall be payable for the period commencing as of July 2, 2007 and continuing until the Maturity Date (as hereinafter defined), which interest shall accrue and shall be payable on the Maturity Date; and

(b)      The entire unpaid Principal Balance and all interest accrued thereon shall be due and payable in full on the date that is sixty (60) days following the date hereof (hereinafter called the **"Maturity Date"**);

(c)      Except as otherwise provided in the succeeding sentence, from and after the date hereof, and until the date on which this Note is paid in full, Maker shall pay interest on the Principal Balance at the Loan Rate. Upon an event of default, interest shall be payable at the rate of sixteen (16%) percent per annum (the **"Default Rate"**).

(d)      No payment of interest or other consideration made or agreed to be made by Maker pursuant to this Note or any other instrument referring to or securing this Note shall, at any time, be deemed to have been computed at an interest rate in excess of the maximum rate of interest permissible by law, if any. In the event such payments of interest or other consideration provided for in this Note or any other instrument referring to or securing this Note shall result in payment of an effective rate of interest which, for any period of time, is in excess of the limit of the usury law or any other law applicable

to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party or parties hereto, be applied to the Principal Balance immediately upon receipt of such monies by Payee with the same force and effect as though Maker had specifically designated, and Payee had agreed to accept, such extra payments as a principal payment, without premium or penalty. If the Principal Balance has been fully paid, any such excess amount shall be refunded to Maker. This provision shall control over every other obligation of Maker hereunder and under any instrument which secures this Note.

(e)    Otherwise, all payments made hereunder shall be applied to amounts due in accordance with the terms hereof.

3.    Prepayment. The Principal Balance and the accrued interest thereon may be prepaid in full or in part at any time, without the payment of any premium or penalty.

4.    Miscellaneous. Maker hereby guaranties payment of this Note, and waives demand for payment, presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of intent to foreclose on any collateral securing this Note, all other notices as to this Note, diligence in collection as to each and every payment due hereunder, and all other requirements necessary to charge or hold such person or entity to any obligation hereunder, and agrees that without any notice Payee may take additional security herefor or may release any or all security herefor; or may from time to time extend, renew, or otherwise modify the date or dates or amount or amounts of payment above recited, with or without consideration, and that, in any such case, Maker shall continue to be bound hereby and to be liable to pay the unpaid balance of the indebtedness evidenced hereby, as so additionally secured, extended, renewed or modified, and notwithstanding any such release, and further agrees to indemnify Payee against and hold Payee harmless from and pay all costs and expenses of collection, including court costs and attorneys' fees (prior to trial, at trial and on appeal) incurred in collecting the indebtedness evidenced hereby, or in exercising or defending, or obtaining the right to exercise, the rights of Payee hereunder, whether suit be brought or not, and in foreclosure, in bankruptcy, insolvency, arrangement, reorganization and other debtor-relief proceedings, in probate, in other court proceedings, or otherwise, whether or not Payee prevails therein.

5.    Default. Time is of the essence hereof. From and after the Maturity Date, interest shall accrue on the Principal Balance at the Default Rate and shall be payable on the first business day of each calendar month or on demand, at the option of Payee.

Payee shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by Payee. All rights and remedies of Payee under the terms of this Note and under any statutes or rules of law shall be cumulative and may be exercised successively or concurrently by Payee. Maker agrees that Payee shall be entitled to all the rights of a holder in due course of negotiable instruments. Any provision of this Note which may be unenforceable or invalid under any law shall be ineffective to the

extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof.

6.    Applicable Law; Jury Trial.    MAKER ACKNOWLEDGES THAT THIS NOTE WAS NEGOTIATED, EXECUTED AND DELIVERED IN THE STATE OF CALIFORNIA.    IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.    TO THE    FULLEST    EXTENT    PERMITTED    BY    LAW,    MAKER    HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE.

MAKER AND PAYEE, BY ITS ACCEPTANCE HEREOF HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION WITH RESPECT TO OR ARISING FROM THIS NOTE.

AT THE OPTION OF, THIS NOTE MAY BE ENFORCED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT IN WHICH THE PROPERTY LIES OR THE STATE COURT SITTING IN THE COUNTY IN WHICH THE PROPERTY LIES; MAKER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURTS AND WAIVES ANY ARGUMENT THAT JURISDICTION IN SUCH FORUMS IS NOT PROPER OR THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT. IN THE EVENT ANY ACTION IS COMMENCED IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

IN WITNESS WHEREOF, Maker has caused this Note to be duly executed and delivered as of the day and year first above set forth.

