PHILIP R. WHITE
MARC D. YOUNGELSON
SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, New York 10020
Tel: (212) 643-7000
Fax: (212) 643-6500

Attorneys for plaintiffs and third party defendants
Steven Alevy and Bankers Capital

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMUSEMENT INDUSTRY, INC., dba WESTLAND INDUSTRIES, and PRACTICAL FINANCE CO., INC., ) ) ) ) | CASE NO. 07 CV 11586 (LAK) (GWG) |
| Plaintiffs, ) ) | **NOTICE OF MOTION** |
| v. ) ) | |
| MOSES STERN, aka MARK STERN; JOSHUA SAFRIN, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND TITLE ASSOCIATES ESCROW, ) ) ) ) ) ) | |
| Defendants. ) ) | |

PLEASE TAKE NOTICE that third party defendants Steven Alevy d/b/a Bankers

Capital ("Bankers Capital"), by and through its undersigned attorneys, hereby

respectfully move before the Honorable Gabriel W. Gorenstein, U.S.M.J., at the Daniel

Patrick Moynihan United States Courthouse, 500 Pearl Street, Room 510, New York, NY

10007, for an order pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) dismissing with

prejudice the Cross Claims of defendants Mark Stern and First Republic Realty Group

LLC ("defendants") in the above-referenced action.

PLEASE TAKE FURTHER NOTICE that by agreement of the parties, defendants' opposition papers are due on September 15, 2008, and Bankers Capital's reply papers are due on October 15, 2008.

PLEASE TAKE FURTHER NOTICE that in support of its motion, Bankers Capital will rely upon the accompanying memorandum of law dated August 1, 2008, the Certification of Marc D. Youngelson, executed on August 1, 2008, and the documents annexed thereto.

Dated: August 1, 2008

> SILLS CUMMIS & GROSS P.C.
> One Rockefeller Plaza
> New York, New York 10112
> Attorneys for plaintiffs and third party
> defendants Steven Alevy and Bankers
> Capital.
>
> By: _____
> Philip R. White
> Marc D. Youngelson

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMUSEMENT INDUSTRY, INC., dba WESTLAND INDUSTRIES, and PRACTICAL FINANCE CO., INC., <br><br> Plaintiffs, <br><br> v. <br><br> MOSES STERN, aka MARK STERN; JOSHUA SAFRIN, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND TITLE ASSOCIATES ESCROW, <br><br> Defendants. | CASE NO. 07 CV 11586 (LAK) (GWG) |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE CROSS CLAIMS OF DEFENDANTS STERN AND FIRST REPUBLIC**

---

SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, NY 10020
(212) 643-7000
Attorneys for Plaintiffs
Amusement Industry, Inc. dba Westland
Industries and Practical Finance Co., Inc.
and Third Party Defendants Steven Alevy
d/b/a Bankers Capital

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT .......................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS:  DEFENDANTS FAIL TO
ALLEGE HOW BANKERS CAPITAL CAUSED THEM ANY HARM ........................ 3

ARGUMENT ....................................................................................... 6

I.     DEFENDANTS' CLAIMS MUST BE DISMISSED BECAUSE THEY
       DID NOT PLEAD, AND CANNOT ESTABLISH, LOSS CAUSATION .......... 7

       A.     Defendants Have Not Alleged How Bankers Capital's Actions
              Caused a Decline in the Value of the Portfolio Properties. ..................... 10

       B.     Defendants Also Have Not Sufficiently Alleged How Bankers'
              Capital's Actions Prevented Stern From Obtaining Refinancing. ........... 12

II.    DEFENDANTS' CLAIMS ALSO MUST BE DISMISSED BECAUSE
       THEY FAIL ADQUATELY TO PLEAD THE REQUISITE ELEMENTS ....... 14

       A.     The Stern Defendants Have Failed to State a Claim for Fraud ................ 14

       B.     Defendants' Breach of Fiduciary Duty Claim Should Be Dismissed
              Because (I) Bankers Capital Did Not Owe Defendants a Fiduciary
              Duty; and (II) It Merely Restates Defendants' Breach of Contract
              Claim. .............................................................................................. 18

       C.     Defendants' Aiding and Abetting Claims Should Be Dismissed
              Because They Have Failed to Allege the Underlying Torts. ................... 23

       D.     Defendants Have Failed to State A Claim For Misappropriation of
              Trade Secrets Because the Information They Allegedly Provided to
              Bankers Capital Was Not a Trade Secret and In Any Case Was Not
              Misappropriated. ............................................................................... 25

       E.     Defendants Fail to State a Claim for Tortious Interference with
              Prospective Economic Advantage Because They Do Not Allege
              that Bankers Capital's Conduct Was Unlawful or Solely Motivated
              by Malice. ......................................................................................... 28

**Table of Contents**
**(continued)**

                                                                                              Page

    F.    Defendants Failed to State a Claim for Tortious Interference with
        Contract Because, As They Contend In Their State Court Action
        Against Citigroup, There Has Been No Breach of Defendants'
        Agreement with Citigroup. ................................................................... 31

III.    THE STERN DEFENDANTS' CLAIMS MUST BE DISMISSED
       BECAUSE THEY ARE WHOLLY IMPLAUSIBLE ........................................ 34

CONCLUSION............................................................................................................. 35

<u>**TABLE OF AUTHORIES**</u>

**Page**

C<small>ASES</small>

<u>Aquino v. Trupin,</u>
    833 F. Supp. 336 (S.D.N.Y. 1993) ........................................................ 7-8, 15

<u>Atlantic Gypsum Co. v. Lloyds Int'l Corp.,</u>
    753 F. Supp. 505 (S.D.N.Y. 1990) ............................................................ 17

<u>ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,</u>
    493 F.3d 87 (2d Cir. 2007)........................................................................ 5

<u>Bear, Stearns Funding, Inc. v. Interface Group,</u>
    361 F. Supp. 2d 283 (S.D.N. Y. 2005)................................................... 24-27

<u>Bell Atlantic Corp. v. Twombly,</u>
    __ U.S. __, 127 S. Ct. 1955 (2007).................................................. Passim

<u>Bennett v. U.S. Trust Co. of New York,</u>
    770 F.2d 308 (2d Cir. 1985)............................................................. Passim

<u>Brady v. Lynes,</u>
    No. 05 Civ. 6540, 2008 U.S. Dist. LEXIS 43512 (S.D.N.Y. June 2, 2008)............... 14

<u>Camp Summit of Summitville, Inc. v. Visinski,</u>
    No. 06-CV-4994, 2007 U.S. Dist. LEXIS 28496 (S.D. N.Y. April 16, 2007) ........... 32

<u>Carvel Corp. v. Noonan,</u>
    3 N.Y.3d 182 (2004) ................................................................................ 29

<u>Citibank v. K-H Corp.,</u>
    968 F.2d 1489 (2d Cir. 1992)........................................................... 10-11, 23

<u>D'Andrea v. Rafla-Demetrious,</u>
    146 F.3d 64 (2d Cir. 1998)....................................................................... 32

<u>Darby Trading Inc. v. Shell Int'l Trading and Shipping Co. Ltd.,</u>
    No. 07-CV-0400, 2008 U.S. Dist. LEXIS 25980 (S.D.N.Y. March 31, 2008) .. 8, 28-30

<u>Europacific Asset Mgmt. Corp. v. Tradescape Corp.,</u>
    No. 03 Civ. 4556, 2005 U.S. Dist. LEXIS 3227 (S.D.N.Y. March 2, 2005)............... 31

<u>Ferguson v. Lion Holding Inc.,</u>
    312 F. Supp. 2d 484 (S.D.N.Y. 2004)........................................................ 4

<u>First Nationwide Bank v. Gelt Funding Corp.,</u>
    27 F.3d 763 (2d Cir. 1994)....................................................................... 32

**Table of Authorities**
**(continued)**

Page

Hampshire Equity Partners II, L.P. v. Teradyne,
    No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261 (S.D.N.Y. March 30, 2005)...... Passim

HFCA Associates Corp. v. Grossman,
    960 F. Supp. 581 (E.D.N.Y. 1997) ................................................................ 12, 14-15

Holloway v. King,
    361 F. Supp. 2d 351 (S.D.N.Y. 2005) ........................................................ 23

In re Bayou Hedge Funds Investment Litigation,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007)........................................................ 22-23

In re Mid-Island Hospital, Inc.,
    273 F.3d 123 (2d Cir. 2002)........................................................................ 23

In re Parmalat Sec. Litig.,
    501 F. Supp. 2d 560 (S.D.N.Y. 2007) (Kaplan, J.)...................................... 5

Iqbal v. Hasty,
    490 F.3d 143 (2d Cir. 2007)...................................................................... 5, 33

Jews For Jesus, Inc. v. Jewish Community Relations Counsel of New York, Inc.,
    968 F.2d 286 (2d Cir. 1992)...................................................................... 7, 31

Johnson & Johnson v. Guidant Corp.,
    525 F. Supp. 2d 336 (S.D.N.Y. 2007)........................................................ 5

JP Morgan Chase Bank v. Winnick,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)........................................................ 23

Kirch v. Liberty Media Corp.,
    449 F.3d 388 (2d Cir. 2006)...................................................................... 31-32

Kregos v. The Associated Press,
    3 F.3d 656 (2d Cir. 1993) ........................................................................ 12, 14

Laub v. Faessel,
    297 A.D.2d 28, 745 N.Y.S.2d 534 (1st Dep't 2002) .................................. 6

Laudenberg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.,
    176 F. Supp. 2d 199 (S.D.N.Y. 2001)........................................................ 4

LNC Investments, Inc. v. First Fidelity Bank, N.A.,
    173 F.3d 454 (2d Cir. 1999)...................................................................... 6-8

iv

**Table of Authorities**
**(continued)**

Page

Matsumura v. Benihana National Corp.,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008).................................................................... 5-6, 15

Mazzaro v. Bank of America,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007).......................................................................... 22

Metropolitan West Asset Mgmt. LLC v. Magnus Funding, Ltd.,
    No. 03 Civ. 5539, 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004)........ 18, 21

Mina Investment Holdings Ltd. v. Lefkowtiz,
    184 F.R.D. 245 (S.D.N.Y. 1999) ................................................................................. 8

Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,
    392 F.3d 520 (2d Cir. 2004)......................................................................................... 8

Northeast General Corp. v. Wellington Advertising, Inc.,
    82 N.Y.2d 158 (1993) ............................................................................................ 18-20

Roeder v. Rogers,
    206 F. Supp. 2d 406 (W.D.N.Y. 2002) .................................................................. 30, 33

Schuh v. Druckman & Sinel, LLP,
    No. 07 Civ. 366, 2008 U.S. Dist. LEXIS 15079 (S.D.N.Y. February 29, 2008)
    (Gorenstein, J.)....................................................................................................... 5-6, 32

Shepard Indus., Inc. v. 135 East 57th Street, LLC,
    No. 97 Civ. 8447, 1999 U.S. Dist. LEXIS 14431 (S.D.N.Y. September 17,
    1999) ................................................................................................................... 28-29, 31

Spithogianis v. Haj-Darwish,
    No. 07 Civ. 4609, 2008 U.S. Dist. LEXIS 824 (S.D.N.Y. January 7, 2008)........ Passim

Village on Canon v. Bankers Trust Co.,
    920 F. Supp. 520 (S.D.N.Y. 1996) ................................................................... 18-19, 21

World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007)..................................................................... 18-19

**Other Authorities**

Fed.R.Civ.P. 12(b)(6)........................................................................................................ 12

FRCP 9(b) ................................................................................................................. Passim

## PRELIMINARY STATEMENT

It is black letter law that a failure adequately to plead loss causation – i.e., that the alleged misconduct caused a non-speculative, quantifiable injury to the claimant – requires dismissal of a fraud claim. As demonstrated below, defendants' cross claims against Bankers Capital should be dismissed because they all suffer from this fatal flaw.

The pleadings in this Action show that there is a dispute between the parties regarding the acquisition of a large portfolio of properties (the "Portfolio") by defendants from an entity known as Colonial. Plaintiffs allege, quite simply, that defendants stole $13 million wired by plaintiffs to an escrow account to finance defendants' Portfolio purchase. Bankers Capital alleges that it is owed a fee for arranging that financing.

For their part, defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic," and, together, the "Stern defendants" or "defendants") allege that Steven Alevy and Bankers Capital (together, "Bankers Capital"), working with nonparties Allen Alevy (the principal of plaintiffs), Robert Friedman (a Bankers Capital employee) and Allen Sragow (plaintiffs' attorney), engaged in a fraudulent scheme to interfere with defendants' attempts to finance and/or purchase the Portfolio so that the Alevy family could "steal" the Portfolio transaction from defendants.

Significantly, defendants admit that Bankers Capital and its "co-conspirators" were unsuccessful – i.e., defendants (i) obtained Portfolio financing from Citigroup, (ii) have control and ownership of the Portfolio, and (iii) took and used the $13 million "advanced" by plaintiffs to finance defendants' Portfolio purchase. Notwithstanding, defendants allege that Bankers Capital's attempted fraud somehow inflicted two kinds of damages upon defendants: (i) a loss in the value of the Portfolio, and (ii) speculative losses attributable to unspecified other financings that defendants "gave up" as a result of

Bankers Capital's actions.  Simply put, defendants have failed to allege any facts that, even if true, would support a finding that anything Bankers Capital did or said caused (i) the Portfolio to lose value; or (ii) defendants to lose any particular financing. Bankers Capital suspects that defendants have asserted their claims in an inappropriate effort to shift their losses on the Portfolio – a real estate acquisition made in a declining real estate market and tightening credit market – to Bankers Capital (and plaintiffs). Whatever their motivation, defendants should not be permitted to avoid the consequences of their unwise investment in this fashion.

In addition to not adequately pleading causation, defendants' claims fail because:

- they do not satisfy the particularity requirements of FRCP 9(b) – applicable to all of defendants' claims, as they sound in fraud – with respect to Bankers Capital's alleged misrepresentations, defendants' alleged reliance on those misrepresentations, and the element of scienter;

- Bankers Capital did not owe defendants a fiduciary duty, as it had no power to bind defendants to anything;

- An aiding and abetting claim will not lie where, as here, the underlying torts have not been adequately pleaded;

- The information defendants allegedly provided to Bankers Capital does not constitute trade secrets;

- A claim for tortious interference with prospective economic relations fails where, as here, defendants do not allege, and cannot establish, that Bankers capital was motivated solely by malice; and

- A claim for tortious interference with contract fails where, as here, there was no breach of the underlying contract.

At bottom, defendants' claims simply make no sense.  What possible motive could Bankers Capital and/or plaintiffs have had to (i) contribute $13 million to defendants' Portfolio acquisition, in return for which plaintiffs have nothing (except this

Action); or (ii) interfere with defendants' purported efforts to obtain refinancing so that they could pay back the $13 million they took?  There is none.

Accordingly, defendants' cross claims should be dismissed.

### SUMMARY OF RELEVANT ALLEGATIONS:  DEFENDANTS FAIL TO ALLEGE HOW BANKERS CAPITAL CAUSED THEM ANY HARM

On June 11, 2008 – more than six months after plaintiffs commenced this Action – defendants filed their cross claims, in which they assert a predictable panoply of claims. Specifically, they assert claims for (i) fraud; (ii) breach of fiduciary duty; (iii) breach of contract; (iv) aiding and abetting fraud; (v) aiding and abetting breach of fiduciary duty; (vi) misappropriation of trade secrets; (vii) tortious interference with prospective business relations; and (viii) tortious interference with contract.[1]

Defendants' cross claims all are based upon the same operative factual allegations – i.e., that Steven Alevy and Bankers Capital, working with Allen Alevy, Allen Sragow and Robert Friedman, engaged in a fraudulent scheme to "steal" the Portfolio transaction. Even though they received financing from Citigroup, they own the Properties, and they have plaintiffs' $13 million, defendants claim to have suffered two types of damages as a result of Bankers Capital's "misconduct:" (i) a decrease in the value of the Portfolio; and (ii) losses arising from a purported inability to refinance the Portfolio.  Defendants, however, utterly fail to allege any facts that would give rise to a causal link between Bankers Capital's conduct and the losses they claim to have suffered.

---

[1]     Also on June 11, and apparently because they missed the May 1, 2008 deadline in this Action for the joinder of additional parties, defendants commenced an action in New York state court (the "State Action") against Allen Alevy, Robert Friedman, Allen Sragow and Avery Egert (defendant Safrin's son-in-law).  In the State Action, defendants allege, practically verbatim, the same unsuccessful fraud scheme.  The State Action defendants anticipate filing a motion to dismiss or stay the State Action in favor of this first-filed Action.

3

First, defendants allege that First Republic Group Corp. ("FRGC"), the

predecessor in interest to First Republic, agreed to purchase the Portfolio for $128 million

from Colonial Realty Limited Partnership ("Colonial").  (Certification of Marc D.

Youngelson, Esq., executed on August 1, 2008 ("Youngelson Cert."), Ex. A ¶ 11 ("Cross

Compl.").)  Some time thereafter, FRGC assigned its interest in the deal to First

Republic.  (Id. ¶ 12.)

In early May 2007, third party defendant Stephen Friedman – Stern's (and

Safrin's) counsel in the Colonial transaction, and a partner at third party defendant

Buchanan Ingersoll – introduced Stern to Steven Alevy.  (Cross Compl. ¶ 16.)

Defendants engaged Bankers Capital to find financing for their Portfolio purchase.  (Id.

¶¶ 18-19.)  Notably, defendants do not (i) allege that they granted Bankers Capital any

authority to bind defendants or otherwise to commit them with respect to any prospective

lenders; or (ii) provide a copy of their alleged agreement with Bankers Capital.

The Stern defendants next claim that Bankers Capital, working together with

nonparties Allen Alevy, Robert Friedman and Allen Sragow, thereafter "orchestrated a

fraudulent scheme to sabotage First Republic's acquisition of the Properties so that the

Alevy family and related affiliates could purchase the Properties."  (Id. ¶ 23.)

Defendants, however, concede that the scheme they allege was unsuccessful.

Specifically, on June 28, 2007, defendants closed on two Citigroup loans in the total

amount of $131,150,000 to finance their Portfolio purchase.  (Id. ¶ 42.)  Then, on July 12,

defendants closed the Colonial transaction.  (Id. ¶ 54.)  Defendants also admit that they

used $13 million provided by plaintiffs in connection with the Colonial closing.  (Id. ¶

45.)  At the same time, however, defendants also claim that the parties had no agreement

4

with respect to defendants' use of plaintiffs' $13 million. (Id. ¶ 54.) Strangely, defendants make no effort whatsoever to justify taking plaintiffs' funds.

