**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| AMUSEMENT INDUSTRY, INC., dba WESTLAND INDUSTRIES, and PRACTICAL FINANCE CO., INC., | ) ) ) ) | CASE NO. 07 CV 11586 (LAK) (GWG) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MOSES STERN, aka MARK STERN; JOSHUA SAFRIN, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND TITLE ASSOCIATES ESCROW, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE CROSS CLAIMS OF DEFENDANTS STERN AND FIRST REPUBLIC**

---

SILLS CUMMIS & GROSS P.C.
One Rockefeller Plaza
New York, NY 10020
(212) 643-7000
Attorneys for Plaintiffs
Amusement Industry, Inc. dba Westland
Industries and Practical Finance Co., Inc.
and Third Party Defendants Steven Alevy
d/b/a Bankers Capital

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS................................................................................... i

TABLE OF AUTHORITIES .......................................................................... ii

PRELIMINARY STATEMENT ..................................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS:  DEFENDANTS FAIL TO
ALLEGE HOW BANKERS CAPITAL CAUSED THEM ANY HARM ....................... 3

ARGUMENT .................................................................................................. 6

I.    DEFENDANTS' CLAIMS MUST BE DISMISSED BECAUSE THEY
      DID NOT PLEAD, AND CANNOT ESTABLISH, LOSS CAUSATION........... 7

      A.    Defendants Have Not Alleged How Bankers Capital's Actions
            Caused a Decline in the Value of the Portfolio Properties. ..................... 10

      B.    Defendants Also Have Not Sufficiently Alleged How Bankers'
            Capital's Actions Prevented Stern From Obtaining Refinancing. ........... 12

II.   DEFENDANTS' CLAIMS ALSO MUST BE DISMISSED BECAUSE
      THEY FAIL ADQUATELY TO PLEAD THE REQUISITE ELEMENTS ....... 14

      A.    The Stern Defendants Have Failed to State a Claim for Fraud ............... 14

      B.    Defendants' Breach of Fiduciary Duty Claim Should Be Dismissed
            Because (I) Bankers Capital Did Not Owe Defendants a Fiduciary
            Duty; and (II) It Merely Restates Defendants' Breach of Contract
            Claim.................................................................................................... 18

      C.    Defendants' Aiding and Abetting Claims Should Be Dismissed
            Because They Have Failed to Allege the Underlying Torts. ................... 23

      D.    Defendants Have Failed to State A Claim For Misappropriation of
            Trade Secrets Because the Information They Allegedly Provided to
            Bankers Capital Was Not a Trade Secret and In Any Case Was Not
            Misappropriated. .................................................................................. 25

      E.    Defendants Fail to State a Claim for Tortious Interference with
            Prospective Economic Advantage Because They Do Not Allege
            that Bankers Capital's Conduct Was Unlawful or Solely Motivated
            by Malice. ............................................................................................. 28

**Table of Contents**
**(continued)**

Page

F.    Defendants Failed to State a Claim for Tortious Interference with
Contract Because, As They Contend In Their State Court Action
Against Citigroup, There Has Been No Breach of Defendants'
Agreement with Citigroup. ...................................................... 31

III.    THE STERN DEFENDANTS' CLAIMS MUST BE DISMISSED
BECAUSE THEY ARE WHOLLY IMPLAUSIBLE ........................................ 34

CONCLUSION ............................................................................................ 35

**TABLE OF AUTHORIES**

**Page**

**CASES**

Aquino v. Trupin,
    833 F. Supp. 336 (S.D.N.Y. 1993) ........................................................ 7-8, 15

Atlantic Gypsum Co. v. Lloyds Int'l Corp.,
    753 F. Supp. 505 (S.D.N.Y. 1990) ............................................................ 17

ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007) ...................................................................... 5

Bear, Stearns Funding, Inc. v. Interface Group,
    361 F. Supp. 2d 283 (S.D.N. Y. 2005) .................................................. 24-27

Bell Atlantic Corp. v. Twombly,
    __ U.S. __, 127 S. Ct. 1955 (2007) .................................................. Passim

Bennett v. U.S. Trust Co. of New York,
    770 F.2d 308 (2d Cir. 1985) ............................................................ Passim

Brady v. Lynes,
    No. 05 Civ. 6540, 2008 U.S. Dist. LEXIS 43512 (S.D.N.Y. June 2, 2008) ................ 14

Camp Summit of Summitville, Inc. v. Visinski,
    No. 06-CV-4994, 2007 U.S. Dist. LEXIS 28496 (S.D. N.Y. April 16, 2007) ............ 32

Carvel Corp. v. Noonan,
    3 N.Y.3d 182 (2004) ............................................................................ 29

Citibank v. K-H Corp.,
    968 F.2d 1489 (2d Cir. 1992) ........................................................ 10-11, 23

D'Andrea v. Rafla-Demetrious,
    146 F.3d 64 (2d Cir. 1998) ...................................................................... 32

Darby Trading Inc. v. Shell Int'l Trading and Shipping Co. Ltd.,
    No. 07-CV-0400, 2008 U.S. Dist. LEXIS 25980 (S.D.N.Y. March 31, 2008) .. 8, 28-30

Europacific Asset Mgmt. Corp. v. Tradescape Corp.,
    No. 03 Civ. 4556, 2005 U.S. Dist. LEXIS 3227 (S.D.N.Y. March 2, 2005) .............. 31

Ferguson v. Lion Holding Inc.,
    312 F. Supp. 2d 484 (S.D.N.Y. 2004) ........................................................ 4

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994) ...................................................................... 32

**Table of Authorities**
**(continued)**

Page

Hampshire Equity Partners II, L.P. v. Teradyne,
No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261 (S.D.N.Y. March 30, 2005)...... Passim

HFCA Associates Corp. v. Grossman,
960 F. Supp. 581 (E.D.N.Y. 1997) ................................................................. 12, 14-15

Holloway v. King,
361 F. Supp. 2d 351 (S.D.N.Y. 2005) ........................................................ 23

In re Bayou Hedge Funds Investment Litigation,
472 F. Supp. 2d 528 (S.D.N.Y. 2007).........................................................22-23

In re Mid-Island Hospital, Inc.,
273 F.3d 123 (2d Cir. 2002).......................................................................... 23

In re Parmalat Sec. Litig.,
501 F. Supp. 2d 560 (S.D.N.Y. 2007) (Kaplan, J.)....................................... 5

Iqbal v. Hasty,
490 F.3d 143 (2d Cir. 2007)....................................................................... 5, 33

Jews For Jesus, Inc. v. Jewish Community Relations Counsel of New York, Inc.,
968 F.2d 286 (2d Cir. 1992)....................................................................... 7, 31

Johnson & Johnson v. Guidant Corp.,
525 F. Supp. 2d 336 (S.D.N.Y. 2007)........................................................ 5

JP Morgan Chase Bank v. Winnick,
406 F. Supp. 2d 247 (S.D.N.Y. 2005)......................................................... 23

Kirch v. Liberty Media Corp.,
449 F.3d 388 (2d Cir. 2006).........................................................................31-32

Kregos v. The Associated Press,
3 F.3d 656 (2d Cir. 1993).......................................................................... 12, 14

Laub v. Faessel,
297 A.D.2d 28, 745 N.Y.S.2d 534 (1st Dep't 2002) ................................... 6

Laudenberg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.,
176 F. Supp. 2d 199 (S.D.N.Y. 2001)......................................................... 4

LNC Investments, Inc. v. First Fidelity Bank, N.A.,
173 F.3d 454 (2d Cir. 1999).........................................................................6-8

iv

**Table of Authorities**
**(continued)**

Page

Matsumura v. Benihana National Corp.,
542 F. Supp. 2d 245 (S.D.N.Y. 2008)..............................................................5-6, 15

Mazzaro v. Bank of America,
525 F. Supp. 2d 381 (S.D.N.Y. 2007)..................................................................... 22

Metropolitan West Asset Mgmt. LLC v. Magnus Funding, Ltd.,
No. 03 Civ. 5539, 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004).......18, 21

Mina Investment Holdings Ltd. v. Lefkowtiz,
184 F.R.D. 245 (S.D.N.Y. 1999) ............................................................................. 8

Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,
392 F.3d 520 (2d Cir. 2004)..................................................................................... 8

Northeast General Corp. v. Wellington Advertising, Inc.,
82 N.Y.2d 158 (1993) ......................................................................................18-20

Roeder v. Rogers,
206 F. Supp. 2d 406 (W.D.N.Y. 2002) .............................................................30, 33

