**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMUSEMENT INDUSTRY, INC., dba )
WESTLAND INDUSTRIES, and )
PRACTICAL FINANCE CO., INC., )  CASE NO. 07 CV 11586 (LAK) (GWG)
)
          Plaintiffs, )  **CERTIFICATION OF MARC D.**
)  **YOUNGELSON**
v. )
)
MOSES STERN, aka MARK STERN; )
JOSHUA SAFRIN, FIRST REPUBLIC )
GROUP REALTY LLC, EPHRAIM )
FRENKEL, and LAND TITLE ASSOCIATES )
ESCROW, )
)
          Defendants. )
)

MARC D. YOUNGELSON hereby certifies:

    1.    I am associated with the firm Sills Cummis & Gross P.C., counsel to plaintiffs

and third party defendants Steven Alevy and Bankers Capital (together, "Bankers Capital") in the

above-captioned Action.  I submit this certification in support of Bankers Capital's motion to

dismiss the cross claims ("Cross Claims") of defendants Mark Stern and First Republic Realty

Group LLC ("defendants").  Except where otherwise stated, I have personal knowledge of the

facts set forth herein.

    2.    Attached hereto as Exhibit A is a true and correct copy of defendants' Cross-

Claims, dated June 11, 2008.

    3.    Attached hereto as Exhibit B is a true and correct copy of the Memorandum of

Law in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction, dated June 11, 2008, filed by First Republic Group Realty LLC and FRGR Managing

4.    Member LLC in the action captioned First Republic Group Realty v. Citigroup, Index. No. 601743/08 (the "Stern/Citi Action").

5.    Attached hereto as Exhibit C is a true and correct copy of the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, entered on June 12, 2008, in the Stern/Citi Action.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on:  August 1, 2008

_____
Marc D. Youngelson

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,

                                         Plaintiffs,

         - against -

MOSES STERN, aka MARK STERN; JOSHUA SAFRIN,
FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM
FRENKEL, LAND TITLE ASSOCIATES ESCROW,

                                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

JOSHUA SAFRIN,

                   Defendant/Third Party-Crossclaim-
                        Counterclaim-Plaintiff,

         - against -

STEPHEN FRIEDMAN, STEVEN ALEVY, BUCHANAN
INGERSOLL & ROONEY, P.C., BANKERS CAPITAL
REALTY ADVISORS LLC, and FIRST REPUBLIC GROUP
CORP.,

                   Third Party Defendants,

         - and -

MOSES STERN, aka MARK STERN, FIRST REPUBLIC
GROUP REALTY LLC, EPHRAIM FRENKEL, and LAND
TITLE ASSOCIATES ESCROW,

                Defendants/Crossclaim Defendants.

         - and -

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES, PRACTICAL FINANCE CO., INC.,

              Plaintiffs/Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

No. 07 Civ. 11586 (LAK) (GWG)
(ECF)

**DEFENDANTS STERN AND FIRST REPUBLIC'S ANSWER TO AND CROSS-CLAIMS AGAINST
THIRD PARTY DEFENDANTS STEVEN ALEVY AND BANKERS CAPITAL REALTY ADVISORS LLC**

Doc #31654203.WPD

Defendants Mark Stern ("Stern") and First Republic Realty Group LLC ("First Republic"), by and through their undersigned attorneys, as and for their answer to the cross-claims of third-party defendants Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy dated June 6, 2008 and as and for their cross-claims against Bankers Capital and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

1.    Stern and First Republic do not respond to the allegations set forth in the Counterclaims of Third-Party Defendant Steven Alevy d/b/a Bankers Capital because those counterclaims are asserted against Third-Party Plaintiff Joshua Safrin ("Safrin").

2.    The allegations of paragraph 1 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 1, except admit that Third-Party Defendant Bankers Capital purports to base jurisdiction of its cross-claims under 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the Action.

3.    The allegations of paragraph 2 of the cross-claims are a legal conclusion as to which no response is required; to the extent that a response is required, Stern and First Republic deny the allegations in paragraph 2, except admit that Third-Party Defendant Bankers Capital purports to base venue on 28 U.S.C. § 1391(a)(2).

4.    Deny the allegations of paragraph 3, except admit that in or about May 2007, Steven Alevy, on behalf of Bankers Capital solicited Stern and First Republic to engage them to secure financing for First Republic's acquisition of a portfolio of properties from Colonial Realty Limited Partnership ("Colonial").

5.    Deny the allegations of paragraph 4.

Doc #31654203.WPD

6.    Deny the allegations of paragraph 5.

7.    Deny the allegations of paragraph 6, except admit that no fee has been paid to Bankers Capital by either Stern or First Republic.

8.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

9.    Deny the allegations of paragraph 8.

10.    Deny the allegations of paragraph 9.

11.    Deny the allegations of paragraph 10.

12.    Deny the allegation of paragraph 11.

13.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

14.    Deny the allegations of paragraph 13.

15.    Deny the allegations of paragraph 14.

16.    Deny the allegations of paragraph 15.

17.    Deny the allegations of paragraph 16, except admit that neither First Republic nor Stern has paid Bankers Capital any fee.

18.    Deny the allegations of paragraph 17

19.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

20.    Deny the allegations of paragraph 19.

21.    Deny the allegations of paragraph 20.

22.    Deny the allegations of paragraph 21.

23.    Deny the allegations of paragraph 22.

24.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

25.    Deny the allegations of paragraph 25.

26.    Deny the allegations of paragraph 26.

27.    Deny the allegations of paragraph 27.

28.    Deny the allegations of paragraph 28.

29.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

30.    Deny the allegations of paragraph 30, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

31.    Deny the allegations of paragraph 31.

32.    Deny the allegations of paragraph 32.

33.    Stern and First Republic repeat their responses to the foregoing paragraphs as if fully set forth herein.

34.    Deny the allegations of paragraph 34, except agrees that Safrin is not entitled to any of the relief he seeks in his third-party complaint.

35.    Deny the allegations of paragraph 35.

36.    Deny the allegations of paragraph 36.

### FIRST AFFIRMATIVE DEFENSE

37.    Third-Party Defendant Bankers Capital has failed to state claims upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

38.    Third-Party Defendant Bankers Capital's claims are barred in whole or in

part because it failed to mitigate its alleged damages.

## THIRD AFFIRMATIVE DEFENSE

39.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, by the doctrines of laches, waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

40.    Third-Party Defendant Bankers Capital's claims are barred, by reason of its fraud, misconduct and/or unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

41.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it waived his right to claim damages by its own acts and omissions.

## SIXTH AFFIRMATIVE DEFENSE

42.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it was negligent and/or failed to exercise reasonable care.

## SEVENTH AFFIRMATIVE DEFENSE

43.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because it ratified the alleged wrongful conduct for which it seeks recovery.

## EIGHTH AFFIRMATIVE DEFENSE

44.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part because it is a dissolved corporation and it is not licensed as a mortgage broker in New York.

## NINTH AFFIRMATIVE DEFENSE

45.    Third-Party Defendant Bankers Capital's claims are barred, in whole or in part, because any harm it suffered is the result of its own contributory negligence.

## RESERVATION OF RIGHTS

46.     Stern and First Republic expressly reserve the right to amend and/or supplement their answer and affirmative defenses as appropriate as discovery proceeds.

## CROSS-CLAIMS AGAINST BANKERS CAPITAL AND STEVEN ALEVY

Defendants Mark Stern ("Stern") and First Republic Group Realty LLC ("First Republic"), by and through their undersigned attorneys, as and for their cross-claims against Third-Party Defendant Bankers Capital Realty Advisors LLC ("Bankers Capital") and Steven Alevy, allege upon knowledge as to themselves and otherwise upon information and belief as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over Stern's and First Republic's cross-claims pursuant to 28 U.S.C. § 1367 and pursuant to the Court's subject matter jurisdiction in the action.

2.     Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to these claims occurred herein.

## PARTIES

3.     Defendant Stern is a resident of the State of New York and, through his ownership of MS Colonial LLC, is an owner of First Republic.

4.     Defendant First Republic is a Delaware limited liability company whose principal place of business is in Monsey, New York. First Republic owns and manages the Properties.

5.     Third-Party Defendant Steven Alevy is a resident of the State of New York. Steven Alevy is a Managing Director of Bankers Capital Realty Advisors LLC ("Bankers Capital") and is the son of Allen Alevy.

6.      Third-Party Defendant Bankers Capital is a dissolved California limited liability company whose principal place of business is in New York, New York. Although Bankers Capital is dissolved, its principals improperly represent that it is an existing limited liability company. Bankers Capital touts itself as being experienced in arranging mortgages and refinancing for real estate investors. Bankers Capital was originally formed in California and previously operated out of the same offices as defendants Allen Alevy and Allen Sragow.

7.      Non-party Allen Alevy is a resident of the State of California.

8.      Non-party Robert Friedman is a resident of the State of New York and is a Managing Director of Bankers Capital.

9.      Non-party Allen Sragow is a resident of the State of California. Sragow is the son-in-law of Allen Alevy, the brother-in-law of Steven Alevy and is principally involved with and performs legal services for the Alevy family and various entities owned by the Alevy family. Allen Sragow also serves as a director of certain companies owned by the Alevy family.

10.      Non-party Avery Egert ("Egert") is a resident of the State of New York. Egert is the President of The Sovereign Group, which is owned by Joshua Safrin ("Safrin"). The Sovereign Group owns and manages various real estate properties in the United States. At all relevant times, Egert had apparent and actual authority to enter into various transactions on behalf of Safrin, including the transactions with respect to the Properties. Safrin and Egert hold a minority interest in First Republic through their ownership of JSAE Colonial LLC.

## FACTUAL BACKGROUND

### The Contract to Purchase the Properties

11.      After lengthy negotiations and discussions, effective as of April 20, 2007, First Republic Group Corp. ("First Republic Corp."), the predecessor in interest to First

Republic. entered into a written contract of sale with Colonial Realty Limited Partnership

("Colonial"). to acquire ten shopping center malls in the Southeast region of the United States for

a purchase price of $128 million (the "Contract"). Under the terms of the Contract, First

Republic Corp. paid Colonial a $1 million non-refundable deposit, with the balance of the

purchase price due at closing. The closing was scheduled to occur no later than June 15, 2007.

12.    After the Contract was executed, First Republic Group Corp. assigned its

right, title and interest under the Contract to First Republic.

13.    Pursuant to several written amendments to the Contract, (a) in exchange

for an additional $2 million non-refundable deposit, the closing date was extended first to June

29, 2007 and then to July 12, 2007; (b) in exchange for an additional $5.5 million, an eleventh

property was added to the transaction, and (c) Colonial agreed to credit $4,447,000 to First

Republic, reducing the purchase price by that amount. Thus, after execution of the several

amendments, the total purchase price for the Properties was approximately $129 million.

14.    In addition to paying Colonial the $129 million purchase price at the

closing, First Republic was also obligated to pay: (a) certain closing costs for the transaction and

(b) to escrow certain funds for capital expenditure improvements, tax and insurance, tenant

improvements, deferred maintenance. and environmental claims as provided for in agreements

subsequently made with First Republic's senior lender.

Stern and First Republic Seek Financing for the Transaction

15.    At the same time that Stern and First Republic were negotiating to acquire

the Properties from Colonial, they were also working with a number of mortgage brokers, but not

Steven Alevy or Bankers Capital, to secure financing for the acquisition and related expenses.

16.    On or about May 9, 2007, Steven Alevy was introduced to Stern by Steven Friedman, a lawyer for Buchanan Ingersoll & Rooney LLP, who advised Stern that he had represented Steven Alevy and the Alevy family in numerous other transactions. Friedman told Stern that Steven Alevy was someone whom he could trust and someone who could assist Stern and First Republic in securing financing for the acquisition of the Properties.

17.    Steven Alevy represented to Stern that he and his company Bankers Capital were licensed mortgage brokers and had arranged for billions of dollars of financings in a variety of large real estate transactions.

18.    Stern explained the entire transaction as well as the economics of the transaction to Steven Alevy and told Steven Alevy he had been working with another broker to secure financing with J.P. Morgan Chase, that J.P. Morgan Chase was very interested in providing the senior financing for the Colonial transaction, but that Stern was trying to increase the amount of senior financing by a few million dollars and to obtain mezzanine financing as well. Steven Alevy persuaded Stern to let him try to arrange both the senior and mezzanine financing for the acquisition. First Republic agreed to retain Steven Alevy and Bankers Capital as its non-exclusive broker to obtain financing for the acquisition of the Properties.

