UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC. dba          :
WESTLAND INDUSTRIES; and PRACTICAL
FINANCE CO., INC.,                    :

          Plaintiffs,          :          07 Civ. 11586 (LAK) (GWG)

   -v.-                             :          REPORT AND
                                   RECOMMENDATION
MOSES STERN, aka MARK STERN; JOSHUA   :
SAFRIN; AVERY EGERT; FIRST REPUBLIC
GROUP REALTY LLC; EPHRAIM FRENKEL;    :
FIRST REPUBLIC GROUP, CORP.;
and LAND TITLE ASSOCIATES ESCROW,     :

          Defendants.          :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Among the many claims in this multi-party case are defendant Avery Egert's "cross-

claims" against third-party defendants Buchanan Ingersoll & Rooney, PC ("BIR") and Stephen

Friedman . See Defendant Avery Egert's Answer to Plaintiffs' Second Amended Complaint,

Affirmative Defenses and Cross-Claims, filed Mar. 22, 2010 (Docket # 384) at 37-41 ¶¶ 145-73

("Egert Cross-Claims").  In his third amended third-party complaint, defendant and third-party

plaintiff Joshua Safrin has also asserted claims against BIR and Friedman.  See Joshua Safrin's

Third Amended Third Party Complaint and Demand for Jury Trial, dated May 7, 2010 (Docket

# 423) ("Safrin Third Am. Third-Party Compl.").  BIR and Friedman have each moved to

dismiss several of Egert's cross-claims, specifically those for: implied indemnification,

fraud/forgery, conspiracy to commit fraud/forgery, breach of duty as agent/negligence, and gross

negligence.[1]  They have also each moved to dismiss certain of Safrin's claims against them,

_____

     [1]See Notice of Motion by Defendant Buchanan Ingersoll & Rooney PC to Dismiss
Defendant Egert's Cross-Claims, filed Apr. 30, 2010 (Docket # 407) ("BIR No. 407 Notice of

specifically the claims for: fraud/forgery, conspiracy to commit fraud/forgery, breach of duty as agent/attorney, and negligence.[2]  We consider both these motions together.  For the reasons stated below, the motions to dismiss Egert's cross-claims should be granted in part and denied in part and the motions to dismiss Safrin's claims should be granted.

I.   BACKGROUND

A.   Claims Brought by Amusement in the Main Complaint

In the main complaint in this action, Amusement Industry, Inc. and Practical Finance

Motion"); Declaration of James J. Maloney, Esq. in Support of Third Party Defendant Buchanan Ingersoll & Rooney PC's Motion to Dismiss Egert's Cross-Claims, filed Apr. 30, 2010 (Docket # 408); Third-Party Defendant Buchanan Ingersoll & Rooney PC's Memorandum of Law in Support of Its Motion to Dismiss Egert's Cross-Claims, filed Apr. 30, 2010 (Docket # 409) ("BIR Mem. No. 409"); Notice of Motion to Dismiss Defendant Egert's Cross-Claims, filed Apr. 30, 2010 (Docket # 410) (joining in BIR Mem. No. 409) ("Friedman No. 410 Notice of Motion"); Memorandum of Law in Opposition to Buchanan Ingersoll & Rooney, PC's and Stephen Friedman's Motion to Dismiss Avery Egert's Cross-Claims, filed May 28, 2010 (Docket # 436) ("Egert Mem. in Opp. No. 436"); Reply Memorandum of Law by Third-Party Defendant Buchanan Ingersoll & Rooney PC in Support of Its Motion to Dismiss Egert's Cross-Claims, filed June 11, 2010 (Docket # 452) ("BIR Reply Mem. No. 452"); Reply Declaration of James J. Maloney, Esq. in Support of Third-Party Defendant Buchanan Ingersoll & Rooney PC's Motion to Dismiss Egert's Cross-Claims, filed June 11, 2010 (Docket # 451).

[2] See Notice of Motion by Third-Party Defendant Buchanan Ingersoll & Rooney PC to Dismiss Safrin's Third Amended Third-Party Complaint, filed May 27, 2010 (Docket # 432) ("BIR No. 432 Notice of Motion"); Declaration of James J. Maloney, Esq. in Support of Third-Party Defendant Buchanan Ingersoll & Rooney PC's Motion to Dismiss Joshua Safrin's Third Amended Third-Party Complaint, filed May 27, 2010 (Docket # 433); Memorandum of Law by Third-Party Defendant Buchanan Ingersoll & Rooney PC in Support of Motion to Dismiss Safrin's Third Amended Third-Party Complaint, filed May 27, 2010 (Docket # 434) ("BIR Mem. No. 434"); Notice of Motion by Stephen Friedman to Dismiss Safrin's Third Amended Third-Party Complaint, filed May 27, 2010 (Docket # 435) (joining in BIR Mem. No. 434) ("Friedman No. 435 Notice of Motion"); Joshua Safrin's Memorandum of Law in Opposition to Buchanan Ingersoll & Rooney's and Stephen Friedman's Motions to Dismiss Safrin's Third Party Claims, filed July 8, 2010 (Docket # 461) ("Safrin Mem. in Opp. No. 461"); Third-Party Defendant Buchanan Ingersoll & Rooney PC's Reply Memorandum of Law in Support of Its Motion to Dismiss Counts One, Two, Four and Five of Defendant Joshua Safrin's Third Amended Third-Party Complaint, filed July 29, 2010 (Docket # 471) ("BIR Reply Mem. No. 471").

Co., Inc. (collectively, "Amusement") have alleged that a number of defendants, including Egert and Safrin, were responsible for the plaintiffs' $13 million loss in a real estate transaction.  See Third Amended Complaint, filed Apr. 27, 2010 (Docket # 405) ("Third Am. Compl.") ¶¶ 1-5.[3] Amusement alleges that in April 2007, First Republic Group, Corp. ("FRG Corp."), controlled by Moses Stern, id. ¶¶ 2, 12-13, entered into a written contract to purchase eleven shopping centers (the "Portfolio") from Colonial Realty Limited Partnership ("Colonial"), id. ¶¶ 2, 20, with a closing date of late June 2007, id. ¶ 2.  First Republic Group LLC ("FRG LLC") was formed on or about June 23, 2007, and at some point after this date but before the date of closing, "FRG Corp. assigned its interest in the purchase contract to FRG LLC."  Id. ¶ 2.

