UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC. dba           :
WESTLAND INDUSTRIES; and PRACTICAL
FINANCE CO., INC.,                     :

             Plaintiffs,          :           07 Civ. 11586 (LAK) (GWG)

   -v.-                                 :           REPORT AND
                                    RECOMMENDATION
MOSES STERN, aka MARK STERN; JOSHUA     :
SAFRIN; FIRST REPUBLIC GROUP REALTY,
LLC; EPHRAIM FRENKEL; FIRST REPUBLIC    :
GROUP CORP.; LAND TITLE ASSOCIATES
AGENCY, LLC (aka LAND TITLE             :
ASSOCIATES); and AVERY EGERT,
                                    :
            Defendants.
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Amusement Industry, Inc. and Practical Finance Co., Inc. (collectively,

"Amusement") have sued defendants Mark Stern, First Republic Group Realty, LLC ("FRG

LLC"),[1] First Republic Group Corp. ("FRG Corp."), Ephraim Frenkel, Land Title Associates

("LTA"), Joshua Safrin, and Avery Egert, seeking damages arising out of their loss of $13

million in a real estate transaction.  See Third Amended Complaint, filed Apr. 27, 2010 (Docket

# 405) ("TAC").  Stern, FRG Corp., Frenkel, and LTA (collectively, "the defendants") have now

moved to dismiss the claims against them.[2]  For the reasons stated below, the motion to dismiss

---

[1] FRG LLC has filed a Chapter 11 bankruptcy petition which results in an automatic stay
of judicial action against it.  See 11 U.S.C. § 362(a)(1).  Accordingly, FRG LLC is not included
in the adjudication of this motion.  See Amusement Industry, Inc. v. Stern, 2010 WL 2976199, at
*1 (S.D.N.Y. July 26, 2010).

[2] See Notice of Motion to Dismiss the Third Amended Complaint Against Mark Stern,
First Republic Group Corp., Ephraim Frenkel and Land Title Associates Escrow, filed June 9,
2010 (Docket # 448); Declaration of Stephen R. Stern in Support of Motion to Dismiss the Third
Amended Complaint Against Mark Stern, First Republic Group Corp., Ephraim Frenkel and

should be granted in part and denied in part.

I.       BACKGROUND

        A.       Plaintiffs' Allegations

        Amusement alleges the following facts, which are presumed true on this motion to

dismiss.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002).

        1.       The Deal

        In April 2007, FRG Corp. – controlled solely by Stern, see TAC ¶¶ 2, 12 – entered into a

written contract to purchase several shopping centers (the "Portfolio") from Colonial Realty

Limited Partnership ("Colonial"), with a closing date set for late June 2007, id. ¶ 2.  In May

2007, Stern and FRG Corp. authorized Bankers Capital Realty Advisors ("Bankers Capital"),

through its principal, Steven Alevy, to secure additional financing on their behalf.  See id. ¶¶ 21-

22.  A new entity, FRG LLC – also controlled solely by Stern – was formed on or about June 23,

2007, id. ¶ 2, and some time before the closing date, which was "on or about July 13, 2007,"

FRG Corp. "assigned its interest in the purchase contract to FRG LLC," id. ¶¶ 2, 21.  In addition

to authorizing Bankers Capital to obtain additional financing, Stern, FRG Corp. and/or FRG

LLC authorized an attorney, Stephen Friedman – who represented Stern, FRG Corp., FRG LLC,

and allegedly, Safrin and Egert – to approach Amusement regarding this same matter.  See id.

_____

Land Title Associates Escrow, filed June 9, 2010 (Docket # 449); Memorandum of Law in
Support of Motion to Dismiss the Third Amended Complaint Against Mark Stern, First Republic
Group Corp., Ephraim Frenkel and Land Title Associates Escrow, filed June 9, 2010 (Docket
# 450) ("Def. Mem."); Plaintiffs' Memorandum of Law in Opposition to Defendants Mark Stern,
First Republic Group Realty, LLC, First Republic Group Corp., Ephraim Frenkel and Land Title
Associates Escrow's Motion to Dismiss Plaintiffs' Third Amended Complaint, filed July 14,
2010 (Docket # 463) ("Pl. Opp. Mem."); Reply Memorandum of Law in Further Support of
Motion to Dismiss the Third Amended Complaint Against Mark Stern, First Republic Group
Corp., Ephraim Frenkel and Land Title Associates Escrow, filed Aug. 6, 2010 (Docket # 479)
("Def. Reply Mem.").

¶¶ 22-23.  Amusement is controlled by Allen Alevy.  Id. ¶ 21.

        2.      Friedman's Representations

Stephen Friedman, then a partner at Buchanan Ingersol and Rooney ("BIR"), repeatedly represented to Amusement that he had been retained by Stern, FRG Corp. and/or FRG LLC, Safrin, and Egert, and that he was authorized to act as an agent for them in connection with the acquisition of the Portfolio.  Id. ¶ 25.  The defendants were aware of those representations and "did not contradict them."  Id. ¶ 26.  Friedman had either actual or apparent authority to bind Stern and FRG Corp.  Id.  At this time, Friedman was "already representing an Alevy family entity in an unrelated transaction . . . and had been a close family friend for many years."  Id. ¶ 28.

Amusement was "enticed by Friedman's representation that Safrin, a respected New York real estate investor, was supplying much of the equity needed for the acquisition."  Id. ¶ 23. Steven Alevy of Bankers Capital, the son of Amusement's Allen Alevy, id. ¶ 21, confirmed that Stern had represented that "Safrin and Egert were supplying most of the equity for the acquisition," id. ¶ 24.  Additionally, on June 4 and 5, 2007, "Stern told Bankers [Capital] that Safrin was a sponsor" of the transaction, with $15 to $18 million in liquidity, and that Safrin would sign the "'carve-outs' on the financing package."  Id. ¶ 78(f)-(g).  Between June 20 and June 29, 2007, Friedman told Bankers Capital and Amusement that the Citigroup financing agreement permitted a "50/50 equity split" between Amusement and Stern-Safrin-Egert.  Id. ¶ 78(k).

        3.      The Letter of Understanding and the Escrow Account

On June 29, 2007, Amusement, relying on representations made by Friedman, Stern, and FRG Corp. and/or FRG LLC, entered into a letter of understanding ("LOU") with Stern on

behalf of FRG Corp. and/or FRG LLC, setting forth a proposal for Amusement's investment.

See id. ¶¶ 29, 31, 78; Letter of Understanding (annexed as Ex. 2 to TAC) ("LOU Ex.").  On or

about June 29, 2007, Amusement wired $13 million to a bank account maintained by Land Title

Associates Escrow ("LTA") at North Fork Bank in accordance with Stern and FRG Corp. and/or

FRG LLC's instructions.  Id. ¶¶ 2, 32.  Friedman told Amusement that the account was the

escrow account being used by FRG Corp. and/or FRG LLC "to accumulate the funds needed to

acquire the Portfolio."  See id. ¶ 32.  Amusement later learned that this account was not the

escrow account being used by FRG Corp. and/or FRG LLC to acquire the Portfolio.  Id. ¶ 42.

Rather, it was Frenkel's general escrow account which contained only the $13 million wired

there by Amusement.  Id.

The LOU set forth the following proposed terms: Amusement would receive 50% equity

and voting interest in the Portfolio and a 12% annual preferred return on its investment; "First

Republic" was to be responsible for "major decisions" including refinancing, sales and

operations; and the parties would have seven days to negotiate a binding agreement, during

which time 100% of the equity and voting interest in the Portfolio was to be held in escrow for

Amusement's benefit.  See id. ¶ 31(a)-(c); LOU Ex.  As a condition of sending the $13 million,

Amusement directed that the money was to be held in escrow by LTA and Frenkel, and was to

be released only if Amusement so instructed.  Id. ¶ 34.  Stern, Friedman, LTA, and LTA's

principal, Ephraim Frenkel, "acknowledged" the terms of this arrangement.  Id.

Safrin, Egert, Stern, and FRG Corp. and/or FRG LLC represented that time was of the

essence and did not inform Amusement until later that Colonial had agreed to an extension of the

closing date.  Id. ¶ 30.  Because of this representation, "Amusement lacked sufficient time for

4

proper due diligence and, therefore, had to decide how to proceed based on the available information." Id. ¶ 29.

