**REDACTED VERSION**
**COMPLETE VERSION FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMUSEMENT INDUSTRY, INC. dba WESTLAND INDUSTRIES; and PRACTICAL FINANCE CO., INC., <br><br> Plaintiffs, <br><br> v. <br><br> MOSES STERN, aka MARK STERN, JOSHUA SAFRIN, AVERY EGERT, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, LAND TITLE ASSOCIATES ESCROW, <br><br> Defendants. <br> -------------------------------------------------------- <br><br> AND RELATED CROSS-ACTIONS | **CASE NO. 7 CV 11586 (LAK) (GWG)** <br><br> **ECF CASE** |

---

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL

---

CRAIG H. MISSAKIAN
AMUSEMENT INDUSTRY, INC.
6665 Long Beach Boulevard
Long Beach, California 90805
Tel: (310) 639-7130
Fax: (310) 639-7210
E-Mail: craig@westlandindustries.com

ELISSA E. KOOLYK
LAW OFFICES OF ELISSA E. KOOLYK
575 Madison Avenue, 10th Floor
New York, New York 10022
Tel: (646) 401-0125
E-Mail: eliekoolyk@gmail.com

*Attorneys for Plaintiffs Amusement Industry, Inc.,*
*Practical Finance Co., Inc., Bankers Capital*
*Realty Advisors, and Steven Alevy*

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................ 1

II.     OVERVIEW ................................................................................................ 4

A. THE OBJECTS OF THE SCHEME ................................................................... 4

B. AMUSEMENT AND SAFRIN ......................................................................... 5

III.   STATEMENT OF FACTS ......................................................................... 7

A. THE FRENKEL INDICTMENT ....................................................................... 7

B. STERN'S ATTORNEYS ................................................................................ 9

C. CO-SCHEMER EPHRAIM FRENKEL ........................................................... 10

D. CRIMES AND FRAUDS .............................................................................. 11

    1.  Elements of the offenses .................................................................. 11

    2.  JP Morgan—wire fraud 18 U.S.C. §1343 ....................................... 12

    3.  Citigroup—18 U.S.C. §§1343 and 1349 ......................................... 16

    4.  Safrin—18 U.S.C. § 1028A ............................................................. 17

    5.  Amusement—Theft of $13 million .................................................. 22

        (a)  Stern lied to Amusement ......................................................... 22

        (b)  Stern converted Amusement's money ...................................... 23

        (c)  Attorneys assisted in laundering funds ................................... 26

    6.  Post-closing Cover Up —18 U.S.C. § 1343 and 1349 ..................... 28

        (a)  The counterfeit promissory note .............................................. 29

        (b)  75/25 magically changes to 87/13 .......................................... 33

IV.   DISCUSSION ........................................................................................... 34

A.  APPLICABLE LAW ................................................................................... 34

B. APPLICATION OF THE LAW TO THE FACTS ................................................ 36

    1.  Probable cause exists ...................................................................... 36

    2.  The attorney-client communications furthered the scheme ............ 39

    3.  Role of each attorney ....................................................................... 42

(a) Friedm an ................................................................................. 42

(b) Herrick ................................................................................. 44

(c) HSR ................................................................................. 45

(d) Minsky ................................................................................. 46

(e) Reiss ................................................................................. 46

(f) Tepfer ................................................................................. 47

4.   In camera review ................................................................. 47

**V.    CONCLUSION ................................................................. 48**

TABLE OF AUTHORITIES

C<small>ASES</small>

*Shahinian v. Tankian*, 242 F.R.D. 255  (S.D.N.Y. 2007) ................................................................ 39

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Civ. 4978, 1999 WL 61442
    (S.D.N.Y. Feb. 3, 1999) ................................................................................................................ 38, 39

*Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, 242 F.R.D. 248 (S.D.N.Y. 2007) ..... 37, 38

*Armstrong v. Collins*, 01 CIV 2437 PAC, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010).......... 41

*Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007) ........................................... 37, 43, 44

*Chevron Corp. v. Salazar*, 275 F.R.D. 437 (S.D.N.Y. 2011) ...................................................... 38

*Duttle v. Bandler & Kass*, 127 F.R.D. 46 (S.D.N.Y. 1989) ........................................................ 42

*In re Enron Corp.*, 349 B.R. 115 (Bankr. S.D.N.Y. 2006) .................................................... 39, 42

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032
    (2d Cir. 1984) ............................................................................................................................ 37, 38

*In re Grand Jury Subpoena*, 419 F.3d 329 (5th Cir. 2005) ......................................................... 43

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994)). .................................................................... 37

*In re Richard Roe, Inc.*, 168 F.3d 69 (2d Cir. 1999) ................................................................... 37

*Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390 (6th Cir. 1999) ............................................ 40

*LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) ................................................................ 41

*Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351 (E.D.N.Y. 2009) .............................................. 51

*S.E.C. v. Herman*, 00Civ.5575, 2004 WL 964104 (S.D.N.Y. May 5, 2004)............. 38, 41, 43, 45

*Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, 98 CIV. 7775, 2004 WL 42280
    (S.D.N.Y. Jan. 7, 2004). ................................................................................................................ 39

*U.S. S.E.C. v. Suman*, 684 F. Supp. 2d 378 (S.D.N.Y. 2010) .................................................... 41

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) .................................................................. 37

*United States v. Magassouba*, 619 F.3d 202 (2d Cir. 2010)...................................................... 15

*United States v. McDonald*, 01-CR-1168, 2002 WL 31956106 (E.D.N.Y. May 9, 2002).......... 39

*United States v. Morales-Martinez*, 672 F. Supp. 762 (D. Vt. 1987) .................................... 42, 45

*United States v. Saccoccia*, 898 F. Supp. 53 (D.R.I. 1995) ................................................. 38, 41

*United States v. Wozniak*, 781 F.2d 95 (7th Cir. 1985) ............................................................. 40

*USA vs. Frenkel*, No. 10 CR 1207 (WWE)................................................................................ 10

S<small>TATUTES</small>

18 U.S.C. § 1028A.................................................................................................................... 15, 20

18 U.S.C. § 1343 ................................................................................................................... 4, 15, 18

18 U.S.C. §1349 .................................................................................................................... 4, 15, 18

18 U.S.C. §1956(a)(1)(B) ........................................................................................................... 14

O<small>THER</small> A<small>UTHORITIES</small>

Federal Jury Practice and Instructions, Criminal (Sixth Ed.) ...................................................... 14

**"That [Stern] can't find $100k and is playi[n]g
in this league is BS, *or worse*, if true."**

*Citigroup banker, June 14, 2007*[1]

## I. INTRODUCTION

The Citigroup banker quoted above was referring to Mark Stern's ("Stern") seeming

inability to find sufficient funds to close the transaction that is at the center of this case. As it

turned out, the banker was prophetic. It was worse; it was a crime. And as discussed below,

whether knowingly or not the attorneys involved in the transaction touched virtually every aspect

of that crime and Stern's communications with those attorneys should be disclosed under the

crime-fraud exception to the attorney-client privilege.

In December 2010, the United States Attorney's Office for the Southern District of New

York indicted Ephraim Frenkel ("Frenkel") for wire fraud and conspiracy to commit wire fraud

under 18 U.S.C. §§ 1343 and 1349 ("the indictment"). (Ex. 2, Indictment.) The indictment

charges Frenkel with participating in a scheme to defraud Citigroup Global Markets Realty

("Citigroup") by inducing it to loan approximately $126 million in connection with the Colonial

real estate transaction. (*Id.*)

In keeping with U.S. Department of Justice guidelines, the indictment does not identify

Stern by name. Nonetheless, the indictment clearly refers to Stern as "the Principal" and

includes him in the charging language: "EPHRAIM FRENKEL, the defendant, ***the Principal***,

and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire,

confederate, and agree together and with each other to commit an offense against the United

---

[1]      (*See* Declaration of Elissa Koolyk ("Koolyk Decl."), at Ex. 1 (hereafter exhibits to the
Koolyk Decl. cited as "Ex. ___".)

States, to wit, to violate Section 1343 of Title 18, United States Code." (Ex. 2, Indict. at ¶ 8 (emphasis added)). Stern invoked his Fifth Amendment privilege against self-incrimination when questioned about the Colonial deal at his deposition in March. (Ex. 3.)

Key components of the Stern scheme and the attempted cover-up that followed included: (1) first misleading J.P. Morgan and then Citigroup about approximately $15,000,000 in fictitious deal expenses; (2) forging Joshua Safrin's ("Safrin") signature on loan and other deal-related documents; (3) fraudulently inducing Plaintiff Amusement Industry, Inc. ("Plaintiff" or "Amusement") to put $13 million into the deal then stealing that money with the help of Frenkel and at least three law firms; and (4) misleading third-party lenders to induce them to refinance the Colonial portfolio in an effort to cover up the original fraud.

Stern could not have, and did not, accomplish this large-scale, sophisticated scheme without help, including the help of several attorneys. As discussed in detail below, each of these attorneys, whether knowingly or unknowingly, did work that facilitated the Stern scheme and efforts to cover it up. For example, the indictment alleges that Stern used approximately $15 million in bogus closing costs to induce Citigroup to loan him approximately $126 million. (Ex. 2, Indict. at ¶¶ 5-6.) Entries on privilege logs appear to show that Stephen Friedman ("Friedman") from Buchanan Ingersoll & Rooney P.C. ("BIR") had communications with Stern and drafted documents related to those fictitious deal expenses.

As another example, according to Citigroup it would have never done Stern's loan without Joshua Safrin's presence in the deal. Safrin is and was a respected real estate investor and without him as a sponsor and personal guarantor the loan would have gone nowhere.

Safrin's signatures on the loan documents, however, were forged.[2]  Attorneys from BIR and

Herrick Feinstein played active roles in obtaining those forged signatures.  In fact, many of the

documents that bore a forged Safrin signature—and there were several—somehow came from or

passed through Friedman.  (*See, e.g.,* Ex. 4; Ex. 5; Ex. 6.)[3]

As discussed in detail below, there is more than ample evidence to demonstrate probable

cause to believe Stern committed a crime.  Under well-settled law, where an attorney has

communications or performs work relating to such crimes, the crime-fraud exception to the

attorney-client privilege applies whether or not the attorney knew about the crime.  Accordingly,

Amusement now seeks production of all of Stern's communications with his attorneys that relate

to obtaining the Citigroup loan, Safrin's signatures, Amusement's participation in the deal, the

use of Amusement's funds, and efforts to refinance the deal.

The probable cause standard applicable to showing a crime or fraud took place is not

onerous and easily satisfied here, especially in light of Stern's recent invocation of the Fifth

Amendment, which raises a strong inference that a crime occurred.  What is also clear is that

Stern's attorneys did work that facilitated the crime or fraud.  As such, Amusement requests that

the Court find that the privilege does not apply and that all communications concerning the

_____

[2]      For purpose of this motion only, Amusement accepts as true that the signatures of Safrin
on the Citigroup loan documents and a document given to Amusement were forged.

