UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------X          [ECF]

AMUSEMENT INDUSTRY, INC., dba WESTLAND
INDUSTRIES; PRACTICAL FINANCE CO., INC.,                      07 Civ. 11586 (LAK) (GWG)

                            Plaintiffs,

          -against-

MOSES STERN, aka MARK STERN, JOSHUA
SAFRIN, FIRST REPUBLIC GROUP REALTY,
LLC, EPHRAIM FRENKEL, FIRST REPUBLIC
GROUP CORP., LAND TITLE ASSOCIATES
AGENCY, LLC (aka LAND TITLE ASSOCIATES),
and AVERY EGERT,

                            Defendants.

--------------------------------------------------------------------------X

AND RELATED CROSS-ACTIONS

--------------------------------------------------------------------------X


MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS
MARK STERN AND FIRST REPUBLIC GROUP CORP.
IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL


HOFFINGER STERN & ROSS, LLP
150 East 58th Street, 19th Floor
New York, New York 10155
(212) 421-4000

**TABLE OF CONTENTS**                                    **Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    Plaintiffs now claim Safrin's signatures were forged,
    yet seek to hold him liable in this action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

    One significant example of Plaintiffs saying whatever suits them is their shifting
    positions regarding whom Friedman represented . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

    Plaintiffs' arguments are outside the scope of the within action; Plaintiffs and
    Steven Alevy in particular clearly understood "their $13 million" could be used
    for non-Colonial transaction purposes, thereby eviscerating their post-transaction
    "laundering" arguments; indeed, not a single document of any type has been
    presented requiring the "funds" to be used in any specific manner . . . . . . . . . . . . .    6

    Plaintiffs' intentionally misleading and improper embellishments regarding
    HSR and Stephen R. Stern are plainly outrageous . . . . . . . . . . . . . . . . . . . . . . . . . .    9

    Further samples of Plaintiffs' misleading statements which they
    masquerade as "facts" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

POINT - PLAINTIFFS FAIL TO ESTABLISH THE REQUISITE FACTS
       TO WARRANT *IN CAMERA* REVIEW OF PRIVILEGED MATERIALS
       AND AN INVASION OF THE ATTORNEY-CLIENT PRIVILEGE . . . . . . . . .    23

        The attempted fishing expedition seeks information irrelevant
        to the within action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

## TABLE OF AUTHORITIES

**Page**

**Cases**

Cendant Corporation v. Shelton, 246 F.R.D. 401 (D. Ct. 2007) . . . . . . . . . . . . . . . . . 24, 27-29

Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983
(Marc Rich & Co.), 731 F.2d 1032 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

In re Richard Roe, Inc., 168 F.3d 69 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Securities and Exchange Commission v. Herman, No. 00 Civ 5575, 2004 WL 964104
(S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

United States v. Jacobs, 117 F.3d 82 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27

United States v. McKeon, 738 F.2d 26 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

United States v. Zolin, 491 U.S. 554, 109 S.Ct. 2619 (1989) . . . . . . . . . . . . . . . . . . . . . . 23, 29

## PRELIMINARY STATEMENT

Defendants Mark Stern ("Stern") and First Republic Group Corp. ("FRG Corp.") (collectively, the "Defendants") submit this Memorandum of Law in opposition to Plaintiffs' motion to compel production and discovery of privileged materials and communications (the "Motion").

The Motion is very long on rhetoric while misstating what the documents Plaintiffs refer to purportedly contain; and, further, being short on the law warranting the invasive-type relief sought. The Motion, much like Plaintiffs' complaint and several times amended complaint, is "built" upon speculation, conclusory statements and blatant misstatements as to what their extensive 180+ exhibits actually contain; consequently, Plaintiffs have established but one thing – their misguided and ill-advised Motion should not be granted.

## STATEMENT OF FACTS

Regrettably, it is necessary to correct but a sampling of the vast and numerous misstatements plaguing Plaintiffs' Memorandum of Law ("Pltfs MOL").

For example, citing paragraphs 5 and 6 of the indictment against Ephraim Frenkel (Pltf Exh 2), Plaintiffs state: "the indictment alleges that Stern used approximately $15 million in bogus closing costs to induce Citigroup to loan him approximately $126 million" (Pltf MOL, p. 2). But Plaintiffs' assertion perhaps takes poetic license when it misstates the cited reference. While referring to certain closing costs, the cited paragraphs of the indictment against Frenkel *do not assert or claim* the costs were "bogus."[1]  Plaintiffs repeat the same refrain, misleadingly,

---

[1]  To be accurate, the indictment alleges Frenkel falsely represented to Citigroup that he had paid the identified closing costs by wire "when in fact he had not made such payments" and that he "made various wire transfers . . . in furtherance of a scheme to defraud Citigroup by inducing Citigroup to loan approximately $126 million using false statements of, among other things, closing costs" (Exh 2, ¶¶ 7, 10). When Plaintiffs quote paragraph 7 of the Frenkel indictment,

when, for example, they refer to paragraphs 5 – 7 of the Frenkel indictment as the basis for their assertion, "to run up the amount of the loan, Stern padded the deal expenses with over $15,000,000 in fictitious costs" (Pltfs MOL, p. 5). Again, and to put it politely, Plaintiffs inappropriately embellish upon the indictment's allegations. Again, the Frenkel indictment alleges Frenkel represented he paid certain closing expenses when he did not (see fn. 1).

If Plaintiffs are one thing it is they are consistent in their inconsistency – just as with the numerous versions of the complaint here and the inconsistent complaints in other actions pending before this Court, they willy-nilly vary their allegations and arguments, sometimes depending on what motion they are making, what action they are in, and what position they think will carry the moment. Some of the more blatant examples follow.

### *Plaintiffs now claim Safrin's signatures were forged, yet seek to hold him liable in this action*

Plaintiffs have sued Joshua Safrin in this action. However, as if they want to forget that claim for purposes of this Motion, in their brief, Plaintiffs take up the cudgels of Joshua Safrin's position and claim the Joshua Safrin signatures were forged ("All of Safrin's signatures on loan and other related documents were forged" [Pltfs MOL, p. 6]). Yet, at the same time, they seem to endorse Safrin's arguments for non-liability; they inconsistently and adversely maintain in this litigation that Safrin was involved in the transaction and is liable to Plaintiffs.[2] Clearly, Plaintiffs switch their arguments and contentions depending on what they believe will be momentarily helpful, with no view toward what the real facts and merits are.

---

they omit the portion stating the reason Frenkel's representation was allegedly false i.e., he represented the payments were made "when in fact he had not made such payments." See Pltfs MOL, p. 8, neglecting to include the government's rationale for claiming Frenkel's representation was false.

[2]     Indeed, Plaintiffs attach as Exhibit 88 something Safrin has thus far somehow withheld in this action – a supposed handwriting examiner's expert report dated February 26, 2009, with supplemental portions dated April 1, 2009 and April 16, 2009, addressed to Safrin's counsel. Safrin has not produced these three-year old "reports" in this action.

