CRAIG H. MISSAKIAN
MARIANA AGUILAR
THOMAS H. KAO
AMUSEMENT INDUSTRY, INC.
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-7130
Fax: (310) 639-7210
E-Mail: craig@westlandreg.com
E-Mail: mariana.a@westlandreg.com
E-Mail: thomas.k@westlandreg.com

ELISSA E. KOOLYK
LAW OFFICES OF ELISSA E. KOOLYK
575 Madison Avenue, 10th Floor
New York, New York 10022
Tel: (646) 401-0125
E-Mail: eliekoolyk@gmail.com

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard, Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210
E-Mail: a.sragow@sragowlawfirm.com

*Attorneys for Plaintiffs Amusement Industry, Inc. and Practical Finance
Co., Inc., and Third Party Defendants Cross-Claimants Steven Alevy and
Bankers Capital Realty Advisors*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMUSEMENT INDUSTRY, INC., d/b/a WESTLAND INDUSTRIES; and PRACTICAL FINANCE CO., INC., <br><br> Plaintiffs, <br><br> v. <br> MOSES STERN aka MARK STERN, JOSHUA SAFRIN, FIRST REPUBLIC GROUP REALTY LLC, EPHRAIM FRENKEL, LAND TITLE ASSOCIATES ESCROW, and AVERY EGERT, <br> Defendants. <br><br> And Related Cross Actions. | CASE NO. 07 CV 11586 (LAK)(GWG) <br><br> ECF CASE <br><br> **REPLY IN SUPPORT OF MOTION TO COMPEL** <br><br> [FILED CONCURRENTLY WITH DECLARATION OF JOHN HOFSAESS] |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

DISCUSSION .......................................................................................................... 5

I.  THE COURT SHOULD GRANT THE MOTION BECAUSE PLAINTIFF HAS
    SATISFIED BOTH PRONGS OF THE CRIME FRAUD TEST ............................. 5

    A.  <u>Probable cause exists that Stern committed a crime or fraud</u> ................................... 5

        1.  *The motion provides more than a reasonable basis to believe that a crime or
            fraud was perpetrated or attempted* .......................................................... 5

        2.  *Nothing in Defendants' oppositions negates the fact that Stern attempted to or
            perpetrated a crime or fraud* .................................................................... 7

    B.  <u>Substantial evidence exists that Stern's attorneys had communications and did
        work that was "reasonably related" to various aspects of the scheme</u> ................... 12

II. PLAINTIFF IS, AT A MINIMUM, ENTITLED TO *IN CAMERA* REVIEW ......... 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*,
   No. 97 Civ. 4978, 1999 WL 61442 (S.D.N.Y. Feb. 3, 1999)................................................ 5

*Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*,
   242 F.R.D. 248 (S.D.N.Y. 2007)..................................................................................... 5, 12

*Armstrong v. Collins*,
   01 CIV 2437 PAC, 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010)........................................ 7

*Cendant Corp. v. Shelton*,
   246 F.R.D. 401 (D. Conn. 2007) ................................................................................. 13, 16

*Chevron Corp. v. Salazar*,
   275 F.R.D. 437 (S.D.N.Y. 2011) ........................................................................................ 5

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983 (Marc Rich & Co.)*,
   731 F.2d 1032 (2d Cir. 1984) ........................................................................................... 16

*In re Search Warrant Executed at Law Offices of Stephen Garea*,
   173 F.3d 429 (6th Cir. 1999) .............................................................................................. 7

*LiButti v. United States*,
   107 F.3d 110 (2d Cir. 1997) ................................................................................................ 6

*Linde v. Arab Bank, PLC*,
   608 F. Supp. 2d 351 (E.D.N.Y. 2009) ............................................................................... 19

*S.E.C. v. Benson*,
   657 F. Supp. 1122 (S.D.N.Y. 1987) .................................................................................... 6

*S.E.C. v. Cymaticolor Corp.*,
   106 F.R.D. 545 (S.D.N.Y. 1985) ........................................................................................ 7

*S.E.C. v. Herman*,
   No. 00 Civ. 5575, 2004 WL 964104 (S.D.N.Y. May 5, 2004)............................................ 16

*S.E.C. v. Invest Better 2001*,
   01 CIV. 11427, 2005 WL 2385452 (S.D.N.Y. May 4, 2005) .............................................. 6

*Savino v. City of New York*,
   331 F.3d 63 (2d Cir. 2003) ................................................................................................. 7

*Shahinian v. Tankian*,
   242 F.R.D. 255 (S.D.N.Y. 2007) ............................................................................ 13, 16, 19

*Specialty Minerals, Inc. v. Pleuss-Stauffer AG*,
   98 CIV. 7775, 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004) ......................................................... 11

*United States v. Andreadis*,
   366 F.2d 423 (2d Cir.1966) ........................................................................................................ 10

*United States v. Jacobs*,
   117 F.3d 82 (2d Cir. 1997) ......................................................................................................... 15

*United States v. Kaplan*,
   02 CR. 883, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ...................................................... 19

*United States v. Stewart*,
   03 CR. 717, 2003 WL 23024461 (S.D.N.Y. Dec. 29, 2003) ...................................................... 7

*United States v. Zolin*,
   491 U.S. 554 (1989) ............................................................................................................ 19, 20

## PRELIMINARY STATEMENT

Faced with a federal indictment identifying him in a scheme to defraud Citigroup, clear evidence showing not only the Citigroup scheme, but wrongful acts involving J.P. Morgan, Petra Capital, Joshua Safrin, and Amusement Industry, Inc. ("Amusement" or "plaintiff") as well, and an adverse inference arising from his blanket assertion of the Fifth Amendment, Mark Stern ("Stern") and his lawyer Stephen Friedman ("Friedman") struggle to divert the Court's attention. Stern does so by distorting the facts and by leveling an endless litany of false, hysterical, and irrelevant attacks on plaintiff. For his part, Friedman purports only to "set the record" straight, but in reality does just the opposite. Wading through all the noise, the facts remain:

- Stern lied to Citigroup about approximately $15 million in deal expenses—from Bruce Minsky, Roman Associates Limited ("Roman Associates"), ACE Capital Group, Inc. ("Ace"), GMAC, and Prudential—all of which were fraudulent.

