1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
3

4  ------------------------------------X
                                       :
5  AMUSEMENT INDUSTRY, INC., et al,    :
                                       :  07-CV-11586 (LAK)
6                     Plaintiffs,      :
                                       :
7              v.                      :  January 16, 2013
                                       :  New York, New York
8  STERN, et al,                       :
                                       :
9                     Defendants.      :
   ------------------------------------X
10

11         TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
         BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
12              UNITED STATES MAGISTRATE JUDGE

13
   APPEARANCES:
14

15  For the Plaintiffs:        CRAIG H. MISSAKIAN, ESQ.
                               Westland Industries, Inc.
16                             6665 Long Beach Blvd
                               Long Beach, CA 90805
17

18  For Buchanan Ingersoll     DAVID BAYNE, ESQ.
     and Rooney:               Kavanaugh, Maloney & Osnato, LLP
19                             415 Madison Avenue
                               New York, New York  10017
20

21

22

23            [Appearances continue next page.]

24

25


   Proceedings recorded by electronic sound recording,
   transcript produced by transcription service

1                    UNITED STATES DISTRICT COURT                    2
                  SOUTHERN DISTRICT OF NEW YORK
3

4    APPEARANCES CONTINUED:

5

6    Avery Egert and              MICHAEL C. RAKOWER, ESQ.
       Safrin Group               Law Office of Michael C. Rakower
7                                 747 Third Avenue, 32nd Floor
                                  New York, NY 10017
8
     For Joshua Safrin:           NICHOLE M. GALVIN, ESQ.
9                                 Neuberger, Quinn, Gielen, Rubin &
                                    Gibber, P.A.
10                                One South Street, 27th Floor
                                  Baltimore, MD 21202
11

12

13

14   Court Transcriber:           SHARI RIEMER
                                  TypeWrite Word Processing Service
15                                211 N. Milton Road
                                  Saratoga Springs, NY 12866
16

17

18

19

20

21

22

23

24

25

1          THE CLERK: <u>Amusement Industry v. Stern</u>, Docket 07-

2    CV-11586.

3          Would the attorneys in the room please state your

4    names for the record.

5          MR. MISSAKIAN: Good morning, Your Honor.  Craig

6    Missakian for Amusement Industry.

7          MR. BAYNE:  Good morning, Your Honor.  David Bayne

8    and James Maloney from Kavanagh Maloney & Osnato for Buchanan

9    Ingersoll & Rooney.

10         MR. STERN:  Good morning, Your Honor.  Stephen Stern

11   for Mark Stern and First Republic.

12         THE COURT: On the phone, Esther Stern, you're there?

13         MS. STERN: Yes.

14         THE COURT: Who else is on the phone?

15         MR. ROSENBERG:  Sam Rosenberg, lawyer for deposition

16   of Esther Stern.

17         MR. RAKOWER: Michael Rakower for Avery Egert and the

18   Safrin Group.

19         THE COURT: I'm sorry, that was Rakower?

20         MR. RAKOWER: Yes.

21         THE COURT: Go ahead.

22         FEMALE ATTORNEY:  Marianna [inaudible] also on

23   behalf of the [inaudible].

24         MS. GAVIN: Nicole Gavin for Joshua Safrin.

25         THE COURT: That's it?  Okay.  Let's start with the

4

1   deposition of Esther Stern first.  I guess, Mr. Rosenberg,

2   you're representing Ms. -- you can be seated if you're not

3   addressing the Court.

4           MR. ROSENBERG: Your Honor, I was retained on Monday

5   and I faxed Mr. Missakian and I called him and he -- I then

6   faxed him again and called him again on Tuesday [inaudible]

7   prepared to have a deposition [inaudible] complicated and

8   [inaudible] also I had other things [inaudible] and he was

9   going to get back to me and he said he needed to speak to

10  these other lawyers and I'm [inaudible] case.

