UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

AMUSEMENT INDUSTRY, INC. dba    :
WESTLAND INDUSTRIES; and PRACTICAL    :
FINANCE CO., INC.,    :
  :
        Plaintiffs,    :      07 Civ. 11586 (LAK) (GWG)
  :
   -v.-    :      <u>OPINION AND ORDER</u>
  :
MOSES STERN, aka Mark Stern; JOSHUA    :
SAFRIN; FIRST REPUBLIC GROUP REALTY    :
LLC; EPHRAIM FRENKEL; and LAND TITLE    :
ASSOCIATES ESCROW, and AVERY EGERT,    :
  :
        Defendants.    :

------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

APPEARANCES OF COUNSEL

For plaintiffs Amusement Industry, Inc., and Practical Finance Co., Inc.:

> Craig Harry Missakian, Long Beach, California; Elissa E. Koolyk, New York, New York

For defendants Mark Stern and First Republic Group Corp.:

> Stephen Stern, Mark W. Geisler, Hoffinger Stern & Ross LLP., New York, New York

For third-party defendant Stephen Friedman:

> Justin Y.K. Chu, Steptoe & Johnson, LLP, New York, New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC. dba           :
WESTLAND INDUSTRIES; and PRACTICAL     :
FINANCE CO., INC.,                     :
                                       :
                    Plaintiffs,        :        07 Civ. 11586 (LAK) (GWG)
                                       :
        -v.-                           :        OPINION AND ORDER
                                       :
MOSES STERN, aka Mark Stern; JOSHUA    :
SAFRIN; FIRST REPUBLIC GROUP REALTY    :
LLC; EPHRAIM FRENKEL; and LAND TITLE   :
ASSOCIATES ESCROW, and AVERY EGERT,    :
                                       :
                    Defendants.        :
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Amusement Industry, Inc. and Practical Finance Co., Inc. (collectively,

"Amusement") have sued defendants Moses Stern, First Republic Group Realty, LLC ("FRG

LLC"), First Republic Group Corp. ("FRG Corp."), Ephraim Frenkel, Land Title Associates

Agency, LLC ("LTA"), Joshua Safrin, and Avery Egert, seeking damages arising out of the loss

of $13 million given to Stern ostensibly to purchase a portfolio of shopping centers (the

"Portfolio") from Colonial Realty Limited Partners ("Colonial") in 2007.  See Third Amended

Complaint, filed Apr. 27, 2010 (Docket # 405) ("Compl.").

Amusement asserts that the financing of the Portfolio constituted a fraudulent scheme

and thus has moved to compel all communications between Stern and the attorneys who

performed services for him on the Colonial transaction — and certain related transactions — on

the ground that the crime-fraud exception to attorney-client privilege and work-product

protection applies.[1]  Stern opposes this motion.[2]  Stephen Friedman, counsel at Buchanan Ingersoll & Rooney, P.C. ("BIR"), which represented Stern in the Colonial transaction, has submitted a brief "in response" to the motion in order to correct purported factual errors in the plaintiffs' papers, but takes no position as to the motion's disposition.[3]

Amusement seeks the disclosure of withheld documents and testimony from five law firms and one individual attorney that consulted with Stern: BIR; Herrick, Feinstein LLP ("Herrick"); Hoffinger Stern and Ross, LLP ("HSR"); Reiss & Eisenpress LLP ("Reiss"); Tepfer & Tepfer P.C. ("Tepfer"); and Bruce Minsky.  See Pl. Mem. at 9.  For the reasons stated below, the motion to compel is granted to the extent indicated below.

---

[1]  See Notice of Motion and Motion to Compel, filed June 6, 2012 (Docket # 649); Memorandum of Law in Support of Motion to Compel, filed June 6, 2012 (Docket # 650) ("Pl. Mem."); Declaration of Elissa E. Koolyk in Support of Moving Parties' Motion to Compel, filed June 6, 2012 (Docket # 651) ("Koolyk Decl."); Notice of Errata in Motion to Compel, filed June 14, 2012 (Docket # 653) ("Notice of Errata").  Amusement also submitted papers in reply to Stern's and Stephen Friedman's opposition.  See Reply in Support of Motion to Compel, filed July 26, 2012 (Docket # 663) ("Pl. Reply Mem."); Declaration of John Hofsaess, filed July 26, 2012 (Docket # 664) ("Hofsaess Decl."); Supplemental Declaration of John Hofsaess, filed July 27, 2012 (Docket # 665–66) ("Hofsaess Supp. Decl."); Notice of Errata Re Motion to Compel, filed Aug. 2, 2012 (Docket # 667); Supplemental Memorandum in Support of Motion to Compel; Declaration of Craig H. Missakian in Support Thereof, filed Nov. 27, 2012 (Docket # 674).

[2]  See Declaration of Mark W. Geisler in Opposition to Motion to Compel, filed July 11, 2012 (Docket # 657) ("Geisler Decl."); Memorandum of Law on Behalf of Defendants Mark Stern and First Republic Group Corp. in Opposition to Plaintiffs' Motion to Compel, filed July 11, 2012 (Docket # 658) ("Def. Mem.").

[3]  See Memorandum of Stephen Friedman in Response to Plaintiffs' Motion to Compel, filed July 11, 2012 (Docket # 659) ("Friedman Mem."), at 1; Declaration of Justin Y.K. Chu in Support of Stephen Friedman's Response to Plaintiffs' Motion to Compel, filed July 11, 2012 (Docket # 660); Declaration of Stephen S. Friedman in Response to Plaintiffs' Supplemental Memorandum to Motion to Compel, filed Dec. 4, 2012 (Docket # 675).

I.      APPLICABLE LAW

      A.      Choice of Law

      This Court's subject matter jurisdiction is based upon diversity.  Compl. ¶ 17.

Accordingly, state law provides the rule of decision concerning the claim of attorney-client

privilege.  See Fed. R. Evid. 501; Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir.

1975); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 470 (S.D.N.Y.

2003).  The parties' briefing does not address the question of choice-of-law.  Instead, the parties

cite exclusively to federal case law with respect to the law governing the crime-fraud exception.

See Pl. Memo. at 34–36; Def. Mem. at 23–32; Pl. Reply Mem. at 5–7, 10–20.  The court need

not decide which law governs inasmuch as New York applies a similar standard as federal law.

"Indeed, 'New York law governing the attorney-client privilege is generally similar to accepted

federal doctrine.'"  Bank of Am., N.A. v. Terra Nova Ins. Co., 211 F. Supp. 2d 493, 495

(S.D.N.Y. 2002) (quoting Bowne of N.Y.C., Inc. v. AmBase Corp., 150 F.R.D. 465, 470

(S.D.N.Y. 1993)); accord NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 124 (N.D.N.Y. 2007).

Moreover, cases decided by New York State courts routinely cite to cases decided by the federal

courts with respect to the crime-fraud exception.  See, e.g., Nowlin v. People, 1 A.D.3d 172, 173

(1st Dep't 2003) (citing United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997)); Ulico Cas. Co.

v Wilson, Elser, Moskowitz, Edelman & Dicker, 1 A.D.3d 223, 224 (1st Dep't 2003) (citing In

re John Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994)).  The Court discerns no difference in the

doctrine as applied in the two jurisdictions.  Therefore, we will look to both federal and New

York case law for the legal principles that control here.

      B.      The Crime-Fraud Exception

      The attorney-client privilege seeks to "encourage full and frank communication between

attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); accord Rossi v. Blue Cross & Blue Shield of Greater N.Y., 73 N.Y.2d 588, 592 (1989). However, "[t]he privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." Clark v. United States, 289 U.S. 1, 15 (1933); accord People ex rel. Vogelstein v. Warden, 150 Misc. 714, 721 (N.Y. Sup. Ct.), aff'd , 242 A.D. 611 (1st Dep't 1934). Case law applies the same exception to attorney work-product. See, e.g., In re Grand Jury Subpoenas Served Upon John Doe, 142 Misc. 2d 229, 231 (N.Y. Sup. Ct. 1988) (citing In re John Doe Corp., 675 F.2d 482 (2d Cir. 1982)). Thus, neither the attorney-client privilege nor the attorney work-product doctrine protect communications made in furtherance of a crime or fraud. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984).

Notably, some courts have construed the exception to reach conduct beyond the technical definitions of crimes or frauds to include other wrongful conduct. See, e.g., Sackman v. Liggett Grp., Inc., 173 F.R.D. 358, 364 (E.D.N.Y. 1997) ("[T]he crime-fraud exception applies to 'intentional torts moored in fraud.'") (quoting Cooksey v. Hilton Int'l Co., 863 F. Supp. 150, 151 (S.D.N.Y. 1994)); In re Heuwetter, 584 F. Supp. 119, 127 (S.D.N.Y. 1984) ("[C]ommunications that enable or aid the client to commit a tort or crime . . . are not protected."); Irving Trust Co. v. Gomez, 100 F.R.D. 273, 277 (S.D.N.Y. 1983) (exception applies to "unlawful conduct regardless of whether such conduct constitutes fraud or any other intentional tort"); Parnes v. Parnes, 80 A.D.3d 948, 951 (3d Dep't 2011) ("The attorney-client privilege will not prevent disclosure or use of any communications made 'in furtherance of a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct.'") (quoting Ulico Cas.

