UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC., et al.              :
                                                              OPINION AND ORDER
                              Plaintiffs,     :   07 Civ. 11586 (LAK) (GWG)

          -v.-                                :

MOSES STERN, aka Mark Stern, et al.:          :

                              Defendants.     :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Amusement Industry, Inc., Practical Finance Co., Inc., Joshua Safrin, Avery Egert, and the Safrin Group, LLC (collectively the "Moving Parties") have moved to amend their pleadings pursuant to Fed. R. Civ. P. 15(a)(2) and Fed. R. Civ. P. 21.  The Moving Parties seek to assert claims for "deceit" under New York Judiciary Law § 487 against Buchanan Ingersoll & Rooney, P.C. ("Buchanan") and Stephen Friedman, who are currently parties, and to join as new parties Hoffinger Stern & Ross LLP ("Hoffinger") and Stephen Stern, who are or were attorneys appearing in this case.  The proposed claims for deceit are premised on the alleged wrongful conduct of these attorneys during the discovery phase of this litigation.  Buchanan and Friedman — whom we will refer to as "the Attorneys" — have filed submissions opposing the motion. For the following reasons, the motion to amend is denied.

I.        BACKGROUND

          A.        The Parties' Allegations in the Current Pleadings

In April 2007, defendant Moses Stern, operating through an entity called First Republic Group, Corp. ("FRG"), entered into a contract with non-party Colonial Realty Limited Partnership for the purchase of a real estate portfolio consisting of eleven shopping centers.  See

Third Amended Complaint, filed Apr. 27, 2010 (Docket # 405) ("3d Am. Compl."), ¶¶ 2, 20.[1]
As the closing date approached, Moses Stern still had not obtained the required amount of
financing for the acquisition, so he authorized Steven Friedman, an attorney at Buchanan, to help
locate potential sources of financing.  See id. ¶¶ 2, 22.  Defendants Joshua Safrin and Avery
Egert, "who were contributing money to facilitate the acquisition of the Portfolio," also allegedly
played a role in securing the additional funds needed for the closing.  See id. ¶ 2.

        In June 2007, Friedman approached plaintiff Amusement Industry, Inc. ("Amusement")
and "offered Amusement the opportunity to invest in the Portfolio."  Id. ¶ 23.  Friedman
"repeatedly represented to Amusement that he had been retained by [Moses] Stern, Safrin, Egert,
and the entity designated to buy the Colonial Portfolio, which was FRG Corp. and/or FRG LLC,
to act as an attorney for them and to serve as an agent for them to locate, negotiate and close
financing for the planned acquisition of the Portfolio."  Id. ¶ 25.  In reliance on Friedman's
representations, on June 29, 2007, Amusement executed a Letter of Understanding with Moses
Stern in which Amusement agreed to provide $13 million in financing in exchange for a 50
percent equity and voting interest in the portfolio.  See id. ¶¶ 29-31.  Amusement thereafter
deposited the $13 million into an escrow account pending finalization of the agreement.  See id.
¶¶ 2, 32-33.  Over the course of the next two weeks, Amusement attempted to negotiate the final
agreement with Moses Stern and the other defendants.  See id. ¶ 35.  However, instead of

---

[1] See also Proposed Fourth Amended Complaint; Demand for Jury Trial (attached as Ex.
A to Declaration of Mariana Aguilar in Support of Moving Parties' Notice of Joint Motion to
Amend Their Pleadings, filed May 9, 2014 (Docket # 759) ("Aguilar Decl.")) ("Prop. Compl.");
Joshua Safrin's Fourth Amended Third-Party Complaint and Demand for Jury Trial (attached as
Ex. A to Declaration of Thomas M. Wood IV in Support of Moving Parties' Notice of Joint
Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 758) ("Wood Decl.")) ("Safrin
Prop. Pl.").

finalizing the financing agreement with Amusement, defendants unilaterally transferred the $13 million out of the escrow account and completed the purchase of the portfolio "without [Amusement's] permission and knowing that they did not have [its] permission." Id. ¶¶ 3-4; see also id. ¶ 40.  Specifically, Amusement alleges that on July 3, 2007, defendant Ephraim Frenkel, who was the principal of Land Title Associates Agency, LLC ("LTA"), "transferred Amusement's money from the account into which Amusement had wired the funds into once controlled by FRG . . . [and] disbursed the $13 million in accordance with instructions from Stern [and] FRG."  Id. ¶ 3.  Defendants subsequently attempted to have Amusement ratify the unauthorized use of its funds, but Amusement refused.  See id. ¶ 4.

Joshua Safrin, who was alleged to have been involved as one of the key investors in defendants' real estate scheme, later contended that "he had no knowledge of any of the representations or actions described in [Amusement's] Complaint" and that he was "unaware of the existence of the Colonial Transaction and the events that occurred in connection with securing the necessary financing until shortly before being served with process in late 2007." See Safrin Prop. Pl. ¶¶ 8-9.  According to Safrin, "[Moses] Stern, Friedman, [and FRG] together with Frenkel, LTA, Buchanan, Steven Alevy/Bankers were an integral part of a conspiracy to defraud Safrin by, among other things, forging his signature on documents relating to the Colonial Transaction . . . and by misappropriating Safrin's identity . . . in order to secure financing for the Colonial Transaction.  Id. ¶ 10.  Safrin alleges that, when Friedman was negotiating with Amusement on Moses Stern's behalf, Friedman represented that "Safrin and/or Egert were equity participants in the Colonial Transaction, when [he] knew that neither Safrin nor Egert had made any such commitment and that Egert was not authorized to make any such commitment on behalf of Safrin."  Id. ¶ 39.