**MAKER:**

By: _____
         Mark Stern

EXHIBIT "7"

## PROMISSORY NOTE

$15,000,000.00

Long Beach, California
July 12, 2007

FOR VALUE RECEIVED, **MARK STERN,** an individual, having an address at 5014 16th Avenue, Suite 372, Brooklyn, New York 11204 (hereinafter called "**Maker**"), promises to pay to the order of Amusement Industries Inc., a California corporation, having an address at _____ (together with any subsequent holder hereof, called "**Payee**") or assigns, the principal sum of FIFTEEN MILLION and No/100 Dollars ($15,000,000.00) or so much thereof as may remain unpaid from time to time (hereinafter called "**Principal Balance**"), with interest on the Principal Balance, until paid in full, at the rates per annum hereinafter specified, in coin or currency, which, at the time or times of payment, is legal tender for the payment of public and private debts in the United States of America, all in accordance with the terms hereinafter set forth. All interest payable hereunder shall be computed on the basis of a 360 day year, but shall be charged for the actual number of days principal is unpaid.

1.    Payment Location. All payments of principal and interest under this Note shall be made in lawful money of the United States of America in immediately available funds to Payee at _____ or at such other place as may be designated by Payee to Maker in writing.

2.    Payments. This Note shall be payable by Maker to Payee as follows:

(a)    The entire unpaid Principal Balance shall be due and payable in full on the date that is sixty (60) days following the date hereof (hereinafter called the "**Maturity Date**");

(b)    Except as otherwise provided in the succeeding sentence, from and after the date hereof, and until the date on which this Note is paid in full, Maker shall pay interest on the Principal Balance at the Loan Rate. Upon an event of default, interest shall be payable at the rate of sixteen (16%) percent per annum (the "**Default Rate**").

(c)    No payment of interest or other consideration made or agreed to be made by Maker pursuant to this Note or any other instrument referring to or securing this Note shall, at any time, be deemed to have been computed at an interest rate in excess of the maximum rate of interest permissible by law, if any. In the event such payments of interest or other consideration provided for in this Note or any other instrument referring to or securing this Note shall result in payment of an effective rate of interest which, for any period of time, is in excess of the limit of the usury law or any other law applicable to the loan evidenced hereby, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party or parties hereto, be applied to the Principal Balance immediately upon receipt of such monies by Payee with the same force and effect as though Maker had specifically designated, and Payee had agreed to accept, such extra payments as a principal

payment, without premium or penalty. If the Principal Balance has been fully paid, any such excess amount shall be refunded to Maker. This provision shall control over every other obligation of Maker hereunder and under any instrument which secures this Note.

(d)    Otherwise, all payments made hereunder shall be applied to amounts due in accordance with the terms hereof.

3.    Prepayment. The Principal Balance and the accrued interest thereon may be prepaid in full or in part at any time, without the payment of any premium or penalty.

4.    Miscellaneous.    Maker hereby guaranties payment of this Note, and waives demand for payment, presentment for payment, notice of nonpayment, protest, notice of protest, notice of dishonor, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of intent to foreclose on any collateral securing this Note, all other notices as to this Note, diligence in collection as to each and every payment due hereunder, and all other requirements necessary to charge or hold such person or entity to any obligation hereunder, and agrees that without any notice Payee may take additional security herefor or may release any or all security herefor, or may from time to time extend, renew, or otherwise modify the date or dates or amount or amounts of payment above recited, with or without consideration, and that, in any such case, Maker shall continue to be bound hereby and to be liable to pay the unpaid balance of the indebtedness evidenced hereby, as so additionally secured, extended, renewed or modified, and notwithstanding any such release, and further agrees to indemnify Payee against and hold Payee harmless from and pay all costs and expenses of collection, including court costs and attorneys' fees (prior to trial, at trial and on appeal) incurred in collecting the indebtedness evidenced hereby, or in exercising or defending, or obtaining the right to exercise, the rights of Payee hereunder, whether suit be brought or not, and in foreclosure, in bankruptcy, insolvency, arrangement, reorganization and other debtor-relief proceedings, in probate, in other court proceedings, or otherwise, whether or not Payee prevails therein.

5.    Default. Time is of the essence hereof. From and after the Maturity Date, interest shall accrue on the Principal Balance at the Default Rate and shall be payable on the first business day of each calendar month or on demand, at the option of Payee.