Defendants further allege that, after closing on the Portfolio, Bankers Capital, again working with Allen Alevy and Allen Sragow, interfered with defendants' (i) efforts to refinance the Properties (the purpose of which allegedly was to repay plaintiffs' $13 million); and (ii) operation of the Properties. (Id. ¶¶ 59 – 68.)

Incredibly, even though they claim that the parties' had no agreement, and they admit that they used plaintiffs' $13 million to close the Colonial transaction, defendants seek a declaratory judgment that (i) they were fraudulently induced into accepting plaintiffs' $13 million, (ii) any agreement they entered with plaintiffs should be rescinded, and (iii) they be permitted to return plaintiffs' funds without interest. Defendants do not allege that they have offered to return plaintiffs' $13 million – they have not – or that they in fact have the financial wherewithal to return that money. Cf. Ferguson v. Lion Holding Inc., 312 F. Supp. 2d 484, 499 (S.D.N.Y. 2004) ("Generally a party seeking rescission of a contract must tender the return of consideration it received pursuant to the voidable contract."); Laudenberg Thalmann & Co. v. Imaging Diagnostic Systems, Inc., 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001) ("To disaffirm the contract, the defrauded party must offer to return any consideration received"). Bankers Capital and plaintiffs suspect that defendants do not have the money to repay plaintiffs.

Even more incredibly, defendants claim to have suffered two types of damages as a result of Bankers Capital's "misconduct:" (i) a decrease in the value of the Portfolio; and (ii) losses arising from a purported inability to refinance the Properties. (Cross Compl. ¶¶ 69, 79, 85, 90, 95, 101, 106, 113, 120.) Defendants, however, utterly fail to

explain anything Bankers Capital did or said caused the losses defendants claim to have

suffered.  For this reason alone, defendants' claims should be dismissed.

## ARGUMENT

After the Supreme Court's seminal decision in Bell Atlantic Corp. v. Twombly,

__ U.S. __, 127 S. Ct. 1955, 1964-65 (2007), a party must "amplify [its] claim with some

factual allegations in those contexts where amplification is needed to render the claim

*plausible*" in order adequately to state its claims for relief.  Iqbal v. Hasty, 490 F.3d 143,

157-58 (2d Cir. 2007) (italics in original); see also ATSI Comm'ns, Inc. v. Shaar Fund,

Ltd., 493 F.3d 87, 93 (2d Cir. 2007) (affirming dismissal).  "Now, in order to survive

dismissal, the plaintiff must provide the grounds upon which his claim rests through

factual allegations sufficient to raise a right to relief above the speculative level."  In re

Parmalat Sec. Litig., 501 F. Supp. 2d 560, 572 (S.D.N.Y. 2007) (Kaplan, J.); Johnson &

Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 345 (S.D.N.Y. 2007) ("In the wake of

Twombly, courts are to apply a flexible 'plausibility standard'") (citing Iqbal).

Further, while it still is the case that a party's factual allegations are to be

accepted as true, conclusory allegations are insufficient.  Matsumura v. Benihana

National Corp., 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) ("the Court is obligated to

accept as true the factual allegations of the amended complaint, drawing all reasonable

inferences in the light most favorable to the plaintiff . . . [h]owever, conclusory

allegations or legal conclusions masquerading as factual conclusions will not suffice to

prevent a motion to dismiss").  "This principle applies with even greater force in a fraud

case governed by the more stringent pleading requirements of Fed. R. Civ. P. 9(b)."

Schuh v. Druckman & Sinel, LLP, No. 07 Civ. 366, 2008 U.S. Dist. LEXIS 15079, at *24

(S.D.N.Y. February 29, 2008) (Gorenstein, J.).  Simply put, "[o]n a motion to dismiss for

failure to state a claim, the issue is whether the plaintiff has established a 'plausible entitlement to relief.'" Matsumura, 542 F. Supp. 2d at 251 (quoting Twombly); Schuh, 2008 U.S. Dist. LEXIS 15079, at *23 ("Factual allegations must be enough to raise a right to relief above the speculative level.") (quoting Twombly).

As demonstrated below, defendants wholly fail to satisfy the foregoing standard.

## I.    DEFENDANTS' CLAIMS MUST BE DISMISSED BECAUSE THEY DID NOT PLEAD, AND CANNOT ESTABLISH, LOSS CAUSATION.

New York law is plain that the Stern defendants must establish loss causation in connection with their claims – i.e., defendants must establish that Bankers Capital's alleged misconduct was the direct and proximate cause of some injury they suffered:

> Loss causation is . . . an integral element of most tort causes of action. See W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 263 (5th ed. 1984) ("An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.")

LNC Investments, Inc. v. First Fidelity Bank, N.A., 173 F.3d 454, 465 (2d Cir. 1999); see also Laub v. Faessel, 297 A.D.2d 28, 30, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) ("For each of the direct causes of action included in the complaint--fraud, negligent misrepresentation and breach of fiduciary duty--plaintiff must establish that the alleged misrepresentations or other misconduct were the direct and proximate cause of the losses claimed . . .Loss causation is the fundamental core of the common-law concept of proximate cause") (citing Prosser and Keeton).

"To establish the required causation, the plaintiff must show that the loss was a direct result of the defendant's wrongful actions and [that it was] independent of other causes." Bennett v. U.S. Trust Co. of New York, 770 F.2d 308, 316 (2d Cir. 1985) (quotation omitted) (brackets in original); Hampshire Equity Partners II, L.P. v.

7

Teradyne, No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261, at *13 (S.D.N.Y. March 30,

2005) ("To establish causation, 'a plaintiff must allege . . . that the subject of the

fraudulent statement or omission was the cause of the actual loss covered.'") (quoting

Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001));

Aquino v. Trupin, 833 F. Supp. 336, 342 (S.D.N.Y. 1993) ("Loss causation turns upon a

question of proximate cause: was the damage complained of a foreseeable result of the

plaintiff's reliance on the fraudulent misrepresentation?") (quotation omitted).  An

attenuated connection between the alleged loss and the alleged misstatement is

insufficient.  Teradyne, 2005 U.S. Dist. LEXIS 5261, at *13 ("If the relationship between

the plaintiff's loss and the information misstated or concealed by the defendant is

attenuated, or if the plaintiff fails to demonstrate a causal connection between the content

of the alleged misstatements or omissions and the harm actually suffered, a fraud claim

will not lie") (quotation omitted).

   "A failure to adequately plead causation is 'fatal to a common law fraud claim

under New York law.'"[2]  Teradyne, 2005 U.S. Dist. LEXIS 5261, at * 13 (quoting

Bennett).  The same is true for defendants' other tort claims.  LNC Investments, 173 F.3d

at 465 ("where damages are sought for breach of fiduciary duty under New York law, the

plaintiff must demonstrate that the defendant's conduct proximately caused injury in

order to establish liability"); Jews For Jesus, Inc. v. Jewish Community Relations

Counsel of New York, Inc., 968 F.2d 286, 292 (2d Cir. 1992) ("To maintain a successful

cause of action for tortious interference with contract, a plaintiff must allege and prove

---

[2]    As discussed below, FRCP 9(b) (i) requires that the elements of the alleged fraud
be pled with particularity; and (ii) applies to all claims that sound in fraud.  See infra at
16.

the existence of a valid contract and damages <u>caused</u> by the defendant's" conduct) (emphasis added); <u>Mina Investment Holdings Ltd. v. Lefkowitz</u>, 184 F.R.D. 245, 254 (S.D.N.Y. 1999) (same) (citing <u>Jews for Jesus</u>); <u>Darby Trading Inc. v. Shell Int'l Trading and Shipping Co. Ltd.</u>, No. 07-CV-0400, 2008 U.S. Dist. LEXIS 25980, at *34 (S.D.N.Y. March 31, 2008) (elements of tortious interference with prospective relations include "defendant's interference caused injury").

Thus, courts have not hesitated to dismiss tort claims where, as here, the claimant fails adequately to plead a causal connection between the misconduct alleged and the loss claimed. <u>Teradyne</u>, 2005 U.S. Dist. LEXIS 5261, at *13 ("A complaint shall be dismissed if the plaintiffs have completely failed to show how they were damaged by the alleged fraud, a showing required by Rule 9(b).") (quoting <u>Aquino</u>); <u>Aquino</u>, 833 F. Supp. at 344 (dismissing aiding and abetting claim because "[l]oss causation . . . is as necessary for a theory of aiding and abetting liability as it is for a primary violation"); <u>Bennett</u>, 770 F.2d at 310 (affirming 12(b)(6) dismissal because "there was an insufficient causal connection between appellee's acts and appellants' loss . . . to state a cause of action"); <u>Mina</u>, 184 F.R.D. at 249 (tortious interference claim dismissed because plaintiffs "failed to allege 'but for' causation").

The loss causation analysis applies with equal force to breach of contract claims. <u>LNC Investments</u>, 173 F.3d at 464-65 ("Ordinarily, causation is required to recover damages for breach of contract. . . Under New York law, in fact, the failure to prove damages is fatal to [a] plaintiff's breach of contract cause of action") (citation omitted); <u>Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in

tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages."). As with tort claims, courts will dismiss breach of contract claims where, as here, the claimant fails adequately to plead damages flowing from the alleged breach. Spithogianis v. Haj-Darwish, No. 07 Civ. 4609, 2008 U.S. Dist. LEXIS 824, at *16 (S.D.N.Y. January 7, 2008) ("Because the plaintiff has not identified any damages flowing from breach of an enforceable agreement that are recoverable under New York law, he has not stated a cognizable contract claim").

Here, defendants have failed to allege any facts that, if true, suggest any rational relationship between Bankers Capital's conduct and the damages defendants seek.

**A.    Defendants Have Not Alleged How Bankers Capital's Actions Caused a Decline in the Value of the Portfolio Properties.**

First, the Stern defendants fail to explain how the unsuccessful fraud scheme to steal the Portfolio caused an alleged decline in the value of the Portfolio Properties. For example, defendants do not identify any statements or omissions by Bankers Capital that caused the value of the Portfolio to fall. Defendants similarly do not explain how their reliance on any such statements or omissions caused the value of the Portfolio to decline. The explanation for defendants' failure is simple: there is no rational relationship between Bankers Capital's actions and any such losses.

Teradyne is instructive. In that case, plaintiff claimed that defendant fraudulently encouraged plaintiff's $55 million investment in Connection Services Corp. ("CSC") by making various positive, but false, statements about CSC. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *1 and *3. Plaintiff lost its investment when CSC's business declined and it filed bankruptcy. Id. at *1. Plaintiff then commenced an action, alleging claims

for fraud, fraudulent inducement, and intentional interference with economic opportunity.
Id. at *4. Defendant moved to dismiss pursuant to FRCP 9(b) and 12(b)(6). Id. at *2.
The court granted defendant's motion, holding that plaintiff had failed to allege how
defendant's misrepresentations caused the loss of plaintiff's investment.[3] Teradyne, 2005
U.S. Dist. LEXIS 5261, at * 14-15 ("Plaintiff suggests no reason why the investment was
wiped out. Plaintiff has alleged the cause of its entering into the transaction in which
Plaintiff lost money, but not the cause of the transaction's turning out to be a losing one")
(citing Citibank v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)); see also Citibank,
968 F.2d at 1495-96 (subsequent decline in value of collateral not causally connected to
defendants' alleged nondisclosure); Bennett, 770 F.2d at 314 ("the misrepresentation
neither induced the purchase nor related to the stock's value").

Rather, as the Teradyne court observed, plaintiff's losses more likely were
attributable to declining market conditions than they were to defendant's conduct:

> Furthermore, when a plaintiff's loss coincides with a market-wide
> phenomenon causing comparable losses to other investors, the probability
> that the loss was caused by an alleged fraud decreases. *First Nationwide
> Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994). Although I
> need not reach the existence of causation, it is infinitely more probably
> that the proximate cause of CSC's bankruptcy and Plaintiff's loss of its
> $55 million investment was the overall decline in the high-tech market
> rather than any collection of optimistic statements [by defendant]. Here,
> Plaintiff has not pled any facts to support an alternate theory. I find that
> Plaintiff has not adequately pled causation and that the Complaint must be
> dismissed under Rule 9(b).

Teradyne, 2005 U.S. Dist. LEXIS 5261, at *16 (italics in original).

As in Teradyne, the Stern defendants utterly have failed to allege any causal link
between Bankers Capital's misconduct and the alleged loss in value of the Portfolio.

---

[3]    The court also held that plaintiff's claims were "subject to the strict pleading
requirements of Rule 9(b)" because they were based on the "same averments of fraud."
Teradyne, 2005 U.S. Dist. LEXIS 5261, at *7-8.

That is because there is no such link.  In fact, unlike <u>Teradyne</u>, defendants do not even allege that Bankers Capital's statements or omissions caused them to invest in the Portfolio.  If anything, defendants' losses plainly are attributable to the notorious nationwide decline in the real estate market over the past few years, not to anything Bankers Capital said or did.  <u>Teradyne</u>, 2005 U.S. Dist. LEXIS 5261, at *16; <u>Bennett</u>, 770 F.2d at 314 ("The loss at issue was caused by the Bennetts' own unwise investment decisions, not by [defendant's] misrepresentation").

**B.     Defendants Also Have Not Sufficiently Alleged How Bankers'
<u>Capital's Actions Prevented Stern From Obtaining Refinancing.</u>**

Defendants also have failed to explain how Bankers Capital's actions caused defendants to be unable to refinance the Properties.  Rather, in vague and conclusory terms, defendants simply allege that Bankers Capital somehow interfered with defendants' refinancing efforts, including by publicly accusing defendants of stealing plaintiffs' $13 million to unspecified members of the lending community.  (Cross Comp. ¶¶ 63 and 66.)  Defendants wholly fail to specify (i) when, where, and how Bankers Capital made such statements; (ii) the precise content of such statements; (iii) the prospective lenders to whom such statements were made; and (iv) how such statements caused any prospective lender not to extend refinancing to defendants.  Defendants also fail to identify any prospective lenders which, but for Bankers Capital's actions, otherwise would have extended refinancing.  Such conclusory allegations are insufficient. <u>Citibank,</u> 968 F.2d at 1497 (conclusory allegations of a causal link not sufficient).

In any case, defendants' alleged inability to obtain refinancing is not a cognizable loss for which they can recover here.  New York law limits fraud damages to "the actual pecuniary loss suffered as a direct result of the misrepresentation." <u>Spithogianis</u>, 2008

12

U.S. Dist. LEXIS 824, at *21; <u>Kregos</u>, 3 F. 3d at 665 ("New York law awards only 'out of pocket' expenses in fraud cases, entitling plaintiffs to damages solely for their actual pecuniary losses. . . [t]he damages must also be independent of other causes") (citations omitted). A lost alternative bargain is recognized as the basis for damages only where "the fraud caused the plaintiff to give up some quantifiable, concrete alternative opportunity." <u>Spithogianis</u>, 2008 U.S. Dist. LEXIS 824, at *22 (citing cases).

In sum, the Stern defendants have not identified any refinancing that they would have obtained but for Bankers Capital's alleged misconduct. The explanation for this again is straightforward: defendants cannot do so. Simply put, defendants' purported inability to obtain re-financing is far too speculative and remote a harm for which they can recover. <u>HFCA</u>, 960 F. Supp. at 586 (dismissing fraud claim because the damages alleged – an inability to obtain certain government approvals – were "too speculative to survive even the most generous application of Fed.R.Civ.P. 12(b)(6)"). As with the declining value of the Portfolio, defendants' inability to obtain refinancing likely is due to the nationwide tightening credit market, not to Bankers Capital's actions.[4]

*****

Defendants' failure adequately to allege a causal link between Bankers Capital's conduct and the damages they seek arises directly from the undisputed fact that, quite simply, the fraud scheme they allege was unsuccessful. At most, defendants' factual allegations constitute a potential affirmative defense to plaintiffs' claims in the Action. Defendants, however, are not entitled to collect damages if they establish this defense.

---

[4]    The Court may take judicial notice of the well known decline in the real estate and financing markets. <u>In re Merrill Lynch & Co.</u>, 289 F. Supp. 2d 416, 421 n. 6 (S.D.N.Y. 2003) ("The Court may take judicial notice of the existence of the internet bubble and its subsequent crash.") (citing F.R.E. 201 and cases).

At bottom, Bankers Capital suspects that defendants have asserted their attenuated damages claims to impose upon Bankers Capital (and plaintiffs) the consequences of defendants' unwise investment in the Portfolio in declining real estate and credit markets. Defendants should not be permitted to shift their losses in this fashion.

Accordingly, all of defendants' damages claims should be dismissed.

## II.    DEFENDANTS' CLAIMS ALSO MUST BE DISMISSED BECAUSE THEY FAIL ADQUATELY TO PLEAD THE REQUISITE ELEMENTS

In addition to failing adequately to plead causation, defendants also fail to plead various requisite elements of their claims.  Accordingly, for the reasons set forth below, defendants' claims must be dismissed.

### A.    The Stern Defendants Have Failed to State a Claim for Fraud.

Defendants first assert a claim for common law fraud against Bankers Capital. The Stern defendants offer few specifics in support of their fanciful claim.  For example, defendants allege, in conclusory fashion, that Steven Alevy and Robert Friedman falsely represented that they had contacted "highly relevant lenders," and that they "believed" they could obtain more financing for Stern than what he was seeking at the time from other lenders (such as JP Morgan Chase).  (Cross Compl. ¶ 22.)  Defendants also allege that Steven Alevy and Robert Friedman "pretended that they were engaged in a serious effort to obtain financing for the purchase."  (Id. ¶ 24.)  In short, Bankers Capital strung Stern along, when "in reality, Steven Alevy and others conspired with Steven Alevy's father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern."  (Id. ¶ 24.)

Defendants also allege, again in vague and conclusory terms, that Bankers Capital somehow "interfered with potential financing sources."  (Cross Compl. ¶ 29.)  For

example, Bankers Capital passed on unspecified "negative information" about Stern to

such lenders. (Id.) Bankers Capital also caused prospective lenders to form a "bad and

incorrect impression" of Stern by making "last minute requests" of Stern to meet with

such lenders, which he was unable to do. (Id. ¶ 32.) Notably, defendants do not allege

that Bankers Capital provided false information to prospective lenders. As noted,

defendants also do not identify a single prospective lender who, but for Bankers Capital's

alleged interference, otherwise would have financed the Portfolio purchase.[5]

The elements of fraud are well known: (i) a material false representation; (ii)

made with knowledge of its falsity; (iii) an intent to defraud; (iv) reasonable reliance; and

(v) damages. Kregos v. The Associated Press, 3 F.3d 656, 665 (2d Cir. 1993); HFCA

Associates Corp. v. Grossman, 960 F. Supp. 581, 585 (E.D.N.Y. 1997) ("Under New

York law, the elements of a claim for rescission based on fraud are misrepresentation,

concealment or nondisclosure of a material fact; an intent to deceive; and an injury

resulting from justifiable reliance by the aggrieved party"). Where, as here, the fraud

claim is based on an alleged nondisclosure, the plaintiff also must allege that defendant

had a duty to disclose as a result of a special relationship – e.g., a fiduciary duty –

between the parties. Brady v. Lynes, No. 05 Civ. 6540, 2008 U.S. Dist. LEXIS 43512, at

*19-20 (S.D.N.Y. June 2, 2008) ("although a cause of action alleging fraud may be

predicated on acts of concealment, the plaintiffs must allege, inter alia, that the defendant

had a duty to disclose the disputed information.")