Schuh v. Druckman & Sinel, LLP,
No. 07 Civ. 366, 2008 U.S. Dist. LEXIS 15079 (S.D.N.Y. February 29, 2008)
(Gorenstein, J.)....................................................................................................5-6, 32

Shepard Indus., Inc. v. 135 East 57th Street, LLC,
No. 97 Civ. 8447, 1999 U.S. Dist. LEXIS 14431 (S.D.N.Y. September 17,
1999) ..............................................................................................................28-29, 31

Spithogianis v. Haj-Darwish,
No. 07 Civ. 4609, 2008 U.S. Dist. LEXIS 824 (S.D.N.Y. January 7, 2008)........ Passim

Village on Canon v. Bankers Trust Co.,
920 F. Supp. 520 (S.D.N.Y. 1996) ...............................................................18-19, 21

World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.,
530 F. Supp. 2d 486 (S.D.N.Y. 2007)................................................................18-19

**Other Authorities**

Fed.R.Civ.P. 12(b)(6)............................................................................................. 12

FRCP 9(b) .......................................................................................................... Passim

## PRELIMINARY STATEMENT

It is black letter law that a failure adequately to plead loss causation – i.e., that the alleged misconduct caused a non-speculative, quantifiable injury to the claimant – requires dismissal of a fraud claim.  As demonstrated below, defendants' cross claims against Bankers Capital should be dismissed because they all suffer from this fatal flaw.

The pleadings in this Action show that there is a dispute between the parties regarding the acquisition of a large portfolio of properties (the "Portfolio") by defendants from an entity known as Colonial.  Plaintiffs allege, quite simply, that defendants stole $13 million wired by plaintiffs to an escrow account to finance defendants' Portfolio purchase.  Bankers Capital alleges that it is owed a fee for arranging that financing.

For their part, defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic," and, together, the "Stern defendants" or "defendants") allege that Steven Alevy and Bankers Capital (together, "Bankers Capital"), working with nonparties Allen Alevy (the principal of plaintiffs), Robert Friedman (a Bankers Capital employee) and Allen Sragow (plaintiffs' attorney), engaged in a fraudulent scheme to interfere with defendants' attempts to finance and/or purchase the Portfolio so that the Alevy family could "steal" the Portfolio transaction from defendants.

Significantly, defendants admit that Bankers Capital and its "co-conspirators" were unsuccessful – i.e., defendants (i) obtained Portfolio financing from Citigroup, (ii) have control and ownership of the Portfolio, and (iii) took and used the $13 million "advanced" by plaintiffs to finance defendants' Portfolio purchase.  Notwithstanding, defendants allege that Bankers Capital's attempted fraud somehow inflicted two kinds of damages upon defendants:  (i) a loss in the value of the Portfolio, and (ii) speculative losses attributable to unspecified other financings that defendants "gave up" as a result of

Bankers Capital's actions.  Simply put, defendants have failed to allege any facts that, even if true, would support a finding that anything Bankers Capital did or said caused (i) the Portfolio to lose value; or (ii) defendants to lose any particular financing. Bankers Capital suspects that defendants have asserted their claims in an inappropriate effort to shift their losses on the Portfolio – a real estate acquisition made in a declining real estate market and tightening credit market – to Bankers Capital (and plaintiffs). Whatever their motivation, defendants should not be permitted to avoid the consequences of their unwise investment in this fashion.

In addition to not adequately pleading causation, defendants' claims fail because:

- they do not satisfy the particularity requirements of FRCP 9(b) – applicable to all of defendants' claims, as they sound in fraud – with respect to Bankers Capital's alleged misrepresentations, defendants' alleged reliance on those misrepresentations, and the element of scienter;

- Bankers Capital did not owe defendants a fiduciary duty, as it had no power to bind defendants to anything;

- An aiding and abetting claim will not lie where, as here, the underlying torts have not been adequately pleaded;

- The information defendants allegedly provided to Bankers Capital does not constitute trade secrets;

- A claim for tortious interference with prospective economic relations fails where, as here, defendants do not allege, and cannot establish, that Bankers capital was motivated solely by malice; and

- A claim for tortious interference with contract fails where, as here, there was no breach of the underlying contract.

At bottom, defendants' claims simply make no sense.  What possible motive could Bankers Capital and/or plaintiffs have had to (i) contribute $13 million to defendants' Portfolio acquisition, in return for which plaintiffs have nothing (except this

Action); or (ii) interfere with defendants' purported efforts to obtain refinancing so that they could pay back the $13 million they took? There is none.

Accordingly, defendants' cross claims should be dismissed.

### SUMMARY OF RELEVANT ALLEGATIONS: DEFENDANTS FAIL TO ALLEGE HOW BANKERS CAPITAL CAUSED THEM ANY HARM

On June 11, 2008 – more than six months after plaintiffs commenced this Action – defendants filed their cross claims, in which they assert a predictable panoply of claims. Specifically, they assert claims for (i) fraud; (ii) breach of fiduciary duty; (iii) breach of contract; (iv) aiding and abetting fraud; (v) aiding and abetting breach of fiduciary duty; (vi) misappropriation of trade secrets; (vii) tortious interference with prospective business relations; and (viii) tortious interference with contract.[1]

Defendants' cross claims all are based upon the same operative factual allegations – i.e., that Steven Alevy and Bankers Capital, working with Allen Alevy, Allen Sragow and Robert Friedman, engaged in a fraudulent scheme to "steal" the Portfolio transaction. Even though they received financing from Citigroup, they own the Properties, and they have plaintiffs' $13 million, defendants claim to have suffered two types of damages as a result of Bankers Capital's "misconduct:" (i) a decrease in the value of the Portfolio; and (ii) losses arising from a purported inability to refinance the Portfolio. Defendants, however, utterly fail to allege any facts that would give rise to a causal link between Bankers Capital's conduct and the losses they claim to have suffered.

---

[1] Also on June 11, and apparently because they missed the May 1, 2008 deadline in this Action for the joinder of additional parties, defendants commenced an action in New York state court (the "State Action") against Allen Alevy, Robert Friedman, Allen Sragow and Avery Egert (defendant Safrin's son-in-law). In the State Action, defendants allege, practically verbatim, the same unsuccessful fraud scheme. The State Action defendants anticipate filing a motion to dismiss or stay the State Action in favor of this first-filed Action.

First, defendants allege that First Republic Group Corp. ("FRGC"), the predecessor in interest to First Republic, agreed to purchase the Portfolio for $128 million from Colonial Realty Limited Partnership ("Colonial"). (Certification of Marc D. Youngelson, Esq., executed on August 1, 2008 ("Youngelson Cert."), Ex. A ¶ 11 ("Cross Compl.").) Some time thereafter, FRGC assigned its interest in the deal to First Republic. (Id. ¶ 12.)

In early May 2007, third party defendant Stephen Friedman – Stern's (and Safrin's) counsel in the Colonial transaction, and a partner at third party defendant Buchanan Ingersoll – introduced Stern to Steven Alevy. (Cross Compl. ¶ 16.) Defendants engaged Bankers Capital to find financing for their Portfolio purchase. (Id. ¶¶ 18-19.) Notably, defendants do not (i) allege that they granted Bankers Capital any authority to bind defendants or otherwise to commit them with respect to any prospective lenders; or (ii) provide a copy of their alleged agreement with Bankers Capital.

The Stern defendants next claim that Bankers Capital, working together with nonparties Allen Alevy, Robert Friedman and Allen Sragow, thereafter "orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that the Alevy family and related affiliates could purchase the Properties." (Id. ¶ 23.)

Defendants, however, concede that the scheme they allege was unsuccessful. Specifically, on June 28, 2007, defendants closed on two Citigroup loans in the total amount of $131,150,000 to finance their Portfolio purchase. (Id. ¶ 42.) Then, on July 12, defendants closed the Colonial transaction. (Id. ¶ 54.) Defendants also admit that they used $13 million provided by plaintiffs in connection with the Colonial closing. (Id. ¶ 45.) At the same time, however, defendants also claim that the parties had no agreement

with respect to defendants' use of plaintiffs' $13 million. (Id. ¶ 54.) Strangely, defendants make no effort whatsoever to justify taking plaintiffs' funds.

Defendants further allege that, after closing on the Portfolio, Bankers Capital, again working with Allen Alevy and Allen Sragow, interfered with defendants' (i) efforts to refinance the Properties (the purpose of which allegedly was to repay plaintiffs' $13 million); and (ii) operation of the Properties. (Id. ¶¶ 59 – 68.)