19.    As First Republic's mortgage broker, Steven Alevy, Robert Friedman and Bankers Capital were hired, among other things, to locate financing sources for First Republic, to negotiate a loan, to procure the acceptance of the borrower's application for a loan, to procure a commitment by the lender for the loan, and to facilitate the consummation of a loan.

20.    Shortly after agreeing to serve as First Republic's non-exclusive broker, Steven Alevy asked Stern to forward him all available information about the Properties, the Colonial transaction, and Stern and First Republic's efforts to obtain financing for the

8

transaction. Stern sent Steven Alevy and Robert Friedman, among other things, the Contract, materials that Stern had received from prospective lenders, such as J.P. Morgan Chase, a statement of his net worth, personal and corporate financial statements and information about his prior business and litigation experiences.

21.    At all times during the relationship, Stern emphasized to Steven Alevy and Robert Friedman that time was of the essence because the contract of sale required the closing to occur no later than June 15, 2007.

**The Fraudulent Scheme to Wrest Control of the Properties from First Republic and Stern**

22.    Within a week after being introduced to Steven Alevy and Robert Friedman, Steven Alevy and Robert Friedman represented to Stern that they had "already contacted some highly relevant lenders," that they believed they could obtain significantly more financing than what was being discussed with J.P. Morgan Chase and that they were processing the information to obtain the financing for the Colonial transaction.

23.    Unbeknownst to Stern and First Republic, Steven Alevy and Robert Friedman were not working to obtain financing for First Republic's transaction with Colonial. Rather, acting in concert with Allen Alevy and Allen Sragow, they orchestrated a fraudulent scheme to sabotage First Republic's acquisition of the Properties so that the Alevy family and related affiliates could purchase the Properties.

24.    Instead of working to obtain financing for First Republic's acquisition of the Properties, Steven Alevy and Robert Friedman worked to obtain the trust of Stern so that he would not pursue financing opportunities, on behalf of First Republic, with other brokers. Steven Alevy and Robert Friedman pretended that they were engaged in a serious effort to obtain financing for the purchase. In reality, Steven Alevy and others conspired with Steven Alevy's

father, Allen Alevy and his brother-in-law, Allen Sragow, to steal the Colonial transaction from Stern.

25.    Allen Alevy and Allen Sragow agreed that if Steven Alevy and Robert Friedman could prevent Stern from being able to finance the transaction, they would step in and purchase the Properties for themselves. Thus, part of their plan was to string Stern along by causing him to believe that Steven Alevy and Robert Friedman were actively seeking to obtain financing for the acquisition of the Properties when, in fact, they were attempting to persuade potential financing sources not to loan money to First Republic.

26.    On May 21, 2007 Steven Alevy and Robert Friedman informed Stern that they would be hearing from lenders in the next two days.

27.    During this time, Steven Alevy and Robert Friedman pressured Stern for all kinds of information, not only about the Properties, but personal information, including prior business activities and litigations. Stern forwarded them such personal information, as well as information that Stern had received about financing opportunities with lenders.

28.    At the request of Steven Alevy and Robert Friedman, Stern made them his exclusive brokers to represent First Republic with respect to most of the lenders who had already expressed an interest to Stern in financing the transaction. Steven Alevy and Robert Friedman told Stern that the other brokers that Stern had contacted were preventing Steven Alevy and Robert Friedman from successfully arranging financing for the transaction.

29.    Every lender who Steven Alevy and Robert Friedman contacted, even if the lender initially expressed an interest in the transaction, eventually appeared to lose interest in providing financing to First Republic for the Colonial transaction. In fact, in breach of their fiduciary duties as First Republic's mortgage broker, Steven Alevy and Robert Friedman

interfered with potential financing sources with whom Stern was already speaking to and passed on to these financing sources negative information about Stern so that they would not agree to lend to First Republic.

30.    When May 23, 2007 passed with no response from any lenders, Steven Alevy and Robert Friedman assured Stern that they expected lots of bids and quotes on May 28, 2007. No concrete bids, quotes or term sheets were presented to Stern or First Republic by Steven Alevy and Robert Friedman by on or about May 28, 2007.

31.    Then, in the beginning of June 2007, Steven Alevy and Robert Friedman purportedly arranged telephone calls and meetings between Stern and lenders, but none of those conferences led to any term sheets to finance the transaction. Steven Alevy and Robert Friedman purposefully did not follow up with lenders who were potentially interested in financing the Colonial transaction.

32.    As part of their scheme to sabotage Stern and First Republic's efforts to finance the Colonial transaction, Steven Alevy and Robert Friedman inundated Stern with last minute requests to attend presentations with prospective lenders that Stern sometimes could not attend which caused prospective lenders to form a bad and incorrect impression of Stern and First Republic. These last minute requests for Stern to attend meetings also diverted Stern's attention from finalizing an agreement with any of the financing sources he was already talking to, but with whom he was not using Steven Alevy, Robert Friedman and Bankers Capital as his broker.

33.    At this same time in or about May and June 2007, Steven Alevy and Robert Friedman, acting in concert with Allen Alevy and Allen Sragow, were trying to steal all or part of the transaction for themselves. Unbeknownst to Stern and First Republic, Steven

11

Alevy and Robert Friedman forwarded most, if not all, of the confidential and proprietary

information provided to them by Stern and First Republic about the transaction and Stern to

Allen Alevy and Allen Sragow who used such information to formulate their own offer to

acquire the Properties.

34.    On June 13, 2007, although Steven Alevy and Robert Friedman

represented that they were arranging meetings with potential lenders to finance the transaction,

Allen Alevy sent an email to Steven Alevy discussing a partnership with "the satmor" (*i.e.,* Stern)

to purchase the Properties. At that time, Stern had neither heard of nor spoken with Allen Alevy,

and Steven Alevy had never mentioned to Stern that he was intending to become Stern's 50%

partner in connection with the acquisition of the Properties. At no time, did Stern or First

Republic ever meet with, correspond with or communicate with Allen Alevy.

35.    In June 2007, while Steven Alevy and Robert Friedman were still feigning

their pursuit of financing opportunities for First Republic, they were instead meeting with lenders

to secure financing for Allen Alevy and his related entities to acquire the Properties. During this

same time, unbeknownst to Stern and First Republic, Steven Alevy met with Petra Capital, a

lender, and sought to secure financing from Petra Capital for an Allen Alevy entity to acquire the

Properties. Steven Alevy gave Petra Capital copies of personal financial statements for Allen

Alevy and told them he was putting together a deal for himself and his father and never said that

he had been retained by Stern and First Republic to act as their broker.

36.    In the beginning of June, Stern was introduced to Avery Egert, the

President of The Sovereign Group, who committed on behalf of Joshua Safrin, to provide $5

million of equity and co-sponsor the transaction in exchange for a minority interest in the entity

that would own the Properties. At all relevant times, Egert had the authority to act on Safrin's

behalf. Unbeknownst to Stern or First Republic, Steven Alevy, Robert Friedman and Bankers Capital previously arranged financing for a number of transactions with either The Sovereign Group or with Safrin and Egert. In fact, unbeknownst to Stern and First Republic, at the very same time that Steven Alevy, Robert Friedman and Bankers Capital were purportedly trying to secure financing for the Colonial transaction, they were working with Egert to secure financing for a real estate project in New York.

37.    Throughout early and mid-June 2007, Steven Alevy and Robert Friedman continued to string Stern along with requests for further information about the Properties and alleged meetings with potential lenders. None of these activities led to securing financing or led to any concrete proposals or receipt of a term sheet.

38.    In mid-June 2007, after Steven Alevy and Robert Friedman were allegedly unable to obtain any financing for Stern and with a June 29 closing date for the Colonial transaction fast approaching, Steven Alevy, Allen Alevy and Allen Sragow stepped up their efforts to implement their plan to take over the Properties. Steven Alevy called Stern and told him that he had "family" in "Long Beach, California," his father Allen Alevy and brother-in-law Allen Sragow, who had the ability and were interested in investing in the Colonial transaction. As described above, without Stern's knowledge or permission and in breach of their fiduciary duties to Stern and First Republic, Steven Alevy and Robert Friedman had forwarded Stern's confidential and proprietary business and personal information about the Colonial transaction and his efforts to secure financing for the transaction to Allen Alevy and Allen Sragow.

39.    Still unaware of the efforts by the Alevys, Robert Friedman and Allen Sragow to sabotage First Republic's acquisition of the Properties, Stern agreed to consider any

proposal made by Steven Alevy for "Long Beach" financing. At the same time, Stern redoubled his own efforts to obtain financing from other sources. Through another mortgage broker, Northmarq, First Republic was able to obtain, within a matter of days, a financing commitment from Citigroup Global Markets Realty Group ("Citigroup") to provide senior and mezzanine financing for the transaction in the total amount of approximately $131 million and was able to close the loan with Citigroup less than two weeks later.

40.    Stern and First Republic were also seeking to obtain additional financing to cover required closing costs and escrow deposits that would need to be made to complete the transaction. By late June 2007, Colonial, the Seller, had agreed to finance the remaining portion of the amount necessary to close the transaction. Under that arrangement, Colonial would agree to take back a $14 million note from First Republic that was secured by an irrevocable letter of credit from a third party with the other essential terms of the financing arrangement in place. Colonial had previously agreed to accept a $2 million irrevocable letter of credit from First Republic as a non-refundable deposit on the transaction.

41.    Stern told Steven Alevy that he had received a commitment from Citigroup to provide the senior and mezzanine financing for the transaction and that the seller had agreed to finance the remaining portion of the transaction. Stern provided a copy of the Citigroup commitment letter to Steven Alevy. Upon learning these facts, Steven Alevy attempted to persuade Stern that First Republic should forego the opportunity to obtain financing from Citigroup because Bankers Capital could obtain greater financing and at a lower interest then what Citigroup was proposing. Steven Alevy also told Stern that First Republic should reject the financing offer by the seller and should instead use Steven Alevy and his family to finance the remaining portion of the financing. On at least two occasions, Steven Alevy

14

attempted to persuade Stern to use him for this additional financing, telling him that they would do lots of deals in the future and Stern would become a "billionaire."

42.    On June 28, 2007, First Republic closed on two loans from Citigroup in the total sum of $131,150,000, which consisted of a $116,150,000 senior loan and a $15,000,000 mezzanine loan. Prior to the closing, Steven Alevy called and emailed Stern to wish him "good luck."

43.    Prior to First Republic's July 12, 2007 closing with Colonial, Citigroup reduced the amount of the loan by approximately $4.5 million because Stern was able to negotiate a reduction in the Colonial purchase price for that same amount. Prior to the July 12, 2007 closing, Stern told Steven Alevy that he had been successful in negotiating a reduction in the purchase price with Colonial, but that Citigroup had reduced the amount of the loan by the same amount. Steven Alevy had been encouraging Stern to obtain an even larger purchase price reduction from Colonial.

44.    Just as the Citigroup loan closing was ending in the early morning hours of June 29, Stern received a telephone call from Steven Alevy saying that he was just around the block and asking Stern if they could meet. Steven Alevy came to the law offices of Latham & Watkins (where the closing was held) at approximately 2:30 a.m. and begged Stern to finance the remainder of the transaction with Steven Alevy and his family instead of with the seller. To that end, Steven Alevy proposed a financing transaction whereby an Allan Alevy-related affiliate would provide First Republic with $13 million of financing in exchange for the Alevy entity receiving a 50% equity and voting interest in the entity owning the properties plus a 12% annual preferred return. The financing proposal was intended to keep their foot in the door and put themselves in a position where, at the very last minute, they could unilaterally decide to pull their

offer, leaving Stern and First Republic with the impossible choice of either walking away from the transaction and losing their nonrefundable $3 million deposit/obligation or acceding to unreasonable conditions that the Alevys and Allen Sragow unilaterally imposed upon them.

45.    Stern and First Republic did not agree to accept the proposal made by Steven Alevy on June 29. Nonetheless, in order to induce Stern and First Republic into accepting their proposal and foregoing other financing opportunities, Allen Alevy and Allen Sragow caused an Allen Alevy-affiliate to wire $13 million to Land Title Associates, the Escrow Agent for the Colonial transaction.