In May 2007, Stern and FRG Corp. arranged for Bankers Capital Realty Advisors ("Bankers Capital") and Friedman – an attorney with BIR who, according to Amusement, represented Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC – to obtain funding for the acquisition.  Id. ¶¶ 21-22, 25.  Friedman approached Amusement with this opportunity and Amusement was "enticed by Friedman's representation that Safrin, a respected New York real estate investor, was supplying much of the equity needed for the acquisition."  Id. ¶ 23.  Steven Alevy, the principal of Bankers Capital, was aware of a representation made by Stern to Friedman on June 7, 2007, that Safrin and Egert "were supplying most of the equity for the acquisition," id. ¶¶ 21, 24, and that "Safrin had expressed his pleasure at participating jointly with the Alevy family in acquiring the Portfolio during a walk on West End Avenue with Steven Alevy in late May or early June of 2007," id. ¶ 24.  Amusement alleges that Friedman had

---

[3] While in some of the briefing for these motions, the parties cite to the second amended complaint, see BIR Mem. No. 409; Egert Mem. in Opp. No. 436 at 1 n.1, Amusement has since filed a third amended complaint and thus all citations herein are to that complaint.

authority to bind Egert and Safrin and that "during one of the conversations between Egert and Steven Alevy that occurred within the two weeks preceding Amusement's transmittal of the $13 million, Egert directed Steven Alevy to negotiate with Friedman for a larger part of the equity in the Portfolio that would come from Safrin's share." Id. ¶ 27. In May or June 2007, Stern and Egert told Steven Alevy that "he" (presumably referring to Stern) and Safrin were "equity participants in the planned acquisition of the Portfolio." Id. ¶ 78(c).

Amusement contends that Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC encouraged Amusement's "sense of urgency" with regard to the transaction by not informing Amusement that Colonial had agreed to delay the closing by 12 days. Id. ¶ 30. On June 29, 2007, Amusement, relying in part on "representations as to the availability of the investment opportunity, the participants in the transaction and Friedman's authority," entered into a letter of understanding with FRG Corp. and/or FRG LLC. Id. ¶ 29. The written letter of understanding, executed by Stern, set forth the proposed terms of Amusement's investment, including that "Amusement would receive a 50% equity and voting interest in the Portfolio, plus a 12% annual preferred return on its investment . . . ." Id. ¶¶ 31, 31(a). Subsequently, on or about June 29, 2007, Amusement wired $13 million into an escrow account with Land Title Associates Escrow ("LTA") at North Fork Bank. Id. ¶¶ 32-33. Amusement consented to this transfer on the understanding that the money was to be released from escrow only if Amusement so instructed. Id. ¶ 34. Additionally, "100% of the equity and voting interest in the Portfolio would be held in escrow for Amusement's benefit" while the parties negotiated the final agreement. Id. ¶ 31(c). Stern, Friedman, LTA, and Ephraim Frenkel, the sole owner of LTA, "acknowledged" the terms of this arrangement. Id. ¶¶ 14, 34.

Between June 29 and July 14, 2007, Amusement attempted to negotiate a final agreement with Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC. Id. ¶ 35. Amusement told Friedman, LTA, and Frenkel that, during these negotiations, the $13 million was not to be released from the escrow account. Id. ¶¶ 35-36. Without Amusement's knowledge or consent, however, the $13 million was transferred on July 3, 2007, from the escrow account into a LTA account at North Fork Bank, owned and controlled by FRG Corp. Id. ¶ 40. Amusement later learned that this account "was not the escrow account FRG Corp. and/or FRG LLC were using for the acquisition from Colonial," but was instead "Frenkel's general escrow account . . . ." Id. ¶ 42. Additionally, during this period, Amusement did not know that FRG Corp. and/or FRG LLC could not perform its obligations under the letter of understanding "because those obligations conflicted with the terms of Citigroup's financing commitment." Id. ¶ 43. While Amusement told Friedman it would not finalize the transaction without first reviewing the documents with Citigroup, neither Stern, Safrin, Egert, FRG Corp., nor FRG LLC provided Amusement with these documents. Id. ¶ 43. This failure on the part of the parties "gave Amusement false confidence that its money was safely in escrow." Id.

In an effort to have Amusement ratify the unauthorized use of the escrow funds, Stern, on behalf of FRG LLC, executed and delivered to Amusement "grant deeds conveying ownership of the individual properties in the Portfolio," and "[a]ssignments of Stern's and Safrin's membership interests in FRG LLC and the underlying LLC ownership structure . . . ." Id. ¶¶ 4, 46(b), 46(c). Pursuant to "an escrow agreement," these items were placed in escrow with Friedman, who had purportedly been representing Stern, Safrin, and FRG Corp. and/or FRG LLC. Id. ¶ 4. Amusement, however, never "accepted . . . these documents and terms for the use

5

of its $13 million."  Id.  Without Amusement's knowledge, and despite the fact that no

agreement had been reached, Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC used the $13

million to close the purchase of the Portfolio on July 12, 2007.  Id. ¶ 49.

      B.    <u>Egert's Cross-Claims</u>

          1.    <u>Factual Allegations Against BIR and Friedman</u>

Egert alleges the following facts in his answer and cross-claims which we presume to be

true on these motions to dismiss.  <u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1

(2002).

Friedman and his former employer, BIR, provided legal services to borrowers and

purchasers on real estate transactions.  Egert Cross-Claims at 32 ¶ 3.  Egert acted as an investor

and/or a broker who located investors for these transactions.  Id.  Joshua Safrin, Egert's father-

in-law, often invested in the transactions.  Id. at 32 ¶ 4.