### 4. Continuing Negotiations

Citigroup had committed to provide approximately $126 million to acquire the Portfolio. Id. ¶ 43. Amusement did not know that FRG Corp. and/or FRG LLC could not perform their obligations under the LOU "because those obligations conflicted with the terms of Citigroup's financing commitment." Id. ¶ 43. Between June 29 and July 14, 2007, Amusement attempted to negotiate a final agreement with Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC, but no agreement was reached, and Amusement notified Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC that it did not regard itself as bound by the LOU in light of the expiration of the seven-day negotiating period it contemplated. Id. ¶¶ 3, 35. During these negotiations, Amusement "repeatedly communicated to Friedman, LTA and Frenkel that its money was not to be released from escrow." Id. ¶ 36. Amusement also insisted that it would not finalize the transaction without reviewing the Citigroup documents, but those documents were not provided to it. Id. ¶ 43. The failure of Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC to supply copies of the Citigroup documents "gave Amusement false confidence that its money was safely in escrow." Id.

### 5. Transfer of the Funds

On July 3, 2007, without Amusement's knowledge or consent, the $13 million was transferred from the escrow account to a separate North Fork Bank account owned by FRG Corp. Id. ¶¶ 3, 40. This account was used for "various expenses" in connection with the acquisition of the Portfolio, as well as for unrelated expenses. Id. ¶ 40. One day before the

closing, "which occurred on or about July 12, 2007," Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC sent Amusement a set of partially executed transaction documents at a time they knew the $13 million had been moved out of the escrow account.  See id. ¶¶ 3-4, 45.  However, Amusement continued to negotiate and refused to release the $13 million, which it believed was still in the escrow account.  See id. ¶¶ 3, 45.  On July 12, 2007, without Amusement's knowledge and despite the fact that no agreement had been reached, Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC used the $13 million to close the purchase of the Portfolio.  Id. ¶¶ 49, 59.  The defendants concealed the fact that the money had been removed from the escrow account and continued negotiations with Amusement notwithstanding their knowledge of this fact.  See id. ¶¶ 76, 79.

In an effort to have Amusement ratify the unauthorized use of the escrow funds, defendants "delivered" a promissory note signed by Stern for $13 million plus interest due on September 10, 2007; a promissory note executed by Stern in favor of Amusement and Practical, its assignee, to pay $15 million in principal also due on September 10, 2007; grant deeds signed by Stern on behalf of FRG LLC "conveying ownership of the individual properties in the Portfolio"; and assignments of Stern and Safrin's "membership interests" in FRG LLC and the underlying LLC.  See id. ¶¶ 4, 46(a)-(c), 47-48, 50; $13 Million Promissory Note (annexed as Ex. 3 to TAC") ("$13 Million Promissory Note"); $15 Million Promissory Note (annexed as Ex. 4 to TAC") ("$15 Million Promissory Note").  These items were placed in escrow pursuant to an escrow agreement "with the attorney and agent who had been representing Stern, Safrin, FRG Corp. and/or FRG LLC" – that is, Friedman.  Id. ¶ 4.  Friedman subsequently conveyed the grant deeds to Steven Alevy, allegedly "for the purpose of creating a security interest in the properties

in acknowledgment of Defendants' unauthorized taking of Amusement's $13 million." Id. ¶ 47.

Amusement, however, never "accepted . . . these documents and terms for the use of its $13

million." Id. ¶¶ 4, 51.   Despite a demand from Amusement, the defendants have refused to

return the $13 million. Id. ¶ 95.

        6.    The Instant Action

Amusement has asserted claims for fraud, negligent misrepresentation, conversion,

conspiracy to commit conversion and/or fraud, and unjust enrichment against Stern, FRG Corp.,

Frenkel, and LTA. Id. ¶¶ 74-83, 84-88, 89-95, 96-104, 128-137.   Amusement also claims that

Stern, individually, breached two promissory notes. Id. ¶¶ 105-10, 111-16.   In addition,

Amusement seeks an equitable lien, a constructive trust, and a purchase money resulting trust

over the Portfolio and any other assets Stern and FRG Corp. purchased with its funds, and

declaratory relief as to its security interest in the Portfolio properties against Stern and FRG

Corp. Id. ¶¶ 57-62, 63-67, 68-70, 71-73.   Finally, Amusement alleges that Frenkel and LTA

breached their fiduciary duty as escrow agents. Id. ¶¶ 117-27.

        B.    The Instant Motion

In all, there are twelve causes of action that name one or more of the defendants.   Stern,

FRG Corp., Frenkel, and LTA have moved to dismiss each of them for failure to state a claim

upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).   See Def. Mem. at 10-49.

II.    APPLICABLE LEGAL STANDARDS

        A.    Failure to State a Claim

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing

party's complaint "fail[s] to state a claim upon which relief can be granted."   While a court must

accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft, 129 S. Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 1950.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 1949 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft, 127 S. Ct. at 1949  (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." Id. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (internal quotation marks omitted).   If the allegations of a complaint show that the complained-of

conduct was "not only compatible with, but indeed was more likely explained by, lawful" conduct, no claim for relief is stated.  Id. at 1950; see also id. at 1951 (allegations in a complaint are rejected where there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

While a court typically examines only the allegations of a pleading on a motion to dismiss, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."  Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (citation omitted).

 B. Pleading Fraud and Negligent Misrepresentation with Particularity

A court does not accept as true on a motion to dismiss "conclusions of law or unwarranted deductions of fact."  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (citations and internal quotation marks omitted), cert. denied, 513 U.S. 1079 (1995).  "This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed. R. Civ. P. 9(b)."  Id. (citations omitted)  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

"[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  While "the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great

specificity." Chill v. Gen. Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Nonetheless, a plaintiff "'must allege facts that give rise to a strong inference of fraudulent intent.'"  Lerner, 459 F.3d at 290 (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)).

In a similar vein, "[c]laims of negligent misrepresentation must also be pled with particularity if based on the same set of facts as intentional fraud claims." Icebox-Scoops, Inc. v. Finanz St. Honoré, B.V., 676 F. Supp. 2d 100, 110 (E.D.N.Y. 2009) (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004); Meisel v. Grunberg, 651 F. Supp. 2d 98, 107-08 (S.D.N.Y. 2009)).

C.    Choice of Law

We first address the threshold issue of which law should apply to Amusement's claims. Because this Court's subject matter jurisdiction is based solely upon diversity, see TAC ¶ 17, we apply the choice of law rules of the forum state – here, New York.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); DeWeerth v. Baldinger, 38 F.3d 1266, 1272 (2d Cir.) (in diversity cases, the federal courts are "bound to follow state law on any matter of substantive law") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)), cert. denied, 513 U.S. 1001 (1994); accord Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 283 (S.D.N.Y. 2009).

1.    Fraud, Negligent Misrepresentation, Conversion, Conspiracy, Declaratory Relief, Breach of Fiduciary Duty, and Unjust Enrichment Claims

While the claims in this case arise under state law, no party has briefed the issue of choice of law with regard to the declaratory judgment claim or the claims of fraud, negligent

10

misrepresentation, conversion, conspiracy to commit conversion and/or fraud, breach of

fiduciary duty, and unjust enrichment.  Because all parties have relied on New York State law in

their memoranda of law, they have implicitly consented to the application of New York law.

This "'implied consent . . . is sufficient to establish choice of law.'"  Krumme v. WestPoint

Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs

v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

        2.      Equitable Lien, Constructive Trust, and Purchase Money Resulting Trust Claims

Amusement has withdrawn its equitable lien, constructive trust, and purchase money

resulting trust claims against Stern and FRG Corp. for the assets obtained or purchased by Stern

and FRG Corp. that were contained in the Portfolio.  See Pl. Opp. Mem. at 9-10 n.4.  Because

Amusement contends that the property obtained or purchased by Stern and FRG Corp., other

than that contained in the Portfolio, is located in New York, see id., and no party has suggested

that any other law applies, we apply New York law to these claims.

        3.      Breach of Promissory Note Claims

Amusement argues that California law applies to its claims seeking enforcement of the

two promissory notes.  See Pl. Opp. Mem. at 41-42.  Stern and FRG Corp. have not briefed the

issue of choice of law with regard to these claims, but cite primarily to California law in their

memoranda of law.  See Def. Mem. at 43-46; Def. Reply Mem. at 40-42.  Here, the promissory

notes at issue contain choice of law clauses stipulating that California law applies to claims

arising out of the notes, see $13 Million Promissory Note ¶ 6; $15 Million Promissory Note ¶ 6,

and waiving the right to argue that the law of another jurisdiction should apply, see $13 Million

Promissory Note ¶ 6 ("Maker hereby unconditionally and irrevocably waives any right to assert

that the law of any other jurisdiction governs this note."); $15 Million Promissory Note ¶ 6 (same).