[3]      Amazingly, it appears that BIR intentionally concealed documents that establish an even
closer connection between Friedman and the forged Safrin documents than previously known.  It
did so by including a clearly non-privileged document on the BIR log using a demonstrably
misleading description.  That document was hidden behind the false description for nearly four
years until its recent production when Amusement demanded revisions to the BIR logs.  (*See
infra* at Part III.D.3 (discussing same)).

transaction, whether oral or written, be disclosed to Amusement or, at a minimum, that the Court

perform an *in camera* review.[4]

## II. OVERVIEW

At its core, the Stern scheme was a close cousin to the common "bust out" scheme, only

larger and more sophisticated.  In the classic version, criminals take over a company, draw down

its credit facilities, and then walk away leaving a debt-ridden shell for creditors and a bankruptcy

court to sift through.  Stern's riff on the classic, which involved aggravated identity theft, wire

fraud, and money laundering, is described below.

REDACTED

### A.    The objects of the scheme

REDACTED

In reality, at least in the short term,[6] the shopping centers

themselves held little interest, as the scheme had a more immediate object—*i.e.*, excess cash that

resulted from Stern's inflating the cost of the deal with $15,000,000 in fictitious expenses.  If all

---

[4]    This motion seeks both documents currently listed on the privilege logs of BIR, Herrick
Feinstein ("Herrick"), and Hoffinger, Stern and Ross, LLP ("HSR") and an order that allows
Stern's attorneys to be deposed about the deal.  Should the Court grant Amusement's request,
and depending upon the nature and breadth of that ruling, Amusement would also support the
appointment of a special master if the Court believes that doing so would facilitate a quicker
review of the documents listed on the various privilege logs.

REDACTED

REDACTED

    In the long term, Stern stood to own a portfolio worth approximately $190,000,000
without having to put up any significant money of his own.  (Ex. 10.)

had gone as planned, the excess deal money would have topped $9,000,000; as it turned out, the pot was only about $2,000,000 but Stern stole it just the same.[7]

As alleged in the indictment, under the terms of his loan Citigroup lent Stern money pursuant to a specified loan-to-cost ratio. That meant the higher the project's overall cost—the purchase price plus all deal-related expenses—the more the bank would lend. (Ex. 2 at ¶¶ 5-7.) To run up the amount of the loan, Stern padded the deal expenses with over $15,000,000 in fictitious costs. (*Id.*) Although Citigroup cut back the amount of the loan at the last minute, Stern still obtained a loan for more than he would have received had Citigroup known of the fictitious costs.

The larger-than-necessary loan combined with Amusement's $13 million allowed Stern to buy the portfolio, pay all the legitimate deal expenses, and still have a pot of about $2 million left over at the end to steal—all without putting any significant money of his own into the deal. The next step in the scheme was to drain that pot of money in a way that disguised the source of the funds and made tracing more difficult, which Stern did with the help of attorney Bruce Minsky ("Minsky") and the law firm Reiss & Eisenpress LLP ("Reiss"). Both Minsky and Reiss laundered the converted funds through their attorney trust accounts by re-directing the funds to various Stern-related or controlled entities or persons.

### B.     Amusement and Safrin

---

[7]     Originally, the total cost of the deal was approximately $152,000,000, which included approximately $6,800,000 million for the reserve accounts and approximately $15,000,000 in fictitious expenses. (Ex. 75.) Subtracting the Citigroup mortgage of $115,000,000 and the mezzanine loan of $15,000,000, and Amusement's $13,000,000 would have left the deal overfunded by approximately $9,000,000. Ultimately, Citigroup cut the size of the loan, which, in turn, shrank the pot Stern intended to steal to approximately $2,000,000.

To accomplish his scheme, Stern needed two things he did not have: Money and name. Enter Amusement and Safrin, both clients of BIR attorney Stephen Friedman ("Friedman"). Amusement supplied the money—*i.e.*, the equity that Citigroup required—and Safrin supplied the name, as Citigroup would not have lent on the deal without a well-known sponsor and a "warm body" guarantor to sign the carve outs.[8]  On his own, Stern had nowhere near the financial wherewithal or track record to do such a large deal—something he knew after a long string of rejections from other lenders.

Friedman, Stern's attorney, pitched the deal to Amusement, and eventually convinced Amusement to invest.  Friedman did so, however, through a number of demonstrably false statements.  The most significant misstatements were that Amusement would receive 50% of the portfolio in exchange for its $13 million investment and that Safrin was putting in equity.  All of the statements turned out to be false and whether Friedman knew they were false or unwittingly conveyed false information given to him by Stern is irrelevant.  The fact remains that Amusement relied on the false statements in wiring $13,000,000 for the deal, and got nothing in return.

As noted above, in addition to Amusement's money, Stern also needed a name, since Citigroup would not have done the deal without Safrin.  In truth, and despite multiple representations from Stern lawyers about Safrin's presence in the deal, not a single attorney appears ever to have spoken to Safrin about the deal.  All of Safrin's signatures on loan and other related documents were forged and there is clear evidence that either Stern or someone in Stern's office did the forging.  Needless to say, had Citigroup known about the forgeries it would not

---

[8]    A "warm body" guarantor refers to someone who has the financial means to pay under the carve out guarantees should a default occur.

have made the loan.  The Safrin forgeries also included a document given to Amusement to mollify it when it tried to get back its $13 million, most of which was already gone by the time Amusement received the forged document.

In reality, on July 12, 2007 Stern found himself between a rock and hard place. Faced with no money and no sponsor and the potential loss of millions if the deal collapsed, he could either let the deal fall apart or steal Amusement's money and Safrin's name.  He opted for the latter.  It appears that he did so believing, wrongly as it turned out, that he could refinance the deal in the wake of the fraud, get Safrin's name off the Citigroup loan, and repay Amusement. Despite his also lying to third party lenders to obtain that refinance money, he never succeeded.

## III.    STATEMENT OF FACTS

### A.    The Frenkel indictment

The indictment against Ephraim Frenkel in USA vs. Frenkel, No. 10 CR 1207 (WWE) alleges that on or about April 20, 2007, First Republic Group, through its "principal" entered into an agreement through a wholly owned corporation, First Republic Group Realty Corp. ("FRG Corp."), to purchase a portfolio of shopping centers in the Southeast from Colonial Realty Limited Partners ("Colonial") for approximately $128,000,000 ("the Colonial deal").   (Ex. 2 at ¶ 1; Ex. 11.)

REDACTED

REDACTED

According to the indictment, the same individual (who the indictment refers to as the "Principal") was the principal of FRG Corp. and FRGR LLC.  (Ex. 2 at ¶1).  There is no dispute that Mark Stern is the "Principal."  The indictment further alleges that "[t]o finance this purchase, First Republic Group Realty through the Principal entered into a $111,150,000 mortgage loan agreement, dated July 11, 2007, with Citigroup Global Markets Realty Corp.

('Citigroup')" and that another Stern-related entity, FRGR Managing Member LLC separately borrowed $15 million from Citigroup through a mezzanine loan agreement dated July 11, 2007. (*Id.* at ¶ 3.)

The indictment continues:

"Prior to the closing, [Frenkel] . . . and the Principal provided Citigroup documentation listing First Republic Group Realty's various closing costs. Among the closing costs identified by Frenkel and the Principal were $8,677,500 to be paid to Prudential Douglas Elliman for brokerage services; $2,325,000 to be paid to GMAC IPG for brokerage/consulting services; $934,500 to be paid to ACE Capital Group for investment advice, transaction structuring and advice and capital formation advice; $2,670,000 to be paid to Roman Associates, Ltd. for acquisition advising fees; and $934,500 to be paid to an attorney for financing feasibility studies, travel to each property, and disbursements."[9]

(*Id.* at ¶ 5)  "The total closing costs were a component in calculating the size of the loan Citigroup was willing to make to the Principal and First Republic Group Realty.  The size of the loan was a set percentage of the total cost.  If the closing costs were inflated, the amount of the loan would be larger than otherwise."   (*Id.* ¶ 6.)

Finally, the indictment alleges that "[o]ver the course of two days, [Frenkel] . . . falsely represented to Citigroup that he paid by wire transfer the purported closing costs incurred by First Republic Group and owed to Prudential Douglas Elliman, GMAC IPG, ACE Capital Group, and Roman Associates, as well as other additional closing costs[.]  (*Id.* at ¶ 7.)  Based on this conduct, the indictment charges Frenkel with a conspiracy to violate 18 U.S.C. §§ 1343 and

---

[9]      The attorney referred to in the indictment is Bruce Minsky.  (Ex. 12.)

1349 for Frenkel and Stern's participation in the scheme to defraud Citigroup. (*Id.* at ¶¶ 8,9)
The indictment also charges Frenkel in Count Two with a violation of Section 1343 for using the
false "closing costs" in a scheme to defraud Citigroup by inducing it to make the loan of
approximately $126 million. (*Id.* at ¶ 10)

### B. Stern's     attorneys

Stern used 5 law firms and 1 individual attorney in connection with the scheme to
defraud Citigroup and Amusement. They were BIR, Herrick, Reiss, HSR, Tepfer & Tepfer, and
Minsky. While it is impossible at this stage to divine the exact contours of what each attorney or
firm did for Stern, what is clear—from privilege log entries and deposition testimony—is that all
of these attorneys, again wittingly or unwittingly, did work that enabled Stern to commit the
ongoing fraud.

According to Stern, Friedman and BIR acted as his "general counsel" in the Colonial
deal. (Ex. 13.) Consistent with that description, and as discussed in detail below, Friedman took
part in virtually every aspect of the deal, including all of those aspects that turned out to be
criminal—including, the forged Safrin signatures,[10] lying to Citigroup and another lender about
deal expenses, and converting Amusement's funds. It also appears that Friedman and BIR
prepared and transmitted a counterfeit, back-dated promissory note that was given to a third
party lender in the post-closing cover-up phase of the crime.[11]

Herrick primarily assisted Stern in structuring the transaction (Ex. 16 at 67:15-68:17.)
and negotiating Stern's loans with Citigroup. (*Id.* at 21:20-25, 70:21-2, 76:14-25, 96:7-13.)

_____

[10]    Friedman recently admitted under oath that he believed the Safrin signatures were
actually signed by Stern or someone in Stern's office. (Ex. 14, Friedman Dep. 712:23-714:12.)

[11]    The original and counterfeit notes are shown side-by-side in Ex. 15.

REDACTED

REDACTED

Herrick, along with Friedman, also functioned as a conduit for the forged Safrin signatures given to Citigroup.  (Exs. 19 – 21.)  Herrick also appears to have had communications relating to the fictitious deal expenses and Stern's attempt to mislead Citigroup about the purchase price.  (Ex. 16 at 314:20-316:11, 443:6-18.)

HSR also had communications concerning deal expenses (Ex. 22; Ex. 23; Ex. 24; Ex. 25; REDACTED Ex. 26 (specifying expenses as payable by Seller, including false expenses).) REDACTED

Further, HSR was involved with the improper release and diversion of Amusement's funds.  (Ex. 31.)