Plaintiffs inappropriately and mistakenly treat the alleged forgery of Safrin's signature as a foregone conclusion. But in doing so, they conveniently sidestep the known and stated facts that Safrin's son-in-law, Avery Egert, *has admitted* signing Safrin's name on some documents relating to the Colonial transaction: "In the context of exploring the Colonial Transaction's opportunities, certain preliminary documents bearing signatures represented as Safrin's were transmitted to [Stephen] Friedman. Each of those documents, which Egert signed or caused to be signed, was transmitted to Friedman via his BIR email addresses." Exh D, Egert's Answer to Cross-Claim of First Republic Group Corp. against Avery Egert, with Affirmative Defenses and Cross-Claims, ECF No. 596, p. 21, ¶ 9. See also, e.g., Exh E , p. 193, l. 18-23. Further, Egert has testified some of Safrin's purported signatures on documents relating to this action appeared to have been affixed by Egert's employee, Joseph Kelemer (see Exh E, p. 179, l. 11-23). Continuing the perpetual merry-go-round of affixing other people's signatures, Egert also noted Kelemer has affixed Egert's signature to documents in various transactions, saying he gave Kelemer a "free hand" to do so. Exh E, p. 20, l. 24 – p. 21, l.20. Thus, Safrin's claim his signature was forged sidesteps other very pertinent questions of fact, such as whether it was affixed by his son-in-law Egert, or Kelemer, or perhaps someone else in company Egert ran conveniently called *The Safrin Group* – in which Safrin allegedly had no ownership interest. Perhaps not surprisingly, when Egert was asked whether he had provided exemplars of *his* handwriting to anyone since September 1, 2007, Egert's attorney invoked the attorney-client privilege, directing Egert not to answer the question. Exh E, p. 446, l. 8 – p. 449, l. 20. Perhaps the negative inference should be applied to *that* invocation mooting any of the plethora of what suits the Plaintiffs depending upon what is to be presented to the Court – thereby, simply requiring this Motion to be denied.

3

Indeed, Joshua Safrin testified he read portions of his son-in-law's deposition, and was upset to learn that Egert admitted he had signed Safrin's name to certain documents.[3]  Exh L, p. 503, l. 18 – p. 504, l. 16.

***One significant example of Plaintiffs saying whatever suits them is their shifting positions regarding whom Friedman represented***

The ***Third*** Amended Complaint ("TAC") in this action is rife with Plaintiffs' allegations that Friedman was attorney for Mark Stern and the purchasing entity of the Portfolio (and Safrin and Egert):

- ". . . In an effort to obtain the needed capital, **Stern, FRG Corp. and/or FRG LLC authorized Steven Alevy and Stephen Friedman, a lawyer they had retained to act as counsel** and to help locate financing, to approach Amusement to determine if it would supply the needed funds." [Exh A, TAC ¶ 22 (emphasis supplied)]

- "Friedman presented a good opportunity to Amusement on behalf of **his clients Stern, Safrin, Egert, and FRG Corp. and/or FRG LLC . . .**" [Exh A, TAC ¶ 23 (emphasis supplied)]

- "**Stephen Friedman**[] . . . **repeatedly represented to Amusement that he had been retained by Stern, Safrin, Egert, and the entity designated to buy the Colonial Portfolio . . .**" [Exh A, TAC ¶ 25(emphasis supplied)]

---

[3]      It is also important to note that Kelemer (Egert's employee) forwarded documents *to* Stephen Friedman purportedly containing Safrin's signature.  In at least one instance, Safrin denied his signature appeared thereon, asserted a lack of knowledge as to who signed his name and denied authorizing anyone to sign it. Exh L, p. 351, l. 9-21.

- ". . .By letter dated May 10, 2007, [**Friedman] was specifically retained by Stern and FRG Corp., as their lawyer** and agent . . ." [Exh A, TAC ¶ 26 (emphasis supplied)]

- "When the events involved in this case occurred, Friedman was already representing an Alevy family entity *in an unrelated transaction at the time . . .*" [Exh A, TAC ¶ 28 (emphasis supplied)]

Thus according to Plaintiffs' very own allegations in the TAC, Friedman was attorney for Mark Stern and the purchasing entity, *and* was representing an Alevy family entity *in an unrelated transaction.*

***But contrary to the allegations in the TAC***, in their separate action against Friedman and Buchanan Ingersoll & Rooney, P.C. (Amusement Industry Inc., et ano v. Buchanan Ingersoll & Rooney P.C., et ano, No 11 CV 4416 ["Amusement v. BIR"]) Plaintiffs squarely averred:

> "[BIR] and Stephen Friedman . . . represented Amusement in connection with a large real estate transaction in mid-2007 in which Amusement lost $13,000,000 and a real estate portfolio worth $190,000,000. . ."
> [Exh F-1, First Amended Complaint, ECF No. 47, ¶ 1]

Indeed, in dismissing most of the claims lodged by Amusement in its original complaint against BIR and Friedman as duplicative of an attorney malpractice claim, the Court stated:

> "Here, plaintiffs have not plead claims under which there was no attorney-client relationship between defendants [i.e., BIR and Friedman] and themselves. Rather, each claim at issue incorporates all the prior allegations of the complaint . . . including of course the allegations that there was an attorney-client relationship between the defendants and Amusement, Comp. ¶¶ 35, 50-54. Indeed, three causes of action specifically repeat the attorney-client relationship allegation and assert it again as a basis for the claim. See ¶¶ 84, 96. 105. . . . Additionally, the substantive claim for damages for each claim of relief is either identical to or a subset of the claim in the malpractice claim"
> [Exh G, Report and Recommendation in Amusement v. BIR, ECF 31, p. 12]

Thus, Plaintiffs engage in sleight-of-hand in their arguments, depending on what "Cv No." appears at the beginning of its pleading/motion papers. Plaintiffs' continual switching of affirmative positions that they plead demonstrates the lack of merit to their arguments, and they should not be permitted to advance contradictory positions.

***Plaintiffs' arguments are outside the scope of the within action; Plaintiffs and Steven Alevy in particular clearly understood "their $13 million" could be used for non-Colonial transaction purposes, thereby eviscerating their post-transaction "laundering" arguments; indeed, not a single document of any type has been presented requiring the "funds" to be used in any <u>specific manner</u>***

To the extent Plaintiffs claim they are trying to ascertain post-transaction information "tracing" the $13 million, their efforts are clearly (a) contrary to their allegations in *this action* and (b) outside the scope of *this action*, in any event.

First, Plaintiffs allege a scheme by which Defendants allegedly recouped approximately $2 million out of $13 million advanced by Plaintiffs. Yet at the outset in this litigation, *Plaintiffs made allegations evidencing <u>their very own admitted and conceded understanding</u> that $4 million was <u>not</u> going to be used for Colonial transaction closing purposes, and would be available for defendant Mark Stern and Joshua Safrin.* Thus, Plaintiffs, again attempt to, sweep under the rug allegations they previously affirmatively made in this very action, whereby they expressly conceded the $13 million was not necessary to close on the Colonial transaction **and at least $4 million of the $13 million was not needed and could be used by Mark Stern and Joshua Safrin**. Try as they might, Plaintiffs cannot hide from the very pleading they drafted and filed or the allegations they presented to this Court

By way of background, the initial pleading filed by Plaintiffs claimed Mark Stern signed both a $13 million promissory note and a $15 million promissory note in relation to the $13

million advanced by Plaintiffs. Plaintiffs' explanation of why the $15 million promissory note was drafted is likewise damning to their position. Thus, Plaintiffs specifically alleged:

> "Amusement's repayment right would now be increased by $2 million to $15 million, *recognizing that [Mark] Stern and [Joshua] Safrin at this point had already expressed their intent to take over $4 million* from the partnership that all parties understood would be left over at closing once Amusement's $13 million was used to close." [Exh B-1, Original Complaint, p. 27, ¶ 53(b)] [Emphasis supplied.]

Notably, the foregoing very **specific** allegation was no accident; it also was asserted verbatim by Plaintiffs in the first federal action it filed, but which was dismissed for failure to properly allege diversity (Exh C, pp. 26-27, ¶ 53[b]).