- Before Citigroup, Stern lied to J.P. Morgan, another potential lender, about a $14 million brokers commission to "Pollard Realty," a nonexistent company located in the residence owned by the wife of a Stern confederate.

- Stern directly and through Friedman misled Amusement into believing that it would receive 50% of the portfolio for its $13 million when under the Citigroup loan agreement Stern and Joshua Safrin had to always own at least 51%.

- Safrin's signatures were forged on the final loan documents given to Citigroup and also on a document given to Amusement.[1]

- Stern used Amusement's $13 million without permission beginning on July 12, contrary

---

[1]    Again, for purpose of this motion only, Amusement accepts as true that the signatures of Safrin on the Citigroup loan documents and a document given to Amusement were forged.

to clear and unequivocal instructions and while knowing the parties did not have a signed agreement.

- Adding insult to injury, Stern used some of Amusement's money not for the Colonial deal but for unrelated transactions, contrary to a statement from Stern's own attorney who told Frenkel that the money was to be used "solely" for the Colonial deal.

- In an effort to cover up the scheme, Stern's attorneys at Buchanan Ingersoll & Rooney prepared and transmitted a counterfeit, backdated promissory note to Petra Capital to induce it to lend money as part of the scheme's cover up.

- Stern concealed, behind false and misleading privilege log entries, inculpatory evidence establishing a connection between himself, Friedman, and "wizzy bizzy" that clearly was not privileged and that should have been produced years ago.

Other than glancing blows, most of these facts go unchallenged. And when a challenge is raised, it has little merit.

For example, Friedman **does not deny that the promissory note Buchanan Ingersoll & Rooney transmitted to Petra was counterfeit**. Rather, and hard as it is to believe, Friedman's defense is that Stern never obtained the loan.[2] In other words, because Stern did not get away with it, the Court should just ignore the conduct. Gratefully, wire fraud, and the crime fraud exception, include conduct even where the defendant does not get away with the cash. Friedman then doubles down by arguing that the counterfeit note had terms **more favorable to Amusement**—again, no harm, no foul. This argument is both galling and absurd in that Amusement **never knew about the counterfeit note let alone received it!**

With regard to the improperly withheld "wizzy bizzy" documents, Friedman again does

---

[2]    Memorandum of Stephen Friedman in Response to Plaintiff's Motion to Compel (hereafter "Friedman Opp."), at 8-9.

not deny that they were withheld but rather that "[n]o one had ever questioned or sought a

revision of the logs until Plaintiff requested a listing of the attachments in late 2011." (Friedman

Opp., at 13.) In other words, it was plaintiff's fault for not asking the right questions. This is not

a game of Battleship and a party's right to discovery should not depend upon a chance question

asked about one document buried among over 1400 (Friedman Opp., at 13); it should depend

upon the integrity of the attorneys creating the log. Here, Stern's attorneys hid potentially

explosive evidence behind a false description. That Stern finally came clean hardly excuses the

conduct.[3]

        As yet another example, Stern for the first time disputes that the deal included over $15

million in fictitious costs, arguing that plaintiff has "inappropriately embellish[ed] the

indictment." As with virtually all of his factual contentions, nowhere does Stern offer a shred of

evidence to show the costs were legitimate. And when asked about them during his recent

deposition, Stern took the 5th, strongly suggesting that they were in fact illegitimate. (Mot., at p.

39 n.23.) As discussed below, there is clear evidence—including deposition testimony from

Bruce Minsky and recent declarations from the former Managing Director of Roman Associates

and the former Vice President of Ace—that the invoices submitted to Citigroup are fakes. This

---

[3]       It bears mentioning that even though BIR eventually produced the documents in question,
conceding that they were not privileged, *only* BIR produced the documents. To date, Stern has
not produced the same documents even though, logically, since they were emails from him he
should have had copies as well. Nor has he explained what happened to his copies.

        Friedman also states that "[n]o effort has ever been made to 'meet and confer' about the
log to attempt to resolve any disputes without court intervention." (Friedman Opp., at 14.)
This statement is puzzling because to date plaintiff has not sought Court intervention to resolve
problems with BIR's log. Plaintiff has in fact notified BIR and other parties of the various
defects in their logs and, if necessary, intends to file a motion challenging the logs, but has not
done so yet. When plaintiff does make that motion it will, of course, satisfy its meet and confer
obligations. A primary basis for that motion will be that Stern does not hold the attorney-client
privilege with respect to many of the documents on the various privilege logs but, rather, that
privilege is held by Citigroup—the current owner of First Republic Group Realty LLC.

evidence is clear, unequivocal, and uncontradicted, and goes to the heart of the Citigroup scheme.