11          THE COURT: Okay.  Mr. Missakian.

12          MR. MISSAKIAN: Your Honor, we asked the other

13  lawyers in the case how they felt about scheduling the

14  deposition six to eight weeks out and Amusement believes

15  that's too long of a time.  Counsel for Joshua Safrin

16  expressed the same sentiment.  I don't believe we've heard

17  from counsel in the courtroom here or from Mr. Rakower but I'm

18  not sure about that.  But generally speaking I think while the

19  case is complex I agree with Mr. Rosenberg.  I think six to

20  eight weeks before this deposition is taken is quite a long

21  time and it should occur sooner than that.

22          THE COURT: Mr. Rosenberg, that's kind of a lengthy

23  period.  Are you planning to work full time on the case

24  between now and eight weeks from now?

25          MR. ROSENBERG: I cannot work full time on this case.

5

1   I have other commitments.

2           THE COURT: I certainly don't --

3           MR. ROSENBERG: I can't drop everything I'm doing.

4           THE COURT: I certainly don't expect you to.  I'm

5   just -- I guess -- it just seems like a long time.

6           MR. ROSENBERG: And I don't even know what I'm

7   getting into here.  I've just -- I don't know the facts.  I've

8   spoken to Mr. Missakian and he tells me there's multiple

9   parties and that there's huge amounts of information in this

10  case.  It's a little complicated because my client is not

11  really a party, not a party, but apparently she signed some

12  documents so there's issues of spousal immunity.  There's many

13  issues on this.  I'll need time.

14          THE COURT: Not immunity.  You mean privilege unless

15  she's being sued.

16          MR. ROSENBERG: Yes, privilege and there also may be

17  questions of immunity too.

18          THE COURT: Immunity?  Okay.

19          MR. ROSENBERG: What I'd told, Mr. Missakian said

20  that this deposition if I understood him correctly could

21  take - could last a day and a half.

22          MR. MISSAKIAN: Your Honor, the only reason I said

23  that is because Mrs. Stern's deposition is being taken in two

24  cases, this case and the related Midland case.  So that's the

25  only reason I said it could take two days because there are

6

1  two cases.

2          With regard to the reference to immunity, I think

3  Mr. Rosenberg means the Fifth Amendment privilege that her

4  husband has asserted.  There may be issues involving that.

5          THE COURT: Okay.

6          MR. ROSENBERG: That's correct.  And the issue that I

7  don't even know the case. [Inaudible] for a very short while

8  but [inaudible] deposition [inaudible].

9          THE COURT: Okay.  Let's do this.  I think six weeks

10 is as much as I can stomach right now.

11         MR. ROSENBERG: Okay.

12         THE COURT: So let's shoot for the last week in

13 February I guess.

14         MR. ROSENBERG: I'm available the 26th, 27th and the

15 28th.

16         THE COURT: Good.  Let's just schedule it right now

17 so that --

18         MR. MISSAKIAN: Your Honor, oddly enough I have

19 another trial in New York that very week.  So --

20         THE COURT: How long is it going to last?

21         MR. MISSAKIAN: It shouldn't go more than that week I

22 don't expect.

23         MR. ROSENBERG: I'm also available the next week.

24         MR. MISSAKIAN: The next week would be great.

25         MR. ROSENBERG: The 6th or 7th.

7

1          MR. MISSAKIAN: Next week would be fine, Your Honor.

2     Thank you.

3          THE COURT: 6th or 7th, 6th and 7th?

4          MR. ROSENBERG: Either.  Anything -- the 4th through

5     the 7th.

6          THE COURT: What do you want?

7          MR. MISSAKIAN: Whatever is convenient for counsel. I

8     don't have my calendar in front of me.  That entire week is

9     free though.

10          THE COURT: Let's say temporarily March 6th and 7th

11     which is a Wednesday and Thursday and obviously if the parties

12     want to agree to something else they can do that.

13          Mr. Missakian, anything else on the Esther Stern

14     issue?

15          MR. MISSAKIAN: No, Your Honor.  Thank you.

16          THE COURT: Mr. Rosenberg, anything else?

17          MR. ROSENBERG: No.  I know nothing [inaudible].

18          THE COURT: Okay.  Thank you every -- you can -- it's

19     a public proceeding so you can either remain on the line or

20     hang up, Mr. Rosenberg and Ms. Stern.  It's up to you.