Co, 1 A.D.3d at 224); People v. Belge, 59 A.D.2d 307, 309 (4th Dep't 1977) (attorney-client
privilege does not protect communications made "for the purpose of committing a crime or tort")
(citation omitted).

A party seeking "to invoke the crime-fraud exception must demonstrate that there is a
factual basis for a showing of probable cause to believe that a fraud or crime has been
committed" — or has been attempted — "and that the communications in question were in
furtherance of the fraud or crime." Jacobs, 117 F.3d at 87; accord Nowlin, 1 A.D.3d at 173. The
"factual basis must strike 'a prudent person' as constituting 'a reasonable basis to suspect the
perpetration or attempted perpetration of a crime or fraud, and that the communications were in
furtherance thereof.'" Jacobs, 117 F.3d at 87 (quoting In re John Doe, Inc., 13 F.3d at 637).
Obviously, there need not be a "definitive[]" showing of the fraudulent nature of the client's
objective; rather, "there need only be presented a reasonable basis for believing that objective
was fraudulent." In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at
1039.

It is sufficient to come within the exception that the client intended to use the attorney's
services in furtherance of a crime or fraud even if the attorney was unaware of this purpose. See
Clark, 289 U.S. at 15 ("The attorney may be innocent, and still the guilty client must let the truth
come out.") (citing cases); Shahinian v. Tankian, 242 F.R.D. 255, 258 (S.D.N.Y. 2007) ("It is
not necessary to show that the attorney was aware of the improper purpose.") (citing In re Grand
Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at 1038); S.E.C. v. Herman, 2004
WL 964104, at *2 (S.D.N.Y. May 5, 2004) ("The pertinent intent is that of the client, not the
attorney.") (citations omitted). Moreover, the crime or fraud for which the client used the
attorney's services need not be the subject of the underlying lawsuit. See generally Antidote

5

Int'l Films, Inc. v. Bloomsbury Publ'g, PLC, 242 F.R.D. 248, 250–51 (S.D.N.Y. 2007).  On the other hand, "the crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Instead, . . . the client communication or attorney work product in question [must] itself [be] in furtherance of the crime or fraud."  In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (emphasis in original).

The probable cause standard "cannot imply 'more probable than not.'"  United States v. Travisano, 724 F.2d 341, 346 (2d Cir.1983); cf. United States v. Howard, 489 F.3d 484, 491 (2d Cir.) (probable cause in the criminal context exists where there is "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested") (citation and internal quotation marks omitted), cert. denied, 522 U.S. 1005 (2007).  Instead, probable cause deals with "probabilities" rather than "hard certainties."  A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).  "Probable cause" in the context of the crime/fraud exception requires that a "prudent person" have a "reasonable basis" for believing that the objective of the client's communication with the attorney was to further a fraudulent scheme.  In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at 1039; see also In re Fresh Del Monte Pineapple, 2007 WL 64189, at *3 (S.D.N.Y. Jan. 4, 2007) (using a "reasonable probability" standard), aff'd, 407 F. App'x 520 (2d Cir. 2010).  Or, as one court has put it, the party seeking to pierce the privilege should demonstrate a "substantial reason" to believe that the party seeking to preserve the privilege "engaged in or attempted to commit a fraud and used communications with its attorney to do so."  In re Omnicom Grp., Inc. Sec. Litig., 2007 WL 2376170, at *11 (S.D.N.Y. Aug. 10, 2007);

accord Aiossa v. Bank of Am., N.A., 2011 WL 4026902, at *6 (E.D.N.Y. Sept. 21, 2011).  In the end, "the probable cause necessary to sustain the exception is not an overly demanding standard."  A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999) (citing Locke v. United States, 11 U.S. (7 Cranch) 339, 348  (1813)).

The Second Circuit has held that "'[t]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause.'"  Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) (quoting United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)). Nonetheless, "if the party seeking to preserve the privilege — the one with superior access to the evidence and in the best position to explain things — provides a satisfactory rebuttal to the movant's initial showing, the privilege should remain."  In re Omnicom Grp., Inc. Sec. Litig., 2007 WL 2376170, at *10 (citations and internal quotation marks omitted).[4]

If the court finds that the crime-fraud exception is applicable, it "does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct."  In re Grand Jury Subpoena, 419 F.3d 329, 343 (5th Cir. 2005).  While there must be a "purposeful nexus" between the crime or fraud and the attorney-client

---

[4] While it is not at issue here, we note that "[a] lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege."  United States v. Zolin, 491 U.S. 554, 572 (1989) (citation omitted).  In order to review documents in camera, there need only be "a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  Id. (citation and internal quotation marks omitted).  "[I]f and when there has been an in camera review, the district court exercises its discretion again to determine whether the facts are such that the exception applies."  Jacobs, 117 F.3d at 87.  However, in camera review of documents is unnecessary where, as it true here, independent evidence provides probable cause to believe that attorney communications took place in furtherance of a crime or fraud.  See United States v. Kaplan, 2003 WL 22880914, at *10 (S.D.N.Y. Dec. 5, 2003).

communication, In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986), it is sufficient that the attorney-client communication be "'reasonably relate[d] to the crime or fraud,'" In re Grand Jury Subpoena, 419 F.3d at 346 (quoting In re Int'l Sys. & Controls Corp. Sec. Litig., 693 F.2d 1235, 1243 (5th Cir. 1982)).

"If production is ordered, the court shall specify the factual basis for the crime or fraud that the documents or communications are deemed to have furthered . . . ." In re Richard Roe, Inc., 68 F.3d at 41.  Additionally, if a court compels testimony, it must "specify the witness or witnesses required to give testimony, the scope of the examination permitted, and the basis . . . for applying the crime-fraud exception."  Id.

C.    Adverse Inference as a Consequence of Invoking the Privilege Against Self-Incrimination

A separate legal principle informs our analysis in this case because during questioning at his deposition, Stern repeatedly invoked his Fifth Amendment privilege against self-incrimination.

A party invoking the privilege against self-incrimination disadvantages an opposing party by preventing it from obtaining otherwise relevant information.  See S.E.C. v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010), aff'd, 421 F. App'x 86 (2d Cir. 2011).  Thus, in a civil case, a court may draw an adverse inference against a person whose invocation of the Fifth Amendment results in obstruction of discovery.  See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ."); accord Marine Midland Bank v. Russo Produce Co., 50 N.Y.2d 31, 42 (1980); Steiner v. De Buono, 239 A.D.2d 708, 710 (3d Dep't), lv. denied, 90 N.Y.2d 808 (1997).  Indeed, "[a]n

adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (citing United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153–54 (1923)).  Courts have drawn such an inference when determining if the crime-fraud exception applies to evidence protected by the attorney-client privilege or work-product doctrine.  See, e.g., Herman, 2004 WL 964104, at *7.

Stern invoked his privilege against self-incrimination in response to nearly every question asked of him during his deposition.  See Deposition of Moses Stern, dated Mar. 14, 2012 (annexed as Ex. 3 to Koolyk Decl.) ("Stern Dep.").  By refusing to answer any questions, Stern obstructed the discovery process, which justifies drawing an inference that any answers he gave in response to the questions would have been unfavorable to him.  See S.E.C. v. Benson, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) ("By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up the right to prove them.  By his initial obstruction of discovery and his subsequent assertion of the privilege, defendant has forfeited the right to offer evidence disputing the plaintiff's evidence or supporting his own denials.").  Accordingly, plaintiff will be permitted to draw adverse inferences against Stern to support its efforts to invoke the crime/fraud exception.

We next discuss whether there is probable cause to believe that Stern engaged in criminal or fraudulent conduct as asserted by Amusement.  We then turn to the issue of whether there is a substantial reason to believe that Stern used attorney-client communications to further any criminal or fraudulent conduct.  Throughout this decision our references to "Stern" are intended to include FRG Corp.

II.   EVIDENCE OF CRIMES OR FRAUDS COMMITTED BY STERN

    A.   Stern's Loan Applications to J.P. Morgan and Citigroup

Amusement contends that Stern committed wire fraud in his efforts to obtain financing

from J.P. Morgan and Citigroup.  See Pl. Mem. at 12, 16.  18 U.S.C. § 1343 punishes a person

who:

> having devised or intending to devise any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to be transmitted by means of
> wire, radio, or television communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the purpose of executing such
> scheme or artifice . . . .

"[T]he essential elements of a . . . wire fraud violation are (1) a scheme to defraud, (2) money or

property as the object of the scheme, and (3) use of the . . . wires to further the scheme."

Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (quoting United States v. Dinome, 86

F.3d 277, 283 (2d Cir. 1996)) (internal quotation marks and brackets omitted).  "[The] words 'to

defraud' . . . . usually signify the deprivation of something of value by trick, deceit, chicane, or

overreaching."  Hammerschmidt v. United States, 265 U.S. 182, 188 (1924).  Determining

whether there is a "scheme to defraud" under section 1343, however, is "measured by a

nontechnical standard.  It is a reflection of moral uprightness, of fundamental honesty, fair play

and right dealing in the general and business life of members of society."  United States v.

Trapilo, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (quoting United States v. Von Barta, 635 F.2d 999,

1005 n.12 (2d Cir. 1980) (other citations, internal quotation marks, and brackets omitted), cert.

denied, 525 U.S. 812 (1998).  To satisfy the statute, it must also be shown that the "defendants

possessed a fraudulent intent . . . . [through] a showing of intended harm . . . ."  United States v.

Starr, 816 F.2d 94, 98 (2d Cir. 1987)) (citations and internal quotation marks omitted).  Finally,

wire fraud requires that the defendant utilize wires incident to an essential part of the scheme; however, "[t]he use of the wires need not be an essential part of the scheme to defraud." United States v. Martin, 411 F. Supp. 2d 370, 374 (S.D.N.Y. 2006) (citing United States v. Altman, 48 F.3d 96, 102 (2d Cir. 1995)).

Amusement also contends that Stern conspired with others to commit wire fraud. See Pl. Mem. at 16. To prove conspiracy, it must be shown that the party "agreed with another to commit the offense; that he 'knowingly' engaged in the conspiracy with the 'specific intent to commit the offenses that were the objects of the conspiracy'; and that an overt act in furtherance of the conspiracy was committed." United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999) (quoting United States v. Salameh, 152 F.3d 88, 145–46 (2d Cir. 1998)), cert. denied, 529 U.S. 1028 (2000).

In May 2007, Stern approached J.P. Morgan with a financing proposal for the Colonial transaction. See Financing Proposal, dated May 18, 2007 (annexed as Ex. 46 to Koolyk Decl.). On May 9, 2007, Richard Koch — Stern's mortgage broker — submitted a "sources and uses" statement to J.P. Morgan that listed an expected $14,700,000 brokerage fee. E-mail from Koch, Vice President, Northmarq Capital, to Michael Cozza, J.P. Morgan (May 9, 2007, 16:11 EST) (annexed as Ex. 54 to Koolyk Decl.) ("May 9 Sources and Uses E-mail"). In drafts of the sources and uses statement prepared that day, the brokerage fee was first listed as $12,380,000, E-mail from Koch to Stern & Friedman (May 9, 2007, 09:38 EST) (annexed as Ex. 62 to Koolyk Decl.), and then as $15,400,000, E-mail from Koch to Stern & Friedman (May 9, 2007, 14:49 EST) (annexed as Ex. 63 to Koolyk Decl.), before the $14,700,000 fee was ultimately submitted to J.P. Morgan, see May 9 Sources and Uses E-mail. During a deposition, when asked if he ever discussed the sources and uses statement submitted to J.P. Morgan, Stern invoked his Fifth

11

Amendment privilege against self-incrimination.  Stern Dep. at 268:18–269:6.

Stern also e-mailed to Koch and Friedman signed copies of brokerage agreements between FRG Corp. and two realty companies.  First, on May 9, 2007, he attached a brokerage agreement with Pollard Realty Company ("Pollard").  See E-mail from Stern to Koch & Friedman (May 9, 2007, 17:00 EST) (annexed as Ex. 56 to Koolyk Decl.) (attaching Brokerage Agreement Between FRG Corp. and Pollard ("Pollard Agreement")).  The agreement was dated March 5, 2007, provided for a three percent commission on the total transaction price, and listed the cost of the Portfolio as $167 million.  Pollard Agreement ¶ 2(b).  Under the agreement, in the event that the purchase price was reduced, the brokerage commission would also be reduced.  Id.  The next day, May 10, 2007, Stern sent an e-mail to Koch and Friedman with a subject line of "Please send a copy of this signed agreement," which had attached to it a signed brokerage agreement between Prudential Douglas Elliman Real Estate ("Prudential") and FRG Corp.  E-mail from Stern to Koch & Friedman (May 10, 2007, 11:49 EST) (annexed as Ex. 55 to Koolyk Decl.) ("May 10 Stern E-mail") (attaching Brokerage Agreement Between FRG Corp. and Prudential, dated Mar. 5, 2007 ("Prudential Agreement")).  Other than the change in the name of the broker, the Prudential Agreement had the same terms as the Pollard Agreement and was also dated March 5, 2007.  The Prudential Agreement was signed on behalf of Prudential by David Frank, a "Licensed Real Estate Rep."  See Prudential Agreement at 3.  Kenneth Haber, Executive Vice President and General Counsel of Prudential, has submitted a sworn statement that a "David Frank" was never employed or associated with Prudential, and that the "agreement is not genuine."  Declaration of Kenneth I. Haber, dated July 27, 2012 (annexed as Ex. 189 to Hofsaess Supp. Decl.) ("Haber Decl."), ¶¶ 2, 3.  Haber has also stated that Prudential never received money from FRG Corp. or Stern, and that it has no documents related to the Colonial transaction.  See Letter from Haber to

12

Allen P. Sragow, Sragow & Sragow (May 12, 2008) (annexed as Ex. 184 to Koolyk Decl.)
("Prudential Letter").

In June 2007, Stern applied for a loan from Citigroup.  See E-mail from Koch to Michael
W. Fallon, Citigroup (June 15, 2007, 11:02 EST) (annexed as Ex. 67 to Koolyk Decl.) (attaching
Interim Loan Application, dated June 13, 2007).  As part of the loan application with Citigroup,
through his mortgage broker Koch, Stern again transmitted "sources and uses" statements listing
the anticipated expenses for the Colonial transaction.  See E-mail from Koch to Fallon & Stern
(May 21, 2007, 10:25 EST) (annexed as Ex. 69 to Koolyk Decl.); E-mail from Koch to Fallon &
Stern (May 30, 2007, 14:52 EST) (annexed as Ex. 70 to Koolyk Decl.).  In support of these
anticipated expenses, Koch submitted to Citigroup copies of agreements FRG Corp. purportedly
entered into with third parties in connection with the closing of the transaction.  See E-mail from
Koch to Fallon, Paul Schuler, Citigroup, & Stern (June 4, 2007, 14:23 EST) (annexed as Ex. 71 to
Koolyk Decl.) ("June 4 Koch E-mail").

First, Koch submitted an engagement letter from Roman Associates Ltd. ("Roman"),
signed by Eric P. Pasini, to serve as acquisition advisor on the transaction.  See id. (attaching
Engagement Letter from Pasini, Managing Dir., Roman, to Stern (Apr. 19, 2007)).  Pasini attests
that the engagement letter "is a fake.  [It] is not a Roman Associates['s] agreement and the
signature . . . is a forgery."  Affidavit of Eric Pasini, dated July 24, 2012 (annexed as Ex. 186 to
Hoffsaess Decl.) ("Pasini Aff."), ¶ 3.  Second, Koch sent Citigroup a copy of the Prudential
Agreement, as well as an amendment to the Prudential Agreement also signed by Frank, as proof
of the brokerage fee.  See June 4 Koch E-mail (attaching Prudential Agreement and Amendment
to Brokerage Agreement, dated May 25, 2007).  Haber stated under oath that neither the
Prudential Agreement nor the amended brokerage agreement are genuine.  See Haber Decl. ¶¶ 2,

13

3.  As already noted, he also stated that Prudential never received any payment for the transaction. Prudential Letter.  Third, Koch submitted to Citigroup a leasing brokerage and consulting agreement between FRG Corp. and GMAC-IPG, signed by John Veracchi, Principal of GMAC-IPG.  See June 4 Koch E-mail (attaching Leasing Brokerage/Consulting Agreement Between FRG Corp. and GMAC-IPG, dated Mar. 7, 2007).  George Donahue, President of GMAC-IPG, has submitted an affidavit indicating that the agreement was not created by him or his employees, and that "John Veracchi" never worked at GMAC-IPG.  Affidavit of George Donahue, dated Feb. 17, 2009 (annexed as Ex. 188 to Hoffsaess Decl.) ("Donahue Aff."), ¶¶ 1, 7–9.  Finally, on June 4, 2007, Stern forwarded to Koch an advisory agreement with Ace Capital Group ("Ace") for investment banking services.  See E-mail from Stern to Koch (June 4, 2007, 21:09 EST) (annexed as Ex. 72 to Koolyk Decl.) ("June 4 Stern E-mail") (attaching Letter from Bruce Steinberger, Exec. Vice President, Ace, to Stern (Jan. 9, 2005)).  Koch forwarded the agreement to Citigroup on June 5, 2007.  See E-mail from Koch to Fallon (June 5, 2007, 9:15 EST) (annexed as Ex. 73 to Koolyk Decl.) ("June 5 Koch E-mail").  Steinberger of Ace declares that the advisory agreement is a fake, that it bears a forged signature, and that Ace had no agreement with FRG Corp. or Stern. Declaration of Bruce Steinberger, dated July 26, 2012 (annexed as Ex. 187 to Hoffsaess Decl.) ("Steinberger Decl."), ¶ 3.