3

According to Safrin, Moses Stern was able to obtain "a commitment from Citigroup to provide senior and mezzanine financing in the amount of approximately $126 million for the purchase of the Portfolio" based on his "representation to Citigroup that Safrin was a sponsor/investor and would sign carve out and environmental guarantees." Id. ¶¶ 40-41.  As part of the negotiations for this transaction, Citigroup required that certain financing and organizational documents be signed by Safrin.  Id. ¶ 51.  Thus, many documents pertaining to the financing agreement with Citigroup, as well as to the closing of the Colonial Transaction, purported to contain Safrin's signature.  See id. ¶¶ 37, 84, 88, 105, 128, 133-34.  However, Safrin contends that he did not sign any documents relating to the negotiations with Citigroup or Amusement and that he was not even aware of the Colonial Transaction until much later.  See id. ¶¶ 47, 50, 52, 90, 100, 125.  Safrin alleges that certain defendants, including Stern, Buchanan, and Friedman, conspired to forge his signature on these documents.  See id. ¶¶ 165-73; see also id. ¶ 87.  Safrin has pointed to certain contemporaneous emails between Moses Stern, attorneys at Buchanan and others — referred to as the "wizzy bizzy" emails — in which these individuals discussed the need for Safrin's signature and exchanged various documents containing forgeries of Safrin's signature.  See id. ¶¶ 84-91, 103-05.  As explained by the Moving Parties, wizzy bizzy is "the anonymous email sender who took part in the forgery of Safrin's signatures on the Citigroup loan document."  See Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 765) ("Mov. Reply"), at 5.

B.      The Alleged Discovery Misconduct

On December 27, 2007, Amusement and a related company filed the original complaint in this action, seeking to recover $13 million in damages from Moses Stern, Joshua Safrin

4

Ephraim Frenkel and other defendants.  See Complaint, filed Dec. 27, 2007 (Docket # 1).

Amusement raised "claims asserting a security interest in the real estate . . . claims of tort

resulting from the theft of the funds . . . [and] claims related to the agreements reached between

the parties and the unjust enrichment of the defendants."  3d Am. Compl. ¶ 5.  Since the filing of

the original complaint, this case became increasingly complex as other parties have been joined

as third party defendants, including Stephen Friedman, Steven Alevy, Buchanan, and Bankers

Capital Realty Advisors LLC.  See Third Party Complaint, filed May 1, 2008 (Docket # 65).

Later, Avery Egert and the Safrin Group, LLC were sued as fourth party defendants.  See Fourth

Party Complaint, filed Mar. 17, 2009 (Docket # 238).  The various parties have asserted

numerous counterclaims, cross-claims, and third party claims.

On March 12, 2008, plaintiffs issued a subpoena to Buchanan, which at that time was a

non-party, requesting documents concerning its representation of Moses Stern in the underlying

real estate transaction and about Stephen Friedman's financing negotiations with Amusement.

See Prop. Compl. ¶ 61.  Specifically, plaintiffs requested: "Documents sent by [Buchanan] to,

and received by [Buchanan] from, Amusement, [Moses Stern], [FRG], [and] Safrin . . .

concerning the loans and First Republic LLC's purchase of shopping centers from Colonial in

2007"; "Documents concerning monies received by [Buchanan] or by Friedman from

Amusement, [Moses] Stern, [FRG], [and] Safrin . . . during the period of April 1, 2007 through

December 31, 2007 as to the loans and First Republic LLC's purchase of shopping centers from

Colonial in 2007"; "Documents that contain information to induce Citigroup to make the loans";

and "Signature pages that contain a signature of Joshua Safrin, from Documents concerning

business or loan transactions."  Id. (emphasis removed).  On March 7, 2008, defendant Safrin

similarly issued subpoenas to Buchanan and to Friedman, seeking, "documents concerning

Safrin," "documents concerning the negotiation and execution of the Loan Agreement between First Republic LLC and Citibank," "documents concerning the negotiation and execution of the Mezzanine Loan Agreement between [FRG] and Citibank," and "documents and communications concerning the closing of the sale of the Property Portfolio." Id. ¶ 62.

Before Buchanan and Friedman complied with the subpoenas, they were contacted by attorneys at Hoffinger about the proper scope of the document production. See id. ¶ 64. At that time, Hoffinger and Stephen Stern of that firm were representing Moses Stern in the litigation. See Notice of Appearance by Stephen Stern, filed Apr. 11, 2008 (Docket # 50). On April 1, 2008, Stephen Stern wrote a letter to Buchanan attorney John Leathers, stating, "[w]e have been instructed to advise [you that] our clients do NOT waive any privilege including, inter alia, the attorney client privilege with respect to any files, documents, communications, etc. in your custody, possession or control and as an outgrowth of your representation of any of our clients." Stephen Stern Letter to Hoffinger, dated Apr. 1, 2008 (annexed as Ex. 1 to Declaration of Jeffrey H. Zaiger in Support of Buchanan Ingersoll & Rooney PC's Opposition to Moving Parties' Joint Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 762) ("Zaiger Decl.")). There followed various communications among Stephen Stern, Leathers, and Friedman regarding Stephen Stern's review of the production and privilege log. See April 22 Email Chain, dated Apr. 22, 2008 (annexed as Ex. 2 to Zaiger Decl.). Over the next couple weeks, Stephen Stern searched through the responsive documents and discussed with several attorneys at Buchanan which subpoenaed documents should be withheld. See April 23 & 24 Email Chain, dated Apr. 24, 2008 (annexed as Exs. 3-4 to Zaiger Decl.); May 6 & 7 Email Chain, dated May 7, 2008 (annexed as Ex. 5 to Zaiger Decl.). These emails reflect that there was some disagreement between Stephen Stern and the Buchanan attorneys about the proper scope of the document

6

request and about which documents should be withheld.  See generally id.

On May 8, 2008, Buchanan and Friedman produced documents and a privilege log in response to plaintiffs' and Safrin's subpoenas.  Prop. Compl. ¶ 63.  The Moving Parties allege, however, that Buchanan and Friedman "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and that they did so by listing "some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs."  Id.  The Moving Parties further contend that "[Hoffinger] and Attorney [Stephen] Stern communicated with [Buchanan] concerning the production and the privilege log," and Hoffinger and Stephen Stern "had asserted that, as counsel for [Moses] Stern[,] . . . they had the 'right to review the documents and privilege log' prior to the production."  Id. ¶ 64.  Thus, it is alleged, "[Buchanan] permitted [Hoffinger] and Attorney [Stephen] Stern to participate in the document review process and on April 23, 2008, Attorney [Stephen] Stern went to [Buchanan's] offices to review the documents prepared for production and [Buchanan's] proposed privilege log."  Id.