Payee shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by Payee. All rights and remedies of Payee under the terms of this Note and under any statutes or rules of law shall be cumulative and may be exercised successively or concurrently by Payee. Maker agrees that Payee shall be entitled to all the rights of a holder in due course of negotiable instruments. Any provision of this Note which may be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof.

6.    Applicable Law; Jury Trial.    MAKER ACKNOWLEDGES THAT THIS NOTE WAS NEGOTIATED, EXECUTED AND DELIVERED IN THE STATE OF

CALIFORNIA.    IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.  TO THE    FULLEST    EXTENT    PERMITTED    BY    LAW,    MAKER    HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS NOTE.

MAKER AND PAYEE, BY ITS ACCEPTANCE HEREOF HEREBY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY  IN ANY ACTION WITH RESPECT TO OR ARISING FROM THIS NOTE.

AT THE OPTION OF PAYEE, THIS NOTE MAY BE ENFORCED IN THE UNITED STATES DISTRICT COURT FOR THE STATE OF CALIFORNIA OR IN A CALIFORNIA STATE COURT; MAKER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURTS AND WAIVES ANY ARGUMENT THAT JURISDICTION IN SUCH FORUMS IS NOT PROPER OR THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT. IN THE EVENT ANY ACTION IS COMMENCED IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

IN WITNESS WHEREOF, Maker has caused this Note to be duly executed and delivered as of the day and year first above set forth.

**MAKER:**

By: _____
         Mark Stern

# EXHIBIT B

# (to Third Party Complaint)

Jonathan D. Lupkin, Esq.
FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, New York 10006
Tel: (212) 412-9500
Fax: (212) 964-9200
Email: jlupkin@fzwz.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

AMUSEMENT INDUSTRY, INC., dba WESTLAND     :   No. 07 Civ. 11586 (LAK)(GWG)
INDUSTRIES; PRACTICAL FINANCE CO., INC.,     :
    :
                          Plaintiffs,     :
    :
    :   **DECLARATION OF**
   - against -     :   **GUS R. LESNEVICH**
    :
MOSES STERN, aka MARK STERN; JOSHUA SAFRIN;   :
FIRST REPUBLIC REALTY LLC, EPHRAIM     :
FRANKEL, LAND TITLE ASSOCIATES ESCROW,     :
    :
                          Defendants.     :

------------------------------------------------------------ x

       GUS R. LESNEVICH declares, pursuant to 28 U.S.C. § 1746, as follows:

           1.       I am a Forensic Document Examiner, and I submit this declaration in connection with defendant Joshua Safrin's motion to dismiss the complaint in the above-captioned action. This declaration is not intended to serve in lieu of an Expert Report, prepared pursuant to Fed. R. Civ. P. 26. A formal Rule 26 report will be prepared and provided at the appropriate time in this litigation.

**Background Qualifications**

           2.       I have extensive experience in the field of forensic document examination and have been working as an expert examiner for the past 40 years. Over the years, I have provided expert services in thousands of civil and criminal cases, including high profile matters in which I was retained on behalf of the United States

Government. Representative of my engagements, I was retained by the United States Government in the following matters:

- United States v. Osama Bin Laden (U.S. Embassy Bombing in Africa);

- United States v. Leona Helmsley;

- United States v. Imelda Marcos;

- United States v. Oliver North;

- United States v. Ivan Boesky;

- United States v. Michael Millken; and

- Investigation into the Suicide of Vincent Foster by Kenneth Starr, Independent Counsel.

My *curriculum vitae*, which is annexed to this declaration as Exhibit A, contains a more complete description of my credentials.

**Scope of Engagement and Findings**

3.      I was retained by counsel for defendant Joshua Safrin to opine on the authenticity of three signatures that purport to be the signatures of Mr. Safrin and that appear on three separate documents (the "Signatures at Issue"). I understand that the documents on which these signatures appear are: (a) an Assignment "Agreement" that appears as an exhibit to the Complaint in this matter; (b) the Mezzanine Loan Agreement dated as of July 11, 2007 between Citigroup Global Markets Realty Corp. and FRGR Managing Member LLC; and (c) The Loan Agreement dated as of July 11, 2007 between Citigroup Global Markets Realty Corp. and First Republic Group Realty LLC. (Copies of the signatures on which I was asked to opine are annexed collectively to this declaration as Exhibit B.)