---

[5]    The only prospective lender identified by name is Petra Capital ("Petra").
According to defendants, Bankers Capital met with Petra in order to secure financing for
an Allen Alevy entity, not the Stern defendants, to purchase the Portfolio. (Cross Compl.
¶ 35.) Again, defendants do not claim that Petra declined financing as a result of
Bankers Capital's conduct. Even if it did, it does not matter:  defendants financed the
Portfolio acquisition with Citigroup.

FRCP 9(b) requires that the foregoing elements be alleged with particularity. Spithogianis, 2008 U.S. Dist. LEXIS 824, at *19 ("Rule 9(b) . . . requires that the circumstances constituting fraud must be stated with particularity"). "These heightened pleading requirements are applicable to any claim that 'sounds in fraud,' regardless of whether fraud is an element of the claim." Matsumura, 542 F. Supp. 2d at 251 (quoting Rombach v. Chang, 355 F.2d 164, 166, 170 (2d Cir. 2004)); Teradyne, 2005 U.S. Dist. LEXIS 5261, at *6-7 (citing cases). Thus, "courts in the Second Circuit have applied Rule 9(b) to any cause of action that bears a close legal relationship to fraud or mistake . . . as well as to individual claims that, as pleaded, are predicated on allegations of fraud." Matsumura, 542 F. Supp. 2d at 251 (citing cases). Courts have described the policy rationale underlying the pleading requirements of Rule 9(b) as three-fold: first, to provide a defendant with fair notice of the plaintiff's claims; second, to protect a defendant's reputation; and, third, to reduce strike suits. Aquino, 883 F. Supp. at 340; HFCA, 960 F. Supp. at 585 (same).

Thus, to satisfy Rule 9(b), a claimant must specify the fraudulent statements, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *5; Spithogianis, 2008 U.S. Dist. LEXIS 824, at *9 (same); HFCA, 960 F. Supp. at 585 ("To satisfy the particularity requirement of Rule 9(b), the allegations should specify the time, place, speaker, and content of the alleged misrepresentations.") (citations omitted). Further, while 9(b) permits a plaintiff to allege intent with some generality, a plaintiff still must "allege facts that give rise to a strong inference of fraudulent intent," which must be done by showing (i) that defendant had motive and opportunity to commit the fraud, or

(ii) by alleging strong circumstantial evidence of bad intent.  Teradyne, 2005 U.S. Dist. LEXIS 5261, at *6; Spithogianis, 2008 U.S. Dist. LEXIS 824, at *9 (inference of intent requires allegations of "both motive and opportunity to defraud or . . . strong circumstance evidence of conscious misbehavior").  Here, defendants fail to supply any of the required particulars.

First, the only misrepresentation defendants attribute to Bankers Capital is that Steven Alevy (and Robert Friedman) falsely represented that they were "actively working to obtain financing" for the Stern defendants' Portfolio purchase, when in fact Bankers Capital was plotting to "steal" the Portfolio.  Defendants offer no specifics concerning these alleged statements.  These conclusory allegations fail to satisfy the particularity requirements of Rule 9(b).

Second, defendants have failed to allege how they relied upon Bankers Capital's alleged misrepresentations.  In fact, defendants allege that they were able to obtain "within a matter of days, a financing commitment from Citigroup" through another broker, which they closed "less than two weeks later."  (Cross Compl. ¶ 39.)  There was no reliance here.

Third, the Stern defendants also allege that Steven Alevy failed to disclose that he was secretly working on behalf of his family to "steal" the transaction.[6]  (Id.)  As discussed below, Bankers Capital did not owe defendants a fiduciary duty, and thus had no duty to disclose.  See infra at 19-23.

---

[6]     Defendants also allege that Allen Alevy and Allen Sragow concealed various material facts.  (Cross Compl. ¶¶ 73-74.)  While not germane to this motion, these allegations fail to state a claim because Allen Alevy and Allen Sragow owed no duty of disclosure to defendants.

Fourth, defendants have failed sufficiently to allege scienter.  Arguably, the Stern defendants allege that Bankers Capital's motive was to "steal" the Portfolio purchase. Defendants, however, utterly fail to set forth any factual allegations indicating that Bankers Capital had motive and opportunity to steal the transaction.  Indeed, Stern's concession that the scheme was unsuccessful confirms there was no such opportunity.

Defendants also have failed to set forth any circumstantial allegations that would give rise to an inference of bad intent.  To the contrary, defendants' allegations simply make no sense.  Why would plaintiffs put up $13 million, which defendants admittedly used to close the Colonial transaction, if they were trying to steal the deal?  In the same vein, why would plaintiffs interfere with defendants' purported efforts to get refinancing so that they could repay plaintiffs' $13 million?  Of course, they would not.  Teradyne, 2005 U.S. Dist. LEXIS 5261, at *10 ("As a matter of law, such allegations of irrational motive cannot support a fraud claim under Rule 9(b)") (citing cases); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (dismissing fraud claims where plaintiff's view of the facts "defie[d] economic reason, and therefore [did] not yield a reasonable inference of intent").

Accordingly, defendants' fraud claim should be dismissed.

**B.     Defendants' Breach of Fiduciary Duty Claim Should Be Dismissed Because (I) Bankers Capital Did Not Owe Defendants a Fiduciary Duty; and (II) It Merely Restates Defendants' Breach of Contract Claim.**

The Stern defendants next assert that Bankers Capital breached its fiduciary duty to defendants by (i) providing their confidential information to the Alevy family and Sragow without permission; (ii) trying to sabotage their financing efforts; and (iii) inducing them to enter into a transaction with plaintiffs.  (Cross Compl. ¶ 83.)

18

Defendants have failed to allege sufficient facts to establish the most basic element of their claim – i.e., that Bankers Capital owed them a fiduciary duty.

The elements of a breach of fiduciary duty claim are (i) the existence of a fiduciary duty; (ii) breach of that duty; and (iii) damages that were proximately caused by the breach. Metropolitan West Asset Mgmt. LLC v. Magnus Funding, Ltd., No. 03 Civ. 5539, 2004 U.S. Dist. LEXIS 11761, at *25-26 (S.D.N.Y. June 25, 2004). As noted, Rule 9(b) applies to such claims where, as here, they are based on fraud. World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) ("the elements of a breach of fiduciary duty based in fraud must be plead with particularity").

"Therefore, in order to survive a motion to dismiss a claim for beach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." WWE, 530 F. Supp. 2d at 504. Further, the fiduciary duty alleged must be independent of any alleged contract between the parties. Metropolitan West, 2004 U.S. Dist. LEXIS 11761, at *26 ("It is well settled, however, that a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated").

New York law is plain that a party owes no fiduciary duty to another where, as here, the first party was asked to find financing sources for the other, but had no power or authority to bind or commit the other to such financing. Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 533 (S.D.N.Y. 1996) ("This arrangement is not the kind of 'exclusive agency' that imposes a fiduciary duty under New York law"); Northeast

General Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 164 (1993) ("This finder did not have the power to negotiate the transaction. This finder did not have the power to do anything except find and introduce prospects . . . . this finder had no power to affect any legal relations of [the principal] and the prospective buyer that would propel the duties into the fiduciary-like sphere"); see also WWE, 530 F. Supp. 2d at 504 ("the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or event 'agent,' but instead by the services agreed to under the contract between the parties") (quoting Northeast General).

Village on Canon is instructive. In that case, defendant ("Bankers Trust") made a one year, $29 million bridge loan to plaintiff ("VOC"), secured by VOC's interest in certain California real estate. Village on Canon, 920 F. Supp. at 525. Shortly after the bridge loan closed, VOC and Bankers Trust entered into an exclusive agency arrangement, pursuant to which Bankers Trust was to solicit investors to provide long-term financing for VOC. Id. VOC claimed that it received oral assurances from Bankers Trust that the bridge loan would be extended if permanent financing was not arranged. Id. The bridge loan, however, was not extended, and Bankers Trust terminated the agreement under which it was to solicit permanent financing for VOC. Id. at 526. Thereafter, VOC defaulted on its bridge loan, and Bankers Trust ultimately conducted a nonjudicial foreclosure on the real property securing that loan. Id.

VOC then sued, alleging that Bankers Trust breached its fiduciary duty to VOC by lulling VOC into believing that the bridge loan would be extended and by failing to obtain permanent financing for VOC. Id. at 532. Bankers Trust moved to dismiss, arguing, inter alia, that it did not owe VOC a fiduciary duty. Id. Relying on Northeast

20

General, the district court held that the parties' arrangement did not impose a fiduciary

duty upon Bankers Trust, and granted Bankers Trust's motion:

> Bankers Trust's obligations under the agreement were limited to
> 'approaching domestic and foreign financial institutions and other
> qualified investors,' (Compl. Ex. 4, P 1), and to 'assessing the interest of
> the Investors in Purchasing or providing Financing and [] obtaining
> proposals[s] from them . . . .' (Compl. Ex. 4., P 2.)  Bankers Trust had no
> authority to commit VOC to any proposal or to negotiate on VOC's
> behalf, as the terms of the agreement make clear. (Compl. Ex. 4, P 1.)
> Bankers Trust could only evaluate the proposals and make
> recommendations. (Compl. Ex. 4, P 6.)  For these services Bankers Trust
> would earn a fee based on a percentage of the value of a deal struck with
> the investor. (Compl. Ex. 4, PP 7-8.)  In other words, rather than acting as
> a broker, Bankers Trust's role under the Financial Advisor Agreement was
> to find interested investors and direct them to VOC, for which Bankers
> Trust would earn a finder's fee. This arrangement is not the kind of
> 'exclusive agency' that imposes a fiduciary duty under New York law. As
> the New York Court of Appeals has explained:

> [A] finder is not a broker, although they perform some related functions.
> Distinguishing between a broker and finder involves an evaluation of the
> quality and quantity of services rendered. The finder is required to
> introduce and bring the parties together, without any obligation or power
> to negotiate the transaction, in order to earn the finder's fee.

> . . .

> this finder had no power to affect any legal relations of [the principal] and
> the prospective buyer that would propel the duties into the fiduciary-like
> sphere.

Id. at 532-533 (quoting Northeast General) (emphasis added).

Here, the Stern defendants' allegations confirm that, Bankers Capital, like

Bankers Trust, was engaged only to locate financing for defendants' Portfolio Properties.

(Cross Compl. ¶ 19 (alleging that Bankers Capital was hired "to locate financing sources

for First Republic") and ¶ 61 (alleging that Bankers Capital was "again engaged . . . to

assist [defendants] in obtaining financing and refinancing of the Properties so that the $13

million advanced to First Republic . . . could be repaid").)  Defendants do not allege that

21

Bankers Capital had any authority to bind defendants to any agreement with prospective lenders. As in <u>Village on Canon</u>, these allegations are insufficient to establish a fiduciary relationship between Bankers Capital and defendants.

Moreover, defendants' breach of fiduciary duty claim arises out of the same facts as their breach of contract claim. Indeed, defendants allege the same "misconduct" in support of both claims. <u>Compare</u> Cross Compl. ¶ 83 (alleging that Bankers Capital breached its fiduciary duty by (i) giving defendants' confidential information to the Alevy family without permission; (ii) trying to "sabotage" defendants' efforts to obtain financing; and (iii) inducing defendants' to enter a transaction with plaintiffs) and ¶ 88 (alleging that Bankers Capital breached its contractual obligations by (i) giving defendants' confidential information to the Alevy family without permission; (ii) failing to obtain financing or refinancing; and (iii) trying to "steal" the deal for the Alevy family). It is black letter law that a party cannot maintain a breach of fiduciary duty claim that arises out of the same facts as a breach of contract claim. <u>Metropolitan West</u>, 2004 U.S. Dist. LEXIS 11761, at *26 (dismissing breach of fiduciary duty claim; "Where a tort claim is 'merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract,' the claim is barred as redundant.") (citation omitted). Defendants concede as much in their February 27, 2008 memorandum of law ("Def. Mem.") in support of their motion to dismiss plaintiffs' claims. (Def. Mem. at 23 (citing <u>Metropolitan West</u>).)

Accordingly, defendants' fiduciary duty claim should be dismissed. <u>Village on Canon</u>, 920 F. Supp. at 533; <u>Metropolitan West</u>, 2004 U.S. Dist. LEXIS 11761, at *27.

22

**C.      Defendants' Aiding and Abetting Claims Should Be Dismissed Because They Have Failed to Allege the Underlying Torts.**

Next, the Stern defendants assert claims for aiding and abetting fraud and breach of fiduciary duty.  First, in vague and conclusory terms, they allege that Bankers Capital aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow.  (Cross Compl. ¶¶ 91-96.)  Second, again in conclusory fashion, defendants allege that Bankers Capital aided and abetted the breaches of fiduciary duty committed by Robert Friedman, Allen Alevy and Allen Sragow.  (Id. ¶¶ 97-102.)  These claims fail because defendants have not sufficiently alleged the underlying torts.

"To state a claim for aiding and abetting fraud under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) actual knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the underlying fraud." Mazzaro v. Bank of America, 525 F. Supp. 2d 381, 387 (S.D.N.Y. 2007); see also In re Bayou Hedge Funds Investment Litigation, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) ("To assert a claim for aiding and abetting, plaintiffs must allege (1) the existence of an underlying tort; (2) defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort.").  Similarly, "[t]o state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach by a fiduciary of obligations to another; (2) actual knowing participation by the defendant in the fiduciary's breach of obligations; and (3) damages to the plaintiff." Mazzaro, 525 F. Supp. 2d at 392.  As noted, Rule 9(b) applies to defendants' aiding and abetting claims because, like all of their claims, they are based upon the alleged fraudulent scheme to

"steal" the Portfolio transaction. <u>JP Morgan Chase Bank v. Winnick</u>, 406 F. Supp. 2d 247, 251 (S.D.N.Y. 2005).

New York courts routinely dismiss aiding and abetting claims where, as here, the underlying torts have not been sufficiently alleged. <u>Citibank</u>, 968 F.2d at 1497 (dismissing claim for aiding and abetting fraud because "primary liability for common law fraud was not sufficiently pleaded"); <u>In re Bayou Hedge Fund</u>, 472 F. Supp. 2d at 534 (dismissing aiding and abetting claim because "[i]n the absence of a fiduciary duty. . .there can be no liability for aiding and abetting").

As demonstrated <u>supra</u>, defendants have failed adequately to plead loss causation in connection with both their fraud and breach of fiduciary duty claims. Defendants also have failed to satisfy Rule 9(b)'s particularity requirements with respect to Bankers Capital's alleged misrepresentations, defendants' purported reliance thereon, and the critical element of scienter. On their breach of fiduciary duty claim, defendants further have not sufficiently alleged that Bankers Capital (or Robert Friedman, a Bankers Capital employee) owed them a fiduciary duty.

Finally, defendants' claim that Bankers Capital "aided and abetted" a breach of fiduciary duty by Allen Alevy and Allen Sragow is preposterous. Defendants set forth utterly no factual allegations that would support a finding that either Mr. Alevy or Mr. Sragow owed defendants a fiduciary duty. As a matter of law, no such duty existed. <u>Holloway v. King</u>, 361 F. Supp. 2d 351, 360 (S.D.N.Y. 2005), <u>aff'd</u> 161 Fed. Appx. 122 (2d Cir. 2005) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation."); <u>In re Mid-Island Hospital, Inc.</u>, 273 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arms length in a commercial transaction,

no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances").

Accordingly, defendants' aiding and abetting claims must be dismissed.

**D.    Defendants Have Failed to State A Claim For Misappropriation of Trade Secrets Because the Information They Allegedly Provided to Bankers Capital Was Not a Trade Secret and In Any Case Was Not Misappropriated.**

Defendants next assert that Bankers Capital misappropriated defendants' trade secrets. (Cross Compl. ¶¶ 103-107.)   According to defendants, they provided certain information concerning the Portfolio purchase for Bankers Capital to use with prospective lenders, including (i) the Contract with Colonial; (ii) unspecified materials "received from prospective lenders;" (iii) a statement of Stern's net worth; and (iv) personal and corporate financial statements and information relating to Stern's prior business and litigation experience.   (Cross Compl. ¶ 20.) The Stern defendants do not allege that they provided this information to Bankers Capital confidentially, or that they in any way restricted Bankers Capital's use of this information.   This claim fails because defendants have not alleged, and cannot establish, that the information they provided to Bankers Capital (i) constituted trade secrets, or (ii) was misappropriated.

A party asserting a misappropriation of trade secret claim must plead that (i) it possessed a trade secret; and (ii) the defendant used that trade secret "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Bear, Stearns Funding, Inc. v. Interface Group, 361 F. Supp. 2d 283, 304 (S.D.N.Y. 2005). Courts have dismissed trade secret misappropriation claims where, as here, the pleadings fail to establish that the information in question is a trade secret. Bear Stearns, 361 F. Supp. 2d at 305 (granting motion to dismiss).

A trade secret is a "formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Bear Stearns, 361 F. Supp. 2d at 304 (quoting Ashland Mgmt. v. Janien, 82 N.Y.2d 395, 407 (1993) (quoting Restatement (First) of Torts § 757 cmt. B)). Information concerning single or ephemeral events in one's business is not a trade secret. Id. at 305 ("a trade secret is 'not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business'") (quoting Softel, Inc. v. Dragon Medical and Scientific Comm'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997)).

Bear Stearns is instructive. In that case, Bear Stearns and Interface entered an agreement pursuant to which Bear Stearns loaned Interface $141 million, secured by certain real property in Las Vegas. Bear Stearns, 361 F. Supp. 2d at 286. The parties' agreement permitted Bear Stearns to securitize the loan – i.e., package all or part of the loan with other loans – and sell it to third parties. Id. Bear Stearns sold a subordinate piece of the loan to a third entity known as SOF-IV, and demanded payment under the parties' agreement for certain expenses associated with this sale. Id. at 288. Interface refused, and Bear Stearns brought suit. Id. Interface asserted a counterclaim for, inter alia, misappropriation of trade secrets, alleging that Bear Stearns wrongfully provided Interface's trade secrets to SOF-IV in connection with marketing and selling the subordinate piece of the loan to that entity. Id. at 289 and 303. Bear Stearns moved to dismiss the claim on the ground that the information provided to SOF-IV was not a trade secret. Id. at 303.