Incredibly, even though they claim that the parties' had no agreement, and they admit that they used plaintiffs' $13 million to close the Colonial transaction, defendants seek a declaratory judgment that (i) they were fraudulently induced into accepting plaintiffs' $13 million, (ii) any agreement they entered with plaintiffs should be rescinded, and (iii) they be permitted to return plaintiffs' funds without interest. Defendants do not allege that they have offered to return plaintiffs' $13 million – they have not – or that they in fact have the financial wherewithal to return that money. Cf. Ferguson v. Lion Holding Inc., 312 F. Supp. 2d 484, 499 (S.D.N.Y. 2004) ("Generally a party seeking rescission of a contract must tender the return of consideration it received pursuant to the voidable contract."); Laudenberg Thalmann & Co. v. Imaging Diagnostic Systems, Inc., 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001) ("To disaffirm the contract, the defrauded party must offer to return any consideration received"). Bankers Capital and plaintiffs suspect that defendants do not have the money to repay plaintiffs.

Even more incredibly, defendants claim to have suffered two types of damages as a result of Bankers Capital's "misconduct:" (i) a decrease in the value of the Portfolio; and (ii) losses arising from a purported inability to refinance the Properties. (Cross Compl. ¶¶ 69, 79, 85, 90, 95, 101, 106, 113, 120.) Defendants, however, utterly fail to

explain anything Bankers Capital did or said caused the losses defendants claim to have suffered.  For this reason alone, defendants' claims should be dismissed.

## ARGUMENT

After the Supreme Court's seminal decision in Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007), a party must "amplify [its] claim with some factual allegations in those contexts where amplification is needed to render the claim *plausible*" in order adequately to state its claims for relief.  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (italics in original); see also ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 93 (2d Cir. 2007) (affirming dismissal).  "Now, in order to survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  In re Parmalat Sec. Litig., 501 F. Supp. 2d 560, 572 (S.D.N.Y. 2007) (Kaplan, J.); Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 345 (S.D.N.Y. 2007) ("In the wake of Twombly, courts are to apply a flexible 'plausibility standard'") (citing Iqbal).

Further, while it still is the case that a party's factual allegations are to be accepted as true, conclusory allegations are insufficient.  Matsumura v. Benihana National Corp., 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) ("the Court is obligated to accept as true the factual allegations of the amended complaint, drawing all reasonable inferences in the light most favorable to the plaintiff . . . [h]owever, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss").  "This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed. R. Civ. P. 9(b)."  Schuh v. Druckman & Sinel, LLP, No. 07 Civ. 366, 2008 U.S. Dist. LEXIS 15079, at *24 (S.D.N.Y. February 29, 2008) (Gorenstein, J.).  Simply put, "[o]n a motion to dismiss for

6

failure to state a claim, the issue is whether the plaintiff has established a 'plausible

entitlement to relief.'"  Matsumura, 542 F. Supp. 2d at 251 (quoting Twombly); Schuh,

2008 U.S. Dist. LEXIS 15079, at *23 ("Factual allegations must be enough to raise a

right to relief above the speculative level.") (quoting Twombly).

As demonstrated below, defendants wholly fail to satisfy the foregoing standard.

**I.      DEFENDANTS' CLAIMS MUST BE DISMISSED BECAUSE THEY DID NOT PLEAD, AND CANNOT ESTABLISH, LOSS CAUSATION.**

New York law is plain that the Stern defendants must establish loss causation in

connection with their claims – i.e., defendants must establish that Bankers Capital's

alleged misconduct was the direct and proximate cause of some injury they suffered:

> Loss causation is . . . an integral element of most tort causes of action.  See
> W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 263 (5th ed.
> 1984) ("An essential element of the plaintiff's cause of action for
> negligence, or for that matter for any other tort, is that there be some
> reasonable connection between the act or omission of the defendant and
> the damage which the plaintiff has suffered.")

LNC Investments, Inc. v. First Fidelity Bank, N.A., 173 F.3d 454, 465 (2d Cir. 1999); see

also Laub v. Faessel, 297 A.D.2d 28, 30, 745 N.Y.S.2d 534, 536 (1st Dep't 2002) ("For

each of the direct causes of action included in the complaint--fraud, negligent

misrepresentation and breach of fiduciary duty--plaintiff must establish that the alleged

misrepresentations or other misconduct were the direct and proximate cause of the losses

claimed . . .Loss causation is the fundamental core of the common-law concept of

proximate cause") (citing Prosser and Keeton).

"To establish the required causation, the plaintiff must show that the loss was a

direct result of the defendant's wrongful actions and [that it was] independent of other

causes." Bennett v. U.S. Trust Co. of New York, 770 F.2d 308, 316 (2d Cir. 1985)

(quotation omitted) (brackets in original); Hampshire Equity Partners II, L.P. v.

Teradyne, No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261, at *13 (S.D.N.Y. March 30, 2005) ("To establish causation, 'a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss covered.'") (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)); Aquino v. Trupin, 833 F. Supp. 336, 342 (S.D.N.Y. 1993) ("Loss causation turns upon a question of proximate cause: was the damage complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?") (quotation omitted). An attenuated connection between the alleged loss and the alleged misstatement is insufficient. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *13 ("If the relationship between the plaintiff's loss and the information misstated or concealed by the defendant is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie") (quotation omitted).

"A failure to adequately plead causation is 'fatal to a common law fraud claim under New York law.'"[2] Teradyne, 2005 U.S. Dist. LEXIS 5261, at * 13 (quoting Bennett). The same is true for defendants' other tort claims. LNC Investments, 173 F.3d at 465 ("where damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability"); Jews For Jesus, Inc. v. Jewish Community Relations Counsel of New York, Inc., 968 F.2d 286, 292 (2d Cir. 1992) ("To maintain a successful cause of action for tortious interference with contract, a plaintiff must allege and prove

---

[2]    As discussed below, FRCP 9(b) (i) requires that the elements of the alleged fraud be pled with particularity; and (ii) applies to all claims that sound in fraud. See infra at 16.

the existence of a valid contract and damages <u>caused</u> by the defendant's" conduct)
(emphasis added); <u>Mina Investment Holdings Ltd. v. Lefkowtiz</u>, 184 F.R.D. 245, 254
(S.D.N.Y. 1999) (same) (citing <u>Jews for Jesus</u>); <u>Darby Trading Inc. v. Shell Int'l Trading
and Shipping Co. Ltd.</u>, No. 07-CV-0400, 2008 U.S. Dist. LEXIS 25980, at *34 (S.D.N.Y.
March 31, 2008) (elements of tortious interference with prospective relations include
"defendant's interference caused injury")**.**

   Thus, courts have not hesitated to dismiss tort claims where, as here, the claimant
fails adequately to plead a causal connection between the misconduct alleged and the loss
claimed. <u>Teradyne</u>, 2005 U.S. Dist. LEXIS 5261, at *13 ("A complaint shall be
dismissed if the plaintiffs have completely failed to show how they were damaged by the
alleged fraud, a showing required by Rule 9(b).") (quoting <u>Aquino</u>); <u>Aquino</u>, 833 F.
Supp. at 344 (dismissing aiding and abetting claim because "[l]oss causation . . . is as
necessary for a theory of aiding and abetting liability as it is for a primary violation");
<u>Bennett</u>, 770 F.2d at 310 (affirming 12(b)(6) dismissal because "there was an insufficient
causal connection between appellee's acts and appellants' loss . . . to state a cause of
action"); <u>Mina</u>, 184 F.R.D. at 249 (tortious interference claim dismissed because
plaintiffs "failed to allege 'but for' causation").

   The loss causation analysis applies with equal force to breach of contract claims.
<u>LNC Investments</u>, 173 F.3d at 464-65 ("Ordinarily, causation is required to recover
damages for breach of contract. . . Under New York law, in fact, the failure to prove
damages is fatal to [a] plaintiff's breach of contract cause of action") (citation omitted);
<u>Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank</u>, 392 F.3d 520, 525 (2d Cir. 2004)
("Causation is an essential element of damages in a breach of contract action; and, as in

tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages."). As with tort claims, courts will dismiss breach of contract claims where, as here, the claimant fails adequately to plead damages flowing from the alleged breach. Spithogianis v. Haj-Darwish, No. 07 Civ. 4609, 2008 U.S. Dist. LEXIS 824, at *16 (S.D.N.Y. January 7, 2008) ("Because the plaintiff has not identified any damages flowing from breach of an enforceable agreement that are recoverable under New York law, he has not stated a cognizable contract claim").

Here, defendants have failed to allege any facts that, if true, suggest any rational relationship between Bankers Capital's conduct and the damages defendants seek.