46.    Believing that Steven Alevy had worked tirelessly for months trying to find financing for First Republic's transaction and induced by Steven Alevy's repeated promises of doing future deals with Stern and making Stern a billionaire, Stern agreed to continue to work with Steven Alevy to pursue the additional financing from Long Beach that needed to be secured to close the Colonial transaction and did not attempt to finalize the seller financing that was in place. To further induce Stern to enter into the transaction with the Alevy family, on or about July 2, Steven Alevy told Stern that with the money that the two of them would make together, they would be able to donate significant funds to charity and send children to study in Jewish institutions in Israel.

47.    On July 2, Steven Alevy emailed Stern a "Letter of Understanding," which was non-binding and subject to certain conditions, none of which was ever fulfilled.' The Letter of Understanding states that "Westland Industries," an entity that neither Stern nor First Republic had ever heard of, and which was controlled by Steven Alevy's family, would provide $13,000,000 for a 50% equity and voting interest and a 12% annual preferred return payable on a monthly basis. The Letter of Understanding further states that the "Parties agree to work in good

faith to finalize these agreements within 7 days" and "[u]ntil such agreements are finalized, 100%
of the equity and voting interest . . . shall be held in escrow for the benefit of Westland." In
addition, the Letter of Understanding states that "[a]ny disagreements or misunderstandings shall
be brought to Stephen Friedman, Esq. for resolution." Steven Friedman  had only been working
with Stern since in or about May 2007, but he had also represented and been a friend of the Alevy
family for fifteen years.  At this time, Steven Friedman was also serving as the Alevy family's
attorney on a transaction involving a project in New York. Finally, the Letter of Understanding
contains signature lines for Mark Stern on behalf of First Republic and Steven Alevy on behalf of
Westland Industries (which was never signed by Steven Alevy), and stated that the offer was open
until the close of business on June 29[th] – four days before the offer had actually been transmitted
to First Republic.  In early July 2007, Stern, then believing he would be able to obtain financing
from the Alevy family and related affiliates, informed Colonial that First Republic no longer
needed to obtain seller financing.

      48.     Michael Libraty, an attorney at Sragow's firm who also maintains an email
address at one of Allen Alevy's company servers, acting at Sragow's direction, then sent Stern's
counsel drafts of a proposed partnership agreement to sign.  Consistent with everything Stern had
advised Steven Alevy from the outset of the broker relationship, Stern refused to sign those
partnership agreements because Stern was not looking to take on a financial partner for the
transaction.

      49.     On July 3, 2007, Colonial threatened to terminate the Contract.  Stern
informed Steven Alevy of Colonial's position and, that same day, Steven Alevy, in breach of his
fiduciary duties to Stern and First Republic, but in furtherance of the fraudulent scheme, passed
this information to Allan Alevy, Allen Sragow and others who schemed how best to take

advantage of Colonial's threat to terminate the Contract and First Republic's dire need for financing.

50.    On Friday July 6, Allen Alevy sent Stern's counsel an email stating that he no longer wished to go forward with the Letter of Understanding writing: "Please take notice: We are not extending our commitment." In his email, Allen Alevy made it clear that if the parties were ever to arrive at an agreement "[i]t must be clearly understood that this is a loan, not a capital contribution. First Republic and Mark Stern will be the only debtors on the Citibank loan." In summarizing the breakdown of the capital account for the transaction, Allen Alevy referred to the transaction as a "Westland Loan" of $13 million.

51.    As a sophisticated real estate businessman, Allen Alevy did not want the transaction to be characterized as a capital contribution because doing so would have obligated himself and his company to execute a recourse guaranty in connection with the Citigroup loans.

52.    Then, on July 11, after learning that the funds received from Citigroup had been disbursed to Colonial, but that further funds were needed to close the transaction with Colonial and pay related closing costs and escrow deposits, Steven Alevy called Stern and told him that "Long Beach" was suddenly unhappy with Stern's financials and his alleged litigious nature and did not want to go forward with the financing. These were the same financials that Steven Alevy had requested in May and which he had been purportedly using to obtain financing from lenders on First Republic's behalf and which he had disclosed to "Long Beach" without Stern's knowledge or permission and in breach of his fiduciary duty to Stern and First Republic.

53.    Armed with the knowledge that Stern had foregone all other financing opportunities in total reliance upon Steven Alevy's assurances that the Alevy family would finance the remaining amount necessary to close the transaction, and aware, at that time, Stern did

not have the ability to raise sufficient liquid funds to close the transaction with Colonial, Allen Alevy and Allen Sragow made unreasonable and coercive last minute demands that First Republic and Stern enter into new agreements that would transfer control of the properties to them or entities controlled by them if Stern did not repay the amounts to be advanced to First Republic within 60 days. These documents were never executed by all parties and neither Stern nor First Republic ever agreed to the conditions that the Allen Alevy and Allen Sragow sought to impose.

54.    On July 12, 2007, Steven Alevy provided oral instructions to the escrow agent to release the $13 million that was being held in escrow. Based on those instructions, the $13 million was released and First Republic closed the Colonial transaction. Bankers Capital assisted Stern and First Republic in preparing the sources and uses documentation for the Colonial transaction, was provided with numerous drafts of the closing statements for the Colonial transaction, and was well aware as to whom the proceeds of the Citigroup loans and the $13 million advanced by the Alevy family were distributed.

55.    The next day, on July 13, Steven Alevy confirmed his oral instructions in writing. However, neither the Escrow Agent nor Steven Alevy were aware that Allen Alevy and Allen Sragow were making further unreasonable and coercive demands of Stern and First Republic, including the demand that they sign an assignment of the Properties from First Republic to a new entity established by the Allen Alevy and Allen Sragow. Allen Alevy and Allen Sragow, not realizing that the funds had already been released to First Republic, stated that they would not enter into the agreement with Stern and First Republic or release the funds in escrow unless all of their demands were met.

56.    On July 16, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the

agreements they were demanding, they did not agree to the release of the $13 million. Sragow added that if the funds were released, they should be retrieved until all of their demands were met.

57.    On July 16, 2007, Allen Sragow emailed the escrow agent and Stern's lawyer and stated that because all of their demands were not met and they had not received all the documents they were demanding, Allen Alevy and Allen Sragow did not agree to the release of the $13 million. Allen Sragow added that if the funds were released, they should be retrieved until all of their demands were met. Because the escrowed funds had already been used to close the Colonial transaction, there was no way to retrieve the released funds. Stern and First Republic did not and would not agree to Allen Alevy and Allen Sragow's demands.

58.    Allen Sragow then sent a letter to Land Title and First Republic's counsel, Stephen Friedman, restating that the escrowed funds were released without receiving the authorization of Allen Alevy or Allen Sragow. Allen Sragow made it clear that the parties had not finalized an agreement because "[n]ot all documents were executed and returned. The agreed upon conditions were not fulfilled." Confirming the lack of an agreement, Allen Sragow offered to "ratify the disbursement" if First Republic and Stern would "execute" new documents, including a reassignment agreement, mutual release and other "modified" agreements. Stern and First Republic did not agree to Allen Sragow's proposal and did not execute those documents.

**The Alevys and Allen Sragow Interfere With First Republic's**
**Operation of the Properties and Attempts to Refinance**

59.    As described above, Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan. Subsequent to the closing with Colonial, Stern and First Republic immediately looked to secure refinancing so that they could take out the financing provided by the Alevy family and

return the funds that Allen Alevy and Allen Sragow contended had been mistakenly released to First Republic by the escrow agent notwithstanding the clear and explicit approval for the release given by Steven Alevy.

60.    Shortly after the July 12, 2007 closing, Stern met with Steven Friedman and Steven Alevy. Steven Alevy was aware that Citigroup had agreed to waive the lock-out period for the first sixty days after closing so that First Republic could refinance the mezzanine portion of its loan and was interested in working as Stern and First Republic's broker to obtain that refinancing. Steven Alevy told Stern that he was the only son in his family, that his father considered him to be the black sheep of the family and that his father put him in charge of family operations in New York. Steven Alevy asked Stern for forgiveness and apologized for the way that he and his family treated Stern during the transaction. Steven Alevy told Stern that the road to hell is often paved with good intentions and that while his intentions were good, he failed to represent him properly as Stern and First Republic's broker. Steven Alevy told Stern that he would act to get him out of his arrangement with Allan Alevy and Allen Sragow and offered to help Stern and First Republic refinance the Properties.

61.    Based on Steven Alevy's promises and assurances, Stern and First Republic once again engaged Steven Alevy, Robert Friedman and Bankers Capital to assist them in obtaining financing and refinancing of the Properties so that the $13 million advanced to First Republic per Steven Alevy's instructions could be repaid. As part of their supposed effort to obtain financing and refinancing after the closing, Steven Alevy and Robert Friedman represented that they were in the process of preparing a "79 page book," which they would use to persuade lenders to refinance the Properties.

62.     In late July 2007, Steven Alevy and Robert Friedman, taking instruction directly from Allen Alevy and Allen Sragow, demanded that Stern provide them with additional information, such as the final Citigroup loan documents and closing statements, leases and rent rolls of the tenants at the Properties, and pictures of the Properties, in order for Steven Alevy, Robert Friedman and Bankers Capital to obtain financing and refinancing. In response and relying upon the brokerage relationship with Steven Alevy, Robert Friedman and Bankers Capital, Stern and First Republic provided them with additional sensitive, confidential and proprietary information about the Properties.

63.     Despite agreeing to work diligently to seek refinancing on First Republic's behalf as their broker, Steven Alevy and Robert Friedman did not make any attempt to do so and instead took every opportunity to prevent Stern and First Republic from obtaining refinancing in furtherance of the scheme to obtain control over the Properties.

64.     Still believing that Steven Alevy, Robert Friedman and Bankers Capital were working diligently to locate refinancing for First Republic solely as its broker, Stern sent them all of the information that he had received concerning the Properties. However, all of the information that Stern was providing to Steven Alevy and Robert Friedman was improperly being forwarded to Allen Alevy and Allen Sragow. For example, on September 10, 2007, Robert Friedman forwarded a confidential email from Stern to Allen Alevy and Allen Sragow, which was cced to Steven Alevy, concerning the refinancing that Steven Alevy, Robert Friedman and Bankers Capital were supposedly working on. Sragow then suggested that Friedman probe Stern for further information as to the timing of the refinancing ("Why not respond: 'Timeframe? I thought you wanted to refinance out Alevy in 60 days?'"), which Friedman did.

65.    Steven Alevy, Robert Friedman and Bankers Capital were unable to secure refinancing for First Republic's mezzanine loan during the sixty day period following closing. While on the one hand, Steven Alevy, Robert Friedman and Bankers were unsuccessful in their efforts to obtain refinancing for the Properties, Allen Alevy and others were, on the other hand, falsely asserting to prospective tenants and to Jones Lang LaSalle, the property manager for the Properties, that they were the owners of the Properties. For example, sometime in late July 2007 or August 2007, unbeknownst to Stern and First Republic, Yanki Greenspan, President of Amusement Industry, Inc. and some of his associates showed up at the two largest properties (Staunton and Decatur) with a camera, began taking pictures of the malls and told tenants and the property managers of the two malls that they were the new owners of the malls. After Stern and First Republic were notified of these intrusions, Greenspan and his associates were removed from the malls.

66.    Defendants also wrongfully accused Stern and First Republic of "stealing" the $13 million that they verbally authorized for release, later confirmed in writing, and publicized that accusation to the business and lending community, making it impossible for Stern and First Republic to refinance the Properties. For example, sometime in late July or August 2007, Allan Alevy contacted the Seller's counsel, the Seller's CFO and another high ranking officer of the Seller and told them that Stern and First Republic had perpetrated a fraud and that Allan Alevy and his related affiliates were the new owners of the Properties.

67.    The Alevys and Allen Sragow subsequently caused the companies that advanced the $13 million to First Republic to sue Stern and First Republic in federal court in New York claiming, among other things, ownership of the Properties and accusing Stern and First Republic of stealing their money and other falsehoods.