On or about June 2007, Friedman introduced Egert to Stern in order to offer Egert the

opportunity to assist Stern with financing for the transaction that would later become the

Colonial Transaction.  Id. at 32 ¶¶ 5-6.  Egert thought about the opportunity for several days.  Id.

at 32 ¶ 7.  During this time, Egert sent Friedman documents "bearing signatures represented as

Safrin's" in order for banks and other investors to investigate Safrin as a potential investor.  Id.

at 32 ¶¶ 8-9.  These documents were either "signed or caused to be signed" by Egert.  Id. at 32

¶ 8.  Egert contends that none of these documents bound Safrin to the transaction and that the

documents merely "permitted banks and other investors to investigate Safrin's bona fides as a

potential investor."  Id. at 32 ¶ 9.  On June 19, 2007, Egert sent an email to Friedman

"indicating that Safrin had not signed, and would not sign, any binding agreements relating to

the Colonial Transaction." Id. at 32-33 ¶ 10.  Egert asserts that between June 26 and June 30, 2007, he told Friedman that he did not want to be involved in the Colonial Transaction and "that he would not bring any investors, including Safrin, to that transaction." Id. at 33 ¶ 11.

At some point during the weeks following these events, Friedman arranged a meeting between Steven Alevy and Stern in order to offer Alevy and Bankers Capital the opportunity to invest in the Colonial Transaction. Id. at 33 ¶¶ 13-14.  Egert asserts that during this meeting, or shortly thereafter, "Friedman and/or Stern fraudulently represented to Steven Alevy and Bankers Capital that Egert and/or Safrin were participants in the Colonial Transaction, when in fact Egert was still considering whether he had any interest in that transaction." Id. at 33 ¶ 15.  Friedman and/or Stern also gave this allegedly false information to Allen Alevy, Steven Alevy's father and the principal of Amusement, who then agreed to wire $13 million into an escrow account for use by Stern in the closing of the Colonial Transaction. Id. at 33-34 ¶ 16.  This account was controlled by Frenkel and LTA. Id. at 34 ¶ 16.

During the summer of 2007, The Safrin Group and its principal, Egert, were involved with Steven Alevy and Bankers Capital in two real estate transactions in addition to the Colonial Transaction. Id. at 31, 34 ¶¶ 1, 17.  Steven Alevy and Bankers Capital did not discuss the Colonial Transaction with Egert and/or The Safrin Group during the course of these transactions. Id. at 34 ¶ 17.  In mid-July 2007, the Colonial Transaction closed. Id. at 34 ¶ 18.  While some of the closing documents for this transaction bear Safrin's signature, Safrin contends that these are forgeries. Id. at 34 ¶¶ 19-20.  A handwriting expert hired by Safrin confirmed that Safrin's signature was forged on four of the closing documents. Id. at 34 ¶ 21.  Egert asserts that he did not sign nor provide these four documents for use in the closing, but that they were submitted by

or on behalf of Friedman and/or Stern and without Egert's knowledge. Id. at 34-35 ¶¶ 22-23. Egert states that he had no knowledge of the Colonial Transaction closing or of the "supposed inclusion of Safrin" in this transaction. Id. at 35 ¶ 24.

Egert alleges that Friedman "participated in the creation and presentation of closing documents bearing Safrin's forged signature," and that Friedman, BIR, Stern, Steven Alevy, Bankers Capital, Frenkel, and LTA knew that "Safrin had not authorized the presentation of such documents" and that such documents were forgeries. Id. at 35 ¶¶ 25-27. Egert did not sign the Operating Agreement for JSAE Colonial LLC, "the only document alleged to have been executed in his name in connection with the Colonial Transaction." Id. at 35 ¶ 28. This document was submitted at the closing by Friedman, BIR, Stern, Steven Alevy, Bankers Capital, Frenkel, and LTA without Egert or Safrin's knowledge. Id. at 35 ¶¶ 29-30.

Egert was not copied on the email sent by Friedman on July 13, 2007, stating that the escrow could be released, or on the response by Frenkel and LTA to this email, requesting authorization from Steven Alevy and Allen Sragow, an attorney for Amusement, for the release. Id. at 36 ¶¶ 33-34. Later on during the day of July 13, 2007, Steven Alevy authorized the release of Amusement's funds in an email sent to Friedman and Frenkel; Egert did not receive a copy of this email. Id. at 36 ¶ 36. On or before July 13, 2007, Frenkel and LTA released Amusement's $13 million from escrow, after which Stern converted the funds for his "own purposes with the assistance of Frenkel and LTA." Id. at 36 ¶¶ 37-38.

2.      Egert's Causes of Action Against BIR and Friedman

Egert asserts cross-claims against BIR and Friedman for implied indemnification, Egert Cross-Claims at 37 ¶¶ 145-48, fraud/forgery, id. at 38 ¶¶ 154-58, conspiracy to commit

fraud/forgery, id. at 39 ¶¶ 159-63, breach of duty as agent/negligence, id. at 39-40 ¶¶ 164-66, and gross negligence, id. at 40 ¶¶ 167-70.  Egert asserts that if Amusement sustained any of the damages alleged in its complaint, then such damages were caused by the actions of Friedman, BIR, and the other defendants.  See id. at 37 ¶ 146.  Specifically, Egert alleges that BIR and Friedman's representation that Egert and Safrin were participants in the Colonial Transaction, including BIR and Friedman's use of documents at the closing containing the forged signatures of Egert and Safrin, induced Amusement to lend Stern and FRG Corp. and/or FRG LLC $13 million toward this transaction.  See id. at 38, 39, 40 ¶¶ 156-57, 161-62, 166.  Egert seeks indemnification from Friedman and BIR in the event judgment is entered against him, id. at 37 ¶ 148, and damages in the amount of attorneys' fees, costs, disbursements, and punitive damages, id. at 38, 39, 40 ¶¶ 158, 163, 166, 170.