"'[A]s a general rule, choice of law provisions . . . are valid and enforceable in [New York].'" Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) (second alteration in original) (quoting Marine Midland Bank, N.A. v. United Mo. Bank, 223 A.D.2d 119, 122-23 (1st Dep't 1996)) (additional citations omitted). "Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 556 (2d Cir. 2000) (citing Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir.1996)). No reason has been given as to why the fraud or public policy exception renders the choice-of-law clause unenforceable. Accordingly, the Court will apply California law to the claims regarding the promissory notes.

III.   DISCUSSION

A.   Fraud (Count 5 ¶¶ 74-83)

Amusement asserts that Stern, FRG Corp., Frenkel, and LTA, along with the other defendants, "knowingly made false statements to Amusement with the motive to induce it to place the $13 million in escrow with Frenkel and LTA and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow." TAC ¶ 76. To state a claim for common law fraud, a plaintiff must show:

> (1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss.

Ross v. Louise Wise Servs., 8 N.Y.3d 478, 488 (2007) (citation and internal punctuation and

quotation marks omitted).  Additionally, as already discussed, Fed. R. Civ. P. 9(b) requires that

fraud be pled with particularity.

       1.   Actionable Statements

 Amusement gives a listing in its third amended complaint of the various statements

forming the basis of the fraud claim.  See TAC ¶¶ 76, 78(a)-(o), 79.  These statements consist

largely of statements made by defendants to Steven Alevy or Bankers Capital, rather than to

Amusement directly.  See id. ¶¶ 78(a), 78(c), 78(d), 78(e), 78(f), 78(g), 78(h), 78(i), 78(k), 78(l),

78(m), 78(n), 78(o).  The subject matter of these statements include assertions that Safrin, Egert,

and Stern were participating in the Colonial Transaction, that certain arrangements were

permissible under the Citigroup financing, and that Amusement's funds would remain in escrow.

Defendants argue that these statement cannot form the basis of a fraud claim because

they were not made to Amusement directly.  See Def. Mem. at 31-33; Def. Reply at 28.  To

support the use of these statements as a basis for its fraud claim, Amusement relies on the

concept of "indirect reliance."  See Pl. Opp. Mem. at 22-26.  The indirect reliance doctrine states

that "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent

representation made by the defendant, if (1) the plaintiff received the information from someone

who had received it from the defendant, and (2) the defendant intended the misrepresentation to

be conveyed to [the plaintiff]."  Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 310 (2d

Cir. 1994) (citations omitted).

Defendants note that Steven Alevy, to whom many statements were made, and his firm,

Bankers Capital, are not alleged to be Amusement's "agents."  See Def. Mem. at 32.  But such

13

an allegation is not necessary.  As long as the defendants intended that Steven Alevy communicate the statements to Amusement to induce it to invest, the elements of indirect reliance are satisfied.  See Turtur, 26 F.3d at 310 (defendants may be subject to liability for fraud if they intended the misrepresentation to be conveyed to plaintiff).  Here, it is alleged that FRG Corp. "authorized" Steven Alevy "to approach Amusement to determine if it would supply the needed funds,"  TAC ¶ 22.  It is reasonable to infer that FRG Corp. and Stern intended that their representations to Alevy regarding the financing of the deal would be communicated to Amusement.

Defendants also note that it is not alleged that Alevy ever actually told Amusement about the substance of these statements.  See Def. Mem. at 32.  But the amended complaint makes clear that Amusement was "enticed" into supplying the $13 million based on these statements, see, e.g., TAC ¶ 23, and alleges directly its own "reliance" on the listed fraudulent statements, id. ¶ 82.  It is a reasonable inference from these allegations that the statements to Alevy were actually conveyed to Amusement.[3]

In sum, because Amusement's third amended complaint contains allegations allowing the inference that the statements made to Steven Alevy or his firm, Bankers Capital, were intended to be conveyed to Amusement, and that the statements were conveyed to Amusement, we consider such statements along with statements that are alleged to have been made to Amusement directly.

---

[3]  At one point, defendants argue that Amusement cannot assert a fraud claim based upon misrepresentations "made to somebody else . . . [and] relied upon by someone else."  Def. Mem. at 32.  But Amusement asserts that it relied on the allegedly fraudulent statements, whether they were communicated to Steven Alevy or Bankers Capital, not that someone else relied on these statements.

14

These statements are as follows:

1) "On May 15, 2007, Stern transmitted personal financial statements via e-mail to Bankers Capital showing Stern to have a personal net worth of $37 million." Id. ¶ 78(a).

2) "During telephone conversations that took place in May or June of 2007, Stern and Egert told Steven Alevy that he and Safrin were equity participants in the planned acquisition of the Portfolio."  Id. ¶ 78(c).

3) "On June 4, 2007, by both telephone and e-mail, Friedman told Steven Alevy that Egert was to be placed on the advisory board of the entity that was acquiring the Portfolio."  Id. ¶ 78(d).

4) "On June 4, 2007, by e-mail, Stern told Steven Alevy that Safrin was on the advisory board of the entity that was acquiring the Portfolio."  Id. ¶ 78(e).

5) "On June 4, 2007, by both telephone and e-mail, Stern told Bankers that Safrin was a sponsor of the acquisition of the Portfolio with between $15 million and $18 million in liquidity."  Id. ¶ 78(f).

6) "On June 5, 2007, by e-mail and later confirmed by Friedman by telephone, Stern told Bankers that Safrin was a co-sponsor of the Portfolio acquisition and will sign the carve-outs on the financing package."  Id. ¶ 78(g).

7) "On June 7, 2007, by both telephone and e-mail, Stern told Bankers that most of the equity for the Portfolio acquisition will come from Safrin and Egert."  Id. ¶ 78(h).

8) "During a telephone conversation in the first week of June 2007, Stern told Steven Alevy that Amusement's $13 million would go straight to Colonial for the purchase of the portfolio."  Id. ¶ 78(I).

9) "In telephone conversations between June 20 and 29, 2007, Friedman told Bankers and Amusement that a 50/50 equity split between Amusement on one hand and Stern, Safrin and Egert on the other was permitted under the financing obtained from Citigroup."  Id. ¶ 78(k).

10) "Shortly before Amusement wired the $13 million, Stern represented, in phone conversations and e-mails, to Steven Alevy that Stern had no affiliation with LTA and Frenkel."  Id. ¶ 78(l).

11) "On June 29, 2007, the LOU, signed by Stern, stated that 100% of the equity and voting interest in the Portfolio would be held in escrow for the benefit of Amusement

until the parties reached a final agreement governing Amusement's participation in the Portfolio." Id. ¶ 78(m).

12) "On June 29, 2007, the LOU, signed by Stern, represented that Amusement's $13 million would only be used towards the purchase of the Portfolio." Id. ¶ 78(n).

13) "On June 29, 2007, Frenkel confirmed in an e-mail to Friedman and Steven Alevy that he would not release the $13 million without prior authorization." Id. ¶ 78(o).

14) "From June 29, 2007 to July 15, 2007, while the parties sought to negotiate a final agreement governing the terms of Amusement's participation in the Portfolio, Stern, Safrin, Egert, Frenkel, LTA, and FRG Corp. and/or FRG LLC had superior information concerning the fact that Amusement's money was removed from the account into which Amusement had wired it, this fact was not readily available to Amusement and Stern, Safrin, Egert, Frenkel, LTA, FRG Corp. and/or FRG LLC knew that Amusement was acting on the basis of mistaken knowledge. Nevertheless, Stern, Safrin, Egert, Frenkel, LTA, and FRG Corp. and/or FRG LLC concealed from Amusement the fact that Amusement's money was removed from the account into which Amusement had wired it." Id. ¶ 79.

15) "Stern, Safrin, Egert, FRG Corp., FRG LLC, Frenkel and LTA knowingly made false statements to Amusement with the motive to induce it to place the $13 million in escrow with Frenkel and LTA and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow. These false statements were made by these defendants so that they could obtain and use Amusement's money to acquire the Portfolio." Id. ¶ 76.