Stern also used attorneys to help him launder the funds he had stolen from Amusement. In particular, Frenkel wired funds to Minsky's attorney trust account and Minsky wired the funds back to Stern or to Stern's confederates.  (Ex. 32 at 134:15-136:3, 138:21-141:10, 141:11-146:11, 146:14-148:21, 150:7-153:19.)  Similarly, Reiss diverted over $300,000 of Amusement's funds to another Stern deal that had nothing to do with the Colonial purchase.  (Exs. 33 - 39.) Frenkel also wired $8.6 million to Tepfer & Tepfer ("Tepfer") to make it appear as if he was paying Prudential Douglas Elliman.  Tepfer received the money and then wired it back to Frenkel.  (Ex. 40 at 17:16-25; Ex. 41; Ex. 33.)

### C.  Co-schemer Ephraim Frenkel

It is unknown how Frenkel stood to profit from this scheme.  What is known, however, is that Frenkel played a crucial role in the fraud both by lying to Citigroup about how much equity Stern had on hand and by releasing Amusement's money without permission.  Even though

Frenkel had never done a transaction of this size, (Ex. 42 at 347:3-8; 356:18-357:6), Stern lied to keep him in the deal recognizing the importance to the scheme of controlling the money. (Ex. 43 (Frenkel is "being used by the big ones and has closed deals of this size more than once").) Ultimately, Citigroup refused to entrust Frenkel with its money (Ex. 45); Amusement was not so lucky.

### D.    Crimes and frauds

The Stern scheme had four main components. First, Stern lied to lenders about deal expenses and forged Safrin's signatures to get a loan. Second, he lied to Amusement through Friedman about the deal to induce Amusement to invest $13 million. Third, after inducing Citigroup to lend and Amusement to invest, he stole Amusement's money. Finally, he tried to cover it all up by refinancing the property to get Safrin off of the loan and give Amusement back its money. But for Stern's inability to do the refinance, the scheme may have worked.

#### 1.    Elements of the offenses

The elements of the various offenses for which probable cause exists are:

Wire Fraud:  18 U.S.C. §1343

(1)    Defendant knowingly devised a scheme to defraud or to obtain money or property by means of material false or fraudulent pretenses, representations, or promises;

(2)    The scheme to defraud pretenses, representations, or promises were material;

(3)    Defendant acted with intent to defraud; and

(4)    Defendant used the wires in advancing, or furthering, or carrying out this scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

See Federal Jury Practice and Instructions, Criminal (Sixth Ed.), §47:07.

Money Laundering:  18 U.S.C. §1956(a)(1)(B)

(1)    Defendant conducted or attempted to conduct a financial transaction involving property constituting the proceeds of specified unlawful activity;

(2)    Defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity; and

(3)    Defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity.

*See* Modern Federal Jury Instructions, vol. 3, Criminal at ¶ 50A-7 (2011)

Aggravated Identity Theft:  18 U.S.C. §1028A

(1)    Defendant, during and in relation to any [enumerated felony violation, including wire fraud]; and

(2)    Knowingly transfers, possesses, or uses, without lawful authority a means of identification of another person.

*See United States v. Magassouba*, 619 F.3d 202 (2d Cir. 2010).                    REDACTED

### 2.    *JP Morgan—wire fraud 18 U.S.C. §1343*

REDACTED


Notwithstanding a booming real estate market, except for Citigroup all lenders passed.  The reasons varied but included that Stern was an unknown, that he had too many lawsuits, or that the investment seemed too speculative.  (Exs. 50-53.)

One of the lenders that Stern applied to was JP Morgan.  On or about May 18, 2007, JP Morgan gave Stern a financing proposal for the purchase of the portfolio, which listed both Mark

Stern and Joshua Safrin as sponsors of the deal.  (Ex. 46.)  As explained above and as alleged in the indictment, a key component of the Stern scheme was to slip fictitious costs into the loan request.  As described in the indictment, where lenders calculated the size of a loan based on a percentage of total cost, overstating the costs would enable Stern to artificially create a larger loan than allowed.  (Ex. 2 at ¶ 6.)

As part of the JP Morgan loan process, Stern submitted, through his mortgage broker Richard Koch, two materially false and misleading documents.  First, he submitted a so-called "sources and uses" statement—a document that purported to list actual deal expenses.  Among the expenses inserted into the statement was a $14,700,000 brokerage fee.  (Ex. 54.)  As back up for this expense, Stern later submitted the second false and misleading document, a brokerage agreement purportedly between First Republic Group Corp. and Prudential Douglas Elliman ("Prudential").

The Prudential brokerage agreement submitted to JP Morgan was a forgery.  (Ex. 184.)  But the forged agreement was not the first fictitious entity that Stern had used, or would use, in trying to get a loan.  As of May 9, 2007, Stern's ostensible broker in the deal was not Prudential at all, but an entity called "Pollard Realty Company" located at 18 Serpi Road, Woodbury, New York ("Pollard").  (Ex. 56.)  Pollard, like Prudential, was a sham.  Its "business address" was a single family residence owned by the wife of Joseph Niederman, a Stern confederate.  (Ex. 7.)  Minsky would later funnel over $470,000 of Amusement's money meant for the Colonial deal to Niederman.  (Exs. 58 - 60.)

Stern, Friedman, and Koch appear to have had communications related to and that culminated in the fraudulent Pollard/Prudential agreement.  For example, on May 7, 2007, Koch asked Stern for the sources and uses statement and Pollard agreement for JP Morgan.  (Ex. 61.)

13

The next day, Friedman and Koch discussed the sources and uses statement and on May 9, 2007 Koch circulated his draft to Stern and Friedman, which draft included a $12,380,000 brokerage commission.  (Ex. 62.)  That same afternoon Koch circulated to Stern and Friedman a revised statement, this time with a $15,400,000 commission.  (Ex. 63.)

Stern emailed Koch the fraudulent brokerage agreement on May 9, 2007.  (Ex. 56.)  The agreement had been back dated to March 5, 2007.  (*Id.* at BIRFR0015006.)  The bogus agreement also misrepresented the purchase price, listing it at $167,000,000 when everyone knew that the actual contract price was $128 million.  (Ex. 64.)  The inflated price appears to have been a means of increasing the fraudulent brokerage commission even further because the agreement calculated the commission on a sliding scale pegged to the purchase price—when the purchase price went down, as it had already, the commission went up.  (*Id.*)

For reasons that are unclear, the next day on May 10, 2007, it appears that Stern and Friedman prepared a new agreement, but this time they substituted Prudential and removed Pollard.  This new fraudulent agreement was resigned and sent to Koch, who forwarded it to JP Morgan on May 10, 2007 by email.  (Ex. 55.)  By that time, however, JP Morgan had seen enough and passed.  As the banker explained, "[t]he brokerage fee keeps going up – first it was $8M, then $12M, and now its $14.7M.  ***Something is not right here and it's making it more and more difficult to believe and include in the costs***."[12]  (Ex. 65.)

_____

[12]    Other lenders had similar reactions.  One observed, "I don't think there is a prayer . . . Not sure we would do this size deal for someone with a total lack of experience . . . and [who] doesn't even have a large real estate portfolio . . . like I said before ***something just smells wrong***."  (Ex. 8) (emphasis added).

It is clear from entries on privilege logs during this period that Friedman played a direct role in preparing both the sources and uses statement and the fraudulent Prudential/Pollard agreements:[13]

| ENTRY # | DATE | TO | FROM | DESCRIPTION | ATTACHMENTS WITHHELD |
|---------|------|-----|------|-------------|----------------------|
| 608 | 5/7/07 | Mark Stern | Stephen Friedman, Esq. | E-mail sent for the purpose of giving legal advice re: brokerage agreement. | |
| 609 | 5/7/07 | Stephen Friedman, Esq. | Mark Stern | E-mail sent for the purpose of obtaining legal advice re: brokerage agreement. | |
| 596 | 5/8/07 | Mark Stern | Stephen Friedman, Esq. | E-mail sent for the purpose of giving legal advice re: brokerage agreement | Draft real estate brokerage agreement (BIRFR 0015441-43) |
| 587 | 5/9/07 | Mark Stern | Stephen Friedman, Esq. | E-mail sent for the purpose of giving legal advice re: brokerage agreement | Draft real estate brokerage agreement (BIRFR 0015009-11) |
| 588 | 5/9/07 | Stephen Friedman, Esq. | Mark Stern | E-mail sent for the purpose of obtaining legal advice re: brokerage agreement[14] | |

---

[13]    Again, whether Friedman's participation was knowing or not is irrelevant for present purposes.

[14]    Many of the entries on the BIR, Herrick, and HSR privilege logs appear to involve giving business as opposed to legal advice and Amusement intends to move to compel the production of many such documents on that basis.  With that in mind, if the Court grants this motion and is also inclined to appoint a special master to review the documents on the logs under the crime-fraud exception it may also be prudent for the special master to review the documents for the business/legal advice distinction that the Court adopted in its January 22, 2010 Order (Docket No. 345) and Decision (Docket No. 357 at pp 24-25.).  This is especially true, where as discussed below, it is very clear that BIR improperly listed non-privileged documents on the log and gave

| ENTRY # | DATE | TO | FROM | DESCRIPTION | ATTACHMENTS WITHHELD |
|---|---|---|---|---|---|
| 589 | 5/9/07 | Mark Stern | Stephen Friedman, Esq. | E-mail sent for the purpose of giving legal advice re: brokerage agreement | Draft real estate brokerage agreement (BIRFR 0015018-20) |

(Ex. 66 at Entry Nos. 587-89, 596, 608-09.)

### 3. *Citigroup—18 U.S.C. §§1343 and 1349*

After JP Morgan passed, Stern focused more intently on Citigroup where he had also applied for a loan on or about June 13, 2007, again including Safrin's name.  (Ex. 67.)  JP Morgan's reaction, and the reaction of other lenders to the inflated expenses[15] had taught Stern a lesson and he would not make the same mistake again.  He decided to break up the single fictitious $15,000,000 expense into multiple fraudulent expenses that totaled $15,000,000, presumably in the hopes of making them less conspicuous.

To induce Citigroup to make a larger loan than warranted Stern submitted several materially false and misleading documents, including, but not limited to: (1) false sources and uses statements (Ex. 69 (May 21 statement listing over $10 million in false brokerage fees); Ex. 70 (May 30 statement listing over $13 million in false brokerage and advising fees)); (2) fraudulent agreements purportedly with Prudential, Roman Associates, GMAC-IPG, Ace Capital Group (Ex. 71; Ex. 72; Ex. 73); (3) false closing statements (Ex. 74 (omitting $4.47 million discount from Colonial);                    REDACTED

REDACTED

those documents blatantly false and misleading descriptions and Herrick has similarly included questionable entries on its logs.  (*See infra* at V.B.3(a)-(b)).