Accordingly, therefore, under Plaintiffs' very own expressed affirmative view, expressed *twice in federal actions, including the action at bar*, they concededly ***knew* at least $4 million was unnecessary for the closing and would be left over, and it concededly was *their understanding* that at least $4 million was going to be used or could be used by Mark Stern and Joshua Safrin as they saw fit.** Consequently, Plaintiffs concededly believed approximately one-third of the money advanced was not needed to close, and their explicit understanding was $4 million could be used in any manner chosen by Mark Stern and Joshua Safrin. Yet now, on the within motion, Plaintiffs seek to "follow" the $13 million. Plaintiffs have continually done so and should not now be permitted, yet again, to disingenuously change their allegations to suit their whims.[4]

---

[4]    When considering the opposition to Plaintiffs' motion, we respectfully ask the Court to take note of the following Second Circuit holding, to wit: "[a] party . . . cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984). This is exactly what Plaintiffs have done here.

Putting aside the foregoing, the within action is clearly <u>not</u> about "following the money." Indeed, Plaintiffs commenced a separate action with that purpose, namely, <u>Amusement Industry, Inc. v. Midland Avenue Associates, LLC, et al.</u>, No. 10 CV 05064 ("<u>Amusement v. Midland</u>"). Accordingly, even if Plaintiffs carry their burden to establish a reason for the Court to inspect materials *in camera*, Plaintiffs are improperly fishing for materials irrelevant to the within action, particularly with respect to attorneys/firms Bruce Minsky, Reiss Eisenpress, Herbert Tepfer and HSR.[5] In <u>Amusement v. Midland</u>, this Court concluded the within action and the <u>Midland</u> action were not duplicative, <u>concluding there was a distinction between the objectives of the two actions – and a different temporal focus on events in the two actions</u>:

> "[t]he TAC [Third Amended Complaint in the <u>Amusement v. Stern, et al.</u> action] is based on the defendants' efforts to induce Amusement to place its $13 million into escrow for the purchase of the Portfolio and the defendants' improper refusal to return this money.   The complaint in the instant [<u>Amusement v. Midland</u>] action, by contrast, is brought against a largely different set of defendants and is based on the diversion of Amusement's funds – after it was taken by Mark Stern and FRG Corp. – to the defendants in this action for uses unrelated to the acquisition of the Portfolio.  . . . In other words, the claims in the TAC are based on the improper refusal to return Amusement's $13 million from escrow, whereas the claims in the instant action are based on the subsequent transfers of a portion of this money."  [Exh H, p. 14]

Thus, in the <u>Amusement v. Midland</u> action, this Court concluded the two actions were not duplicative.  Given what the Court found to be <u>distinct sets of events in the two actions</u>, the motion at bar in the within action improperly seeks discovery regarding the alleged subsequent transfers of the $13 million – issues outside the scope of the within action.

---

[5]    In any event, there is no claim by Plaintiffs of communications between Mark Stern and Herbert Tepfer, Esq.

***Plaintiffs' intentionally misleading and improper embellishments regarding HSR and Stephen R. Stern are plainly outrageous***

Unfortunately, Plaintiffs apparently find it difficult to accurately state what their exhibits or the facts indicate, and demonstrate a need to embellish their allegations and to take undeserved poetic license to support "facts" which simply do not exist – or worse, that they seemingly concoct. For example, Plaintiffs state "HSR also had communications concerning deal expenses" (Pltfs MOL, p. 10). However, the exhibits they cite merely show:

> (a) an HSR attorney was *one of ten cc's* on an email between a Citigroup representative and Frenkel (Exh 22);
>
> (b) an HSR attorney was *one of nine cc's* on an email from one Citigroup representative to another Citigroup representative and Frenkel (Exh 23),
>
> (c) an HSR attorney was *one of eleven cc's* on an email from Frenkel to a Citigroup representative (Exh 24)[6];
>
> (d) an email from an HSR attorney to Brad Siegal (attorney for the seller) stating "I was just contacted by Mark [Stern] who advised he was on a call with you and John regarding an expense item, I left you a voicemail as you were not in. Can you draft something and send it as a text message to me to review covering this item? Thanks." (Exh 25);
>
> (e) after being copied on an email from Stern to seller's representative and seller's counsel regarding certain fees the seller had agreed to pay, an email

---

[6]  It is important to note – not a single e mail of these referenced makes mention of any approval by HSR of any content of any e mail, any discussion re: any expense e mail or closing statement e mail or any creation of an invoice or expense by anyone at HSR – and, indeed, any dialogue by anyone at HSR regarding same. The reason is abundantly clear. Neither HSR nor Stephen R. Stern were involved with the closing or the disbursement of funds or projected expenses with regard to the closing at any time or for any reason. It was simply not their role or responsibility.

from one HSR attorney to another listed a summary of obligations under the purchase and sale agreement and commented the client may have negotiated for items not in the contract, such as who bears "survey prep" fees and attorneys fees (Exh 26). Plaintiffs cannot resist themselves, however, wrongly describing the email as "specifying expenses as payable by Seller, including false expenses" and ignoring the underlying email whereby Stern listed certain items seller/seller's attorney had agreed to pay in connection with the closing (Exh 26);

(f) Plaintiffs refer to certain correspondence, Exhibits 27-30, in which they assert the HSR firm falsely claimed the purchaser was ready, willing and able to close (Pltfs MOL, p. 10); however, the actual documents state, ". . . we understand our client has signed documents and demonstrated it is ready, willing and able to close . .." (Exh 27); and "I am informed your client [i.e., seller] advised that my client's [i.e., purchaser's] readiness, willingness and ability to close is not in question . . ." (Exh 28); and HSR did not send, receive and was not even copied on Exhibits 29 and 30. But of course, to tie Plaintiffs down to the real facts would only trip them up.

(g) Plaintiffs characterize one email from an HSR attorney to Frenkel as establishing "HSR was involved with the improper release and diversion of Amusement's funds" (Pltfs MOL p. 10). However, this effort by Plaintiffs is likewise ill-advised and ill-conceived in that Exhibit (no. 31) is merely a ministerial email passing along certain information received from Stern, and advising Frenkel to contact Stern if any of the information (conveyed to the

10

attorney by Mark Stern) *is inaccurate, incorrect or inappropriate*[7] (Exhibit 31).   Moreover, Plaintiffs contradict their very own argument, arguing "Frenkel clearly knew not to release Amusement's funds without the required authorizations" (citing Exhibits 183, 178, 179, 180, which include communications on July 10 and July 12 from Plaintiffs' attorney Allen Sragow to Frenkel on the subject (Exhs 179, 180) [on which HSR was not copied] (Pltfs MOL, p. 26, n.18).   Plaintiffs cannot even keep their positions consistent within the scope of one brief.

As if this were not damning enough reaching conclusions that are not supported by the documents they submit, there is more.   Later, Plaintiffs inaccurately – actually it seems **deceitfully** – point to Exhibits 22-26 above as supporting the statement, "HSR assisted Stern in his frauds primarily by helping him in the **preparing of closing statements and the identification of expenses**" (Pltfs MOL, p. 45 [emphasis supplied]).   **Notably, nothing** in the exhibits supports a claim, allegation, supposition, inference, etc. that HSR prepared, or helped anyone prepare, closing statements or approved them or consented to their content.   Being one of ten or eleven cc'd recipients of an email is not the preparation of the email or any of its attachments or the approval of any of them.   Iindeed, there is not a single communication of any type suggesting approval or consent or knowledge or preparation of any of the attachments [the closing statements].   And as to Plaintiffs' cryptic reference to "identification of expenses" – whatever that generalized statement is supposed to mean – boils down to a comment that apparently Mark Stern negotiated for the seller to pay some expense items.   There is no creation

---

[7]      Plaintiffs omit that the foregoing ministerial email was flanked on both sides by a July 10th and July 12th communication from plaintiffs to Frenkel, *instructing Frenkel not to release funds.*   See Pltfs Exhs 179, 180.

or preparation or assistance of any type by HSR with regard to any expense and, most importantly, there is no direct or indirect evidence that truly supports this outrageous statement. It is most disgraceful and, frankly, appalling, that Plaintiffs resort to such blatant misrepresentation of documents.