Friedman and Stern also deny that Amusement's funds were stolen because Frenkel purportedly received permission on July 13 to use the funds from Steven Alevy, who Friedman describes as "an owner of Amusement and the son of its principal, Allen Alevy[.]"  (Friedman Opp., p. 1.) It is disturbing, not to mention disingenuous, that Friedman, a seasoned transactional lawyer, would suggest to the Court that a minority shareholder could by virtue of being Allen Alevy's son have the power approve anything.  But even more troubling is that Friedman fails to tell the Court that all of Amusement's $13 million was converted on July 12—one day prior to Steven Alevy's purported release of the funds.[4]

Finally, both oppositions devote substantial effort trying to exonerate Hoffinger, Stern & Ross, LLP ("HSR") and Friedman, two of Stern's lawyers on the deal.  As plaintiff made clear in its original motion, however, whether the attorneys knowingly took part in Stern's scheme is an issue not now before the Court.  Rather, the law only requires a showing of probable cause to believe *Stern* took part in a crime or other wrongdoing and then a showing that the attorney's work furthered the crime.  Here, it is sufficient to show that the attorneys' work, almost by necessity, touched every aspect of this deal, including every aspect of the deal that turned out to be a part of the scheme.

Stern and Friedman have tried mightily to deflect the Court's attention, but the fact

---

[4]     As discussed further below, the alleged Steven Alevy release has been a constant refrain in this case.  In reality, it is nothing more than a red herring.  Everyone, Frenkel and Friedman included, knew that the only two people with authority to approve release of Amusement's funds were Allen Alevy himself and Allen Sragow, one of Amusement's California lawyers. *See infra* at 9 (discussing same).  It is undisputed that neither of those two individuals ever approved the release.  The charade of having Steven Alevy approve the release after the fact was clearly meant to cover up the theft which, unbeknownst to Steven Alevy or anyone else from Amusement, had already started the day before.

remains that a federal grand jury indicted Frenkel for a scheme that Stern orchestrated and that

indictment is more than supported by the facts now before the Court.  While it is obviously true

that "an indictment against Frenkel is not an indictment against Mark Stern,"[5] the indictment is

nonetheless a finding of probable cause and that combined with the facts presented provides

more than adequate basis for the relief sought.  As such, plaintiff respectfully requests that the

Court grant the motion in its entirety or, in the alternative, conduct an *in camera* review of the

relevant documents.

**DISCUSSION**

I.    **THE COURT SHOULD GRANT THE MOTION BECAUSE PLAINTIFF HAS
      SATISFIED BOTH PRONGS OF THE CRIME FRAUD TEST**

Both Stern and Friedman try to turn plaintiff's motion into a trial on the merits.  While

presumably Stern's day will come, that day is not now.  At this stage, only two questions face the

Court.  First, whether a "reasonable basis" exists to believe Stern committed a crime or fraud.

*Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, 242 F.R.D. 248, 250-51 (S.D.N.Y. 2007).

And second, whether the communications in question were in furtherance of a crime or fraud.

The standard, as one court put it, "in this context is 'not an overly demanding' one."  *Chevron*

*Corp. v. Salazar*, 275 F.R.D. 437, 451 (S.D.N.Y. 2011) (quoting *A.I.A. Holdings, S.A. v. Lehman*

*Brothers, Inc.*, No. 97 Civ. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999)).

A.    **Probable cause exists that Stern committed a crime or fraud**

1.    ***The motion provides more than a reasonable basis to believe that a
       crime or fraud was perpetrated or attempted***

There can be no question that Stern attempted to and did perpetrate crimes and frauds in

connection with the Colonial deal.  Facts that support this claim, as discussed in detail in the

---

[5]    Memorandum of Law on Behalf of Defendants Mark Stern and First Republic Group
Corp. in Opposition to Plaintiffs' Motion to Compel ("Stern Opp."), at 24.

moving papers, include the admittedly fraudulent invoices, or accepting Stern's description of

the crime—the lie he told Citigroup about having paid those expenses (Stern Opp., at 1 n.1), the

admittedly forged Safrin signatures on the final loan documents, signatures that no one,

including Avery Egert, had the authority to sign (Ex. 14, at 712:23-714:12 (attaching Friedman

deposition excerpts); Ex. 87, at 215:5-226:9 (attaching Safrin deposition excerpts)), and the bait

and switch with Amusement in which it was promised 50% of the portfolio but received nothing

for its $13 million.[6]

Indeed, having now taken the 5th, Stern has not only offered nothing to rebut plaintiff's

evidence but should be precluded from doing so as well.  As the court explained in *S.E.C. v.*

*Benson*, 657 F. Supp. 1122 (S.D.N.Y. 1987), Stern "cannot have it both ways [and b]y hiding

behind the protection of the Fifth Amendment as to his contentions, he gives up the right to

prove them.  By his initial obstruction of discovery and his subsequent assertion of the privilege,

defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting

his own denials."  *Id.* at 1129; s*ee also S.E.C. v. Invest Better 2001*, 01 CIV. 11427 (BSJ), 2005

WL 2385452, at *2 (S.D.N.Y. May 4, 2005) ("The court does not deny that it may not make the

invocation of a party's Fifth amendment right costly, however [the defendant]'s risk of losing

this case on the merits without the use of the evidence is not the type of cost that is prohibited.");

*S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. 545, 550 (S.D.N.Y. 1985) ("In light of the defendant's

invocation of his fifth amendment rights regarding the basis of his defenses and denials, a total

preclusion order is appropriate."); *LiButti v. United States*, 107 F.3d 110, 120 (2d Cir. 1997)

---

[6]    The Amusement-Stern-Safrin relationship began with a so-called "letter of understanding" stating that "Westland and First Republic would enter into an agreement whereby Westland will provide $13,000,000 for a 50% equity and voting interest in" the portfolio of eleven shopping centers.  (Ex. 106.)  Needless to say, Amusement received nothing for its money and, in fact, could not have received 50% of the portfolio under the clear terms of the Citigroup loan.  (Ex. 67 at p.8.)