21          MR. ROSENBERG: Thank you very much.

22          THE COURT: Okay.  Thank you.

23          We're now turning to a letter dated December 21 from

24     plaintiff with a response dated January 3rd regarding

25     production of certain documents in non native -- I'm sorry, in

1  native format.  Let me give the big picture on this and then

2  we'll have to give -- get more specifics.

3          There is sufficiently limited universe of documents.

4  I'm not saying they're all going to get produced but even the

5  universe is sufficiently limited that I don't view this as the

6  kind of burdensome request that's reflected in the case law

7  where there's wholesale productions being sought of documents

8  in different formats.  So that's a critical distinction for

9  me.

10         Another critical distinction is unlike most cases in

11  front of me, this case has people asserting Fifth Amendment

12  privileges, strong evidence of fraudulent conduct and there's

13  good reason to believe that there may be documents with

14  metadata that could be helpful.  So there's going to be some

15  production.  But the question in my mind is what and Mr.

16  Missakian, I think what's lacking here and I guess this is the

17  forum in which to do it though if there's some other forum I'm

18  willing to hear it.  In other words, if you want to send

19  letters or something but I need a connection between

20  particular Bates numbers I guess and what could be found and

21  so I'll -- by means of the metadata.

22         It's just not clear -- that's just the part of the

23  letter briefing that was very skimpy and conclusory.

24  Everything -- everyone was focusing on the procedural pieces.

25  So those are now out of the way.  What can you do on this?  I

1   have -- from the other side's letter I have the actual

2   document requests but what documents are going to have

3   metadata and why are they going to be helpful?

4           MR. MISSAKIAN: Your Honor, we could do it in a

5   couple of ways.  We could go through each document now and I

6   could tell you here what we believe the relevance of each

7   document is or we can make another submission that goes

8   document by document and explains the relevance to the issues

9   in the case.

10          THE COURT: However you want to do it.

11          MR. MISSAKIAN: Well, I think --

12          THE COURT: Maybe there's some principles that you

13  might want to determine if you're operating correctly under

14  them.  Maybe I can answer some generic questions. Maybe whole

15  numbers of them fit into some category or other.

16          MR. MISSAKIAN: Your Honor, that's how I was going to

17  approach it today if the Court wanted to discuss it.  In my

18  mind the documents that we've requested break out into really

19  three categories of documents.  The first category relates to

20  alleged forged signatures of Joshua Safrin.  The second

21  category relates to documents that were given to CitiGroup and

22  other potential lenders by Mark Stern that we believe are

23  fraudulent in specific ways.

24          For example, the Court is aware that Mr. Frankel has

25  been indicted in relationship to this case and in that

1  indictment there are invoices that allegedly relate to

2  expenses that Mr. Stern was going to incur in connection with

3  this transaction.

4          THE COURT: Brokerage or something else?

5          MR. MISSAKIAN: There were consulting agreements.

6  There were brokerage agreements.  For example, there was an

7  alleged broker's fee due Prudential Douglas Ellerman for

8  approximately $9 million I believe.  Plaintiff has submitted

9  declarations from the people that those invoices allegedly

10  came from and they've all stated under oath that they were

11  forged and counterfeit documents.

12          There are also -- within that same category there

13  are a number of operating agreements and other corporate

14  related documents that changed over time and I can get into

15  more detail as to why those changes relate to the scheme to

16  defraud that we've alleged.

17          The last category is the post closing.  This deal

18  closed in July of 2007.  That's when Amusement's money was

19  taken without its permission.  In the period that followed

20  that we've alleged that Mark Stern attempted to cover up the

21  initial theft by refinancing the portfolio shopping centers,

22  and in his attempt to refinance that portfolio shopping

23  centers he went to lenders to refinance a portion of the loan

24  he had obtained from CitiGroup.  One of those potential third

25  party lenders was Petra Capital, and Petra was given a number

11

1  of documents that we believe were fraudulent.  For example,

2  there was a counterfeit promissory note that was given to

3  Petra that was meant to reflect Amusement's interest in the

4  portfolio or in the transaction.  Now there's been -- Mr.