On July 5, 2007, Frenkel sent an e-mail to Citigroup attaching invoices purportedly created by Prudential, Roman, GMAC-IPG, Ace and Minsky billing for work done on the Colonial transaction.  E-mail from Frenkel to Schuler & Koch (July 5, 2007, 11:18 EST) (annexed as Ex. 76 to Koolyk Decl.) ("July 5 Frenkel E-mail") (attaching invoices)).  Frenkel transmitted the invoices on Stern's behalf, as the body of his e-mail indicated that he was sending "[c]opies of invoices received from Stern."  Id.  Each of these entities has denied the authenticity

of the invoice allegedly created by it.  See Haber Decl. ¶ 4 (the $8,677,500 invoice "is not

genuine"); Pasini Aff. ¶ 4 ("I have reviewed this invoice and it . . . is a fake.  [It] is not a Roman

Associate invoice."); Donahue Aff. ¶¶ 7–9 (invoice was not created by him or his employees and

bears the signature of a person who never worked at GMAC-IPG); Steinberger Decl. ¶ 4 (invoice

"is a fake"); Deposition of Bruce Minsky, dated Mar. 22, 2011 (annexed as Ex. 185 to Hoffsaess

Decl.) ("Minsky Dep."), at 22:22–23:8 ("This is not my invoice.").  When asked whether these

entities provided any services or received compensation in relation to the Colonial transaction,

Stern invoked his privilege against self-incrimination.  See Stern Dep. at 259:21–268:17.

On July 13, 2007, Stern transmitted a Purchasers Closing Statement to Citigroup that

listed expenses allocated to Prudential, Roman, Ace, GMAC-IPG, and Minsky.  See E-mail from

Stern to Fallon, Schuler, Frenkel & Steven Fleissig, Herrick (July 13, 2007, 13:37 EST) (annexed

as Ex. 75 to Koolyk Decl.) ("July 13 Stern E-mail") (attaching Purchasers Closing Statement).

Prudential, Roman, GMAC-IPG and Ace all deny receiving any compensation as a result of the

Colonial transaction.  See Haber Decl. ¶ 5 (Prudential received no money from the Colonial

transaction); Pasini Aff. ¶ 5 (LTA wired money to Roman on July 12, 2007 in error and Roman

returned the money on July 16, 2007); Donahue Aff. ¶ 11 (GMAC-IPG did not receive money as

a result of Colonial transaction); Steinberger Decl. ¶ 4 (Ace did not provide or bill for any

services related to the Colonial transaction).  Stern invoked his privilege against self-

incrimination when specifically asked about the closing statement.  See Stern Dep. at 266:16–25.

On December 10, 2010, a grand jury indicted Frenkel for his role in the Colonial

transaction.  See Indictment, United States v. Frenkel, 10 Cr. 1207 (WWE) (S.D.N.Y. Dec. 7,

2010) (Docket # 19) ("Frenkel Indictment").  The indictment alleges that Frenkel and the

"Principal" of First Republic Group, who is also alleged to be the Principal of FRG LLC and First

Republic Group Managing Member LCC, entered into a conspiracy to commit wire fraud.  See id. ¶¶ 8–9.  It alleges that Frenkel committed wire fraud by submitting false "closing costs" in a scheme to defraud Citigroup.  Id. ¶ 10.  The indictment finds that the object of submitting false costs was to increase the size of the loan, as the Citigroup loan was calculated as a percentage of the total cost.  Id. ¶ 6.  The indictment details that Frenkel and the "Principal" transmitted the following closing costs to Citigroup:

> $8,677,500 to be paid to Prudential Douglas Elliman for brokerage services; $2,325,000 to be paid to GMAC IPG for brokerage/consulting services; $934,500 to be paid to ACE Capital Group for investment advice, transaction structuring and advice and capital formation advice; $2,670,000 to be paid to Roman Associates, Ltd. for acquisition advising fees; and $934,500 to be paid to an attorney for financing feasibility studies, travel to each property, and disbursements.

Id. ¶ 5.  The indictment also states that Frenkel "falsely represented to Citigroup that he paid by wire transfer the purported closing costs incurred by First Republic Group and owed to Prudential Douglas Elliman, GMAC IPG, ACE Capital Group, and Roman Associates, as well as other additional closing costs when in fact he had not made such payments."  Id. ¶ 7.

In light of the evidence described above, there is overwhelming evidence that, in applying for loans from J.P. Morgan and Citigroup, Stern engaged in a scheme to defraud.  Unrefuted evidence shows that Stern, through his agents Koch and Frenkel, see June 4 Koch E-mail; July 5 Frenkel E-mail, submitted false agreements and invoices in the loan application process with Citigroup, see Haber Decl.; Pasini Aff.; Donahue Aff.; Minsky Dep. at 22:22–23:8.

The Frenkel indictment lends further support to the claim that Stern's representations to Citigroup constituted a scheme to defraud.  See United States v. Stewart, 2003 WL 23024461, at *2 (S.D.N.Y. Dec. 29, 2003) ("[A]n indictment may provide probable cause to believe that the crime charged was committed . . . .").  Stern is plainly the "Principal" referred to in the

indictment.  See, e.g., Answer of Mark Stern and First Republic Group Corp. to Third Amended

Complaint; Counterclaims; Crossclaims; and Demand for Jury Trial, filed Apr. 29, 2011 (Docket

# 575), ¶ 12 (Stern is the sole shareholder of FRG Corp.); Certification (annexed as Ex. 4 to

Koolyk Decl.) (Stern identifies himself as "President of First Republic Realty LLC and FRGR

Managing Member LLC").  The indictment concludes that Stern and Frenkel intentionally

inflated the transaction expenses in order to increase the amount that Citigroup would be willing

to lend, as "the loan was a set percentage of the total cost."  Frenkel Indictment ¶ 6.  While one of

the bases of the indictment may have been Frenkel's subsequent misrepresentations to Citigroup

that he had paid the fees when he had not, see Def. Mem. at 1–2 n.1, there is separate evidence,

discussed above, showing that the invoices and agreements were false and in furtherance of

Stern's scheme to inflate the loan.  Indeed, Stern has refused to answer questions on this topic,

see Stern Dep. at 270:10–15 (invoking privilege against self-incrimination to question: "Isn't one

of the reasons you were trying to fabricate these closing costs was so that the bank would lend

you more money?"), providing a significant reason to believe Amusement's allegations.  Thus,

there is probable cause to believe that Stern made these misrepresentations with the goal of

inducing Citigroup to lend him money.

Furthermore, while many of the false documents submitted to Citigroup were sent by

Koch and Frenkel, Stern's involvement is unmistakable.  The Purchasers Closing Statement —

which listed false closing expenses — was sent to Citigroup directly from Stern's e-mail address.

See July 13 Stern E-mail.  With respect to the submission of the other false documents, there is a

strong inference that Stern, Koch and Frenkel entered into a conspiracy the object of which was to

induce Citigroup to lend based on false and misleading expenses.  This inference derives from the

fact that Koch and Frenkel submitted these documents on FRG Corp.'s behalf.  Moreover,

17

evidence shows that the Ace advisory agreement came from Stern, see June 4 Stern E-mail, and

that he sent it to Koch to forward to Citigroup, see June 5 Koch E-mail.

Finally, each of these false documents was submitted through e-mail, see, e.g., June 4

Koch E-mail; July 5 Frenkel E-mail, which satisfies the use of the wires element, see, e.g., United

States v. Siembida, 604 F. Supp. 2d 589, 596–97 (S.D.N.Y. 2008), aff'd, 374 F. App'x 189 (2d

Cir. 2010).  Therefore, there is probable cause to conclude that Stern committed wire fraud and

conspiracy to commit wire fraud in his dealings with Citigroup.