Based on this conduct, the Moving Parties allege in their proposed complaint that Buchanan, Hoffinger, Friedman, and Stephen Stern "engaged in an intentional pattern of deceit and collusion with the intent to deceive Plaintiffs and the United States District Court for the Southern District of New York."  Id. ¶ 149.  Specifically, Moving Parties assert that these individuals and entities "participated in the May 2008 Production and in the preparation of the May 2008 Privilege Log, which wrongfully omitted certain key documents from the production and improperly listed documents on the privilege log . . . [and] did so with the intent to deceive Plaintiffs and the Court by attempting to conceal the true nature of [Moses] Stern's scheme and

the involvement of Friedman in that scheme."  Id. ¶ 150.

The Moving Parties assert that the documents that were improperly withheld include:

a. A June 29, 2007 3:18 p.m. email where Friedman forwarded to Stern an email that he had previously sent to Egert with the subject line: "Let's talk."  Friedman then stated in the body of the email: "Here are all the documents."  Attached to the email were signature pages that Citigroup needed Safrin to sign for the Colonial deal to close including: (1) the Directorship Agreement; (2) the JSAE Colonial LLC Operating Agreement; (3) the FRGR Holdings LLC Operating Agreement; (4) the Guaranty; (5) the Environmental Indemnity; and (6) the Officer's Certificate.

b. A June 29, 2007 3:21 p.m. email that Friedman sent to Stern with the subject line: "Signature Examples." Friedman then stated in the body of the email: "Signature Examples."  Attached to that email were five emails from Joseph Kelemer, an employee of The Safrin Group, attaching various examples of what purported to be Joshua Safrin's signature.

c. A July 11, 2007 3:09 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy attaching an email from wizzy bizzy to Herrick Feinstein, LLP ("Herrick") attorney Dena Cohen ("Cohen") attaching Safrin's purported signature on Colonial deal-related documents.

d. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Cohen attaching Safrin's purported signature on Colonial deal-related documents.

e. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Stephen Fleissig attaching Safrin's purported signature on Colonial deal-related documents.

Id. ¶ 65.[2]

---

[2] Buchanan's former counsel David Bayne explains in his declaration that all of these withheld documents were identified on the May 2008 privilege log except the email from June 29, 2007, at 3:18 p.m.  See Declaration of David F. Bayne, filed May 30, 2014 (Docket # 763) ("Bayne Decl."), ¶ 5.  According to Bayne, the email from June 29, 2007, at 3:18 p.m., was not included on the privilege log because it "was located in the wrong client folder."  Id. ¶ 4(a).

C.     The Moving Parties Become Aware of the Discovery Misconduct

On August 28, 2009, David Miller, counsel for Safrin and fourth party defendants Avery

Egert and the Safrin Group, wrote a letter to Buchanan's counsel about certain documents that

had been listed on the privilege log that Miller suspected were "not protected by the attorney-

client privilege."  Miller Letter to Bayne, dated Aug. 28, 2009 (annexed as Ex. 7 to Zaiger

Decl.), at 1.  Miller noted that the privilege log contained "at least three documents concerning

'Safrin'" but that it was not at all clear about the nature and scope of such documents.  Id. at 2.

Accordingly, Miller requested that Buchanan "identify with specificity any documents pertaining

to Joshua Safrin, Avery Egert and/or The Safrin Group that have been withheld on grounds of

privilege and provide sufficient information so that [they] may determine whether good cause

exists for seeking an order compelling the production of those documents."  Id.  Buchanan's

counsel forwarded the letter to Stephen Stern in an email, writing, "[b]ecause the privilege

belongs to your clients we wanted to bring you into this conversation promptly."  August 28

Email to Stephen Stern, dated Aug. 28, 2009 (annexed as Ex. 8 to Zaiger Decl.).

On September 8, 2009, Buchanan's counsel responded to Miller's August 28 letter.  See

September 8 Letter to Miller, dated Sept. 8, 2009 (annexed as Ex. 9 to Zaiger Decl.) ("Bayne

Letter").  Buchanan noted in the letter that it had "forwarded [the] correspondence to [Hoffinger]

for consideration because the privilege . . . belongs to their clients . . . [and Buchanan] is simply

a stake holder in this dispute."  Id. at 1.  Buchanan then asserted that the privilege had properly

been claimed for the withheld documents, arguing that "[Buchanan's] role in the Colonial

Transaction was as legal counsel for [Moses] Stern and his affiliated entities.  If you have reason

to believe that [Buchanan] acted in some other capacity, then please provide us with the basis for

your belief.  Similarly, if you have evidence that [Buchanan] rendered purely commercial advice

on any specific topic rather than legal advice, please provide us with your evidence." Id. at 2.

Buchanan stated that it was refusing to "provide additional information about each of the

thousands of documents on the privilege log," contending that this request "appears to be aimed

more at diverting our time and spending our client's money than it does with any good faith

discovery dispute." Id. at 2-3.  Nevertheless, Buchanan conceded, "[i]f there are specific

documents on the log about which you are interested in gaining more information to assess the

claim of privilege, then please identify such documents . . . and we will determine with

[Hoffinger] whether there is more information that we can provide." Id. at 3.  Additionally,

Buchanan agreed to "review the specific entries identified in [the] letter mentioning 'Safrin' and

will consult with [Hoffinger] concerning whether to continue to maintain the assertion of the

privilege over them and will advise [Miller] of their decision." Id.

On October 6, 2009, Buchanan's counsel wrote another letter to Miller, stating, "we have

been authorized by [Hoffinger] to produce the documents bates stamped . . . BIRFR0005909-20,

which are attachments to a privileged email over which [Hoffinger] continues to assert the

privilege . . . . We will produce these documents to all parties shortly."  October 6 Letter to

Miller, dated Oct. 6, 2009 (annexed as Ex. 10 to Zaiger Decl.) ("October 6 Letter").  On October

19, 2009, Buchanan followed through on this promise by producing these and other documents

on a disc, and providing "a supplemental privilege log of documents from this production that

[Moses] Stern's counsel has designated as being covered by the attorney client privilege."

October 19 Letter from Bayne, dated Oct. 19, 2009 (annexed as Ex. 12 to Declaration of Thomas

M. Wood in Support of Moving Parties' Reply in Support of Their Joint Motion to Amend Their

Pleadings, filed June 16, 2014 (Docket # 767) ("Wood Supp. Decl.")).  Among the documents

produced in October 2009 were some of the documents the Moving Parties now assert had been

10

improperly and deliberately withheld in the May 2008 production.  Specifically, "[t]he

attachments to the June 29, 2007 3:21 p.m. email from Stephen Friedman to [Moses] Stern

. . . were produced in October 2009 bates-numbered BIRFR0005909-0005920" but "[t]he cover

email, which had been identified [in the privilege log]," was not produced until July 2013.