4.      I compared the Signatures at Issue to no fewer that 38 exemplars of known signatures of Mr. Safrin, which, I am advised, were created at or around the time

the Signatures at Issue.  Based upon my analysis, and applying well-established
techniques for assessing forensically the authenticity of signatures, I am of the opinion, to
a high degree of professional certainty, that the Signatures at Issue are not genuine
signatures of Joshua Safrin.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Martinsburg, Pennsylvania on February 26, 2008.

GUS R. LESNEVICH

# EXHIBIT A

## (to the Lesnevich Decl.)

# Curriculum Vitae

## of

## Gus R. Lesnevich
### *Forensic Document Examiner*

After 38 years in the field of Forensic Document Examination, I have relocated my office and laboratory to my farm located in south-central Pennsylvania. As I enter semi-retirement, I will continue to accept cases on a more limited basis.

1684 Henrietta Mountain Road
Martinsburg, Pennsylvania 16662
(814) 793-2377
(814) 793 -3790 Fax
WWW.LESNEVICH.COM

Each year, my office will be closed from July 1 through August 31, and from December 15 through January 15. During that time, my telephone calls and e-mails will be monitored, and exceptions will be made for prior commitments scheduled during those time periods.

# QUALIFICATIONS
## OF
## GUS R. LESNEVICH

After four years as a CID Agent (Criminal Investigator), I began my training in the field of Questioned Document Examination at the United States Military Crime Laboratory, Fort Gordon, Georgia. Upon completion of my training (1968 to 1970), I was certified by the Department of Defense, U.S. Army, as Examiner of Questioned Documents. During my military service, I served as Examiner, both in the United States, and as Chief, Questioned Document Section, U.S. Military Crime Laboratory (Provisional) South Viet Nam.

Upon leaving military service, I entered private practice in Atlanta, Georgia. During this time, I worked as a Handwriting Expert for some of the leading law firms in the South, as well as handling civil disputes for private corporations and individual claimants and plaintiffs.

In 1974, I was recruited by the United States Secret Service. In 1976, I was promoted to Senior Document Examiner, at the Secret Service Identification Branch, a division of Special Investigations. During my tenure with the Secret Service, I was responsible for the training of junior examiners, and assuming individual responsibility for the examination of U.S. Treasury Checks, Saving Bonds, Banking Documents, etc., as well as the examination of threatening correspondence directed at the President of the United States, and other persons under the protection of the Secret Service.

In August of 1981, I left the United States Secret Service and re-entered private practice. Although I continue to work for the U.S. Attorneys, Federal, and State Law Enforcement Agencies, Legal Aid and Public Defenders, the predominance of my work is in the private sector.

I have qualified and testified as an Expert Witness in all Courts of the United States Armed Forces, State Courts along the East Coast of the United States and Federal Courts throughout the United States.

NOTE:For additional information please visit
2004 U.S. App.Lexis 12432
www.ca3.uscourts.gov/opinarch/033915p.pdf

# CURRICULUM VITAE
## GUS R. LESNEVICH

**June 1962 to March 1965**

Military Policeman, United States Army, Korea and Brooklyn, New York

**April 1965 to March 1968**

United States Army Certified Criminal Investigator, (CID Agent), Nuremberg, Bavaria, Germany

**April 1968 to June 1970**

Resident Trainee (full-time student) in the field of Questioned Documents - United States Army Criminal Investigation Laboratory, Fort Gordon, Georgia

**July 1970 to April 1972**

Examiner of Questioned Documents - United States Army Criminal Investigation Laboratory, Fort Gordon, Georgia, and United States Army Criminal Investigation Laboratory, (Provisional) South Viet Nam

**May 1972 to August 1974**

Private practice, Examiner of Questioned Documents - Atlanta, Georgia

**August 1974 to July 1981**

Examiner of Questioned Documents, Senior Examiner of Questioned Document - Identification Laboratory, United States Secret Service, Washington, District of Columbia

**August 1981 to August 2005**

Private practice, Forensic Document Examiner - outside of Philadelphia, Pennsylvania

**September 2005**

Relocated to south central Pennsylvania, accepting cases on a limited basis.