26

The court granted the motion, holding that Bear Stearns was authorized to disclose the information in connection with marketing the loan, as such information was intended to be available to potential purchasers:

> The information that Interface contends constitutes trade secrets is information that Bear Stearns was expressly authorized to disclose in connection with a loan securitization . . . In view of the ease with which any capital market purchaser of the security could acquire and distribute the information, such information cannot possibly fit within even the broadest interpretation of New York's definition of a trade secret.

Bear Stearns, 361 F. Supp. 2d at 305.  The court also held that, even if the information were kept secret, it did not qualify as a trade secret because it concerned only a single, ephemeral event – the sale of the loan – and was not a process or information used in the continuous operation of Interface's business. Id. at 306 ("the financial information . . . simply cannot conceivably be regarded as a process or device for continuous use in the operation of Interface's business . . . the financial and loan information are independent and ephemeral facts . . . which, even drawing all reasonable inferences in Interface's favor, are not trade secrets") (citation omitted).

As in Bear Stearns, the information defendants provided to Bankers Capital does not constitute a trade secret.  Specifically, defendants allege that they provided Bankers Capital with "the Contract [with Colonial], materials that Stern had received from prospective lenders. . .a statement of [Stern's] net worth, personal and corporate financial statements and information about his prior business and litigation experiences." (Cross Compl. ¶ 20; see also ¶ 27.)  In connection with refinancing efforts, defendants gave Bankers Capital unspecified "additional sensitive, confidential and proprietary information about the Properties." (Id. ¶ 62.)  Defendants do not allege that they restricted, by contract or otherwise, Bankers Capital's use or dissemination of this

material (much of which came from prospective lenders). Indeed, quite the opposite is true. Like Bear Stearns, Bankers Capital was free – in fact, Bankers Capital was engaged – to provide this information to prospective lenders during both financing and refinancing efforts. Cf. Bear Stearns, 361 F. Supp. 2d at 304 ("far from keeping this information secret, the Loan Agreement ensured that it would be available to any party involved in purchasing a securitization of the loan").

Further, the Stern defendants do not explain how the information given to Bankers Capital constituted "a process or device for continuous in the operation of" defendants' business. Rather, as in Bear Stearns, the information in question concerned single, ephemeral events – i.e., defendants' efforts to obtain Portfolio financing.

Finally, defendants cannot establish that Bankers Capital misappropriated any information. To the contrary, defendants in fact admit that they agreed to consider financing proposals from plaintiffs. (Cross Compl. ¶ 46.) Thus, Bankers Capital plainly was entitled to provide to plaintiffs the same information Bankers Capital provided to any other prospective lenders. There was no misappropriation here.

Accordingly, defendants' misappropriation claim should be dismissed.


**E.     Defendants Fail to State a Claim for Tortious Interference with Prospective Economic Advantage Because They Do Not Allege that Bankers Capital's Conduct Was Unlawful or Solely Motivated by Malice.**

Defendants next assert that Bankers Capital tortiously interfered with defendants' prospective business relations with prospective lenders, tenants and Citigroup. (Cross Compl. ¶¶ 108-115.) For example, defendants were wrongfully accused of stealing plaintiffs' $13 million in the business and lending community, which allegedly made it

impossible for defendants to obtain refinancing.  (Cross Compl. ¶ 66.)  Defendants,

however, offer no specifics in support of this conclusory allegation.

 With respect to the Properties, Allen Alevy – not Bankers Capital – allegedly

falsely asserted to actual and prospective tenants, and to Jones Lang LaSalle (the property

management company), that Amusement, not Stern, owned the Portfolio.  (Cross. Compl.

¶ 65.)  The Alevys and Sragow also allegedly caused plaintiffs to commence this Action,

in which plaintiffs again assert ownership of the Properties and accuse defendants of

stealing their money (and other unidentified "falsehoods").  (Id. ¶ 67.)  Finally, the Stern

defendants claim that the Alevys and Sragow have interfered with the operation of the

Properties by filing lis pendens in certain states.  (Id. ¶ 68.)

 This claim fails because defendants do not allege that Bankers Capital used

unlawful means or acted solely out of malice.

 To state a claim for tortious interference with prospective relations, a plaintiff

must allege "the defendant's interference with business relations existing between the

plaintiff and a third party, either with the sole purpose of harming the plaintiff or by

means that are dishonest, unfair or in any way improper."  Shepard Indus., Inc. v. 135

East 57th Street, LLC, No. 97 Civ. 8447, 1999 U.S. Dist. LEXIS 14431, at *17 (S.D.N.Y.

September 17, 1999); Darby Trading, 2008 U.S. Dist. LEXIS 25980, at *34 (elements of

tortious interference with prospective relations are: (i) business relationship with a third

party; (ii) defendant knew of and intentionally interfered with that relationship; (iii)

defendant acted solely out of malice, or used dishonest, unfair, or improper means; and

(iv) causation).

The New York Court of Appeals has held that "where a suit is based on interference with a nonbinding relationship . . . as a general rule, the defendant's conduct must amount to a crime or an independent tort." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004); see also Darby, 2008 U.S. Dist. LEXIS 25980, at *37 (quoting Carvel). As an exception to this general rule, a claimant must show that the defendant engaged in conduct "for the sole purpose of inflicting intentional harm on plaintiff." Id. (quoting Carvel). These requirements are "more demanding than those for interference with [the] performance of an existing contract." Shepard, 1999 U.S. Dist. LEXIS 14431, at *17-18.

Since Carvel, "courts have been stingy in their interpretation of this tort, and have resisted invitations to go beyond the language of the Court of Appeals." Darby, 2008 U.D. Dist. LEXIS 25980, at *46 (citing cases). Thus, courts have dismissed claims for tortious interference with prospective relations where, as here, the activities in question were not unlawful or motivated solely by malice. Darby, 2008 U.S. Dist. LEXIS 25980, at *46 (citing cases); see also Shepard, 1999 U.S. Dist. LEXIS 14431, at *18 (dismissing claim because acts in question were "intended to advance [a party's] own legitimate business interests.").

Here, the Stern defendants allege that Bankers Capital tortiously interfered with defendants' prospective relations by (i) asserting, or causing others to assert, to Colonial, tenants and Jones Lang LaSalle (the property manager) that plaintiffs owned the Properties; and (ii) accusing defendants of "stealing" Amusement's $13 million, including by commencing this Action. (Cross Compl. ¶¶ 66, 67, 111.) Defendants do not allege that Bankers Capital (or Allen Alevy, Allen Sragow or Robert Friedman) acted (i) in a criminal or otherwise unlawful manner in making such statements; or (ii) with the

30

sole purpose of inflicting harm on the Stern defendants. Indeed, in light of defendants'

admission that they took and used Amusement's $13 million – even though they

disingenuously claim that the parties had no agreement regarding that money – the

"misconduct" alleged by defendants plainly could have been motivated by a desire to

protect plaintiffs' legitimate business interests – i.e., getting defendants to honor their

obligations to plaintiffs, and protecting their interest in the Portfolio – and not by malice

or the sole purpose of hurting defendants. In short, defendants have failed to allege

"egregious conduct so culpable . . . that it could be the basis for a claim of tortious

interference with economic relations." Darby, 2008 U.S. Dist. LEXIS 25980, at *47

(quoting Carvel); Roeder v. Rogers, 206 F. Supp. 2d 406, 412 (W.D.N.Y. 2002) ("There

was a legitimate purpose in filing the notice of pendency because it provided notice to the

world of the pending litigation and the fact that it may affect title to, and use and

enjoyment of, the property described . . . A notice pendency hardly falls within the

typical definition of wrongful conduct warranting liability for tortious interference.")

aff'd, 58 Fed. Appx. 879 (2d. Cir. 2003).

　　　　Accordingly, defendants' claim for tortious interference with prospective

economic advantage should be dismissed.


**F.**　　**Defendants Failed to State a Claim for Tortious Interference with Contract Because, As They Contend In Their State Court Action Against Citigroup, There Has Been No Breach of Defendants' Agreement with Citigroup.**

　　　　Finally, defendants assert that Bankers Capital has tortiously interfered with

defendants' loan agreement with Citigroup by filing lis Pendens in certain states. (Cross

Compl. ¶¶ 116-122.)  This claim fails for the simple reason that there has been no breach of the Citigroup agreement.

To state a claim for tortious interference with contract, a plaintiff must allege that "(1) a valid contract exists; (2) a third party had knowledge of the contract; (3) the third party intentionally and improperly procured the breach of contract; and (4) the breach resulted in damages to the plaintiff." Shepard, 1999 U.S. Dist. LEXIS 14431, at *14; see also Jews for Jesus, 968 F.2d at 292 (plaintiff must allege "intentional interference with that contract without reasonable justification"); Europacific Asset Mgmt. Corp. v. Tradescape Corp., No. 03 Civ. 4556, 2005 U.S. Dist. LEXIS 3227, at *24 (S.D.N.Y. March 2, 2005) ("It is also generally required that the underlying contract be breached").

"Improper intentional interference is generally shown by a tortfeasor inducing or otherwise causing a third person not to perform his contractual obligations to the plaintiff." Shepard, 1999 U.S. Dist. LEXIS 14431, at *17.

Courts have dismissed tortious interference with contract claims where, as here, the claimant fails to establish that the defendant (i) caused a breach of the underlying contract; or (ii) did not have reasonable justification for its actions.  Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) (affirming 12(b)(6) dismissal where "[t]he district court correctly determined . . . that the plaintiffs fail to allege the fourth element, actual breach")  Defendants' claim fails for both these reasons.

First, the Stern defendants allege that Bankers Capital tortiously interfered with defendants' loan agreement with Citigroup by filing lis Pendens against the Properties, which has "caused Citigroup to assert that the loans are in default." (Cross Compl. ¶ 119.)  Defendants, however, disingenuously fail to disclose that they have taken the exact

opposite position in their New York state court action against Citigroup, captioned <u>First Republic Group Realty LLC v. Citigroup</u>, Index No. 601743/08 (the "Stern/Citigroup Action"). <u>Schuh</u>, 2008 U.S. Dist. LEXIS 15079, at *24 (on a 12(b)(6) motion to dismiss, the Court may consider the pleadings, "documents that are attached to the complaint or incorporated in it by reference [and] matters of public record, such as court filings.")

In the Stern/Citigroup Action, the Stern defendants sought a temporary restraining order and preliminary injunction enjoining Citigroup from calling a default and foreclosing on certain collateral securing Citigroup's $126 million loan to the Stern defendants. (Youngelson Cert. Ex. B.)  Defendants' sole argument on likelihood of success on the merits was that there has been no breach of the Citigroup loan agreements. (<u>Id.</u> at 8 ("Plaintiffs are not in Default of the loan Agreement or the Mezz.").)

On June 12, 2008, Justice Lowe issued a temporary restraining order enjoining Citigroup from taking any action in furtherance of its notice of default, which order currently remains in effect. (Youngelson Cert. Ex. C.)  In other words, Justice Lowe found that the Stern defendants were reasonably likely to succeed on their claim that they had not breached their agreements with Citigroup.

Simply put, as there has been no breach of the Citigroup agreements, defendants cannot establish that Bankers Capital tortiously interfered with those agreements. <u>Kirch</u>, 449 F.3d at 402; <u>Camp Summit of Summitville, Inc. v. Visinski</u>, No. 06-CV-4994, 2007 U.S. Dist. LEXIS 28496, at *41 (S.D. N.Y. April 16, 2007) (dismissing claim because "[w]ithout a breach, there can be no tortious interference claim"); <u>see</u> <u>also</u> <u>D'Andrea v. Rafla-Demetrious</u>, 146 F.3d 64 (2d Cir. 1998) ("Because there was no breach of contract

33

in the instant case, D'Andrea's tortious interference with contractual relations claim must fail.")

Further, the filing of lis Pendens – the "tortious" conduct alleged by defendants – is not sufficient to support the element of lack of reasonable justification. <u>Roeder</u>, 206 F. Supp. 2d at 412.

Accordingly, the Stern defendants' tortious interference with contract claim should be dismissed.

## III.    THE STERN DEFENDANTS' CLAIMS MUST BE DISMISSED BECAUSE THEY ARE WHOLLY IMPLAUSIBLE

As noted, defendants' claims must meet the "flexible plausibility standard" announced by the Supreme Court in <u>Twombly</u>. <u>Iqbal</u>, 490 F. 3d at 157 (quoting <u>Twombly</u>).  At the end of the day, defendants' claims fail this test.

First, defendants complain that Bankers Capital (with others) sabotaged their efforts to finance the Portfolio acquisition.  In the next breath, however, defendants acknowledge that they in fact were not sabotaged at all, as they were able to obtain financing from Citigroup "within a matter of days."

Defendants also whine that Bankers Capital tried to "steal" the Portfolio deal. However, they also admit that they closed their transaction with Colonial and that they now own the Properties.  Again, no sabotage.

Defendants further claim that they somehow were fraudulently induced to accept plaintiffs' $13 million, which defendants admit they used to close the Colonial transaction.  At the same time, defendants claim that they had no agreement with plaintiffs regarding that money.  If anything, defendants' pleadings confirm their wrongful appropriation of plaintiffs' $13 million – if there was no agreement with

plaintiffs, then what right did defendants have to take and use the $13 million?  In reality,

defendants are claiming that plaintiffs pressed $13 million into defendants' hands, and

then held their fingers closed when they tried to give it back.  Pure nonsense.

Most implausible of all, defendants claim that Bankers Capital and plaintiffs

interfered with defendants' efforts to obtain refinancing so that they could pay back

plaintiffs' $13 million.  Defendants' claim defies both economic reason and common

sense:  if defendants had obtained refinancing, the parties likely would not be here.

Accordingly, defendants' claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Bankers Capital respectfully requests that the Court

dismiss all of the Stern defendants' cross claims with prejudice.

Dated:  New York, New York
      August 1, 2008

                    SILLS CUMMIS & GROSS P.C.


                    By:  /s/ Marc D. Youngelson
                        Philip R. White
                        Marc D. Youngelson

                        One Rockefeller Plaza
                        New York, NY 10020
                        Telephone: (212) 643-7000

                        Attorneys for Plaintiffs and Third Party
                        Defendants Steven Alevy and Bankers
                        Capital

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMUSEMENT INDUSTRY, INC., dba    )
WESTLAND INDUSTRIES, and     )
PRACTICAL FINANCE CO., INC.,    )     CASE NO. 07 CV 11586 (LAK) (GWG)
                        )
         Plaintiffs,    )     **CERTIFICATION OF MARC D.**
                        )     **YOUNGELSON**
v.                      )
                        )
MOSES STERN, aka MARK STERN;    )
JOSHUA SAFRIN, FIRST REPUBLIC    )
GROUP REALTY LLC, EPHRAIM     )
FRENKEL, and LAND TITLE ASSOCIATES    )
ESCROW,                    )
                        )
         Defendants.    )
_____ )

MARC D. YOUNGELSON hereby certifies:

     1.     I am associated with the firm Sills Cummis & Gross P.C., counsel to plaintiffs

and third party defendants Steven Alevy and Bankers Capital (together, "Bankers Capital") in the

above-captioned Action. I submit this certification in support of Bankers Capital's motion to

dismiss the cross claims ("Cross Claims") of defendants Mark Stern and First Republic Realty

Group LLC ("defendants"). Except where otherwise stated, I have personal knowledge of the

facts set forth herein.

     2.     Attached hereto as Exhibit A is a true and correct copy of defendants' Cross-

Claims, dated June 11, 2008.

     3.     Attached hereto as Exhibit B is a true and correct copy of the Memorandum of

Law in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction, dated June 11, 2008, filed by First Republic Group Realty LLC and FRGR Managing

    4.      Member LLC in the action captioned First Republic Group Realty v. Citigroup,

Index. No. 601743/08 (the "Stern/Citi Action").

    5.      Attached hereto as Exhibit C is a true and correct copy of the Order to Show

Cause for Temporary Restraining Order and Preliminary Injunction, entered on June 12, 2008, in

the Stern/Citi Action.

    I certify under penalty of perjury that the foregoing is true and correct.

Executed on:  August 1, 2008

_____

Marc D. Youngelson

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                                       Plaintiffs,

           - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN,
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                                 Defendants.

No. 07 Civ. 11586 (LAK) (GWG) (ECF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSHUA SAFRIN,

                  Defendant/Third Party-Crossclaim-
                      Counterclaim-Plaintiff,

           - against -

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC GROUP
CORP.,

                        Third Party Defendants,

           - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND
TITLE ASSOCIATES ESCROW,

                    Defendants/Crossclaim Defendants.

           - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.,

                  Plaintiffs/Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS STERN AND FIRST REPUBLIC'S ANSWER TO AND CROSS-CLAIMS AGAINST
THIRD PARTY DEFENDANTS STEVEN ALEVY AND BANKERS CAPITAL REALTY ADVISORS LLC**

Doc #31654203.WPD

Defendants Mark Stern ("Stern") and First Republic Realty Group LLC ("First Republic"), by and through their undersigned attorneys, as and for their answer to the cross-claims of third-party defendants Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy dated June 6, 2008 and as and for their cross-claims against Bankers Capital and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

1.      Stern and First Republic do not respond to the allegations set forth in the Counterclaims of Third-Party Defendant Steven Alevy d/b/a Bankers Capital because those counterclaims are asserted against Third-Party Plaintiff Joshua Safrin ("Safrin").

2.      The allegations of paragraph 1 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 1, except admit that Third-Party Defendant Bankers Capital purports to base jurisdiction of its cross-claims under 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

3.      The allegations of paragraph 2 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 2, except admit that Third-Party Defendant Bankers Capital purports to base venue on 28 U.S.C. § 1391(a)(2).

4.      Deny the allegations of paragraph 3, except admit that in or about May 2007, Steven Alevy, on behalf of Bankers Capital solicited Stern and First Republic to engage them to secure financing for First Republic's acquisition of a portfolio of properties from Colonial Realty Limited Partnership ("Colonial").

5.      Deny the allegations of paragraph 4.

6.      Deny the allegations of paragraph 5.

7.      Deny the allegations of paragraph 6, except admit that no fee has been paid to Bankers Capital by either Stern or First Republic.