**A.    Defendants Have Not Alleged How Bankers Capital's Actions Caused a Decline in the Value of the Portfolio Properties.**

First, the Stern defendants fail to explain how the unsuccessful fraud scheme to steal the Portfolio caused an alleged decline in the value of the Portfolio Properties. For example, defendants do not identify any statements or omissions by Bankers Capital that caused the value of the Portfolio to fall. Defendants similarly do not explain how their reliance on any such statements or omissions caused the value of the Portfolio to decline. The explanation for defendants' failure is simple: there is no rational relationship between Bankers Capital's actions and any such losses.

Teradyne is instructive. In that case, plaintiff claimed that defendant fraudulently encouraged plaintiff's $55 million investment in Connection Services Corp. ("CSC") by making various positive, but false, statements about CSC. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *1 and *3. Plaintiff lost its investment when CSC's business declined and it filed bankruptcy. Id. at *1. Plaintiff then commenced an action, alleging claims

10

for fraud, fraudulent inducement, and intentional interference with economic opportunity. Id. at *4.  Defendant moved to dismiss pursuant to FRCP 9(b) and 12(b)(6).  Id. at *2. The court granted defendant's motion, holding that plaintiff had failed to allege how defendant's misrepresentations caused the loss of plaintiff's investment.[3]  Teradyne, 2005 U.S. Dist. LEXIS 5261, at * 14-15 ("Plaintiff suggests no reason why the investment was wiped out.  Plaintiff has alleged the cause of its entering into the transaction in which Plaintiff lost money, but not the cause of the transaction's turning out to be a losing one") (citing Citibank v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)); see also Citibank, 968 F.2d at 1495-96 (subsequent decline in value of collateral not causally connected to defendants' alleged nondisclosure); Bennett, 770 F.2d at 314 ("the misrepresentation neither induced the purchase nor related to the stock's value").

Rather, as the Teradyne court observed, plaintiff's losses more likely were attributable to declining market conditions than they were to defendant's conduct:

> Furthermore, when a plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the probability that the loss was caused by an alleged fraud decreases. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994).  Although I need not reach the existence of causation, it is infinitely more probably that the proximate cause of CSC's bankruptcy and Plaintiff's loss of its $55 million investment was the overall decline in the high-tech market rather than any collection of optimistic statements [by defendant].  Here, Plaintiff has not pled any facts to support an alternate theory.  I find that Plaintiff has not adequately pled causation and that the Complaint must be dismissed under Rule 9(b).

Teradyne, 2005 U.S. Dist. LEXIS 5261, at *16 (italics in original).

As in Teradyne, the Stern defendants utterly have failed to allege any causal link between Bankers Capital's misconduct and the alleged loss in value of the Portfolio.

---

[3]    The court also held that plaintiff's claims were "subject to the strict pleading requirements of Rule 9(b)" because they were based on the "same averments of fraud." Teradyne, 2005 U.S. Dist. LEXIS 5261, at *7-8.

That is because there is no such link.  In fact, unlike <u>Teradyne</u>, defendants do not even allege that Bankers Capital's statements or omissions caused them to invest in the Portfolio.  If anything, defendants' losses plainly are attributable to the notorious nationwide decline in the real estate market over the past few years, not to anything Bankers Capital said or did.  <u>Teradyne</u>, 2005 U.S. Dist. LEXIS 5261, at *16; <u>Bennett</u>, 770 F.2d at 314 ("The loss at issue was caused by the Bennetts' own unwise investment decisions, not by [defendant's] misrepresentation").

**B.    Defendants Also Have Not Sufficiently Alleged How Bankers'
Capital's Actions Prevented Stern From Obtaining Refinancing.**

Defendants also have failed to explain how Bankers Capital's actions caused defendants to be unable to refinance the Properties.  Rather, in vague and conclusory terms, defendants simply allege that Bankers Capital somehow interfered with defendants' refinancing efforts, including by publicly accusing defendants of stealing plaintiffs' $13 million to unspecified members of the lending community.  (Cross Comp. ¶¶ 63 and 66.)  Defendants wholly fail to specify (i) when, where, and how Bankers Capital made such statements; (ii) the precise content of such statements; (iii) the prospective lenders to whom such statements were made; and (iv) how such statements caused any prospective lender not to extend refinancing to defendants.  Defendants also fail to identify any prospective lenders which, but for Bankers Capital's actions, otherwise would have extended refinancing.  Such conclusory allegations are insufficient. <u>Citibank</u>, 968 F.2d at 1497 (conclusory allegations of a causal link not sufficient).

In any case, defendants' alleged inability to obtain refinancing is not a cognizable loss for which they can recover here.  New York law limits fraud damages to "the actual pecuniary loss suffered as a direct result of the misrepresentation."  <u>Spithogianis</u>, 2008

U.S. Dist. LEXIS 824, at *21; Kregos, 3 F. 3d at 665 ("New York law awards only 'out of pocket' expenses in fraud cases, entitling plaintiffs to damages solely for their actual pecuniary losses. . . [t]he damages must also be independent of other causes") (citations omitted). A lost alternative bargain is recognized as the basis for damages only where "the fraud caused the plaintiff to give up some quantifiable, concrete alternative opportunity." Spithogianis, 2008 U.S. Dist. LEXIS 824, at *22 (citing cases).

In sum, the Stern defendants have not identified any refinancing that they would have obtained but for Bankers Capital's alleged misconduct. The explanation for this again is straightforward: defendants cannot do so. Simply put, defendants' purported inability to obtain re-financing is far too speculative and remote a harm for which they can recover. HFCA, 960 F. Supp. at 586 (dismissing fraud claim because the damages alleged – an inability to obtain certain government approvals – were "too speculative to survive even the most generous application of Fed.R.Civ.P. 12(b)(6)"). As with the declining value of the Portfolio, defendants' inability to obtain refinancing likely is due to the nationwide tightening credit market, not to Bankers Capital's actions.[4]

*****

Defendants' failure adequately to allege a causal link between Bankers Capital's conduct and the damages they seek arises directly from the undisputed fact that, quite simply, the fraud scheme they allege was unsuccessful. At most, defendants' factual allegations constitute a potential affirmative defense to plaintiffs' claims in the Action. Defendants, however, are not entitled to collect damages if they establish this defense.

---

[4]     The Court may take judicial notice of the well known decline in the real estate and financing markets. In re Merrill Lynch & Co., 289 F. Supp. 2d 416, 421 n. 6 (S.D.N.Y. 2003) ("The Court may take judicial notice of the existence of the internet bubble and its subsequent crash.") (citing F.R.E. 201 and cases).

13

At bottom, Bankers Capital suspects that defendants have asserted their attenuated damages claims to impose upon Bankers Capital (and plaintiffs) the consequences of defendants' unwise investment in the Portfolio in declining real estate and credit markets. Defendants should not be permitted to shift their losses in this fashion.

Accordingly, all of defendants' damages claims should be dismissed.

## II.    DEFENDANTS' CLAIMS ALSO MUST BE DISMISSED BECAUSE THEY FAIL ADQUATELY TO PLEAD THE REQUISITE ELEMENTS

In addition to failing adequately to plead causation, defendants also fail to plead various requisite elements of their claims. Accordingly, for the reasons set forth below, defendants' claims must be dismissed.

### A.    The Stern Defendants Have Failed to State a Claim for Fraud.

Defendants first assert a claim for common law fraud against Bankers Capital. The Stern defendants offer few specifics in support of their fanciful claim. For example, defendants allege, in conclusory fashion, that Steven Alevy and Robert Friedman falsely represented that they had contacted "highly relevant lenders," and that they "believed" they could obtain more financing for Stern than what he was seeking at the time from other lenders (such as JP Morgan Chase). (Cross Compl. ¶ 22.) Defendants also allege that Steven Alevy and Robert Friedman "pretended that they were engaged in a serious effort to obtain financing for the purchase." (Id. ¶ 24.) In short, Bankers Capital strung Stern along, when "in reality, Steven Alevy and others conspired with Steven Alevy's father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern." (Id. ¶ 24.)