68.    Finally, in two states where the filing of a lawsuit is not a necessary condition precedent to file a lis pendens and where the lis pendens statutes were most favorable to them, the Alevys and Allen Sragow caused the entities that advanced the $13 million to First Republic to improperly file lis pendens on the Properties in an attempt to cause First Republic to default on the loans and guaranties and prevent it from securing refinancing. As a result of their efforts, Citigroup has asserted to Stern and First Republic that the filing of such lis pendens is an event of default under the loans and has accelerated the entire amount of the loans. Citigroup has also informed Stern that it has the right to demand payment from him under the guaranty.

*    *    *

69.    In sum, as a result of the fraudulent scheme described above, Stern and First Republic were (i) fraudulently induced into accepting the $13 million financing provided by the Alevy family and related affiliates; (ii) prevented from obtaining more favorable financing from other lending sources; and (iii) prevented from refinancing the Properties. Additionally, Citigroup has asserted that First Republic is in default of its loans. Defendants' tortious conduct damages the value of the Properties and Stern's interest in First Republic. Steven Alevy and Bankers Capital are liable for all such damages.

## AS AND FOR A FIRST CAUSE OF ACTION

### For Fraud Against Steven Alevy and Bankers Capital

70.    Stern and First Republic repeat and reallege paragraphs 1 through 69 of this pleading as if fully set forth herein.

71.    Robert Friedman and Steven Alevy individually and on behalf of Bankers Capital repeatedly represented to Stern and First Republic that they were actively working to obtain financing for First Republic's transaction with Colonial. Robert Friedman and Steven

Alevy failed to disclose that they were working on behalf of the Alevy family and Allen Sragow to sabotage First Republic's purchase of the Properties so that the Alevy family and related affiliates could purchase the Properties.

72.    The false representations of fact and concealment of material facts induced Stern and First Republic to, among other things, employ Robert Friedman, Steven Alevy and Bankers Capital as their mortgage brokers, appoint them as their exclusive brokers for a number of lenders with whom they were previously seeking financing, provide them with confidential and proprietary information, cease negotiating with lenders and other brokers with respect to the Colonial transaction and the post-closing refinancing of the transaction, and enter into negotiations with Allen Alevy and Allen Sragow to finance a portion of the Colonial transaction.

73.    In late June and July 2007, after Steven Friedman, on behalf of Stern and First Republic, entered into discussions with Allen Alevy and Allen Sragow regarding financing for the Colonial transaction, Allen Alevy and Allen Sragow concealed the fact that they had been receiving Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic.

74.    After the July 12, 2007 closing, Allen Alevy and Allen Sragow concealed the fact that they continued to receive Stern and First Republic's confidential and proprietary information from Steven Alevy and Robert Friedman and had been discussing with them ways to wrest control of the Properties from Stern and First Republic. As part of their fraudulent plan, Allen Alevy and Allen Sragow directly and through other third parties under their control, falsely represented to the Seller, to Jones Lang Lasalle, the property manager for the Properties, and to

tenants of the Properties that they and companies that they controlled were the owners of the Properties.

75.    Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to. among other things, cease negotiating with other potential lending sources, including the seller. with respect to the Colonial transaction. and enter into negotiations with the Alevy family and related affiliates to finance the Colonial transaction. Furthermore, subsequent to the July 12, 2007 closing, Allen Alevy's and Allen Sragow's concealment of material facts induced Stern and First Republic to. among other things, cease negotiating with other potential lending sources to obtain refinancing for the Properties.

76.    Stern and First Republic reasonably relied to their detriment on the truthfulness of these representations.  Steven Alevy and Bankers Capital knew or should have known that Stern and First Republic would rely on their representations when made.  Had Stern and First Republic known that the Steven Alevy and Bankers Capital were acting fraudulently to sabotage First Republic's purchase of the Properties, they would have sought and obtained financing and refinancing from other sources and would not have accepted financing from the Alevy family and related affiliates.

77.    The misrepresentations of material fact and failure to disclose material facts were made intentionally or recklessly for the purpose of sabotaging First Republic's transaction with Colonial and were made with complete or reckless disregard as to their truthfulness.

78.    Steven Alevy and Bankers Capital acted with scienter in that they knew or recklessly disregarded the material falsity and misleading nature of the statements made to Stern and First Republic.

79.    As a direct and proximate result of the fraudulent acts described above, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial arising from First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by these tortious acts.

80.    The actions described above were willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and were in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SECOND CAUSE OF ACTION

### For Breach of Fiduciary Duty Against Steven Alevy and Bankers Capital

81.    Stern and First Republic repeat and reallege paragraphs 1 through 80 of this pleading as if fully set forth herein.

82.    As First Republic's mortgage broker, Steven Alevy and Bankers Capital owed fiduciary duties to Stern and First Republic, including an undivided fiduciary duty of loyalty, the duty to work for their interests, the duty not to provide Stern and First Republic's confidential and proprietary information to others without their permission, the duty to avoid conflicts of interest and the duty to perform the work in a competent manner.

83.    Steven Alevy and Bankers Capital breached their fiduciary duties to Stern and First Republic by, among other things, providing Stern and First Republic's confidential and proprietary information to the Alevy family and Allen Sragow without Stern and First Republic's

permission, failing to assist and, in fact, trying to sabotage First Republic's efforts to obtain financing and refinancing and by inducing Stern and First Republic to enter into a transaction with the Alevy family and related affiliates.

84.     In breaching their fiduciary duties to Stern and First Republic, Steven Alevy and Bankers Capital acted adversely to the interests of Stern and First Republic and for their own personal interests and those of the Alevy family and Allen Sragow.

85.     As a direct and proximate result of Steven Alevy and Bankers Capital's breaches of fiduciary duty described above, Stern and First Republic seek: (i) rescission of any agreement that they may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

## AS AND FOR A THIRD CAUSE OF ACTION

### For Breach of Contract Against Bankers Capital and Steven Alevy

86.     Stern and First Republic repeat and reallege paragraphs 1 through 85 of this pleading as if fully set forth herein.

87.     Stern and First Republic on the one hand and Robert Friedman, Steven Alevy and Bankers Capital on the other hand entered into a brokerage agreement in May 2007. Pursuant to that agreement, Robert Friedman, Steven Alevy and Bankers Capital were obligated to attempt in good faith to obtain financing on Stern and First Republic's behalf in connection

with the Colonial transaction and to protect Stern and First Republic's confidential and proprietary information that they received as Stern and First Republic's broker.

88.     Bankers Capital and Steven Alevy materially breached the contractual obligations by. among other things, (a) failing to try to obtain financing and refinancing on Stern and First Republic's behalf in connection with the Colonial transaction, (b) meeting with lenders to obtain financing for the Colonial transaction on behalf of the Alevy family and related affiliates, and (c) providing Stern and First Republic's confidential and proprietary to the Allen Alevy, Allen Sragow and others without Stern or First Republic's permission.

89.     Stern and First Republic substantially performed their obligations under the brokerage agreement with Robert Friedman. Steven Alevy and Bankers Capital.

90.     As a direct and proximate result of Steven Alevy and Bankers Capital's breaches of contract. Stern and First Republic seek: (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

### For Aiding and Abetting Fraud Against Steven Alevy and Bankers Capital

91.     Stern and First Republic repeat and reallege paragraphs 1 through 90 of this pleading as if fully set forth herein.

92.    Steven Alevy and Bankers Capital knew that Allan Alevy, Robert Friedman and Allen Sragow had committed fraud by, among other things, failing to disclose to Stern and First Republic that, along with the Alevy family and Allen Sragow, they were all actively working to sabotage Stern and First Republic's financing for the transaction with Colonial so that the Alevy family and related affiliates could acquire the Properties in their own right.

93.    Steven Alevy and Bankers Capital aided and abetted the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting their fraud in connection with the Colonial transaction. At the direction of Allen Alevy and Allen Sragow, Steven Alevy and Robert Friedman concealed the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that Steven Alevy, Robert Friedman and Bankers Capital had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which those individuals used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

94.    Steven Alevy and Bankers Capital's aiding and abetting of Allen Alevy, Robert Friedman and Allen Sragow's fraud proximately caused damages to Stern and First Republic in that, absent their aiding and abetting the fraud, Stern and First Republic would not have engaged Steven Alevy, Robert Friedman and Bankers Capital as their broker, would not have entered into negotiations with the Alevy family to finance the Colonial transaction and would not have agreed to engage Steven Alevy, Robert Friedman and Bankers Capital to refinance the Colonial transaction.

95.     By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the fraud committed by Allen Alevy, Robert Friedman and Allen Sragow, Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from their inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

96.     Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

### AS AND FOR A FIFTH CAUSE OF ACTION

**Against Steven Alevy and Bankers Capital for Aiding and Abetting Breach**

**of Fiduciary Duty**

97.     Stern and First Republic repeat and reallege paragraphs 1 through 96 of this pleading as if fully set forth herein.

98.     Steven Alevy and Bankers Capital knew that Allen Alevy, Robert Friedman and Allen Sragow were breaching their fiduciary duties to Stern and First Republic by, among other things, receiving Stern and First Republic's confidential and proprietary information without their permission, sabotaging Stern and First Republic's efforts to obtain financing and refinancing and by inducing Stern and First Republic to enter into a transaction with Allen Alevy and his related entities.

99.    Steven Alevy and Bankers Capital aided and abetted the breaches of fiduciary duty committed by Allen Alevy. Robert Friedman and Allen Sragow by, among other things, knowingly and substantially assisting in the breaches of fiduciary duties in connection with the Colonial transaction. Allen Alevy and Allen Sragow directed Steven Alevy and Robert Friedman to conceal the fact that they were acting in the interests of Allen Alevy and Allen Sragow and that they had misappropriated confidential and proprietary information belonging to Stern and First Republic and passed that information onto Allen Alevy and Allen Sragow, which Allen Alevy and Allen Sragow used in connection with their attempt to wrest control of the Properties from Stern and First Republic.

100.    Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy. Robert Friedman and Allen Sragow caused damages to Stern and First Republic in that, absent their aiding and abetting the breach of such fiduciary duties, Stern and First Republic would not have engaged Steven Alevy. Robert Friedman and Bankers Capital as their broker, would not entered into negotiations with the Alevy family and related entities to finance the Colonial transaction and would not have engaged Steven Alevy. Robert Friedman and Bankers Capital to secure refinancing for the Colonial transaction.

101.    By reason of Steven Alevy's and Bankers Capital's aiding and abetting of the breaches of fiduciary duties committed by Allen Alevy. Robert Friedman and Allen Sragow. Stern and First Republic seek: (i) rescission of any agreement that Stern and First Republic may have entered into with the Alevy family and related affiliates with respect to the $13 million of funds advanced to Stern and First Republic; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value

of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts.

102.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

### For Misappropriation of Stern's and First Republic's Trade Secrets

103.    Stern and First Republic repeat and reallege paragraphs 1 through 102 of this pleading as if fully set forth herein.

104.    Stern and First Republic's proprietary and confidential information concerning the Properties constitutes trade secrets under New York common law.

105.    Bankers Capital and Steven Alevy conspired and did in fact misappropriate Stern's and First Republic's proprietary and confidential information and lied to Stern and First Republic about their intended use of that information. The actions of Steven Alevy and Bankers Capital constitute improper, willful and malicious "misappropriation" of trade secrets under New York common law.

106.    As a direct consequence of the improper, willful and malicious misappropriation of trade secrets by Steven Alevy and Bankers Capital, Stern and First Republic have been damaged in an amount to be determined at trial but believed to exceed $65,000,000.

107.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree

of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern
and First Republic are therefore entitled to an award of punitive and exemplary damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION

#### For Tortious Interference With Prospective Business Relations

108.    Stern and First Republic repeat and reallege paragraphs 1 through 107 of
this pleading as if fully set forth herein.

109.    Pursuant to its contract with Colonial, First Republic became the lawful
and legal owner of the Properties, and, as the lawful owner of the Properties, was entitled to
exploit its economic interest in those Properties free from interference by any other third parties.

110.    Steven Alevy and Bankers Capital were at all times aware that, following
the July 12, 2007 closing, First Republic was the lawful owner of the Properties.

111.    Notwithstanding their knowledge that First Republic was the lawful owner
of the Properties, Steven Alevy and Bankers Capital intentionally and tortiously interfered with
First Republic's ownership of those properties by, among other things, claiming to the Seller or
causing other third parties under their control to claim, to tenants and the Property Manager of
the Properties that Allen Alevy and related affiliates were the lawful and legal owner of the
properties.