Egert also asserts a cross-claim against BIR and Friedman for contribution, see id. at 37-38 ¶¶ 149-53 (second cross-claim), but BIR and Friedman have not moved to dismiss this claim, see BIR No. 407 Notice of Motion; Friedman No. 410 Notice of Motion.

    C.    <u>Safrin's Claims</u>

        1.    <u>Factual Allegations Against BIR and Friedman</u>

Safrin's allegations against BIR and Friedman are similar to those asserted by Egert. Safrin alleges that Amusement's claims against him are based on misrepresentations made to Amusement by BIR and Friedman, among others, about Safrin's participation in the Colonial Transaction, see Safrin Third Am. Third-Party Compl. ¶ 6, including the forging of his signature on documents related to the transaction, id. ¶ 9.  Safrin alleges that these misrepresentations were made "with the intent to induce Amusement to provide financing in connection with the Colonial

Transaction," id. ¶ 6, and that he was unaware of the existence of this transaction, id. ¶ 8.

Safrin asserts that he "did not know Egert was contemplating an investment in the Colonial Transaction or that [Egert] had transmitted any of Safrin's personal information or documents to Friedman, [BIR] or anyone else in connection" with the transaction. Id. ¶ 37. Safrin claims that he did not hire Friedman or BIR to represent him and that he did not communicate or suggest to them that they were to act as his agents or to bind him on matters relating to his real estate investments generally, or the Colonial Transaction specifically. Id. ¶ 33.

Safrin alleges that the Citigroup financing was obtained in part based on representations made to the company that Safrin was an investor in this transaction. Id. ¶ 40. Safrin asserts, however, that he never represented to anyone that he would invest in the transaction. Id. ¶ 41. Specifically, Safrin claims that he did not authorize anyone to form the entity known as JSAE Colonial LLC, id. ¶ 44, nor did he authorize Friedman to represent that Friedman would be responsible for obtaining Safrin's signature on any documents for use in the closing of the transaction, id. ¶ 51. Safrin further alleges that he never had a conversation with Steven Alevy regarding the Colonial Transaction. Id. ¶ 59.

Safrin claims that despite the fact that Stern knew that Safrin was not investing in the transaction, Stern represented to Steven Fleissig, an attorney at Herrick Feinstein, that Safrin was participating in the deal and he sent Fleissig documents containing Safrin's signature for use in the closing. Id. ¶¶ 79-80. Safrin alleges that his signature on these documents was forged, id. ¶ 80, and that he never signed any documents relating to the Colonial Transaction, id. ¶ 118, including the JSAE Colonial Operating Agreement, id. ¶ 83. Furthermore, Safrin asserts that

even though Friedman "knew that Safrin and Egert were not participants in the Colonial Transaction," id. ¶ 84, he "took no action to notify Safrin of the forgery or to notify the others involved in the Colonial Transaction that Safrin's signature was a forgery," id. ¶ 85; see id. ¶ 86.

Finally, Safrin states that he did not use the $13 million placed by Amusement into the escrow account, id. ¶ 111. Nor could he use the money because he "had no access to the North Fork Bank account and no authority or control over Stern, FRG Corp. and/or FRG LLC, LTA or Frenkel through which to gain access to the funds." Id. ¶ 112.

2.    <u>Safrin's Causes of Action Against BIR and Friedman</u>

Safrin makes claims against BIR and Friedman for fraud/forgery, id. ¶¶ 134-42, conspiracy to commit fraud/forgery, id. ¶¶ 143-49, breach of duty as agent/ attorney, id. ¶¶ 158-65, and negligence, id. ¶¶ 166-72. He alleges that any damages sustained by Amusement were caused by the actions of BIR and Friedman, and that he has been sued by Amusement because of these actions. See id. ¶¶ 135, 139-40, 145, 149, 163, 165, 170, 172. Consequently, Safrin seeks relief in the form of attorneys' fees, costs and disbursements, as well as punitive damages. Id. ¶¶ 142, 149, 165, 172. Safrin also makes claims against BIR and Friedman for conspiracy to violate N.Y. Civil Rights Law § 51, id. ¶¶ 150-57 (third claim), implied indemnification, id. ¶¶ 173-78 (sixth claim), and contribution, id. ¶¶ 179-82 (seventh claim), but BIR and Friedman have not moved to dismiss these claims, see BIR No. 432 Notice of Motion; Friedman No. 435 Notice of Motion.

## II.    <u>LAW GOVERNING MOTIONS TO DISMISS</u>

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted . . . ." While a court

11

must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 129 S. Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 1949-50.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 1949 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 127 S. Ct. at 1949 (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n] . . . that the pleader is entitled to relief.'" Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

III.     DISCUSSION

While the claims in this case arise under state law, no party has briefed the issue of choice of law.  Because all parties have relied on New York State law in their memoranda of law, they have implicitly consented to the application of New York law.  This "'implied consent . . . is sufficient to establish choice of law.'"  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

A.     Egert's Cross-Claim for Implied Indemnification (Claim I)

Egert brings a cross-claim for implied indemnification, see Egert Cross-Claims at 37 ¶¶ 145-48, alleging that "[i]f Amusement sustained damages . . . through any actions attributable to Egert, then such injuries and damages were caused by the actions of Friedman [and] BIR," among others, id. at 37 ¶ 146.  BIR and Friedman contend that Egert has failed to allege a claim for implied indemnification, see BIR Mem. No. 409 at 8-11; BIR Reply Mem. No. 452 at 2-3, stating that "[p]laintiffs are not seeking to hold [Egert] liable for any act or omission of BIR" and/or Friedman, BIR Mem. No. 409 at 9; see id. at 10.