### 2.   Pleading with Particularity under Rule 9(b)

We now consider whether these 15 statements "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Lerner, 459 F.3d at 290 (citation and internal quotation marks omitted).

Statements 1 through 13 easily satisfy the first three elements as to specificity, identity of the speaker, and time/location. In addition, the amended complaint alleges that these statements were actually false and were made to induce Amusement to place the $13 million in escrow. See

16

TAC ¶ 78.[4]

Statement 14, id. ¶ 79, is an allegation of a fraudulent omission.  Where fraud is "'premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff.'" Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 449-50 (S.D.N.Y. 2006) (quoting Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)).  Statement 14 meets the first two elements of the pleading burden.  But because, as is discussed in sections III.A.3 and III.A.4 below, Amusement has not shown reliance or causation with respect to this omission, we do not discuss the remaining elements here.

Statement 15, TAC ¶ 76, does not specify with particularity any of the statements made by each of the defendants it names.  It fails to specify the contents of each statement, who made each statement, and when or where each statement was made.  See Sofi Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006) ("Where fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant.") (internal quotation marks and citation omitted).  Rather, it reads more as a conclusion or summary explaining Amusement's theory of the events giving rise to this suit.  Thus, it will not be considered as containing any independent actionable statements.

---

[4]  The fraudulent intent with respect to statement 9, id. ¶ 78(k), regarding the 50/50 split permitted under the Citigroup financing documents, can be inferred here from the earlier allegation that such an equity split was not permitted under the Citigroup financing scheme, id. ¶ 43.

3.      Reasonable Reliance

The defendants argue that Amusement could not have reasonably relied on these statements.  See Def. Mem. at 36-37.  A fraud claim under New York law requires that a plaintiff demonstrate its reasonable reliance on a false statement made by the defendant.  See Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).  "The reliance requirement means that it is insufficient for a fraud plaintiff to show merely that some chain of events beginning with a false statement by defendants led to his injury."  Schuh v. Druckman & Sinel, LLP, 2008 WL 542504, at *10 (S.D.N.Y. Feb. 29, 2008).  Claims that reliance was in some way "unjustified might, if proven, constitute a defense, but it does not impair the sufficiency of the complaint."  Delane Check Cashing Corp. v. Katz, 127 A.D.2d 735, 735 (2d Dep't 1987).  As one court has noted:

> [M]ost cases where courts have granted motions to dismiss because of a failure to adequately plead reasonable reliance have concerned situations where a plaintiff failed to examine readily available information, relied on oral representations of information when it could easily have asked for additional information, or failed to properly investigate a transaction.

Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (citation omitted).

The only non-conclusory argument by defendants as to reliance is that it was unreasonable for Amusement, which was represented by counsel, to rely on any statements made by Stephen Friedman because Friedman was representing the defendants in this transaction.  See Def. Mem. at 37.  To support this argument they cite case law holding that a plaintiff cannot "'justifiably rely on the legal opinion or conclusions of his or her adversary's counsel.'"  Id. (quoting I.L.G.W.U. Nat'l Ret. Fund v. Cuddlecoat, Inc., 2004 WL 444071, at *3 (S.D.N.Y. Mar. 11, 2004) and citing Kregos v. Associated Press, 3 F.3d 656, 665 (2d Cir. 1993), cert.

18

denied, 510 U.S. 1112 (1994); Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245, 257-58 (S.D.N.Y. 2008)).  Defendants are presumably referring to statements 3 and 9, which assert that Friedman misrepresented that Egert was to be placed on the advisory board of the entity acquiring the Portfolio and that an equity split was permitted by the Citigroup documents. Defendants' argument as to these statements is rejected, however, because they do not necessarily consist of legal opinions or conclusions, but rather might be construed as statements of fact.

The question of reliance as to statement 14 – concerning the failure to disclose that the $13 million had been transferred out of the escrow account – presents a different question. While Amusement was obviously harmed by the loss of the $13 million, nothing in the amended complaint explains how Amusement was separately harmed by the failure to reveal that the money had been improperly removed from the escrow account.  Put in other terms, Amusement does not make factual allegations reflecting that it took any detrimental action in reliance on that particular omission.  Accordingly, any claim based on statement 14 must fail because of the lack of reliance.

### 4.   Causation

Defendants argue that their alleged statements, or the statements made by Friedman on behalf of Stern and FRG Corp., could not have caused Amusement's injuries.  See Def. Mem. at 36.  "To establish causation, plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." Laub v. Faessel, 297 A.D.2d 28, 31 (1st Dep't 2002) (collecting cases).  We address each type of

causation separately.

a.    <u>Transaction Causation</u>

Transaction causation is often synonymous with "but for" causation.  <u>See</u> <u>In re Initial</u> <u>Pub. Offering Secs. Litig.</u>, 399 F. Supp. 2d 298, 306 (S.D.N.Y. 2005), <u>aff'd</u>, <u>Tenney v. Credit</u> <u>Suisse First Boston Corp.</u>, 2006 WL 1423785 (2d Cir. May 19, 2006), <u>cert.</u> <u>denied</u>, <u>Liu v. Credit</u> <u>Suisse First Boston Corp.</u>, 549 U.S. 1077 (2006).  "But for" causation is established in a fraud claim when a plaintiff shows that, absent the defendant's wrongdoing, the plaintiff would not have suffered any injury.  <u>See</u> <u>Zito v. Leasecomm Corp.</u>, 2003 WL 22251352, at *19 (S.D.N.Y. Sept. 30, 2003); <u>accord</u> <u>AUSA Life Ins. Co. v. Ernst & Young</u>, 206 F.3d 202, 209 (2d Cir. 2000) ("Transaction causation means that the violations in question caused the appellant to engage in the transaction in question.") (citation and internal quotation marks omitted); <u>Moore v.</u> <u>PaineWebber, Inc.</u>, 189 F.3d 165, 172 (2d Cir. 1999) ("To show transaction causation, the plaintiffs must demonstrate that <u>but</u> <u>for</u> the defendant's wrongful acts, the plaintiffs would not have entered into the transactions that resulted in their losses.") (citation omitted) (emphasis in original).

Defendants make no argument with respect to transaction causation, other than noting that it must be alleged.  <u>See</u> Def. Mem. at 36-37.  In fact, defendants' only argument on the issue of causation is that because Steven Alevy authorized the release of the escrow funds, he was the cause of Amusement's injury.  <u>See</u> <u>id.</u> at 36.  But, putting aside the point that the third amended complaint does not contain any allegation that Steven Alevy authorized release of the funds, this is merely an argument that some other party constituted a "but for" cause of Amusement's loss. As case law notes, there can be "multiple 'but for' causes of varying degrees of directness" that

20

cause the plaintiff's damages.  <u>Zito</u>, 2003 WL 22251352, at *19.  Here, Amusement alleges that the defendants' statements induced it to enter into the LOU, with the result that it paid the $13 million into escrow, and that the defendants thereafter improperly took this money.  <u>See</u> TAC ¶ 78.  Thus, "but for" defendants' statements, Amusement would not have suffered any injuries.

> b.    <u>Loss Causation</u>

The loss causation requirement in a common law fraud claim is equivalent to the "proximate" cause concept found in other tort cases and in the federal securities context.  <u>See</u> <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343 F.3d 189, 196-97 (2d Cir. 2003) (loss causation in common law fraud claims comparable to federal securities fraud claims); <u>Laub</u>, 297 A.D.2d at 31 ("[l]oss causation is the fundamental core of the common-law concept of proximate cause") (citations omitted); <u>accord</u> <u>AUSA Life Ins. Co.</u>, 206 F.3d at 209 ("Loss causation is causation in the traditional 'proximate cause' sense – the allegedly unlawful conduct caused the economic harm.") (citation omitted).  To show loss causation, a plaintiff must show that the defendant's misrepresentation "directly and proximately caused" his losses.  <u>Laub</u>, 297 A.D.2d at 31 (citations omitted).

Defendants argue that Steven Alevy's authorization to release the funds cut off any liability for their representations about participation in the Portfolio and for their omissions as to the financing documents and the location of the funds.  <u>See</u> Def Mem. at 36.  But, as already noted, the third amended complaint contains no allegation that Steven Alevy authorized the release of the funds.