[15]      One potential lender summed it up succinctly:  "There are $15,000,000 of brokers fees!" (Ex. 68.)

REDACTED

REDACTED

[16] These
same fraudulent invoices form the basis for the indictment.[17] Koch forwarded the fraudulent

Roman, Prudential, and GMAC-IPG agreements to Citigroup on June 4, 2007. (Ex. 77.) Frenkel

REDACTED

forwarded the fraudulent invoices by email to Citigroup on July 5, 2007. (Ex. 76.)

REDACTED

REDAC    And like the first fraudulent agreement delivered to JP Morgan, it also appears that
TED

Friedman had a hand in the new set of fraudulent documents as well, as these June 4, 2007

entries on the BIR log indicate:

| ENTRY # | DATE | TO | FROM | DESCRIPTION |
|---------|------|-----|------|-------------|
| 514 6/ | 4/07 | Stephen Friedman, Esq. | Mark Stern | E-mail for the purpose of obtaining legal advice re: fees. |

(Ex. 66 at Entry No. 514.)

### 4.    *Safrin—18 U.S.C. § 1028A*

As a condition of the loan, Citigroup required that Joshua Safrin sign carve out

guarantees and other loan-related documents, which consisted of environmental indemnity

agreement, officer's certificates, directorship agreement, loan agreement, mezzanine loan

agreement, JSAE Colonial Operating Agreement, FRG LLC Operating Agreement, and non-

---

[16]    The new set of fake expenses totaled $15,541,500.00 broken up as follows: (1) $8,677,500 Prudential; (2) $2,325,000 GMAC-IPG; (3) $934,500 ACE Capital Group; (4) $2,670,000 Roman Associates, Ltd.; and (5) $934,500 Bruce Minsky. (Ex. 2, Indict. at ¶ 5.)

[17]    As discussed in detail below, the Citigroup scheme also involved the additional crime of aggravated identity theft in the forgery of Joshua Safrin's signature. (See infra at III.D.3 (discussing involvement of attorneys from Herrick and BIR in obtaining the forged signatures).

REDACTED

consolidation opinion letter certification.  (Ex. 67; Ex. 80; Ex. 81; Ex. 82 at 94:20 – 25.) REDACTED

Safrin has stated under oath that his signatures on all deal-related documents were forged, something that a forensic handwriting expert has confirmed and which appears to be undisputed. (Ex. 87 at 219:19-226:9; Ex. 88.)  The forgery of Safrin's signatures constituted a key act in furtherance of the scheme and, as discussed below, the evidence strongly suggests that Stern, or someone in Stern's office, forged Safrin's signatures.  It also appears that Friedman took an active role in obtaining the forged signatures and, up until now, BIR actively and improperly concealed the true extent of his involvement and knowledge of those fraudulent signatures.

The most disturbing example of this which calls into question the integrity of BIR's entire privilege logs, involves Friedman's knowledge of the case's most enigmatic figure, "wizzy bizzy."  It was wizzy bizzy using the email account who emailed Herrick attorneys Steven Fleissig and Dena Cohen forged Safrin signatures that were given to Citigroup. (Ex. 19.) Originally, Friedman testified under oath not to have known of the emails from wizzy bizzy until this litigation:

> Q:  Have you ever seen this document [email from wizzy bizzy to Fleissig dated 6/29/07] before?
>
> A:  Yes . . . I became aware of it during the course of the litigation

(Ex. 14 at 184:19 – 185:6.)

> Q:  You see there's an e-mail there from wizzy bizzy dated July 2nd, 2007 at 11:18 a.m.?  Do you see that?
>
> A:          (Nodding.)
>
> Q:  Were you aware that wizzy bizzy sent that email in response to Ms. Cohen's email which we've marked as S. Friedman 24 where she says "I need to receive copies of Joshua Safrin's signature pages by fax immediately"?
>
> A:  I was not.

(*Id.* at 223:13-22.)

However, buried in BIR's original privilege log were Document 4777 and Document 4794 with these entries:

| BIRFR0004777 BI | RFR0004793 | 7/11/2007 | Stephen Friedman Esq. | Mark Stern | Email sent for the purpose of receiving legal advice re: closing documents | A/C |
|---|---|---|---|---|---|---|
| BIRFR0004794 BI | RFR0004809 | 7/11/2007 | Stephen Friedman Esq. | Mark Stern | Email sent for the purpose of receiving legal advice re: closing documents | A/C |

(Ex. 89.)

Had Amusement not recently insisted that BIR revise its logs, that is exactly where Document 4777 and Document 4794 would have remained, as they had for 4 years. (Koolyk Decl. at ¶¶ 2-5.) BIR produced the two documents for the first time on June 4, 2012. (Ex. 90.) Neither Document 4777 nor Document 4794 has anything to do with "legal advice" or with legitimate closing documents, as the misleading description suggested. But just as disturbing is the fact that the documents, for the first time, connect Mark Stern, Stephen Friedman, and wizzy bizzy. That these documents, which are clearly not privileged, were not only withheld but concealed is an outrage.

Beyond Friedman's connection to wizzy bizzy, even more basically, he and Herrick's Dena Cohen were at the center of the forged Safrin signatures. Documents bearing forged signatures passed through Friedman's fingers on the road to being signed. (*See, e.g.,* Exs 4-6.) At times, Friedman even volunteered to obtain Safrin's signature, though Friedman too had never spoken to Safrin about the deal. (Ex. 14 at 142:3-6; Ex. 91.) And Cohen is the one who REDACTED received the forged signatures and sent them to Citigroup. (Ex. 19.)

Between June 26 and 27, 2007, Friedman assumed responsibility for obtaining Safrin's signature on all of the deal documents. (Ex. 91 (June 26, 2007 email from Friedman "Could you also ensure that we get the signature pages from Latham that Mr. Safrin will need to sign?").)

REDACTED

REDACTED

REDACTED

Herrick believed that Friedman represented Safrin and Friedman assured Herrick that he would get the signature pages to Latham & Watkins for the closing. (Ex. 96.)

At his recent deposition, however, Friedman conceded that by June 29, 2007 he knew that Safrin would not sign any of the deal documents. (Ex. 14 at 650:4-17.) Nevertheless, on June 29, at 3:24 p.m. Friedman received an email from Herrick attorney Stephen Fleissig sending him a "Certification" for Safrin to sign. (*Id.*; Ex. 4 (June 29 email from Fleissig to Friedman, "Steve- I will need this signed by Safrin to release our opinion letter (unless you assure me that he'll sign it on Monday.")) Friedman said he would have Safrin sign the Certification (*Id.*) and less than an hour later, all of the Safrin signature pages, including the "Certification" sent an hour earlier to Friedman, were sent to Fleissig from "wizzy bizzy" using email account "lol11211@yahoo.com" (the "June 29 wizzy bizzy email"). (Ex. 19.) Safrin maintains that the signatures in the June 29 wizzy bizzy email are forgeries. (Ex. 87 at 215:5-218:9.)

At 11:15 a.m. on July 2, 2007, Cohen sent an email to Stern, Friedman, and others indicating that she needed copies of Safrin's signature pages by fax immediately. (Ex. 5.) Three minutes later, at 11:18 a.m., Cohen received an email from "wizzy bizzy" forwarding the June 29 wizzy bizzy email with signature pages purportedly signed by Safrin attached (the "July 2 Wizzy Bizzy email"). (Ex. 81.) After reviewing the signature pages, Cohen noted that the signature page for the JSAE Operating Agreement was missing signatures by Safrin as a member and by the other members of JSAE. (Ex. 83.)

After marking an "x" where Safrin and his son-in-law Avery Egert needed to sign as members, Cohen scanned and emailed the signature page to Friedman with a copy to Stern asking that he have Safrin and the other members of JSAE sign by the "x's" and return it to her by fax or pdf and deliver four originals to Latham & Watkins. (*Id.*) At 1:54 p.m., Cohen received an email from "wizzy bizzy" attaching the signature page for the JSAE Operating Agreement purporting to bear signatures by Safrin and Egert (the "JSAE wizzy bizzy Email").

Strangely, the signatu re page atta ched to the JSAE wizzy bizzy e    mail was not the same document that Cohen had originally sent to Friedman and Stern.

The "x's" Cohen had marked on the signature page were gone , and Safr in's signature on behalf of the com pany was different than the   signature on the page Cohen sent Friedm  an and Stern earlier in the day. ( *Id.*)  Neither Egert nor Safrin signed  or authorized anyone else to sign their signatures to the JSAE Operating Agreem  ent. (Ex. 87 at 197:7-  198:10; Ex. 97 at 497:8-498:19.)  Stern has invoked the protections of th e Fifth Amendment on all m atters pertaining to JSAE. (*See, e.g.*, Ex. 3, at 17:10-26:14.)

On July 5, 2007 at 6:15 p.m ., Cohen sent an  email to Friedman with a copy to Stern and others asking Friedman to have Safrin sign attached signature pages for the new loan agreem ents with Citigroup. (Ex. 6.)  She asked Friedm  an to scan a copy to her and   send four originals to Latham & W atkins. ( *Id.*)  On July  6, 2007, at 11:38 a.m ., Cohen received an em ail from wizzy bizzy.  Attached to  that em ail were four copies  each of the signa ture pages for the rev ised loan and mezzanine loan agreem ents purportedly signed by Safrin (the "July 6 wizzy bizzy em  ail"). (Ex. 80.)  T he signatures were forgeries. (E  x. 87 at 220:9-221:2.)  No   communications have been produced explaining why the July 6 wizzy bi zzy email was sent or how the signature pages to the revised loan agreements were provided to wizzy bizzy.  It is likely that Cohen sent them to Friedman as seem ed to be her pattern and aske    d that he have Safrin sign them   , but if such communications exist they are being withheld as privileged.

On July 10, 2007, at 11:24 a.m     ., Cohen received an em  ail from Stern that attached Officer's Certificates for a opinion lette r that Ster n had signed. (Ex. 99.)  Seven m  inutes later, Cohen received an em ail from wizzy bizzy, which  attached the sam e Officer's Certificates b ut bearing forged Safrin signatures ( the "July 10  wizzy bizzy email"). (Ex. 100; Ex. 87 at 225:4-226:9; Exs. 57 - 58.)  No commu    nications have been produced  between Cohen and Stern or Friedman where she asks for the two signed Offi     cer's C ertificates.  If such communications exist, they have been withheld as privileged.

The attachments to Stern's  July 10, 2007 em ail and wizzy  bizzy's em ail seven m inutes

later both have the same name and consecutive parenthetical numbers. The file name for the attachment to Stern's email was "Tuesday, July 10, 2007 (5).pdf" and the file name to the attachment to wizzy bizzy's July 10 email was "Tuesday, July 10, 2007 (6).pdf." The common file naming format strongly suggests that both documents were signed and scanned at the same location.