Plaintiffs also claim Exhibits 172-174 show HSR knew there was a 75%/25% ownership structure between MS Colonial LLC and JSAE Colonial LLC, and that the 75/25 structure "contradicted the ownership structure where Plaintiff was promised a 50% ownership interest" (Pltfs MOL, pp. 45-46). But those exhibits only show the chart was forwarded as an attachment to HSR in a June 29, 2007 email from a Herrick attorney to a Citigroup representative, on which *ten* persons were cc'd, including an HSR attorney (Exh 172, 173). Exhibit 174 merely is an unexecuted copy of the so-called LOOU sent by Steven Alevy to Stephen Friedman and Mark Stern, which was thereafter forwarded to HSR. Notwithstanding Plaintiffs' imaginative wishful thinking, the exhibits do not establish the existence of any supposed contradiction, much less HSR's knowledge of any supposed contradiction. And, the structure of the parties for the transaction was not discussed with HSR as, again, this was not the role or responsibility of HSR or attorney Stephen Stern in connection with the transaction. But; then, everyone involved knew this – even Plaintiffs who had no communication with HSR prior to the closing.

Similarly, Plaintiffs urge Exhibit 31 shows "HSR played a part in advising Stern about his authority to disburse Plaintiff's funds." Pltfs. MOL, p. 45. But anyone bothering to simply take a look at Exhibit 31 will readily note said exhibit shows nothing of the sort, by direction or indirection – and it certainly contains no advice by HSR to Stern about anything. . To the contrary, Exhibit 31 simply reflects what Mark Stern purportedly told one of his attorneys, which was simply administratively passed on to Frenkel, ***with the express proviso that if anything***

*conveyed was inaccurate, incorrect or inappropriate, to contact Stern.  Nothing more, nothing less, and certainly not "[advice to] Stern about his authority to disburse Plaintiff's funds."*
Indeed, neither of the **Plaintiff's names is even mentioned or alluded to in the email.**

As to attorney Stephen R. Stern and the HSR firm, Plaintiffs continue to mislead. Plaintiffs assert Frenkel [not HSR or attorney Stern] wrote checks totaling $150,000 to Stephen Stern and HSR, and assert a $50,000 check payable to Stephen Stern was deposited by the wife of Mark Stern's alleged friend Malke Malik; not attorney Stern or HSR.  While fully aware Stephen Stern stated numerous time that he never received the $50,000 check which was apparently deposited into a Malik account, and that Stephen Stern provided information to Plaintiffs voluntarily quite some time ago on that score in the Adversary Proceeding matter and in the Amusement v. Midland action, Plaintiffs incredibly assert, "Thus far, HSR has not documented the basis for the amounts it received, nor explained how part of the funds ended up back in the hands of [Mark] Stern's friend."  Pltfs MOL, p. 27.  Sadly, stopping at nothing, not only is Plaintiffs' statement thoroughly misleading, it is outrageously inaccurate.  For quite some time, Plaintiffs have known quite well HSR and Stephen R. Stern received fees for legal services – that had nothing to do with the $50,000 check referenced above.  This was established in the Adversary Proceeding and in the Amusement v. Midland action.  And as Plaintiffs well know from the Amusement v. Midland litigation (as well as prior materials provided to Plaintiffs' counsel in connection with Amusement's ill-fated Adversary Proceeding brought in relation to the First Republic Group Realty LLC bankruptcy), attorney Stephen Stern does not know, and it is not for him to explain, how a check he **did not receive** "*ended up back* in the hands of Mark Stern's friend."  As the funds were not received by Stephen Stern, they did not "end[] up back" in someone else's hands.  This type of vicious allegation unsupported by any fact is simply

nothing more than an unwarranted and unsubstantiated accusation to support that which cannot be supported by any fact, document, testimony, etc.

Moving away from the $50,000 check which Stephen Stern did <u>not</u> receive, as to Plaintiffs' implicit claims that HSR/Stephen Stern, Esq. somehow unjustifiably received a total of $100,000 in connection with representation of Mark Stern/the entities in the Colonial transaction, Plaintiffs have already taken their shot at that claim, in their First Amended Complaint in the <u>Amusement v. Midland</u> action, with adverse results. In the <u>Midland</u> action, this Court stated:

> "The [Midland] complaint does little to allege with specificity that any money paid to Stephen Stern was without fair consideration. The complaint at one point states, without elaboration, that a $150,000 payment to Stern was a 'fake expense[].' Compl. ¶ 48. But later in the complaint, Amusement gives further detail regarding why the expense was fake, stating in substance that $50,000 of the $150,000 sum due to Stern's firm (because the firm was 'purportedly entitled to fees') was diverted by Mark Stern to 'Malik.' <u>Id.</u> ¶ 101. The unmistakable implication of this statement is that Stern and his firm were entitled to the remaining $100,000 that they presumably received. <u>Id.</u> There is no factual explanation as why its entitlement to fees was 'purported[].' Thus, the allegations are insufficient to allege that the payment to Stern was not for an antecedent debt."

[Exh H, p. 19]

This Court further held,

> "Amusement makes the additional argument that, in any event, it has shown that there was a lack of good faith in the transfer . . . [N]othing in the complaint alleges that there was any lack of good faith <u>with respect to the particular payment sought to be set aside</u>: that is, the moneys retained by Stephen Stern or his firm, apparently in the amount of $100,000. In other words, there is nothing in the complaint – other than general allegations regarding the lack of propriety in the carrying out of the transaction – to suggest an absence of good faith by either Mark Stern or Stephen Stern that Stephen Stern or his firm was not entitled to the $100,000 payment."

[Exh H, p. 20 (emphasis in original)]

14

The allegations in the case at bar are no less lacking, baseless or conclusory than those made in the <u>Midland</u> case. Indeed, the arguments made herein by Plaintiffs are a plain effort to obtain a different result than that reached against them in <u>Midland</u>. Such patent gamesmanship should not be rewarded, or condoned.

### *Further samples of Plaintiffs' misleading statements which they masquerade as "facts"*

Throughout, Plaintiffs continue to play fast and loose with their mistaken factual assertions and misrepresentation of what exhibits state. Thus, by way of example only:

(a) "Notwithstanding a booming real estate market, except for Citigroup all lenders passed. The reasons varied but included that Stern was an unknown, that he had too many lawsuits, or that the investment seemed too speculative. (Exs 50-53). Pltfs MOL, p. 12. But putting aside Plaintiffs' unsupported comment regarding the booming market, the cited Exhibits just don't support their statements lenders were not interested because "Stern was an unknown [or] had too many lawsuits." Exhibit 50 simply doesn't say that; nor do Exhibits 51 – 53.[8]

(b) Plaintiffs assert certain deposition excerpts submitted as Exhibit 32 establish that "Frenkel wired funds to Minsky's attorney trust account and Minsky wired the funds back to Stern or to Stern's confederates" (Pltfs MOL, p. 10). However, the excerpts do not even mention Frenkel. Indeed, while Plaintiffs would prefer not to mention it, Minsky testified First Republic Group owed a debt to Payless Office Products (Exh

---

[8]      Exhibit 51, a June 1, 2007 email from Pembrook Group to Robert Friedman of Steven Alevy's company, and cc'g Steven Alevy, states "We are not comfortable with 92% of cost in these markets and these risks. . . . we feel that this upside [potential] is too speculative for our preferences . . ." (Exh 51). Exhibit 52 reported "the business people at Hudson advised this afternoon there exist significant business issues." Exhibit 53 refers to a potential lender's views on whether it was a 80% LTC/LTV bridge loan, an 85% loan or something above 90%, and the increasing risks. None of these emails (or the others cited by Plaintiffs) mentions Mark Stern or any purported lawsuits.