("An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader.").

Further, a grand jury has already returned an indictment against Frenkel. That indictment raises a presumption of probable cause of Frenkel's commission of the crimes, and it is undisputed that Stern is the principal behind Frenkel's actions. *See United States v. Stewart*, 03 CR. 717, 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003) (stating indictment may be sufficient to establish first prong of crime fraud analysis); *In re Search Warrant Executed at Law Offices of Stephen Garea*, No. 97-4112, 1999 WL 137499, at *3 (6th Cir. Mar. 5, 1999) (relying on an indictment as "*prima facie* support" to show a sufficiently serious crime or fraud occurred); *see also Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (holding grand jury indictment raises presumption of probable cause in malicious prosecution claims).

Given the undisputed case against Stern and the heavy weight of these inferences, the court has more than probable cause to conclude Stern committed a crime. *See, e.g. Armstrong v. Collins*, 01 CIV 2437 PAC, 2010 WL 1141158, at *34 (S.D.N.Y. Mar. 24, 2010) (granting summary judgment on fraudulent transfer claim when testimony by defendant's co-conspirator, coupled with defendant's own refusal to testify, established "beyond any reasonable dispute" that defendant committed a fraudulent transfer). This alone should be sufficient to order production of any allegedly protected communications and documents relating to the various aspects of the scheme or, at a minimum, to order an *in camera* review.

### 2. *Nothing in Defendants' oppositions negates the fact that Stern attempted to or perpetrated a crime or fraud*

Defendants raise a number of legal and factual arguments trying to undermine the clear existence of probable cause, including that the Bruce Minsky, Roman Associates, ACE, GMAC, and Prudential expenses were legitimate, that Steven Alevy properly "released" Amusement's

7

funds, that Amusement meant for its funds to be used however Stern pleased, and that the
counterfeit note given to Petra in refinancing the deal was for Amusement's benefit.  None of
these arguments has merit.

First, Stern claims that the closing expenses listed in the Frenkel indictment were not
bogus, implying for the first time in this litigation that they were legitimate expenses and that
Frenkel was indicted not because the expenses were fraudulent, but instead because he simply
failed to pay them.  (Stern Opp., at 1-2.)  Stern's statement is ridiculous.  The June 28, 2007
invoice from Bruce Minsky for $934,500 is a fake.  Minsky testified that the invoice was not his,
that it was not prepared by his office, that he has no understanding as to who prepared the
invoice, that he did not perform any of the tasks listed on the invoice, that neither the letterhead,
telephone number, or the address shown on the invoice belong to him,[7] and "that it is absurd for
[anyone] to think that an attorney would send a bill for that amount of money with two lines"
describing the services rendered.  (Ex. 185, at 22:22-23:8, 172:19-173:24, 191:11-194:15,
197:15-24, 198:16-200:19, Exs. 2, 9 (attaching Minsky deposition excerpts).)

Nor is there any dispute that the June 26, 2007 Roman Associates invoice for $2,670,000
was fabricated.  Eric Pasini, Roman Associates' former Managing Director, has stated that the
invoice "is a fake," that it is not a Roman Associates' invoice, and that "Roman Associates did
not create th[e] invoice and did not bill First Republic Group Corp. or Mark Stern for any
services relating to the acquisition of shopping centers from the Colonial Realty Limited
Partnership."  (Ex. 186.)  And Bruce Steinberger, Ace's former Vice President, has said the same

---

[7]     In fact, the address on the purported Minsky invoice belonged to Land Title Associates,
Frenkel's company.  (*Compare* Ex. 76 (purported Minsky invoice listing Minsky's address as
1979 Marcus Avenue, Suite 209, Lake Success, New York, New York) *with* Exs. 33, 34 (listing
the 1979 Marcus Avenue address as the address for First Republic Group c/o Land Title
Associates).)

thing: The alleged Ace invoice "is a fake"—"Ace did not create th[e] invoice and did not bill First Republic Group Corp. or Mark Stern for any services relating to the acquisition of shopping centers from the Colonial Realty Limited Partnership." (Ex. 187.) Likewise, GMAC and Prudential Douglas Elliman Real Estate have disavowed any involvement in the Colonial deal whatsoever. (Exs. 184, 188; *see* Hofsaess Decl. ¶¶ 5-6.) There is simply no basis to believe that the invoices are anything but fabricated.