5  Bayne stated in his letter to the Court that that -- it wasn't

6  a counterfeit promissory note.  Well, it actually was.  This

7  is -- Amusement was given a promissory note, actually two in

8  July.

9         THE COURT: I think I remember this.  It had a

10 paragraph added to make it look like a convertible debenture

11 or something?

12        MR. MISSAKIAN: That's correct, Your Honor.  Mr.

13 Bayne said well, it's not counterfeit because that paragraph

14 benefitted Amusement.  Well, the problem is Amusement never

15 got that promissory note, didn't know about it.  The fact that

16 Mr. Stern, Mark Stern has not denied that he signed that note

17 doesn't matter.  The counterfeit is something that purports to

18 be something that it isn't and in this case Petra was given a

19 promissory note that they represented to be the same note that

20 was given to Amusement and that's just not true and that's the

21 definition of counterfeit.

22        So those are the four categories of documents.

23        THE COURT: Wait, four.  I have three.

24        MR. MISSAKIAN: I'm sorry.  I apologize, Your Honor.

25 The three categories of documents.

12

1         With regard to the first one, the forged signatures,

2    there are three documents in particular that are extremely

3    important and these three documents were also referred to in

4    our crime fraud motion.  These are three documents that were

5    listed by Buchanan Ingersoll & Rooney on a privilege log that

6    I believe they prepared and they sat on that log since 2008.

7    They should have been produced a long time ago.  These are

8    documents that draw a critical connection between Mark Stern,

9    Stephen Friedman and Wizzy Busy.  Wizzy Busy is the person who

10    sent the -- what appear to be forged Joshua Safrin signatures

11    to Herrick Feinstein which were then used to get the loan from

12    CitiGroup.  These three documents should have been produced a

13    long time ago.  They were --

14         THE COURT: When you say documents, you're talking

15    about emails or the attachments to the emails or what?

16         MR. MISSAKIAN: Well, the way it -- actually it's

17    both, Your Honor.  These three entries on the privilege log

18    are emails.  If you look at the actual document what you have

19    is an email from Mark Stern and then you have attached to

20    that --

21         THE COURT: An email from Mark Stern to?

22         MR. MISSAKIAN: To Stephen Friedman.

23         THE COURT: Right.

24         MR. MISSAKIAN: And then you have attached to that

25    email an email from Wizzy Busy --

13

1          THE COURT: Attached or forwarded?

2          MR. MISSAKIAN: Well, my understanding is the

3    signatures that were sent to Herrick Feinstein, the Joshua

4    Safrin signatures originally Wizzy Busy sent forged Joshua

5    Safrin signatures to Herrick Feinstein.  So you have that one

6    email.

7          THE COURT: So this is an email from Wizzy Busy to

8    Herrick first?

9          MR. MISSAKIAN: First.

10          THE COURT: First there was an email from Wizzy Busy

11    to Herrick.

12          MR. MISSAKIAN: Correct.  First in the chain.  That

13    email, the Wizzy Busy email then is forwarded to Mark Stern.

14          THE COURT: By Herrick?

15          MR. MISSAKIAN: No, by Wizzy Busy.

16          MR. BAYNE: He's copied on the email to Herrick,

17    Judge.  Stern is copied on the email to Herrick.

18          MR. MISSAKIAN: That's true but that's not what we're

19    talking about in these entries.

20          THE COURT: Let's not worry about the entries.  Let's

21    worry about the documents that you're seeking.

22          MR. MISSAKIAN: We're talking about three emails.

23          THE COURT: I don't want to get into the history of

24    the entries.  So let's just talk about the documents.

25          MR. MISSAKIAN: There are three emails that comprise

1  the documents that we've referred to in the request.  One of

2  those is the email from Wizzy Busy to Herrick.  One of those

3  is an email from Wizzy Busy forwarding that email to Herrick

4  to Mark Stern.