Viewed independently of the Citigroup loan application, there is also probable cause to

believe Stern committed wire fraud with respect to his dealings with J.P. Morgan.  While

Amusement does not provide direct proof that any false brokerage agreement was submitted to

J.P. Morgan, the fact that Stern and Koch changed the brokerage fee in drafts of the sources and

uses statement several times on a single date, May 9, 2007, is extremely suspicious.  Moreover,

because Stern invoked his Fifth Amendment privilege in response to questions on this specific

topic, see Stern Dep. at 268:21–269:12, all inferences must be drawn against him.  Finally, on

May 10, 2007, while in the midst of negotiations with J.P. Morgan, Stern sent Koch a signed copy

of the fraudulent Prudential Agreement, see May 10 Stern E-mail; see Haber Decl. ¶ 3, which is

the same false agreement that Stern submitted to Citigroup, see June 4 Koch E-mail.  In light of

the substantial evidence that Stern submitted false documents, including the Prudential

Agreement, to Citigroup to obtain a loan for the same transaction less than two months later, and

in light of Stern's refusal to answer questions, a reasonable person would infer that Stern's efforts

to obtain a loan from J.P. Morgan were part of an attempt to defraud J. P. Morgan.  Probable

cause is also supported by the inclusion of Joshua Safrin's name in the proposal presented to J.P.

Morgan, see Financing Proposal, dated May 18, 2007, for the reasons described in the next

section.  Accordingly, given that the communications relating to the loan were made by e-mail, probable cause exists that Stern committed wire fraud, attempted to commit wire fraud, and/or conspired to commit wire fraud in his efforts to obtain financing from J.P. Morgan.

B.     Forgery of Joshua Safrin's Signature

As discussed in the previous section, there is probable cause to believe that the attempts to obtain financing from Citigroup and J.P. Morgan for the Colonial transaction constituted a scheme to defraud.  In its brief, Amusement points to a particular aspect of the Citigroup scheme as reflecting a separate criminal act: specifically, Stern's forging Safrin's signature in connection with the paperwork necessary to obtain financing from Citigroup.  See Pl. Mem. at 17–22, 28. Given the existence of the scheme to defraud already described, it is not necessary to consider this particular aspect of the deal separately.  Nonetheless, because Amusement has raised it, and because it only bolsters the existing probable cause to believe that Stern's efforts to obtain financing were part of a fraudulent scheme, and that he acted with fraudulent intent, we address the allegations of forgery as well.

A person commits forgery "when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument."  N.Y. Penal Law § 170.05.[5]  "In essence,

---

[5] A "written instrument" is "any instrument or article . . . used for the purpose of reciting, embodying, conveying or recording information, or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person."  Id. § 170.00.

Amusement has also claimed Stern committed aggravated identity-theft against Safrin in violation of 18 U.S.C. § 1028A, which prohibits "knowingly transfer[ing], possess[ing], or us[ing], without lawful authority, a means of identification of another person" while committing an enumerated felony, including wire fraud.  See Pl. Mem. at 12, 17–22.  Because Amusement has shown that there was a forgery, it is not necessary to consider whether the identity theft statute was also violated.

19

the crime of forgery involves the making, altering, or completing of an instrument by someone other than the ostensible maker or drawer or an agent of the ostensible maker or drawer." People v. Levitan, 49 N.Y.2d 87, 90 (1980).  As a general rule, "there can be a forgery only if the actor is not the ostensible maker or drawer of the instrument and is not authorized by that person to either make, complete or alter the instrument." Id. at 91.

Citigroup's counsel, Latham & Watkins LLP ("Latham"), required a number of documents to be signed by Safrin, whom Stern had claimed was participating in the deal.  See, e.g., E-mail from Dena Cohen, Herrick, to Fleissig, Koch & Stern (July 9, 2007, 8:31 EST) (annexed as Ex. 84 to Koolyk Decl.) (attaching Loan Agreements purportedly signed by Safrin and stating that the "originals should be at Latham").  On June 29, 2007, Fleissig — an attorney at Herrick who represented Stern in the Colonial transaction — sent an e-mail to Friedman with Stern and other Herrick attorneys copied, requesting that Safrin sign an attached certification.  E-mail from Fleissig to Friedman, Stern, Cohen & Ken Kobylowski, Herrick (June 29, 2007, 15:34 EST) (annexed as Ex. 4 to Koolyk Decl.) ("June 29 Fleissig E-mail").  Forty-four minutes later, an e-mail identified as coming from "wizzy bizzy" using the account "lol11211@yahoo.com" was sent to Fleissig; it attached a signed copy of the requested certification along with a number of other loan documents that bear the purported signature of Safrin.  See E-mail from "wizzy bizzy" to Fleissig (June 29, 2007, 16:22 EST) (annexed as Ex. 19 to Koolyk Decl.) ("June 29 Wizzy Bizzy E-mail").

On July 2, 2007, Cohen — another Herrick attorney — sent an e-mail to Stern, Friedman, Fleissig, and Koch stating that she "need[ed] to receive copies of Joshua Safrin's signature pages by fax immediately."  E-mail from Cohen to Stern, Friedman, Fleissig & Koch (July 2, 2007, 11:15 EST) (annexed as Ex. 5 to Koolyk Decl.) ("July 2 Cohen E-mail I").  Three minutes later,

"wizzy bizzy" forwarded to Cohen the e-mail sent to Fleissig on June 29, 2007, which attached the signature pages allegedly signed by Safrin. See E-mail from "wizzy bizzy" to Cohen (July 2, 2007, 11:18 a.m. EST) (annexed as Ex. 81 to Koolyk Decl.) ("July 2 Wizzy Bizzy E-mail"). Cohen noticed that Safrin's signature was not included on the operating agreement. She placed an "x" next to the line where Safrin was supposed to sign. She attached it to an e-mail addressed to Friedman, with Stern and Fleissig copied, requesting that Safrin sign four original copies to be sent to Latham, and requesting that a copy be sent back to her. E-mail from Cohen to Friedman, Stern & Fleissig (July 2, 2007, 12:08 EST) (annexed as Ex. 83 to Notice of Errata) ("July 2 Cohen E-mail II"). Less than two hours later, Cohen received another e-mail from "wizzy bizzy" attaching the operating agreement bearing the purported signature of Safrin, but without the "x" that she had placed on the document. E-mail from "wizzy bizzy" to Cohen (July 2, 2007, 13:54 EST) (annexed as Ex. 83 to Notice of Errata).

On July 5, 2007, Cohen e-mailed Friedman, with copies sent to Stern and Fleissig, a request that Friedman have Safrin sign attached signature pages for the loan agreements with Citigroup. E-mail from Cohen to Friedman, Stern & Fleissig (July 5, 2007, 18:15 EST) (annexed as Ex. 6 to Koolyk Decl.) ("July 5 Cohen E-mail"). "Wizzy bizzy" replied to Cohen on July 6, 2007 with an e-mail attaching copies of the signature pages for the loan agreements bearing Safrin's signature. See E-mail from "wizzy bizzy" to Cohen (July 6, 2007, 11:38 EST) (annexed as Ex. 80 to Koolyk Decl.) ("July 6 Wizzy Bizzy E-mail"). On July 10, 2007, Stern e-mailed Cohen, attaching an Officer's Certificate bearing his signature. E-mail from Stern to Cohen (July 10, 2007, 11:24 EST) (annexed as Ex. 99 to Koolyk Decl.) ("July 10 Stern E-mail"). "Wizzy bizzy" e-mailed Cohen seven minutes later attaching an Officer's Certificate bearing Safrin's purported signature. See E-mail from "wizzy bizzy" to Cohen (July 10, 2007, 11:31 EST)

(annexed as Ex. 100 to Koolyk Decl.) ("July 10 Wizzy Bizzy E-mail").  The filing names of the officer's certificates attached to the Stern and "wizzy bizzy" e-mails bore significant similarities: the Officer's Certificate bearing Stern's signature was labeled "Tuesday, July 10, 2007 (5).pdf," see July 10 Stern E-mail, while the Officer's Certificate attached to the "wizzy bizzy" e-mail bearing Safrin's purported signature was labeled "1387150067 - Tuesday, July 10, 2007 (6).pdf," see July 10 Wizzy Bizzy E-mail.

Finally, on July 11, 2007, Friedman sent an e-mail to Stern attaching, among other things, a document that assigned Safrin's membership interests in JSAE Colonial LLC ("JSAE Colonial"), which required his signature.[6]  E-mail from Friedman to Stern & Steven Alevy, Bankers Capital Realty Advisors (July 11, 2007, 16:35 EST) (annexed as Ex. 132 to Koolyk Decl.) (attaching JSAE Assignment).  Thirty-four minutes later, Stern e-mailed Friedman attaching the assignment bearing Safrin's signature, see E-mail from Stern to Friedman (July 11, 2007, 17:09 EST) (annexed as Ex. 134 to Koolyk Decl.), which Friedman then forwarded to Amusement's counsel, see E-mail from Friedman to Steven Alevy, Michael Libraty, Amusement, & Joel Ganz, BIR (July 11, 2007, 17:30 EST) (annexed as Ex. 134 to Koolyk Decl.) ("July 11 Assignment and Promissory Notes E-mail").  Between the time that Friedman sent Stern the e-mail attaching the JSAE Assignment and the time that Stern replied to Friedman, Safrin was on a plane from London to New York.  See E-mail from Continental Airlines, Inc. to Walter Levi (Apr. 27, 2007, 12:34 EST) (annexed as Ex. 135 to Koolyk Decl.) (confirming Safrin's flight

---

[6] MS Colonial LLC and JSAE Colonial are entities that jointly owned FRGR Holdings LLC.  See E-mail from Fleissig to Schuler (June 29, 2007, 11:23 EST) ("June 29 Organizational Chart E-mail") (annexed as Ex. 173 to Koolyk Decl.).  FRGR Holdings LLC solely owned FRGR Managing Member LLC, which in turn was the sole member and manager of First Republic Group Realty LLC, which was the principal borrower from Citigroup.  Id.

reservation on July 11, 2007 from London, Heathrow departing at 6:00 p.m. GMT, and arriving at New York, JFK at 9:00 p.m. EST); Joshua Safrin's Passport (annexed as Ex. 135 to Koolyk Decl.) (stamp of United States Customs dated July 11, 2007). Consequently, Safrin could not have signed the JSAE Assignment. Moreover, Stern invoked his privilege against self-incrimination when asked if he forged Safrin's name on the JSAE Assignment. Stern Dep. at 453:19–24.