Bayne Decl. ¶ 4(b).  Counsel for Safrin, Thomas Wood, asserts that when Buchanan made this

production in October 2009, it should have "produce[d] the entire Signature Examples email

with all of its attachments (BIRFR005908-5920) and redact[ed] the purportedly privileged

communication on the email."  Wood Supp. Decl. ¶ 15.  Wood also asserts that because

Buchanan "release[d] only the attachments . . . without any metadata," this "ma[de] it impossible

for the Moving Parties to determine that the released documents were attachments to the

Signature Examples email and not just five separate emails with attachments."  Wood Supp.

Decl. ¶ 15.  The Court notes that, notwithstanding this assertion, Buchanan's October 6 Letter to

Miller specifically stated that Buchanan would be producing "documents bates stamped . . .

BIRFR0005909-20, which are attachments to a privileged email."  October 6 Letter.

On May 31, 2012, after all of the parties except Buchanan had been deposed, Buchanan

produced a revised privilege log and also produced "approximately 895 documents previously

withheld as privileged or non-responsive."  Wood Supp. Decl. ¶ 16.  It was at this point that

Buchanan produced most of the documents now at issue including "[t]he July 11, 2007 3:09 p.m.

email from Mark Stern to Stephen Friedman," "[t]he July 11, 2007, 3:16 p.m. email from Mark

Stern to Stephen Friedman attaching email to Dena Cohen," and "[t]he July 11, 2007 3:16 p.m.

email from Mark Stern to Stephen Friedman attaching email to Stephen Fleissig."  Bayne Decl.

¶¶ 4(c)-(e).  Although the produced documents "were originally electronic documents consisting

of emails with attachments," Buchanan "unilaterally and without explanation produced them in a

11

format that stripped them of all metadata making it more burdensome and difficult, if not

impossible, for the Moving Parties to use the information efficiently."  Wood Supp. Decl. ¶ 16.

From June 2012 until November 2012, Buchanan's counsel and Safrin's counsel engaged in

various communications during which Safrin's counsel attempted to obtain "native files or tiffs

with metadata and extracted text" of the aforementioned documents.  See Metadata Emails

(annexed as Ex. 13 to Wood Supp. Decl.), at 1.

> In a letter dated October 9, 2012, Safrin's counsel, Thomas Wood, wrote the following:
>
> [Buchanan's] May 2012 production included approximately 895 documents that [Buchanan] withheld for over four years based on claims that the documents were either irrelevant or privileged . . . . [Buchanan] then produced documents that are not even arguably privileged and are critical to [Safrin's] claims and defenses . . . .  [Buchanan's] decision to withhold documents identified by Bates Nos. BIRFR0004777-80, BIRFR0004794-4796, BIRFR0004830-4832, which are the emails from Mark Stern to Stephen Friedman forwarding emails sent from wizzy bizzy to Mark Stern containing signature pages with Safrin's forged signature, for over four years is incomprehensible. It is even more troubling in light of the fact that between August and October 2009, David Miller . . . objected to [Buchanan's] assertion of privilege over documents identified in [Buchanan's] privilege log as involving 'Safrin' and asked [Buchanan] to review all the documents identified on its privilege log . . . . [Buchanan] claimed that Egert, The Safrin Group and Safrin were on a 'fishing expedition' and refused to review the documents or revise the privilege log . . . . By refusing to revise the log, [Buchanan's counsel] essentially concealed the nature of many of the documents identified on the privilege log and prevented Safrin from being able to properly assess [Buchanan's] assertion of privilege.  The result is that Safrin had to wait two more years to receive critical emails that are in no way privileged . . . . The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery responses.

Id. at 8-9.  In another letter dated November 16, 2012, Wood further contended:

> [Buchanan] has an affirmative obligation under Federal Rules of Civil Procedure 26(e) to correct any erroneous assertions of privilege . . . . Contemporaneous communications in 2008 demonstrate it was [Buchanan] not Mark Stern or [Hoffinger] that reviewed the responsive documents, determined which documents to withhold as privileged, and prepared the privilege log with no apparent input from Stern or [Hoffinger] . . . . It was [Buchanan's] in-house counsel that made the initial determination of which documents were subject to a valid claim of privilege and then certified that they had a reasonable

basis for withholding the documents based on claims of privilege.  Having done so, [Buchanan] remains responsible to supplement or correct those assertions.

Id. at 17-18.  In the same letter, Wood asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading."  Id. at 20.  Wood continued, "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege.  If [Buchanan] had identified [these] Email Messages . . . on its May 2008 privilege log, Mr. Safrin would have challenged the assertion of privilege and discovered these critical communications."  Id.  In May 2013, Buchanan still had not produced the metadata or native copies of the documents, so the parties brought this issue to the attention of the Court.  See generally Letters to the Honorable Gabriel W. Gorenstein, dated May 2013 (annexed as Exs. 15-16 to Wood Supp. Decl.).

Meanwhile, Amusement, together with several other parties, filed a motion to compel Buchanan and other parties to produce certain documents pursuant to the crime-fraud exception to the attorney-client privilege.  See Notice of Motion and Motion to Compel, filed June 6, 2012 (Docket # 649).  On February 11, 2013, this Court granted the motion to compel and identified certain categories of documents that were to be produced.  See Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 440-41 (S.D.N.Y. 2013).  In compliance with the order, in July 2013 Buchanan produced, among other documents, the "June 29, 2007 3:21 p.m. email from Stephen Friedman to Mark Stern," which was bates-numbered BIRFR0005908.  Bayne Decl. ¶ 4(b).[3]

---

[3] This document was the cover email to the attachment documents that had been produced in October 2009.

At the same time, Buchanan produced "[t]he June 29, 2008 3:18 p.m. email from Stephen Friedman to Mark Stern bates-numbered BIRFR0047204-0047227."  Id. ¶ 4(a).  When producing it, Buchanan's counsel explained that it had not previously been produced because it was "saved in a folder for a different client which is why it was not part of [Buchanan's] document production in this case."  July 11 Baynes Email, dated July 11, 2013 (annexed as Ex. 18 to Wood Supp. Decl.), at 4.  However, the Moving Parties allege, "when [Buchanan] produced the files for that deal, the email was missing form those files as well."  See Mov. Reply at 8; see also Declaration of Craig H. Missakian in Support of Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 766) ("Missakian Decl."), ¶¶ 3-5.