# ADDENDUM TO
# CURRICULUM VITAE
# GUS R. LESNEVICH

**July 1970 to April 1972**

> Instructor, Questioned Documents - United States Army Criminal Investigation School, Fort Gordon, Georgia

**August 1970 to March 1971**

> Specialized Training in Printing, Forgery and Counterfeiting - United States Mint, Treasury Department, Washington, District of Columbia and United States Military Printing Facilities, Japan

**August 1974 to July 1981**

> Instructor, Questioned Documents Course - United States Secret Service, Washington, District of Columbia

**April 1977 to July 1981**

> Training of Examiners undergoing Resident Training in the Field of Forensic Document Examination - United States Secret Service Identification Laboratory, Washington, District of Columbia

**July 1981 to Present**

> Since entering private practice, I have continued training individuals undergoing Resident Training in the field of Forensic Document Examination.

**Certifications:**

> Department of Defense, U.S. Army (1970)
> American Board of Forensic Document Examiners (1980)
> --    Re-certified for 5-year periods (1985, 1990, 1995 and 2000)
> --    Relinquished certification in August, 2005.
>      (September, 2005 - limited practice)

# GUS R. LESNEVICH HAS BEEN RETAINED
## AS A GOVERNMENT EXPERT
## IN THE FOLLOWING CASES

**People vs. Edward Leary**
(N.Y.C. Subway Firebombing)

**People vs. Abraham Hirschfeld**

**People vs. Chuck Jones**
(Marla Maples' Publicist)
1994 and 1999

**U.S. vs. Eddie Antar**
(Crazy Eddy)

**U.S. vs. Don King**
(1985, 1995 and 1998)

**U.S. vs. Giovanni Gambino**

**U.S. vs. Leona Helmsley**

**U.S. vs. Autumn Jackson**
(Bill Cosby)

**U.S. vs. Imelda Marcos**

**U.S. vs. Bess Myerson**

**U.S. vs. Darryl Strawberry**

**U.S. vs. Lawrence Cusack**
(President Kennedy Papers)

**U.S. vs. Rutland**

**U.S. vs. Osama Bin Laden**
(U.S. Embassy Bombing in Africa)

**U.S. vs. Mokhtar Haouari and
Abdelghani Meskini**
(Y2K Millennium Bomb Plot of LAX)

*Kenneth Starr, Independent Counsel*

**Vincent Foster Suicide**

*Lawrence E. Walsh, Independent Counsel*
*Iran-Contra Affair*

**U.S. vs. Thomas Clines**
**U.S. vs. Albert Hakim**
**U.S. vs. Lt. Col. Oliver North**
**U.S. vs. Admiral John Poindexter**
**U.S. vs. General Richard Secord**
**U.S. vs. Caspar Weinberger**

*Insider Trading*

**U.S. vs. Ivan Boesky**
**U.S. vs. GAF Corporation**
**U.S. vs. Boyd L. Jefferies**
**U.S. vs. Dennis B. Levine**
**U.S. vs. Michael Milken**

*Federal Prosecution*

**Medellin, Cali and Bogota Cartels**

**NOTE:**   For additional information please visit
2004 U.S. App.Lexis 12432
www.ca3.uscourts.gov/opinarch/033915p.pdf

# EXHIBIT B

# (to the Lesnevich Decl.)

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

WITNESS:                                ASSIGNOR:

                                        JOSHUA SAFRIN

_____                 _____


WITNESS:                                ASSIGNEE:

                                        _____

                                        By: _____


_____                 By: _____
                                        Name:
                                        Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

FIRST REPUBLIC GROUP REALTY LLC, a Delaware limited liability company

By: _____
       Name: Mark Stern
       Title:  President

LENDER:

CITIGROUP GLOBAL MARKETS REALTY CORP., a New York corporation

By: _____
       Name:
       Title:

WITH RESPECT TO SECTIONS 9.1 and 9.2, ONLY

SPONSOR: MARK SAFRIN

By: _____

SPONSOR: JOSHUA SAFRIN

By: _J. Safri_____

Loan Agreement (First Republic Group Realty LLC)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

FRGR MANAGING MEMBER LLC, a Delaware limited liability company

By: _____
    Name: Mark Stern
    Title: President

LENDER:

CITIGROUP GLOBAL MARKETS REALTY CORP., a New York corporation

By: _____
    Name:
    Title:

WITH RESPECT TO SECTIONS 9.1 and 9.2, ONLY

SPONSOR: MARK SAFRIN

By: _____

SPONSOR: JOSHUA SAFRIN

By: _____ _J. Safin_____

Mezzanine Loan Agreement (FRGR Managing Member LLC)