8.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

9.      Deny the allegations of paragraph 8.

10.      Deny the allegations of paragraph 9.

11.      Deny the allegations of paragraph 10.

12.      Deny the allegation of paragraph 11.

13.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

14.      Deny the allegations of paragraph 13.

15.      Deny the allegations of paragraph 14.

16.      Deny the allegations of paragraph 15.

17.      Deny the allegations of paragraph 16, except admit that neither First Republic nor Stern has paid Bankers Capital any fee.

18.      Deny the allegations of paragraph 17

19.      Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

20.      Deny the allegations of paragraph 19.

21.      Deny the allegations of paragraph 20.

22.      Deny the allegations of paragraph 21.

23.      Deny the allegations of paragraph 22.

24.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

25.     Deny the allegations of paragraph 25.

26.     Deny the allegations of paragraph 26.

27.     Deny the allegations of paragraph 27.

28.     Deny the allegations of paragraph 28.

29.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

30.     Deny the allegations of paragraph 30, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

31.     Deny the allegations of paragraph 31.

32.     Deny the allegations of paragraph 32.

33.     Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

34.     Deny the allegations of paragraph 34, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

35.     Deny the allegations of paragraph 35.

36.     Deny the allegations of paragraph 36.

## FIRST AFFIRMATIVE DEFENSE

37.     Third-Party Defendant Bankers Capital has failed to state claims upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

38.     Third-Party Defendant Bankers Capital's claims are barred in whole or in

part because it failed to mitigate its alleged damages.

## THIRD AFFIRMATIVE DEFENSE

39.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, by the doctrines of laches, waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

40.    Third-Party Defendant Bankers Capital's claims are barred, by reason of its fraud, misconduct and/or unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

41.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it waived his right to claim damages by its own acts and omissions.

## SIXTH AFFIRMATIVE DEFENSE

42.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it was negligent and/or failed to exercise reasonable care.

## SEVENTH AFFIRMATIVE DEFENSE

43.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it ratified the alleged wrongful conduct for which it seeks recovery.

## EIGHTH AFFIRMATIVE DEFENSE

44.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part because it is a dissolved corporation and it is not licensed as a mortgage broker in New York.

## NINTH AFFIRMATIVE DEFENSE

45.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because any harm it suffered is the result of its own contributory negligence.

## RESERVATION OF RIGHTS

46.     Stern and First Republic expressly reserve the right to amend and/or supplement their answer and affirmative defenses as appropriate as discovery proceeds.

## CROSS-CLAIMS AGAINST BANKERS CAPITAL AND STEVEN ALEVY

Defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by and through their undersigned attorneys, as and for their cross-claims against Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Stern's and First Republic's cross-claims pursuant to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the action.

2.     Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to these claims occurred herein.

## PARTIES

3.     Defendant Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

4.     Defendant First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York. First Republic owns and manages the Properties.

5.     Third-Party Defendant Steven Alevy is a resident of the State of New York. Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.

6.     Third-Party Defendant Bankers Capital is a dissolved California limited liability company whose principal place of business is in New York, New York. Although Bankers Capital is dissolved, its principals improperly represent that it is an existing limited liability company. Bankers Capital touts itself as being experienced in arranging mortgages and refinancing for real estate investors. Bankers Capital was originally formed in California and previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.

7.     Non-party Allen Alevy is a resident of the State of California.

8.     Non-party Robert Friedman is a resident of the State of New York and is a Managing Director of Bankers Capital.

9.     Non-party Allen Sragow is a resident of the State of California. Sragow is the son-in-law of Allen Alevy, the brother-in-law of Steven Alevy and is principally involved with and performs legal services for the Alevy family and various entities owned by the Alevy family. Allen Sragow also serves as a director of certain companies owned by the Alevy family.

10.     Non-party Avery Egert ("Egert") is a resident of the State of New York. Egert is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin"). The Sovereign Group owns and manages various real estate properties in the United States. At all relevant times, Egert had apparent and actual authority to enter into various transactions on behalf of Safrin, including the transactions with respect to the Properties. Safrin and Egert hold a minority interest in First Republic through their ownership of JSAE Colonial LLC.

## FACTUAL BACKGROUND

### The Contract to Purchase the Properties

11.     After lengthy negotiations and discussions, effective as of April 20, 2007, First Republic Group Corp. ("First Republic Corp."), the predecessor in interest to First

Republic, entered into a written contract of sale with Colonial Realty Limited Partnership

("Colonial"), to acquire ten shopping center malls in the Southeast region of the United States for

a purchase price of $128 million (the "Contract"). Under the terms of the Contract, First

Republic Corp. paid Colonial a $1 million non-refundable deposit, with the balance of the

purchase price due at closing. The closing was scheduled to occur no later than June 15, 2007.

          12.     After the Contract was executed, First Republic Group Corp. assigned its

right, title and interest under the Contract to First Republic.

          13.     Pursuant to several written amendments to the Contract, (a) in exchange

for an additional $2 million non-refundable deposit, the closing date was extended first to June

29, 2007 and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh

property was added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First

Republic, reducing the purchase price by that amount. Thus, after execution of the several

amendments, the total purchase price for the Properties was approximately $129 million.

          14.     In addition to paying Colonial the $129 million purchase price at the

closing, First Republic was also obligated to pay: (a) certain closing costs for the transaction and

(b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant

improvements, deferred maintenance, and environmental claims as provided for in agreements

subsequently made with First Republic's senior lender.

**Stern and First Republic Seek Financing for the Transaction**

          15.     At the same time that Stern and First Republic were negotiating to acquire

the Properties from Colonial, they were also working with a number of mortgage brokers, but not

Steven Alevy or Bankers Capital, to secure financing for the acquisition and related expenses.

16.    On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer for Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy and the Alevy family in numerous other transactions. Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist Stern and First Republic in securing financing for the acquisition of the Properties.

17.    Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

18.    Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well. Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition. First Republic agreed to retain Steven Alevy and Bankers Capital as its non-exclusive broker to obtain financing for the acquisition of the Properties.

19.    As First Republic's mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for First Republic, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

20.    Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and Stern and First Republic's efforts to obtain financing for the

transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract.

materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a

statement of his net worth, personal and corporate financial statements and information about his

prior business and litigation experiences.

21.     At all times during the relationship, Stern emphasized to Steven Alevy and

Robert Friedman that time was of the essence because the contract of sale required the closing to

occur no later than June 15, 2007.

**The Fraudulent Scheme to Wrest Control of the Properties from First Republic and Stern**

22.     Within a week after being introduced to Steven Alevy and Robert

Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already

contacted some highly relevant lenders," that they believed they could obtain significantly more

financing than what was being discussed with J.P. Morgan Chase and that they were processing

the information to obtain the financing for the Colonial transaction.

23.     Unbeknownst to Stern and First Republic, Steven Alevy and Robert

Friedman were not working to obtain financing for First Republic's transaction with Colonial.

Rather, acting in concert with Allen Alevy and Allen Sragow, they orchestrated a fraudulent

scheme to sabotage First Republic's acquisition of the Properties so that the Alevy family and

related affiliates could purchase the Properties.

24.     Instead of working to obtain financing for First Republic's acquisition of

the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he

would not pursue financing opportunities, on behalf of First Republic, with other brokers.

Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain

financing for the purchase.  In reality, Steven Alevy and others conspired with Steven Alevy's

father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

       25.     Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for themselves. Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

       26.     On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

       27.     During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations. Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

       28.     At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction. Steven Alevy and Robert Friedman told Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

       29.     Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction. In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman

interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

30.    When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007. No concrete bids, quotes or term sheets were presented to Stern or First Republic by Steven Alevy and Robert Friedman by on or about May 28, 2007.

31.    Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction. Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

32.    As part of their scheme to sabotage Stern and First Republic's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused prospective lenders to form a bad and incorrect impression of Stern and First Republic. These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

33.    At this same time in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves. Unbeknownst to Stern and First Republic, Steven

Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary information provided to them by Stern and First Republic about the transaction and Stern to Allen Alevy and Allen Sragow who used such information to formulate their own offer to acquire the Properties.

34.    On June 13, 2007, although Steven Alevy and Robert Friedman represented that they were arranging meetings with potential lenders to finance the transaction, Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (i.e., Stern) to purchase the Properties. At that time, Stern had neither heard of nor spoken with Allen Alevy, and Steven Alevy had never mentioned to Stern that he was intending to become Stern's 50% partner in connection with the acquisition of the Properties. At no time, did Stern or First Republic ever meet with, correspond with or communicate with Allen Alevy.

35.    In June 2007, while Steven Alevy and Robert Friedman were still feigning their pursuit of financing opportunities for First Republic, they were instead meeting with lenders to secure financing for Allen Alevy and his related entities to acquire the Properties. During this same time, unbeknownst to Stern and First Republic, Steven Alevy met with Petra Capital, a lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the Properties. Steven Alevy gave Petra Capital copies of personal financial statements for Allen Alevy and told them he was putting together a deal for himself and his father and never said that he had been retained by Stern and First Republic to act as their broker.

36.    In the beginning of June, Stern was introduced to Avery Egert, the President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5 million of equity and co-sponsor the transaction in exchange for a minority interest in the entity that would own the Properties. At all relevant times, Egert had the authority to act on Safrin's

behalf. Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert. In fact, unbeknownst to Stern and First Republic, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

37.    Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders. None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

38.    In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Steven Alevy, Allen Alevy and Allen Sragow stepped up their efforts to implement their plan to take over the Properties. Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction. As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to Stern and First Republic, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

39.    Still unaware of the efforts by the Alevys, Robert Friedman and Allen Sragow to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any

proposal made by Steven Alevy for "Long Beach" financing. At the same time, Stern redoubled
his own efforts to obtain financing from other sources. Through another mortgage broker,
Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment
from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine
financing for the transaction in the total amount of approximately $131 million and was able to
close the loan with Citigroup less than two weeks later.

  40. Stern and First Republic were also seeking to obtain additional financing
to cover required closing costs and escrow deposits that would need to be made to complete the
transaction. By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion
of the amount necessary to close the transaction. Under that arrangement, Colonial would agree
to take back a $14 million note from First Republic that was secured by an irrevocable letter of
credit from a third party with the other essential terms of the financing arrangement in place.
Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First
Republic as a non-refundable deposit on the transaction.

  41. Stern told Steven Alevy that he had received a commitment from
Citigroup to provide the senior and mezzanine financing for the transaction and that the seller
had agreed to finance the remaining portion of the transaction. Stern provided a copy of the
Citigroup commitment letter to Steven Alevy. Upon learning these facts, Steven Alevy
attempted to persuade Stern that First Republic should forego the opportunity to obtain financing
from Citigroup because Bankers Capital could obtain greater financing and at a lower interest
then what Citigroup was proposing. Steven Alevy also told Stern that First Republic should
reject the financing offer by the seller and should instead use Steven Alevy and his family to
finance the remaining portion of the financing. On at least two occasions, Steven Alevy

attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

42.     On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan.  Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

43.     Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern was able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

44.     Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet.  Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller.  To that end, Steven Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return.  The financing proposal was intended to keep their foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their

offer, leaving Stern and First Republic with the impossible choice of either walking away from the transaction and losing their nonrefundable $3 million deposit/obligation or acceding to unreasonable conditions that the Alevys and Allen Sragow unilaterally imposed upon them.

45.      Stern and First Republic did not agree to accept the proposal made by Steven Alevy on June 29. Nonetheless, in order to induce Stern and First Republic into accepting their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused an Allen Alevy-affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the Colonial transaction.

46.      Believing that Steven Alevy had worked tirelessly for months trying to find financing for First Republic's transaction and induced by Steven Alevy's repeated promises of doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured to close the Colonial transaction and did not attempt to finalize the seller financing that was in place. To further induce Stern to enter into the transaction with the Alevy family, on or about July 2, Steven Alevy told Stern that with the money that the two of them would make together, they would be able to donate significant funds to charity and send children to study in Jewish institutions in Israel.

47.      On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which was non-binding and subject to certain conditions, none of which was ever fulfilled. The Letter of Understanding states that "Westland Industries," an entity that neither Stern nor First Republic had ever heard of, and which was controlled by Steven Alevy's family, would provide $13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a monthly basis. The Letter of Understanding further states that the "Parties agree to work in good

faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100%
of the equity and voting interest . . . shall be held in escrow for the benefit of Westland." In
addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall
be brought to Stephen Friedman, Esq. for resolution." Steven Friedman had only been working
with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy
family for fifteen years. At this time, Steven Friedman was also serving as the Alevy family's
attorney on a transaction involving a project in New York. Finally, the Letter of Understanding
contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of
Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open
until the close of business on June 29th – four days before the offer had actually been transmitted
to First Republic. In early July 2007, Stern, then believing he would be able to obtain financing
from the Alevy family and related affiliates, informed Colonial that First Republic no longer
needed to obtain seller financing.

       48.    Michael Libraty, an attorney at Sragow's firm who also maintains an email
address at one of Allen Alevy's company servers, acting at Sragow's direction, then sent Stern's
counsel drafts of a proposed partnership agreement to sign. Consistent with everything Stern had
advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those
partnership agreements because Stern was not looking to take on a financial partner for the
transaction.

       49.    On July 3, 2007, Colonial threatened to terminate the Contract. Stern
informed Steven Alevy of Colonial's position and, that same day, Steven Alevy, in breach of his
fiduciary duties to Stern and First Republic, but in furtherance of the fraudulent scheme, passed
this information to Allan Alevy, Allen Sragow and others who schemed how best to take

advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

        50.     On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: <u>We are not extending our commitment.</u>" In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

        51.     As a sophisticated real estate businessman, Allen Alevy did not want the transaction to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

        52.     Then. on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that further funds were needed to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing. These were the same financials that Steven Alevy had requested in May and which he had purportedly been using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to Stern and First Republic.

        53.     Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, Stern did

not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to them or entities controlled by them if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and neither Stern nor First Republic ever agreed to the conditions that the Allen Alevy and Allen Sragow sought to impose.

54. On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow. Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction. Bankers Capital assisted Stern and First Republic in preparing the sources and uses documentation for the Colonial transaction, was provided with numerous drafts of the closing statements for the Colonial transaction, and was well aware as to whom the proceeds of the Citigroup loans and the $13 million advanced by the Alevy family were distributed.

55. The next day, on July 13, Steven Alevy confirmed his oral instructions in writing. However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of Stern and First Republic, including the demand that they sign an assignment of the Properties from First Republic to a new entity established by the Allen Alevy and Allen Sragow. Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not enter into the agreement with Stern and First Republic or release the funds in escrow unless all of their demands were met.

56. On July 16, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the

agreements they were demanding, they did not agree to the release of the $13 million. Sragow added that if the funds were released, they should be retrieved until all of their demands were met.

57.    On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all of their demands were met. Because the escrowed funds had already been used to close the Colonial transaction, there was no way to retrieve the released funds. Stern and First Republic did not and would not agree to Allen Alevy and Allen Sragow's demands.

58.    Allen Sragow then sent a letter to Land Title and First Republic's counsel, Stephen Friedman, restating that the escrowed funds were released without receiving the authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify the disbursement" if First Republic and Stern would "execute" new documents, including a reassignment agreement, mutual release and other "modified" agreements. Stern and First Republic did not agree to Allen Sragow's proposal and did not execute those documents.

**The Alevys and Allen Sragow Interfere With First Republic's Operation of the Properties and Attempts to Refinance**

59.    As described above, Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan. Subsequent to the closing with Colonial, Stern and First Republic immediately looked to secure refinancing so that they could take out the financing provided by the Alevy family and

return the funds that Allen Alevy and Allen Sragow contended had been mistakenly released to First Republic by the escrow agent notwithstanding the clear and explicit approval for the release given by Steven Alevy.

60.     Shortly after the July 12, 2007 closing, Stern met with Steven Friedman and Steven Alevy. Steven Alevy was aware that Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan and was interested in working as Stern and First Republic's broker to obtain that refinancing. Steven Alevy told Stern that he was the only son in his family, that his father considered him to be the black sheep of the family and that his father put him in charge of family operations in New York. Steven Alevy asked Stern for forgiveness and apologized for the way that he and his family treated Stern during the transaction. Steven Alevy told Stern that the road to hell is often paved with good intentions and that while his intentions were good, he failed to represent him properly as Stern and First Republic's broker. Steven Alevy told Stern that he would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to help Stern and First Republic  refinance the Properties.

61.     Based on Steven Alevy's promises and assurances, Stern and First Republic once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist them in obtaining financing and refinancing of the Properties so that the $13 million advanced to First Republic per Steven Alevy's instructions could be repaid. As part of their supposed effort to obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman represented that they were in the process of preparing a "79 page book," which they would use to persuade lenders to refinance the Properties.

62.     In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing. In response and relying upon the brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, Stern and First Republic provided them with additional sensitive, confidential and proprietary information about the Properties.

63.     Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent Stern and First Republic from obtaining refinancing in furtherance of the scheme to obtain control over the Properties.

64.     Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for First Republic solely as its broker, Stern sent them all of the information that he had received concerning the Properties. However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow. For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on. Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe? I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to  obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties.  For example, sometime in late July 2007 or August 2007, unbeknownst to Stern and First Republic, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the property managers of the two malls that they were the new owners of the malls.  After Stern and First Republic were notified of these intrusions, Greenspan and his associates were removed from the malls.

66.    Defendants also wrongfully accused Stern and First Republic of "stealing" the $13 million that they verbally authorized for release, later confirmed in writing, and publicized that accusation to the business and lending community, making it impossible for Stern and First Republic to refinance the Properties.  For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's counsel, the Seller's CFO and another high ranking officer of the Seller and told them that Stern and First Republic had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the Properties.

67.    The Alevys and Allen Sragow subsequently caused the companies that advanced the $13 million to First Republic to sue Stern and First Republic in federal court in New York claiming, among other things, ownership of the Properties and accusing Stern and First Republic of stealing their money and other falsehoods.

68.     Finally, in two states where the filing of a lawsuit is not a necessary condition precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, the Alevys and Allen Sragow caused the entities that advanced the $13 million to First Republic to improperly file lis pendens on the Properties in an attempt to cause First Republic to default on the loans and guaranties and prevent it from securing refinancing. As a result of their efforts, Citigroup has asserted to Stern and First Republic that the filing of such lis pendens is an event of default under the loans and has accelerated the entire amount of the loans. Citigroup has also informed Stern that it has the right to demand payment from him under the guaranty.

*   *   *

69.     In sum, as a result of the fraudulent scheme described above, Stern and First Republic were (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii) prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties. Additionally, Citigroup has asserted that First Republic is in default of its loans. Defendants' tortious conduct damages the value of the Properties and Stern's interest in First Republic. Steven Alevy and Bankers Capital are liable for all such damages.

### AS AND FOR A FIRST CAUSE OF ACTION

#### For Fraud Against Steven Alevy and Bankers Capital

70.     Stern and First Republic repeat and reallege paragraphs 1 through 69 of this pleading as if fully set forth herein.