Defendants also allege, again in vague and conclusory terms, that Bankers Capital somehow "interfered with potential financing sources." (Cross Compl. ¶ 29.) For

example, Bankers Capital passed on unspecified "negative information" about Stern to such lenders. (Id.) Bankers Capital also caused prospective lenders to form a "bad and incorrect impression" of Stern by making "last minute requests" of Stern to meet with such lenders, which he was unable to do. (Id. ¶ 32.) Notably, defendants do not allege that Bankers Capital provided false information to prospective lenders. As noted, defendants also do not identify a single prospective lender who, but for Bankers Capital's alleged interference, otherwise would have financed the Portfolio purchase.[5]

The elements of fraud are well known: (i) a material false representation; (ii) made with knowledge of its falsity; (iii) an intent to defraud; (iv) reasonable reliance; and (v) damages. Kregos v. The Associated Press, 3 F.3d 656, 665 (2d Cir. 1993); HFCA Associates Corp. v. Grossman, 960 F. Supp. 581, 585 (E.D.N.Y. 1997) ("Under New York law, the elements of a claim for rescission based on fraud are misrepresentation, concealment or nondisclosure of a material fact; an intent to deceive; and an injury resulting from justifiable reliance by the aggrieved party"). Where, as here, the fraud claim is based on an alleged nondisclosure, the plaintiff also must allege that defendant had a duty to disclose as a result of a special relationship – e.g., a fiduciary duty – between the parties. Brady v. Lynes, No. 05 Civ. 6540, 2008 U.S. Dist. LEXIS 43512, at *19-20 (S.D.N.Y. June 2, 2008) ("although a cause of action alleging fraud may be predicated on acts of concealment, the plaintiffs must allege, inter alia, that the defendant had a duty to disclose the disputed information.")

---

[5]    The only prospective lender identified by name is Petra Capital ("Petra"). According to defendants, Bankers Capital met with Petra in order to secure financing for an Allen Alevy entity, not the Stern defendants, to purchase the Portfolio. (Cross Compl. ¶ 35.) Again, defendants do not claim that Petra declined financing as a result of Bankers Capital's conduct. Even if it did, it does not matter: defendants financed the Portfolio acquisition with Citigroup.

FRCP 9(b) requires that the foregoing elements be alleged with particularity. Spithogianis, 2008 U.S. Dist. LEXIS 824, at *19 ("Rule 9(b) . . . requires that the circumstances constituting fraud must be stated with particularity"). "These heightened pleading requirements are applicable to any claim that 'sounds in fraud,' regardless of whether fraud is an element of the claim." Matsumura, 542 F. Supp. 2d at 251 (quoting Rombach v. Chang, 355 F.2d 164, 166, 170 (2d Cir. 2004)); Teradyne, 2005 U.S. Dist. LEXIS 5261, at *6-7 (citing cases). Thus, "courts in the Second Circuit have applied Rule 9(b) to any cause of action that bears a close legal relationship to fraud or mistake . . . as well as to individual claims that, as pleaded, are predicated on allegations of fraud." Matsumura, 542 F. Supp. 2d at 251 (citing cases). Courts have described the policy rationale underlying the pleading requirements of Rule 9(b) as three-fold: first, to provide a defendant with fair notice of the plaintiff's claims; second, to protect a defendant's reputation; and, third, to reduce strike suits. Aquino, 883 F. Supp. at 340; HFCA, 960 F. Supp. at 585 (same).

Thus, to satisfy Rule 9(b), a claimant must specify the fraudulent statements, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *5; Spithogianis, 2008 U.S. Dist. LEXIS 824, at *9 (same); HFCA, 960 F. Supp. at 585 ("To satisfy the particularity requirement of Rule 9(b), the allegations should specify the time, place, speaker, and content of the alleged misrepresentations.") (citations omitted). Further, while 9(b) permits a plaintiff to allege intent with some generality, a plaintiff still must "allege facts that give rise to a strong inference of fraudulent intent," which must be done by showing (i) that defendant had motive and opportunity to commit the fraud, or

16

(ii) by alleging strong circumstantial evidence of bad intent.  Teradyne, 2005 U.S. Dist. LEXIS 5261, at *6; Spithogianis, 2008 U.S. Dist. LEXIS 824, at *9 (inference of intent requires allegations of "both motive and opportunity to defraud or . . . strong circumstance evidence of conscious misbehavior").  Here, defendants fail to supply any of the required particulars.

First, the only misrepresentation defendants attribute to Bankers Capital is that Steven Alevy (and Robert Friedman) falsely represented that they were "actively working to obtain financing" for the Stern defendants' Portfolio purchase, when in fact Bankers Capital was plotting to "steal" the Portfolio.  Defendants offer no specifics concerning these alleged statements.  These conclusory allegations fail to satisfy the particularity requirements of Rule 9(b).

Second, defendants have failed to allege how they relied upon Bankers Capital's alleged misrepresentations.  In fact, defendants allege that they were able to obtain "within a matter of days, a financing commitment from Citigroup" through another broker, which they closed "less than two weeks later."  (Cross Compl. ¶ 39.)  There was no reliance here.

Third, the Stern defendants also allege that Steven Alevy failed to disclose that he was secretly working on behalf of his family to "steal" the transaction.[6]  (Id.)  As discussed below, Bankers Capital did not owe defendants a fiduciary duty, and thus had no duty to disclose.  See infra at 19-23.

---

[6]     Defendants also allege that Allen Alevy and Allen Sragow concealed various material facts.  (Cross Compl. ¶¶ 73-74.)  While not germane to this motion, these allegations fail to state a claim because Allen Alevy and Allen Sragow owed no duty of disclosure to defendants.

Fourth, defendants have failed sufficiently to allege scienter. Arguably, the Stern defendants allege that Bankers Capital's motive was to "steal" the Portfolio purchase. Defendants, however, utterly fail to set forth any factual allegations indicating that Bankers Capital had motive and opportunity to steal the transaction. Indeed, Stern's concession that the scheme was unsuccessful confirms there was no such opportunity.

Defendants also have failed to set forth any circumstantial allegations that would give rise to an inference of bad intent. To the contrary, defendants' allegations simply make no sense. Why would plaintiffs put up $13 million, which defendants admittedly used to close the Colonial transaction, if they were trying to steal the deal? In the same vein, why would plaintiffs interfere with defendants' purported efforts to get refinancing so that they could repay plaintiffs' $13 million? Of course, they would not. Teradyne, 2005 U.S. Dist. LEXIS 5261, at *10 ("As a matter of law, such allegations of irrational motive cannot support a fraud claim under Rule 9(b)") (citing cases); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (dismissing fraud claims where plaintiff's view of the facts "defie[d] economic reason, and therefore [did] not yield a reasonable inference of intent").

Accordingly, defendants' fraud claim should be dismissed.

### B.    Defendants' Breach of Fiduciary Duty Claim Should Be Dismissed Because (I) Bankers Capital Did Not Owe Defendants a Fiduciary Duty; and (II) It Merely Restates Defendants' Breach of Contract Claim.

The Stern defendants next assert that Bankers Capital breached its fiduciary duty to defendants by (i) providing their confidential information to the Alevy family and Sragow without permission; (ii) trying to sabotage their financing efforts; and (iii) inducing them to enter into a transaction with plaintiffs. (Cross Compl. ¶ 83.)

18

Defendants have failed to allege sufficient facts to establish the most basic element of their claim – i.e., that Bankers Capital owed them a fiduciary duty.

The elements of a breach of fiduciary duty claim are (i) the existence of a fiduciary duty; (ii) breach of that duty; and (iii) damages that were proximately caused by the breach. Metropolitan West Asset Mgmt. LLC v. Magnus Funding, Ltd., No. 03 Civ. 5539, 2004 U.S. Dist. LEXIS 11761, at *25-26 (S.D.N.Y. June 25, 2004). As noted, Rule 9(b) applies to such claims where, as here, they are based on fraud. World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc., 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) ("the elements of a breach of fiduciary duty based in fraud must be plead with particularity").

"Therefore, in order to survive a motion to dismiss a claim for beach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." WWE, 530 F. Supp. 2d at 504. Further, the fiduciary duty alleged must be independent of any alleged contract between the parties. Metropolitan West, 2004 U.S. Dist. LEXIS 11761, at *26 ("It is well settled, however, that a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated").

New York law is plain that a party owes no fiduciary duty to another where, as here, the first party was asked to find financing sources for the other, but had no power or authority to bind or commit the other to such financing. Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 533 (S.D.N.Y. 1996) ("This arrangement is not the kind of 'exclusive agency' that imposes a fiduciary duty under New York law"); Northeast

General Corp. v. Wellington Advertising, Inc., 82 N.Y.2d 158, 164 (1993) ("This finder did not have the power to negotiate the transaction. This finder did not have the power to do anything except find and introduce prospects . . . . this finder had no power to affect any legal relations of [the principal] and the prospective buyer that would propel the duties into the fiduciary-like sphere"); see also WWE, 530 F. Supp. 2d at 504 ("the dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or event 'agent,' but instead by the services agreed to under the contract between the parties") (quoting Northeast General).