112.    Steven Alevy and Bankers Capital's intentional and willful interference
has caused and induced prospective lenders to deny financing to Stern and First Republic in
connection with the Properties, has caused  tenants to cancel their leases and has caused
Citigroup to assert that First Republic is in default of the loan agreements and to inform Stern
that it has the right to demand payment of the Guaranteed Recourse Obligations of Borrower
from Stern.

113.    As a direct and proximate result of the foregoing, Stern and First Republic have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

114.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and deliberate, and demonstrated a complete absence of care and attention to duty and a high degree of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern and First Republic are therefore entitled to an award of punitive and exemplary damages.

115.    Moreover, as a direct and proximate result of the foregoing, Stern and First Republic are threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from contacting the Seller, tenants and the Property Manager of the Properties and interfering with Stern and First Republic's lawful ownership and management of the Properties.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### For Tortious Interference With Contract

116.    Stern and First Republic repeat and reallege paragraphs 1 through 115 of this pleading as if fully set forth herein.

117.    First Republic and Citigroup entered into two loan agreements in July 2007 pursuant to which Citigroup loaned First Republic $126,150,000 in connection with First Republic's acquisition of the Properties. In addition, Stern provided Citigroup with a guaranty of recourse obligations of First Republic.

118.    Steven Alevy and Bankers Capital were, at all times aware, of First Republic's loan agreements with Citigroup and Stern's guaranty of recourse obligations.

119.    Steven Alevy and Bankers Capital tortiously interfered with the loan agreements between First Republic and Citigroup and Stern's guaranty by, among other things,

conspiring and or aiding and abetting the actions of Allen Alevy and Allen Sragow to improperly
file lis pendens against the Properties, which has caused Citigroup to assert that the loans are in
default and inform Stern that it has the right to demand that Stern make payment of the
Guaranteed Recourse Obligations of the Borrower.

120.    As a direct and proximate result of the foregoing, Stern and First Republic
have been damaged in an amount to be proven at trial, but believed to exceed $65,000,000.

121.    Steven Alevy and Bankers Capital's conduct was willful, knowing, and
deliberate, and demonstrated a complete absence of care and attention to duty and a high degree
of moral culpability, and was in conscious disregard of Stern and First Republic's rights. Stern
and First Republic are therefore entitled to an award of punitive and exemplary damages.

122.    Moreover, as a direct and proximate result of the foregoing, Stern and First
Republic are threatened with immediate and irreparable additional loss and damage, and will
continue to be so threatened unless Steven Alevy and Bankers Capital are enjoined from
interfering with Stern's and First Republic's relationship with Citigroup.

## AS AND FOR A NINTH CAUSE OF ACTION

### For Declaratory Relief

123.    Stern and First Republic repeat and reallege paragraphs 1 through 122 of
this pleading as if fully set forth herein.

124.    An actual, justiciable controversy exists between Stern and First Republic
and Steven Alevy and Bankers Capital within the meaning of CPLR 3001.

125.    A dispute exists between Stern and First Republic on the one hand and
Steven Alevy and Bankers Capital on the other hand as to whether Stern and First Republic and

the Alevy family and related affiliates entered into an agreement in connection with the Colonial transaction.

126.    Stern and First Republic contend that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that there was no binding agreement with respect to the $13 million of financing received from the Alevy family or related affiliates.

127.    Steven Alevy and Bankers Capital contend that the $13 million of financing provided by the Alevy family and related affiliates was either an equity contribution to the entity owning the Properties or that it was a loan which, if not repaid within 60 days, permitted the Alevy family and related affiliates to obtain 100% control of the Properties.

128.    Stern and First Republic seek a declaratory judgment that they were either fraudulently induced to accept $13 million of financing from the Alevy family and related affiliates or that no binding agreement was entered into with the Alevy family and related affiliates and that they be permitted to rescind any transaction and return the $13 million, without interest, to such individuals and/or entities.

WHEREFORE, Stern and First Republic demand judgment as follows:

A.    on the first cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, plus punitive damages, together with prejudgment interest and costs;

B.      on the second cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

C.      on the third cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their breaches of contract, together with prejudgment interest and costs;

D.      on the fourth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to the $13 million of funds advanced to them; (ii) compensatory damages in an amount to be proven at trial arising from Stern and First Republic's inability to refinance the Properties and (iii) compensatory damages in an amount to be proven at trial arising from the loss in the value of the Properties and the loss in the value of Stern's interest in First Republic caused by their tortious acts, together with prejudgment interest and costs;

E.      on the fifth cause of action, (i) rescission of any agreement that Stern or First Republic may have entered into with the Alevy family or related affiliates with respect to

the $13 million of funds advanced to them: (ii) compensatory damages in an amount to be proven

at trial arising from Stern and First Republic's inability to refinance the Properties and (iii)

compensatory damages in an amount to be proven at trial arising from the loss in the value of the

Properties and the loss in the value of Stern's interest in First Republic caused by their tortious

acts, together with prejudgment interest and costs;

          F.    on the sixth cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, together with punitive damages,

prejudgment interest and costs, and an injunction preventing Steven Alevy and Bankers Capital

from contacting tenants and the Property Manager of the Properties and interfering with Stern

and First Republic's ownership and management of the Properties;

          G.    on the seventh cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital

from contacting and interfering with prospective lenders and tenants of First Republic;

          H.    on the eighth cause of action, compensatory damages in an amount to be

determined at trial but believed to exceed $65,000,000, plus punitive damages, together with

prejudgment interest and costs; and an injunction preventing Steven Alevy and Bankers Capital

from interfering with Stern and First Republic's relationship with Citigroup;

          I.    on the ninth cause of action, a declaration that Stern and First Republic

were either fraudulently induced to accept $13 million of financing from the Alevy family or

related affiliates or that no binding agreement was entered into with them and that Stern and First

Republic be permitted to rescind any transaction and return the $13 million, without interest, to

them;

J.      awarding to Stern and First Republic pre-and post-judgment interest, the

costs and disbursements of this action, and attorneys' fees as authorized by law; and

K.      granting to each of Stern and First Republic such other and further relief as

the Court may deem to be just and proper.

Dated:   New York, New York
         June 11, 2008

                                        KAYE SCHOLER LLP

                                        By: /s/ Michael A. Lynn
                                        Arthur Brown (AB-0627)
                                        Michael Lynn (ML-6052)
                                        Efrem Schwalb (ES-5288)
                                        KAYE SCHOLER LLP
                                        425 Park Avenue
                                        New York, New York 10022
                                        Tel: (212) 836-8000
                                        Fax: (212) 836-8689
                                        Email: mlynn@kayescholer.com


                                        Stephen R. Stern (SS-5665)
                                        HOFFINGER STERN & ROSS LLP
                                        150 East 58th Street
                                        New York, New York 10155
                                        Tel: (212) 421-4000
                                        Fax: (212) 750-1259
                                        Email: srstern@hsrlaw.com

                                        *Attorneys for Mark Stern and First
                                        Republic Group Realty LLC*

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FIRST REPUBLIC GROUP REALTY LLC :    Index No. 601743/08
and FRGR MANAGING MEMBER LLC, :
                                :
                Plaintiffs, :
                                :
       -against- :
                                  :
CITIGROUP GLOBAL MARKETS REALTY : 
CORP., :
                                  :
                Defendant. :

**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR
A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, New York 10022
(212) 319-8500

-and-

REISS EISENPRESS LLP
425 Madison Avenue, 11th Floor
New York, New York 10017
(212) 753-2424 x109

Attorneys for Plaintiffs,
First Republic Group Realty LLC
and FRGR Managing Member LLC

June 11, 2008

SL1 824153v1/103664.00001

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................2

II. STATEMENT OF FACTS..........................................................3

III. ARGUMENT...........................................................................3

   A.  Plaintiffs Satisfy the Requirements for Injunctive Relief. ..........................3

   B.  Plaintiffs Will Suffer Irreparable Harm If A Preliminary
      Injunction Is Not Granted. ...............................................................3

      (i)  Plaintiffs May Have No Remedy for Citi's Acts Other Than
         Injunctive Relief. ...............................................................4

      (ii)  Damage to Plaintiffs' Goodwill, Business Reputation, And
         Creditworthiness Is Causing Irreparable Harm. .......................5

      (iii)  Loss of Control Over Plaintiffs' Business Will Cause Irreparable
         Harm. ................................................................................7

   C.  Plaintiffs Are Likely To Succeed On The Merits. .................................8

      (i)  A Lis Pendens Is Not a Lien; If It Is, the Default Letters Were
         Served Prematurely. ...........................................................9

         (a)  A Lis Pendens Is Not a Lien. ......................................9

         (b)  The May 7 Default Letters Were Served Prematurely. ......14

      (ii)  Plaintiffs Have Not Entered Into a Major Lease Without Citi's
         Consent; If Citi is Deemed to Have Withheld Consent, Its
         Failure to Consent is Unreasonable. .....................................14

         (a)  Plaintiffs Have Not Entered Into a Major Lease Without
            Citi's Consent. ........................................................14

         (b)  If Citi is Deemed to Have Withheld Consent to the
            Mr. Sandman Lease, Its Failure to Consent is
            Unreasonable. .........................................................15

      (iii)  Borrower Did Not Make Misrepresentations In The Loan
         Documents; And If Any Representations Are Deemed Incorrect,
         They Are Immaterial. ..........................................................16

      (iv)  The May 7 and May 15 Defaults Letters Were Mailed to the
         Wrong Address, Rendering Service Ineffective. ........................18

   D.  A Balancing Of The Equities Favors The Grant Of A
      Preliminary Injunction. ...................................................................19

IV. CONCLUSION.......................................................................21

ST.1 824153v1/103664.00001

Plaintiffs First Republic Group Realty LLC ("First Republic") and FRGR Managing Member LLC (the "Manager" or "FRGR"; together with First Republic, the "Plaintiffs"), by their counsel, Stevens & Lee, P.C., and Reiss Eisenpress LLP, respectfully submit this memorandum of law in support of their application for a temporary restraining order and a preliminary injunction enjoining defendant Citigroup Global Markets Realty Corp. ("Citi" or "Defendant"), its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons acting in concert with Citi, from acting in furtherance of three default notices issued and served improperly by Citi, and notices of sale scheduling a public auction of Citi's collateral for June 17, 2008, which threatens irreversibly to transfer control of Plaintiffs' businesses to satisfy Plaintiffs' $126 million debt to Citi on a fully-performing loan.

## I.  INTRODUCTION

Citi threatens to act pursuant to improperly-issued and improperly-served Default Notices[1] to sell on June 17, 2008, FRGR's 100% limited liability membership interest in First Republic, irreparably injuring Plaintiffs' businesses, assets and investments without any determination of the merits of Citi's claims.  Moreover, premised on these alleged defaults, Citi so far has withheld reimbursement of expenses totaling $161,000 required under the loan documents.  This mandates granting the injunctive relief sought, and time is of the essence.

Citi will suffer no injury or prejudice if the Plaintiffs are granted injunctive relief. Plaintiffs have fully performed their financial obligations under the Loan Agreement and the Mezz, so Citi's financial interests are not in jeopardy.  Because Plaintiffs will continue to perform their financial obligations, any delay incidental to an injunction which maintains the

---

[1]    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Complaint, a copy of which is attached as Exhibit O to the Affidavit of Mark Stern in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary Injunction (the "Stern Aff.")

2

*status quo* pending discovery and trial on the merits will not prejudice Citi. Even assuming

technical defaults — and Plaintiffs prove below that they have not breached *any* provision of the

Loan Agreement or the Mezz, technical or financial — the technical breaches that Citi alleges do

not adversely affect the value of the collateral which Citi proposes to sell out from Plaintiffs in

less than one week. The balance of equities clearly tilts in Plaintiff's favor, mandating the

issuance of the injunctive relief sought.

## II.    STATEMENT OF FACTS

The relevant facts are set forth at length in the accompanying Affidavit of Mark

Stern in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction (the "Stern Aff."), which is incorporated herein as if set forth at length.