1.     Legal Standard

"Implied indemnity is a restitution concept which permits shifting the loss because to fail to do so would result in the unjust enrichment of one party at the expense of the other."  Mas v. Two Bridges Assocs. by Nat'l Kinney Corp., 75 N.Y.2d 680, 690 (1990) (citing McDermott v. City of New York, 50 N.Y.2d 211, 216-17 (1980)) (additional citations omitted); accord Hernandez v. GPSDC (N.Y.) Inc., 2008 WL 220636, at *7 (S.D.N.Y. Jan. 28, 2008).  It is grounded in the "principle that 'every one is responsible for the consequences of his own

13

negligence, and if another person has been compelled . . . to pay the damages which ought to have been paid by the wrongdoer, they may be recovered from him.'"  Raquet v. Braun, 90 N.Y.2d 177, 183 (1997) (quoting Oceanic Steam Navigation Co. v. Compania Transatlantica Espanola, 134 N.Y. 461, 468 (1892)) (additional citation omitted).  Thus, indemnity may be implied "to prevent a result which is regarded as unjust or unsatisfactory" and "is frequently employed in favor of one who is vicariously liable for the tort of another . . . ."  Rosado v. Proctor & Schwartz, Inc., 66 N.Y.2d 21, 24 (1985) (citations and internal quotation marks omitted).  In general terms, indemnity allows a defendant to recover for a loss occasioned solely "by imputation of law," Mas, 75 N.Y.2d at 690, that it would otherwise be forced to bear on its own.  See, e.g., Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 301, 307-09 (S.D.N.Y. 2010).

   2. Discussion

   BIR and Friedman assert that Egert is not entitled to implied indemnification because "[p]laintiffs allege that Egert's own conduct," not that of BIR or Friedman, "exposed [Egert] to liability on the claims asserted against him."  BIR Mem. No. 409 at 9; BIR Reply Mem. No. 452 at 3 (citing Broyhill Furniture Indus., Inc. v. Hudson Furniture Galleries, LLC, 61 A.D.3d 554, 556 (1st Dep't 2009); Edge Mgmt. Consulting, Inc. v. Blank, 25 A.D.3d 364, 367 (1st Dep't 2006)).  Egert responds that he is entitled to implied indemnification "because Friedman's bad acts may have been the sole cause for Amusement's alleged belief that Safrin and Egert were participating in the Portfolio Purchase."  Egert Mem. in Opp. No. 436 at 7.  Egert asserts that it was Friedman who "induced Amusement to place its funds in escrow for the supposed purpose of participating in the Portfolio Purchase," id., and who "played a decisive role in the improper release of Amusement's $13 million in escrowed funds," id. at 8.

14

It is true that indemnity is not available under New York law where the proposed indemnitee bears fault for the injury for which he seeks indemnification.  Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 319, 326-27 (S.D.N.Y. 2010) (citing Johnson City Cent. Sch. Dist. v. Fid. & Deposit Co. of Md., 272 A.D.2d 818, 822 (3d Dep't 2000) ("where [joint] tortfeasors share in responsibility for the same injury . . . apportionment through contribution, rather than a shifting of the entire loss through implied indemnification, is generally the appropriate remedy")); see Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1284 (2d Cir. 1996) ("common-law indemnity is barred altogether where the party seeking indemnification was itself at fault, and both tortfeasors violated the same duty to the plaintiff") (citations omitted).  A party is entitled to indemnification, however, when he alleges a scenario in which he could be found both free from fault and at the same time liable for damages – in other words, a situation where the party could be found vicariously liable (or liable in any other way imputed by law) because of his relationship with the opposing party.  Amusement Indus., Inc., 693 F. Supp. 2d at 327.

Here, Egert has alleged facts that might allow him to be found both free from fault and still liable for damages to Amusement.  Egert's cross-claim against BIR and Friedman is premised on BIR and Friedman having improperly purported to act on behalf of Egert.  See Egert Cross-Claims at 33, 35, 36 ¶¶ 15-16, 23, 25, 31-32 (asserting Friedman and/or Stern fraudulently represented Egert and/or Safrin's participation in the transaction); see id. at 33 ¶¶ 11-12 (alleging Egert informed Friedman that he was not interested in the transaction).  In other words, Egert asserts that BIR and Friedman lacked any actual authority to act on his behalf.  At the same time, the underlying complaint contains allegations that BIR and Friedman had apparent authority to bind Egert, see Third Am. Compl. ¶¶ 23, 24, 25, 27, as well as

allegations of conduct undertaken by BIR and Friedman purportedly on behalf of Egert and Safrin, see, e.g., id. ¶¶ 78(d), 78(k).

This situation is thus similar to that with which we dealt when BIR and Friedman moved to dismiss Safrin's claim for implied indemnity. As we noted there:

> [I]f a principal[, here, Egert,] commits acts that create an apparent agency relationship and the principal thereby becomes responsible to an outside party for the agent's acts, this does not necessarily mean that the principal is barred from obtaining indemnity. Even if the agent was imbued with <u>apparent</u> authority in a third person's eyes, the agent would necessarily know that it could not properly purport to bind the principal without <u>actual</u> authority. If the agent acted without actual authority, there is no reason that it should not be held responsible for the principal's liability. <u>See, e.g.</u>, <u>Gleason v. Temple Hill Assocs.</u>, 159 A.D.2d 682, 683-84 (2d Dep't 1990) (agent with apparent authority must indemnify principal with respect to agent's acts outside the scope of its actual authority). As between a principal who – perhaps unintentionally – creates apparent authority and an agent who acts knowing he has no actual authority, it is only fair that the principle of indemnity would permit the principal to recover from the improperly acting agent.

<u>Amusement Indus., Inc.</u>, 693 F. Supp. 2d at 309. Thus, we held that Safrin had stated a claim for implied indemnification because "Safrin's assertion that there was no relationship between him and" BIR did not "bar him from asserting that, should such a relationship be found, [BIR] [was] obligated to indemnify him." <u>Id.</u> at 308 (citations omitted). The same reasoning applies here.