In any event, the question before us is whether the injury to Amusement "is the natural and probable consequence of the defrauder's misrepresentation or . . . [whether] the defrauder

ought reasonably to have foreseen that the injury was a probable consequence of his fraud."

Solar Travel Corp. v. Nachtomi, 2001 WL 641151, at *4 (S.D.N.Y. June 8, 2001) (citations and

internal quotation marks omitted) (omission in original); accord Citibank, N.A. v. K.H. Corp.,

968 F.2d 1489, 1495-96 (2d Cir. 1992).  Amusement has alleged that the defendants' statements

induced its delivery of the $13 million to the defendants, see TAC ¶¶ 2, 23, 76, and that these

defendants then improperly took control of that $13 million, see id. ¶¶ 40-44.  This is sufficient

to support a claim that the various statements proximately caused the loss of Amusement's $13

million.

However, the analysis with respect to statement 14 – alleging the failure to inform

Amusement about the transfer of the escrow funds – stands on a different footing.  There are no

non-conclusory allegations as to how the defendants' failure to reveal that the money was no

longer in escrow (as opposed to the taking of the money itself) proximately caused harm to

Amusement.  The only harm alleged by Amusement is the loss of the $13 million itself.  The

failure to reveal to Amusement that its money had been taken did not cause Amusement that

particular injury.  No other injury is alleged.  Accordingly, any claim based on statement 14 must

fail because of the lack of causation (as well as for the lack of reliance, as discussed in the

previous section).

*   *   *

In sum, the motion to dismiss Amusement's fraud claim must be granted as to any claims

based on statements 14 and 15, but must be denied as to statements 1 through 13.

B.     Negligent Misrepresentation (Count 6 ¶¶ 84-88)

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted); see also Plaza Penthouse LLP v. CPS 1 Realty LP, 2009 WL 2568734, at *4 (N.Y. Sup. Ct. Aug. 10, 2009) (negligent misrepresentation claims under New York law require a "special relationship of trust of confidence, which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given") (internal quotation marks and citation omitted).  Liability for negligent misrepresentation may be imposed "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996); Accusystems, Inc. v. Honeywell Info. Sys., Inc., 580 F. Supp. 474, 480 (S.D.N.Y. 1984) ("New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties.") (citations omitted).  Finally, a plaintiff must show that the negligent misrepresentation caused its injuries. Laub, 297 A.D.2d at 30-31. The causation requirement for a negligent misrepresentation claim is the same as the causation requirement for a claim of fraud. See id.

While the existence of a special relationship is a "fact-intensive, case-by-case inquiry," In re Vivendi Universal, S.A., 2004 WL 876050, at *13 (S.D.N.Y. Apr. 22, 2004) (citation omitted), courts have dismissed pleadings that contain insufficient allegations on this point, see, e.g., @Wireless Enters., Inc. v. AI Consulting, LLC, 2006 WL 3370696, at *13 (W.D.N.Y. Oct. 30, 2006); MBIA Ins. Co. v. GMAC Mortg. LLC, 914 N.Y.S.2d 604, 611 (Sup. Ct. 2010).

We analyze Amusement's claims against Stern/FRG Corp. and Frenkel/LTA separately. We consider only statements 1 through 13 inasmuch as we have determined that with respect to statement 14, there was no reliance or causation, and that statement 15 was not pled with particularity.

        1.    Stern and FRG Corp.

There are no allegations suggesting a "special relationship" between Stern and FRG Corp. on the one hand and Amusement on the other.  The transaction between the defendants and Amusement is alleged to have been nothing more than an arm's length business arrangement between sophisticated and experienced parties, a circumstance insufficient to create a "special relationship."  See Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC, 74 A.D.3d 652, 653 (1st Dep't 2010) ("[T]he parties to the agreements dealt at arm's length, so the close relationship required to support the negligent misrepresentation claim was lacking.") (citations omitted); Silvers v. State, 68 A.D.3d 668, 669 (1st Dep't 2009) ("the arm's-length business relationship . . . is not generally considered to be of the sort of a confidential or fiduciary nature that would support a cause of action for negligent misrepresentation") (citation omitted); Plaza Penthouse LLP, 2009 WL 2568734, at *4 (no claim for negligent misrepresentation because case "involve[d] an ordinary business relationship between a buyer and seller who negotiated a

contract at arm's length, both being represented by counsel") (citation omitted).  The complaint

reflects that the parties on both sides were operating independently, with no prior existing

relationship and with no reason to repose trust in the other.  See, e.g., M & T Bank Corp. v.

Gemstone CDO VII, Ltd., 68 A.D.3d 1747, 1747 (4th Dep't 2009) (finding no special

relationship in part because "the parties had no relationship prior to this arms-length

transaction") (citing cases).  Nor is it alleged that the defendants had special "expertise" that they

were holding forth to induce plaintiffs to trust them.  See generally MBIA Ins. Co., 914

N.Y.S.2d at 611 ("courts have not found specialized knowledge where the alleged area of

expertise involves the particulars of the defendant's business").  As demonstrated by MBIA Ins.

Co., the mere fact that a defendant possesses certain documentation relating to a transaction is

not enough to meet the "special expertise" element.  See id.  Accordingly, the requisite "special

relationship" element of the negligent misrepresentation claim has not been pled.  See, e.g.,

Thomas H. Lee, 612 F. Supp. 2d at 285 (negligent misrepresentation claim dismissed because

plaintiffs "failed to allege, as they must under New York law, that there was a 'near-privity'

relationship between the parties"); Benjamin Shapiro Realty Co., LLC. v. Kemper Nat'l Ins.

Cos., 303 A.D.2d 245, 245 (1st Dep't 2003) (plaintiff and defendant "had no contractual

relationship and the fact that plaintiff had contact with [defendant] in the course of obtaining the

certificates of  insurance did not give rise to the sort of relationship, i.e., one approaching that of

privity, requisite to the imposition of liability for negligent misrepresentation") (citation

omitted); MBIA Ins. Corp. v. Royal Bank of Canada, 2010 WL 3294302, at *34 (N.Y. Sup. Ct.

Aug. 19, 2010) ("The special relationship is limited to situations involving a 'fiduciary

relationship or a position of trust or confidence . . . [and][c]ommercial parties acting at arms'

length in negotiating a contract are not in a special relationship.'") (citations omitted) (alterations

and omission in original); Stan Winston Creatures, Inc. v. Toys "R" Us, Inc., 2004 WL 1949071,

at *5 (N.Y. Sup. Ct. Sept. 1, 2004) (because here there was nothing more than an "arms' length

dealing between separate business entities," the "mere allegation that plaintiffs relied on advice

received from Toys "R" Us about the production and marketing of toy figures, and that Toys "R"

Us was aware of any such reliance, d[id] not suffice to state a claim for negligent

misrepresentation") (citations omitted); see also Sebastian Holdings, Inc. v. Deutsche Bank AG,

78 A.D.3d 446, 447 (1st Dep't  2010) (no fiduciary relationship found because "[p]laintiff's

alleged reliance on defendant's superior knowledge and expertise in connection with its foreign

exchange trading account ignores the reality that the parties engaged in arm's-length transactions

pursuant to contracts between sophisticated business entities that do not give rise to fiduciary

duties") (citations omitted); AJW Partners LLC v. Itronics Inc., 68 A.D.3d 567, 568 (1st Dep't

2009) ("there can be no fiduciary obligation in a contractual arm's length relationship between a

debtor and note-holding creditor") (citations omitted).

  Plaintiffs make a number of arguments in their attempt to hold Stern and FRG Corp.

liable for negligent misrepresentations, though they make virtually no effort to link up these

theories to particular factual statements that are alleged to be false.  See Pl. Opp. Mem. at 26-33.