Safrin has stated that all of the signature pages attached to the June 29, July 2, July 6 and July 10 "wizzy bizzy emails" are forgeries. (Ex. 87 at 215:13-219:3.) An examination of the signatures by an expert corroborated what Safrin maintained – that his signature on all of the documents had been forged. (Ex. 88.) Under questioning at his deposition, Friedman claimed that he did not know the identity of wizzy bizzy and only now suspects that the emails originated from Stern's office. (Ex. 14, Friedman Dep., 712:23 - 714:12.) Fleissig, who worked with Friedman throughout the transaction, testified that he suspected Friedman was involved in the false signatures. (Ex. 16, Fleissig 278:7-20.)

### 5.      *Amusement—Theft of $13 million*

#### (a)      **Stern lied to Amusement**

In addition to requiring that Safrin sign the carve out guarantees, Citigroup also required that Stern and Safrin always control at least 51% of FRG LLC (the borrower) and that they could not assign their interests or transfer or otherwise encumber the Portfolio properties without Citigroup's permission. (Ex. 67.) The loan agreements also prohibited any change to the ownership structure without Citigroup's approval. (*Id.*)

Notwithstanding the express prohibitions in the loan agreements, Friedman represented to Amusement that it would receive 50% of the partnership that owned the portfolio and Stern and Safrin would get the other half. (Ex. 105 at 25:14-21.) Toward the end of June, Stern and

Amusement worked to draft a letter of understanding ("LOU") outlining the 50/50 partnership, which Stern executed and returned.  (Ex. 106.)  On July 2, 2007, based on the signed LOU Amusement wired $13 million dollars wired to an account at Frenkel's company, Land Title Associates ("LTA").  (Ex. 107-108.) The LOU specifically provided that the funds were to be used for the Colonial deal and were to be held in escrow while the parties attempted to negotiate a partnership agreement.  (Ex. 106.)

**(b)**                              **Stern converted Amusement's money**

After Stern, through Friedman, successfully induced Amusement to wire its $13 million to the Frenkel-controlled bank account the next step was to get the money out of escrow. Initially, Stern went through the motions of obtaining Amusement's permission for release of the funds.  But eventually, when Stern's time ran out, he just took the money.                    REDACTED

Unknown to Amusement, prior to it depositing its $13 million with Frenkel, Stern had suffered several setbacks in his efforts to close the deal.                    REDACTED

                                                        Eventually, Stern convinced Colonial to extend the deadline to July 12, 2007.  (Ex. 109.)  If Stern did not meet this deadline, however, he would not only lose a $4.5 million credit, but Colonial would also have the right to cancel the deal and take Stern's deposit, which at that point had increased to $2 million.  (Ex. 110 at HF002114.)

Even though Amusement deposited its $13 million with Frenkel on July 2, 2007 it would not release the funds until the parties' had signed partnership agreements.  An Amusement attorney in Long Beach prepared draft agreements and sent them to Friedman, who Amusement believed was its New York attorney on the deal.  (Exs. 111 - 114.)  Friedman, however, ignored them.  (Ex. 115 at 39:3-20.)   Plaintiff also asked Friedman for copies of the Citigroup loan

documents.  (Ex. 116.)  Friedman denied that he had the loan documents when it now appears

that he had them all along  (Ex. 117; Ex. 118 (June 26 email attaching loan documents to

Friedman); Ex. 66 at Entry Nos. 208-10.)

In hindsight, Friedman's ignoring the draft partnership agreements and the fact that he

had the Citigroup loan documents makes perfect sense.  He knew that the proposed 50/50

partnership, which was reflected in the draft agreements, was impossible under the Citigroup

loan.  For that reason, he also knew that he could not give Amusement a copy of the Citigroup

loan documents.  Eventually, Amusement demanded its money back anyway.

Rather than giving Amusement its money back, Friedman advised Amusement that

withdrawing the money to soon would result in a breach of contract and Stern and Safrin would

sue for $60 million in damages.  (Ex. 105 at 199:13-20.)  To mollify Amusement, Friedman

promised that he would restructure the transaction to protect Amusement's interests with a series

of documents, including assignment agreements, warranty deeds, and two promissory notes.

As the July 12, 2007 deadline loomed, Stern became more and more desperate.  So, at the

same time that Friedman worked to convince Amusement to release the funds based on the

revised deal structure (what he dubbed "belt and suspenders") (*Id.* at 653:25-654:12), Stern

worked a backdoor angle.  He approached Steven Alevy, the son of Amusement's principal

Allen Alevy, and tried to convince Steven Alevy to release the funds.  Steven Alevy, however,

did not work for Amusement and had no legal or other authority to release Amusement's $13

million.                                                                    REDACTED

Notwithstanding that Steven Alevy had no authority over the money, on the morning of

July 12, at 10:50 a.m., Stern emailed Steven Alevy          REDACTED

REDACTED

Stern called Steven Alevy repeatedly over the next hour.  (Ex. 120

("He insists it is urgent that you call him.").)

At 11:52 a.m. on July 12, Herrick emailed Frenkel and Stern stressing that "you must

begin wiring out all closing funds in your account immediately—these cannot wait one more

minute."  (Ex. 121.)  Stern forwarded this to Friedman.  (*Id.*)  At 12:04 p.m., Koch emailed Stern

and Frenkel to say the same thing, "[I]t is extremely important that all the wires go out

immediately as per the closing statement."  (Ex. 122.)  Frenkel immediately replied, "working on

it."  (*Id.*)

At 12:12 p.m., the Amusement attorney in California, unaware of the July 12 closing and

Stern's deadline emailed Friedman to tell him that Amusement was still waiting on additional

documents before it would release the funds.  (Ex. 123.)  In response at 12:20 p.m., Friedman

said of Amusement's California counsel, "I hate these guys.  I really do."  (*Id.*)  Over the next

hour, Friedman worked with Stern to get signatures and documents needed to convince Plaintiff

to release its money.  (Ex. 124.)  At 12:49 p.m., he sent documents back to the California

attorney, urging, "Now, let's go."  (Ex. 125.)

At 2:10 p.m. Citigroup emailed Stern's team asking, "What is the status of wires for

Lenders charges?"  (Ex. 126.)  Stern was cornered.  If he failed to close again, he stood to lose

not only a hefty discount on the purchase price but also his $3 million deposit.  Seemingly, he

had little choice but to direct Frenkel to release the funds, which he and Friedman did on July 12,

2007.

According to Frenkel, he spoke with Friedman on July 12, 2007 and Friedman told

Frenkel to begin releasing the funds.  (Ex. 42 at 407:16-23.)  Frenkel spoke to Stern to confirm

the release, and Stern directed Frenkel where to send funds.  (*Id.* at 592:15 - 594:11.)  At 2:34 p.m., in an email copying Stern, Frenkel announced, "I am authorized to release $26,500,000 from Escrow.  Wires are in process." (Ex. 126.)  In total, Frenkel wired out $8 million of Amusement's money on July 12 even though Amusement did not give permission for the release on that day, or at anytime before or after thereafter.[18]  (Ex. 127.)

### (c)    Attorneys assisted in laundering funds

Three law firms and one attorney were involved in the laundering/diversion of Amusement's funds, Tepfer, Reiss, HSR, and Minsky, with Minsky being the most active participant.

One of the wire transfers that Frenkel made on July 12 was ostensibly to Prudential to pay an $8.6 million broker's fee.  As noted above, the Prudential invoice was a fraud and, in reality, the money went to the law firm of Tepfer & Tepfer who though connected to Stern and Frenkel had no connection to the Colonial transaction.  (Ex. 40 at 17:16-25; Ex. 41; Ex. 33.) After "parking" the funds with Tepfer for a short time, the money was wired back to Frenkel.

---

[18]    Frenkel clearly knew not to release Amusement's funds without the required authorizations.  (*See, e.g.*, Ex. 183 (July 6 email from Alevy to Friedman telling him not to release funds without Alevy's written permission); Ex. 178 (July 9 email from Sragow to Friedman reminding him not to release funds without specific authorization from Alevy or Sragow); Ex. 179 (July 10 letter from Sragow to Frenkel and Friedman stating that money should not be released without authorization from his office); Ex. 180 (July 12 email from Sragow to Frenkel again reminding him not to release "without our written authorization").)  Even after releasing almost all of the money, Frenkel still tried to cover his tracks by attempting to get Amusement to okay the release that, unbeknownst to Amusement, had already occurred.  For example at 2:59 p.m. Frenkel asked Alevy to okay the release of "the $13,000,000 we are holding."  (Ex. 182.)  In truth, by 2:59 p.m., all but about $2.5 million was gone.  (Ex. 33 at p. 2.)

Approximately $2 million of Amusement's funds went to Minsky. Minsky, in turn, wired the funds to Stern or Stern-related individuals and entities. Payless, a company solely owned by Stern's associate, received $945,327. (Ex. 98; Ex. 129.) Joseph Niederman, Stern's close friend, received $470,000. (Exs. 58-60.) Midland Avenue Associates, a Stern-controlled company, received $636,649. (Ex. 98; Ex. 130.) None of these individuals or entities had any connection to the Colonial transaction.

Reiss and HSR also received part of Amusement's money from Frenkel. On July 13, 2007, Frenkel transferred $350,000 to Reiss. (Ex. 33, Ex. 127; Ex. 153.) Days later, Stern directed Reiss to transfer $300,000 of those funds to the firm of Archer & Greiner in connection with another unrelated Stern real estate deal. (Exs. 35-39.)

Frenkel also wrote checks totaling $150,000 to Stephen Stern and HSR. (Ex. 33 at pp 42-45.) From those checks, a $50,000 check payable to Stephen Stern was deposited by the wife of Stern's close friend, Malke Malik. Malik was the wife of Moshe Malik an individual who later helped Stern provide false lender certifications in this transaction. (Exs. 131, 133.) Thus far, HSR has not documented the basis for the amounts it received, nor explained how part of the funds ended up back in the hands of Stern's friend.

Although Friedman does not appear to have received any of Amusement's funds, he was nonetheless involved in the theft to the extent that he took part in efforts to mollify Amusement and dissuade if from pulling its funds before July 12, 2007. In that regard, Friedman prepared documents that he promised would protect Amusement's interests, including a $15 million promissory note, assignments of the membership interests of MS Colonial LLC and of JSAE Colonial LLC. These documents were meant to accomplish an immediate transfer of both Stern's and Safrin's interests in the portfolio and the properties themselves. The JSAE

27

assignment that Friedman prepared and gave to Amusement, however, also had a forged Safrin signature.