32, p. 143).    And the shotgun use of the word "Confederates" is typical of the meritless generalized mudslinging Plaintiffs engage in.

(c) Engaging in generalized hit-and-run tactics, Plaintiffs assert, <u>without explanation</u>, "Herrick [Feinstein] also prepared opinion letters given to Citigroup which turned out to be false in key respects," citing two exhibits which are opinion letters, but ***failing*** to state in what regard Plaintiffs claim the Herrick opinion letters were false.  Pltfs MOL, p.10.    Also, failing to state how any other attorney was involved with the opinion letters – that is, because HSR, attorney Stephen Stern, Sherri Eisenpress, Minsky, etc. were not involved.

(d) Plaintiffs also assert "Frenkel . . . wired $8.6 million to Tepfer & Tepfer . . . to make it appear as if he was paying Prudential Douglas Elliman," citing Exhibits 40, 41 and 33.  While Plaintiffs draw inferences, those are merely Plaintiffs' conclusions; the exhibits ***do not establish*** that Frenkel wired the sum "to make it appear as if he was paying Prudential Douglas Elliman."   Again, failing to show how any "confederate" attorneys were involved – because there is no evidence to demonstrate same.

(e) Plaintiffs, citing Exhibits 58-60, assert Minsky "would later funnel over $470,000 of Amusement's money meant for the Colonial deal to Niederman" (Pltfs MOL, p. 13). The exhibits do not establish this- statement, much less that Minsky transferred or "funneled" Amusement's money to Niederman.  To be sure, the exhibits show on or about August 21, 2007 $120,000 was transferred from Minsky to Kesef Properties, Inc., a company owned by Niederman.  But that is all the exhibits establish.  And, Plaintiffs, again, shamelessly ignore the past – the adverse decision they received in <u>Amusement v. Midland</u>, wherein their *amended* complaint was dismissed against

Niederman.   In the <u>Midland</u> action, this Court noted Amusement did <u>not</u> allege Niederman "personally received any funds belonging to Amusement" [Exh H, p. 40] but, rather, alleged a sum was transferred to an entity controlled by Niederman for his benefit.  The conclusory allegations were found insufficient to establish a piercing of the corporate veil, and <u>all claims against Niederman were dismissed</u>.   To make matters worse while shockingly contradicting themselves yet again, in their Rule 26 Statement, Amusement asserted $120,000 was disbursed to Kesef; not $470,000 [Exh I, p. 4].  Now, however, Plaintiffs fabricate new positions, hoping their past positions will be forgotten.  The need to embellish, and concoct additional material and pass it off as "fact" supposedly supported by referenced exhibits, confirms the total unreliability and absence of merit to Plaintiffs' arguments.

(f) Plaintiffs, citing Exhibits 61-63, which are email communications between Richard Koch and Stern, on which Stephen Friedman [but no other attorney] is cc'd on two communications, assert attorney Friedman and Koch[9] "discussed the sources and uses statement" without evidentiary support, as the cited exhibits do not evidence any such discussion (Pltfs MOL, p. 14).  But more to the point, Friedman being cc'd on two emails fails to establish any communication between Friedman and Stern regarding the sources and uses.  Yet again, fiction plays better than fact; however, fiction is no substitute for the facts necessary to support Plaintiffs' motion.

(g) Continuing their campaign of baseless conclusions, Plaintiffs assert a brokerage agreement with Pollard Realty was fraudulent, and that the agreement had been "backdated" to March 5, 2007 (Pltfs MOL, p. 14).  Yet, Plaintiffs also misstate the

---

[9]   Again, no reference to HSR or attorney Stern is made here.

content of the document, stating: "The bogus [brokerage] agreement also misrepresented the purchase price, listing it at $167,000,000 when everyone knew that the actual contract price was $128 million." Pltfs MOL, p. 14. However, the so-called "bogus [brokerage] agreement" dated "as of March 5, 2007" just <u>did not</u> so state. Rather, that agreement indicated the purchaser <u>had not entered into an agreement to purchase, but, rather, was "prepared to negotiate and enter into a purchase and sale agreement</u>" (Pltfs Exh 56). The brokerage agreement referred to "if and when a purchase and sale agreement . . . has been executed by the parties . . ." (Exh 56, agreement p. 1). Indeed, the brokerage agreement set forth a sliding scale of commissions, depending on the purchase price, and stating that as of that point, the seller had offered to sell the properties for $167,000,000 (Exh 56, agreement p. 2). Thus, it is <u>absolutely false</u> for Plaintiffs to assert the brokerage agreement stated the purchase price was $167,000,000. A reading of the brokerage agreement – dated as of March 5, 2007, weeks before a purchase and sale agreement was executed – clearly states otherwise. It is merely another indication of the desperate and misleading lengths Plaintiffs need to go to in order to manufacture a story for their motion.

(h) Citing Exhibit 55, an email of May 10, 2007 from Stern to Richard Koch, cc'g Stephen Friedman [not HSR or attorney Stern], Plaintiffs state "it appears Stern *and Friedman* prepared a new agreement, but this time they substituted Prudential and removed Pollard" (Pltfs MOL, p. 14 [emphasis supplied]). Again, for the purposes of

their motion, Plaintiffs embellish, and there is no indication Friedman prepared the document or assisted in its preparation.[10]

(i) Citing Exhibit 68, Plaintiffs state a potential lender stated "There are $15,000,000 of brokers fees!" (Pltfs MOL, n. 15 at p. 16).   What Plaintiffs fail to reveal, however, is the potential lender's email was written in reference to information received from Steven Alevy's company, Bankers Capital.  Apparently the amount of brokers' fees did not shock Steven Alevy [a principal of the Plaintiffs and the very person who authorized the release of the money in question].   Moreover, given Plaintiffs' apparent view that anyone who receives, even as a "cc," a copy of a document must have prepared and assisted in the preparation of the same, Allen Alevy's own son, Steven Alevy, must have prepared the document which Plaintiffs claim contains false fees as the document was transmitted by Steven Alevy's company by his employee, Robert Friedman.

(j) As to Safrin, Plaintiffs assert: "Safrin has stated under oath that his signatures on all deal-related documents were forged, something that a forensic handwriting expert has confirmed and which appears to be undisputed" (Pltfs MOL, p. 18).   However, Plaintiffs blatantly misstate the record, and quickly sweep under the rug *their* claims against Safrin.  For if it truly were undisputed that Safrin's signatures were forged

---

[10]     The assertion that a privilege log contains a description of emails being sent for the purpose of giving or obtaining legal advice about a brokerage agreement does not indicate or implicate the applicability of a crime-fraud exception, or that the advice was in furtherance of any crime/fraud. Similarly, a privilege log entry regarding an email sent on June 4, 2007 "for the purpose of obtaining legal advice re: fees" does not establish any connection to the allegedly false brokerage or other fees referred to in Exhibits 76 or 75, sent, respectively, July 5, 2007 and July 13, 2007, and on which attorney Friedman was not copied.  Thus, Plaintiffs conveniently miss several steps in jumping to the erroneous conclusion, "it also appears Friedman had a hand in the new set of fraudulent documents as well, as these June 4, 2007 entries [sic – only one entry is set forth in the brief] on the BlR log indicate" (Pltfs MOL, p. 17).

and unauthorized, why would Plaintiffs continue to maintain their action against Safrin?   In any event, the alleged forgery of Safrin's signature is not undisputed, as the following indicates: (a) Plaintiffs continue to maintain their claims against Safrin; (b) the supposed handwriting expert has not been examined (expert depositions have not been scheduled); (c) Safrin's son-in-law, Avery Egert, admittedly affixed Safrin's signatures to some documents relating to the transaction [Exh D, p. 21, ¶ 9]; and (d) Egert's counsel refused to allow Egert answer questions regarding whether *he* provided handwriting exemplars to anyone for examination [Exh E, p. 446, l. 8 – p. 449, l. 20].[11]

(k) Plaintiffs unfairly criticize BIR for producing documents originally listed years ago on a privilege log, after Plaintiffs requested descriptions of attachments of documents on the original privilege log.   On preparing the descriptions of attachments, it appeared some documents were mistakenly listed as privileged.   Thus, BIR has forthrightly produced many additional documents.   In any event, notwithstanding Plaintiffs' self-righteous attitude, the documents do not establish "Friedman's connection to wizzy bizzy."   Moreover, Plaintiffs themselves recently changed their privilege logs.   So, what apparently what can be done by Plaintiffs cannot be done by BIR or anyone else.