Second, the purported "release" by Steven Alevy on July 13, 2007 is a red herring. It meant nothing and was simply intended by Stern to cover up the conversion of Amusement's funds that had already occurred a day earlier. (*See* Mot., at 24-26.) Stern, Friedman, and Frenkel knew that authorization for the release had to come specifically from either Allen Alevy or Allen Sragow alone. *Id.* Notwithstanding Friedman's legal opinion to the contrary, it almost goes without saying that the son of a corporation's officer, whether that son is a minority shareholder or not, has no authority whatsoever to take action on behalf of the corporation. And, of course, the Steven Alevy "release" is irrelevant in the first place because all $13 million of Amusement's funds had been converted on July 12, most likely with Friedman's knowledge.[8]

Third, in a particularly tortured argument, Stern takes two statements, one from a July 6 email and one from plaintiff's prior complaint, out of context and spins them into the claim that Amusement handed Stern, a virtual stranger, $13 million to spend as he saw fit. This argument flies in the face of a ***July 11*** email from Stern's attorneys at HSR in which Stephen Stern says about the money: "I just spoke with Mark . . . [and] [t]he proceeds of [the Amusement] wire were earmarked and designated ***solely*** for use in connection with a pending transaction with Colonial[.]" (Ex. 31 (emphasis added).) Similarly, the parties' letter of understanding makes it

---

[8]    Some of the wire transfers on July 12 bounced back as a result of Frenkel's wiring the money to confederates, such as Tepfer & Tepfer, who wired the money back.

clear that the money was "for a 50% equity and voting interest" in the portfolio. (Ex. 106.) In light of these two documents, one from HSR itself, it is difficult to take seriously Stern's claim that "indeed, not a single document of any type has been presented requiring the 'funds' to be used in any specific manner."[9] (Stern Opp., at 6.)

Even more to the point, however, Stern attempts to use a statement in an old pleading about the $4 million that supposedly would have been left over at the close of the deal as evidence of Amusement's intent as to how its money could be used. (Stern Opp., at 6.) That statement, however, was a statement made earlier in the parties' dealings and assumed that the parties would eventually reach an agreement. Stern's tortured logic includes the premise that the parties actually reached that agreement, which as he knows never happened. In other words, Stern points to a discussion about a partnership that never materialized as proof that he did not steal the money. Since an agreement was never reached, Stern had no authority to use any of Amusement's money, whether it be $4.00 or $4 million, let alone $13 million.

Next, Friedman attempts to argue that this Court should not consider Stern's fraudulent acts in attempting to obtain financing from Petra because, in effect, no one got hurt. Neither BIR nor Friedman deny involvement in preparation and transmission of the counterfeit note to Petra Capital. Rather, Friedman argues that no one complained and the refinancing did not close. (Friedman Opp., at 7-9.) These arguments make little sense. Petra did not complain about the counterfeit note because it did not know the note was counterfeit. Amusement did not complain because it did not even know of the existence of the counterfeit note until discovery in this litigation. Moreover, that the scheme did not work is irrelevant. *See, e.g., United States v. Andreadis*, 366 F.2d 423, 431 (2d Cir. 1966) (holding mail fraud does not require that victims

---

[9]    If by this argument Stern intends to say that he took and used Amusement's money before the parties had any signed agreements, then he is correct.

actually be defrauded); *see also Specialty Minerals, Inc. v. Pleuss-Stauffer AG*, 98 CIV. 7775, 2004 WL 42280, at *4 (S.D.N.Y. Jan. 7, 2004) (attempted commission of crime or fraud sufficient to trigger crime fraud exception).  Finally, that Stern intended to use the loan proceeds to pay off Amusement (Friedman Opp., at 9) or that the note contained more favorable terms to Amusement is also irrelevant.  *Id.*  Amusement did not know about the note in the first place, and thus the "more favorable" terms were lost on it.  And that Stern intended to rob Petra to pay plaintiff, rarely, if ever, constitutes a defense.

Stern also amazingly defends only the Pollard brokerage agreement, implicitly conceding that the identical Prudential brokerage agreement was a fake.  (Stern Opp., at 17-18; Exs.  55, 56.)  But even this argument fails.  Stern does not offer any evidence that the properties were ever offered for $167,000,000, or that the Pollard agreement was actually created in March.  Nor can he.  As of April 2007, the contract price for the portfolio was $128,000,000.  (Ex.  11 at 11.)  Had the Pollard contract been real and signed in March, the fee would have been a fixed amount once the purchase price was settled in April when the contract was signed.  Yet the brokerage fee kept climbing, even on the very day Stern presented the Pollard agreement to his loan broker Richard Koch, going from $8,000,000 (Ex.  65) to $12,380,000 (Ex.  62) to $15,400,000 (Ex. 63).  As JP Morgan noted: "The brokerage fee keeps going up – first it was $8M, then $12M, and now its $14.7M.  Something is not right here and it's making it more and more difficult to believe and include in the costs."  (Ex.  65)  The Pollard agreement was a back-dated fake.

Finally, Stern argues that the discovery sought here is somehow outside of the scope of discovery allowed by Rule 26 because the use of Amusement's funds is the subject matter of another lawsuit.  It is difficult to take this argument seriously since the conversion of Amusement's funds is a central issue in this case.  As such, whether attorneys took part in that

conversion is well within the scope of permissible discovery.  It also makes practical sense to address the issue here rather making a separate motion in the companion case.  *See Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, 242 F.R.D. 248, 251 (S.D.N.Y. 2007) (permitting crime fraud motion to be made with evidence relevant to claims not in the complaint).

### B.    Substantial evidence exists that Stern's attorneys had communications and did work that was "reasonably related" to various aspects of the scheme

Stern's attorneys touched every aspect of the underlying transaction, including the parts that turned out to be fraudulent.  While neither Friedman nor HSR can deny that they worked on the deal, they try to shift the standard by arguing that plaintiff has not demonstrated they knowingly took part in Stern's scheme, suggesting that proof of knowing participation is part of plaintiff's burden.  It is not.