5           THE COURT: Hold on.  Wizzy Busy to Stern forwarding

6  the email, go ahead.

7           MR. MISSAKIAN: And then the last step is Mark Stern

8  forwarding that to Stephen Friedman.

9           THE COURT: Okay.  So I mean they say that Stern or

10  Friedman you think was cc'd on that first email to Herrick?

11           MR. BAYNE: No, Your Honor, he was not.

12           THE COURT: He was not, okay.  So for purposes of

13  what we're doing today the only thing we're talking about I

14  assume was the third thing because that's the only thing

15  Friedman would have; right?

16           MR. MISSAKIAN: Well, we'd like the -- all three of

17  them because Mark Stern did not produce --

18           THE COURT: No, no.  When it says we would like them,

19  what is it that Friedman you think has of these three emails?

20  Doesn't he just have that final?  Why would he have the other

21  emails unless they were attached to the third email?  He just

22  has the third email plus whatever is either attached or

23  forwarded within it; right?

24           MR. MISSAKIAN: He has all three.  These documents

25  have been produced to us.  So we have seen them.

15

1          THE COURT: It doesn't make sense he would have all

2    three.  When you say have them, what does that mean?  If he's

3    not a recipient of the first two emails directly -- right?

4          MR. MISSAKIAN: That's correct.

5          THE COURT: Why would he have -- what does it mean to

6    have them?  So one day print them out for them and give them

7    to him?  What does that mean to have them?

8          MR. MISSAKIAN: I apologize, Your Honor.  I'm not

9    explaining this clearly.  Mark Stern at some point it appears

10   forwarded both the original Herrick email and the Wizzy Busy

11   email to Friedman.

12         THE COURT: To Friedman, yes.  So that's the only

13   email we're talking about plus -- which includes either an

14   attachment or a forwarding.

15         MR. MISSAKIAN: Yes, that's correct.  I apologize.

16   Now I understand, yes.

17         THE COURT: So we have this one document from Stern

18   to Friedman which presumably is -- exists as a email on a

19   server.  How does it exist right now?

20         MR. MISSAKIAN: Yes, that's our presumption.  It

21   exists on a server at Buchanan, Ingersoll & Rooney or has been

22   preserved on a separate hard drive.

23         THE COURT: And that includes a PDF attachment or not

24   or who knows?

25         MR. MISSAKIAN: I don't know what form the

16

1  attachments are.

2         THE COURT: I just wonder if there's any -- is there

3  metadata associated with emails as opposed to documents?

4         MR. MISSAKIAN: Yes.  There are headers in the emails

5  and include metadata.  For example, it will show when it was

6  opened or what folder it went into.

7         THE COURT: By Friedman?

8         MR. MISSAKIAN: Correct.

9         THE COURT: Not by the -- Wizzy Busy or any of these

10 other people?

11        MR. MISSAKIAN: No, but those documents, the

12 attachment so to speak to that email Friedman received may

13 have metadata in them.  For example, if they're PDFs they will

14 have metadata embedded in those documents and those documents

15 were neither produced nor logged by Mark Stern.  So the only

16 source of those documents appears to be this email.

17        MR. BAYNE: Your Honor, may I?  Herrick Feinstein --

18        THE COURT: I'm going to get to you in one second.

19        MR. BAYNE: Sure.

20        THE COURT: I was about to ask about Herrick.

21 Wouldn't Herrick have this also?  Not that you're not entitled

22 to go to Friedman but it seems like Herrick would have the

23 original.

24        MR. MISSAKIAN: Yes, Herrick received the original

25 from Wizzy Busy, that's correct.

17

1          THE COURT: Right.

2          MR. BAYNE: And produced them long ago, Your Honor.

3          THE COURT: Right.  Again, I'm not --

4          MR. BAYNE: We're not asking for the metadata from

5    Herrick.

6          THE COURT: I'll give you a chance to speak on this

7    one.  Go ahead.  Did you wan to say something?