 Safrin testified under oath that none of the signatures on the deal-related documents were his. See Deposition of Joshua Safrin, dated Feb. 29, 2010 (annexed as Ex. 87 to Koolyk Decl.) ("Safrin Dep."), at 216:4–226:21. While this testimony alone would be enough to warrant a belief that the signatures were forged, a forensic document examiner compared 11 questioned signatures on the documents to 38 signatures known to belong to Safrin and determined that the questioned signatures were not written by Safrin. Report of Examination, dated Feb. 26, 2009 (annexed as Ex. 88 to Koolyk Decl.), at 2.

In addition, the evidence is overwhelming that Stern, or an individual working at his or FRG Corp's behest, was the source of the forged Safrin signatures. There is direct evidence of this fact in at least one instance. On July 11, 2007, an e-mail attaching the JSAE Assignment bearing Safrin's forged signature was sent from Stern's e-mail, which Friedman then forwarded to Amusement's counsel. See July 11 Assignment and Promissory Notes E-mail. As a consequence, there is probable cause to conclude that Stern committed forgery with regards to the JSAE Assignment.

Stern's personal involvement in the forgery of the signatures on the loan documents originating from "wizzy bizzy" is not as direct but still powerful. First, the file names of the Officer's Certificates sent on July 10, 2007 by Stern bearing his signature, see July 10 Stern E-

23

mail ("Tuesday, July 10, 2007 (5).pdf"), and "wizzy bizzy" bearing Safrin's signature, see July 10 Wizzy Bizzy E-mail ("1387150067 - Tuesday, July 10, 2007 (6).pdf"), bear enough resemblance to suggest that they were sent by the same individual.  Most importantly, each time that Fleissig or Cohen requested from Stern that a document be signed by Safrin, they received a an email (from "wizzy bizzy") attaching the requested document bearing Safrin's purported signature.  The e-mails requesting Safrin's signature were sent only to Stern and his attorneys or agents. See June 29 Fleissig E-mail (sent to Friedman, Stern, Cohen, and Kobylowski); July 2 Cohen E-mail I (sent to Stern, Friedman, Fleissig and Koch); July 2 Cohen E-mail II (sent to Friedman, Fleissig, and Stern); July 5 Cohen E-mail (sent to Friedman, Fleissig, and Stern).  Given that the "wizzy bizzy" e-mails were responsive to these requests, it is likely that Stern either personally sent these e-mails or directed someone else to do so.  Accordingly, there is probable cause to believe that Stern or someone acting on his behalf forged Safrin's signatures on the documents and then sent them anonymously via the "wizzy bizzy" e-mail address.

Stern presents evidence that Egert, Safrin's son-in-law, admitted during a deposition that he had signed Safrin's name to some documents relating to the Colonial transaction.  Deposition of Avrahom Egert, dated Feb. 1, 2012 (annexed as Ex. D to Geisler Decl.), at 70:20–23, 121:2–123:25; see also Friedman Mem. at 4 ("Safrin's son-in-law Egert has testified that he was indeed authorized to sign Safrin's name and that he in fact signed the documents bearing Safrin's signature that were sent to Friedman by the Safrin Group.").  This testimony does not negate the probable cause that Stern committed forgery.  See A.I.A. Holdings, S.A., 1999 WL 61442, at *5 ("The fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause.").  Nor does the court need to give this evidence much weight in light of the fact that Stern has not provided an explanation as to why requests to him for Safrin's signature were

24

responded to by means of an e-mail from "wizzy bizzy."[7]

      C.     <u>Stern's Obtaining of Money from Amusement</u>

Citigroup and J.P. Morgan were not the only parties from whom Stern sought financing, of course. Amusement alleges that Stern fraudulently induced it to contribute $13 million towards the Colonial deal. <u>See</u> Pl. Mem. at 22–23. The evidence shows that Friedman told Allen Alevy that under the terms of the deal Amusement would own 50 percent of the Portfolio and that the other 50 percent would be split between Stern and Safrin. Deposition of Allen Edward Alevy, dated Jan. 4, 2011 (annexed as Ex. 105 to Koolyk's Decl.) ("Allen Alevy Dep."), at 25:14–21. This arrangement would have been a violation of Stern's obligations to Citigroup under the loan agreement, which required that Stern and Safrin own at least 51 percent of the Portfolio. <u>See</u> Interim Loan Application at 8–9. To induce Amusement to put money into the deal, Stern — on behalf of FRG Corp. — signed a "Letter of Understanding" with Westland — a name under which Amusement did business. <u>See</u> Letter from Steven Alevy to Stern (June 29, 2007) (annexed as Ex. 106 to Koolyk Decl.) ("LOU"). Although the LOU was not signed by Amusement, and makes reference to the agreement not being "finalized," it refers to Amusement providing $13,000,000 in exchange for "50 percent equity and voting interest" in the Portfolio. <u>Id.</u> Until the agreement was "finalized," the interests in the Portfolio were to be "held in escrow for the benefit of" Amusement. <u>Id.</u> On the same date the LOU was e-mailed to Amusement, Amusement deposited $13 million in an escrow account at LTA. <u>See</u> Bank Statement of LTA's

---

     [7] Stern argues that Amusement should not be permitted to claim that the Safrin signatures are forgeries in this motion while at the same time maintaining claims against Safrin. <u>See</u> Def. Mem. at 2 (Amusement "inconsistently and adversely maintain[s] in this litigation that Safrin was involved in the transaction and is liable to Plaintiffs"). But the fact that the claims made by Amusement in a pleading allegedly vary with the evidence presented here does not negate probable cause.

Escrow Account, dated July 31, 2007 (annexed as Ex. 108 to Koolyk Decl.) ("LTA Escrow I")
(July 2, 2007 entry).

There is probable cause to conclude that Stern engaged in a scheme to defraud by
promising Amusement 50 percent ownership in the Portfolio in return for its $13 million
investment.  As reflected in the LOU, Stern represented to Amusement that it would receive 50
percent ownership in the Portfolio.  See LOU.  This representation was false, as the terms of the
Citigroup loan prevented Stern and Safrin from collectively owning less than 51 percent.  See
Interim Loan Application at 8–9.  Moreover, Stern knew this representation was false.  See E-
mail from Stern to Koch (June 15, 2007, 10:43 EST) (annexed as Ex. 67 to Koolyk Decl.)
(forwarding signed copy of Interim Loan Application).

Amusement also contends that Stern acted fraudulently by submitting false and
misleading promissory notes, assignments, and warranty deeds to Amusement to induce it to
release the $13 million from escrow.  Pl. Mem. at 27, 45.  When the Colonial transaction was
scheduled to close, Amusement was reluctant to release the funds.  See, e.g., E-mail from Libraty
to Friedman (July 12, 2007, 12:12 EST) (annexed as Ex. 123 to Koolyk Decl.) (requesting mutual
releases).  In response, Friedman attempted to persuade Amusement to release the funds based on
a revised deal structure, which he dubbed "belt and suspenders."  Allen Alevy Dep. at
653:25–654:12.  On July 11, 2007, Friedman sent Amusement a $13 million promissory note with
Stern as the maker that was payable in 60 days, and assignments of ownership interests in MS
Colonial LLC ("MS Colonial Assignment") and the JSAE Colonial.  See July 11 Assignment and
Promissory Notes E-mail (attaching promissory note and assignments).  On July 12, 2007,
Friedman sent Amusement warranty deeds in the Portfolio properties, see E-mail from Friedman
to Libraty (July 12, 2007, 12:22 EST) (annexed as Ex. 171 to Koolyk Decl.) ("July 12 Warranty

Deeds E-mail"), and a $15 million promissory note with Stern as the maker payable within 60 days, E-mail from Friedman to Libraty, Stern & Steven Alevy (July 12, 2007, 15:49 EST) (annexed as Ex. 125 to Koolyk Decl.) ("July 12 Promissory Note E-mail").