   D.      The Filing of the Instant Motion

   Soon after the July 2013 production, the Court approved an amended discovery schedule, which set the following deadlines: February 18, 2014, as the close of all fact discovery; July 11, 2014, as the close of all expert discovery; and August 15, 2014, as the date by which all pre-motion letters for dispositive motions must be filed.  See Endorsed Letter, filed Aug. 20, 2013 (Docket # 708).  On November 26, 2013, the Court granted the parties' request to stay discovery pending a mediation scheduled for February 4, 2014.  See Endorsed Letter, Nov. 26, 2013 (Docket # 733).  On December 11, 2013, Stephen Stern was permitted to withdraw as Moses Stern's counsel.  See Stipulation and Order, filed Dec. 11, 2013 (Docket # 736).  Meanwhile, the stay of discovery was extended to March 10, 2014.  See Order, filed Jan. 28, 2014 (Docket # 737).  After receiving notification that the parties failed to reach a settlement, the Court lifted the discovery stay on March 17, 2014.  See Endorsed Letter, filed Mar. 17, 2014 (Docket # 739).  On March 28, 2014, the Court approved a new discovery schedule setting the fact discovery

deadline for June 30, 2014, expert discovery deadline for October 17, 2014, and the deadline for

filing pre-motion letters for dispositive motions for October 17, 2014.  See Amended Schedules,

filed Mar. 28, 2014 (Docket # 741) ("March 2014 Schedule").[4]

On May 6, 2014, the Moving Parties sought permission to make the instant motion to

amend the pleadings, which was granted.  See Order, filed May 7, 2014 (Docket # 750).  They

filed their joint motion to amend their pleadings three days later.  See Plaintiffs, Third-Party

Plaintiff Joshua Safrin, Defendant Avery Egert and Fourth Party Defendant The Safrin Group,

LLC's Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 755).  In

support of their motion, the Moving Parties have submitted legal memoranda, declarations,

accompanying exhibits, and copies of the proposed amended pleadings.[5]  Buchanan and

Friedman have submitted legal memoranda as well as declarations and exhibits in opposition to

the joint motion to amend.[6]

## II.    LAW GOVERNING MOTIONS TO AMEND

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend]

---

[4] Thus, fact discovery is now closed, with the exception of some residual matters. However, the expert discovery and pre-motion letter deadlines have been extended by several months.

[5] See Moving Parties' Memorandum in Support of Their Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 756) ("Mov. Mem."); Declaration of Michael C. Rakower in Support of Joint Motion to Amend Pleadings, filed May 9, 2014 (Docket # 757) ("Rakower Decl."); Avery Egert's Proposed Answer to Plaintiffs' Proposed Fourth Amended Complaint (annexed as Ex. 1 to Rakower Decl.); Wood Decl.; Safrin Prop. Pl.; Aguilar Decl.; Prop. Compl.; Mov. Reply; Missakian Decl.; Wood Supp. Decl.

[6] See Buchanan Ingersoll & Rooney PC's Memorandum of Law in Opposition to Moving Parties' Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 761) ("Buchanan Mem."); Zaiger Decl.; Bayne Decl.; Memorandum of Stephen Friedman in Opposition to Motion to Amend, filed May 30, 2014 (Docket # 764) ("Friedman Mem.").

when justice so requires."  Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party . . . [or] futility of amendment."  Foman v. Davis, 371 U.S. 178, 182 (1962); accord Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).  The Second Circuit has characterized Rule 15 as encompassing a "liberal" amendment policy.  See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008).  A motion to amend under Rule 15(a)(2) may be made at any stage of the litigation, see, e.g., Laurent v. PricewaterhouseCoopers LLP, 2012 WL 3614043, at *3 (S.D.N.Y. Aug. 15, 2012), and "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith,'" AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010) (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993)).  Under Rule 15(a)(2), the "non-movant bears the burden of showing prejudice, bad faith and futility of the amendment."  Grant v. Citibank (S.D.), N.A., 2010 WL 5187754, at *6 (S.D.N.Y. Dec. 6, 2010) (citations omitted).[7]

III.    DISCUSSION

---

[7] In circumstances where a scheduling order sets a deadline for amending a complaint, however, the more onerous "good cause" standard under Rule 16(b) applies.  See Parker v. Columbia Pictures Indus., 204 F.3d 326, 339-40 (2d Cir. 2000); accord Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003); Lincoln v. Potter, 418 F. Supp. 2d 443, 453 (S.D.N.Y. 2006) ("When a party moves to amend the pleadings after the deadline to do so in the court's scheduling order has passed, he must satisfy the good cause requirement of Fed. R. Civ. P. 16(b) . . . .").  That is, a court can properly "deny[ ] leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."  Parker, 204 F.3d at 340.  The "primary consideration" in determining whether good cause has been shown "is whether the moving party can demonstrate diligence."  Kassner v. 2nd Avenue Delicatessen Inc, 496 F.3d 229, 244 (2d Cir. 2007).  Here, the Moving Parties appear to concede that the Court's deadline to amend passed years before the filing of their motion and thus that the Rule 16's "good cause" standard applies.  See Mov. Reply at 32.  Nevertheless, we do not consider the applicability of the "good cause" standard because the motion fails under the more liberal Rule 15(a)(2) standard.

16

As noted, the Moving Parties seek to add claims against current parties, Buchanan and Friedman, and non-parties, Stephen Stern and Hoffinger, for violation of section 487 of the New York Judiciary Law based on their claim that these parties wrongfully omitted key documents from their document production and instead improperly and misleadingly listed them on the privilege log.  See Prop. Compl. ¶ 150.  Section 487 provides that "[a]n attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is liable to "the party injured [for] treble damages, to be recovered in a civil action."  N.Y. Jud. Law § 487(1); accord Polanco v. NCO Portfolio Mgmt., Inc., 2014 WL 2483180, at *9 (S.D.N.Y. June 3, 2014) ("Section 487(1) . . . allows for claims against attorneys who engage in acts of deceit or collusion that are directed at a court or that occur during the course of a pending judicial proceeding.") (internal quotation marks and citation omitted).  The Attorneys have raised various grounds in opposition to the motion, including futility and prejudice.  We focus our attention exclusively on the issue of delay and prejudice as it is sufficient to dispose of the motion.