71.     Robert Friedman and Steven Alevy individually and on behalf of Bankers Capital repeatedly represented to Stern and First Republic that they were actively working to obtain financing for First Republic's transaction with Colonial. Robert Friedman and Steven

24

Alevy failed to disclose that they were working on behalf of the Alevy family and Allen Sragow

to sabotage First Republic's purchase of the Properties so that the Alevy family and related

affiliates could purchase the Properties.

72.     The false representations of fact and concealment of material facts induced

Stern and First Republic to, among other things, employ Robert Friedman, Steven Alevy and

Bankers Capital as their mortgage brokers, appoint them as their exclusive brokers for a number

of lenders with whom they were previously seeking financing, provide them with confidential

and proprietary information, cease negotiating with lenders and other brokers with respect to the

Colonial transaction and the post-closing refinancing of the transaction, and enter into

negotiations with Allen Alevy and Allen Sragow to finance a portion of the Colonial transaction.

73.     In late June and July 2007, after Steven Friedman, on behalf of Stern and

First Republic, entered into discussions with Allen Alevy and Allen Sragow regarding financing

for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been

receiving Stern and First Republic's confidential and proprietary information from Steven Alevy

and Robert Friedman and had been discussing with them ways to wrest control of the Properties

from Stern and First Republic.

74.     After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed

the fact that they continued to receive Stern and First Republic's confidential and proprietary

information from Steven Alevy and Robert Friedman and had been discussing with them ways to

wrest control of the Properties from Stern and First Republic. As part of their fraudulent plan,

Allen Alevy and Allen Sragow directly and through other third parties under their control, falsely

represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to

tenants of the Properties that they and companies that they controlled were the owners of the Properties.

75.     Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to. among other things, cease negotiating with other potential lending sources, including the seller. with respect to the Colonial transaction. and enter into negotiations with the Alevy family and related affiliates to finance the Colonial transaction.  Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to. among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

76.     Stern and First Republic reasonably relied to their detriment on the truthfulness of these representations.  Steven Alevy and Bankers Capital knew or should have known that Stern and First Republic would rely on their representations when made.  Had Stern and First Republic known that the Steven Alevy and Bankers Capital were acting fraudulently to sabotage First Republic's purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

77.     The misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging First Republic's transaction with Colonial and were made with complete or reckless disregard as to their truthfulness.

78.     Steven Alevy and Bankers Capital acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements made to Stern and First Republic.

79.    As a direct and proximate result of the fraudulent acts described above,

Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may

have entered into with the Alevy family and related affiliates with respect to the $13 million of

funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial

arising from First Republic's inability to refinance the Properties and (iii) compensatory damages

in an amount to be proven at trial arising from the loss in the value of the Properties and the loss

in the value of Stern's interest in First Republic caused by these tortious acts.

80.    The actions described above were willful, knowing, and deliberate, and

demonstrated a complete absence of care and attention to duty and a high degree of moral

culpability, and were in conscious disregard of Stern and First Republic's rights. Stern and First

Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty Against Steven Alevy and Bankers Capital

81.    Stern and First Republic repeat and reallege paragraphs 1 through 80 of

this pleading as if fully set forth herein.

82.    As First Republic's mortgage broker, Steven Alevy and Bankers Capital

owed fiduciary duties to Stern and First Republic, including an undivided fiduciary duty of

loyalty, the duty to work for their interests, the duty not to provide Stern and First Republic's

confidential and proprietary information to others without their permission, the duty to avoid

conflicts of interest and the duty to perform the work in a competent manner.

83.    Steven Alevy and Bankers Capital breached their fiduciary duties to Stern

and First Republic by, among other things, providing Stern and First Republic's confidential and

proprietary information to the Alevy family and Allen Sragow without Stern and First Republic's

permission, failing to assist and, in fact, trying to sabotage First Republic's efforts to obtain

financing and refinancing and by inducing Stern and First Republic to enter into a transaction

with the Alevy family and related affiliates.

        84.     In breaching their fiduciary duties to Stern and First Republic, Steven

Alevy and Bankers Capital acted adversely to the interests of Stern and First Republic and for

their own personal interests and those of the Alevy family and Allen Sragow.

        85.     As a direct and proximate result of Steven Alevy and Bankers Capital's

breaches of fiduciary duty described above, Stern and First Republic seek: (i) rescission of any

agreement that they may have entered into with the Alevy family and related affiliates with

respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to

be proven at trial arising from First Republic's inability to refinance the Properties and (iii)

compensatory damages in an amount to be proven at trial arising from the loss in the value of the

Properties and the loss in the value of Stern's interest in First Republic caused by their tortious

acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Bankers Capital and Steven Alevy

        86.     Stern and First Republic repeat and reallege paragraphs 1 through 85 of

this pleading as if fully set forth herein.

        87.     Stern and First Republic on the one hand and Robert Friedman, Steven

Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007.

Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated

to attempt in good faith to obtain financing on Stern and First Republic's behalf in connection

with the Colonial transaction and to protect Stern and First Republic's confidential and proprietary information that they received as Stern and First Republic's broker.

88.     Bankers Capital and Steven Alevy materially breached the contractual obligations by, among other things, (a) failing to try to obtain financing and refinancing on Stern and First Republic's behalf in connection with the Colonial transaction, (b) meeting with lenders to obtain financing for the Colonial transaction on behalf of the Alevy family and related affiliates, and (c) providing Stern and First Republic's confidential and proprietary to the Allen Alevy, Allen Sragow and others without Stern or First Republic's permission.

89.     Stern and First Republic substantially performed their obligations under the brokerage agreement with Robert Friedman, Steven Alevy and Bankers Capital.

90.     As a direct and proximate result of Steven Alevy and Bankers Capital's breaches of contract, Stern and First Republic seek: (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

### For Aiding and Abetting Fraud Against Steven Alevy and Bankers Capital

91.     Stern and First Republic repeat and reallege paragraphs 1 through 90 of this pleading as if fully set forth herein.

92.     Steven Alevy and Bankers Capital knew that Allan Alevy, Robert Friedman and Allen Sragow had committed fraud by, among other things, failing to disclose to Stern and First Republic that, along with the Alevy family and Allen Sragow, they were all actively working to sabotage Stern and First Republic's financing for the transaction with Colonial so that the Alevy family and related affiliates could acquire the Properties in their own right.

93.     Steven Alevy and Bankers Capital aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. At the direction of Allen Alevy and Allen Sragow, Steven Alevy and Robert Friedman concealed the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy, Robert Friedman and Bankers Capital had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which those individuals used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

94.     Steven Alevy and Bankers Capital's aiding and abetting of Allen Alevy, Robert Friedman and Allen Sragow's fraud proximately caused damages to Stern and First Republic in that, absent their aiding and abetting the fraud, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not have entered into negotiations with the Alevy family to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

95.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from their inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

96.     Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

### AS AND  FOR A FIFTH CAUSE OF ACTION

**Against Steven Alevy and Bankers Capital for Aiding and Abetting Breach**

**of Fiduciary Duty**

97.     Stern and First Republic repeat and reallege paragraphs 1 through 96 of this pleading as if fully set forth herein.

98.     Steven Alevy and Bankers Capital knew that Allen Alevy, Robert Friedman and Allen Sragow were breaching their fiduciary duties to Stern and First Republic by, among other things, receiving Stern and First Republic's confidential and proprietary information without their permission, sabotaging Stern and First Republic's efforts to obtain financing and refinancing and by inducing Stern and First Republic to enter into a transaction with Allen Alevy and his related entities.

99.     Steven Alevy and Bankers Capital aided and abetted the breaches of fiduciary duty committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

100.     Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow caused damages to Stern and First Republic in that, absent their aiding and abetting the breach of such fiduciary duties, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related entities to finance the Colonial transaction and would not have engaged Steven Alevy, Robert Friedman and Bankers Capital to secure refinancing for the Colonial transaction.

101.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to Stern and First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value

of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

102.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### For Misappropriation of Stern's and First Republic's Trade Secrets

103.    Stern and First Republic repeat and reallege paragraphs 1 through 102 of this pleading as if fully set forth herein.

104.    Stern and First Republic's proprietary and confidential information concerning the Properties constitutes trade secrets under New York common law.

105.    Bankers Capital and Steven Alevy conspired and did in fact misappropriate Stern's and First Republic's proprietary and confidential information and lied to Stern and First Republic about their intended use of that information. The actions of Steven Alevy and Bankers Capital constitute improper, willful and malicious "misappropriation" of trade secrets under New York common law.

106.    As a direct consequence of the improper, willful and malicious misappropriation of trade secrets by Steven Alevy and Bankers Capital, Stern and First Republic have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

107.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability. and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### For Tortious Interference With Prospective Business Relations

108.    Stern and First Republic repeat and reallege paragraphs 1 through 107 of this pleading as if fully set forth herein.

109.    Pursuant to its contract with Colonial, First Republic became the lawful and legal owner of the Properties, and. as the lawful owner of the Properties. was entitled to exploit its economic interest in those Properties free from interference by any other third parties.

110.    Steven Alevy and Bankers Capital were at all times aware that, following the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

111.    Notwithstanding their knowledge that First Republic was the lawful owner of the Properties, Steven Alevy and Bankers Capital intentionally and tortiously interfered with First Republic's ownership of those properties by, among other things, claiming to the Seller or causing other third parties under their control to claim, to tenants and the Property Manager of the Properties that Allen Alevy and related affiliates were the lawful and legal owner of the properties.

112.    Steven Alevy and Bankers Capital's intentional and willful interference has caused and induced prospective lenders to deny financing to Stern and First Republic in connection with the Properties, has caused  tenants to cancel their leases and has caused Citigroup to assert that First Republic is in default of the loan agreements and to inform Stern that it has the right to demand payment of the Guaranteed Recourse Obligations of Borrower from Stern.

113.     As a direct and proximate result of the foregoing, Stern and First Republic have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

114.     Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

115.     Moreover, as a direct and proximate result of the foregoing, Stern and First Republic are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from contacting the Seller, tenants and the Property Manager of the Properties and interfering with Stern and First Republic's lawful ownership and management of the Properties.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract

116.     Stern and First Republic repeat and reallege paragraphs 1 through 115 of this pleading as if fully set forth herein.

117.     First Republic and Citigroup entered into two loan agreements in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties. In addition, Stern provided Citigroup with a guaranty of recourse obligations of First Republic.

118.     Steven Alevy and Bankers Capital were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations.

119.     Steven Alevy and Bankers Capital tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things,

conspiring and or aiding and abetting the actions of Allen Alevy and Allen Sragow to improperly file lis pendens against the Properties, which has caused Citigroup to assert that the loans are in default and inform Stern that it has the right to demand that Stern make payment of the Guaranteed Recourse Obligations of the Borrower.

120.    As a direct and proximate result of the foregoing, Stern and First Republic have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

121.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

122.    Moreover, as a direct and proximate result of the foregoing, Stern and First Republic are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from interfering with Stern's and First Republic's relationship with Citigroup.

## AS AND FOR A NINTH CAUSE OF ACTION

### For Declaratory Relief

123.    Stern and First Republic repeat and reallege paragraphs 1 through 122 of this pleading as if fully set forth herein.

124.    An actual, justiciable controversy exists between Stern and First Republic and Steven Alevy and Bankers Capital within the meaning of CPLR 3001.

125.    A dispute exists between Stern and First Republic on the one hand and Steven Alevy and Bankers Capital on the other hand as to whether Stern and First Republic and

the Alevy family and related affiliates entered into an agreement in connection with the Colonial transaction.

126.    Stern and First Republic contend that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from the Alevy family or related affiliates.

127.    Steven Alevy and Bankers Capital contend that the $13 million of financing provided by the Alevy family and related affiliates was either an equity contribution to the entity owning the Properties or that it was a loan which, if not repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

128.    Stern and First Republic seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that no binding agreement was entered into with the Alevy family and related affiliates and that they be permitted to rescind any transaction and return the $13 million, without interest, to such individuals and/or entities.

**WHEREFORE,** Stern and First Republic demand judgment as follows:

A.    on the first cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, plus punitive damages, together with prejudgment interest and costs;

B.    on the second cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

C.    on the third cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract, together with prejudgment interest and costs;

D.    on the fourth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

E.    on the fifth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to

the $13 million of funds advanced to them: (ii) compensatory damages in an amount to be proven

at trial arising from Stern and First Republic's inability to refinance the Properties and (iii)

compensatory damages in an amount to be proven at trial arising from the loss in the value of the

Properties and the loss in the value of Stern's interest in First Republic caused by their tortious

acts, together with prejudgment interest and costs;

      F.     on the sixth cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, together with punitive damages,

prejudgment interest and costs, and an injunction preventing Steven Alevy and Bankers Capital

from contacting tenants and the Property Manager of the Properties and interfering with Stern

and First Republic's ownership and management of the Properties;

      G.     on the seventh cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital

from contacting and interfering with prospective lenders and tenants of First Republic;

      H.     on the eighth cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital

from interfering with Stern and First Republic's relationship with Citigroup;

      I.     on the ninth cause of action, a declaration that Stern and First Republic

were either fraudulently induced to accept $13 million of financing from the Alevy family or

related affiliates or that no binding agreement was entered into with them and that Stern and First

Republic be permitted to rescind any transaction and return the $13 million, without interest, to

them;

J.     awarding to Stern and First Republic pre-and post-judgment interest, the costs and disbursements of this action, and attorneys' fees as authorized by law; and

K.     granting to each of Stern and First Republic such other and further relief as the Court may deem to be just and proper.

Dated:   New York, New York
June 11, 2008

KAYE SCHOLER LLP

By: /s/ Michael A. Lynn
Arthur Brown (AB-0627)
Michael Lynn (ML-6052)
Efrem Schwalb (ES-5288)
KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
Tel: (212) 836-8000
Fax: (212) 836-8689
Email: mlynn@kayescholer.com

Stephen R. Stern (SS-5665)
HOFFINGER STERN & ROSS LLP
150 East 58th Street
New York, New York 10155
Tel: (212) 421-4000
Fax: (212) 750-1259
Email: srstern@hsrlaw.com

*Attorneys for Mark Stern and First Republic Group Realty LLC*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FIRST REPUBLIC GROUP REALTY LLC
and FRGR MANAGING MEMBER LLC,

                  Plaintiffs,

        -against-

CITIGROUP GLOBAL MARKETS REALTY
CORP.,

                Defendant.

Index No. 601743/08

---

**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR
A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, New York 10022
(212) 319-8500

-and-

REISS EISENPRESS LLP
425 Madison Avenue, 11th Floor
New York, New York 10017
(212) 753-2424 x109

Attorneys for Plaintiffs,
First Republic Group Realty LLC
and FRGR Managing Member LLC

June 11, 2008

SL1 824158v1/103664.00001

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ...........................................................................................................2

II.  STATEMENT OF FACTS ...........................................................................................3

III. ARGUMENT ..................................................................................................................3

    A.   Plaintiffs Satisfy the Requirements for Injunctive Relief. .............................................3

    B.   Plaintiffs Will Suffer Irreparable Harm If A Preliminary
        Injunction Is Not Granted. ...........................................................................................3

        (i)   Plaintiffs May Have No Remedy for Citi's Acts Other Than
            Injunctive Relief. .............................................................................................4

        (ii)  Damage to Plaintiffs' Goodwill, Business Reputation, And
            Creditworthiness Is Causing Irreparable Harm. ...............................................5

        (iii) Loss of Control Over Plaintiffs' Business Will Cause Irreparable
            Harm. ..............................................................................................................7

    C.   Plaintiffs Are Likely To Succeed On The Merits. ........................................................8

        (i)   A Lis Pendens Is Not a Lien; If It Is, the Default Letters Were
            Served Prematurely. .........................................................................................9

            (a)   A Lis Pendens Is Not a Lien. ...............................................................9

            (b)   The May 7 Default Letters Were Served Prematurely. ........................14

        (ii)  Plaintiffs Have Not Entered Into a Major Lease Without Citi's
            Consent; If Citi is Deemed to Have Withheld Consent, Its
            Failure to Consent is Unreasonable. ...............................................................14

            (a)   Plaintiffs Have Not Entered Into a Major Lease Without
                 Citi's Consent. ....................................................................................14

            (b)   If Citi is Deemed to Have Withheld Consent to the
                 Mr. Sandman Lease, Its Failure to Consent is
                 Unreasonable. ......................................................................................15

        (iii) Borrower Did Not Make Misrepresentations In The Loan
            Documents; And If Any Representations Are Deemed Incorrect,
            They Are Immaterial. ......................................................................................16

        (iv)  The May 7 and May 15 Defaults Letters Were Mailed to the
            Wrong Address, Rendering Service Ineffective. ...............................................18

    D.   A Balancing Of The Equities Favors The Grant Of A
        Preliminary Injunction. ...............................................................................................19

IV.  CONCLUSION ............................................................................................................21

SL1 824158v1/103664.00001

Plaintiffs First Republic Group Realty LLC ("First Republic") and FRGR Managing Member LLC (the "Manager" or "FRGR"; together with First Republic, the "Plaintiffs"), by their counsel, Stevens & Lee, P.C., and Reiss Eisenpress LLP, respectfully submit this memorandum of law in support of their application for a temporary restraining order and a preliminary injunction enjoining defendant Citigroup Global Markets Realty Corp. ("Citi" or "Defendant"), its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons acting in concert with Citi, from acting in furtherance of three default notices issued and served improperly by Citi, and notices of sale scheduling a public auction of Citi's collateral for June 17, 2008, which threatens irreversibly to transfer control of Plaintiffs' businesses to satisfy Plaintiffs' $126 million debt to Citi on a fully-performing loan.

## I.   INTRODUCTION

Citi threatens to act pursuant to improperly-issued and improperly-served Default Notices[1] to sell on June 17, 2008, FRGR's 100% limited liability membership interest in First Republic, irreparably injuring Plaintiffs' businesses, assets and investments without any determination of the merits of Citi's claims. Moreover, premised on these alleged defaults, Citi so far has withheld reimbursement of expenses totaling $161,000 required under the loan documents. This mandates granting the injunctive relief sought, and time is of the essence.

Citi will suffer no injury or prejudice if the Plaintiffs are granted injunctive relief. Plaintiffs have fully performed their financial obligations under the Loan Agreement and the Mezz, so Citi's financial interests are not in jeopardy. Because Plaintiffs will continue to perform their financial obligations, any delay incidental to an injunction which maintains the

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Complaint, a copy of which is attached as Exhibit O to the Affidavit of Mark Stern in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary Injunction (the "Stern Aff.")