Village on Canon is instructive. In that case, defendant ("Bankers Trust") made a one year, $29 million bridge loan to plaintiff ("VOC"), secured by VOC's interest in certain California real estate. Village on Canon, 920 F. Supp. at 525. Shortly after the bridge loan closed, VOC and Bankers Trust entered into an exclusive agency arrangement, pursuant to which Bankers Trust was to solicit investors to provide long-term financing for VOC. Id. VOC claimed that it received oral assurances from Bankers Trust that the bridge loan would be extended if permanent financing was not arranged. Id. The bridge loan, however, was not extended, and Bankers Trust terminated the agreement under which it was to solicit permanent financing for VOC. Id. at 526. Thereafter, VOC defaulted on its bridge loan, and Bankers Trust ultimately conducted a nonjudicial foreclosure on the real property securing that loan. Id.

VOC then sued, alleging that Bankers Trust breached its fiduciary duty to VOC by lulling VOC into believing that the bridge loan would be extended and by failing to obtain permanent financing for VOC. Id. at 532. Bankers Trust moved to dismiss, arguing, inter alia, that it did not owe VOC a fiduciary duty. Id. Relying on Northeast

General, the district court held that the parties' arrangement did not impose a fiduciary

duty upon Bankers Trust, and granted Bankers Trust's motion:

> Bankers Trust's obligations under the agreement were limited to
> 'approaching domestic and foreign financial institutions and other
> qualified investors,' (Compl. Ex. 4, P 1), and to 'assessing the interest of
> the Investors in Purchasing or providing Financing and [] obtaining
> proposals[s] from them . . . .' (Compl. Ex. 4., P 2.)  Bankers Trust had no
> authority to commit VOC to any proposal or to negotiate on VOC's
> behalf, as the terms of the agreement make clear. (Compl. Ex. 4, P 1.)
> Bankers Trust could only evaluate the proposals and make
> recommendations. (Compl. Ex. 4, P 6.)  For these services Bankers Trust
> would earn a fee based on a percentage of the value of a deal struck with
> the investor. (Compl. Ex. 4, PP 7-8.)  In other words, rather than acting as
> a broker, Bankers Trust's role under the Financial Advisor Agreement was
> to find interested investors and direct them to VOC, for which Bankers
> Trust would earn a finder's fee. This arrangement is not the kind of
> 'exclusive agency' that imposes a fiduciary duty under New York law. As
> the New York Court of Appeals has explained:

> [A] finder is not a broker, although they perform some related functions.
> Distinguishing between a broker and finder involves an evaluation of the
> quality and quantity of services rendered. The finder is required to
> introduce and bring the parties together, without any obligation or power
> to negotiate the transaction, in order to earn the finder's fee.

> . . .

> <u>this finder had no power to affect any legal relations of [the principal] and
> the prospective buyer that would propel the duties into the fiduciary-like
> sphere.</u>

Id. at 532-533 (quoting <u>Northeast General</u>) (emphasis added).

Here, the Stern defendants' allegations confirm that, Bankers Capital, like

Bankers Trust, was engaged only to locate financing for defendants' Portfolio Properties.

(Cross Compl. ¶ 19 (alleging that Bankers Capital was hired "to locate financing sources

for First Republic") and ¶ 61 (alleging that Bankers Capital was "again engaged . . . to

assist [defendants] in obtaining financing and refinancing of the Properties so that the $13

million advanced to First Republic . . . could be repaid").)  Defendants do not allege that

Bankers Capital had any authority to bind defendants to any agreement with prospective lenders. As in <u>Village on Canon</u>, these allegations are insufficient to establish a fiduciary relationship between Bankers Capital and defendants.

Moreover, defendants' breach of fiduciary duty claim arises out of the same facts as their breach of contract claim. Indeed, defendants allege the same "misconduct" in support of both claims. <u>Compare</u> Cross Compl. ¶ 83 (alleging that Bankers Capital breached its fiduciary duty by (i) giving defendants' confidential information to the Alevy family without permission; (ii) trying to "sabotage" defendants' efforts to obtain financing; and (iii) inducing defendants' to enter a transaction with plaintiffs) and ¶ 88 (alleging that Bankers Capital breached its contractual obligations by (i) giving defendants' confidential information to the Alevy family without permission; (ii) failing to obtain financing or refinancing; and (iii) trying to "steal" the deal for the Alevy family). It is black letter law that a party cannot maintain a breach of fiduciary duty claim that arises out of the same facts as a breach of contract claim. <u>Metropolitan West</u>, 2004 U.S. Dist. LEXIS 11761, at *26 (dismissing breach of fiduciary duty claim; "Where a tort claim is 'merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract,' the claim is barred as redundant.") (citation omitted). Defendants concede as much in their February 27, 2008 memorandum of law ("Def. Mem.") in support of their motion to dismiss plaintiffs' claims. (Def. Mem. at 23 (citing <u>Metropolitan West</u>).)

Accordingly, defendants' fiduciary duty claim should be dismissed. <u>Village on Canon</u>, 920 F. Supp. at 533; <u>Metropolitan West</u>, 2004 U.S. Dist. LEXIS 11761, at *27.

22

C.    **Defendants' Aiding and Abetting Claims Should Be Dismissed
Because They Have Failed to Allege the Underlying Torts.**

Next, the Stern defendants assert claims for aiding and abetting fraud and breach

of fiduciary duty.  First, in vague and conclusory terms, they allege that Bankers Capital

aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen

Sragow.  (Cross Compl. ¶¶ 91-96.)  Second, again in conclusory fashion, defendants

allege that Bankers Capital aided and abetted the breaches of fiduciary duty committed

by Robert Friedman, Allen Alevy and Allen Sragow.  (Id. ¶¶ 97-102.)  These claims fail

because defendants have not sufficiently alleged the underlying torts.

"To state a claim for aiding and abetting fraud under New York law, a plaintiff

must allege: (1) the existence of an underlying fraud; (2) actual knowledge of the fraud

by the aider and abettor; and (3) substantial assistance by the aider and abettor in the

achievement of the underlying fraud."  Mazzaro v. Bank of America, 525 F. Supp. 2d

381, 387 (S.D.N.Y. 2007); see also In re Bayou Hedge Funds Investment Litigation, 472

F. Supp. 2d 528, 532 (S.D.N.Y. 2007) ("To assert a claim for aiding and abetting,

plaintiffs must allege (1) the existence of an underlying tort; (2) defendant's actual

knowledge of the underlying tort; and (3) defendant's provision of substantial assistance

in the commission of the underlying tort.").  Similarly, "[t]o state a claim for aiding and

abetting breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach

by a fiduciary of obligations to another; (2) actual knowing participation by the defendant

in the fiduciary's breach of obligations; and (3) damages to the plaintiff."  Mazzaro, 525

F. Supp. 2d at 392.  As noted, Rule 9(b) applies to defendants' aiding and abetting claims

because, like all of their claims, they are based upon the alleged fraudulent scheme to

"steal" the Portfolio transaction. <u>JP Morgan Chase Bank v. Winnick</u>, 406 F. Supp. 2d 247, 251 (S.D.N.Y. 2005).

New York courts routinely dismiss aiding and abetting claims where, as here, the underlying torts have not been sufficiently alleged. <u>Citibank</u>, 968 F.2d at 1497 (dismissing claim for aiding and abetting fraud because "primary liability for common law fraud was not sufficiently pleaded"); <u>In re Bayou Hedge Fund</u>, 472 F. Supp. 2d at 534 (dismissing aiding and abetting claim because "[i]n the absence of a fiduciary duty. . .there can be no liability for aiding and abetting").

As demonstrated <u>supra</u>, defendants have failed adequately to plead loss causation in connection with both their fraud and breach of fiduciary duty claims. Defendants also have failed to satisfy Rule 9(b)'s particularity requirements with respect to Bankers Capital's alleged misrepresentations, defendants' purported reliance thereon, and the critical element of scienter. On their breach of fiduciary duty claim, defendants further have not sufficiently alleged that Bankers Capital (or Robert Friedman, a Bankers Capital employee) owed them a fiduciary duty.

Finally, defendants' claim that Bankers Capital "aided and abetted" a breach of fiduciary duty by Allen Alevy and Allen Sragow is preposterous. Defendants set forth utterly no factual allegations that would support a finding that either Mr. Alevy or Mr. Sragow owed defendants a fiduciary duty. As a matter of law, no such duty existed. <u>Holloway v. King</u>, 361 F. Supp. 2d 351, 360 (S.D.N.Y. 2005), <u>aff'd</u> 161 Fed. Appx. 122 (2d Cir. 2005) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation."); <u>In re Mid-Island Hospital, Inc.</u>, 273 F.3d 123, 130 (2d Cir. 2002) ("When parties deal at arms length in a commercial transaction,

no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances").