## III.   ARGUMENT

### A.   Plaintiffs Satisfy the Requirements for Injunctive Relief.

It is well settled that to be entitled to a temporary preliminary injunction, plaintiffs

must show a likelihood of success on the merits, danger of irreparable injury in the absence of an

injunction, and a balance of the equities in their favor. *Aetna Ins. Co. v. Capasso*, 75 N.Y. 2d

860, 862, 552 N.Y.S. 2d 918 (1990) *W. T. Grant Co. v. Srogi*, 52 N.Y. 2d 496, 517, 438 N.Y.S.

2d 761 (1981); *Gerald Modell, Inc. v. Morgenthau*, 764 N.Y.S. 2d 779, 783-84 (2d Dep't 2003).

Plaintiff satisfies each of these requirements.

### B.   Plaintiffs Will Suffer Irreparable Harm If A Preliminary Injunction Is Not Granted.

Section 6301 of the CPLR provides in relevant part that "[a] temporary restraining

order may be granted pending a hearing for preliminary injunction where it appears that

immediate and irreparable injury, loss or damage will result unless defendant is restrained before

the hearing can be had." CPLR § 6301. A preliminary injunction is a provisional remedy

3

designed to maintain the status quo during the pendency of the action. *Gerald Modell*, 764 N.Y.S. 2d at 783-84 ("the purpose of this provisional remedy is not to determine the ultimate rights of the parties, but to maintain the status quo until there can be a full hearing on the merits").

In construing what is irreparable harm, the single most important prerequisite for the issuance of a preliminary injunction, *see Bell & Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983), courts commonly observe that it is injury for which a monetary award cannot adequately compensate. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 73 (2d Cir. 1979) (per curiam); *see Vanderminden v. Vanderminden*, 226 A.D. 2d 1037, 1041, 641 N.Y.S. 2d 732 (3d Dep't 1996) (observing that "money damages is not a harm which is irreparable).

### (i) Plaintiffs May Have No Remedy for Citi's Acts Other Than Injunctive Relief.

Under the peculiar circumstances of this case, irreparable harm is manifest, for money damages may not be available.

Sections 10.13 of the Loan Agreement and the Mezz provide that Plaintiffs' sole remedies for any claims that Citi has acted unreasonably or delayed in acting shall be limited to commencing an action for injunctive relief or declaratory judgment. The language appears to limit Plaintiffs' remedies for Citi's acts, however egregious, to injunctive relief and declaratory judgment.[2] Thus, Plaintiffs' need for injunctive relief is crucial to prevent further injury to Plaintiffs' assets, business, reputation and creditworthiness. It may be Plaintiffs' sole recourse.

---

[2]     Plaintiffs reserve their rights to seek monetary damages if those provisions of the Loan Agreement and the Mezz prove unenforceable or inapplicable. Stern Aff. ¶63.

4

Because Citi may contend that Plaintiffs cannot obtain monetary damages as recompense for Citi's improper issuance of the Default Letters and its threatened sale of collateral, any harm which Plaintiffs suffer may be irreparable without injunctive relief.

### (ii) Damage to Plaintiffs' Goodwill, Business Reputation, And Creditworthiness Is Causing Irreparable Harm.

By publishing Notices of Sale of all eleven Shopping Centers in local newspapers, Citi has indisputably harmed Plaintiffs' business reputation, goodwill and creditworthiness. As set forth in the accompanying Affidavit of Mark Stern, as a result of the publication of the Notices of Sale, local managers have asked the Plaintiffs if the Shopping Centers are shutting down, and the press is making the same inquiries. Account representatives and mall managers from Jones Lang LaSalle America's, Inc., the managers of all eleven Shopping Centers, have been forwarding copies of the published Notices of Sale to the Manager and asking what it all means. The concern underlying their inquiries is apparent, an understandable reaction to the public dissemination of news that control of the Shopping Centers which employ them may be involuntarily transferred. It can reasonably be assumed that by now, all of the Shopping Centers' tenants have seen the ads and are aware of their implications. But the natural implication — that Plaintiffs are in financial distress — is wrong, as finances have absolutely nothing to do with the purely technical defaults which Citi has alleged, especially in the face of Plaintiffs' timely performance of all financial obligations under the Loan Agreement and the Mezz. Stern Aff. ¶63.

Irreparable injury exists where, as here, the Plaintiffs' business is in immediate danger of injury, loss or damage to its good will, business reputation or creditworthiness. A loss of good will is sufficient to constitute irreparable harm. For example, in *Brintec Corp. v. Akzo, N.V.*, 129 A.D. 2d 447, 448, 514 N.Y.S. 2d 18 (1st Dep't 1987), the court recognized that, absent

5

an injunction, "the good will of plaintiff's business would suffer irreparable harm." Similarly, in

*Hay Group, Inc. v. Nadel*, 170 A.D. 2d 398, 399, 566 N.Y.S. 2d 616 (1st Dep't 1991), the First

Department held that a threat to a business's good will is enough to establish irreparable injury

warranting a preliminary injunction "without the necessity of showing actual loss of customers."

*See also People by Abrams v. Anderson*, 137 A.D. 2d 259, 529 N.Y.S. 2d 917 (4th Dep't 1988),

wherein it was held that a plaintiff seeking a preliminary injunction should not be required to

suffer further economic harm by a loss of good will and patronage during the pendency of the

action. *Accord, Social Spirits, Inc. v. Town of Colonie*, 70 A.D. 2d, 1036, 418 N.Y.S. 2d 227

(3d Dep't 1979); *Alside Div. of Associated Materials Inc. v. Leclair*, 295 A.D. 2d 873, 874, 743

N.Y.S. 2d 898 (3d Dep't 2002) ("a dilution of the good will [a company] has developed" suffices

to constitute irreparable harm for injunction purposes).

Moreover, potential damage to Plaintiffs' business reputation constitutes

irreparable harm for purposes of injunctive relief. In *Klein, Wagner & Morris v. Lawrence A.*

*Klein, P.C.*, 186 A.D. 2d 631, 588 N.Y.S. 2d 424 (2d Dep't 1992), the Second Department found

that a threat to a party's reputation will constitute irreparable harm:

> The second element of proof required for a preliminary injunction
> is that irreparable injury will occur if the relief is denied.
> Irreparable injury in this context means any injury for which
> money damages are insufficient [citation omitted]. The plaintiffs
> contend that the appellants' use of the name Lawrence A. Klein
> would ... affect the plaintiffs' reputation with clients, potential
> clients, and the legal community. We find that these claims are of
> the type which could constitute irreparable harm.

186 A.D. 2d at 633. *See also Forty-Seventh-Fifth Comp. v. Nektalov*, 225 A.D. 2d 343,

638 N.Y.S. 2d 625 (1st Dep't 1996).

Similarly, In *Rottkamp v. Wulforst Farms, LLC*, 17 Misc. 3d 382, 388,

844 N.Y.S. 2d 600 (Sup. Ct. Suffolk Co. 2007), the court found that "the potential damage to a

business reputation is a sufficient basis to establish irreparable injury." Moreover, the court

recognized that damage to business reputation and good will can be difficult or impossible to

quantify. *Id.; see also Konishi v. Lin*, 88 A.D. 2d 905, 450 N.Y.S. 2d 585 (2d Dep't 1982)

(damage to business reputation is enough to establish irreparable injury). The "threat to goodwill

and creditworthiness is sufficient to establish irreparable injury warranting the granting of

injunctive relief." *Four Times Square Assoc., L.L.C. v. Cigna Invs., Inc.*, 306 A.D. 2d 4, 6,

764 N.Y.S. 2d 1, (1st Dep't 2003).

      Finally, the court should evince "a sensitivity to the possibility of irreparable

harm to ... reputation resulting from unfounded accusations." *Anonymous v. Bureau of*

*Professional Med. Conduct*, 309 A.D. 2d 44, 49, 764 N.Y.S. 2d 247 (1st Dep't 2003).

      As shown in the accompanying Affidavit of Mark Stern, Plaintiffs' assets and

business, good will, business reputation, and creditworthiness are in immediate danger as a direct

result of Citi's publication of the Notice of Sale in local newspapers and Citi's other actions.

This constitutes irreparable harm under New York law, which must be enjoined.

(iii) <b>Loss of Control Over Plaintiffs' Business Will Cause<br>Irreparable Harm.</b>

      Citi has given notice of its intention to sell at public auction on June 17, 2008 all

of the Manager's right, title and 100% interest in First Republic. Simply put, if Citi is not

enjoined, the Plaintiffs will lose complete control over their business. This harm is indisputably

irreparable. *See, e.g., Suchodolski Assocs. Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, *4

(S.D.N.Y. Dec. 10, 2003) (holding that the dilution of a party's stake in, or a party's loss of

control over, a business constitutes irreparable harm), *citing Street v. Vitti*, 685 F. Supp. 379, 384

(S.D.N.Y. 1988) (finding irreparable harm where forced sale of plaintiffs' shares would "destroy

their voice in management"); *Clark v. Pattern Analysis and Recognition Corp.*, 87 Misc. 2d 385,

7

384 N.Y.S. 2d 660, 661 (Sup. Ct. Oneida Co. 1976) (finding "no question" that plaintiffs would be irreparably harmed because "they would lose their status as shareholders"); *Rebell v. Muscat*, 26 A.D. 2d 685, 272 N.Y.S. 2d 478, 480 (2d Dep't 1966) (finding "undeniable probability of irreparable harm" where plaintiffs' shares would be diluted); *see also Vanderminden v. Vanderminden*, 226 A.D. 2d at 1041 (holding shift in balance of power or loss of management control over business to be irreparable); *Mr. Natural, Inc. v. Unadulterated Food Prods., Inc.*, 152 A.D. 2d 729, 730, 544 N.Y.S. 2d 182 (2d Dep't 1989) (holding loss of control of business or suffering dissolution to be irreparable); *CanWest Global Comm. Corp. v. Mirkaei Tikshoret Limited*, 9 Misc. 3d 845, 872, 804 N.Y.S. 2d 549 (Sup. Ct. N.Y. Co. 2005) (holding right to participate in management of business to be irreparable); *cf. Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (right to continue a business "is not measurable entirely in monetary terms").

As these cases make clear, the harm caused by the forced loss of control over one's business, whether through the shifting of control to co-management or the absolute ceding of control to a third party, is by definition irreparable. Plaintiffs' control over its business is in immediate danger if Citi proceeds with its auction sale scheduled for June 17, 2008. This irreparable harm must be enjoined.

### C. Plaintiffs Are Likely To Succeed On The Merits.

Plaintiffs are very likely to succeed on the merits because Plaintiffs are not in Default of the Loan Agreement or the Mezz. The explanation is straightforward:

- Under applicable state law, the various Lis Pendens do not constitute Liens, and even if they are Liens, the Default Letters were served prematurely;

- Plaintiffs have not entered into a Major Lease without the consent of Citi in violation the Loan Agreement and the Mezz, and even if Citi is deemed to have withheld consent, its failure to consent is unreasonable;

8

- Plaintiffs did not make misrepresentations in the loan documents, and even if any representations are deemed incorrect, they are not material; and

- The Default Letters dated May 7 and May 15, 2008, were not mailed to Plaintiffs' correct address, and thus not validly served.

### (i) A Lis Pendens Is Not a Lien; If It Is, the Default Letters Were Served Prematurely.

#### (a) A Lis Pendens Is Not a Lien.

Section 1 of the Loan Agreement defines "Lien" as follows[3]:

> "Lien" shall mean, with respect to each Individual Property, any mortgage, deed, of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer, of, on or affecting Borrower, an Individual Property, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

Thus, if there was no lien created, there was no violation of Section 5.2.1 of the Loan Agreement, and therefore, no Event of Default under Section 8.1(a)(xiii) of the Loan Agreement and their analogs under the Mezz.

The Governing Law section of the Loan Agreement (Section 10.3(a)) provides specifically that the law of the situs of the property will govern as "with respect to the creation, perfection, priority and enforcement of the liens and security interests created by the Loan Agreement." As shown below, under the law of the situs of the various filed Lis Pendens, a lis pendens is not a lien or encumbrance. Therefore, there is no lien created by reason of the Lis Pendens. Accordingly, no Event of Default under either the Loan Agreement or the Mezz has occurred. Citi's claim is baseless.

---

[3]    The definition of "Lien" in the Loan Agreement and the Mezz are substantially the same. See Stern Aff. Exs A and B.