BIR and Friedman assert that this holding does not apply to Egert's cross-claim for indemnification because the underlying complaint "does not seek to impose liability on Egert based on Friedman or BIR acting as Egert's agent." BIR Mem. No. 409 at 10 (citation omitted). But in the underlying complaint Amusement in fact alleges that "Friedman had actual and/or apparent authority to bind Egert," Third Am. Compl. ¶ 27, and that "Friedman had a broad agency and attorney client relationship with Egert . . . that encompassed Friedman's role in the transactions at issue," id. Amusement also alleges that it was, among other things, "Friedman's

16

authority" that influenced its decision to enter into the letter of understanding, id. ¶ 29, and that statements made by Friedman to Steven Alevy on June 4, 2007, that Egert was to be placed on the advisory board of the entity that was acquiring the Portfolio, induced Amusement to place the $13 million in escrow, see id. ¶ 78(d).  Accordingly, it is possible that Egert could be held liable to plaintiffs simply as "a result of the imputation of an[] alleged act or omission by BIR" and/or Friedman.  BIR Mem. No. 409 at 10.

BIR and Friedman also argue that "Egert's allegation concerning the alleged forgery of his signature on the JSAE Colonial LLC Operating Agreement cannot form the basis for an indemnification claim" because neither Egert nor plaintiffs allege that they received or relied upon the alleged forgery.  BIR Mem. No. 409 at 10-11.  But the cross-claim in fact alleges that Friedman and BIR "proffered documents to Amusement and others purportedly signed by Egert and Safrin that had been forged," Egert Cross-Claims at 38 ¶ 155, and that "those representations and related omissions of fact induced [Amusement] to lend Stern and [FRG Corp. and/ or FRG LLC] $13 million toward the Colonial Transaction," id. at 38 ¶ 157.

Accordingly, Egert has stated a claim for implied indemnification.

B.   Egert's Cross-Claims for Fraud/Forgery, Conspiracy to Commit Fraud/Forgery, Breach of Duty as Agent/Negligence, and Gross Negligence (Cross-Claims III-VI) and Safrin's Claims for Fraud/Forgery, Conspiracy to Commit Fraud/Forgery, Breach of Duty as Agent/Attorney, and Negligence (Claims I, II, IV, and V)

1.   Subject Matter Jurisdiction

Friedman and BIR argue that the Court lacks subject matter jurisdiction over Egert's third through sixth cross-claims.  See BIR Mem. No. 409 at 12-14; BIR Reply Mem. No. 452 at 4-5.  Friedman and BIR purport to make the same argument with regard to Safrin's first, second, fourth, and fifth claims in their memorandum of law in support of the motions to dismiss.  See

17

BIR Mem. No. 434 at 14 (stating "no common nucleus of operative facts as between the Colonial Transaction and Citigroup loans, on the one hand, and the Amusement Transaction, on the other"). They raise this argument only in the introduction to their argument in this memorandum, see id., however, and not under a separate heading as required by Local Civil Rule 7.1(a) (requiring that "all motions and all oppositions thereto shall be supported by a memorandum of law . . . divided, under appropriate headings, into as many parts as there are points to be determined"). While we might decline to consider an argument raised in violation of Local Civil Rule 7.1(a), we consider it here inasmuch as it purports to call into question the Court's subject matter jurisdiction. See Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

a.    Legal Standard

The cross-claims against Friedman and BIR have no independent jurisdictional basis, as there is no diversity of citizenship between Egert, Friedman, and BIR, and neither Egert nor Safrin's claims raise a federal question. Thus, these claims must be dismissed unless the Court can exercise supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. 28 U.S.C. § 1367(a) provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

The Second Circuit has held that "disputes are part of the same case or controversy within § 1367 when they derive from a common nucleus of operative fact." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006) (citation and internal quotation

18

marks omitted); accord Patel v. Baluchi's Indian Rest., 2009 WL 2358620, at *4 (S.D.N.Y. July 30, 2009).  In deciding whether disputes derive from a "common nucleus of operative fact," courts typically employ a test that references an underlying "federal claim."  Here, the basis for federal jurisdiction in the main complaint is a diversity claim, not a federal question claim. Accordingly, to avoid confusion, we adjust the test to reference the "main" claim and refer to the second claim as the "third-party" claim rather than as the "state" claim.

To determine whether there is supplemental jurisdiction, a court asks whether "the facts underlying the . . . claims substantially overlapped . . . [or] the [main] claim necessarily brought the facts underlying the [third-party] claim before the court . . . even if the [third-party] claim is asserted against a party different from the one named in the [main] claim." Achtman, 464 F.3d at 335 (internal quotation marks and citations omitted).  "Essentially, supplemental jurisdiction will be found where the [main] and [third-party] claims arise from the same basic facts. Conversely, supplemental jurisdiction does not lie 'when the [main] and [third-party] claims rest[] on essentially unrelated facts.'" Bu ex rel. Bu v. Benenson, 181 F. Supp. 2d 247, 251 (S.D.N.Y. 2001) (citing Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704 (2d Cir. 2000)) (emphasis omitted); accord Amusement Indus., Inc. v. Stern, 2010 WL 276464, at *3 (S.D.N.Y. Jan. 22, 2010)

b.    Egert's Cross-Claims

Friedman and BIR contend that the Court lacks subject matter jurisdiction over Egert's third through sixth cross-claims – for fraud/forgery, conspiracy to commit fraud/forgery, breach of duty as agent/negligence, and gross negligence – because those claims are "exclusively about BIR and Friedman's alleged conduct in the Colonial Transaction."  BIR Mem. No. 409 at 12; see

19

id. at 12-14.  BIR and Friedman's argument relies upon the existence of a number of factual

allegations relating to the closing of the purchase of the properties, which they characterize as

the "Colonial Transaction," as opposed to Amusement's lending of money, which they

characterize as the "Amusement Transaction."  See BIR Mem. No. 409 at 12-14.  It is not

necessary to determine whether this Court would have subject matter jurisdiction over claims

based upon allegations relating exclusively to the "Colonial Transaction," however, because

Egert's cross-claims do not assert any cause of action based solely upon those allegations.