  Plaintiffs argue that "a special relationship may be imputed to defendants that make

misrepresentations through third-parties, when those third-parties do have a special relationship

with the claimants."  Pl. Opp. Mem. at 30 (citation omitted).  But while, as described in the next

section, the plaintiffs have adequately pled a special relationship as to Frenkel and LTA, they do

not explain why any particular statement attributed to Stern and FRG Corp. becomes actionable

because of the presence of Frenkel and LTA in this matter.  Their argument on this point, see Pl. Opp. Mem. at 30, is not clear, and the cases to which they cite, Westinghouse Elec. Supply Co. v. Pyramid Champlain Co., 193 A.D.2d 928, 931 (3d Dep't 1993) and Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 425-26 (1989), do not support the result they seek.  In Westinghouse, the Court found that an allegation that there was an "agency" relationship between the two parties satisfied the "special relationship" requirement.  See 193 A.D.2d at 931.  No such "agency" relationship is alleged here, however.  Ossining involved a claim of negligent misrepresentation against engineers – thus fulfilling the "special expertise" requirement.  See 73 N.Y.2d at 425-26; see, e.g., Kimmell, 89 N.Y.2d at 263 (1996) (noting that "[p]rofessionals, such as lawyers and engineers, by virtue of their training and expertise, may have special relationships of confidence and trust with their clients, and [that] in certain situations . . . liability for negligent misrepresentation" may be imposed "when they have failed to speak with care") (citations omitted).  Moreover, the only question in Ossining was whether the relationship between the plaintiff and the defendant engineers met the requirement of "contractual privity," which is required in cases of negligent misrepresentation where, as here, only economic damages are alleged.  See 73 N.Y.2d at 421-22, 424-26.  Notably, Kimmell made it clear that "[t]he analysis in a commercial case . . . is necessarily different from [Ossining] . . . because of the absence of obligations arising from the speaker's professional status.  In order to impose tort liability . . . there must be some identifiable source of a special duty of care." Kimmell, 89 N.Y.2d at 264.  As already discussed, in a commercial transaction such as the one

here, there was no such duty of care.[5]

Amusement also argues that the LOU, entered into by Amusement and Stern/FRG Corp., creates a "separate independent basis to find a special relationship" between Amusement on one hand and Stern/FRG Corp. on the other, pointing to the requirement documented in the LOU that each party "'work in good faith to finalize these agreements within 7 days.'"  See Pl. Opp. Mem. at 31 (quoting LOU Ex.).  But even assuming arguendo that the LOU was enforceable, this particular clause cannot be reasonably construed to mean that Stern and FRG Corp. placed themselves "in a special position of confidence and trust with" Amusement.  Instead, the LOU reflects that the parties dealt with each other as business people negotiating a transaction at arms' length.  Tomoka Re Holdings, Inc. v. Loughlin, 2004 WL 1118178 (S.D.N.Y. May 19, 2004), a case Amusement cites in support of its argument, see Pl. Opp. Mem. at 31, is of no relevance because it involved a contract that contained an explicit representation that the plaintiff was "relying upon the accuracy" of the defendant's representations.  2004 WL 1118178, at *6.  Moreover, Amusement never alleges that it was bound by the LOU and indeed alleges that the $13 million was used despite the fact that no final agreement was reached.  See TAC ¶¶ 3, 4, 51; Pl. Opp. Mem. at 11-12.

Amusement also argues that "in the negligent misrepresentation context, New York

---

[5]  Amusement asserts that Westinghouse should govern this case because defendants' "use of Plaintiff's relationship with third-party [defendant] Stephen Friedman can be extended to Stern and FRG Corp."  Pl. Opp. Mem. at 30-31.  But, while it was alleged that Friedman was representing "an Alevy family entity in an unrelated transaction," TAC ¶ 28, it is not alleged that Friedman had ever represented Amusement itself.  In any event, the complaint alleges that Stephen Friedman held himself out as the attorney for the defendants and other parties, not as the attorney for Amusement, see id. ¶ 25, and thus Amusement knew that Friedman was not its attorney.

courts permit . . . a plaintiff to avoid the special relationship requirement based on a party's superior knowledge . . . ."  Pl. Opp. Mem. at 29 (citing @Wireless Enterprises, Inc., 2006 WL 3370696, at *12); see Pl. Opp. Mem. at 31-33.  As an initial matter, the Court notes that the case law on which this argument is based has cited to the portion of the New York Court of Appeals' decision in Kimmell that addressed the "justifiable reliance" element of a negligent misrepresentation claim, not the question of whether a duty existed to begin with.  See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 102-03 (2d Cir. 2001); @Wireless Enterprises, Inc., 2006 WL 3370696, at *12.  Specifically, Kimmell held that in determining whether "justifiable reliance" – not the threshold  "special relationship" – exists in a particular case, several factors should be considered, including whether the party making the representations had superior knowledge.  See 89 N.Y.2d at 264.  Kimmell states:

> [A] fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose.

Id.  Kimmell at no point suggests that the finding of a "special relationship" was not a threshold requirement of a negligent misrepresentation claim.

Be that as it may, the Second Circuit has discussed all three factors – including the third factor regarding information supplied by the speaker – in determining whether a "special relationship" imposing a duty of care exists to begin with, see Suez Equity Investors, L.P., 250 F.3d at 103-04, and thus we will assume that we should do so as well.  In this regard, the Second Circuit has held that where the plaintiff has not pled a "special relationship of trust or confidence," and where "the allegations with respect to the other Kimmell factors [that is,

special expertise and superior knowledge,] are soft, a claim for negligent misrepresentation is dismissible under Rule 12(b)(6)."  Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 188 (2d Cir. 2004).  Here, as already discussed, no "special relationship of trust or confidence" existed between Amusement and Stern/FRG Corp., and there are no allegations at all supporting one of the Kimmell factors: specifically, whether the defendants had "unique or special expertise."  Accordingly, Amusement has not pled facts that show the threshold "special relationship" between the parties.[6]

Accordingly, the negligent misrepresentation claim should be dismissed as to Stern and FRG Corp.

### 2.    Frenkel and LTA

There are three statements attributable to Frenkel or LTA: statements 13, 14, and 15.  For the reasons already stated, only statement 13 is at issue.

Amusement alleges that a special relationship of trust and confidence arose when it placed its $13 million into escrow with Frenkel and LTA.  See id. ¶ 86.  For the reasons described in section III.I below, we conclude that Frenkel and LTA owed Amusement a fiduciary duty as escrow agents.  Defendants do not contest that a showing of a fiduciary duty establishes the requisite special relationship element.  Nor have they argued that the complaint fails to allege any of the other elements of a negligent misrepresentation claim.  Thus, Frenkel and LTA's motion to dismiss Amusement's negligent misrepresentation claim should be denied

---

[6]  Amusement cites to case law regarding omissions, see Pl. Opp. Mem. at 26-27 (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)) (additional citations omitted), but only statement 14 alleges an omission and that statement is not at issue because of the absence of allegations regarding causation and reliance.

with respect to statement 13.

      C.      Conversion (Count 7 ¶¶ 89-95)

To state a claim for conversion under New York law, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006) (citations omitted). A plaintiff must show (1) a "possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Id. at 50 (citations omitted). Interference with a plaintiff's right to possession may be "by a wrongful: (I) taking; (ii) detention; or (iii) disposal." Corporacion Fruticola De Chincha v. Watermelon Depot, Inc., 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (citing Pierpoint v. Hoyt, 260 N.Y. 26, 29 (1932)). "Some affirmative act – asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant – has always been an element of conversion." State v. Seventh Regiment Fund, Inc., 98 N.Y.2d 249, 260 (2002) (citations omitted).

Amusement's allegations meet all of these elements. Amusement placed its money into escrow with LTA pursuant to the LOU on or about June 29, 2007. See TAC ¶¶ 31-32. Amusement did not give authority for the money to be released. See id. ¶¶ 36-38. Despite the lack of authority to use the money, LTA and Frenkel moved the money to an account controlled by FRG Corp. See id. ¶ 40. Finally, Stern and FRG Corp. used the escrow money for the closing of the Portfolio. See id. ¶ 49. In other words, Amusement had a possessory interest in

the $13 million and the defendants took control of that $13 million without Amusement's permission.

The defendants argue that the $13 million was to be commingled with the rest of the funds needed to acquire the Portfolio, that it was not kept as a "separate, distinct, separately identifiable chattel and, therefore, [that it] cannot form the basis for a conversion claim."  Def Mem. at 40.  The two cases they cite for this proposition, however, are not apposite.  In The High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420 (S.D.N.Y. 1998), the court dismissed  a conversion claim brought by investors because the plaintiffs were simply seeking the return of money they had invested.  Id. at 429.  Auguston v. Spry, 282 A.D.2d 489 (2d Dep't 2001), similarly involved an investor seeking return of moneys invested.  Id. at 489-90, 491.  Auguston dismissed the conversion claim because plaintiff's $200,000 investment "was to be commingled into the [defendant] corporation's capital."  Id. at 491.  Here, Amusement contends that the $13 million was to remain undisturbed in the escrow account until some later time when an agreement would be reached as to its disposition.  While that disposition might have eventually included commingling once release of the funds was authorized, Amusement does not contend that the release was ever authorized.  Thus, it does not seek return of money paid towards an investment.  Rather, it seeks the return of the specifically identified $13 million the plaintiffs placed in escrow, which was only to be released if Amusement gave defendants the authority to do so.  Id. ¶¶ 33-35, 55.