Again, it appears that either Stern or someone in his office signed Safrin's name.  On July 11, 2007, Friedman sent an email to Stern attaching copies of the documents to be signed, including the JSAE Assignment.  (Ex. 14 at 253:21-254:7; Ex. 132.)  When pressed for an explanation of why Freidman sent the JSAE Assignment to Stern, Friedman claimed he was merely forwarding it to "his client . . . to coordinate having the document signed[.]"  (Ex. 14 at 500:2-10.)  Less than an hour later, Stern sent an email to Friedman attaching the signed documents, including the JSAE Assignment purportedly signed by Safrin.  (Ex. 134.)  Shortly thereafter, Friedman forwarded the executed documents to Amusement's California counsel.  (*Id.*)

When Stern was asked if he forged Safrin's name to the JSAE Assignment, Stern invoked the Fifth Amendment.  (Ex. 3 at 543:19-24.)  In fact, it is not possible that Safrin signed the JSAE Assignment.  During the time between when Friedman sent the JSAE Assignment and other documents to Stern and when Stern returned the signed documents, including the JSAE Assignment purportedly signed by Safrin, Safrin was on a plane returning to New York from London.  (Ex. 135.)  When Friedman was asked if he discussed with Stern how the purported signature of Safrin got on the JSAE Assignment, he asserted the attorney-client privilege.  (Ex. 14 at 257:4-16.)

### 6.    *Post-closing Cover Up —18 U.S.C. § 1343 and 1349*

During execution of the scheme, Stern needed Amusement and its money; after July 12,

2007, however, with its money gone Amusement became a loose end.[19]  To clean up that loose

end, Stern began efforts to refinance the Citigroup mezzanine loan to repay Amusement and, in

the process, also remove Safrin's name from the Citigroup loan.  Stern again turned to his

lawyers for help and they began approaching third party lenders, including Petra Capital

("Petra").  But just as with Citigroup, Stern had to deceive Petra as well by misleading them

about Amusement's interest in the portfolio and about other aspects of the transaction.  In the

course of the negotiations with Petra, Stern and his attorneys at BIR would give Petra a

counterfeit promissory note and false certification, a false and misleading opinion letter, and

mislead them about Safrin's interest in the portfolio.  Attorneys from BIR were closely involved

in the Petra negotiations and prepared and delivered many of the misleading documents.

### (a)    The counterfeit promissory note

Although it appears that Stern concealed Amusement's presence in the deal from

Citigroup before the closing, by the time of the refinance Amusement's interest was well known.

Stern, of course, could not refinance the mezzanine loan without Citigroup's approval and

eventually Citigroup saw a Petra term sheet that referred to Amusement's interest as "preferred

equity."[20]  (Exs. 136, 137.)  Not surprisingly, Citigroup inquired further as the loan agreements

---

[19]    A dangerous loose end in that Amusement's chairman Allen Alevy threatened to go to     REDACTED
the police.  Friedman was able to dissuade Alevy from going to the police and in so doing bought
Stern valuable time.  (Ex. 105 at 253:16-255:2.)

[20]    In his haste to complete the refinancing and take Amusement out, Stern never got his
story straight on whether Amusement's $13 million constituted a personal loan or an equity
interest, and he frequently bounced back and forth between the two characterizations.  In some
instances                                      REDACTED

           Ex. 141 (October 31 email from Stern to Fallon stating: "(a)gain, the loan
was on a personal level and not reflective of any conflict with the loan docs or requiring any
modification to it").)  At other times, however, Stern described Amusement's interest as equity.
(*See, e.g.*, Ex. 142 (Stern represents that he does not owe any money to any individual or entity

seemed to prevent such an interest.  (Ex. 181.)  To avoid a default under the Citigroup

agreements, Friedman backtracked for Stern and claimed Amusement's interest was something

different.  (Ex. 137.)  However, the original note that Friedman drafted and Stern signed did not

match the description given to Petra.  (Ex. 125.)  Recognizing this, Friedman and his BIR

colleague Erica Sternin appear to have had communications with Stern that culminated in the

preparation of a second counterfeit note, which was then emailed to Petra's counsel on August

28, 2007, as the excerpt from the BIR Revised Privilege Log indicates.  (Exs. 138, 139.)

| ENTRY # | DATE | TO | FROM | DESCRIPTION | ATTACHMENT WITHHELD |
|---|---|---|---|---|---|
| 735 | 8/28/07 | Stephen Friedman, Esq. | Erica Sternin, Esq. | E-mail sent for the purpose of giving legal advice re: financing. | Promissory Note (BIRFR0028289-91) |
| 1074 | 8/28/07 | Erica Sternin, Esq. | Mark Stern | E-mail sent for the purpose of obtaining legal advice re: lending | Promissory Note (BIRFR 0043969-71) |

(Ex. 66 at entry nos. 735, 1074.)

By that point, however, Citigroup wanted more and asked for a formal assurance that

Amusement's interest was not equity and asked Stern to certify that he had not "pledged any

interest, direct or indirect, in any of the Properties."  Even though both Stern and Friedman knew

that he had pledged both the actual properties and his interest in the borrowers to Amusement,

Stern executed that certification anyway on November 6, 2007.  (Ex. 147.)  Prior to sending the

---

in an amount of $5,000 or more); Ex. 143 (August 9 email from Fallon asking about amount of "preferred equity" in Stern's term sheet with Petra); Ex. 144 (November 7 term sheet with Petra, executed by Stern, referring to " 'preferred' equity from Steven Alevy"); Ex. 145 (May 19 email from GF Financial to Tremont referring to "$15M to buy out current preferred equity").)  Stern finally, it appears, settled on the position that Amusement's $13 million constitutes a personal loan.  (Ex. 146 at 116:4-117:5.)

certificate, however, Stern seems to have sought legal advice from Friedman and BIR attorney

Ellen Shapiro, as shown on the BIR Revised Privilege Log.

| ENTRY # | DATE | TO | FROM | CC | DESCRIPTION | ATTACHMENT WITHHELD |
|---|---|---|---|---|---|---|
| | 11/6/07 | Ellen Shapiro, Esq. | Mark Stern | | Email sent for the purpose of obtaining legal advice re: lending | Certificate (BIRFR 0041100) |
| | 11/6/07 | Stephen Friedman, Esq. | Mark Stern | Leta Greenstein | Email sent for the purpose of obtaining legal advice re: lending | Certificate (BIRFR0035790) |
| | 11/13/07 | Stephen Friedman, Esq. | Leta Greenstein | Mark Stern | E-mail sent for the purpose of giving legal advice re: a certificate | Draft certificate (BIRFR 0000140) |

(Ex. 66 at entry nos. 20, 879, 1039.)  Stern transmitted the fraudulent certificate to Citigroup

assuring Citigroup that no person or entity, other than Citigroup, had an interest in the Colonial

REDACTED

portfolio.  (Ex. 147.)

As part of the refinance process, Petra also asked BIR and Friedman    REDACTED

But at

that point, **both** Friedman and Stern had already received demand letters from Amusement and

knew that litigation was imminent.  (Exs. 149, 150.)  So Friedman got cute.  He rewrote Petra's REDACTED

REDACTED

Petra's counsel caught the gambit and re-edited the opinion letter accordingly.  BIR then

begin to have multiple conversations internally, with Stern, and with other members of Stern's

legal team about "litigation."  For example:

31

| ENTRY # | DATE | TO | FROM | CC | DESCRIPTION |
|---------|------|-----|------|-----|-------------|
| 668 09/ | 17/07 | Stephen Friedman, Esq. | Stephen Stern, Esq. | | E-mail sent for the purpose of giving legal advice re: litigation. |
| 669 09/ | 17/07 | Stephen Friedman, Esq. | Stephen Stern, Esq. | | E-mail sent for the purpose of giving legal advice re: litigation. |
| 670 09/ | 17/07 | Stephen Friedman, Esq. | Stephen Stern, Esq. | | E-mail sent for the purpose of giving legal advice re: litigation. |
| 651 10/ | 19/07 | Stephen Friedman, Esq. | Mark Stern | | E-mail sent for the purpose of obtaining legal advice re: litigation. |
| 650 10/ | 21/07 | Mark Stern | Stephen Friedman, Esq. | | E-mail sent for the purpose of giving legal advice re: litigation. |
| 649 10/ | 21/07 | Stephen Friedman, Esq. | Ellen Shapiro, Esq. | | E-mail sent for the purpose of giving legal advice re: litigation. |

REDACTED

(Ex. 66 at entry nos. 649-51, 668-70; *see also* entry nos. 634-36, entry nos. 652-53.)

REDACTED

Needless to say, not only could BIR "ascertain" the requested information, it already had first hand knowledge of it but concealed it from Petra.

The next draft of BIR's opinion letter has seemingly been withheld by BIR as privileged, although it is unclear how a document from Petra could be protected.

| ENTRY # | DATE | TO | FROM | DESCRIPTION |
|---|---|---|---|---|
| 116 | 12/00/07 | Stephen Friedman, Esq. | Petra | Draft Petra Opinion Letter |

(Ex. 154 at Entry No. 116.)

**(b)      75/25 magically changes to 87/13**

When Citigroup approved the original loan it believed what Herrick and BIR represented to it that Safrin owned 25% of the borrower through JSAE Colonial LLC.  After the deal closed, however, and Stern tried to refinance the loan to pay off Amusement, that 25% appears to have become an obstacle as well since Petra required information from all owners with a 20% or higher stake in the portfolio.

REDACTED

REDACTED

REDACTED

By claiming Safrin had a reduced interest, Stern and Friedman avoided having to provide Petra, as they would any other third party lender,            REDACTED

To do this, Friedman and Stern created a new            REDACTED

A new version of the Operating

---

[21]      Defendants have produced no documents to show that Stern, Friedman, or anyone else informed Safrin of this change or that explain the seeming transfer of Safrin's interests to Stern.

Agreement with the new organization chart was then signed with what Friedman and Stern purported to be Safrin's signature.[22]  (Ex. 162 at BIRFR0030992.)  Petra relied on Stern's and Friedman's representations and sought to have Safrin removed as sponsor and guarantor from the original loan documents as part of the refinancing deal.  (Ex. 165.)

## IV. DISCUSSION

### A.    Applicable law

"The crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.' "  *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (alteration in original) (quoting *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir. 1994)). The crime-fraud exception also abrogates the work product doctrine.  *See In re Richard Roe, Inc.,* 168 F.3d 69, 71-72 (2d Cir. 1999).  The purpose of the exception is " 'to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.' "  *Jacobs*, 117 F.3d at 87 (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989) (internal quotations omitted).

While the crime-fraud exception will not apply to communications with defense counsel relating to their strategies for litigation about past frauds, it does apply to those attorney communications that were made during the commission of the crime itself.  *See Jacobs*, 117 F.3d at 87 (exception applies to communications for conduct that was "contemplated or ongoing"); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984) (same); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 406 (D. Conn. 2007) (applying exception to

---

22      This purported Safrin signature is significantly different than the one originally transmitted by wizzy bizzy on June 29, 2007.  (*Compare* Ex. 19 at HF-2-0006 *with* Ex. 162.)

communications "contemporaneous" with fraud).

The crime or fraud does not have to occur or even be the same conduct sued on for the exception to apply; " 'it need only have been the objective of the [ ] communication.' " *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039; *Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, 242 F.R.D. 248, 250-51 (S.D.N.Y. 2007) (applying crime fraud exception to email despite fact fraud suggested in email was not same fraud plaintiff alleged in complaint).