(l) Citing Friedman's deposition, Exh 14 at p. 650, *Plaintiffs change Friedman's testimony* from his recollection that Egert had taken the position that Safrin would not sign a guaranty, and had not backed off that position as of June 29, 2007 or thereafter,

---

[11]     It is most curious that the version of Safrin's purported forensic handwriting expert report annexed to Plaintiff's motion papers surfaced for the first time in connection with Plaintiffs' motion.

into a statement that Friedman "conceded that by June 29, 2007 he knew that Safrin would not sign any of the deal documents" (Pltfs MOL, p. 20). However, the cited testimony related to a particular document, a guaranty, and not to any and every type of "deal document." For example, the Certification contained within Exhibit 4 is not a guaranty, as Plaintiffs well know.

(m) Citing Exhibits 99 and 100, respectively a July 10, 2007, 11:24:55 AM email from Mark Stern to Dena Cohen attaching documents with his signatures to an email with a subject line "Signatures," and a July 10 2007, 11:31 AM email from "wizzy bizzy" to Dena Cohen attaching what appears to be the same base documents but purportedly signed by Safrin (and not by Mark Stern) with a subject line "Signed Documents," Plaintiffs assert the two attachments "have the same name and consecutive parenthetical numbers," leading Plaintiffs to conclude both documents were signed and scanned at the same location  (Pltfs MOL, pp. 21-22). However, Plaintiffs' characterizations of the separate documents are wrong. Exhibit 99 (from Mark Stern) identifies the attachments as "Tuesday, July 10, 2007 (5).pdf" whereas Exhibit 100 (from "wizzy bizzy") identifies the attachments as "**1387150067**- Tuesday, July 10, 2007 (6).pdf [emphasis supplied]."    Moreover, there are other visible differences between the two cover emails. In any event, it is baseless and incorrect for Plaintiffs to assert the two attachments "have the same name."

(n) Citing the deposition of Herrick attorney Steven Fleissig, Plaintiffs state Fleissig "testified that he suspected [Stephen] Friedman was involved in the false signatures." Pltfs MOL. P. 22. In actuality, the cited testimony states, "l don't know who signed Mr. Safrin's name to the documents, if Mr. Safrin, in fact, didn't sign it. But I believe

that that too was facilitated by Mr. Friedman" (Exh 16, 278:7-10). Not surprisingly, the cited testimony is not the clear statement Plaintiffs assert in their brief.

(o) ***Without citation to any exhibit***, Plaintiffs assert with conviction as an absolute fact "Steven Alevy . . . did not work for Amusement and had no legal or other authority to release Amusement's $13 million." Pltfs MOL, p. 24. However, Plaintiffs *conveniently* omit the so-called "LOU" was emailed to Mark Stern by Steven Alevy, and as drafted contained a signature line for Steven Alevy to sign on behalf of Westland Industries, Amusement's "dba" as Plaintiffs' caption confirms (Exh J), and Steven Alevy is an owner of Amusement (Exh K, p. 2, ¶ 1). Additionally, Steven Alevy had apparent authority to authorize the release of the $13 million. Plaintiffs' unsupported and unsupportable assertions are of no value.

The foregoing is but a sampling of some of a host of the many misstatements set forth in Plaintiffs' brief. Defendants understand counsel for Stephen Friedman will be submitting various misstatements contained in Plaintiffs' brief concerning Friedman. Given the clear unreliability of Plaintiffs' statements, which over and over are unsupported and even contradicted by the exhibits they cite, Plaintiffs' motion should be denied for this reason alone.

## POINT

### PLAINTIFFS FAIL TO ESTABLISH
### THE REQUISITE FACTS TO WARRANT
### *IN CAMERA* REVIEW OF PRIVILEGED MATERIALS AND
### AN INVASION OF THE ATTORNEY-CLIENT PRIVILEGE

More than two decades ago, the Supreme Court cautioned:

> "A blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk. There is also reason to be concerned about the possible due process implications of routine use of *in camera* proceedings. . . . Finally, we cannot ignore the burdens *in camera* review places upon the district courts, which may well be required to evaluate large evidentiary records without open adversarial guidance by the parties.
> There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents. . . ."

United States v. Zolin, 491 U.S. 554, 571, 109 S.Ct. 2619, 2630 (1989) [citations omitted].

With Plaintiffs' Motion, the Supreme Court's warnings tell the whole story and come to fruition. Plaintiffs' Motion is no more than a patent groundless fishing expedition, based upon the unsurprising garden variety fact that there were attorney-client communications around the time a "defendant" allegedly committed fraud. Merely because there were attorney-client communications around the time a person or entity allegedly committed fraud, fails to either support or establish Plaintiffs' conclusion, i.e., that every attorney who provided advice with respect to a real estate shopping mall transaction either wittingly or unwittingly furthered a fraudulent transaction. Additionally, and unlike many cases where the so-called "crime-fraud exception" is invoked, there was nothing illegal about the underlying transaction, i.e., an entity's purchase of a dozen shopping malls in the southeastern part of the United States.

Plaintiffs have not carried their burden.

23

First, an indictment against Frenkel is not an indictment against Mark Stern. While the Frenkel indictment *might* establish reasonable cause to believe Frenkel committed a crime or fraud, the grand jury's action against Frenkel obviously is not grand jury action against Mark Stern. Further, as demonstrated above, Plaintiffs' rampant misstatements about what documents purportedly contain and the unwarranted leaps Plaintiffs make in inventing conclusions therefrom are no substitutes for the factual predicate Plaintiffs must establish in order to warrant the extraordinary relief the request.

Beyond that, there are several fundamental points – drawn from the very cases Plaintiffs cite – which must be borne in mind. Critically, it is not enough to show that a client communicated with counsel while the client was engaged in criminal activity. Cendant Corporation v. Shelton, 246 F.R.D. 401, 406. (D. Ct. 2007). Rather, the opponent of the attorney-client privilege must show the communications were *in furtherance* of a crime or fraud. United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997). This key phrase appears in all cases cited regarding this type of motion. And, the failure by Plaintiffs to satisfy this standard is what sounds the death knell for the Motion.

Moreover, the crime-fraud exception cannot be invoked simply because attorney-client communications have "the potential to be relevant evidence in connection with a crime or fraud." Cendant, 246 F.R.D. at 406. With these basic principles in mind, it is submitted Plaintiffs have not carried their burden, and the Motion should be denied.