Friedman, for example, devotes *an entire section* to the argument that "Plaintiff's Contention That Friedman Engaged In Criminal Or Fraudulent Conduct Is Baseless."  (Friedman Opp., at 3.)  Plaintiff, of course, made no such contention.  In fact, plaintiff stated the exact opposite—"whether Friedman's participation was knowing or not is irrelevant for present purposes."  (Mot., at 15 n.13.)  Friedman also attributes to plaintiff the argument that "because Stern invoked his Fifth Amendment privilege . . . Friedman *automatically became part of an alleged criminal enterprise*[.]"  (Friedman Opp., at 2 (emphasis added).)  Plaintiff did not, of course, make that, admittedly absurd, contention either.

Like Friedman, HSR tries to shift the focus from what Stern did to what HSR did not.  For example, HSR takes issue with plaintiff's statement that "HSR was involved with the improper release and diversion of Amusement's funds."  (Stern Opp., at 10-11.)  In characteristic understatement, HSR describes this statement as "inaccurate, incorrect or inappropriate."  (*Id*.)  Rather, it describes the email—in which HSR attorney Stephen Stern instructs Frenkel that "I am

12

informed that only [First Republic Group] has the authority to mandate or designate the payee of the wire"—as "merely a ministerial [act] passing along certain information received from Stern[.]" (Stern Opp., at 10.) However, whether a "ministerial" act or not, the fact remains that HSR performed an act that involved the release of Amusement's funds and, apparently, had communications with Stern on the topic. That HSR did not know the information given to it by Stern was false may absolve HSR but it does not change the analysis here.

Similarly irrelevant is the nature of the underlying transaction or the nature of the work the attorneys did. For example, Stern argues that "there was nothing illegal about the underlying transaction." (Stern Opp., at 23.) True, buying shopping malls is not inherently illegal. Friedman similarly argues that "[t]here is nothing untoward, or indeed unusual, for a commercial real estate attorney to provide advice on a brokerage agreement." (Friedman Opp., at 3.) True again. But both are being intentionally obtuse. That the work and the transaction ***could have been*** done legally is entirely irrelevant to whether ***in this case*** Stern engaged in wrongdoing.

In *Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn. 2007), for example, the crime fraud exception applied to work done by an attorney who formed a trust, even though, to use defendant's words, there is "nothing illegal," "untoward or, indeed, unusual" about forming a trust. It is how the trust was used—just like it was how the fake brokerage agreements here were used—that triggers the exception. *See id.* at 406-07. Similarly, in *Shahinian v. Tankian*, 242 F.R.D. 255 (S.D.N.Y. 2007), the court applied the crime fraud exception to communications about a tax return prepared by the defendant's attorney because, unknown to the attorney, the tax return contained false information passed along by the client. There, like here, there was "nothing illegal," "untoward or, indeed, unusual" about preparing a tax return, yet the exception applied anyway. *See id.* at 259-61.

13

In fact, the case law is crystal clear that the exception applies even though the attorney may be entirely innocent, which for now we can assume is also the situation here. As one court put it, "[a] fraud-doer will often wish to hide his or her misdeeds from the lawyer and use the lawyer as the vehicle to unknowingly communicate the false information to others." *Shahinian*, 242 F.R.D. at 261.

Here, Friedman does not deny that he acted as the general counsel for the transaction and that his firm's work touched many aspects of the scheme. For example, Friedman does not deny that he did work related to brokerage expenses. In fact, he suggests that such work was to be expected in a deal like this. Friedman's roles were diverse. He was the point person for pitching the investment to Amusement (Ex. 105, at 92:21-93:15 (attaching A. Alevy deposition excerpts)), initiated contact with Safrin through his son-in-law Avery Egert (Ex. 14, at 406:20-23 (attaching Friedman deposition excerpts); Ex. 97, at 56:3-5 (attaching Egert deposition excerpts)), was in the "procurement chain" of documents bearing the forged Safrin signatures (*see, e.g.*, Exs. 91, 93-94), and his firm created and transmitted a counterfeit promissory note to Petra (Ex. 66, Entry Nos. 735, 1074; Exs. 138-139). Friedman offers nothing, let alone a declaration, to counter these claims. Moreover, the entries on the privilege logs and questions to which Friedman invoked the privilege are at least some evidence that he and his firm did work and had communications in these areas.[10]

Friedman's claim that none of plaintiff's exhibits show that a document bearing a Safrin forgery came from or passed through him is false. The evidence clearly shows that many documents passed through Friedman at some point on the path to being forged. For example,

---

[10]    Friedman argues that his assertions of the attorney-client privilege should not be read to mean he acted improperly. That may be true. Friedman's assertions of privilege, however, are relevant simply because they show he had confidential communications with Stern about particular topics relevant to the scheme.

Exhibit 4 shows Fleissig sending to Friedman a certification page on June 29 and stating "Steve – I will need this signed by Safrin to release our opinion letter (unless you assure me that he'll sign it by Monday)." Exhibit 19 shows that the same certification page that went to Friedman came back to Herrick through "wizzy bizzy" with a forged signature. Exhibit 5 shows Dena Cohen asking Stern's group, including Friedman, for Safrin signatures. Exhibit 6 shows Dena Cohen asking Friedman to have Safrin sign the loan agreements. Exhibit 20 shows that the loan agreement signature pages that went to Friedman came back through "wizzy bizzy" with a forged signature. Moreover, Exhibit 90, recently released by BIR, shows that Stern forwarded the "wizzy bizzy" signatures to Friedman on July 11.