8          MR. BAYNE: Yes, Your Honor.  In their letter to the

9    Court they say the reason they want this metadata on the Wizzy

10   Busy emails is to find out who Wizzy Busy is.  They made no

11   showing in the letters that the metadata in the emails are

12   going to identify Wizzy Busy.  We've know about Wizzy Busy

13   since 2008 and in fact the plaintiffs subpoenaed Yahoo where

14   the email address is from, the domain, and also the ISP

15   providers that apparently this email went through and they

16   were unable to find out who Wizzy Busy was.  Now, they made no

17   showing that the email is going to provide them with any

18   additional information.  The whole point of getting metadata

19   is to provide or yield information that will be relevant and

20   useful in the case.

21          So far we're not hearing anything that will tell us

22   that the email will provide any additional information that we

23   do not already know.  So I don't think they've met their

24   burden for asking us to reproduce these documents in a

25   different format.

1          THE COURT: You think that somehow there will be

2    metadata in the PDF attachment.  Is that what it is?

3          MR. MISSAKIAN: There will be metadata in the PDF.

4    It's not going to show when the underlying document was

5    created but it will show when the PDF was created presumably

6    and there is metadata embedded in the email that Stephen

7    Friedman received from Mark Stern and that metadata -- I don't

8    know what it says but it may be relevant to the issue of

9    whether or not Stephen Friedman was aware of Wizzy Busy and

10   the connection between Mark Stern and Wizzy Busy which he

11   denied in his deposition.  Then after that this email shows up

12   showing a very clear connection between the three.

13         MR. BAYNE:  Well, it had the emails from Herrick

14   that were sent by Wizzy Busy since at least 2009.

15         THE COURT: But not in native format.

16         MR. BAYNE: No, but they never sought it from

17   Herrick.

18         THE COURT: I understand that.

19         MR. MISSAKIAN: Your Honor, that -- those emails to

20   Herrick did not draw the connection between Mark Stern, Wizzy

21   Busy and Stephen Friedman.  That's the fact that was buried in

22   this privilege log for four years that should have been

23   disclosed long ago.

24         THE COURT: So, no, no.  I said I didn't want to get

25   into the privilege log.  I want to get into what data might be

19

1  available in this.  So which of the requests are this

2  Stern/Friedman email?

3          MR. MISSAKIAN: Your Honor, those are 12, 13 and 14.

4          THE COURT: And those are -- those three page numbers

5  correspond to the three emails you're talking about?

6          MR. MISSAKIAN: The three request numbers, yes, 12,

7  13 --

8          THE COURT: But I think as we've already figured out

9  they only have really -- only the third one is one that could

10  possibly have the metadata; right?

11          MR. MISSAKIAN: I can't tell you which within the --

12  for example, Request Number 12 refers to a document control

13  range of 4830 to 4833.  I can't tell you which document within

14  that range is --

15          THE COURT: I'm asking you conceptually.  How is that

16  Friedman produced three separate documents when he only got

17  one thing with attachments?  Did he get different Bates

18  numbers to different versions?  Do you understand my problem?

19  This is the first thing I asked you about.  It seems like he

20  only got one email which had either attachments or forwarding

21  or whatever it was.

22          MR. MISSAKIAN: Your Honor, I believe it's three

23  separate emails.

24          MR. BAYNE: Your Honor, there were three separate

25  emails sent by Mr. Stern to Mr. Friedman on July 11th I

20

1  believe, several weeks after these emails had been sent to

2  Herrick.

3          THE COURT: Got it.

4          MR. BAYNE: And that's the three that were produced

5  here.

6          THE COURT: I think I understand.  So that's 12, 13

7  and 14.  Is that it for Safrin signatures?

8          MR. MISSAKIAN: I'm sorry, Your Honor.

9          THE COURT: Mr. Missakian, is that the limit of

10 numbers of requests that relate to Safrin signatures?

11         MR. MISSAKIAN: No, there are others, Your Honor.

12         THE COURT: Okay.  Keep going.

13         MR. MISSAKIAN: Number 19 and 20.

14         THE COURT: Hold on a second.

15                  [Pause in proceedings.]