There is probable cause to conclude that Stern committed wire fraud by submitting these assignments and warranty deeds.  See July 11 Assignment and Promissory Notes E-mail; July 12 Warranty Deeds E-mail.  The Citigroup agreement forbade assignments and encumbrances.  See Interim Loan Application at 8–9.  Despite this prohibition, Stern, acting through his counsel, created these documents as part of an effort to induce Amusement to release the $13 million from escrow.  See, e.g., July 12 Promissory Note E-mail (attaching promissory note and stating "Now, let's go" to indicate a need to release the funds from escrow).

In sum, there is probable cause to believe that Stern engaged in a scheme to defraud in his efforts to obtain financing from Amusement.

D.     Use of the $13 Million

Amusement also asserts Stern stole or converted the funds Amusement placed in escrow. Pl. Mem. at 23–26.  On or about July 2, 2007, Amusement deposited $13 million into an escrow account at LTA.  See LTA Escrow I.  Sragow, Amusement's attorney, informed Frenkel on several occasions not to release the funds without his authorization.  See E-mail from Sragow to LTA (July 10, 2007, 17:23 EST) (annexed as Ex. 179 to Koolyk Decl.) (instructing Frenkel to not release the funds without authorization from Sragow's office); Facsimile from Sragow to Frenkel & Sheina Zilberger, LTA (July 12, 2007) (annexed as Ex. 180 to Koolyk Decl.) ("[T]he $13,000,000 [is] not to be released from escrow without our written authorization.").

Even though no such written authorization was ever given prior to the release of the funds, Frenkel disbursed millions of dollars from the escrow account to various entities connected with

the Colonial transaction.  See Bank Statement of LTA's Escrow Management Account, dated July 31, 2007 (annexed as Ex. 127 to Koolyk Decl.) ("LTA Escrow II").  Evidence strongly indicates that Stern directed Frenkel where to wire the funds.  See Deposition of Ephraim Frenkel, dated Oct. 19, 2009 (annexed as Ex. 42 to Notice of Errata) ("Frenkel Dep."), at 592:15–593:11 (Stern directed Frenkel where to wire the money); E-mail from Stephen Stern, HSR, to Frenkel (July 11, 2007, 10:48 EST) (annexed as Ex. 31 to Koolyk Decl.) ("July 11 Stephen Stern E-mail") (stating that Stern gave Frenkel information necessary to wire funds from escrow account).

Under New York law, theft takes place when, "with intent to deprive another of property or to appropriate the same to himself or to a third person, [a person] wrongfully takes, obtains or withholds such property from an owner thereof."  New York Penal Law § 155.01; see also id. § 155.42.  Accordingly, there is probable cause to believe that Stern committed the crime of theft with respect to Amusement's funds when, in circumstances where he had already acted fraudulently to obtain the funds to begin with, he took control of those funds in the escrow account without permission and disbursed the funds to others.

E.    Money Laundering Following Release of the $13 Million

Citing 18 U.S.C. § 1956 (a)(1)(B), Amusement claims that Stern and Frenkel laundered the money following the release of the funds.  See Pl. Mem. at 12, 26–28.  Amusement alleges that the money laundering occurred through monetary transactions involving three law firms and one individual attorney: HSR, Tepfer, Reiss, and Minsky.  Id. at 26–28.

In order to prove that a person committed money laundering, it must be shown:

(1) that the [person] conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the [person] knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the [person] knew that the financial transaction was designed in whole or in

28

part to conceal or disguise the source, ownership, control, etc., of those proceeds [or to avoid a transaction reporting requirement under State or Federal law].

United States v. Maher, 108 F.3d 1513, 1527–28 (2d Cir. 1997).  A financial transaction includes, among other things, any transaction affecting interstate or foreign commerce "involving the movement of funds by wire or other means" or "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."  18 U.S.C. § 1956(c)(4).  Section 1956(c)(7) lists various offenses that constitute a "specified offense" including wire fraud.  See 18 U.S.C. § 1956(c)(7)(A) ("specified offenses" encompass offenses listed under 18 U.S.C. § 1961(1), including wire fraud under 18 U.S.C. § 1343).  The anti-money laundering statute, however, "does not criminalize the mere spending of proceeds of specified unlawful activity."  United States v. Stephenson, 183 F.3d 110, 120 (2d Cir. 1999).  Rather, the statute requires "proof of intent to conceal;" thus, "an ordinary purchase made with ill-gotten gains does not violate the money laundering statute."  Id. at 121; see also United States v. Gotti, 457 F. Supp. 2d 411, 423 (S.D.N.Y. 2006) ("'If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.'") (quoting United States v. Garcia-Emanuel, 14 F.3d 1469, 1474 (10th Cir. 1994)).

Amusement points to a number of transfers from and back to the escrow account that appear suspicious and unnecessary.  See Pl. Mem. at 26–28; LTA Escrow II.  However, Amusement has not shown probable cause to believe that Stern designed these transfers "in whole or in part to conceal or disguise the source, ownership, [or] control . . . of [the] proceeds."  Maher, 108 F.3d at 1528.  Indeed, there is simply no evidence on this point.  Accordingly, Amusement has not shown probable cause to believe that Stern committed the crime of money

29

laundering.

       F.      <u>Wire Fraud In Obtaining Financing from Petra Following the Close of the Transaction</u>

Amusement claims that Stern committed wire fraud in his dealings with a lender following the close of the Colonial transaction.  Pl. Mem. at 28–34.  Following the closing, Stern negotiated with Petra Mortgage Capital Corp. LLC ("Petra") to refinance a mezzanine loan that was part of the original financing.  <u>See</u> Preliminary Terms for Mezzanine Financing of the Colonial Mall Portfolio Between FRG Corp. & Petra, dated Aug. 2, 2007 (annexed as Ex. 136 to Koolyk Decl.).  In negotiating with Petra and its counsel, Proskauer Rose, LLP ("Proskauer"), Stern labeled Amusement's interest in the Portfolio "preferred equity" that had to be paid down within 60 days.  <u>See</u> E-mail from Robert Maccrone, Petra, to Andrea Anderson, Proskauer, Andrea Ascher, Proskauer, & John Bucci, Petra (Aug. 28, 2007, 10:37 EST) (annexed as Ex. 137 to Koolyk Decl.) ("Aug. 28 Petra E-mail") (stating Stern had represented that he had 60 days to pay off "preferred equity").

As previously noted, Friedman had sent to Amusement a $15 million promissory note on July 12, 2007.  <u>See</u> $15 Million Promissory Note.  That note did not, however, include language that matched the "preferred equity" label that Stern subsequently placed on Amusement's interest in negotiations with Petra.  As a result, Friedman transmitted to Petra an altered promissory note that included new language permitting Amusement, in the event of default, "to convert the unpaid Principal Balance, together with the interest accrued thereon, into a direct or indirect pro rata equity interest in First Republic Realty LLC . . . ."  E-mail from Friedman to Ascher & Anderson (Aug. 28, 2007, 18:49 EST) (annexed as Ex. 139 to Koolyk Decl.) ("Aug. 28 Friedman Promissory Note E-mail") (attaching Promissory Note Between Stern and

Amusement, dated July 12, 2007 ("Revised Promissory Note")); see also E-mail from Erica Sternin, BIR, to Bucci (Aug. 28, 2007, 17:29 EST) (annexed as Ex. 138 to Koolyk Decl.) ("Aug. 28 Sternin Promissory Note E-mail") (attaching Revised Promissory Note).  Aside from the additional language, the revised promissory note was exactly the same, including the signature of Stern and the date the note was made.  Compare $15 Million Promissory Note with Revised Promissory Note.  BIR was obviously acting at Stern's behest in making these transmissions. See Aug. 28 Sternin Promissory Note E-mail ("Please see the attached[, which was] requested to be sent by our client, Mark Stern.").  When asked about the altered promissory note at his deposition, Stern invoked his privilege against self-incrimination.  See Stern Dep. at 414:12–24.

Stern also misrepresented to Petra the nature of Safrin's ownership in the Portfolio.  In June 2007, he had represented to Citigroup that JSAE Colonial, an entity controlled by Safrin, owned 25 percent of FRGR Holding — the entity that owned and controlled the entities that borrowed from Citigroup.  See June 29 Organizational Chart E-mail (describing an organizational chart showing "Stern's entity with 75% and Joshua [Safrin's] entity with 25%").  In August 2007, Stern represented to Petra's counsel that JSAE Colonial only owned 13 percent of FRGR Holding, however.  E-mail from Friedman to Anderson (Aug. 9, 2007, 15:43 EST) (annexed as Ex. 164 to Koolyk Decl.) ("Aug. 9 Organizational Chart E-mail") (attaching organizational chart with JSAE Colonial having only a 13 percent interest in FRGR Holding). Stern has provided no evidence explaining the discrepancy.