The Second Circuit has held that an amendment prejudices a non-moving party when, among other things, "the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute."  Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000).  Case law further explains that "'[o]ne of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.'"  MHANY Mgmt. Inc. v. Cnty. of Nassau, 843 F. Supp. 2d 287, 341 (E.D.N.Y. 2012) (quoting H.L. Hayden Co. v. Siemens Med. Sys., 112 F.R.D. 417, 419 (S.D.N.Y. 1986) (collecting cases)).

17

With these principles in mind, we believe several circumstances weigh against granting leave to amend.  First, while not dispositive, the Moving Parties waited for a significant period after becoming aware of the Attorneys' wrongful discovery conduct before filing the instant motion to amend.  While it is well-established that "delay, standing alone, is an insufficient basis to deny leave to amend," U.S. for and on Behalf of Mar. Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi., 889 F.2d 1248, 1254 (2d Cir. 1989) (citations omitted), a court "plainly has discretion . . . to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice" the non-movant, Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990).  In general, "'[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.'"  Evans v. Syracuse City Sch. Dist., 704 F.2d 44, 47 (2d Cir. 1983) (quoting Advocat v. Nexus Indus., Inc., 497 F. Supp. 328, 331 (D. Del. 1980)).

While the alleged wrongful discovery conduct occurred in 2008, see Prop. Compl. ¶¶ 63-64, we measure the delay from the time the Moving Parties became aware of the facts that serve as the basis for their proposed claims, see, e.g., Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 304 (N.D.N.Y. 2013) (denying motion to amend where "despite being aware, even before she commenced this action, of the protected activity she now seeks to add to her Complaint, Plaintiff failed to move to amend in a timely fashion"); Suro v. United States, 107 F. Supp. 2d 206, 210 (E.D.N.Y. 2010) (denying motion to amend where "Plaintiffs have long had notice of a potential claim against [the party that they wish to join]").  The Moving Parties explain that they "discovered [some of the wrongfully withheld] emails in May 2012, when [Buchanan] released documents from its privilege log" and that they then "took immediate steps to determine the extent of [Buchanan's] concealment."  Mov. Reply at 33-34.  They contend that

18

"any 'delay' in bringing their claims is attributable to [Buchanan] and Friedman," because Buchanan refused "to do anything more until after the Court ruled on the crime-fraud motion" in February 2013.  Id. at 34-35.  They also note that they did not receive one of the documents — the "Let's talk" email, dated June 29, 2007, at 3:18 p.m. — until June 6, 2013.  Id. at 34.  Additionally, the Moving Parties suggest that they did not file the motion sooner because "[i]n late July [2013], the parties began discussing settlement and worked to find an acceptable mediator."  Id. at 34.

Notwithstanding these explanations for their conduct, we believe that the Moving Parties' delay in bringing the instant motion was to some extent unjustified.  The Moving Parties implicitly admit that they were put on notice of the Attorneys' discovery misconduct in May 2012 when they received a number of the emails at issue.  See Mov. Reply at 33-34.  Moreover, it is clear from the documents submitted in support of the instant motion that the Moving Parties were aware of the essentials of the offending conduct by at least November 2012, about 18 months before the motion to amend was eventually filed.  In a series of communications between counsel for Safrin and Buchanan in Fall 2012, Safrin's counsel accused Buchanan of engaging in the same discovery misconduct alleged in the proposed claims.  See Metadata Emails at 8-9 ("Safrin had to wait two more years to receive critical emails that are in no way privileged . . . . The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery response.").

On November 16, 2012, Safrin's counsel asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading," and that "[b]y providing

inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege."  Id. at 20.  These accusations track the allegations in the Moving Parties' proposed claims that Buchanan "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and "listed some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs."  Prop. Compl. ¶ 63.

Additionally, the Fall 2012 correspondence indicates that the Moving Parties realized the significance of these "critical" emails in that they knew the emails "contain[ed] signature pages with Safrin's forged signature."  Metadata Emails at 9-10.  Thus, the letters suggest that, at that time, the Moving Parties believed not only that the Attorneys had concealed the emails but also that the Attorneys had acted intentionally to hide evidence that was damaging to themselves and their clients.  Furthermore, by November 2012, the Moving Parties were aware of Hoffinger and Stephen Stern's role in the withholding of these documents as Buchanan's counsel had noted their involvement in a letter to Safrin's counsel as early as September 8, 2009.  See Bayne Letter; see also Prop. Compl. ¶ 64 ("[Buchanan] permitted [Hoffinger] and Attorney Stern to participate in the document review process . . . .").

Given the fact that the Moving Parties were aware of the essential elements of their proposed section 487 claims by November 2012, we believe there was unjustified delay in bringing the instant motion.  We do not give great weight to the Moving Parties's assertions regarding Buchanan's alleged refusal to produce the metadata or native files as the Moving Parties have not shown why this prevented them from understanding the scope of the conduct at issue.  Also, while we do not believe that settlement discussions would necessarily justify delay,

we note that they did not begin until July 2013 and thus they do not explain the failure to act during the previous eight month period when the Moving Parties had all the information they needed to bring the claim.  Also, it is of no moment that the Moving Parties did not receive two of the documents at issue until July 2013 as the conduct amounting to deceit was represented in the documents released in the previous productions.  Finally, even under the Moving Parties' view of the facts, they had all the emails as of July 2013 and yet took no action until May 2014.  The stay of discovery was not put into effect until November 2013, and thus, four months elapsed during the critical fact discovery phase without any effort made to pursue these claims.

But we need not dwell on the question of whether the Moving Parties acted with alacrity in bringing this motion.  Even if the Moving Parties had been able to justify their delay, other circumstances would lead us to conclude that allowing the amendment would be prejudicial and inappropriate.  We begin by noting this litigation is in its final stages.  The initial scheduling order in March 2008 set October 1, 2008, as the deadline for the "completion of all discovery."  See Scheduling Order, filed Mar. 5, 2008 (Docket # 41).  It took the ensuing six years for the parties to actually complete — or nearly complete — the fact discovery in this case, during which discovery deadlines were repeatedly extended as more parties and claims were added to the case.  As noted by Buchanan, the parties have taken 59 days of testimony from 39 witnesses.  See Buchanan Mem. at 6.  The Moving Parties did not seek to file the instant motion to amend until less than 60 days before fact discovery was set to close.  Granting the instant motion to amend risks unduly delaying the case by requiring the Court to reopen fact discovery to allow the parties to take depositions and obtain documentary evidence concerning the Attorneys' alleged wrongful conduct.  Courts have commonly denied motions to amend in such circumstances.  See, e.g., iMedicor, Inc v. Access Pharm., Inc., 290 F.R.D. 50, 53 (S.D.N.Y.