2

*status quo* pending discovery and trial on the merits will not prejudice Citi. Even assuming

technical defaults — and Plaintiffs prove below that they have not breached *any* provision of the

Loan Agreement or the Mezz, technical or financial — the technical breaches that Citi alleges do

not adversely affect the value of the collateral which Citi proposes to sell out from Plaintiffs in

less than one week. The balance of equities clearly tilts in Plaintiff's favor, mandating the

issuance of the injunctive relief sought.

## II.  STATEMENT OF FACTS

The relevant facts are set forth at length in the accompanying Affidavit of Mark

Stern in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction (the "Stern Aff."), which is incorporated herein as if set forth at length.

## III.  ARGUMENT

### A.  Plaintiffs Satisfy the Requirements for Injunctive Relief.

It is well settled that to be entitled to a temporary preliminary injunction, plaintiffs

must show a likelihood of success on the merits, danger of irreparable injury in the absence of an

injunction, and a balance of the equities in their favor. *Aetna Ins. Co. v. Capasso*, 75 N.Y. 2d

860, 862, 552 N.Y.S. 2d 918 (1990) *W. T. Grant Co. v. Srogi*, 52 N.Y. 2d 496, 517, 438 N.Y.S.

2d 761 (1981); *Gerald Modell, Inc. v. Morgenthau*, 764 N.Y.S. 2d 779, 783-84 (2d Dep't 2003).

Plaintiff satisfies each of these requirements.

### B.  Plaintiffs Will Suffer Irreparable Harm If A Preliminary Injunction Is Not Granted.

Section 6301 of the CPLR provides in relevant part that "[a] temporary restraining

order may be granted pending a hearing for preliminary injunction where it appears that

immediate and irreparable injury, loss or damage will result unless defendant is restrained before

the hearing can be had." CPLR § 6301. A preliminary injunction is a provisional remedy

3

designed to maintain the status quo during the pendency of the action. *Gerald Modell*, 764 N.Y.S. 2d at 783-84 ("the purpose of this provisional remedy is not to determine the ultimate rights of the parties, but to maintain the status quo until there can be a full hearing on the merits").

In construing what is irreparable harm, the single most important prerequisite for the issuance of a preliminary injunction, see *Bell & Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983), courts commonly observe that it is injury for which a monetary award cannot adequately compensate. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 73 (2d Cir. 1979) (per curiam); see *Vanderminden v. Vanderminden*, 226 A.D. 2d 1037, 1041, 641 N.Y.S. 2d 732 (3d Dep't 1996) (observing that "money damages is not a harm which is irreparable).

### (i) Plaintiffs May Have No Remedy for Citi's Acts Other Than Injunctive Relief.

Under the peculiar circumstances of this case, irreparable harm is manifest, for money damages may not be available.

Sections 10.13 of the Loan Agreement and the Mezz provide that Plaintiffs' sole remedies for any claims that Citi has acted unreasonably or delayed in acting shall be limited to commencing an action for injunctive relief or declaratory judgment. The language appears to limit Plaintiffs' remedies for Citi's acts, however egregious, to injunctive relief and declaratory judgment.[2] Thus, Plaintiffs' need for injunctive relief is crucial to prevent further injury to Plaintiffs' assets, business, reputation and creditworthiness. It may be Plaintiffs' sole recourse.

---

[2]    Plaintiffs reserve their rights to seek monetary damages if those provisions of the Loan Agreement and the Mezz prove unenforceable or inapplicable. Stern Aff. ¶63.

4

Because Citi may contend that Plaintiffs cannot obtain monetary damages as recompense for Citi's improper issuance of the Default Letters and its threatened sale of collateral, any harm which Plaintiffs suffer may be irreparable without injunctive relief.

### (ii) Damage to Plaintiffs' Goodwill, Business Reputation, And Creditworthiness Is Causing Irreparable Harm.

By publishing Notices of Sale of all eleven Shopping Centers in local newspapers, Citi has indisputably harmed Plaintiffs' business reputation, goodwill and creditworthiness. As set forth in the accompanying Affidavit of Mark Stern, as a result of the publication of the Notices of Sale, local managers have asked the Plaintiffs if the Shopping Centers are shutting down, and the press is making the same inquiries. Account representatives and mall managers from Jones Lang LaSalle America's, Inc., the managers of all eleven Shopping Centers, have been forwarding copies of the published Notices of Sale to the Manager and asking what it all means. The concern underlying their inquiries is apparent, an understandable reaction to the public dissemination of news that control of the Shopping Centers which employ them may be involuntarily transferred. It can reasonably be assumed that by now, all of the Shopping Centers' tenants have seen the ads and are aware of their implications. But the natural implication — that Plaintiffs are in financial distress — is wrong, as finances have absolutely nothing to do with the purely technical defaults which Citi has alleged, especially in the face of Plaintiffs' timely performance of all financial obligations under the Loan Agreement and the Mezz. Stern Aff. ¶63.

Irreparable injury exists where, as here, the Plaintiffs' business is in immediate danger of injury, loss or damage to its good will, business reputation or creditworthiness. A loss of good will is sufficient to constitute irreparable harm. For example, in *Brintec Corp. v. Akzo, N.V.*, 129 A.D. 2d 447, 448, 514 N.Y.S. 2d 18 (1st Dep't 1987), the court recognized that, absent

5

an injunction, "the good will of plaintiff's business would suffer irreparable harm." Similarly, in

*Hay Group, Inc. v. Nadel*, 170 A.D. 2d 398, 399, 566 N.Y.S. 2d 616 (1st Dep't 1991), the First

Department held that a threat to a business's good will is enough to establish irreparable injury

warranting a preliminary injunction "without the necessity of showing actual loss of customers."

*See also People by Abrams v. Anderson*, 137 A.D. 2d 259, 529 N.Y.S. 2d 917 (4th Dep't 1988),

wherein it was held that a plaintiff seeking a preliminary injunction should not be required to

suffer further economic harm by a loss of good will and patronage during the pendency of the

action. *Accord, Social Spirits, Inc. v. Town of Colonie*, 70 A.D. 2d, 1036, 418 N.Y.S. 2d 227

(3d Dep't 1979); *Alside Div. of Associated Materials Inc. v. Leclair*, 295 A.D. 2d 873, 874, 743

N.Y.S. 2d 898 (3d Dep't 2002) ("a dilution of the good will [a company] has developed" suffices

to constitute irreparable harm for injunction purposes).

Moreover, potential damage to Plaintiffs' business reputation constitutes

irreparable harm for purposes of injunctive relief. In *Klein, Wagner & Morris v. Lawrence A.*

*Klein, P.C.*, 186 A.D. 2d 631, 588 N.Y.S. 2d 424 (2d Dep't 1992), the Second Department found

that a threat to a party's reputation will constitute irreparable harm:

> The second element of proof required for a preliminary injunction
> is that irreparable injury will occur if the relief is denied.
> Irreparable injury in this context means any injury for which
> money damages are insufficient [citation omitted]. The plaintiffs
> contend that the appellants' use of the name Lawrence A. Klein
> would ... affect the plaintiffs' reputation with clients, potential
> clients, and the legal community. We find that these claims are of
> the type which could constitute irreparable harm.

186 A.D. 2d at 633. *See also Forty-Seventh-Fifth Comp. v. Nektalov*, 225 A.D. 2d 343,

638 N.Y.S. 2d 625 (1st Dep't 1996).

Similarly, *In Rottkamp v. Wulforst Farms, LLC*, 17 Misc. 3d 382, 388,

844 N.Y.S. 2d 600 (Sup. Ct. Suffolk Co. 2007), the court found that "the potential damage to a

6

business reputation is a sufficient basis to establish irreparable injury." Moreover, the court

recognized that damage to business reputation and good will can be difficult or impossible to

quantify. *Id.; see also Konishi v. Lin*, 88 A.D. 2d 905, 450 N.Y.S. 2d 585 (2d Dep't 1982)

(damage to business reputation is enough to establish irreparable injury). The "threat to goodwill

and creditworthiness is sufficient to establish irreparable injury warranting the granting of

injunctive relief." *Four Times Square Assoc., L.L.C. v. Cigna Invs., Inc.*, 306 A.D. 2d 4, 6,

764 N.Y.S. 2d 1, (1st Dep't 2003).

Finally, the court should evince "a sensitivity to the possibility of irreparable

harm to ... reputation resulting from unfounded accusations." *Anonymous v. Bureau of*

*Professional Med. Conduct,* 309 A.D. 2d 44, 49, 764 N.Y.S. 2d 247 (1st Dep't 2003).

As shown in the accompanying Affidavit of Mark Stern, Plaintiffs' assets and

business, good will, business reputation, and creditworthiness are in immediate danger as a direct

result of Citi's publication of the Notice of Sale in local newspapers and Citi's other actions.

This constitutes irreparable harm under New York law, which must be enjoined.

### (iii) Loss of Control Over Plaintiffs' Business Will Cause Irreparable Harm.

Citi has given notice of its intention to sell at public auction on June 17, 2008 all

of the Manager's right, title and 100% interest in First Republic. Simply put, if Citi is not

enjoined, the Plaintiffs will lose complete control over their business. This harm is indisputably

irreparable. *See, e.g., Suchodolski Assocs. Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, *4

(S.D.N.Y. Dec. 10, 2003) (holding that the dilution of a party's stake in, or a party's loss of

control over, a business constitutes irreparable harm), *citing Street v. Vitti*, 685 F. Supp. 379, 384

(S.D.N.Y. 1988) (finding irreparable harm where forced sale of plaintiffs' shares would "destroy

their voice in management"); *Clark v. Pattern Analysis and Recognition Corp.*, 87 Misc. 2d 385,

7

384 N.Y.S. 2d 660, 661 (Sup. Ct. Oneida Co. 1976) (finding "no question" that plaintiffs would

be irreparably harmed because "they would lose their status as shareholders"); *Rebell v. Muscat*,

26 A.D. 2d 685, 272 N.Y.S. 2d 478, 480 (2d Dep't 1966) (finding "undeniable probability of

irreparable harm" where plaintiffs' shares would be diluted); *see also Vanderminden v.*

*Vanderminden*, 226 A.D. 2d at 1041 (holding shift in balance of power or loss of management

control over business to be irreparable); *Mr. Natural, Inc. v. Unadulterated Food Prods., Inc.*,

152 A.D. 2d 729, 730, 544 N.Y.S. 2d 182 (2d Dep't 1989) (holding loss of control of business or

suffering dissolution to be irreparable); *CanWest Global Comm. Corp. v. Mirkaei Tikshoret*

*Limited*, 9 Misc. 3d 845, 872, 804 N.Y.S. 2d 549 (Sup. Ct. N.Y. Co. 2005) (holding right to

participate in management of business to be irreparable); *cf. Semmes Motors, Inc. v. Ford Motor*

*Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (right to continue a business "is not measurable entirely

in monetary terms").

     As these cases make clear, the harm caused by the forced loss of control over

one's business, whether through the shifting of control to co-management or the absolute ceding

of control to a third party, is by definition irreparable. Plaintiffs' control over its business is in

immediate danger if Citi proceeds with its auction sale scheduled for June 17, 2008. This

irreparable harm must be enjoined.

## C.  Plaintiffs Are Likely To Succeed On The Merits.

     Plaintiffs are very likely to succeed on the merits because Plaintiffs are not in

Default of the Loan Agreement or the Mezz. The explanation is straightforward:

- Under applicable state law, the various Lis Pendens do not constitute Liens, and even
  if they are Liens, the Default Letters were served prematurely;

- Plaintiffs have not entered into a Major Lease without the consent of Citi in violation
  the Loan Agreement and the Mezz, and even if Citi is deemed to have withheld
  consent, its failure to consent is unreasonable;

8

- Plaintiffs did not make misrepresentations in the loan documents, and even if any representations are deemed incorrect, they are not material; and

- The Default Letters dated May 7 and May 15, 2008, were not mailed to Plaintiffs' correct address, and thus not validly served.

### (i) A Lis Pendens Is Not a Lien; If It Is, the Default Letters Were Served Prematurely.

#### (a) A Lis Pendens Is Not a Lien.

Section 1 of the Loan Agreement defines "Lien" as follows[3]:

> "Lien" shall mean, with respect to each Individual Property, any mortgage, deed, of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer, of, on or affecting Borrower, an Individual Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

Thus, if there was no lien created, there was no violation of Section 5.2.1 of the Loan Agreement, and therefore, no Event of Default under Section 8.1(a)(xiii) of the Loan Agreement and their analogs under the Mezz.

The Governing Law section of the Loan Agreement (Section 10.3(a)) provides specifically that the law of the situs of the property will govern as "with respect to the creation, perfection, priority and enforcement of the liens and security interests created by the Loan Agreement." As shown below, under the law of the situs of the various filed Lis Pendens, a lis pendens is not a lien or encumbrance. Therefore, there is no lien created by reason of the Lis Pendens. Accordingly, no Event of Default under either the Loan Agreement or the Mezz has occurred. Citi's claim is baseless.

---

[3] The definition of "Lien" in the Loan Agreement and the Mezz are substantially the same. See Stern Aff. Exs A and B.

9

In Georgia, "[a] lis pendens is not a lien on the property." *Dime Say. Bank of New York, FSB v. Sandy Springs Assoc., Inc.*, 261 Ga. 485, 486, 405 S.E. 2d 491, 493 (Ga. 1991). "A lis pendens simply gives notice to prospective purchasers that a lawsuit involving the realty has been filed. It does not prevent the sale of the property, nor is it a lien on the property." *Aiken v. Citizens & Southern Bank of Cobb County*, 249 Ga. 481, 482, 291 S.E. 2d 717, 719 (Ga. 1982) *cert. denied*, 459 U.S. 973, 103 S. Ct. 307, 74 L. Ed. 2d 287 (1982) *citing Lankford v. Milhollin*, 203 Ga. 491, 47 S.E. 2d 70 (1948).

Likewise, in Alabama, "[t]he sole purpose of a lis pendens notice is to afford notice to a bona fide purchaser who might purchase the property during the pendency of the action." *Ex parte State Dept. of Revenue*, 886 So. 2d 817, 821 (Ala. Civ. App. 2003), *citing Scott v. Hales*, 575 So. 2d 1058, 1060 (Ala. 1991); *Batson v. Etheridge*, 239 Ala. 535, 195 So. 873 (1940). "The purpose of the lis pendens record is to afford purchasers a method of protecting themselves against existing claims." *Matter of Yuan*, 178 B.R. 273, 274 (Bankr. N.D. Ala. 1995), citing *Batson v. Etheridge*, 239 Ala. 535, 195 So. 873 (1940).

In North Carolina, a lis pendens "is a statutory device by which the world is put on notice that an order of attachment has been issued with respect to certain real property owned by a party against whom a monetary judgment is sought." *In re Medlin*; 229 B.R. 353, 358 (Bankr. E.D.N.C. 1998) (*quoting Edwards v. Brown's Cabinets and Millwork, Inc.*, 305 S.E. 2d 765 (N.C. Ct. App. 1983)). A lis pendens notice "fixes the priority of the lien that arises when the order of attachment is subsequently perfected by judgment and levy." *Medlin*, 229 B.R. at 358. But only after judgment and levy is a lien on real property created; then, the lien on real property will relate back to the time when the notice of lis pendens was docketed. N.C. Gen. Stat. 1-440.33(b)(1).

10

> The sole object of lis pendens is to keep the subject in controversy within the power of the court until final decree and to make it possible for courts to execute their judgments. It gives notice of a claim of which otherwise a prospective purchaser would be ignorant. All property which is the subject matter of suit under the doctrine of lis pendens is res litigiosa and is in custodia legis.

*Massachusetts Bonding & Insurance Co. v. Knox*, 18 S.E. 2d 436, 438-39 (N.C. 1942). The

North Carolina code provides for three situations in which notice of lis pendens may be utilized.

See N.C. Gen. Stat. § 1-116(a). The three situations are: "(1) Actions affecting title to real

property; (2) Actions to foreclose any mortgage or deed of trust or to enforce any lien on real

property; and (3) Actions in which any order of attachment is issued and real property is

attached." *Id.; see Gilley v. Shoffner*, 345 F. Supp. 2d 563, 565 (M.D.N.C. 2004); *Zinn v.

Walker*, 87 N.C. App. 325, 361 S.E. 2d 314 (1987) (finding that a real estate developer who

entered into an offer to purchase agreement held only a contractual interest in the resale profits

and could not file a notice of lis pendens). If the plaintiffs complaint fails to assert a claim

falling within the scope of actions contemplated by NCGS § 1-116(a), then the court may cancel

the notice of lis pendens on a motion by the owner of the land without final resolution of the

plaintiffs complaint.

Under South Carolina law, a party may file a notice of lis pendens in an action

affecting title to real property. *See* S.C. Code. Ann. §15-11-10 (2005). From the time of its

filing, a notice of lis pendens:

> shall be constructive notice to a purchaser or encumbrancer of the property affected thereby, and every person whose conveyance or encumbrance is subsequently executed or subsequently recorded shall be deemed a subsequent purchaser or encumbrancer and shall be bound by all proceedings taken after the filing of such notice to the same extent as if he were made a party to the action.

*Id.* § 15-11-20.

11

In South Carolina, "[t]he lis pendens mechanism is not designed to aid either side in a dispute between private parties. Rather, lis pendens is designed primarily to protect unidentified third parties by alerting prospective purchasers of property as to what is already on public record, i.e., the fact of a suit involving property." *BidZirk, LLC v. Smith*, Civ. No. 6:06-0109, 2007 WL 1377576, at *2 (D.S.C. May 07, 2007). Thus, a lis pendens simply notifies potential purchasers that there is pending litigation that may affect their title to real property and that the purchaser will take subject to the judgment, without granting any substantive rights. *Id.*

Under Virginia law, a lis pendens is not effective to create a lien on real property. *Green Hill Corp. v. Kim*, 842 F.2d 742, 744 (4th Cir. 1988). Such a filing simply puts potential purchasers of real property on notice about pending litigation and provides a warning to look carefully at the property's title. *Geris v. Piedmont Federal Corp.*, Civ. No. 93-836-A, 1994 WL 603198, *1 (E.D. Va. April 14, 1994). In Virginia "a lis pendens neither creates or enforces a lien but serves as notice of a claim to the property." *Dworsky v. Cohen*, No. CH-03-677-1, 2003 WL 22521434, *1 (Va. Cir. Ct. July 14, 2003) (*citing* 12A MICHIE'S JURISPRUDENCE OF VIRGINIA AND WEST VIRGINIA, Lis Pendens §2 at 452 (2002)). A memorandum of lis pendens is merely a notice to third parties that a claim has been asserted. *Garza v. Zanville*, No. 99981, 1988 WL 619325, *1 (Va. Cir. Ct. August 30, 1988) (*citing Bray v. Landgren*, 1616 Va. 699 (1934)). It is not a seizure, nor does it alone create a lien on property. It is merely a warning to others that rights which they may acquire will be subject to any valid judgment entered in the pending suit. *Id.* at 713.