Accordingly, defendants' aiding and abetting claims must be dismissed.

**D.      Defendants Have Failed to State A Claim For Misappropriation of Trade Secrets Because the Information They Allegedly Provided to Bankers Capital Was Not a Trade Secret and In Any Case Was Not Misappropriated.**

Defendants next assert that Bankers Capital misappropriated defendants' trade secrets.  (Cross Compl. ¶¶ 103-107.)   According to defendants, they provided certain information concerning the Portfolio purchase for Bankers Capital to use with prospective lenders, including (i) the Contract with Colonial; (ii) unspecified materials "received from prospective lenders;" (iii) a statement of Stern's net worth; and (iv) personal and corporate financial statements and information relating to Stern's prior business and litigation experience.  (Cross Compl. ¶ 20.)  The Stern defendants do not allege that they provided this information to Bankers Capital confidentially, or that they in any way restricted Bankers Capital's use of this information.  This claim fails because defendants have not alleged, and cannot establish, that the information they provided to Bankers Capital (i) constituted trade secrets, or (ii) was misappropriated.

A party asserting a misappropriation of trade secret claim must plead that (i) it possessed a trade secret; and (ii) the defendant used that trade secret "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means."  Bear, Stearns Funding, Inc. v. Interface Group, 361 F. Supp. 2d 283, 304 (S.D.N. Y. 2005). Courts have dismissed trade secret misappropriation claims where, as here, the pleadings fail to establish that the information in question is a trade secret.  Bear Stearns, 361 F. Supp. 2d at 305 (granting motion to dismiss).

25

A trade secret is a "formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Bear Stearns, 361 F. Supp. 2d at 304 (quoting Ashland Mgmt. v. Janien, 82 N.Y.2d 395, 407 (1993) (quoting Restatement (First) of Torts § 757 cmt. B)). Information concerning single or ephemeral events in one's business is not a trade secret. Id. at 305 ("a trade secret is 'not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business'") (quoting Softel, Inc. v. Dragon Medical and Scientific Comm'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997)).

Bear Stearns is instructive. In that case, Bear Stearns and Interface entered an agreement pursuant to which Bear Stearns loaned Interface $141 million, secured by certain real property in Las Vegas. Bear Stearns, 361 F. Supp. 2d at 286. The parties' agreement permitted Bear Stearns to securitize the loan – i.e., package all or part of the loan with other loans – and sell it to third parties. Id. Bear Stearns sold a subordinate piece of the loan to a third entity known as SOF-IV, and demanded payment under the parties' agreement for certain expenses associated with this sale. Id. at 288. Interface refused, and Bear Stearns brought suit. Id. Interface asserted a counterclaim for, inter alia, misappropriation of trade secrets, alleging that Bear Stearns wrongfully provided Interface's trade secrets to SOF-IV in connection with marketing and selling the subordinate piece of the loan to that entity. Id. at 289 and 303. Bear Stearns moved to dismiss the claim on the ground that the information provided to SOF-IV was not a trade secret. Id. at 303.

The court granted the motion, holding that Bear Stearns was authorized to disclose the information in connection with marketing the loan, as such information was intended to be available to potential purchasers:

> The information that Interface contends constitutes trade secrets is information that Bear Stearns was expressly authorized to disclose in connection with a loan securitization . . . In view of the ease with which any capital market purchaser of the security could acquire and distribute the information, such information cannot possibly fit within even the broadest interpretation of New York's definition of a trade secret.

Bear Stearns, 361 F. Supp. 2d at 305. The court also held that, even if the information were kept secret, it did not qualify as a trade secret because it concerned only a single, ephemeral event – the sale of the loan – and was not a process or information used in the continuous operation of Interface's business. Id. at 306 ("the financial information . . . simply cannot conceivably be regarded as a process or device for continuous use in the operation of Interface's business . . . the financial and loan information are independent and ephemeral facts . . . which, even drawing all reasonable inferences in Interface's favor, are not trade secrets") (citation omitted).

As in Bear Stearns, the information defendants provided to Bankers Capital does not constitute a trade secret. Specifically, defendants allege that they provided Bankers Capital with "the Contract [with Colonial], materials that Stern had received from prospective lenders. . .a statement of [Stern's] net worth, personal and corporate financial statements and information about his prior business and litigation experiences." (Cross Compl. ¶ 20; see also ¶ 27.) In connection with refinancing efforts, defendants gave Bankers Capital unspecified "additional sensitive, confidential and proprietary information about the Properties." (Id. ¶ 62.) Defendants do not allege that they restricted, by contract or otherwise, Bankers Capital's use or dissemination of this

27

material (much of which came from prospective lenders). Indeed, quite the opposite is true. Like Bear Stearns, Bankers Capital was free – in fact, Bankers Capital was engaged – to provide this information to prospective lenders during both financing and refinancing efforts. Cf. Bear Stearns, 361 F. Supp. 2d at 304 ("far from keeping this information secret, the Loan Agreement ensured that it would be available to any party involved in purchasing a securitization of the loan").

Further, the Stern defendants do not explain how the information given to Bankers Capital constituted "a process or device for continuous in the operation of" defendants' business. Rather, as in Bear Stearns, the information in question concerned single, ephemeral events – i.e., defendants' efforts to obtain Portfolio financing.

Finally, defendants cannot establish that Bankers Capital misappropriated any information. To the contrary, defendants in fact admit that they agreed to consider financing proposals from plaintiffs. (Cross Compl. ¶ 46.) Thus, Bankers Capital plainly was entitled to provide to plaintiffs the same information Bankers Capital provided to any other prospective lenders. There was no misappropriation here.

Accordingly, defendants' misappropriation claim should be dismissed.

**E.    Defendants Fail to State a Claim for Tortious Interference with Prospective Economic Advantage Because They Do Not Allege that Bankers Capital's Conduct Was Unlawful or Solely Motivated by Malice.**

Defendants next assert that Bankers Capital tortiously interfered with defendants' prospective business relations with prospective lenders, tenants and Citigroup. (Cross Compl. ¶¶ 108-115.) For example, defendants were wrongfully accused of stealing plaintiffs' $13 million in the business and lending community, which allegedly made it

impossible for defendants to obtain refinancing. (Cross Compl. ¶ 66.) Defendants,

however, offer no specifics in support of this conclusory allegation.

With respect to the Properties, Allen Alevy – not Bankers Capital – allegedly

falsely asserted to actual and prospective tenants, and to Jones Lang LaSalle (the property

management company), that Amusement, not Stern, owned the Portfolio. (Cross. Compl.

¶ 65.) The Alevys and Sragow also allegedly caused plaintiffs to commence this Action,

in which plaintiffs again assert ownership of the Properties and accuse defendants of

stealing their money (and other unidentified "falsehoods"). (Id. ¶ 67.) Finally, the Stern

defendants claim that the Alevys and Sragow have interfered with the operation of the

Properties by filing lis pendens in certain states. (Id. ¶ 68.)

This claim fails because defendants do not allege that Bankers Capital used

unlawful means or acted solely out of malice.

To state a claim for tortious interference with prospective relations, a plaintiff

must allege "the defendant's interference with business relations existing between the

plaintiff and a third party, either with the sole purpose of harming the plaintiff or by

means that are dishonest, unfair or in any way improper." Shepard Indus., Inc. v. 135

East 57th Street, LLC, No. 97 Civ. 8447, 1999 U.S. Dist. LEXIS 14431, at *17 (S.D.N.Y.

September 17, 1999); Darby Trading, 2008 U.S. Dist. LEXIS 25980, at *34 (elements of

tortious interference with prospective relations are: (i) business relationship with a third

party; (ii) defendant knew of and intentionally interfered with that relationship; (iii)

defendant acted solely out of malice, or used dishonest, unfair, or improper means; and

(iv) causation).

The New York Court of Appeals has held that "where a suit is based on interference with a nonbinding relationship . . . as a general rule, the defendant's conduct must amount to a crime or an independent tort." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004); see also Darby, 2008 U.S. Dist. LEXIS 25980, at *37 (quoting Carvel). As an exception to this general rule, a claimant must show that the defendant engaged in conduct "for the sole purpose of inflicting intentional harm on plaintiff." Id. (quoting Carvel). These requirements are "more demanding than those for interference with [the] performance of an existing contract." Shepard, 1999 U.S. Dist. LEXIS 14431, at *17-18.