9

In Georgia, "[a] lis pendens is not a lien on the property." *Dime Say. Bank of New York, FSB v. Sandy Springs Assoc., Inc.*, 261 Ga. 485, 486, 405 S.E. 2d 491, 493 (Ga. 1991). "A lis pendens simply gives notice to prospective purchasers that a lawsuit involving the realty has been filed. It does not prevent the sale of the property, nor is it a lien on the property." *Aiken v. Citizens & Southern Bank of Cobb County*, 249 Ga. 481, 482, 291 S.E. 2d 717, 719 (Ga. 1982) *cert. denied*, 459 U.S. 973, 103 S. Ct. 307, 74 L. Ed. 2d 287 (1982) *citing Lankford v. Milhollin*, 203 Ga. 491, 47 S.E. 2d 70 (1948).

Likewise, in Alabama, "[t]he sole purpose of a lis pendens notice is to afford notice to a bona fide purchaser who might purchase the property during the pendency of the action." *Ex parte State Dept. of Revenue*, 886 So. 2d 817, 821 (Ala. Civ. App. 2003), *citing Scott v. Hales*, 575 So. 2d 1058, 1060 (Ala. 1991); *Batson v. Etheridge*, 239 Ala. 535, 195 So. 873 (1940). "The purpose of the lis pendens record is to afford purchasers a method of protecting themselves against existing claims." *Matter of Yuan*, 178 B.R. 273, 274 (Bankr. N.D. Ala. 1995), citing *Batson v. Etheridge*, 239 Ala. 535, 195 So. 873 (1940).

In North Carolina, a lis pendens "is a statutory device by which the world is put on notice that an order of attachment has been issued with respect to certain real property owned by a party against whom a monetary judgment is sought." *In re Medlin*, 229 B.R. 353, 358 (Bankr. E.D.N.C. 1998) (*quoting Edwards v. Brown's Cabinets and Millwork, Inc.*, 305 S.E. 2d 765 (N.C. Ct. App. 1983)). A lis pendens notice "fixes the priority of the lien that arises when the order of attachment is subsequently perfected by judgment and levy." *Medlin*, 229 B.R. at 358. But only after judgment and levy is a lien on real property created; then, the lien on real property will relate back to the time when the notice of lis pendens was docketed. N.C. Gen. Stat. 1-440.33(b)(1).

10

> The sole object of lis pendens is to keep the subject in controversy within the power of the court until final decree and to make it possible for courts to execute their judgments. It gives notice of a claim of which otherwise a prospective purchaser would be ignorant. All property which is the subject matter of suit under the doctrine of lis pendens is res litigiosa and is in custodia legis.

*Massachusetts Bonding & Insurance Co. v. Knox*, 18 S.E. 2d 436, 438-39 (N.C. 1942). The North Carolina code provides for three situations in which notice of lis pendens may be utilized. See N.C. Gen. Stat. § 1-116(a). The three situations are: "(1) Actions affecting title to real property; (2) Actions to foreclose any mortgage or deed of trust or to enforce any lien on real property; and (3) Actions in which any order of attachment is issued and real property is attached." *Id.; see Gilley v. Shoffner*, 345 F. Supp. 2d 563, 565 (M.D.N.C. 2004); *Zinn v. Walker*, 87 N.C. App. 325, 361 S.E. 2d 314 (1987) (finding that a real estate developer who entered into an offer to purchase agreement held only a contractual interest in the resale profits and could not file a notice of lis pendens). If the plaintiffs complaint fails to assert a claim falling within the scope of actions contemplated by NCGS § 1-116(a), then the court may cancel the notice of lis pendens on a motion by the owner of the land without final resolution of the plaintiffs complaint.

Under South Carolina law, a party may file a notice of lis pendens in an action affecting title to real property. *See* S.C. Code. Ann. §15-11-10 (2005). From the time of its filing, a notice of lis pendens:

> shall be constructive notice to a purchaser or encumbrancer of the property affected thereby, and every person whose conveyance or encumbrance is subsequently executed or subsequently recorded shall be deemed a subsequent purchaser or encumbrancer and shall be bound by all proceedings taken after the filing of such notice to the same extent as if he were made a party to the action.

*Id.* § 15-11-20.

11

In South Carolina, "[t]he lis pendens mechanism is not designed to aid either side in a dispute between private parties. Rather, lis pendens is designed primarily to protect unidentified third parties by alerting prospective purchasers of property as to what is already on public record, i.e., the fact of a suit involving property." *BidZirk, LLC v. Smith*, Civ. No. 6:06-0109, 2007 WL 1377576, at *2 (D.S.C. May 07, 2007). Thus, a lis pendens simply notifies potential purchasers that there is pending litigation that may affect their title to real property and that the purchaser will take subject to the judgment, without granting any substantive rights. *Id.*

Under Virginia law, a lis pendens is not effective to create a lien on real property. *Green Hill Corp. v. Kim*, 842 F.2d 742, 744 (4th Cir. 1988). Such a filing simply puts potential purchasers of real property on notice about pending litigation and provides a warning to look carefully at the property's title. *Geris v. Piedmont Federal Corp.*, Civ. No. 93-836-A, 1994 WL 603198, *1 (E.D. Va. April 14, 1994). In Virginia "a lis pendens neither creates or enforces a lien but serves as notice of a claim to the property." *Dworsky v. Cohen*, No. CH-03-677-1, 2003 WL 22521434, *1 (Va. Cir. Ct. July 14, 2003) (*citing* 12A MICHIE'S JURISPRUDENCE OF VIRGINIA AND WEST VIRGINIA, Lis Pendens §2 at 452 (2002)). A memorandum of lis pendens is merely a notice to third parties that a claim has been asserted. *Garza v. Zanville*, No. 99981, 1988 WL 619325, *1 (Va. Cir. Ct. August 30, 1988) (*citing Bray v. Landgren*, 1616 Va. 699 (1934)). It is not a seizure, nor does it alone create a lien on property. It is merely a warning to others that rights which they may acquire will be subject to any valid judgment entered in the pending suit. *Id.* at 713.

The view that a lis pendens does not, by itself, create a lien on real property is widespread, if not universal. Certainly New York courts consistently hold that the filing of a lis

12

pendens is merely a method of giving notice and does not create a lien. *In re Perasin*, 364 B.R. 868, 872 (N.D.N.Y. 2006), *citing In re American Motor Club, Inc.*, 109 B.R. 595, 597 (Barth. E.D.N.Y. 1990) ("A notice of pendency ... does not create a lien or encumbrance on the property. It merely allows the plaintiff to prosecute its lawsuit to the execution of a judgment by putting the world on constructive notice that the property is the subject of a pending lawsuit."); *Simon v. Vanderveer*, 155 N.Y. 377, 382, 49 N.E. 1043 (1898) ("The lis pendens is merely notice of some claim made in respect of the property ... [and] it does not of itself create an incumbrance apart from the equity on which the action is founded.'"); *Finkelman v. Wood*, 203 A.D. 2d 236, 609 N.Y.S. 2d 655, 656 (1994) ("[N]otice[s] of pendency ... have as their general object the preservation of existing property rights and do not affect the merits of those interests."); *Schoepp v. State*, 69 A.D. 2d 917, 415 N.Y.S. 2d 276, 277 (1979) ("The lis pendens does not create an encumbrance or a lien ... [I]t merely provides notice that an action is pending which may affect title to real property."); *see also Palatine Nat'l Bank of Palatine, Illinois v. Strom (In re Strom)*, 97 B.R. 532, 535-36, n.9 (Bankr. D. Minn. 1989), *aff'd*, 921 F.2d 836 (8th Cir. 1991) (noting that, under Minnesota law, "the sole function of a lis pendens is to give notice of the pendency of an action (citations omitted) ... The filing of a notice of lis pendens does not create a lien on property."); *Sierra v. Santana (In re Sierra)*, 79 B.R. 89, 91 (Bankr. S.D. Fla. 1987) ("Under Florida law, the recording of a Notice of Lis Pendens serves as notice of the pendency of an action relating to the property described in the notice ... There is no indication ... that the filing and recording of a lis pendens constitutes a lien ..."); *David. Leonard Associates, P.C. v. Airport-81 Nursing Care (In re Airport-81 Nursing Care)*, 32 B.R. 960, 964 (Bankr. M.D. Tenn. 1983) (noting that under Tennessee law, "filing a notice of lien lis pendens ... does not in and of itself create a lien. Such a filing is merely a procedural step"); *Title Guar. and Ins. Co. v. Campbell*,

13

106 N.M. 272, 277, 742 P.2d 8, 13 (Ct. App. 1987) (in New Mexico, "a notice of lis pendens provides constructive notice to subsequent purchasers and encumbrances of litigation affecting the title to real property" ... [A] notice of lis pendens is "not effective in itself to create a lien").

Thus, in accordance with the law of the situs of each filed Lis Pendens, the several Lis Pendens do not constitute a Lien. The Plaintiffs are therefore not in default, and the May 7 Default Letters should be deemed null and void.

### (b) The May 7 Default Letters Were Served Prematurely.

Even if the Lis Pendens were deemed liens under the law of the situs of each Shopping Center, the Loan Agreement and the Mezz do not permit Citi to declare a default until the passage of at least thirty days after the Borrower received actual notice of the filing of the Lis Pendens against each Shopping Center. Stern Aff. ¶21; Loan Agreement, §8.1(a)(xiii). In fact, as set forth more fully in the Stern Affidavit, Plaintiffs first received actual notice of the filing of the various Lis Pendens only when they received the May 7 Default Letters. Stern Aff. ¶¶13-14. Thus, the May 7 Default Letters were premature, as they were served prior to the expiration of the thirty-day notice period mandated by the Loan Agreement and the Mezz.

Because the May 7 Default Letters were prematurely issued, they should be deemed null and void.

### (ii) Plaintiffs Have Not Entered Into a Major Lease Without Citi's Consent; If Citi is Deemed to Have Withheld Consent, Its Failure to Consent is Unreasonable.

### (a) Plaintiffs Have Not Entered Into a Major Lease Without Citi's Consent.

Plaintiffs have established that they have not entered into a Major Lease without Citi's consent. The relevant facts are as follows: The McGehee Center was one of the centers financed by Citi under the Loan Agreement. Stern Aff. ¶28. At the time of the loan closing, the

14

anchor store premises had been vacant for more than five years. *Id.* at ¶29. Following the closing, First Republic and its agents actively sought an anchor tenant for McGehee Center, which is in a depressed area and is located across the street from another shopping center that had vacant stores. *Id.* Throughout this process, Citi and First Republic maintained regular communications, both oral and written, regarding First Republic's effort to find a new tenant for the anchor store. Plainly, Citi supported the effort. *Id.* at ¶¶30-31. In its normal course of operations, and in accordance with the terms of the Loan Agreement, First Republic regularly forwarded letters of intent and spreadsheets with lease summaries to Citi, which then signified its approval of new leases, both orally and in writing. *Id.* Before entering into the Mr. Sandman Lease, Plaintiffs sent the McGehee Center letter of intent to Citi. *Id.* at ¶30.

Despite its many chances to raise an issue or disapprove of the Mr. Sandman Lease, until May 15, 2008, Citi never once refused approval in any form, and referred to the Mr. Sandman Lease as "good news". *Id.* at ¶31. The fact remains that Citi representatives signified Citi's approval of the Mr. Sandman Lease, both orally and in writing, having urged Plaintiffs to enter into the Mr. Sandman Lease and having insisted on promptly receiving a copy of the executed lease.

**(b) If Citi is Deemed to Have Withheld Consent to the Mr. Sandman Lease, Its Failure to Consent is Unreasonable.**

Even if Citi is deemed to have refused to consent to the Mr. Sandman Lease, Citi's refusal was unreasonable and this action is the appropriate remedy under Loan Agreement and the Mezz. Sections 10.13 of the Loan Agreement and the Mezz provide that Borrower's sole remedies under the agreements for any claims or adjudication that Lender or its agents have acted unreasonably or delayed in acting, shall be limited to commencing an action seeking injunctive relief or declaratory judgment. Citi was aware that the McGehee Center was located

15

in a depressed area, across the street from another shopping center that had vacant stores, and Citi was aware that the addition of an anchor tenant was critical to the success of the McGehee Center. Because Citi wholly supported and indeed encouraged First Republic's entry into the Mr. Sandman Lease, if this Court finds that Citi did not formally approve it as a Major Lease, Citi's withholding of clear written approval was unreasonable.