Rather, Egert's allegations are based directly upon Amusement's assertion that Friedman's

representations regarding Safrin and Egert's role in the transaction induced Amusement to place

the funds in escrow.  See Egert Mem. in Opp. No. 436 at 7-9.  Thus, as discussed above – and

contrary to BIR and Friedman's contention that Egert does not claim "that [an allegedly forged

document] was ever provided to Plaintiffs," BIR Mem. No. 409 at 12 – the cross-claims

explicitly state that Friedman and BIR "proffered documents to Amusement and others

purportedly signed by Egert and Safrin that had been forged," Egert Cross-Claims at 38 ¶ 155,

and that "those representations and related omissions of fact induced [Amusement] to lend Stern

and [FRG Corp. and/or FRG LLC] $13 million toward the Colonial Transaction," id. at 38 ¶ 157.

Thus, it is clear that Egert's cross-claims "substantially overlap[]" with or "arise from the

same basic facts" as the claims made by Amusement against Egert in the main complaint.

c.    Safrin's Claims

The same reasoning applies to Safrin's claims.  While Friedman and BIR have made no

specific arguments as to why the Court lacks subject matter jurisdiction over Safrin's claims

against these third-party defendants, it is clear that Safrin's claims relate directly to Friedman

and BIR's alleged use of Safrin's name to induce Amusement to enter into the transaction which resulted in the loss of the $13 million.  See, e.g., Safrin Third Am. Third-Party Compl. ¶ 6.  This is sufficient to show that Safrin's and Amusement's claims derive from a "common nucleus of operative fact."

*     *     *

In sum, for the above reasons we may exercise supplemental jurisdiction over both Egert's and Safrin's claims.

    2.    The "American Rule"

BIR and Friedman argue that both Egert's third through sixth cross-claims and Safrin's first, second, fourth, and fifth claims should be dismissed because they seek only damages for attorneys' fees, which are barred under the "American Rule."  See BIR Mem. No. 409 at 15-16; BIR Reply Mem. No. 452 at 5-6; BIR Mem. No. 434 at 16-17; BIR Reply Mem. No. 471 at 4-7. Because the analysis under this rule is the same for both Egert and Safrin's claims, we will examine them together.

The claims Egert and Safrin make are claims for fraud/forgery, conspiracy to commit fraud/forgery, breach of duty as agent/attorney, negligence, and gross negligence.  Each of these causes of action requires proof of damages or injury.  See, e.g., Art Capital Grp., LLC v. Neuhaus, 70 A.D.3d 605, 607 (1st Dep't 2010) (fraud, conspiracy to defraud); Ruiz v. Griffin, 71 A.D.3d 1112, 1114 (2d Dep't 2010) (negligence); Kaminsky v. Herrick, Feinstein LLP, 59 A.D.3d 1, 7 (1st Dep't 2008) (attorney malpractice).  But neither Safrin nor Egert allege that they have lost any money or have been otherwise harmed by the transaction described in their pleadings.  Rather, the only damage they allege arises from the fact that they have been drawn

21

into <u>this litigation</u> because of Friedman and BIR's actions, and thus that they have been compelled to expend attorneys' fees and other costs to defend the claims brought against them by these other parties.

a.    <u>Legal Standard</u>

Under New York law it is well settled that absent a statute or contractual provision, attorneys' "fees and the legal expenses necessarily incurred in carrying on a lawsuit are not generally considered items of expense recoverable as general or special damages." <u>Coopers and Lybrand v. Levitt</u>, 52 A.D.2d 493, 496 (1st Dep't 1976) (citation omitted); <u>accord</u> <u>Goldberg v. Mallinckrodt, Inc.</u>, 792 F.2d 305, 309 (2d Cir. 1986); <u>Healing Power, Inc. v. Ace Cont'l Exps., Ltd.</u>, 2008 WL 4693246, at *6 (E.D.N.Y. Oct. 17, 2008); <u>Rahabi v. Morrison</u>, 81 A.D.2d 434, 437 (2d Dep't 1981); <u>Cent. Trust Co., Rochester v. Goldman</u>, 70 A.D.2d 767, 767 (4th Dep't 1979).  This rule is, however, "subject to the well-recognized exception which permits a cause of action where 'through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred.'" <u>N.Y. Cooling Towers, Inc. v. Goidel</u>, 10 Misc. 3d 219, 222 (Sup. Ct. 2005) (quoting <u>Shindler v. Lamb</u>, 25 Misc. 2d 810, 812 (Sup. Ct. 1959), <u>aff'd</u> 10 A.D. 826 (1st Dep't 1960), <u>aff'd</u> 9 N.Y.2d 621 (1961)) (additional citations omitted); <u>accord</u> <u>Healing Power, Inc.</u>, 2008 WL 4693246, at *6 ("In limited circumstances, a fraud victim may recover attorney's fees – at least those predating the litigation alleging fraud – as out of pocket damages.") (internal quotation marks and citations omitted); <u>Chase Manhattan Bank, N.A. v. Each Individual Underwriter Bound to Lloyd's Policy No. 790/004A89005</u>, 258 A.D.2d 1, 5 (1st Dep't 1999).  This narrow

22

exception is often referred to as the "tort of wrongful involvement in litigation" exception, see,

e.g., Cortec Indus., Inc. v. Sum Holding L.P., 1994 WL 722708, at *4  (S.D.N.Y. Dec. 30, 1994)

(internal quotation marks and citation omitted), and applies only where the attorneys' fees and

costs were incurred in a litigation prior to that in which the fees are sought as damages, see

Healing Power, Inc., 2008 WL 4693246, at *6; Chase Manhattan Bank, N.A., 258 A.D.2d at 5;

Coopers and Lybrand, 52 A.D.2d at 496; N.Y. Cooling Towers, Inc., 10 Misc. 3d at 222.

Courts have required that the claim arise from a prior litigation because a factual

determination from the earlier suit is necessary to determine the applicability of the exception –

i.e., whether a party's tortious acts wrongfully involved the aggrieved party in the earlier

litigation – in the later suit.  See, e.g., Answering Serv., Inc. v. Egan, 785 F.2d 1084, 1087 (D.C.