In sum, Amusement has stated a claim for conversion against Stern, FRG Corp., Frenkel, and LTA.

D.      Conspiracy to Commit Conversion and/or Fraud (Count 8 ¶¶ 96-104)

Amusement alleges that the defendants participated in a conspiracy to commit conversion and/or fraud with respect to the misappropriation of the $13 million.  To establish a prima facie case for conspiracy, a plaintiff must allege the primary tort and four additional elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury."  Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991) (citing Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986)).

We have already found that the primary torts – conversion and fraud – have been stated. With respect to the conspiracy elements, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008) (citations omitted); accord In re Harvard Knitwear, Inc., 153 B.R. 617, 628 (E.D.N.Y. 1993) ("[T]he nature of conspiracies often make it impossible to provide details at the pleading stage.  A plaintiff therefore should be allowed to resort to the discovery process and not easily be subject to dismissal of his complaint alleging conspiracy.").

Defendants' argument on this point consists essentially of their argument that the underlying torts have not been pled, Def. Mem. at 41-43, Reply Mem. at 38 – a position we have already rejected.  Defendants make no effort to indicate which of the additional civil conspiracy elements have not been pled here, and the Court does not believe itself bound to address arguments not raised by the defendants themselves.  Defendants' reliance on an allegation

contained in the original complaint and not repeated in the third amended complaint, see Def.

Mem. at 42, is irrelevant as the Court is not being asked to address the claims in the original

complaint.

Accordingly, the defendants' motion to dismiss the claims of civil conspiracy with

respect to any surviving fraud claims and the conversion claim should be denied.

E.    Unjust Enrichment (Count 12 ¶¶ 128-137)

Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges

"(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good

conscience require restitution."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (citation

and internal quotation marks omitted); accord Paramount Film Distrib. Corp. v. State of New

York, 30 N.Y.2d 415, 421 (1972) ("The essential inquiry in any action for unjust enrichment or

restitution is whether it is against equity and good conscience to permit the defendant to retain

what is sought to be recovered.") (citations omitted), cert. denied, 414 U.S. 829 (1973).  The

"essence" of an unjust enrichment claim is that "one party has received money or a benefit at the

expense of another."  Kaye, 202 F.3d at 616 (citation and internal quotation marks omitted).

Therefore, to support a claim for unjust enrichment, Amusement must show that Stern/FRG

Corp. and Frenkel/LTA have received some benefit at Amusement's expense.

Amusement has stated a claim for unjust enrichment against Stern and FRG Corp.

because it has alleged that Stern and FRG Corp. (among others) received a benefit at the expense

of Amusement when they obtained possession of the $13 million to complete the real estate deal

orchestrated by Stern.  See TAC ¶¶ 49, 59.  Obviously, Amusement was harmed by the loss of

this money.

It has not stated a claim against Frenkel and LTA, however, because it has made no allegation as to how Frenkel and LTA benefitted from the money placed in escrow.  Amusement points to its allegation that "[d]efendants" used the money in a "variety of unauthorized ways," id. ¶ 5; see Pl. Opp. Mem. at 49, but this allegation is too vague and conclusory to constitute a proper allegation that Frenkel and LTA themselves received a benefit from the $13 million.

Accordingly, the claim for unjust enrichment must be dismissed against Frenkel and LTA.

    F.    <u>Purchase Money Resulting Trust, Constructive Trust and Equitable Lien (Counts 1, 2, 3 ¶¶ 57-62, 63-67, 68-70)</u>

    1.    <u>Purchase Money Resulting Trust (Count 3 ¶¶ 68-70)</u>

A purchase money resulting trust may be established if "in violation of a trust, the transferee has purchased property with the money of another person." <u>Mendel v. Hewitt</u>, 161 A.D.2d 849, 851 (3d Dep't 1990) (citing N.Y.E.P.T.L. § 7-1.3(a)).  Here, plaintiffs' third amended complaint alleges that Stern and FRG Corp. were entrusted with plaintiffs' $13 million and that Stern and FRG Corp. used that $13 million to purchase the Colonial Portfolio.  <u>See, e.g.</u>, TAC ¶¶ 4, 49, 59.  As previously noted, however, Amusement has now withdrawn this claim, and seeks to place liens only on "assets Stern and FRG Corp. obtained or purchased other than the realty contained in the Portfolio."  Pl. Opp. Mem. at 9-10 n.4.  The problem with plaintiffs' pleading is that it does not identify any "property" purchased with its $13 million other than the Colonial Portfolio.  At best, it alleges that the $13 million was used for "expenses unrelated to the purchase of the Portfolio." TAC ¶ 61; <u>accord</u> <u>id.</u> ¶ 40 ("funds were disbursed from the account" to which the $13 million had been wired "for expenses, debts or the purchase of assets unrelated to the Portfolio").  These allegations are too vague to allow the Court to impose the relief

requested: a trust on identifiable "property" purchased with the $13 million.  Accordingly, the claim for a purchase money resulting trust should be dismissed.

> 2.   <u>Constructive Trust (Count 2 ¶¶ 63-67)</u>

 Amusement does not seek a constructive trust with respect to the $13 million it transferred to the defendants.  Rather, it seeks to impose a trust only on certain assets – the non-Portfolio assets – purchased with that $13 million.  <u>See</u> Pl. Opp. Mem. at 9-10 n.4.  "New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment."  <u>In re Ades Berg Grp. Investors</u>, 550 F.3d 240, 245 (2d Cir. 2008) (quoting <u>Sharp v. Kosmalski</u>, 40 N.Y.2d 119, 121 (1976)); <u>accord</u> <u>Steinbeck v. Steinbeck Heritage Found.</u>, 2010 WL 3995982, at *4 (2d Cir. Oct. 13, 2010); <u>DLJ Mortg. Capital, Inc. v. Kontogiannis</u>, 2009 WL 1652253, at *4 (E.D.N.Y. June 4, 2009).  Here, there was no transfer of non-Portfolio assets from Amusement to defendants.  Thus, no constructive trust could be placed on these assets.

Moreover, as previously discussed, the relationship between Amusement and Stern/FRG Corp. with respect to Amusement's investment in the Colonial properties was no different from that of parties to an ordinary business arrangement, and thus the "confidential or fiduciary relationship" element is not satisfied as well.[7]

_____

[7] Amusement argues that pursuant to <u>Counihan v. Allstate Ins. Co.</u>, 194 F.3d 357 (2d Cir. 1999) and <u>Golden Budha Corp. v. Canadian Land Co. of Am., N.V.</u>, 931 F.2d 196 (2d Cir. 1991), it is not necessary to allege a fiduciary duty in order to pursue a claim for a constructive trust.  <u>See</u> Pl. Opp. Mem. at 14-15 (citing <u>Counihan</u>, 194 F.3d at 361-62; <u>Golden Budha Corp.</u>, 931 F.2d at 202).  The Second Circuit has since made clear, however, that a "confidential or fiduciary relationship" is a required element in imposing a constructive trust under New York law.  <u>In re Ades Berg Grp. Investors</u>, 550 F.3d at 245 ("New York law requires four elements to

Accordingly, this claim too must be dismissed.

3.     Equitable Lien (Count 1 ¶¶ 57-62)

The New York Court of Appeals has held that

> New York law allows the imposition of an equitable lien if there is an express or implied agreement "that there shall be a lien on specific property" (Teichman v. Cmty. Hosp. of W. Suffolk, 87 N.Y.2d 514, 520 [1996] [internal quotation marks and citation omitted]).  Such an agreement must evince a sufficiently clear intent that the property is to be "held, given or transferred as security for the obligation" (id. [internal quotation marks and citation omitted]).  A party's "mere expectation, however sincere, is insufficient to establish an equitable lien" (Scivoletti v. Marsala, 61 N.Y.2d 806, 809 [1984] ).