In determining whether the crime-fraud exception applies, "[t]he pertinent intent is that of the client, not the attorney." *SEC v. Herman*, 00Civ.5575, 2004 WL 964104, at *2 (S.D.N.Y. May 5, 2004). Thus, the exception applies even if the attorney is unaware of the client's purpose. Seeking advice in order to further an ongoing or future criminal activity constitutes an abuse of the attorney-client relationship and, in such cases, the purpose of the privilege is not served by preventing disclosure. *United States v. Saccoccia*, 898 F. Supp. 53, 57 (D.R.I. 1995).

To invoke the exception, the party seeking disclosure must show (1) that there is probable cause to believe that a fraud or crime has been attempted or committed and (2) that the communications in question were in furtherance of the crime or fraud. *See Chevron Corp. v. Salazar*, 275 F.R.D. 437, 451-52 (S.D.N.Y. 2011). The evidence provided need only give " 'a prudent person . . . a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.' " *Antidote Int'l Films, Inc.*, 242 F.R.D. at 250 (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1039.

With respect to the first element, the probable cause standard is "not an overly demanding" one. *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Civ. 4978, 1999 WL

61442, at *5 (S.D.N.Y. Feb. 3, 1999) (finding probable cause deals with probabilities—not rigid

certainties).  Courts have found, for example, that such "reasonable basis" existed when the

defendant misrepresented or mischaracterized material facts.  *See, e.g.*, *Salazar*, 275 F.R.D. 454-

455 (finding reasonable basis to suspect fraud in foreign judgment where there was evidence of

forged expert reports and attempts to cover up misconduct); *In re Enron Corp.*, 349 B.R. 115,

127 (Bankr. S.D.N.Y. 2006) (finding reasonable basis of fraud where evidence suggested that

defendant knowingly mischaracterized structure of loan transaction to circumvent loan

covenants).

Courts have also found "reasonable basis" where defendants failed to disclose all material

facts.  *Shahinian v. Tankian*, 242 F.R.D. 255, 259 (S.D.N.Y. 2007) (finding reasonable basis

where defendants' submissions to IRS contained several omissions of key material facts about

defendants' finances); *Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, 98 CIV. 7775, 2004 WL

42280, at *10-11 (S.D.N.Y. Jan. 7, 2004) (finding reasonable basis based on defendants' failures

to disclose prior art in patent application).

Nor does "an innocent explanation . . . consistent with the facts alleged . . . negate

probable cause."  *A.I.A. Holdings, S.A.*, 1999 WL 61442, at *5; *see also United States v.

McDonald*, 01-CR-1168, 2002 WL 31956106, at * 5 (E.D.N.Y. May 9, 2002) (holding

notwithstanding defendants' explanation otherwise, government need only establish it more

likely than not that defendants engaged in fraudulent scheme and that communications were in

furtherance of that fraud).

      **B.**    **<u>Application of the law to the facts</u>**

    *1.*        ***Probable cause exists***

Even putting aside the probable cause determination inherent in the Frenkel indictment,

the evidence that Stern committed wire fraud and aggravated identity theft is overwhelming and certainly far more than necessary to meet the relatively low probable cause standard.  Although it would be impossible to catalog every false statement or fraudulent document involved in a transaction that was permeated with fraud, the main aspects of the scheme included:

- Misleading JP Morgan about the bogus Pollard/Prudential commission;

- Misleading Citigroup about the Prudential and other fictitious expenses charged in the indictment;

- Forging Safrin's signatures on loan documents given to Citigroup and to Amusement;

- Falsely promising Amusement a 50/50 partnership to induce it to wire $13 million to Frenkel;

- Misleading Amusement about Safrin's participation in the Colonial deal;

- Converting Amusement's $13 million;

- Using attorney trust accounts to disguise the transfer and use of the money stolen from Amusement;

- After much of Amusement's money was already gone, giving Amusement a document with a forged Safrin signature to convince Amusement to give consent to release its funds; and

- Misleading Petra to induce it to refinance the Citigroup mezzanne loan by giving it a counterfeit promissory note and knowingly false draft opinion letter.

Taken together, Stern's conduct would support, at minimum, charges for wire fraud.  *Cf. United States v. Wozniak*, 781 F.2d 95, 96 (7th Cir. 1985) (describing scheme to defraud government loan program by inflating property price and misrepresenting down payments to

obtain higher loan); *Isaak v. Trumbull Sav. & Loan Co.,* 169 F.3d 390, 393 (6th Cir. 1999)

(describing bust out scheme wherein perpetrators take out loans or attract investors for seemingly

legitimate ventures, divert proceeds for personal gain, then seek to shield themselves in

bankruptcy), as well as claims for conversion, forgery, and money laundering.

That probable cause exists is even clearer in light of Stern's repeated assertion of his

Fifth Amendment privilege during his recent deposition.  Stern's refusal to answer questions

about his conduct raises a strong adverse inference that even alone should establish probable

cause.  As the Second Circuit has explained,

> [T]he district court should be m indful of Justice Brandeis' classic
> admonition: "Silence is often ev idence of the m ost persuasive
> character."  W hile the strength and cogency of the adverse
> inference should, of course, be test ed against the other evidence in
> the case, "the claim of privilege will not prevent an adverse finding
> or even summary judgm ent if the litigant does not present
> sufficient evidence to sa tisfy the us ual evidentiary burdens in th e
> litigation."

*LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) (quoting *United States ex rel.*

*Bilokumsky v. Tod*, 263 U.S. 149, 153-54 (1923), *quoted with approval in Baxter,* 425 U.S. at

319, 96 S.Ct. at 1558); *U.S. S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) *aff'd,*

421 F. App'x 86 (2d Cir. 2011) (according adverse inference significant weight in granting

summary judgment, particularly where defendants invoked Fifth Amendment without even

having been criminally charged); *Armstrong v. Collins*, 01 CIV 2437 PAC, 2010 WL 1141158

(S.D.N.Y. Mar. 24, 2010) *reconsideration denied,* 01 CIV 2437 PAC, 2011 WL 308260, at *34

(S.D.N.Y. Jan. 31, 2011).

Accordingly, an individual's invocation of the Fifth Amendment privilege will often be

sufficient alone to sustain the conclusion that the client's communications with counsel fall

under the crime-fraud exception.  *S.E.C. v. Herman*, 00Civ.5575, 2004 WL 964104 (S.D.N.Y.

May 5, 2004); *see also United States v. Saccoccia*, 898 F. Supp. 53, 62 (D.R.I. 1995) (stating that

a claim of attorney-client privilege is logically inconsistent with a Fifth Amendment claim over

the same information because the crime-fraud exception would vitiate the attorney-client

privilege).

Here, an adverse inference can be, and should be, drawn against Stern on virtually every

aspect of the transaction.[23] As noted above, these assertions alone warrant a probable cause

finding; when those assertions are considered with the mountain of corroborating evidence, they

are damning.  *See Collins*, 2010 WL 1141158, at *34 (granting summary judgment on fraudulent

transfer claim when testimony by defendant's co-conspirator, coupled with defendant's own

refusal to testify, established "beyond any reasonable dispute" that defendant committed a

fraudulent transfer).

2.    *The attorney-client communications furthered the scheme*

Stern's communications with his attorneys were also clearly "in furtherance" of the crime

since the communications reasonably related to the subject matter of the possible misconduct.

*See In re Enron Corp.*, 349 B.R. 115, 127 (Bankr. S.D.N.Y. 2006)*; United States v. Morales-

Martinez*, 672 F. Supp. 762, 765 (D. Vt. 1987) (applying crime-fraud exception where attorney

unknowingly helped client submit forged document and privileged communications were

_____

[23]    Stern invoked his Fifth Amendment privilege against incrimination in response to the full
gamut of questions posed to him at his deposition about the transaction.  (Ex. 3 (attaching Stern
deposition excerpts) (*see, e.g.,* Stern Dep. 259:23-25, 260:14-16, 265:14-16, 273:13-18, 273:19-
24 (false expenses submitted to JP Morgan and Citigroup); 138:24-25, 228:17-18, 239:14-15
(misrepresentations of equity in deal); 9:11-12, 16:18-19, 139:5-6, 139:18-22 (misrepresentations
of Safrin presence in deal); 296:6-15, 338:21-339:2, 353:24-25 (misrepresentations to
Amusement); 232:19-20; 233:17-18, 297:24-298:8, 347:12-15, 347:19-21; 397:3-5 (Amusement
money transferred without authority); 414:12-13, 414:17-19 (falsified promissory note).

proximate in time to transaction); *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 53–54 (S.D.N.Y. 1989) (communications relating to operation of sales staff not privileged because staff used as instrument of fraud).

In *Herman*, the SEC asserted securities fraud claims against the defendants Millennium Services Corporation, Branin Investments, Phillip Herman, and Marc Wein for fraudulent statements and nondisclosures in a private placement of shares. The SEC alleged that the defendants raised $4.8 million by misrepresenting to investors that the money was to be used to purchase a portfolio of funeral homes. In reality, the defendants loaned the money to Branin, paid preferred shareholders of Millennium, and took the money for themselves. The defendants also misrepresented that other sophisticated investors had invested in the venture and failed to disclose the true risks of the investment.

During the SEC's investigation, both Herman and Wein refused to answer the SEC's question based on the Fifth Amendment. *Herman*, 2004 WL 964104, at *5. Later in discovery, the transactional attorneys who represented defendants in the deal resisted deposition questions and discovery on the basis of the attorney-client privilege. *Id.* at *6. The SEC moved to compel discovery, and the district court granted the motion, reasoning that the defendants' assertion of the Fifth Amendment raised an adverse inference to support a conclusion that the crime-fraud exception applied.

The *Herman* court ordered the transactional attorneys to produce privileged documents and testify regarding all matters reasonably related to the transaction, including any communications that addressed the purposes of the private offering, the drafting of the offering documents that discussed the purpose of the offering or the intended use of the funds, the arranging for and carrying out of the fund transfers to Branin and its affiliates, the terms for the

40

loans to the affiliates, the actual use of those funds by Branin and its affiliates, and any discussions of the limitations imposed by the offering documents on the use of the Millennium funds. *Id.* at *7-8.

In "the proper case," where there is a "showing of the client's entire representation being in furtherance of the alleged crime or fraud," the crime-fraud exception may allow "the potential disclosure of a client's entire file." *In re Grand Jury Subpoena*, 419 F.3d 329, 344 fn. 12 (5th Cir. 2005). *Cendant Corp.*, 246 F.R.D. at 407. This is such a proper case, as all of Stern's privileged communications were in furtherance of a single, ongoing scheme and cover up.