Plaintiffs rely on a series of inapposite cases. For example, United States v. Jacobs, 117 F.3d 82 (2d Cir. 1997), presents a far cry from the circumstances at bar. In Jacobs, the defendant became a key player in a scheme known as a "Debt Elimination Program" whereby debtors would pay defendant 15% of the debt's face value in exchange for (phony) certified drafts drawn

on nonexistent financial entities in Mexico. The 15% was distributed one-third to defendant/his

agents, one-third to the supposed "brains" behind the scheme, and one-third to another person

involved in the scheme. Thus, as defendant was fully aware, no money went to any supposed

financial institution listed as the purported issuer of the phony "certified drafts" payable to the

creditor. At issue were two attorney-client communications, in which the defendant's attorney

had "discussed the many potential problems associated with the DEP, explained the legal

liabilities that could flow from them, and strongly advised [defendant] to have nothing to do with

the DEP." 117 F.3d at 86. In analyzing the crime-fraud exception, the Second Circuit held:

> "A party wishing to invoke the crime-fraud exception must demonstrate that there
> is a factual basis for a showing of probable cause to believe that a fraud or crime
> has been committed and that the communications in question were in furtherance
> of the fraud or crime. This is a two-step process. First, the proposed factual basis
> must strike a 'prudent person' as constituting 'a reasonable basis to suspect the
> perpetration or attempted perpetration of a crime or fraud, and that the
> communications were in furtherance thereof' . . . Once there is a showing of a
> factual basis, the decision whether to engage in an *in camera* review of the
> evidence lies in the discretion of the district court. . . . Second, if and when there
> has been an *in camera* review, the district court exercises its discretion again to
> determine whether the facts are such that the exception applies. These factual
> determinations are governed by the clearly erroneous standard."
> 117 F.3d at 87 [citations omitted] [emphasis supplied.]

The Second Circuit found the proponent – the government-- had established a sufficient

factual basis to show probable cause existed to believe a fraud had been committed by the

defendant and that his attorney's communications were in furtherance of the fraud as a result of

the following evidence:

> "Defendant told [an undercover FBI agent] that his attorney started 'lookin' into
> this' and gave his opinion that 'if, they would honor those drafts in an acceptable
> manner, there was absolutely nothing about the program that was illegal.'
> Defendant stated that his attorney spent time with certain individuals apparently
> in connection with matters charged in the indictment and actually attended one of
> the seminars. Defendant also said that his attorney told him 'they were kiting the
> drafts that ah, he didn't know how long it would be.' These statements by
> defendant do support a good faith belief by a reasonable person that *in camera*

25

review of the letters from the attorney to defendant may reveal evidence to establish the claim that the crime-fraud exception applies."
117 F.3d at 88.

As the Second Circuit made clear in <u>Jacobs</u>,

"<u>With strong emphasis on intent</u>, the crime-fraud exception applies 'only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity' . . . It is therefore relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel."
117 F.3d at 88 [citation omitted; first emphasis ours; second emphasis in original]

Continuing, the Second Circuit summarized the ample basis the district court had to show

a pre-conceived intent to embark on a criminal course:

"Before Attorney Swob wrote the May 28, 1987 letter to Jacobs, Jacobs had already agreed to host a seminar in Cincinnati and obtained a false driver's license, social security card and juristic identification in Mexico. These facts, the district court held, indicated that Jacobs had formed an intent to become involved in the debt elimination program *before* he received his attorney's advice. More inculpatory still, the evidence presented indicated that Jacobs had been picked to be a leader in the scheme and knew about the commission structure. Since the 15% purchase price was being split three ways—5% to Jacobs and helpers, 5% to Happy Dutton and 5% to Paul Robinson—a reasonable person would recognize that nothing remained to back the "certified drafts." A reasonable person would also have noticed, and questioned the fact, that the address for the juristic identities and each of the several banks "backing" the certified drafts was the same post office box in Mexico. Jacobs had this information before he sought Attorney Swob's advice. Thus there was evidence that Jacobs had set upon an illegal course before seeking advice about the scheme's legality; then, in the words of the district court: "What then were those communications?" Memo. Or., June 27, 1995, at 5.

Lending more weight to the reasonable belief that Jacobs intended to utilize the communications from Attorney Swob to further his fraudulent scheme is the fact that *he did so.* On several occasions Jacobs used the communications to lend credibility to the scheme, by <u>telling prospective customers that his attorney declared the program legal</u>. Thus, it is reasonable to believe (although there was some evidence to the contrary) that Jacobs' intent in securing Attorney Swob's opinion was to further his Debt Elimination Plan fraud. Accordingly, the attorney-client privilege cannot protect those communications, and the admission of the letters was not an abuse of the district court's discretion."
[117 F.3d at 88-89] [emphasis supplied]

Thus, Jacobs stands in stark contrast to the case at bar. In Jacobs, the defendant directly and affirmatively *sought counsel's opinion on the legality of the scheme/program, affirmatively misrepresented to others he had obtained an opinion of counsel approving the scheme/program, and affirmatively misquoted from the attorney's opinion when advising customers about the opinion of counsel*.[12] **In the case at bar, none of those items exists**. And, there is no claim Stern/FRG Corp. solicited the advice of counsel regarding the legitimacy of any alleged expenses associated with the purchase, there is no claim Stern/FRG Corp./engaged in incriminating acts such as those engaged in by Jacobs prior to soliciting and obtaining legal advice, etc., and, indeed, there is no claim the legality of the purchase of shopping malls itself was of an inherently dubious legal nature. To be abundantly clear, Jacobs is far afield from the case at bar.

Similarly distinguishable is Cendant Corporation v. Shelton, 246 F.R.D. 401 (D. Ct. 2007), where a District Court permitted depositions be taken of two attorneys with respect to a limited subject, i.e., the alleged fraudulent transfer by defendant Shelton of certain assets to a family trust formed by attorneys and a management company. There, Defendant Shelton had testified "the reason he engaged in certain transactions, including their timing, was that they were all part of the estate plan that was put together by lawyers who formed the Trust and SCIP [the management company]." 246 F.R.D. at 404. The District Court had "previously found that probable cause exists to believe that defendant Shelton engaged in a fraudulent transfer of assets to the Trust and to SCIP" (246 F.R.D. at 405); thus, the first prong was established. The second prong was established through the plaintiff's production of evidence that (a) "there is probable cause to believe that the assistance of each of these attorneys was sought by defendant Shelton in

---

[12]    "Attorney Swob's letters actually told Jacobs that the scheme was of dubious legality and that he should steer clear of it. . . . Jacobs, on the other hand, reported that his attorney had *approved* of his participation. Jacobs accomplished this deception essentially by quoting a sentence of one of the letters out of context." 117 F.3d at 89; see also 117 F.3d, n. 6 at 90.

furtherance of the fraud"; (b) "notwithstanding Shelton's deposition testimony that he started his estate planning in 1997, he did not contact any attorney about estate planning until after the fraud at Cendant had been disclosed and shareholder claims were being asserted against him"; (c) "Shelton's primary purpose in forming and operating each of these entities was to use them as a vehicle for shielding assets from creditors who were making claims against him while maintaining his control over those assets"; and (d) "Shelton used the legal services of these two attorneys to form and/or operate vehicles for carrying out the fraud . . ." 246 F.R.D. at 406.

Unlike Cendant, there is *no such evidence produced by Plaintiffs* to sustain a finding that attorneys' services were used in the manner Shelton used the services in Cendant. Indeed, the Cendant Court makes several points which operate *against* the relief plaintiffs seek. Thus, Cendant noted the mere coincidence of attorney-client communications occurring while the client is allegedly engaging in a fraud is insufficient to require communications be revealed. The Cendant Court quoted the Second Circuit's decision in In re Grand Jury Subpoenas Duces Tecum (Corporate Grand Jury Witness), 798 F.2d 32, 34 (2d Cir. 1986) as follows:

> "The crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity."
> 246 F.R.D. at 406.