As with Friedman, defendants assert that HSR was ignorant of the fraud, but defendants do not deny that HSR advised Stern on his expenses for the Colonial deal or that it had privileged discussions with Stern about his authority to release Amusement's funds. (Mot., at 45-46.) And as with Friedman, defendants stop short of providing declaration testimony attesting that Stephen Stern and HSR did not assist Stern in those matters. Notably, Exhibit 26 shows that HSR had communications with Stern about deal expenses that were significant enough to redact. Though Stern asserts that HSR was entitled to all the funds it got from Stern in this deal, neither he nor HSR have ever stated exactly what they did for the money. (Stern Opp., at 13-14.) Regardless, whether or not HSR was entitled to its fee is irrelevant to the instant motion.

Stern attempts to distinguish the instant case from others in which the crime fraud exception has been applied are also without merit. For example, with regard to *United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) he argues that:

> In <u>Jacobs</u>, the defendant directly and affirmatively *sought counsel's opinion on the legality of the scheme/program, affirmatively misrepresented to others he had obtained an opinion of counsel approving the scheme/program, and affirmatively misquoted from the attorney's opinion when advising customers about the opinion*

15

*of counsel.*  [Footnote omitted]  **In this case at bar, none of those items exists**.
And there is no claim Stern/FRG Corp. solicited the advice of counsel regarding
the legitimacy of any alleged expenses associated with the purchase, there is no
claim Stern/FRG Corp./ [sic] engaged in incriminating acts such as those engaged
in by Jacobs prior to soliciting and obtaining legal advice, etc., and, indeed, there
is no claim the legality of the purchase of shopping malls itself was of an
inherently dubious legal nature.

(Stern Opp., at 27 (emphasis in original).)  Stern misunderstands the law.  In describing how the

attorney's work fit into the crime or fraud in *Jacobs* the court did not purport to set forth a test.

Rather, it simply applied the probable cause standard to the particular facts of that case.  To

suggest that these ***particular actions*** are required in every application of the crime fraud

exception is silly and akin to saying that *Shahinian* established a rule that every case must

involve a fraudulent tax return.  Every crime is different and every attorney's work will be

different, requiring each application of the crime fraud exception to be evaluated on a case-by-

case basis.[11]

Like Friedman, HSR also denies that they knowingly participated in the fraud.  While

that may be true, the facts are clear that HSR did do work that furthered the fraud.  For example,

HSR clearly misled Colonial, wittingly or unwittingly, about whether Stern had the money to

close.  (*Cf.* Exs. 27-28 (letters from HSR regarding Stern's ability to close the deal, claiming in

one that he was "ready, willing and able to close") *and* Ex. 30 (Stern was in fact "short of capital

on the day of closing").)  Stern also argues that simply because he was cc'd on emails that

---

[11]    Stern, similarly, tries to distinguish *Cendant Corp. v. Shelton*, 246 F.R.D. 401 (D. Conn.
2007), *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983 (Marc Rich & Co.)*,
731 F.2d 1032 (2d Cir. 1984), and *S.E.C. v. Herman*, No. 00 Civ. 5575, 2004 WL 964104
(S.D.N.Y. May 5, 2004) by pointing out factual differences between the cases and the present
case that are wholly irrelevant.  For example, Stern tries to distinguish *Herman* because "unlike
Herman, there is no claim of an offering memorandum in the case at bar drafted by counsel [.]"
(Stern Opp., at 30.)  Again, the offering memorandum in *Herman* was not an element, it was a
vehicle and that this case does not involve an offering circular—just as *Cendant*, *Rich*, *Salazar*
and *Shahinian* did not involve them either but found the exception anyway—is completely
irrelevant.

touched various parts of the scheme that alone does not mean he was "involved" in the scheme. That may well be true also. But for purposes of this motion cc'd emails do provide concrete evidence that the attorneys communicated with Stern on those particular subjects.

      Unable to rebut the evidence, Stern resorts to irrelevant attacks on plaintiff. Stern first argues that plaintiff has taken "shifting positions" and doing so should undermine the evidence plaintiff presented. (Stern Opp., at 6.) The short answer to Stern's charge is that no such inconsistencies exist. Stern claims that plaintiff has "shift[ed] positions regarding whom Friedman represented" in the Colonial deal pointing out that the "***Third*** Amended Complaint ("TAC") in this action is rife with Plaintiffs' allegations that Friedman was attorney for Mark Stern and the purchasing entity of the Portfolio (and Safrin and Egert)[.]" (Stern Opp., at 4 (emphasis in original).) He continues: "***But contrary to the allegations in the TAC***, in their separate action against Friedman and Buchanan Ingersoll & Rooney, P.C. . . . Plaintiffs squarely averred '[BIR] and Stephen Friedman . . . represented Amusement[.]' " (Stern Opp., at 5 (emphasis in original).)

      Stern's "Aha!" moment falls flat. As an initial matter, Amusement believed that Friedman represented all three parties in the deal, Stern, Safrin, ***and*** Amusement together and the two complaints from which Stern quotes are entirely consistent with that view. That an attorney can properly represent two different parties to the same transaction should hardly come as a surprise to HSR, who represented two parties in connection with the Colonial deal. Alleging that Friedman represented Stern, for example, does not mean conversely that Amusement is alleging that Friedman did not represent Amusement as well. Legally and logically the two simply do not follow. But more importantly, who Friedman represented in the deal is totally irrelevant to whether ***Stern*** committed a crime and whether Friedman and HSR, knowingly or not, helped to

further that crime; who represented Amusement is irrelevant in that analysis.