16         THE COURT: 19 and 20, what are those?

17         MR. MISSAKIAN: Number 19 is a July 11, 2007 email

18 from Mark Stern to Stephen Friedman attaching an officer's

19 certificate signatures.

20         THE COURT: And 20?

21         MR. MISSAKIAN: And 20 is an email from Mark Stern to

22 Stephen Friedman attaching a designation of independent

23 director agreement.

24         MR. BAYNE: Just so we're clear, Your Honor, these

25 are not Wizzy Busy emails.  These are separate emails sending

21

1   Safrin's signatures.

2           THE COURT: Directly from Stern?

3           MR. BAYNE: Right.  I believe so, Your Honor.

4           THE COURT: But they have -- they're forgeries

5   according to you, Mr. Missakian; right?

6           MR. MISSAKIAN: They appear to be, Your Honor, yes.

7           THE COURT: Go ahead.

8           MR. MISSAKIAN: Then 32 and 33.  Number 32 is an

9   email from Stephen Friedman to Joel Gantz.  Joel Gantz is

10  another attorney at -- was another attorney at Buchanan

11  attaching an Safrin Associates LLC certificate.  This is a

12  document that relates to another transaction, not the Colonial

13  transaction, and then 33 is an email --

14          THE COURT: But has forged signatures in your view?

15          MR. MISSAKIAN: Yes, Your Honor.

16          MR. BAYNE: Your Honor, I don't believe Mr. Safrin

17  has said that those are not his signature.  I mean I have to

18  go back and look but I don't remember --

19          THE COURT: I'm wondering if this is the right forum

20  to do this now.

21          MR. MISSAKIAN: Your Honor, I think you may be right.

22  It may be more productive to make a submission to the Court

23  detailing --

24          THE COURT: I'm overruling many of the objections.

25  I'm prepared to order production of some number of documents

22

1    in their native format on the understanding that it's going to

2    be some limited number and on the understanding there's going

3    to be a showing that there's some significant evidentiary

4    value to them particularly if they relate to some kind of

5    fraudulent conduct on Stern's part.

6         So I need to have identified what the documents are

7    and maybe you'll drop some or maybe the two of you can work

8    this out because it's going to be ordered and I would like to

9    limit burden if there really is a burden.  I don't know that

10   there truly is but I don't want to just wholesale say well,

11   every document is going to be produced without a showing as to

12   its relevance.  Not only its relevance but the fact that

13   there's some potential for metadata.  I don't need a strong

14   showing that -- what it's going to show because if there are

15   forged signatures and altered documents and documents that

16   brokers and consultants are saying aren't real being

17   transmitted by Stern to Friedman I want to give plaintiff

18   every opportunity to look and see if there's some clue in the

19   metadata.  I'm not going to require them to make a showing in

20   advance that they're necessarily going to find it.

21        So with that in mind, maybe you can put something

22   today, Mr. Missakian, and before you come to me show it the

23   other side and maybe you guys can strike a bargain and if not

24   then I'll decide what I'm going to order.

25             MR. MISSAKIAN: That's fair, Your Honor.  I'll do my

23

1  best to work it out with Mr. Bayne if possible.

2          THE COURT: Mr. Bayne, I'll give you a chance to

3  address that proposal, not that it's likely my mind is going

4  to be changed.

5          MR. BAYNE: I think you're correct, Your Honor.  I

6  think a written submission is the best way to approach this if

7  it's going to be necessary.  We think that the plaintiff

8  should have to make some sort of showing that the metadata

9  will provide some evidence of something that hasn't already

10 been established in this case.  From what we've seen so far

11 Mr. Missakian hasn't come forward at least in his letter to

12 the Court and what he said today to tell us why the metadata

13 will be relevant or will be useful in any way in this matter.

14 So I think he and I need to have some discussion --

15         THE COURT: I'm not putting a very high bar on that

16 just so you're aware but there's going to be some bar.  So

17 it's just -- it's just -- I don't want to just willy-nilly

18 order everything he asked for without the showing.