Citigroup's approval was required before any refinancing of the loan with Petra could take place.  See E-mail from Fallon to Koch, Schuler & Ron Wechsler, Citigroup (Aug. 9, 2007, 10:22 EST).  On November 14, 2007, Stern sent a certification to Citigroup attesting that he had not "pledged any interest, direct or indirect, in any of the Properties."  E-mail from Stern to

Fallon (Nov. 14, 2007, 17:01 EST) (annexed as Ex. 147 to Koolyk Decl.) (attaching Certificate, dated Nov. 6, 2006). However, this certification was false as Stern had transmitted a signed agreement on July 11, 2007 assigning his interest in MS Colonial to Amusement. See MS Colonial Assignment.

Given the series of misrepresentations that Stern made to Petra and Citigroup following the close of the transaction, there is probable cause to believe that his attempts to obtain financing from Petra (including his efforts to obtain Citigroup's approval for that financing) constituted a scheme to defraud. Because e-mails were used in his attempts to obtain the financing, there is probable cause to believe that he committed wire fraud.

III.   COMMUNICATIONS WITH ATTORNEYS IN FURTHERANCE OF STERN'S CRIMES/FRAUDS

As noted, Amusement has shown probable cause to believe that Stern engaged in four fraudulent or illegal schemes: (1) Stern's efforts to obtain financing from J.P. Morgan; (2) Stern's efforts to obtain financing from Citigroup; (3) Stern's acquisition and theft of Amusement's $13 million; and (4) Stern's effort to obtain financing from Petra. Stern could not and did not effectuate these transactions without the assistance of attorneys. Indeed, the evidence shows that Stern frequently communicated with or transmitted documents to other parties to these transactions exclusively through his attorneys.

Stern identified Friedman as his "general coun[sel]" in the Portfolio transaction. See E-mail from Stern to Fleissig, Koch & Stern (May 9, 2007, 15:54 EST) (annexed as Ex. 13 to Koolyk Decl.).[8] Friedman specifically acted on Stern's behalf to obtain the $13 million from

_____

[8] As already noted, Stern used Friedman in various respects to obtain or transmit documents for which Safrin's signature was required, including for the transmission of documents that had forged signatures. See July 11 Assignment and Promissory Notes E-mail; E-

Amusement.  See, e.g., Allen Alevy Dep. at 25:14–21; Frenkel Dep. at 407:16–23; July 12

Promissory Note E-mail; Revised Privilege Log for Buchanan Ingersoll and Rooney, PC and

Stephen Friedman, Esq. (annexed as Ex. 66 to Koolyk Decl.) (entry ## 98–99).  Additionally,

Stern used BIR to transmit documents to Petra.  See Aug. 9 Organizational Chart E-mail; Aug.

28 Friedman Promissory Note E-mail; Aug. 28 Sternin Promissory Note E-mail.

　　　Stern used Herrick to negotiate with Citigroup.  See Deposition of Steven D. Fleissig,

dated Mar. 8, 2012 (annexed as Ex. 16 to Koolyk Decl.) ("Fleissig Dep."), at 21:20–25.

Herrick's opinion letters for Stern were submitted to Citigroup.  See, e.g., Letter from Herrick to

Citigroup Global Markets Realty Corp. (July 11, 2007) (annexed as Ex. 17 to Koolyk Decl.).

Additionally, Herrick attorneys had conversations with Stern regarding the deal expenses

submitted to Citigroup.  See Fleissig Dep. at 314:17–316:11.  With respect to the Safrin

signatures, Herrick attorneys received e-mails from "wizzy bizzy" attaching documents bearing

the forged signature of Safrin, which they then transmitted to Citigroup.  See, e.g., June 29

Wizzy Bizzy E-mail (Fleissig); July 2 Wizzy Bizzy E-mail (Cohen).

　　　Stern used HSR attorneys to communicate directly with the seller in the Colonial

transaction.  See, e.g., E-mail from Stephen Stern, HSR, to Brad Siegal (July 4, 2007, 00:33

EST) (annexed as Ex. 28 to Koolyk Decl.) ("regarding an expense item").  Stern also used HSR

attorneys by, for example, involving them in an analysis of the expenses Stern and Colonial each

assumed under the purchase and sales agreement, which necessarily involved considerations of

---

mail from Friedman to Cohen, Fleissig, Sean Moran, BIR, & James P. Weaver, BIR (June 26,
2007, 17:45 EST) (annexed as Ex. 91 to Koolyk Decl.); E-mail from Cohen to Friedman (June
26, 2007, 20:46 EST) (annexed as Ex. 94 to Koolyk Decl.); E-mail from Cohen to Friedman
(June 27, 2007, 16:25 EST) (annexed as Ex. 95 to Koolyk Decl.); E-mail from Friedman to
Fleissig (June 27, 2007, 18:05 EST) (annexed as Ex. 96 to Koolyk Decl.).

the false expenses.  See E-mail from Mark Geisler, HSR, to Stephen Stern (July 9, 2007, 16:22

EST) (annexed as Ex. 26 to Koolyk Decl.) (analysis considering expenses, such as fees assigned

for Ace and Roman).  Stern also used Stephen Stern as a conduit to send information to Frenkel

concerning his efforts to obtain Amusement's funds.  See July 11 Stephen Stern E-mail

(providing instructions to Frenkel).

       We have given just some examples of the involvement of BIR, Herrick and HSR to make

the larger point: that Stern's attorneys were being used by him precisely to undertake various

tasks that were required to effectuate the financial transactions at issue.  Stern does not and

cannot contest this fact.  Obviously, Stern could direct these attorneys only through his own

communications with them.  There is no suggestion that Stern consulted with these attorneys

about the loans and deals at the time they were being transacted for any purpose other than

bringing them to fruition.  Because we have found the transactions on which these attorneys

worked to each constitute illegal schemes devised by Stern, Stern's communications with his

attorneys to effectuate them were necessarily "in furtherance of" his illegal conduct.  See, e.g., In

re Grand Jury Subpoena, 419 F.3d at 343 n.12 ("upon the proper showing of the client's entire

representation's being in furtherance of the alleged crime or fraud,"a client's "entire file" may be

ordered disclosed); Cendant Corp. v. Shelton,  246 F.R.D. 401, 406 (D. Conn. 2007) (where

defendant "used the legal services of . . . two attorneys to form and/or operate vehicles for

carrying out the fraud, . . . that establishes probable cause to believe that the assistance of each of

these two attorneys with respect to the areas as to which [plaintiff] seeks to question them was

sought in furtherance of the fraud").

       In his brief on this motion, Stern asserts that plaintiffs are seeking documents simply

because there were attorney-client communications "around the time" Stern allegedly committed

fraud.  Def. Mem. at 23.  But the Court is not finding that the privilege is lost with respect to any communications with these attorneys – regardless of the time period – as to any other transactions or matters.  Only Stern's communications with his attorneys to effectuate the four transactions must be revealed.  Stern would apparently limit plaintiffs to identifying particular communications to counsel seeking advice as to the legality of the scheme or the bona fides of particular representations.  See id. at 27.  But Stern's communications with his attorneys at the time the transactions were being undertaken were themselves in furtherance of the scheme because Stern effectuated the scheme by using these attorneys to advise him on the transactions and to communicate with others on his behalf in order to implement the transactions.  Stern does not even marshal any evidence to dispute this fact.  Nor does he claim that his communications with these attorneys on these transactions were for a purpose other than to bring the transactions to fruition.

Accordingly, we find probable cause to believe that Stern's communications with BIR, Herrick, and HSR concerning the subject matter of the four transactions at the time they were being undertaken were communications "in furtherance of a crime or fraud." Jacobs, 117 F.3d at 87.  The Court makes no finding that any of these attorneys had any knowledge that they were being used by Stern for fraudulent or illegal purposes.  Nor is such a finding necessary for the crime/fraud exception to be applicable since the crime-fraud exception applies even if the attorney has no inkling that the matter he or she is working on involves any improper conduct. See, e.g., Clark, 289 U.S. at 15; United States v. Kerik, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008).

IV.    CONCLUSION

Plaintiffs' motion to compel based on the applicability of the crime-fraud exception

(Docket # 649) is granted to the extent discussed herein.

Any communication between Stern and Buchanan Ingersoll & Rooney, P.C.; Herrick, Feinstein LLP; or Hoffinger Stern and Ross, LLP concerning (1) Stern's efforts to obtain financing from J.P. Morgan; (2) Stern's efforts to obtain financing from Citigroup; (3) Stern's acquisition and use of Amusement's $13 million; or  (4) Stern's efforts to obtain financing from Petra at the time the transactions were being undertaken are deemed unprotected by the attorney-client privilege and the work product doctrine.  The parties are directed to produce forthwith all unprotected documents previously withheld.

SO ORDERED.

Dated: February 11, 2013
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

36