2013) ("[A]ssertion of plaintiff's new claims would both require defendant to expend significant additional resources to conduct discovery and prepare for trial, and significantly delay resolution of the dispute."); Suro, 107 F. Supp. 2d at 209-10 (allowing the amendment would require the court to "re-open discovery" which would "cause substantial and unnecessary delay in a case that already has been litigated for almost five years"); accord Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603-04 (4th Cir. 2010) (non-moving party would be prejudiced by reopening of discovery where motion to amend was filed at the "close of a three-year long discovery process and on the eve of the deadline for dispositive motions"); Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods. Corp., 542 F.2d 1010, 1013 (8th Cir. 1976) (non-moving party had already "completed extensive discovery based upon the numerous defenses previously asserted" and where "[n]ew theories of defense and a new counterclaim advanced at this late date would necessarily reopen much of the discovery").

The Moving Parties respond that the amendment "will not require the parties to expend additional resources or significantly delay resolution of the dispute because discovery pertinent to the claim is already in process."  Mov. Mem. at 6.  They assert that "[t]he parties have all but confirmed the deposition schedule for the witnesses most likely to have information regarding the Section 487 Claim" and that "Safrin has already served a request for production of documents on Buchanan and subpoenas duces tecum on Kaye Scholer, [Hoffinger], the Law Offices of Stephen R. Stern, and Attorney Stern requesting documents relevant to the proposed Section 487 Claim."  Id.  But these statements fall far short of assuring the Court that the amendments would not further prolong this already six-year-old case.  The reality is that the proposed claims have nothing to do with the existing claims in this case, and thus, the Moving Parties are seeking to fold an entirely new litigation into the current one.  The new claims

alleging deceit by the Attorneys relate to the Attorneys' failure to produce particular documents in discovery during the course of the litigation of this case.  Those actions are not factually similar in the least to the existing claims in this case, which revolve exclusively around a real estate transaction and the subsequent dealings between Amusement and the other parties to effectuate that transaction, all of which occurred in 2007.  Additionally, the damages that resulted from these two courses of conduct have nothing to do with each other.  Accordingly, the discovery to determine what the Attorneys and the proposed non-parties did and what damages resulted from such conduct will be entirely different from the discovery that has been pursued to date.  There is no common ground between these two sets of claims other than some overlap in parties.

Furthermore, given the prior history of this case, there will inevitably be motions to dismiss (aspects of which would require serious consideration based on the parties' briefing of the "futility" issue) and myriad discovery disputes regarding these collateral claims, all of which will likely cause further delays.  Additionally, as the Moving Parties themselves concede, they "may seek leave to amend again to add [other Buchanan] attorneys as additional defendants to their respective Section 487 claims" depending on "the outcome of discovery" regarding the proposed claims.  Mov. Mem. at 2 n.1.  Finally, there would be nothing to stop the proposed defendants from asserting claims of their own once joined to the case.

Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case.  These courts have recognized that the addition of such collateral claims in amended pleadings can easily delay resolution of the case due to the need to engage in substantial additional discovery regarding the new factual contentions.  See Ansam

Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985) (upholding denial of motion to amend where the plaintiff's "new claims concerned a different period of time and were derived from a different statute" given that "discovery had already been completed and [the defendant] had already filed a motion for summary judgment"); Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., 148 F. Supp. 2d 321, 327 (S.D.N.Y. 2001) ("Prejudice is particularly likely where the amendment raises new theories of recovery or would require additional discovery.") (citation omitted); accord Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1428-29 (7th Cir. 1993) ("[T]he district judge acted within the bounds of reason in refusing to allow the suit to be expanded to take in . . . an entirely new and separate claim."); Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (no abuse in discretion in district court's denial of motion to file amended complaint where "[t]he new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense"); Vonage Holdings Corp. v. SBC Internet Servs., Inc., 2007 WL 3169167, at *3 (N.D. Tex. Oct. 30, 2007) (refusing motion to add new claims in patent dispute case because the new claims were "completely unrelated to the voice-compression technology that is at issue in this litigation . . . [and would] undoubtedly further delay the resolution of this case, require additional discovery, and further complicate an already complex case"); Lover v. District of Columbia, 248 F.R.D. 319, 322 (D.D.C. 2008) ("Prejudice is likely if the amended complaint contains new complex and serious charges which would undoubtably require additional discovery for the defendants to rebut.") (internal quotation marks, brackets, and citation omitted); see generally 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2014) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to

engage in significant new preparation, the court may deem it prejudicial.").

Prejudice is particularly likely to result where, as in this case, the moving party seeks to add collateral claims at a late stage in the litigation process.  See, e.g., In re Am. Int'l Grp., Inc. Sec. Litig., 2008 WL 2795141, at *3 (S.D.N.Y. July 18, 2008) ("[A] proposed amendment causes undue prejudice if, at an advanced stage of litigation, the amendment concerns 'an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice.'") (quoting Ansam, 760 F.2d at 446); Seymour/Jones v. Lefebvre, 1991 WL 165203, at *1 (E.D. Pa. Aug. 22, 1991) (denying motion to amend on grounds of prejudice because proposed additional claims "concern only one of the three defendants, . . . are entirely new and separate claims based on unrelated facts and events[,] . . . [and] they would involve additional discovery at a point when the discovery period has almost expired").  We thus conclude that the potential for delay and resulting prejudice strongly favors denial of the motion to amend.

The cases the Moving Parties cite on the issue of prejudice do not change our view.  See Mov. Mem. at 5-6; Mov. Reply at 36-37.  These cases simply recognize that a motion to amend should not be denied on the ground that it would require the opposing party to "expend significant additional time and money" on additional discovery where circumstances otherwise suggest that granting the amendment would be fair, such as where the case is in an early stage of litigation.  Hahn v. Domy Rooms, Inc., 2008 WL 3874313, at *3 (S.D.N.Y. Aug. 18, 2008) (granting motion to amend when the parties had "only exchanged initial disclosures" and where there was no allegation that plaintiff did not timely file motion to amend); see also Block, 988 F.2d at 351 (upholding district court's grant of motion to amend because the non-moving parties' allegations that "they were prejudiced solely because of the time, effort and money they expended in litigating this matter . . . do not arise to . . . 'substantial prejudice.'"); Am. Med.