The view that a lis pendens does not, by itself, create a lien on real property is widespread, if not universal. Certainly New York courts consistently hold that the filing of a lis

12

pendens is merely a method of giving notice and does not create a lien. *In re Perosio*, 364 B.R. 868, 872 (N.D.N.Y. 2006), *citing In re American Motor Club, Inc.*, 109 B.R. 595, 597 (Barth. E.D.N.Y. 1990) ("A notice of pendency ... does not create a lien or encumbrance on the property. It merely allows the plaintiff to prosecute its lawsuit to the execution of a judgment by putting the world on constructive notice that the property is the subject of a pending lawsuit."); *Simon v. Vanderveer*, 155 N.Y. 377, 382, 49 N.E. 1043 (1898) ("The lis pendens is merely notice of some claim made in respect of the property ... [and] it does not of itself create an incumbrance apart from the equity on which the action is founded.'"); *Finkelman v. Wood*, 203 A.D. 2d 236, 609 N.Y.S. 2d 655, 656 (1994) ("[N]otice[s] of pendency ... have as their general object the preservation of existing property rights and do not affect the merits of those interests."); *Schoepp v. State*, 69 A.D. 2d 917, 415 N.Y.S. 2d 276, 277 (1979) ("The lis pendens does not create an encumbrance or a lien ... [I]t merely provides notice that an action is pending which may affect title to real property."); *see also Palatine Nat'l Bank of Palatine, Illinois v. Strom (In re Strom)*, 97 B.R. 532, 535-36, n.9 (Bankr. D. Minn. 1989), *aff'd*, 921 F.2d 836 (8th Cir. 1991) (noting that, under Minnesota law, "the sole function of a lis pendens is to give notice of the pendency of an action (citations omitted) ... The filing of a notice of lis pendens does not create a lien on property."); *Sierra v. Santana (In re Sierra)*, 79 B.R. 89, 91 (Bankr. S.D. Fla. 1987) ("Under Florida law, the recording of a Notice of Lis Pendens serves as notice of the pendency of an action relating to the property described in the notice ... There is no indication ... that the filing and recording of a lis pendens constitutes a lien ..."); *David. Leonard Associates, P.C. v. Airport-81 Nursing Care (In re Airport-81 Nursing Care)*, 32 B.R. 960, 964 (Bankr. M.D. Tenn. 1983) (noting that under Tennessee law, "filing a notice of lien lis pendens ... does not in and of itself create a lien. Such a filing is merely a procedural step"); *Title Guar. and Ins. Co. v. Campbell*,

13

106 N.M. 272, 277, 742 P.2d 8, 13 (Ct. App. 1987) (in New Mexico, "a notice of lis pendens provides constructive notice to subsequent purchasers and encumbrances of litigation affecting the title to real property" ... [A] notice of lis pendens is "not effective in itself to create a lien").

Thus, in accordance with the law of the situs of each filed Lis Pendens, the several Lis Pendens do not constitute a Lien. The Plaintiffs are therefore not in default, and the May 7 Default Letters should be deemed null and void.

### (b) The May 7 Default Letters Were Served Prematurely.

Even if the Lis Pendens were deemed liens under the law of the situs of each Shopping Center, the Loan Agreement and the Mezz do not permit Citi to declare a default until the passage of at least thirty days after the Borrower received actual notice of the filing of the Lis Pendens against each Shopping Center. Stern Aff. ¶21; Loan Agreement, §8.1(a)(xiii). In fact, as set forth more fully in the Stern Affidavit, Plaintiffs first received actual notice of the filing of the various Lis Pendens only when they received the May 7 Default Letters. Stern Aff. ¶¶13-14. Thus, the May 7 Default Letters were premature, as they were served prior to the expiration of the thirty-day notice period mandated by the Loan Agreement and the Mezz.

Because the May 7 Default Letters were prematurely issued, they should be deemed null and void.

### (ii) Plaintiffs Have Not Entered Into a Major Lease Without Citi's Consent; If Citi is Deemed to Have Withheld Consent, Its Failure to Consent is Unreasonable.

### (a) Plaintiffs Have Not Entered Into a Major Lease Without Citi's Consent.

Plaintiffs have established that they have not entered into a Major Lease without Citi's consent. The relevant facts are as follows: The McGehee Center was one of the centers financed by Citi under the Loan Agreement. Stern Aff. ¶28. At the time of the loan closing, the

14

anchor store premises had been vacant for more than five years. *Id.* at ¶29. Following the

closing, First Republic and its agents actively sought an anchor tenant for McGehee Center,

which is in a depressed area and is located across the street from another shopping center that

had vacant stores. *Id.* Throughout this process, Citi and First Republic maintained regular

communications, both oral and written, regarding First Republic's effort to find a new tenant for

the anchor store. Plainly, Citi supported the effort. *Id.* at ¶¶30-31. In its normal course of

operations, and in accordance with the terms of the Loan Agreement, First Republic regularly

forwarded letters of intent and spreadsheets with lease summaries to Citi, which then signified its

approval of new leases, both orally and in writing. *Id.* Before entering into the Mr. Sandman

Lease, Plaintiffs sent the McGehee Center letter of intent to Citi. *Id.* at ¶30.

Despite its many chances to raise an issue or disapprove of the Mr. Sandman

Lease, until May 15, 2008, Citi never once refused approval in any form, and referred to the

Mr. Sandman Lease as "good news". *Id.* at ¶31. The fact remains that Citi representatives

signified Citi's approval of the Mr. Sandman Lease, both orally and in writing, having urged

Plaintiffs to enter into the Mr. Sandman Lease and having insisted on promptly receiving a copy

of the executed lease.

### (b) If Citi is Deemed to Have Withheld Consent to the Mr. Sandman Lease, Its Failure to Consent is Unreasonable.

Even if Citi is deemed to have refused to consent to the Mr. Sandman Lease,

Citi's refusal was unreasonable and this action is the appropriate remedy under Loan Agreement

and the Mezz. Sections 10.13 of the Loan Agreement and the Mezz provide that Borrower's sole

remedies under the agreements for any claims or adjudication that Lender or its agents have

acted unreasonably or delayed in acting, shall be limited to commencing an action seeking

injunctive relief or declaratory judgment. Citi was aware that the McGehee Center was located

15

in a depressed area, across the street from another shopping center that had vacant stores, and Citi was aware that the addition of an anchor tenant was critical to the success of the McGehee Center. Because Citi wholly supported and indeed encouraged First Republic's entry into the Mr. Sandman Lease, if this Court finds that Citi did not formally approve it as a Major Lease, Citi's withholding of clear written approval was unreasonable.

Moreover, while reserving its rights, Plaintiffs advised Citi that Mr. Sandman had agreed to return its Lease. Plaintiffs then requested that Citi approve a new lease with Mr. Sandman on identical terms. Citi has unreasonably failed to respond to Plaintiffs' request.

Finally, Mr. Sandman has agreed to nullify its lease, curing any alleged default in its entirety.

Therefore, no Event of Default under either the Loan Agreement or the Mezz occurred. The May 15 Default Letters were improperly issued and should be deemed null and void.

### (iii) Borrower Did Not Make Misrepresentations In The Loan Documents; And If Any Representations Are Deemed Incorrect, They Are Immaterial.

Citi's June 3 Default Letters are based on circumstances surrounding the signature of Joshua Safrin's name on certain loan documents. While the specific default alleged is vague, Citi appears to have hedged its bet by contending that (i) Safrin's signatures are forged; (ii) Safrin's name was signed by an unauthorized agent, or (iii) Safrin's name was signed by an authorized agent.[4] Apparently, Citi contends that each of these three scenarios would have created a default under the Loan Agreement and the Mezz.

---

[4]     Notably, Safrin does not allege that Plaintiffs participated in the alleged forgery.

16

No judicial determination has been made that Safrin's signatures are forged, and Plaintiffs deny the allegations of forgery. The signatures in question were either Safrin's or those of his authorized agent, and all allegations of forgery will be denied by First Republic and other third-party defendants on the record when they timely answer Safrin's third-party complaint in the District Court Litigation. Stern Aff. ¶¶45-46. There is simply no evidence of forgery on which to base issuance of the Default Letters.

As for Citi's suggestion that Safrin's signature was executed by an unauthorized agent, there is also no evidence on which to base issuance of the Default Letters. Signature by an unauthorized agent would not necessarily give rise to a default under the Loan Agreement and Mezz, however, because unlike an outright forgery, an unauthorized agent with apparent authority binds his principal. *Hallock v. State*, 474 N.E. 2d 1178, 1182 (N.Y. 1984). With or without authority, the capacity to bind would render true the Borrower's representation under Section 4.1.2 of the Loan Agreement that the Loan Documents had been duly-executed and were binding and enforceable. And such unauthorized but binding agency would fall outside the scope of a default under Section 8.1(a)(v) of the Loan Agreement, for that section requires a representation that is "false or misleading in any material respect." The signature of an unauthorized agent with capacity to bind, while arguably "false or misleading" as to identity, would be immaterial, because his principal would be bound.

Least availing of Citi's claims is the suggestion that a default would arise from the signature of Safrin's name by an authorized agent. Plainly, such a scenario would fall outside of the scope of the default provisions of the Loan Agreement; the signature would be neither false nor misleading, and Safrin would be bound. Under well settled New York law, no cause of action arises in favor of one unaware that a signature is that of an authorized agent, not his

17

principal. *See Thompson v. New York Trust Co.*, 266 A.D. 384 (N.Y. Sup. Ct. 1943) (dismissing a complaint against a decedent's attorney-in-fact who, despite authorization, had failed to disclose his agency and was accused of committing forgery); *see also Young v. Perry*, 42 A.D. 247 (N.Y. Sup. Ct. 1899) (observing in a corporate context that "while it is the preferable way for an agent in executing any instrument in the name of the principal to add his own name as agent, so that the instrument may show by what person the signature was written, still in law the writing of the name of the principal alone is sufficient. It is competent and proper also for the agent to sign simply the principal's name."); *Van Norden v. Rosenberg*, 62 Misc. 285 (NY Sup. Ct. 1909) (same).

Without proof of forgery, no Event of Default under either the Loan Agreement or the Mezz arose from the circumstances of Safrin's signatures. The June 3 Default Letters were improperly issued and should be deemed null and void.

### (iv) The May 7 and May 15 Defaults Letters Were Mailed to The Wrong Address, Rendering Service Ineffective.

Even assuming that the Lis Pendens were "Liens" within the meaning of the Loan Agreement and the Mezz, and assuming further that Citi properly withheld its consent to the Sandman Lease, the May 7 and May 15 Default Letters were ineffective for the most simple and indisputable of reasons: they were misaddressed.

Sections 10.6 of the Loan Agreement and the Mezz supply the mailing addresses for service of "all notices or written communications hereunder ..." The mailing address for Borrower is the following:

18

If to Borrower:    First Republic Group Realty LLC
[FRGR Managing Member LLC]
c/o First Republic Group
241 Fifth Avenue
New York, New York 10018

Attention: Mark Stern and Joshua Safrin
Facsimile No.: (646) 219-6529

In fact, both the May 7 and May 15 Default Letters were mailed to the Plaintiffs at **214** Fifth Avenue, not **241** Fifth Avenue. Because service did not comply with requirements of the Loan Agreement and the Mezz, these Default Letters were ineffective for any purpose. *Regency Towers LLC v. Landou*, 807 N.Y.S. 2d 863, 865 (2006) (where notice of termination of lease in landlord/ holdover tenant proceeding was sent to incorrect apartment number, proceeding must be dismissed).

That actual notice might eventually have been received by Plaintiffs does not remedy Citi's failure to comply with the express service requirements.

> [N]otice is a matter of due process, not getting lucky, and "[w]hen the requirements for service of process have not been met, it is irrelevant that defendant may have actually received the documents."

*Regency Towers LLC*, 807 N.Y.S. 2d at 865, *citing Raschel v. Rish*, 69 N.Y. 2d 694, 697 (1986).

Therefore, because the May 7 and May 15 Default Letters were misaddressed, the Default Letters should be deemed null and void.

### D. A Balancing Of The Equities Favors The Grant Of A Preliminary Injunction.

The balancing of the equities weighs heavily in Plaintiffs' favor. Citi does not and cannot allege any financial default. These are fully-performing loans, timely and fully paid. Citi alleges only straw-man technical violations, violations which the Plaintiffs forcibly deny and indeed disprove in these motion papers. Even if the technical defaults were true, they would not

19

jeopardize the value of the Shopping Centers or Citi's collateral or disprove the satisfactory

performance of the debt-service by the Plaintiffs.

    Absent injunctive relief, Citi's acts pursuant to the improper Default Notices and

Citi's sale scheduled for June 17, 2008 of FRGR's 100% limited liability membership interest in

First Republic will cause irreparable injury to Plaintiffs' businesses, assets and investments

without any determination of the merits of Citi's claims. So too will Citi's ongoing withholding

of reimbursement of expenses required under the loan documents cause irreparable injury. This

mandates granting the injunctive relief sought. *See 136 East 64th Street Tenants Assoc. v.

Bloom*, 86 A.D. 2d 808, 809, 452 N.Y.S. 2d 578, 580 (1st Dep't 1982) (maintaining *status quo*

until unresolved issues could be determined at trial); *Schweizer v. Town of Smithtown*,

19 A.D. 3d 682, 682, 798 N.Y.S. 2d 99, 100 (2d Dep't 2005) (the purpose of a preliminary

injunction is to maintain the status quo pending determination of the action).

    Time is of the essence to grant Plaintiffs' relief.

    On the other hand, Citi will suffer no injury or prejudice if the Plaintiffs are

granted the injunctions they seek. Plaintiffs have fully performed their financial obligations

under the Loan Agreement and the Mezz, so Citi's financial interests are not in jeopardy.

Because Plaintiffs have fully-performed their financial obligations and will continue to do so,

any delay incidental to maintaining the *status quo* pending discovery and trial on the merits is not

prejudicial. Finally, even assuming technical defaults for purposes of argument — and Plaintiffs

contend they have *not* breached any provision of the Loan Agreement or the Mezz — the

breaches that Citi alleges do not adversely affect the value of the collateral. The balance of

equities clearly tilts in Plaintiff's favor. *See Somers Assoc., Inc. v. Corvino*, 156 A.D. 2d 218,

219, 220, 528 N.Y.S. 2d 480, 481 (1st Dep't 1989); *Tanzer Economic Associates, Inc. Profit*

*Sharing Plan v. Universal Food Specialties, Inc.*, 87 Misc. 2d 167, 176, 383 N.Y.S. 2d 472, 479 (Sup. Ct. N.Y. Co. 1976) (a grant of injunction should issue if it causes less harm than a denial of the same); *see also Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (a balance of equities tips in the movant's favor where "[appellant's] irreparable harm discussed earlier outweighs any harm that [appellee] might suffer as a result of a preliminary injunction issuing against it").

## IV.  CONCLUSION

For all of the reasons set forth above, the Default Letters are invalid and void. Plaintiffs are entitled to a temporary restraining order and preliminary injunction because they have demonstrated a likelihood of success on the merits, danger of irreparable injury in the absence of an injunction, and a balance of the equities tipping decidedly in their favor.

[remainder of page intentionally left blank]

21

# EXHIBIT C



008528    013789

At IAS Part 56 of the
Supreme Court of the State of
New York, held at the County
Courthouse, 60 Centre Street,
New York, New York, on the
12 day of June, 2008

PRESENT: Hon. HON. RICHARD B. LOWE, III , J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**MOTION SEQUENCE # 001**

FIRST REPUBLIC GROUP REALTY LLC
and FRGR MANAGING MEMBER LLC,

          Plaintiffs,

-against-

CITIGROUP GLOBAL MARKETS REALTY
CORP.,

          Defendant.

Index No. 601743/08

**ORDER TO SHOW CAUSE
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

Upon the annexed Complaint,[1] dated June 11, 2008; the Affidavit of Mark Stern

in Support of Temporary Restraining Order and Preliminary Injunction, sworn to on June 11,

2008 (the "Stern Affidavit"); the Affirmation of Chester B. Salomon in Support of a Temporary

Restraining Order and Preliminary Injunction, dated June 11, 2008; and Plaintiff's Memorandum

of Law in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction; and sufficient cause appearing therefor, it is hereby:

        ORDERED that Defendant SHOW CAUSE before this Court, at IAS Part 56

located at the New York County Courthouse, 60 Centre Street, New York, New York, 10007

Courtroom, on the 19th day of June, 2008, at 9 :30 a m., or as soon thereafter as counsel

can be heard, WHY an order should not be issued pursuant to CPLR §§6301, et. seq.:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Complaint.

SL1 822351v1/103664.00001

preliminarily enjoining and restraining Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, from taking any action, direct or indirect, in furtherance of the Notices of Default or Notices of Collateral Sale, as defined in Stern Affidavit; and preliminarily mandatorily enjoining Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, to make all advances and pay all reimbursements required by the loan documents;

and it is further

ORDERED that, sufficient cause having been shown therefor, pending the hearing ~~and determination~~ of Plaintiff's motion for a preliminary injunction:

Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, shall be temporarily enjoined and restrained from taking any action, direct or indirect, in furtherance of the Notices of Default or Notices of Collateral Sale; and temporarily mandatorily enjoined to make all advances and pay all reimbursements required by the loan documents;

and it is further

ORDERED that service of a copy of this Order to Show Cause and all papers submitted in support thereof, by hand, or upon Defendant or its Counsel on or before on June 12, 2008, shall be deemed good and sufficient service hereof; and it is further

ORDERED that opposing papers, if any, shall be served by hand upon Plaintiff's counsel by 5:00 p.m. on June 18th 17th, 2008.

ENTER:

_____
HON. RICHARD J. HOLWELL, III
J.S.C.

ORAL ARGUMENT DIRECTED

_____
J.S.C.

SL1 822351v1/103664.00001

*Index No.*                    *Year 2008*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FIRST REPUBLIC GROUP REALTY LLC and FRGR
MANAGING MEMBER LLC,

                              Plaintiffs,

- against -

CITIGROUP GLOBAL MARKETS REALTY CORP.,

                              Defendant.

**ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**STEVENS & LEE, P.C.**

*Attorneys for*

485 MADISON AVENUE
NEW YORK, N.Y.  10022
(212) 319-8500

*Service of a copy of the within*                    *is hereby admitted.*

Dated:

.....................................................................
                              *Attorney(s) for*

SL1 525708v1/000000.00000