Since Carvel, "courts have been stingy in their interpretation of this tort, and have resisted invitations to go beyond the language of the Court of Appeals." Darby, 2008 U.D. Dist. LEXIS 25980, at *46 (citing cases). Thus, courts have dismissed claims for tortious interference with prospective relations where, as here, the activities in question were not unlawful or motivated solely by malice. Darby, 2008 U.S. Dist. LEXIS 25980, at *46 (citing cases); see also Shepard, 1999 U.S. Dist. LEXIS 14431, at *18 (dismissing claim because acts in question were "intended to advance [a party's] own legitimate business interests.").

Here, the Stern defendants allege that Bankers Capital tortiously interfered with defendants' prospective relations by (i) asserting, or causing others to assert, to Colonial, tenants and Jones Lang LaSalle (the property manager) that plaintiffs owned the Properties; and (ii) accusing defendants of "stealing" Amusement's $13 million, including by commencing this Action. (Cross Compl. ¶¶ 66, 67, 111.) Defendants do not allege that Bankers Capital (or Allen Alevy, Allen Sragow or Robert Friedman) acted (i) in a criminal or otherwise unlawful manner in making such statements; or (ii) with the

sole purpose of inflicting harm on the Stern defendants. Indeed, in light of defendants' admission that they took and used Amusement's $13 million – even though they disingenuously claim that the parties had no agreement regarding that money – the "misconduct" alleged by defendants plainly could have been motivated by a desire to protect plaintiffs' legitimate business interests – i.e., getting defendants to honor their obligations to plaintiffs, and protecting their interest in the Portfolio – and not by malice or the sole purpose of hurting defendants. In short, defendants have failed to allege "egregious conduct so culpable . . . that it could be the basis for a claim of tortious interference with economic relations." Darby, 2008 U.S. Dist. LEXIS 25980, at *47 (quoting Carvel); Roeder v. Rogers, 206 F. Supp. 2d 406, 412 (W.D.N.Y. 2002) ("There was a legitimate purpose in filing the notice of pendency because it provided notice to the world of the pending litigation and the fact that it may affect title to, and use and enjoyment of, the property described . . . A notice pendency hardly falls within the typical definition of wrongful conduct warranting liability for tortious interference.") aff'd, 58 Fed. Appx. 879 (2d. Cir. 2003).

Accordingly, defendants' claim for tortious interference with prospective economic advantage should be dismissed.

**F.    Defendants Failed to State a Claim for Tortious Interference with Contract Because, As They Contend In Their State Court Action Against Citigroup, There Has Been No Breach of Defendants' Agreement with Citigroup.**

Finally, defendants assert that Bankers Capital has tortiously interfered with defendants' loan agreement with Citigroup by filing lis Pendens in certain states. (Cross

31

Compl. ¶¶ 116-122.)  This claim fails for the simple reason that there has been no breach of the Citigroup agreement.

To state a claim for tortious interference with contract, a plaintiff must allege that "(1) a valid contract exists; (2) a third party had knowledge of the contract; (3) the third party intentionally and improperly procured the breach of contract; and (4) the breach resulted in damages to the plaintiff." Shepard, 1999 U.S. Dist. LEXIS 14431, at *14; see also Jews for Jesus, 968 F.2d at 292 (plaintiff must allege "intentional interference with that contract without reasonable justification"); Europacific Asset Mgmt. Corp. v. Tradescape Corp., No. 03 Civ. 4556, 2005 U.S. Dist. LEXIS 3227, at *24 (S.D.N.Y. March 2, 2005) ("It is also generally required that the underlying contract be breached").

"Improper intentional interference is generally shown by a tortfeasor inducing or otherwise causing a third person not to perform his contractual obligations to the plaintiff." Shepard, 1999 U.S. Dist. LEXIS 14431, at *17.

Courts have dismissed tortious interference with contract claims where, as here, the claimant fails to establish that the defendant (i) caused a breach of the underlying contract; or (ii) did not have reasonable justification for its actions. Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) (affirming 12(b)(6) dismissal where "[t]he district court correctly determined . . . that the plaintiffs fail to allege the fourth element, actual breach")  Defendants' claim fails for both these reasons.

First, the Stern defendants allege that Bankers Capital tortiously interfered with defendants' loan agreement with Citigroup by filing lis Pendens against the Properties, which has "caused Citigroup to assert that the loans are in default." (Cross Compl. ¶ 119.)  Defendants, however, disingenuously fail to disclose that they have taken the exact

32

opposite position in their New York state court action against Citigroup, captioned First Republic Group Realty LLC v. Citigroup, Index No. 601743/08 (the "Stern/Citigroup Action"). Schuh, 2008 U.S. Dist. LEXIS 15079, at *24 (on a 12(b)(6) motion to dismiss, the Court may consider the pleadings, "documents that are attached to the complaint or incorporated in it by reference [and] matters of public record, such as court filings.")

In the Stern/Citigroup Action, the Stern defendants sought a temporary restraining order and preliminary injunction enjoining Citigroup from calling a default and foreclosing on certain collateral securing Citigroup's $126 million loan to the Stern defendants. (Youngelson Cert. Ex. B.) Defendants' sole argument on likelihood of success on the merits was that there has been no breach of the Citigroup loan agreements. (Id. at 8 ("Plaintiffs are not in Default of the loan Agreement or the Mezz.").)

On June 12, 2008, Justice Lowe issued a temporary restraining order enjoining Citigroup from taking any action in furtherance of its notice of default, which order currently remains in effect. (Youngelson Cert. Ex. C.) In other words, Justice Lowe found that the Stern defendants were reasonably likely to succeed on their claim that they had not breached their agreements with Citigroup.

Simply put, as there has been no breach of the Citigroup agreements, defendants cannot establish that Bankers Capital tortiously interfered with those agreements. Kirch, 449 F.3d at 402; Camp Summit of Summitville, Inc. v. Visinski, No. 06-CV-4994, 2007 U.S. Dist. LEXIS 28496, at *41 (S.D. N.Y. April 16, 2007) (dismissing claim because "[w]ithout a breach, there can be no tortious interference claim"); see also D'Andrea v. Rafla-Demetrious, 146 F.3d 64 (2d Cir. 1998) ("Because there was no breach of contract

33

in the instant case, D'Andrea's tortious interference with contractual relations claim must

fail.")

Further, the filing of lis Pendens – the "tortious" conduct alleged by defendants –

is not sufficient to support the element of lack of reasonable justification.  <u>Roeder</u>, 206 F.

Supp. 2d at 412.

Accordingly, the Stern defendants' tortious interference with contract claim

should be dismissed.

**III.    THE STERN DEFENDANTS' CLAIMS MUST BE DISMISSED<br>BECAUSE THEY ARE WHOLLY IMPLAUSIBLE**

As noted, defendants' claims must meet the "flexible plausibility standard"

announced by the Supreme Court in <u>Twombly</u>.  <u>Iqbal</u>, 490 F. 3d at 157 (quoting

<u>Twombly</u>).  At the end of the day, defendants' claims fail this test.

First, defendants complain that Bankers Capital (with others) sabotaged their

efforts to finance the Portfolio acquisition.  In the next breath, however, defendants

acknowledge that they in fact were not sabotaged at all, as they were able to obtain

financing from Citigroup "within a matter of days."

Defendants also whine that Bankers Capital tried to "steal" the Portfolio deal.

However, they also admit that they closed their transaction with Colonial and that they

now own the Properties.  Again, no sabotage.

Defendants further claim that they somehow were fraudulently induced to accept

plaintiffs' $13 million, which defendants admit they used to close the Colonial

transaction.  At the same time, defendants claim that they had no agreement with

plaintiffs regarding that money.  If anything, defendants' pleadings confirm their

wrongful appropriation of plaintiffs' $13 million – if there was no agreement with

34

plaintiffs, then what right did defendants have to take and use the $13 million?  In reality, defendants are claiming that plaintiffs pressed $13 million into defendants' hands, and then held their fingers closed when they tried to give it back.  Pure nonsense.

Most implausible of all, defendants claim that Bankers Capital and plaintiffs interfered with defendants' efforts to obtain refinancing so that they could pay back plaintiffs' $13 million.  Defendants' claim defies both economic reason and common sense:  if defendants had obtained refinancing, the parties likely would not be here.

Accordingly, defendants' claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Bankers Capital respectfully requests that the Court dismiss all of the Stern defendants' cross claims with prejudice.

Dated: New York, New York
      August 1, 2008

SILLS CUMMIS & GROSS P.C.

By:  /s/ Marc D. Youngelson
     Philip R. White
     Marc D. Youngelson

One Rockefeller Plaza
New York, NY 10020
Telephone: (212) 643-7000

Attorneys for Plaintiffs and Third Party
Defendants Steven Alevy and Bankers
Capital