Moreover, while reserving its rights, Plaintiffs advised Citi that Mr. Sandman had agreed to return its Lease. Plaintiffs then requested that Citi approve a new lease with Mr. Sandman on identical terms. Citi has unreasonably failed to respond to Plaintiffs' request.

Finally, Mr. Sandman has agreed to nullify its lease, curing any alleged default in its entirety.

Therefore, no Event of Default under either the Loan Agreement or the Mezz occurred. The May 15 Default Letters were improperly issued and should be deemed null and void.

### (iii) Borrower Did Not Make Misrepresentations In The Loan Documents; And If Any Representations Are Deemed Incorrect, They Are Immaterial.

Citi's June 3 Default Letters are based on circumstances surrounding the signature of Joshua Safrin's name on certain loan documents. While the specific default alleged is vague, Citi appears to have hedged its bet by contending that (i) Safrin's signatures are forged; (ii) Safrin's name was signed by an unauthorized agent, or (iii) Safrin's name was signed by an authorized agent.[4] Apparently, Citi contends that each of these three scenarios would have created a default under the Loan Agreement and the Mezz.

---

[4]    Notably, Safrin does not allege that Plaintiffs participated in the alleged forgery.

16

No judicial determination has been made that Safrin's signatures are forged, and Plaintiffs deny the allegations of forgery. The signatures in question were either Safrin's or those of his authorized agent, and all allegations of forgery will be denied by First Republic and other third-party defendants on the record when they timely answer Safrin's third-party complaint in the District Court Litigation. Stern Aff. ¶¶45-46. There is simply no evidence of forgery on which to base issuance of the Default Letters.

As for Citi's suggestion that Safrin's signature was executed by an unauthorized agent, there is also no evidence on which to base issuance of the Default Letters. Signature by an unauthorized agent would not necessarily give rise to a default under the Loan Agreement and Mezz, however, because unlike an outright forgery, an unauthorized agent with apparent authority binds his principal. *Hallock v. State*, 474 N.E. 2d 1178, 1182 (N.Y. 1984). With or without authority, the capacity to bind would render true the Borrower's representation under Section 4.1.2 of the Loan Agreement that the Loan Documents had been duly-executed and were binding and enforceable. And such unauthorized but binding agency would fall outside the scope of a default under Section 8.1(a)(v) of the Loan Agreement, for that section requires a representation that is "false or misleading in any material respect." The signature of an unauthorized agent with capacity to bind, while arguably "false or misleading" as to identity, would be immaterial, because his principal would be bound.

Least availing of Citi's claims is the suggestion that a default would arise from the signature of Safrin's name by an authorized agent. Plainly, such a scenario would fall outside of the scope of the default provisions of the Loan Agreement; the signature would be neither false nor misleading, and Safrin would be bound. Under well settled New York law, no cause of action arises in favor of one unaware that a signature is that of an authorized agent, not his

17

principal. *See Thompson v. New York Trust Co.*, 266 A.D. 384 (N.Y. Sup. Ct. 1943)

(dismissing a complaint against a decedent's attorney-in-fact who, despite authorization, had

failed to disclose his agency and was accused of committing forgery); *see also Young v. Perry*,

42 A.D. 247 (N.Y. Sup. Ct. 1899) (observing in a corporate context that "while it is the

preferable way for an agent in executing any instrument in the name of the principal to add his

own name as agent, so that the instrument may show by what person the signature was written,

still in law the writing of the name of the principal alone is sufficient. It is competent and proper

also for the agent to sign simply the principal's name."); *Van Norden v. Rosenberg*, 62 Misc. 285

(NY Sup. Ct. 1909) (same).

      Without proof of forgery, no Event of Default under either the Loan Agreement or

the Mezz arose from the circumstances of Safrin's signatures. The June 3 Default Letters were

improperly issued and should be deemed null and void.

      **(iv)  The May 7 and May 15 Defaults Letters Were Mailed to**
          **The Wrong Address, Rendering Service Ineffective.**

      Even assuming that the Lis Pendens were "Liens" within the meaning of the Loan

Agreement and the Mezz, and assuming further that Citi properly withheld its consent to the

Sandman Lease, the May 7 and May 15 Default Letters were ineffective for the most simple and

indisputable of reasons: they were misaddressed.

      Sections 10.6 of the Loan Agreement and the Mezz supply the mailing addresses

for service of "all notices or written communications hereunder ..." The mailing address for

Borrower is the following:

18

If to Borrower:    First Republic Group Realty LLC
                   [FRGR Managing Member LLC)
                   c/o First Republic Group
                   241 Fifth Avenue
                   New York, New York 10018

                   Attention: Mark Stern and Joshua Safrin
                   Facsimile No.: (646) 219-6529

In fact, both the May 7 and May 15 Default Letters were mailed to the Plaintiffs at 214 Fifth Avenue, not 241 Fifth Avenue. Because service did not comply with requirements of the Loan Agreement and the Mezz, these Default Letters were ineffective for any purpose. *Regency Towers LLC v. Landou*, 807 N.Y.S. 2d 863, 865 (2006) (where notice of termination of lease in landlord/ holdover tenant proceeding was sent to incorrect apartment number, proceeding must be dismissed).

That actual notice might eventually have been received by Plaintiffs does not remedy Citi's failure to comply with the express service requirements.

> [N]otice is a matter of due process, not getting lucky, and "[w]hen the requirements for service of process have not been met, it is irrelevant that defendant may have actually received the documents."

*Regency Towers LLC*, 807 N.Y.S. 2d at 865, *citing Raschel v. Rish*, 69 N.Y. 2d 694, 697 (1986).

Therefore, because the May 7 and May 15 Default Letters were misaddressed, the Default Letters should be deemed null and void.

### D. A Balancing Of The Equities Favors The Grant Of A Preliminary Injunction.

The balancing of the equities weighs heavily in Plaintiffs' favor. Citi does not and cannot allege any financial default. These are fully-performing loans, timely and fully paid. Citi alleges only straw-man technical violations, violations which the Plaintiffs forcibly deny and indeed disprove in these motion papers. Even if the technical defaults were true, they would not

19

jeopardize the value of the Shopping Centers or Citi's collateral or disprove the satisfactory performance of the debt-service by the Plaintiffs.

Absent injunctive relief, Citi's acts pursuant to the improper Default Notices and Citi's sale scheduled for June 17, 2008 of FRGR's 100% limited liability membership interest in First Republic will cause irreparable injury to Plaintiffs' businesses, assets and investments without any determination of the merits of Citi's claims. So too will Citi's ongoing withholding of reimbursement of expenses required under the loan documents cause irreparable injury. This mandates granting the injunctive relief sought. *See 136 East 64th Street Tenants Assoc. v. Bloom*, 86 A.D. 2d 808, 809, 452 N.Y.S. 2d 578, 580 (1st Dep't 1982) (maintaining *status quo* until unresolved issues could be determined at trial); *Schweizer v. Town of Smithtown*, 19 A.D. 3d 682, 682, 798 N.Y.S. 2d 99, 100 (2d Dep't 2005) (the purpose of a preliminary injunction is to maintain the status quo pending determination of the action).

Time is of the essence to grant Plaintiffs' relief.

On the other hand, Citi will suffer no injury or prejudice if the Plaintiffs are granted the injunctions they seek. Plaintiffs have fully performed their financial obligations under the Loan Agreement and the Mezz, so Citi's financial interests are not in jeopardy. Because Plaintiffs have fully-performed their financial obligations and will continue to do so, any delay incidental to maintaining the *status quo* pending discovery and trial on the merits is not prejudicial. Finally, even assuming technical defaults for purposes of argument — and Plaintiffs contend they have *not* breached any provision of the Loan Agreement or the Mezz — the breaches that Citi alleges do not adversely affect the value of the collateral. The balance of equities clearly tilts in Plaintiff's favor. *See Somers Assoc., Inc. v. Corvino*, 156 A.D. 2d 218, 219, 220, 528 N.Y.S. 2d 480, 481 (1st Dep't 1989); *Tanzer Economic Associates, Inc. Profit*

20

SL1 824158v1/103664.00001

*Sharing Plan v. Universal Food Specialties, Inc.*, 87 Misc. 2d 167, 176, 383 N.Y.S. 2d 472, 479 (Sup. Ct. N.Y. Co. 1976) (a grant of injunction should issue if it causes less harm than a denial of the same); *see also Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (a balance of equities tips in the movant's favor where "[appellant's] irreparable harm discussed earlier outweighs any harm that [appellee] might suffer as a result of a preliminary injunction issuing against it").

## IV.   CONCLUSION

For all of the reasons set forth above, the Default Letters are invalid and void. Plaintiffs are entitled to a temporary restraining order and preliminary injunction because they have demonstrated a likelihood of success on the merits, danger of irreparable injury in the absence of an injunction, and a balance of the equities tipping decidedly in their favor.

[remainder of page intentionally left blank]

21

# EXHIBIT C



008528                                    013789
At IAS Part 56 of the
Supreme Court of the State of
New York, held at the County
Courthouse, 60 Centre Street,
New York, New York, on the
12 day of June, 2008

PRESENT: Hon. HON. RICHARD B. LOWE, III _____, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**MOTION SEQUENCE # 001**

FIRST REPUBLIC GROUP REALTY LLC
and FRGR MANAGING MEMBER LLC,

                     Plaintiffs,

-against-

CITIGROUP GLOBAL MARKETS REALTY
CORP.,

                     Defendant.

Index No. 601743/08

**ORDER TO SHOW CAUSE
FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

Upon the annexed Complaint,[1] dated June 11, 2008; the Affidavit of Mark Stern

in Support of Temporary Restraining Order and Preliminary Injunction, sworn to on June 11,

2008 (the "Stern Affidavit"); the Affirmation of Chester B. Salomon in Support of a Temporary

Restraining Order and Preliminary Injunction, dated June 11, 2008; and Plaintiff's Memorandum

of Law in Support of Order to Show Cause for a Temporary Restraining Order and a Preliminary

Injunction; and sufficient cause appearing therefor, it is hereby:

ORDERED that Defendant SHOW CAUSE before this Court, at IAS Part 56

located at the New York County Courthouse, 60 Centre Street, New York, New York, 10007

Courtroom, on the 20th day of June, 2008, at 9:30 a. m., or as soon thereafter as counsel

can be heard, WHY an order should not be issued pursuant to CPLR §§6301, et. seq.:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Complaint.

SLI 822351v1/103664.00001

preliminarily enjoining and restraining Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, from taking any action, direct or indirect, in furtherance of the Notices of Default or Notices of Collateral Sale, as defined in Stern Affidavit; and preliminarily mandatorily enjoining Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, to make all advances and pay all reimbursements required by the loan documents;

and it is further

ORDERED that, sufficient cause having been shown therefor, pending the hearing ~~and determination~~ of Plaintiff's motion for a preliminary injunction:

Defendant, its affiliates, partners, agents, servants, employees, officers, attorneys, and all other persons in active concert or participation with them, shall be temporarily enjoined and restrained from taking any action, direct or indirect, in furtherance of the Notices of Default or Notices of Collateral Sale; and temporarily mandatorily enjoined to make all advances and pay all reimbursements required by the loan documents;

and it is further

ORDERED that service of a copy of this Order to Show Cause and all papers submitted in support thereof, by hand, or upon Defendant or its Counsel on or before _____ m.

on June 12 , 2008, shall be deemed good and sufficient service hereof; and it is further

ORDERED that opposing papers, if any, shall be served by hand upon Plaintiff's counsel by 5 :00 p.m. on June 18, 2008. 17th

ENTER:

HON. RICHARD J. HOLWELL, JR
J.S.C.

ORAL ARGUMENT DIRECTED
HON. RICHARD J. HOLWELL, JR
J.S.C.

Index No.                          Year 2008

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FIRST REPUBLIC GROUP REALTY LLC and FRGR
MANAGING MEMBER LLC,

                              Plaintiffs,

                    - against -

CITIGROUP GLOBAL MARKETS REALTY CORP.,

                              Defendant.

ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION

STEVENS & LEE, P.C.
Attorneys for

485 MADISON AVENUE
NEW YORK, N.Y. 10022
(212) 319-8500

Service of a copy of the within                    is hereby admitted.

Dated:

                         ............................................

                         Attorney(s) for

SL1 525708v1/000000.00000