Cir. 1986); Taylor v. Tellez, 610 A.2d 252, 256 (D.C. 1992).

b.      Discussion

In this case, Egert and Safrin seek reimbursement of their attorneys' fees and costs as

damages for their claims and cross-claims.  See Egert Cross-Claims at 38, 39, 40 ¶¶ 158, 163,

166, 170; Safrin Third Am. Third-Party Compl. ¶¶ 142, 149, 165, 172.  Thus, the American Rule

would bar Egert and Safrin's attempt to recover these fees unless the "tort of wrongful

involvement in litigation" exception has been pled.  Egert argues that he is entitled to attorneys'

fees because these fees were "proximately caused by BIR [and Friedman's] tortious acts."  Egert

Mem. in Opp. No. 436 at 11; see id. at 12 (arguing attorneys' fees "constitute consequential

damages arising from [a] tort or breach").  Safrin similarly argues that these fees are not barred

by the American Rule because they "fall squarely within" the tort of wrongful involvement in

litigation exception to the rule.  See Safrin Mem. in Opp. No. 461 at 37.  Putting aside the fact

23

that this tort is not actually pled by name in any of the pleadings, Egert and Safrin's efforts to seek attorneys' fees under the various causes of action all suffer from the same defect: they are attempting to recover for their attorneys' fees in this very litigation. New York case law repeatedly makes clear, however, that such fees are recoverable only where a party has been forced to expend them in some "earlier litigation." Shindler, 25 Misc. 2d at 812; accord Healing Power, Inc., 2008 WL 4693246, at *6 ("In limited circumstances, a fraud victim may recover attorney's fees – at least those predating the litigation alleging fraud – as out of pocket damages.") (internal quotation marks and citations omitted); Chase Manhattan Bank, N.A., 258 A.D.2d at 5 ("The exception is stated in Shindler as follows: If, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred.") (internal quotation marks and citation omitted); Coopers and Lybrand, 52 A.D.2d at 496 (same); N.Y. Cooling Towers, Inc., 10 Misc. 3d at 222 (same). In other words, Egert and Safrin cannot recover attorneys' fees in this litigation because it is the same litigation in which they are incurring the defense costs that they seek as damages from BIR and Friedman.

Egert argues that in fact he seeks more than just attorneys' fees and thus the American Rule does not apply. See Egert Mem. in Opp. No. 436 at 12-13. He points to the fact that his cross-claims seek "'just and appropriate relief.'" Id. at 12 (quoting Egert Cross-Claims at 41). But this phrasing cannot change the applicability of the American Rule because Egert has not identified any damages or injury resulting from the conduct alleged in his cross-claims other than that in the form of the attorneys' fees, costs and disbursements he is incurring as a result of

24

the litigation he is being forced to defend.  Accordingly, the unadorned plea for "other relief,"

Egert Cross-Claims at 41, cannot defeat the applicability of the American Rule in this case.  Nor

does the request for punitive damages change this outcome because it is settled that "New York

does not recognize an independent cause of action for punitive damages.  Instead, a demand or

request for punitive damages is parasitic and possesses no viability absent its attachment to a

substantive cause of action."  Randi A.J. v. Long Island Surgi-Center, 46 A.D.3d 74, 80 (2d

Dep't 2007) (internal quotation marks, citation, and bracketing omitted).  Thus, any punitive

damage claim must be heard in the same proceeding as the substantive claim.[4]

For these reasons, Egert's cross-claims three through six and Safrin's first, second,

fourth, and fifth claims against third-party defendants BIR and Friedman are barred by the

American Rule and should be dismissed.

IV.    CONCLUSION

For the foregoing reasons, Friedman and BIR's motions to dismiss (Docket ## 407, 410)

certain of Egert's cross-claims should be granted in part and denied in part.  Friedman and BIR's

---

[4]  The cases cited by Safrin, see Safrin Mem. in Opp. No. 461 at 37-39, are either
distinguishable or irrelevant to this case.  In Winkler v. Allvend Indus., Inc., 186 A.D.2d 732 (2d
Dep't 1992), the defendants defaulted in serving an answer, and thus the court did not apply the
exception to the American Rule in determining the award of fees but rather analyzed whether the
fees incurred pre-inquest fell under the "out-of-pocket" rule used in determining "actual
pecuniary loss sustained as a direct result of fraud."  Id. at 733.  In Curiale v. Capolino, 883 F.
Supp. 941 (S.D.N.Y. 1995), Curiale brought suit to recover attorneys' fees incurred not in the
present litigation but in an earlier litigation which Curiale alleged he had been forced to defend
due to the malfeasance of the defendant in the instant action.  Id. at 951.  In N.Y. Cooling
Towers, Inc., 10 Misc. 3d 219, the court's decision to deny the defendants' motion to dismiss
under the American Rule was preceded by an earlier arbitration determining that the defendant
in the instant action had in fact caused the damages which resulted in the arbitrator's award.  See
id. at 220, 222-23.  And in Independence Leasing Corp. v. Aquino, 133 Misc. 2d 564 (Co. Ct.
1986), the court based its award of attorneys' fees not on the exception to the American Rule but
on a theory of implied indemnification.  Id. at 573.

motions to dismiss certain of Safrin's claims (Docket ## 432, 435) should be granted.

Specifically, Egert's third, fourth, fifth, and sixth cross-claims against third-party defendants BIR and Friedman should be dismissed.  Safrin's first, second, fourth, and fifth claims against third-party defendants BIR and Friedman should be dismissed.  Egert's first cross-claim (for implied indemnification) should not be dismissed.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 14, 2011
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

motions to dismiss certain of Safrin's claims (Docket ## 432, 435) should be granted.

Specifically, Egert's third, fourth, fifth, and sixth cross-claims against third-party defendants BIR and Friedman should be dismissed.  Safrin's first, second, fourth, and fifth claims against third-party defendants BIR and Friedman should be dismissed.  Egert's first cross-claim (for implied indemnification) should not be dismissed.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 14, 2011
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

26