M & B Joint Venture, Inc. v. Laurus Master Fund, Ltd., 12 N.Y.3d 798, 800 (2009).

This claim fails because, as already discussed, plaintiffs do not identify "specific property" on which the equitable lien can arise.

G.     Declaratory Judgment (Count 4 ¶¶ 71-73)

 The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Amusement seeks a declaratory judgment that it has "a security interest in the eleven properties in the Portfolio in the amount of at least $13 million."  TAC ¶ 73.  Defendants have moved to dismiss this claim, see Def. Mem. at 25-31, and Amusement has made no argument in opposition to that motion.

Accordingly, the claim for declaratory relief should be dismissed.

---

prove a constructive trust," including "a confidential or fiduciary relationship") (citation omitted); see Steinbeck, 2010 WL 3995982, at *4 (same).

H.    Breach of Promissory Notes (Counts 9 and 10 ¶¶ 105-10, 111-16)

Amusement seeks to recover amounts due under two promissory notes.  See TAC ¶¶ 105-16.  Under California law, a promissory note can only be enforced by a "holder" of such an instrument.  See Cal. Com. Code. § 3301.  A "holder" of a note under California law is either: "(A) the person in possession of a negotiable instrument that is payable either to bearer or, to an identified person that is the person in possession; or (B) the person in possession of a document of title if the goods are deliverable either to bearer or to the order of the person in possession."  Id. § 1201(21).  Furthermore, "if an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder."  Id. § 3201(b).

In its complaint, Amusement at no point alleges that the two notes were delivered into its possession.  In fact, the only allegation on this score is that it rejected the offer of the notes.  See TAC ¶¶ 51, 109, 115.  While Amusement points to paragraphs 45, 46, and 48 of its complaint as alleging possession, see Pl. Opp. Mem. at 42, paragraph 45 makes no mention of a promissory note, paragraph 46 refers to a $13 million note that was sent on July 11, 2007 to Steven Alevy, not to Amusement, and paragraph 48 refers to yet another promissory note for $13 million signed on July 12, 2007, but without any explanation of who took possession of that note.  Contrary to Amusement's argument, see Pl. Opp. Mem. at 42, there is no allegation that Alevy was acting as its agent for purposes of receiving the notes.

Thus, Amusement has not stated a claim for breach of any promissory notes.

I.    Breach of Fiduciary Duty (Count 11 ¶¶ 117-127)

To state a claim for the breach of a fiduciary duty under New York law, "a plaintiff must

prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't 2007) (citation omitted). Here, Amusement claims that LTA and Frenkel breached a fiduciary duty which arose because LTA and Frenkel were serving as Amusement's escrow agents. See Pl. Opp. Mem. at 46-48.

LTA and Frenkel do not contest that an escrow agent has a fiduciary duty to the depositor of escrow funds. Nor could they. See, e.g., Cash v. Titan Fin. Servs., Inc., 58 A.D.3d 785, 789 (2d Dep't 2009) ("'an escrow agent can be held liable for . . . breach of fiduciary duty as escrowee'") (quoting Takayama v. Schaefer, 240 A.D.2d 21, 25 (2d Dep't 1998)) (omission in original); T.T.S.G. v. Kubic, 226 A.D.2d 132, 133 (1st Dep't 1996) ("[a]s escrow agent, defendant owes a fiduciary duty to the parties to the transaction") (citations omitted). Accordingly, the only question is whether the complaint contains allegations that LTA and Frenkel were acting as Amusement's escrow agents.

Case law reflects that an escrow agreement exists if it is shown "that there is (a) an agreement regarding the subject matter and delivery of the funds, (b) a third-party depositary, (c) delivery of the funds to a third party conditioned upon the performance of some act or the occurrence of some event, and (d) relinquishment by the grantor or depositor." Mortg. Elec. Registration Sys., Inc. v. Maniscalco, 46 A.D.3d 1279, 1281 (3d Dep't 2007) (internal quotation marks, citations, and brackets omitted); accord In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir.), cert. denied, 537 U.S. 882 (2002); Gianoukas v. Campitiello, 2009 WL 3270808, at *2 (S.D.N.Y. Oct. 13, 2009). The plaintiff's allegations as to the nature of the escrow relationship are thin, but meet the standards of notice pleading under Fed. R. Civ. P. 8(a). Amusement

alleges that "LTA and Frenkel acknowledged . . . that the [$13 million] was to be held in escrow by LTA and Frenkel and released only if Amusement so instructed."  TAC ¶ 34.  It also alleges that "[o]n June 29, 2007, Frenkel confirmed in an e-mail to Friedman and Steven Alevy that he would not release the $13 million without prior authorization."  TAC ¶ 78(o).  These allegations, in combination with the allegations that the money was actually transferred to LTA, are sufficient to allow the inference that the elements of an escrow agreement under New York law are met.

LTA and Frenkel argue that they cannot have a fiduciary duty as escrow agents because it is not alleged that there was a written escrow agreement.  See Def. Mem. at 47-48.  While case law sometimes adverts to the fact that an escrow agreement must be in writing, see In re AppOnline.com, Inc., 315 B.R. 259, 274 (E.D.N.Y. 2004) ("[u]nder New York law, to establish an escrow arrangement there must be a written agreement") (citations and internal quotation marks omitted); Nat'l Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn, 165 Misc. 2d 539, 544 (N.Y. Sup. Ct. 1994) ("[a]n escrow is a written agreement") (citations omitted), aff'd, 227 A.D.2d 106 (1st Dep't 1996), neither these cases nor any other cases cited by the parties hold that an agreement that otherwise establishes an escrow relationship fails if the agreement is oral rather than in writing.  Nor is the Court aware of any such cases.  Indeed, in T.T.S.G. v. Kubic, 226 A.D.2d 132, 133 (1st Dep't 1996), the First Department appears to have assumed that an oral agreement regarding an escrow arrangement would be enforceable.  Id.  In another case, the Fourth Department concluded that an "escrow account was established pursuant to an agreement between the parties," Johnson v. Optometrix, Inc, 75 A.D.3d 1073, 1074 (4th Dep't 2010), even though, as the dissenting opinion pointed out,

"[n]o written escrow agreement was signed," id.[8]  Moreover, New York's Statute of Frauds does not require that escrow agreements be in writing.  See N.Y. Gen. Oblig. Law § 5-701(a).

Accordingly, the mere fact that the complaint does not allege a written agreement is insufficient to require dismissal of the claim of breach of fiduciary duty.

IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss the third amended complaint (Docket # 448) filed by Stern, FRG Corp., Frenkel, and LTA should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) the claims of fraud (Count 5) as to statements 14 and 15; (2) the claim of negligent misrepresentation (Count 6) with regard to Stern and FRG Corp. as to all statements and with regard to Frenkel and LTA as to all statements other than statement 13; (3) the claim for unjust enrichment (Count 12) against Frenkel and LTA; (4) the claim for a purchase money resulting trust (Count 3); (5) the claim for a constructive trust (Count 2); (6) the claim for an equitable lien (Count 1); (7) the claim for declaratory relief (Count 4); and (8) the claims for breach of promissory notes (Counts 9 and 10).  The other claims should not be dismissed.[9]

---

[8]  While the defendant's attorney in Johnson sent a cover letter stating that the money was to be held in escrow until the parties executed a written settlement agreement, the escrow agent never signed any documents.  Id.

[9] Thus, the remaining claims consist of: (1) claims of fraud against Stern and FRG Corp. with respect to statements 1 through 12, and a claim of fraud against Frenkel and LTA with respect to statement 13 (Count 5); (2) a claim of negligent misrepresentation against Frenkel and LTA with respect to statement 13 (Count 6); (3) a claim of conversion against all defendants (Count 7); (4) a claim of conspiracy against all defendants with respect to the remaining fraud and conversion claims (Count 8); (5) a claim of breach of fiduciary duty against Frenkel and LTA (Count 11); and (6) a claim of unjust enrichment against Stern and FRG Corp. (Count 12).

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

New York, New York 10007.  Any request for an extension of time to file objections must be

directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be

permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v.

Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham,

Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010). ).

Dated: February 17, 2011
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

42

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

New York, New York 10007.  Any request for an extension of time to file objections must be

directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be

permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v.

Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham,

Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010). ).

Dated: February 17, 2011
     New York, New York

          GABRIEL W. GORENSTEIN
          United States Magistrate Judge