In *Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007), the plaintiff asserted that the crime-fraud exception entitled it to depose defendant's transactional attorneys on all issues pertaining to their formation of a trust and other business entities. The court concluded that the first prong of the crime-fraud exception was satisfied because there was probable cause to show that defendant engaged in fraudulent conveyances of assets, and it found that defendant's reason for using his transactional attorneys was to create the trust and business entities used as vehicles for those fraudulent conveyances. The court rejected the defendant's argument that it had to identify specific communications in furtherance of the fraud. Instead, citing *In re Grand Jury Subpoena,* 419 F.3d at 344 fn. 12, the *Cendant* court ordered the transactional attorneys to answer all questions with regard to their work in forming or operating the trust and other entities that were used in defendant's fraud. *Id.* at 405-407.

Here, it is not an exaggeration to say that every aspect of the Colonial deal from beginning to end was permeated with fraud and that therefore the attorneys should be required to disclose all communications with Stern about the transaction. Those communications would include communications about financing the deal, about Safrin's involvement, deal expenses, the

Safrin signatures, Amusement's involvement, use and release of Amusement's funds, and the post-closing refinance efforts.  As such, all of the work done by attorneys on the deal, which relates directly to every aspect of the fraud, should therefore be subject to the crime-fraud exception.

Even if the Court were to focus instead on individual communications, acts, or documents, the exception should still apply broadly because the key aspects of the fraud accounted for the bulk of what the lawyers did for Stern, especially with regard to BIR, Friedman, and Herrick.  *Herman*, 2004 WL 964104, at *7-8 (ordering disclosure of all communications, drafts, and documents related to fraudulent deal); *Morales-Martinez*, 672 F. Supp. at 765 (applying crime-fraud exception to privileged communications that were proximate in time to the transaction); *Duttle*, 127 F.R.D. at 53-54 (communications relating to operation of sales staff not privileged because staff used as instrument of fraud).

### 3. *Role of each attorney*

#### (a)     **Friedman**

Again, according to Stern, Friedman and BIR acted as his general counsel in the Colonial deal.  As such, they had communications and performed work relating to each aspect of the scheme, including the fictitious deal expenses, forgery of Safrin's signatures, forming entities such as JSAE that functioned as vehicles for the fraud, communicating with Amusement, communicating with Frenkel, drafting other documents for Amusement, and playing a role in the post-closing efforts to mislead Petra.

Friedman repeatedly invoked the attorney-client privilege when asked about these areas, suggesting that he had contemporaneous communications about these events with Stern. *See, e.g.,* Friedman Dep. 403:3 – 407:10 (funds needed to close); *Id.* at 135:12-16; 203:24-

204:11; 205:15-22; 205:16-25; 213:11-16; 268:21-269:25; 390:11-24; 457:1-16; 567:5-17; 611:3-22; 613:15-22; 667:6 – 669:4 (Safrin's involvement in the deal); *Id.* at 182:7-15; 253:4-20; 257:3-12; 342:2-19; 697:7-17 (Safrin's forged signatures).

The BIR log also demonstrates that Friedman and other BIR attorneys took part in these key parts of the scheme.  (See, e.g., Ex. 66, Entry Nos. 514, 587-89, 596, 608-09 (communications regarding fees and brokerage agreement), 137, 504 (e-mail attaching signature and email for purpose of obtaining legal advice regarding credit authorization attaching same), 613 (e-mail sent for purpose of obtaining legal advice regarding Safrin), 76-77, 85-86, 88-92 (communications regarding Amusement documents including mutual release, promissory note, warranty deeds, escrow agreement, and assignment), 735, 1074 (communications regarding promissory note), 634-36, 649-53, 668-70 (BIR discussions with Mark Stern and Stephen Stern regarding litigation), 20, 879, 1039 (communications regarding certificate); Ex. 154 at Entry No. 116 (draft Petra Opinion letter).)

Obviously, a key aspect of the fraud was the forgery of the Safrin signatures and attorneys from BIR and HSR were at the center of those signatures.  In fact, many times Friedman would act as the person in charge of getting the signatures from Safrin.  For example, on May 11, 2007, Koch asked Stern and Friedman to have credit authorization forms signed by Stern and Safrin.  (Ex. 169.)   The BIR Revised Privilege Log contains an entry for an email on June 11, 2007 from Friedman to Stern about the credit authorization.  (Ex. 66 at Entry No. 504.)

As another example, on July 2, 2007, Herrick attorney Dena Cohen wrote to the deal team (including Stern and Friedman):  "I need to receive copies of Joshua Safrin's signature pages by fax immediately."  (Ex. 5.)  The privilege log for that day includes an email from Friedman to Stern, vaguely described as "email sent for the purpose of giving legal advice re:

closing conditions." (Ex. 66 at No. 137.) The description is likely misleading as this attachment to the email is described only as a "signature page," most likely Safrin's. (*Id.*)

Similarly, the post-closing attempts to refinance the property factored into the attempted cover-up and involved at least one counterfeit document prepared by BIR. On August 28, 2007, Friedman and Erica Sternin, another BIR attorney, appear to have prepared a fake promissory note for Petra. (*See discussion, supra Section* III. D. 3.) The original BIR privilege log entry for the documents identified as BIRFR0028288 AND BIRFR0043968 contain no reference to attachments and were previously, and vaguely, described only as "E-mail sent for the purpose of giving legal advice re: financing" and "E-mail sent for purpose of giving legal advice: lending." (Ex. 89.) The revised log, however, identifies for the first time attachments to both documents as "Promissory Note," which given the date and the parties involved is most likely the counterfeit note given to Petra. (Ex. 66 at Entry Nos. 735, 1074.)

### (b)    Herrick

Nor was BIR the only firm involved in the fraud. For example, on June 28, 2007, Herrick attorney Stephen Fleissig had a privileged conversation with Stern regarding Safrin's involvement. (Ex. 16 at 99:10-16.) Privilege log entries around the same time also indicate that Stern discussed Safrin with Herrick attorneys. For instance, log entries for June 28, 2007, reflect communications relating to carve outs, operating agreements, and loan documents—the very documents that would have required Safrin's involvement and signature. (Ex. 66, Entry Nos. 164-66, 169-71, 175-76, 1023, 1087-88.) And there is an entry on the Herrick log for a communication among attorneys about a certification on June 28, 2007, one day before Fleissig emailed Stern and Friedman a certificate for Safrin to sign and it came back fully executed from

wizzy bizzy. (Ex. 170 at p. 23 (June 28, 2007 "Communication among counsel re: certification").)

Fleissig provided advice regarding Stern's closing expenses, which have been demonstrated to be false. (Ex. 16 at 314:20-316:11; Ex. 170 at pp 10-11 (June 27, 28, 2007 communications regarding "billing," "fees," and "invoice," and July 12, 2007 "communications among counsel re: expenses.").) Fleissig also had privileged communications with Stern regarding a $4.5 million dollar purchase price discount that he had obtained from Colonial but that Stern tried to conceal from Citigroup. (Ex. 16 at 443:6-18; *see also* Ex. 170 at p. 18 (July 9, 10, 2007 (communications "re: purchase price").)

Herrick also took part in aspects of the fraud involving Amusement. On July 11, 2007, Friedman was working to provide Amusement warranty deeds ostensibly to protect Amusement's interests. (Ex. 132; Ex. 171.) These deeds were not only worthless but violated the Citigroup loans which prohibited assignment or encumbrance of the Portfolio properties. On that same day, Friedman had privileged conversations with Dena Cohen about "proposed deeds." (Ex. 66, Entry Nos. 98-99.) This cannot be a mere coincidence. Given the proximity of the conversation with Friedman's efforts, it is probable that Herrick was also involved in this important aspect of the fraud on Amusement.

(c)     <strong>HSR</strong>

HSR assisted Stern in his frauds primarily by helping him in the preparation of closing statements and the identification of expenses. (Exs 22 – 26 (specifying expenses as payable by Seller, including false expenses).) Further, HSR played a part in advising Stern about his authority to disburse Plaintiff's funds. (Ex. 31.) It did this while knowing that the proposed ownership structure between MS Colonial LLC and JSAE Colonial LLC provided that each

entity would hold 75% and 25% shares respectively (Exs. 172 - 173), and that this contradicted the ownership structure where Plaintiff was promised a 50% ownership interest. (Ex. 174 (showing conflicting partnership structure within the LOU).) Based on this, HSR's privileged communications about matters encompassing Stern's deal expenses, partnership structures, negotiations with Plaintiff, and authority to release funds should be disclosed.

### (d) Minsky

With regard to Minsky, he was the attorney primarily responsible for helping Stern launder the money he stole from Plaintiff by dispersing the funds to Stern's friends and related entities. At his deposition, Minsky admitted that he had privileged communications with Stern about the source of such funds. (Ex. 32 at 100:8-105: 18, 115:6- 116:4.) He also admitted having privileged conversations with Stern in furtherance of the individual transfers of funds to such entities as Midland, Schapiro, and Niederman. (Ex. 32 at 134:15-136:3, 138:21-141:10, 141:11-146:11, 146:14-148:21, 150:7-153:19.) Given Minsky's clear admissions about his involvement in furtherance of Stern's frauds, his privileged communications about matters such as the source of Stern's funds and where they were sent should be subject to disclosure.

### (e) Reiss

Like Minsky, Reiss was also used by Stern to misappropriate funds from the transaction. As discussed above, Stern employed Reiss to transmit at least $300,000 from the Colonial purchase to a wholly separate real estate transaction between Stern and Pulte Homes. (Exs. 33 – 39.) As Stern's transactional attorneys in the Pulte deal (Ex. 175), it is likely that RES must have had privileged conversations with Stern with regard to the source of his funds or their intended purpose. Because such conversations would have been in furtherance of Stern's fraudulent conveyances, they should be disclosed.

46

### (f)   Tepfer

As with Minsky and Reiss, Stern used Tepfer to pass off fake expenses and launder funds.  Stern claimed a closing cost with Prudential of roughly $8.6 million dollars, but at closing he directed this amount to be transferred to Tepfer's accounts, where it then inexplicably returned to Frenkel's accounts.   (Ex. 40 at 17:16-25; Ex. 41; Ex. 33.)  To the extent that Stern or any of his agents claim privilege over their communications with Tepfer regarding his assistance in passing these false expenses, such communications should be disclosed.

### 4.   *In camera review*

Amusement contends that because the transaction at issue here was so permeated with fraud from the outset and that but for the assistance of his attorneys Stern would not have been able to accomplish the objects of his scheme, all communications relating to the transaction are subject to the crime-fraud exception.  Alternatively, Amusement would respectfully request an in camera review either by the Court or by a special master of the written communications on the various logs.  *Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 361 (E.D.N.Y. 2009) (ordering *in camera* review "in abundance of caution" and requiring defendants to produce all logged materials relating to transaction).

47

**V.      CONCLUSION**

For all the foregoing reasons, Amusement respectfully requests that the Court grant its

motion in its entirety.


Respectfully submitted,

AMUSEMENT INDUSTRY, INC.


By_____/s/_____
          Elissa Koolyk
          *Attorneys for Plaintiffs*
          *Amusement Industry, Inc., Practical Finance*
          *Co., Inc., Bankers Capital Realty Advisors,*
          *and Steven Alevy*

48