The Cendant Court further noted:

> "[D]efendant Shelton correctly notes that **unless there is a purposeful nexus between the attorney-client communications and the perpetration of the alleged fraud, there is not a sufficient basis to invade the privilege**. . . . In [In re Richard Roe, 68 F.3d 38, 40-41 (2d Cir. 1995)], the court held that the crime-fraud exception cannot be invoked simply because attorney-client communications have the potential to be relevant evidence in connection with a crime or fraud . . ."
> 246 F.R.D. at 406. [emphasis supplied]

Finally, the <u>Cendant</u> Court noted that where the exception is found to apply, it does not necessarily cover every confidential communication between an attorney and client but, rather, "'the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal conduct'" (246 F.R.D. at 407, quoting <u>In re Grand Jury Subpoena</u>, 419 F.3d 329, 343 [5th Cir. 2005]). Indeed, the crime-fraud exception "should not provide a reason to permit opponents of the privilege to engage in groundless fishing expeditions." (246 F.R.D. at 407, internal quotations omitted, quoting <u>United States v. Zolin</u>, 491 U.S. 554, 571 [1989]). These cited portions of the foregoing decisions are directly on point in the within case.

Nor is the case at bar akin to <u>In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983 (Marc Rich & Co.)</u>, 731 F.2d 1032 (2d Cir. 1984). In that case, after losing an appeal of a contempt order, and losing a subsequent motion for relief from the contempt order, Marc Rich & Co. A.G. ("AG") entered into a two-page Sale Agreement, made to be effective seven days *earlier*, between AG and its CEO pursuant to which AG sold all its stock in a wholly-owned American subsidiary to the CEO for a price to be determined in the future. The timeline was fairly instructive: on June 29, 1983, contempt fines resumed against AG; on July 7, 1983 the Sale Agreement was entered into, retroactive to June 30, 1983; on July 15, 1983, the Court issued a judgment for $1,000,000 in accrued contempt fines plus $50,000 per day for continued noncompliance with a subpoena; on July 20, 1983, the government learned of the Sale Agreement. The Second Circuit ruled the government established adequate reason to believe the sale was a fraudulent conveyance, intended to delay/hinder collection of the contempt fines. Thus, documents/communications dated before the government's inadvertent discovery of the

Sale Agreement were found to have been in furtherance of the fraud and therefore not covered by the attorney-client privilege. But once again, the circumstances of the case demonstrate the vastly different, and limited, scenario under which a court will apply the crime-fraud exception.

Securities and Exchange Commission v. Herman, No. 00 Civ 5575, 2004 WL 964104 (S.D.N.Y. 2004), also cited by Plaintiffs, is instructive and demonstrates Plaintiffs have simply failed to carry their burden here. In Herman, a private offering memorandum for Millennium Services Corporation which allegedly contained false and misleading statements had been prepared by counsel.[13] One attorney invoked the Fifth Amendment privilege at his deposition. One defendant (non-attorney) pled guilty to a 113 count indictment relating to the transactions at issue. Two defendants (including the one who ultimately pled guilty) and an accountant asserted the Fifth Amendment privilege during an SEC pre-suit investigation. Under these circumstances, the Court allowed discovery from certain attorneys under the crime-fraud exception, stating:

> "Certainly, any communications that addressed the purposes of the private offering, the drafting of those portions of the offering documents that discussed the purpose of the offering or the intended use of the funds, the arranging for and carrying out of the fund transfers to Branin [a company wholly owned by Millennium chairman Herman] and its affiliates, the terms for the loans to the affiliates, the actual use of those funds by Branin and its affiliates, and any discussions of the limitations imposed by the offering documents on the use of the Millennium funds are all properly subject to disclosure, both by document production and by deposition testimony." [2004 WL 964104 at *8]

In contrast, unlike Herman, there is no claim of an offering memorandum in the case at bar drafted by counsel, or any attorney who invoked the Fifth Amendment privilege, or a principal defendant who pled guilty to charges stemming from the offering.

---

[13]    Instructive here are the numerous e mail referenced above where Plaintiffs make absolutely no reference or suggest HSR, BIR or any individual attorney [e.g., Stephen Stern, Stephen Friedman, Sherri Eisenpress, Bruce Minsky, etc.] prepared or approved a single closing statement or invoice in question. Moreover, there is no showing any of the foregoing attorneys approved nor was their approval sought with regard to any such closing statements or invoices.

Thus, the cases require the opponent of the privilege to establish a nexus between the alleged crime/fraud and the attorney-client communication. Plaintiffs' burden "is not satisfied by a showing that the material in question 'might provide evidence of a crime or fraud.'" (Herman, 2004 WL 964104 at *3, quoting In re Richard Roe, Inc., 168 F.3d 69, 71 [2d Cir. 1999]). Plaintiffs have failed to carry their burden on the motion.[14]

### *The attempted fishing expedition seeks information irrelevant to the within action*

Even if Plaintiffs had carried their burden to establish a reason for the Court to inspect materials *in camera*, which they have not done, Plaintiffs are improperly fishing for materials irrelevant to the within action, particularly with respect to attorneys/firms Bruce Minsky, Reiss Eisenpress, Herbert Tepfer and HSR. In Amusement v. Midland, this Court concluded the within action and the Midland action were not duplicative, concluding there was a distinction between the objectives of the two actions – and a different temporal focus on events in the two actions:

> "[t]he TAC [Third Amended Complaint in the Amusement v. Stern, et al. action] is based on the defendants' efforts to induce Amusement to place its $13 million into escrow for the purchase of the Portfolio and the defendants' improper refusal to return this money. The complaint in the instant [Midland] action, by contrast, is brought against a largely different set of defendants and is based on the diversion of Amusement's funds – after it was taken by Mark Stern and FRG Corp. – to the defendants in this action for uses unrelated to the acquisition of the Portfolio. . . . In other words, the claims in the TAC are based on the improper refusal to return Amusement's $13 million from escrow, whereas the claims in the instant action are based on the subsequent transfers of a portion of this money." [Exh H, p. 14]

---

[14]    Given the numerous circumstances present in Herman, it is wholly misleading and inaccurate for Plaintiffs to portray Herman as a case holding the mere assertion of the Fifth Amendment privilege by an individual is "sufficient alone to sustain the conclusion that the client's communications with counsel fall under the crime-fraud exception" (Pltfs MOL, pp. 38-30).

Thus, again, in the <u>Midland</u> action, the Court concluded the two actions were not duplicative. Given what the Court found to be distinct sets of events in the two actions, the motion at bar in the within action improperly seeks discovery regarding the alleged subsequent transfers of the $13 million – which is <u>not</u> the subject of the within action. In <u>Herbert v. Lando</u>, 441 U.S. 153, 99 S.Ct. 1635 (1979) the Supreme Court stated,

> "the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, *speedy*, and *inexpensive* determination of every action." (Emphasis added.) To this end, the requirement of <u>Rule 26(b)(1)</u> that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . ." <u>Rule 26(c)</u>. With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process."

Here, too, the relevance requirement should not be ignored but, rather, "firmly applied." Thus, in the event the Court were to grant any portion of Plaintiffs' motion, it is submitted the Court should reject any portion of Plaintiffs' motion which would seek any materials or communications dated after July 16, 2007.

## Conclusion

Plaintiffs' Motion is founded on misleading statements and unsupported ethereal supposition. It is not enough that there were attorney-client communications occurring at a time when Plaintiffs claim a client was engaged in a crime/fraud; rather, Plaintiffs must establish more in order to warrant a Court undertaking the effort of conducting an in camera review. Here, Plaintiffs have failed to carry their burden. Their Motion should be denied.

Dated: New York, New York
      July 11, 2012

                                  HOFFINGER STERN & ROSS, LLP
                                  Attorneys for Defendants Mark Stern and
                                  First Republic Group Corp.

                                  _____
                                  Stephen R. Stern
                                  Mark W. Geisler
                                  150 East 58th Street, 19th Floor
                                  New York, New York 10155
                                  (212) 421-4000