Second, instead of denying that it received some of Amusement's money, HSR claims that plaintiff's statement that "HSR has not documented the basis for the amounts it received, nor explained how part of the funds ended up back in the hands of [Mark] Stern's friend" as "thoroughly misleading" and, for good measure, "outrageously inaccurate." (Stern Opp., at 13.) In truth, it is neither. Notwithstanding the claim that "Plaintiffs have known quite well HSR and Stephen R. Friedman received fees for legal services," HSR has never offered a shred of evidence to demonstrate *why* it received $100,000 in connection with this deal. Never. Just referring to "legal services," even if "stated numerous times," says nothing about the nature of those services. Neither HSR nor Stephen Stern have provided a declaration explaining what it did for the money. In fact, the only documents HSR has provided are redacted invoices that do not even identify specific matters.

Third, instead of contesting that Minsky was used to launder Colonial deal money, Stern takes issue with the fact that the exhibits only show that the money went to Joseph Niederman's company, not Niederman himself. (Stern Opp., at 16.) This is irrelevant, as the real issue is not where the money went but that it came from Stern's attorney. It is also inaccurate. Minsky paid $120,000 to Kesef and $350,000 to Benjamin Irwin, and both of those payments were for Niederman's benefit. (Ex. 32 at 146:14 -16 ("Q: On August 20, 2007, you wired $350,000 to Benjamin Irwin, LLC? A: Yes"); 148:1-4 (A: "[T]he payment contractually would have been on behalf of Joseph Niederman."); Exs. 58-59, 98.)[12]

---

[12]    The Court in *Amusement Industry, Inc. v. Midland Avenue Associates, LLC*, 10 CV 5064, accepted the allegations that the $470,000 ($120,000 + $350,000) Minsky wired to Kesef and Benjamin Irwin was for the benefit of Niederman, who exercised complete and actual dominion over those corporate entities. (Stern Opp. Ex. H, at 40-41.) In dismissing Niederman, the Court

## II.    PLAINTIFF IS, AT A MINIMUM, ENTITLED TO *IN CAMERA* REVIEW

Plaintiff believes that it has shown both probable cause that Stern perpetrated a crime or fraud and that he used his attorneys in furtherance of that scheme.  That alone is sufficient for a court to conclude that a client's communications with an attorney were intended to facilitate a crime or fraud and to order the production of those communications without the necessity of an *in camera* review.  *See, e.g.*, *Shahinian v. Tankian*, 242 F.R.D. 255, 259 (S.D.N.Y. 2007) (court ordered all documents concerning false statements included in attorney-prepared tax returns be produced and all deposition questions concerning the false statements be answered).  *United States v. Zolin*, 491 U.S. 554 (1989) "and its progeny make clear that *in camera* review is a discretionary alternative to establishing the crime-fraud exception with independent evidence." *See United States v. Kaplan*, 02 CR. 883 (DAB), 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003) (*in camera* review not necessary for law office personal injury claim files bearing names of individuals already indicted or convicted for bringing false personal injury claims).

Should the Court decline to order production at this stage however, plaintiff requests an *in camera* review of the relevant communications.  To warrant such a review, plaintiff need only show that an *in camera* review of the materials may reveal evidence to establish that the crime fraud exception applies.  *See Linde v. Arab Bank, PLC*, 608 F. Supp. 2d 351, 361 (E.D.N.Y. 2009) (standard to obtain *in camera* review lower than that required to overcome attorney-client privilege).

Stern tries to distort this relatively low standard by misquoting *Zolin*, suggesting that the Supreme Court made it more difficult to challenge the privilege.  Stern's reliance on *Zolin* is particularly odd because *Zolin* did just the opposite.  The Court's actual holding—the statement

---

only found that the allegations were insufficient to pierce the corporate veil and impose **direct** liability on Niederman. (*Id.* at 41.)

Stern omitted—makes that clear.  The missing portion of the opinion:

> In fashioning a standard for determining when *in camera* review is appropriate, we begin with the observation that "*in camera* inspection . . . is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure."  Fried, Too High a Price for Truth: The Exception to the Attorney-Client Privilege for Contemplated Crimes and Frauds, 64 N.C.L.Rev. 443, 467 (1986).  We therefore conclude that a ***lesser evidentiary showing*** is needed to trigger *in camera* review than is required ultimately to overcome the privilege.  *Ibid.*  The threshold we set, in other words, ***need not be a stringent one***.

> We think that the following standard strikes the correct balance.  Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,"  *Caldwell v. District Court,* 644 P.2d 26, 33 (Colo.1982), that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

*Zolin*, 491 U.S. at 572 (emphasis added). The facts here combined with the Frenkel indictment and the adverse inference arising from Stern's invocation of the Fifth Amendment are more than enough to cause "a reasonable person" to believe that "the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *Id.*

## CONCLUSION

For all the foregoing reasons, Amusement respectfully requests that the Court grant its motion in its entirety.

Dated: July 26, 2012                          Respectfully submitted,

                                              AMUSEMENT INDUSTRY, INC.


                                      By____/s/_____
                                            Craig H. Missakian
                                            *Attorneys for Plaintiffs Amusement Industry, Inc.*
                                            *and Practical Finance Co., Inc., and Third Party*
                                            *Defendants Cross-Claimants Steven Alevy and*
                                            *Bankers Capital Realty Advisors*