19         MR. BAYNE: I also think it's somewhat unfair to have

20 waited until the very end of discovery to raise this issue.

21 In fact, discovery, fact discovery is now closed.

22         THE COURT: I understand that.

23         MR. BAYNE: Are we going to reopen it?

24         THE COURT: If he was asking for all 3,000 documents

25 to be produced in native format we wouldn't be treating it

24

1  this way but the maximum universe is going to be in the 80s it

2  sounds like.  So this is a pretty limited burden.  It's not

3  going to delay anything.

4              Any other business, Mr. Missakian?

5              MR. MISSAKIAN: Your Honor, I was hoping to revisit

6  the Court's order on January 2nd with regard to the documents

7  that Mr. Friedman was ordered to produce relating to the

8  $250,000.00 he received but I don't believe Mr. Chu is on the

9  phone.

10             THE COURT: Well, also he asked until today to

11 respond to your letter.

12             MR. MISSAKIAN: I did not know that.  I traveled on

13 Monday.  That may have happened and I just didn't see it.

14             THE COURT: I think we had asked him to tell you that

15 but maybe it got lost in the shuffle.

16             MR. MISSAKIAN: I wasn't aware of that.

17             MR. BAYNE: Judge, before we go on, Mr. Safrin's

18 attorneys are asking for the native files for 1,100 documents.

19 Do you think perhaps they could be directed to coordinate with

20 Mr. Missakian so we don't do this twice?

21             THE COURT: Well, it certainly wasn't presented to

22 me.  Who's on the phone for Mr. Safrin?

23             MS. GALVIN: Nicole Galvin.  We'd be happy to

24 coordinate.

25             THE COURT: I don't know the particulars of what was

1  requested by Mr. Safrin previously.  So it's a clean slate as

2  far as you guys are concerned.  For all I know the request is

3  totally unreasonable or reasonable.  I have no idea.  So sure,

4  go ahead and coordinate.

5          What else can I do for you?

6          MR. BAYNE:  I realize Your Honor is very busy but

7  there are also a lot of disputes about the privilege logs

8  which may become moot when Your Honor decides the crime fraud

9  motion.  Do you have --

10         THE COURT: The crime fraud motion.

11         MR. BAYNE: Do you have an estimate of when you're

12  going to get to that?

13         THE COURT: I want to be realistic.  I think the best

14  case scenario is three weeks and the worst case scenario is

15  sometime after that.  I don't know that that helps you.

16  People are holding off on things depending upon how I decide

17  that; is that what's going on?

18         MR. BAYNE: Yes, I think Mr. Missakian wrote you a

19  letter saying that we would put that off until we saw what

20  happened as a result of the decision on the motion.

21         THE COURT: Well now you've inspired me to act in a

22  shorter period.  I have a trial next week which is going to

23  make things harder for me but I think there's a good shot I

24  can do it three weeks from Friday.  So I'll make that my

25  mental deadline.

26

1          If you want to write me a letter after that asking

2   what the plan is -- in fact, let me direct you so you don't

3   feel inhibited about doing that.  Mr. Missakian, why don't you

4   write me a letter on the 11th if you want to -- to ask about

5   progress and maybe I can give you some direction.  I have been

6   busy not only on many other cases but other Amusement matters

7   including I think a BIR motion.

8          MR. MISSAKIAN: Yes, Your Honor.

9          THE COURT: In the 11 case; right?

10         MR. MISSAKIAN: Yes, Your Honor.

11         THE COURT: Motion to dismiss.

12         MR. MISSAKIAN: That's outstanding, yes.

13         THE COURT: That will come sooner.  Anything else?

14         MR. BAYNE: I don't think so, Your Honor.

15         MR. MISSAKIAN: No, Your Honor.

16         THE COURT: Thank you everyone.

17                    * * * * *

18

19

20

21

22

23

24

25

27

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                              _____

6                                        Shari Riemer

7   Dated:   January 20, 2013