Ass'n v. United Healthcare Corp., 2006 WL 3833440, at *6-7 (S.D.N.Y. Dec. 29, 2006) (no

"undue prejudice" where "the parties have completed only preliminary discovery as to the

'proper parties in this action' and have not yet engaged in any significant discovery on the

merits" and where the proposed claims "are based on 'substantially similar' allegations of

misconduct" as the earlier claims); Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc., 795

F. Supp. 639, 644 (S.D.N.Y. 1992) (finding joinder of additional parties to be appropriate where

"discovery relating to the counterclaims began only recently" because the case "would

encompass essentially the same issues regardless of whether or not [the proposed parties] were

added as counter-defendants").  Here, by contrast, the Court's concern is not simply that

additional discovery will be required but that numerous depositions have already been taken,

extensive document production has been made, the parties are at the final stage of the litigation,

and the proposed claims have nothing to do with the claims currently being litigated.  Cf.

Interpublic Grp. of Cos., Inc. v. Fratarcangelo, 2002 WL 31720355, at *2 (S.D.N.Y. Dec. 4,

2002) ("Although the burden of undertaking additional discovery, standing alone, does not

warrant a denial of a motion to amend a pleading on the grounds of prejudice, . . . when that

discovery addresses what is essentially a collateral matter—as it does in this action—denial is

warranted.") (internal citation omitted); see also Grace v. Rosenstock, 228 F.3d 40, 53-54 (2d

Cir. 2000) ("The court also has discretion to deny leave to amend . . . where the belated motion

would unduly delay the course of proceedings by, for example, introducing new issues for

discovery.") (internal citations omitted); Ansam, 760 F.2d at 446 (upholding denial of motion to

amend where the proposed claims "concerned a different period of time and were derived from a

different statute" and where "discovery had already been completed and [defendant] had already

filed a motion for summary judgment").

26

Finally, the addition of the collateral claims regarding the alleged discovery misconduct would further muddle this already complex case.  When parties move to add claims involving completely different factual allegations and legal theories from the underlying suit, courts may exercise their discretion to deny amendment "in order to avoid unnecessary complexity and confusion."  Robinson v. Buffaloe & Assocs., PLC, 2013 WL 4017045, at *2 (M.D. Tenn. Aug. 6, 2013); see also Harris v. Armstrong, 2005 WL 756523, at *1 (D. Conn. Mar. 31, 2005) ("Underlying [Rule 15(a)] is an assumption that the amended complaint will clarify or amplify the original cause of action.  The proposed amendments would not serve these purposes but instead would add numerous unrelated parties and claims.  Accordingly, the motion for leave to amend is denied."); Trilithic, Inc. v. Wavetek U.S. Inc., 6 F. Supp. 2d 803, 809 (S.D. Ind. 1998) (denying motion to file supplemental pleading under Rule 15(d) because "the [proposed] breach of contract claim is so unrelated to the underlying patent infringement action that it constitutes extraneous matter that will likely protract and complicate the litigation"); Triangle Indus., Inc. v. Kennecott Copper Corp., 402 F. Supp. 210, 212 (S.D.N.Y. 1975) (rejecting addition of certain claims where they "raise[ ] the question [of] whether amendments (and supplementation) of the complaint would not add to the complications of an already over-complicated case to the extent that no jury could reasonably be expected to assimilate the facts or render and [sic] intelligent or just verdict"); United States v. Eight Tracts of Land in Town of Brookhaven, Suffolk Cnty., State of N.Y., 270 F. Supp. 160, 164 (E.D.N.Y. 1967) ("While amendments are as a general rule, freely granted as justice may require, they should be denied when their allowance prevents an equitable determination of the main suit and confuses the real issues involved."); see generally 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 ("[I]f the court determines that . . . the issues raised by the amendment are remote from the other issues in the case and might confuse

27

or mislead the jury, leave to amend may be denied.").  We do not think it appropriate to burden a

jury with both unraveling the complexities of the original real estate transaction and judging the

actions of attorneys in conducting document production during the course of the litigation.

In a case involving analogous circumstances, Stiller v. Colangelo, 221 F.R.D. 316 (D.

Conn. 2004), the court denied the plaintiff's motion to amend a complaint to add claims

involving the defendant's "hand[ling] of this litigation since the filing of the Complaint" because

it would prejudice the defendant by "add[ing] claims different in character and purpose from

those articulated in the initial complaint" that would "require additional discovery . . . and undue

delay in the resolution of the case."  221 F.R.D. at 317.  Stiller denied the motion also on

grounds that the proposed claims were "sufficiently remote from the initial complaint . . . [that]

[t]he jury is likely to be confused when asked to consider both [the defendant's] behavior as [the

plaintiff's] legal representative and his behavior as [the plaintiff's] legal adversary.  Moreover,

exposing the jury to allegations of wrongful conduct during the course of this litigation could

easily prejudice the jury against [the defendant]."  Id.  Here too the addition of the new claims

would unnecessarily confuse a jury as it would be asked to simultaneously consider Buchanan

and Friedman's alleged wrongful conduct both as negotiators representing Moses Stern in the

underlying real estate transaction and as litigators responding to document subpoenas in the

ensuing legal proceedings.  Given the factual and legal dissimilarities between the underlying

lawsuit and the proposed claims, any such claim is best brought as a separate suit and not as part

of this case.[8]

---

[8] Nothing herein should be construed as addressing the question of whether the Moving
Parties may move for sanctions in this litigation based on the conduct alleged in the proposed
complaint — whether against parties or attorneys, including former attorneys.  See Hakim v.
Leonhardt, 126 F. App'x 25, 26 (2d Cir. 2005) ("[A] court may hold an attorney responsible for

IV.    CONCLUSION

For the foregoing reasons, the Moving Parties' motion to amend their pleadings (Docket

# 755) is denied.

Dated: September 10, 2014
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

discovery noncompliance even after he or she has been relieved as counsel.") (citations omitted).