UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AMUSEMENT INDUSTRY, INC. dba                    :
WESTLAND INDUSTRIES; and PRACTICAL
FINANCE CO., INC.,                              :

               Plaintiffs,                    :       07 Civ. 11586 (LAK) (GWG)

    -v.-                                        :       REPORT AND
                                                     RECOMMENDATION
MOSES STERN, aka MARK STERN; JOSHUA           :
SAFRIN; FIRST REPUBLIC GROUP REALTY,
LLC; FIRST REPUBLIC GROUP CORP.; LAND         :
TITLE ASSOCIATES AGENCY, LLC aka LAND
TITLE ASSOCIATES; AVERY EGERT, and            :
EPHRAIM FRENKEL,

                                          :

               Defendants.
------------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiffs Amusement Industry, Inc. and Practical Finance Co., Inc. (collectively,

"Amusement") brought this action against defendant Moses Stern, corporate defendants First

Republic Group Realty LLC and First Republic Group, Corp. (collectively, "FRG"), as well as a

number of other defendants seeking damages resulting from the loss of $13 million dollars in a

real estate transaction.  Before the court is Amusement's motion for summary judgment.[1]  For

_____

    [1] See Plaintiffs Amusement Industry, Inc.'s and Practical Finance Co., Inc.'s Notice of
Motion and Motion for Summary Judgment on Fraud, Conversion, Conspiracy, and Unjust
Enrichment Counts, and Compensatory Damages, filed October 19, 2015 (Docket # 828);
Amusement Industry, Inc.'s and Practical Finance Co., Inc.'s Memorandum of Points and
Authorities in Support of their Motion for Summary Judgment, filed in redacted form on October
19, 2015 (Docket # 829) and filed in unredacted form on July 28, 2016 (Docket # 860) ("Pl.
Mem."); Declaration of Michael F. McGowan, filed October 19, 2015 (Docket # 831)
("McGowan Decl."); Declaration of John W. Hofsaess in Support of Plaintiffs Amusement
Industry, Inc.'s and Practical Finance Co., Inc.'s Motion for Summary Judgment, filed October
19, 2015 (Docket # 833) ("Hofsaess Decl."); Separate Statement of Undisputed Facts in Support
of Amusement Industry, Inc.'s and Practical Finance Co. Inc.'s Motion for Summary Judgment,
filed in redacted form on October 19, 2015 (Docket # 834) and filed in unredacted form on July
28, 2016 (Docket # 861) ("P56.1"); Notice of Errata Concerning Rule 56.1 Statement in Support
of Motion for Summary Judgment, filed October 21, 2015 (Docket # 835); Notice of Errata for

the reasons stated below, Amusement's motion should be granted.

I.     BACKGROUND

      The following facts, except where otherwise noted, are undisputed or represent facts for

which plaintiffs have supplied admissible evidence and that defendants failed to controvert.[2]

_____

Exhibits Attached to Declaration of John W. Hofsaess in Support of Motion for Summary
Judgment, filed October 21, 2015 (Docket # 836); Defendant Moses Sterns' [sic] response to
Plaintiffs' Statement of Undisputed Facts pursuant to Local Civil Rule 56.1, filed January 22,
2016 (Docket # 848) ("D56.1"); Defendant Moses Stern's Memorandum of Law in Opposition
to Plaintiffs' Motion for Summary Judgment, filed January 22, 2016 (Docket # 849) ("Def.
Mem."); Declaration of Brian K. Condon in Opposition to Plaintiffs' Motion for Summary
Judgment, filed January 22, 2016 (Docket # 850); Amusement Industry, Inc.'s and Practical
Finance Co., Inc.'s Reply Memorandum of Points and Authorities in Support of their Motion for
Summary Judgment, filed February 26, 2016 (Docket # 851) ("Pl. Reply"); Supplemental
Declaration of John W. Hofsaess in Support of Amusement Industry, Inc.'s and Practical
Finance Co., Inc.'s Motion for Summary Judgment, filed February 26, 2016 (Docket # 852)
("Hofsaess Reply Decl."); Reply Separate Statement of Undisputed Material Facts in Support of
Plaintiffs Amusement Industry, Inc.'s and Practical Finance Co., Inc.'s Motion for Summary
Judgment, filed February 26, 2016 (Docket # 853) ("Reply P56.1").

      Note: some documents that were originally filed in redacted form as attachments to
Docket # 833 (Hofsaess Decl.) have been filed in unredacted form as attachments to Docket
# 860 (Pl. Mem.).

      [2] Stern filed a counterstatement to plaintiffs' statement of material facts as required by
Local Civil Rule 56.1.  See D56.1.  In nearly all of Stern's 56.1 counter-statements, hosever,
Stern purports to controvert a statement in Amusement's Rule 56.1 statement but fails to do so.
Instead, Stern states that he "[d]en[ies] the allegations" without citing evidence to support the
denial, see, e.g., D56.1 ¶¶ 10-11, 16, 27; fails to respond because "th[e] allegation . . . has been
redacted," see, e.g., D56.1 ¶¶ 24-26; or admits to part of the corresponding statement, without
addressing the entirety of the statement, and without citing any evidence that would support a
denial of part of the statement, see, e.g., ¶¶ 37, 40.  Furthermore, Stern frequently fails to provide
any "citation[s] to evidence which would be admissible," as required by Local Rule 56.1(c), and
provides almost no references to any evidence supporting his statements.  Accordingly, the
material facts contained in Amusement's statements are deemed admitted, because Stern has
failed to "specifically controvert[]" the statements as required by Local Civil Rule 56.1(c).  See
Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1
(2d Cir. 1998).  We note that we have only deemed a statement of plaintiffs to be admitted if the
statement was actually supported by admissible evidence.

      As to Stern's claim that he could not controvert some of plaintiffs' statements because

A.    <u>The Colonial Deal</u>

In 2007, FRG entered into an agreement to purchase a portfolio of 11 retail shopping centers in the southeastern United States from Colonial Realty Limited Partnership ("Colonial") for approximately $128 million. P56.1 ¶ 1; D56.1 ¶ 1; Purchase and Sale Agreement, dated April 20, 2007 (annexed as Ex. 1 to Hofsaess Decl.) ("Purchase and Sale Agreement"). At the time, Stern was acting as the President and CEO of FRG. <u>See</u> Certification, dated June 2007 (annexed as Ex. B to McGowan Decl.), at ECF *37;[3] Email from Mark Stern to Michael Fallon, dated July 13, 2007 (annexed as Ex. 6 to Pl. Mem.). Stern signed the purchase agreement on behalf of FRG. <u>See</u> Purchase and Sale Agreement at 45. The closing date of the Colonial deal was initially scheduled for June 15, 2007, but was extended to June 29, 2007, upon Stern's agreement to make a $2 million deposit towards the purchase price. P56.1 ¶ 6; D56.1 ¶ 6. Previously, FRG had only made a deposit of $1 million toward the deal, and no other funds were placed in escrow. P56.1 ¶ 5; D56.1 ¶ 5. Attorney Stephen Friedman acted as FRG's "general counsel" in the Colonial Deal. P56.1 ¶ 8; D56.1 ¶ 8.

On May 18, 2007, JP Morgan Chase ("JP Morgan") submitted a financing proposal for the purchase of the Colonial portfolio, which listed both Stern and Joshua Safrin as sponsors of the deal. P56.1 ¶ 12; D56.1 ¶ 12. JP Morgan later declined to pursue the financing proposal. P56.1 ¶ 21; D56.1 ¶ 21.

---

certain portions were redacted, this claim is rejected as frivolous because the unredacted version was obviously available to Stern if he did not have it already — either by asking plaintiffs for it or by asking the Court for assistance in the unlikely event there was any problem obtaining the unredacted version from plaintiffs. Notably, plaintiffs have provided uncontradicted sworn testimony that they in fact provided the unredacted version to Stern at the same time they provided the redacted version. <u>See</u> Hofsaess Reply Decl. ¶¶ 2-4.

[3] "ECF *__" refers to page numbers assigned by the ECF system.

Stern applied to Citigroup for a similar loan to finance the Colonial purchase.  P56.1
¶ 23; D56.1 ¶ 23.  This application once again listed Joshua Safrin's name.  Id.  On July 11,
2007, Citigroup agreed to provide an $111,150,000 mortgage loan "pursuant to a maximum
loan-to-cost ratio of 83.4%."  P56.1 ¶¶ 24-25; accord Promissory Note, dated July 11, 2007
(annexed as Ex. 39 to Pl. Mem.).  That same day, a separate Stern-related entity, FRGR
Managing Member LLC, borrowed $15 million from Citigroup through a "mezzanine loan."
P56.1 ¶ 26; accord Promissory Note, dated July 11, 2007 (annexed as Ex. 40 to Pl. Mem.).

Stern later pled guilty to each count of an 18-count Information associated with his
actions in obtaining financing from Citigroup for the Colonial Deal.  P56.1 ¶¶ 32-33; D56.1
¶¶ 32-33; accord Plea Transcript, dated March 11, 2013 (annexed as Ex. 47 to Hofsaess Decl.)
("Plea Transcript").  The charges listed in the Information included both conspiracy to commit
wire fraud and wire fraud associated with the Colonial Deal.  P56.1 ¶ 33; D56.1 ¶ 33.  During
Stern's plea allocution, he described the scheme and admitted that "[he] and others submitted
false information to Citigroup to get the bank to issue a loan, approximately $126,500,000.
Among other things, Citigroup was led to believe that certain closing costs were legitimate,
when in fact they were not."  P56.1 ¶ 34 (alteration in original); accord Plea Transcript at 56.[4]  In
a later 30(b)(6) deposition of Citigroup, Marcus Giancaterino testified that Citigroup would
never have approved the loan to FRG had Joshua Safrin not been listed as a guarantor on the
loan, due to Stern's "experience level . . . financial capabilities . . . [and] bankruptcy."
Deposition of Marcus Giancaterino, dated April 27, 2011 (annexed as Ex. 60 to Hofsaess Decl.)

---

[4] When questioned by plaintiffs in this matter regarding whether he signed the closing
statement associated with the Colonial Deal and whether he believed it to be true and accurate,
Stern invoked his Fifth Amendment privilege.  P56.1 ¶ 35; see Deposition of Moses Stern, dated
March 15, 2012 (annexed as Ex. 51 to Pl. Mem.) ("Stern March 15 Dep."), at 367-68.

("Giancaterino Dep."), at 124.  Giancaterino also testified that it was Safrin's abilities as a

property investor, "with a substantial portfolio and a larger net worth than Stern," that had

helped entice Citigroup to approve the loan.  Id. at 125.

Prior to the closing of the Colonial Deal with Citigroup, Stephen Friedman approached

Allen Alevy of Amusement and offered Amusement the opportunity to invest in the Colonial

portfolio.  See Deposition of Allen Edward Alevy, dated January 4, 2011 (annexed as Ex. 61 to

Hofsaess Decl.) ("Allen Alevy January 4 Dep."), at 88-89.  Allen Alevy believed Stern and the

Stern-related entities did not have enough money to close the Colonial Deal, which led them to

seek out other investors, including Amusement.  Id. at 86-88.  He further stated that he believed

"Stern, FRG Corp. and/or FRG, LLC [had] authorized Steven Alevy and Stephen Friedman . . .

to approach Amusement to determine if it would supply the needed funds," id. at 94, and that

Stephen Friedman would represent Amusement, Safrin, and Stern in the ultimate transaction.  Id.

at 58.  When Stern was deposed in this case, and questioned as to whether he "ask[ed] Stephen

Friedman to contact [Allen] Alevy and/or Amusement to see if they would invest in the Colonial

deal," Stern invoked his Fifth Amendment privilege.  Stern March 15 Dep. at 341.

Amusement eventually agreed to invest $13 million in the Colonial Deal, in return for

which Stephen Friedman promised Allen Alevy a 50% ownership of the portfolio as a whole.

See Allen Alevy January 4 Dep. at 25-26, 197.  Stephen Friedman informed Allen Alevy that the

other 50% ownership would be split between Safrin and Stern.  Id.  In late June 2007, Stern

agreed to these terms, articulated in a letter of understanding ("LOU"), which outlined

Amusement's 50% equity purchase of the Colonial Deal.  See P56.1 ¶ 78; D56.1 ¶ 78; accord

Email from Steven Alevy to Stephen Friedman and Mark Stern, dated July 2, 2007 (attached to

Stern March 15 Dep.), at ECF *94.  These terms, however, directly contradicted the terms of

Stern's agreement with Citigroup regarding financing for the Colonial deal, which required that "Mark Stern and Joshua Safrin own[] not less than 51.0% of the . . . ownership interest in the Borrower." Interim Loan Application, dated June 13, 2007 (attached to email from Richard Koch to Michael Fallon, dated June 15, 2007 (annexed as Ex. 38 to Hofsaess Decl.)) ("Citigroup Loan Application"), at 8-9, which Stern "[a]cknowledged and accepted" on June 13, 2007, id. at 17. When questioned as to whether he was aware that the LOU terms contradicted with the Citigroup Loan Application terms, Stern invoked his Fifth Amendment privilege. Stern March 15 Dep. at 343-44.

Beyond the significant ownership opportunity, Amusement was further enticed by Stephen Friedman's representation that "Safrin, a respected New York real estate investor, was supplying much of the equity needed for the acquisition." P56.1 ¶ 47; D56.1 ¶ 47; accord Allen Alevy January 4 Dep. at 88-89; id. at 48 (Allen Alevy states that Stephen Friedman told him that Safrin "was putting in anywhere between 5 and 15 million."). Stern had also made representations to Robert Friedman of Banker's Capital that Safrin was involved in the deal, and these representations were then repeated to Amusement. See, e.g., Email from Mark Stern to Robert Friedman, dated June 5, 2007 (attached to Stern March 15 Dep.), at ECF *104 (Stern represents that "Safri [sic] will be the co-sponsor and will be signing on carveouts."); Email from Mark Stern to Robert Friedman, dated June 7, 2007 (attached to Stern March 15 Dep.), at ECF *105 ("Most of the equity will come from Joshua Safrin and Avery Egert") (capitalization omitted); Deposition of Steven Alevy, dated January 13, 2013 (annexed as Ex. 66 to Hofsaess Decl.) (Steven Alevy January 13 Dep.), at 445-46.[5] Stern transmitted to Robert Friedman

_____

[5] Plaintiffs do not identify Robert Friedman or explain his role in the Colonial transaction. Stern does not contest, however, that Robert Friedman was hired as FRG's

information about Safrin, including that he was the founder, "primary partner and [p]resident of The Safrin Group," an organization that had "significant investments in many properties," and that the Safrin Group "manage[d] a large diversified portfolio," in which Safrin was directly involved.  See Joshua Samuel Safrin: The Safrin Group LLC: Safrin Group Management (attached to Stern March 15 Dep.) ("Safrin Group Bio"), at ECF *101.  Robert Friedman also transmitted to Amusement Stern's representation that Safrin would sign carve out guarantees for Amusement, which would have permitted Amusement to have recourse against Safrin for its loan under certain circumstances.  See P56.1 ¶ 52; accord Email from Mark Stern to Robert Friedman, dated June 5, 2007 (attached to Stern March 15 Dep.), at ECF *104; Steven Alevy January 13 Dep. at 445-47; Pl. Mem. at 9 n.11.

In fact, none of this was true.  Safrin had not agreed to be a participant in the Colonial transaction.  See Deposition of Joshua Safrin, dated March 1, 2012 (annexed as Ex. 67 to Hofsaess Decl.) ("Safrin March 1 Dep."), at 348-49, 386-87; Stern March 15 Dep. at 453 (Stern invokes his Fifth Amendment privilege when asked whether he forged Safrin's signature to induce Amusement to invest in the Colonial Deal).  Also, Safrin had no "interest in or affiliation with The Safrin Group."  P56.1 ¶ 59; D56.1 ¶ 59; accord Deposition of Joshua Safrin, dated February 29, 2012 (annexed as Ex. 64 to Hofsaess Decl.) ("Safrin February 29 Dep."), at 44; Deposition of Joshua Safrin, dated March 2, 2012 (annexed as Ex. 70 to Hofsaess Decl.) ("Safrin March 2 Dep."), at 525.  Indeed, he had no knowledge of the "Safrin Group Bio" that Stern had provided to Robert Friedman.  Safrin March 1 Dep. at 260-61.

---

mortgage broker and was tasked, in part, with locating and arranging financing sources for the Colonial Deal.  See First Amended Third Party Complaint of Mark Stern Against Avery Egert, filed March 15, 2010 (Docket # 383), ¶ 20.

Unbeknownst to Safrin, however, Citigroup had required that Safrin sign certain carve out guarantees and other loan-related documents.  See P56.1 ¶ 134; accord Giancaterino Dep. at 124; Citigroup Loan Application at 13-14 (describing the type of carve out agreement Citigroup required).  Starting in late June 2007, Herrick Feinstein LLP ("Herrick"), a law firm working with Citigroup, began sending Stephen Friedman the necessary signature pages associated with the Colonial deal for which Safrin's signature was required.  P56.1 ¶ 137; Emails and attachments (annexed as Exs. 118-120 of Hofsaess Decl.).

The transmittal of the signatures occurred as follows: on June 29, 2007, Stephen Friedman emailed Stern copies of documents apparently unrelated to the Colonial deal that contained purported exemplars of Safrin's signature.  See Emails and Attachments (annexed as Ex. 129 to Hofsaess Decl.).  Friedman's email was titled "Signature Examples."  Id.  The documents required by Citigroup, bearing signatures purportedly from Safrin, were then sent to Herrick on June 29, July 2, July 9, and July 10, 2007, from an account with the username "Wizzy Bizzy."  P56.1 ¶ 135; D56.1 ¶ 135; see also Emails and Attachments (annexed as Ex. B to McGowan Decl.).  Safrin testified, however, that he did not sign any of the Colonial deal documentation or authorize anyone else to sign on his behalf.  P56.1 ¶ 142; see also Safrin March 1 Dep. at 215-26.  When Stern was asked at his deposition whether he was "wizzy bizzy" and whether he had forged Safrin's signature, he invoked his Fifth Amendment privilege.  See Stern March 15 Dep. at 424, 453; Deposition of Moses Stern, dated March 14, 2012 (annexed as Ex. 8 to Pl. Mem.) ("Stern March 14 Dep."), at 68-71.  So did Stephen Friedman.  See Deposition of Stephen Friedman, Esq., dated October 7, 2014 (annexed as Ex. 37 to Hofsaess Decl.), at 26-27.

B.      The Escrow Account

After agreeing to the terms in the LOU, Amusement placed $13 million into an escrow account while the parties worked toward finalizing the terms of their transaction.  See Email from Anna Chase to Stephen Friedman, dated July 6, 2007 (annexed as Ex. 74 to Hofsaess Decl.); Emails (annexed as Ex. 73 to Hofsaess Decl.).  The escrow account was managed by Ephraim Frenkel of Land Title Associates.  See Email from Ephraim Frenkel to Paul Schuler and others, dated July 5, 2007 (annexed as Ex. 12 to Hofsaess Decl.); Fax from Allen Sragow to Ephraim Frankel [sic], dated July 12, 2007 (annexed as Ex. 105 to Hofsaess Decl.).  Amusement informed Stephen Friedman and Land Title Associates that the funds could not be released without written approval from Amusement, specifically Allen Alevy or Allen Sragow, Amusement's attorney.[6]

On July 12, 2007, the parties to the deal engaged in discussions regarding the potential release of Amusement's $13 million.  Early that morning, Stern emailed Steven Alevy asking him to "[p]lease . . . release the money by Frenkel so he can release it," suggesting that Citigroup was getting increasingly impatient.  Email from Mark Stern to Steven Alevy, dated July 12, 2007 (annexed as Ex. 84 to Pl. Mem.).  That afternoon, attorneys from Herrick emailed both Frenkel

_____

        [6] See Email from Anna Chase to Stephen Friedman, dated July 6, 2007 (annexed as Ex. 74 to Hofsaess Decl.) (Allen Alevy tells Stephen Friedman, with Stephen Alevy copied, to "not release that $13,000,000 without my written permission."); Email from Allen Sragow to Stephen Friedman, dated July 9, 2007 (annexed as Ex. 75 to Hofsaess Decl.) (instructing Stephen Friedman not to authorize the release of the $13 million "without specific authorization from Allen Alevy or [Sragow])"); Email from Allen Sragow to Land Title Associates, dated July 10, 2007 (annexed as Ex. 76 to Pl. Mem.) (instructing Land Title Associates not to release any of the $13 million "without written authorization from [Sragow's] office," with Friedman, Steven Alevy, and others copied); Fax from Allen Sragow to Ephraim Frankel [sic], dated July 12, 2007 (annexed as Ex. 105 to Hofsaess Decl.) (Sragow confirms that he spoke with a representative in Frenkel's office and again conveyed the instruction not to release Amusement's funds without written authorization).

and Stern instructing them to "begin wiring out all closing funds . . . immediately," an email that Stern immediately sent to Stephen Friedman.  Email from Mark Stern to Stephen Friedman, dated July 12, 2007 (annexed as Ex. 86 to Hofsaess Decl.).  Amusement, however, had not granted approval of the transaction and was still requesting further documentation from Stephen Friedman regarding the deal.  See Email from Michael Libraty to Stephen Friedman, dated July 12, 2007 (annexed as Ex. 96 to Hofsaess Decl.); Email from Michael Libraty to Stephen Friedman, dated July 12, 2007 (annexed as Ex. 97 to Hofsaess Decl.).

Land Title Associates's records indicate that on July 12, 2007, it began releasing Amusement's $13 million from escrow.  P56.1 ¶¶ 120-22; accord Escrow Management Account, dated July 31, 2007 (annexed as Ex. 83 to Pl. Mem.) ("Escrow Management Account").  There is no evidence that Allen Alevy or Allen Sragow ever authorized the release.  While negotiating with Amusement and maintaining to Amusement that the funds were still held in escrow, Stephen Friedman contacted Frenkel and instructed him to release Amusement's money. Deposition of Ephraim Frenkel, dated October 20, 2009 (annexed as Ex. 13 to Hofsaess Decl.) ("Frenkel October 20 Dep."), at 407; Emails (annexed as Ex. 107 to Hofsaess Decl.) (Friedman continues to work with Michael Libraty regarding the "[l]ast step before release of funds."). Frenkel then contacted Stern, who instructed Frenkel on where to disburse the funds.  Frenkel October 20 Dep. at 593-94.[7]  The funds were disbursed to various accounts that were mostly "unrelated to the Colonial Transaction, including the transfers to Tepfer & Tepfer, Bruce

---

[7] The day after the release of the funds, Stephen Friedman stated to Frenkel that Frenkel and Amusement could "release the escrow."  Emails, dated July 13, 2007 (annexed as Ex. 108 to Hofsaess Decl.) (capitalization omitted).  But in the same exchange it was made clear that the "escrow" being referred to was not Amusement's $13 million, because Stephen Friedman stated to Frenkel that he "assume[d]" the $13 million for the Colonial deal "was long ago released . . . " Id.

Minsky, Esq., GMAC, Land Title Associates, and Roman Associates."  P56.1 ¶ 125; Escrow

Management Account.[8]  As of July 16, 2007, Amusement indicated to Frenkel, Stephen

Friedman, and Stern its suspicion that the escrow funds had been released, instructing Frenkel to

"retrieve" the funds if "by . . . error" the funds had been released.  See Email from Allen Sragow

to Ephraim Frenkel, dated July 16, 2007 (annexed as Ex. 112 to Pl. Mem.).  On August 6, 2007,

Amusement made a formal demand that the funds be returned.  See Fax from Allen Sragow to

Ephraim Frankel [sic], dated August 6, 2007 (attached to Email from Ephraim Frenkel to

Stephen Friedman, dated August 6, 2007 (annexed as Ex. 110 to Hofsaess Decl.)).  The funds

were never returned to Amusement.  See P56.1 ¶ 133; Allen Alevy January 4 Dep. at 26.

## II.   LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(a) provides that summary judgment is appropriate when "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A

genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (citation omitted); see

also Fed. R. Civ. P. 56(c)(4) (parties shall "set out facts that would be admissible in evidence.")

In determining whether a genuine issue of material fact exists, "[t]he evidence of the

non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the

_____

[8]  Because Stern failed to specifically controvert Amusement's claim that the
organizations to which funds were sent were "unrelated to the Colonial Transaction," see D56.1
¶ 125, this contention is deemed admitted.

11

non-moving party.  Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S.

144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine

issue as to any material fact and that it is entitled to a judgment as a matter of law, the

non-moving party must offer "concrete evidence from which a reasonable juror could return a

verdict in his favor," Anderson, 477 U.S. at 256, and "may not rely on conclusory allegations or

unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citation

omitted).

III.    DISCUSSION

        Plaintiffs have moved for summary judgment on the issue of whether the Court is

permitted to draw negative inferences against Stern based on Stern and Stephen Friedman's

decisions to invoke their Fifth Amendment privileges when they were deposed.  They also seek

summary judgment finding Stern liable for $13 million in damages on the grounds that Stern (1)

obtained Amusement's $13 million through fraud, (2) converted the $13 million; (3) was

unjustly enriched in the amount of $13 million; and (4) engaged in a conspiracy to commit fraud

under New York law.[9]  We begin by addressing the negative inference issue.

        A.      Negative Inference

        "[A] party in a civil proceeding has the right to assert the privilege against self-

incrimination."  Bank of America, N.A. v. Fischer, 927 F. Supp. 2d 15, 26 (E.D.N.Y. 2013)

(citations omitted).  Where a party chooses to invoke this privilege, however, "[a] court may

---

        [9] While Amusement's notice of motion (Docket # 828) states Amusement is seeking a
judgment against Stern and "First Republic Group Realty, LLC," its memorandum of law barely
mentions this entity and provides no argument as to why Amusement is entitled to summary
judgment against it.  Accordingly, we construe the motion for summary judgment as directed
only to Stern.

draw an adverse inference against [that] party . . . because the invocation of the privilege results
in a disadvantage to opposing parties by keeping them from obtaining information they could
otherwise get." U.S. S.E.C. v. Suman, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010), aff'd, 421 F.
App'x 86 (2d Cir. 2011).  Indeed, a party who invokes this privilege "must bear the consequence
of lack of evidence, and the claim of privilege will not prevent an adverse finding or even
summary judgment if the litigant does not present sufficient evidence to satisfy the usual
evidentiary burdens in the litigation." United States v. Certain Real Prop. & Premises Known as
4003-4005 5th Ave., Brooklyn, N.Y., 55 F.3d 78, 83 (2d Cir. 1995) (internal citations and
quotation marks omitted); accord Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("The Fifth
Amendment does not forbid adverse inferences against parties to civil actions when they refuse
to testify in response to probative evidence offered against them.").  Nevertheless, "a motion for
summary judgment cannot be granted on an adverse inference alone; rather, the inference must
be weighed with other evidence in the matter in determining whether genuine issues of fact
exist." Suman, 684 F. Supp. 2d at 386 (citing LiButti v. United States, 178 F.3d 114, 124 (2d
Cir. 1999)) (further citations omitted).

        At his deposition, Stern invoked his Fifth Amendment privilege in response to a number
of Amusement's questions, see Stern March 14 Dep.; Stern March 15 Dep.  We thus assume that
a truthful response to those questions would have been adverse to Stern.  See, e.g., Fischer, 927
F. Supp. 2d at 26 (drawing negative inference against defendants as to "all aspects" of plaintiff's
claims).

         Amusement also requests that the Court draw an adverse inference against Stern based
on non-party Stephen Friedman's invocation of the same privilege during his own deposition.
Pl. Mem. at 32.  The Second Circuit has found that a non-party's invocation of the Fifth

Amendment may be used to draw a negative inference against a party where "the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." LiButti, 107 F.3d at 124 (citing Idaho v. Wright, 497 U.S. 805, 819 (1990)).  In LiButti, the Second Circuit articulated a non-exhaustive list of factors to guide a trial court in making such a determination.  They include (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation.  Id. at 123-24.

Here, all the factors point in favor of drawing a negative inference against Stern based on Stephen Friedman's invocation of privilege.  Stephen Friedman acted as Stern's "general counsel" with regard to the Colonial Deal, see P56.1 ¶ 8; D56.1 ¶ 8; accord Email from Mark Stern to Steven Flessig, dated May 9, 2007 (annexed as Ex. 10 to Hofsaess Decl.), which formed the basis of the alleged fraud and other misconduct in this matter.  Stephen Friedman also served as Allen Alevy's point of contact when dealing with Stern on the Colonial deal.  Indeed, Stephen Friedman was integral to developing the transaction between Amusement and FRG.  He first approached Amusement regarding the Colonial deal, see Allen Alevy January 4 Dep. at 88-89; made repeated representations that Safrin was involved in the transaction, see, e.g., id. at 48, 53, 56-57; and proposed the 50/50 equity split that subsequently formed the LOU between the parties, id. at 25-26.  Stephen Friedman's testimony also would have been directly relevant to Amusement's claim of forgery, as he was the author of the "Signature Examples" email, which contained the exemplars of Safrin's signature and which Stephen Friedman sent to Stern.  See Emails and Attachments (annexed as Ex. 129 to Hofsaess Decl.).  Finally, Stephen Friedman's testimony would also have formed important evidence regarding Stern's knowledge that Land

Title Associates lacked permission to release Amusement's funds from escrow.  Stephen

Friedman was directly notified by both Allen Alevy and Sragow that their authorization was

required prior to the escrow funds being released, see, e.g., Email from Anna Chase to Stephen

Friedman, dated July 6, 2007 (annexed as Ex. 74 to Hofsaess Decl.); Emails (annexed as Ex. 75

to Hofsaess Decl.).  As the point of contact between Amusement and Stern, Stephen Friedman

was the appropriate person to provide testimony on Stern's overall knowledge regarding the

transaction.

Notably, Stern does not directly oppose the drawing of a negative inference, although he

draws different inferences regarding the "relationship(s) between the parties."  Def. Mem. at 12.

Even on this issue, Stern merely argues that Friedman had worked with Amusement on other

matters prior to the Colonial Deal, and that at some point during the transaction at issue,

Amusement appeared to believe that Friedman was actually working on its behalf.  See id. at 13.

But this evidence does not diminish Stern's strong connection to Stephen Friedman in the

acquisition of Amusement's $13 million, including the uncontroverted evidence that Stephen

Friedman assisted Stern in providing forgeries of Safrin's signature for the Colonial closing.

Accordingly, an adverse inference will be granted against Stern based on both Stern and

Stephen Friedman's invocation of the Fifth Amendment privilege.

B.    Fraud

"Under New York law, the elements of common law fraud are a material, false

representation, an intent to defraud thereby, and reasonable reliance on the representation,

causing damage to the plaintiff."  Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999) (citation

and internal quotation marks omitted); accord Suez Equity Investors, L.P. v. Toronto-Dominion

Bank, 250 F.3d 87, 104-05 (2d Cir. 2001) ("A New York common law fraud claim is defined as

a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury.") (citations omitted).[10]  Indirect misrepresentations may also form a sufficient basis for a finding of fraud.  See Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 310 (2d Cir. 1994) ("a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]") (citing Rosen v. Spanierman, 894 F.2d 28, 33-34 (2d Cir. 1990); Peerless Mills, Inc. v. American Tel & Tel. Co, 527 F.2d 445, 450 (2d Cir. 1975)).

A claim of fraud under New York law "also requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud."  Suez Equity Investors, L.P., 250 F.3d at 105 (citation and internal quotation marks omitted).

Amusement's fraud claim is based upon its allegations that:

Stern and Stephen Friedman intentionally misrepresented multiple material facts that they knew would have caused Amusement to never invest in the Colonial Deal, including, inter alia:

1) That Safrin had agreed to invest money in the Colonial Deal and partner with Stern . . .

2) That Safrin would contribute most of the equity to acquire the Colonial Portfolio . . . anywhere between 5 and 15 million.

3) That Safrin had agreed to sign 'bad boy' carve-outs to guarantee the mortgage

---

[10] The parties' briefs cite to New York case law and thus we apply the law of New York to plaintiffs' claims.  See, e.g., Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

financing for the deal . . .

4) That a 50/50 equity split between Amusement, on one hand, and Stern, Safrin[,] and Egert on the other, was permitted under the financing obtained from Citigroup . . .

Pl. Mem. at 37-38 (internal citations and quotation marks omitted).  Defendants have not

disputed Amusement's claim that Stern made or caused to be made these false representations to

Amusement or that the above four representations qualify as "material."  Instead, defendants

argue that there are disputes of fact regarding "whether Stern intended to defraud Amusement,

whether Amusement reasonably relied upon any statements made by Stern, and causation of loss

to Amusement."  See Def. Mem. at 14.  We address these elements in turn.

      1.     Intent to Defraud

Amusement's theory of fraud is based on Stern's "repeated misrepresentations of

numerous material facts," which caused Amusement to invest in the Colonial Deal.  Pl. Mem. at

40.[11]

In New York, to establish "the requisite showing of intent to deceive," a party must

establish a defendant's "'guilty knowledge or willful ignorance.'"  Schwartz v. Newsweek, Inc.,

653 F. Supp. 384, 390 (S.D.N.Y. 1986) (quoting Manufacturers & Traders Trust Co. v.

Sapovitch, 296 N.Y. 226, 229 (1947)), aff'd 827 F.2d 879 (2d Cir. 1987), abrogation on other

grounds recognized by Reichelt v. Emhart Corp., 921 F.2d 425 (2d Cir. 1990).  "[M]ere

carelessness" is not sufficient.  Id.  Nevertheless, because fraudulent intent "is rarely susceptible

to direct proof," it may ordinarily be "established by circumstantial evidence and the legitimate

---

[11] Amusement also briefly argues that Stern should be held responsible for Stephen Friedman's misrepresentations associated with the Colonial deal, as the two were "co-schemer[s]" in their plot to defraud Amusement.  Pl. Mem. at 39.  We need not discuss this issue, however, given the volume of evidence of fraud on Stern's part alone.

inference[s] arising therefrom." <u>Century Pac., Inc. v. Hilton Hotels Corp.</u>, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007) (citations and internal quotation marks omitted).  Thus, fraudulent intent can be established where a plaintiff provides evidence "that support[s] a 'strong inference that the defendants possessed the requisite fraudulent intent.'"  <u>Enzo Biochem, Inc. v. Johnson & Johnson</u>, 1992 WL 309613, at *11 (S.D.N.Y. Oct. 15, 1992) (quoting <u>Cosmas v. Hassett</u>, 886 F.2d 8, 12-13 (2d Cir. 1989)).  Such an inference may be shown, for example, by establishing a motive to defraud or by identifying "conscious behavior by the accused party."  <u>Id.</u> at *11 (brackets, citations, and internal quotation marks omitted).

Here, Stern made numerous misrepresentations to Amusement to obtain its investment in the Colonial Deal.  We discuss only two such representations, however, as they suffice to show Stern's fraudulent intent in light of Stern's strong financial motivation to ensure Amusement's participation in the deal, especially when combined with the negative inference we draw from Stern and Stephen Friedman's invocation of privilege.  These misrepresentations relate to (1) Safrin's involvement in the Colonial deal and (2) the agreement that Amusement would hold 50% equity in the Colonial portfolio.

Stern, through FRG, initiated the Colonial deal transaction, P56.1 ¶ 1; D56.1 ¶ 1, and sought loans from JP Morgan, Citigroup, and Amusement.  Throughout this period, Stern and Stephen Friedman, who was working with Stern at the time, continually made representations that Joshua Safrin was a major investor in the Colonial portfolio.[12]  These included

---

[12]  <u>See</u>, <u>e.g.</u>, P56.1 ¶ 12; D56.1 ¶12 (financing proposal submitted by JP Morgan listing Stern and Safrin as sponsors); P56.1 ¶ 23; D56.1 ¶ 23 (loan application to Citigroup containing Safrin's name); Email from Mark Stern to Robert Friedman, dated June 5, 2007 (attached to Stern March 15 Dep.), at ECF *104 (Stern states that "Safri [sic] will be the co-sponsor and will be signing on carveouts"); Email from Mark Stern to Robert Friedman, dated June 7, 2007 (attached to Stern March 15 Dep.), at ECF *105 ("Most of the equity will come from JOSHUA

representations that Safrin would agree to sign "carveout[]" guarantees, see Email from Mark Stern to Robert Friedman, dated June 5, 2007 (attached to Stern March 15 Dep.), at ECF *104 — a guarantee specifically required by the Citigroup loan due to Stern's lack of experience in real estate and minimal financial assets, see Giancaterino Dep. at 124-25; Citigroup Loan Application at 13-14.

 The involvement of Safrin and the existence of his carve out guarantee, however, were fabricated by Stern or persons acting on his behalf.  Safrin repeatedly testified without contradiction that he never had any involvement in the Colonial deal and did not sign any documents used in the deal.  See Safrin March 1 Dep. at 348-49, 386-87; id. at 215-26; see also Safrin February 29 Dep. at 44 (Safrin denies any affiliation with Safrin Group LLC).  As already described, uncontroverted evidence submitted by Amusement demonstrates that Stern and Stephen Friedman worked together to forge Safrin's signature to foster the illusion that Safrin was involved in the Colonial Deal.  In addition, Amusement has submitted uncontroverted forensic evidence showing that the documents containing the forged Safrin signatures were sent from the same IP address that Stern used.  See P56.1 ¶ 155; accord McGowan Decl. ¶¶ 12, 19.  Specifically, a forensic examination of Stern's flash drive, conducted by the information management firm Stroz Friedberg LLC ("Stroz"), revealed, among other things, that "emails attaching the Safrin Signature Pages . . . and emails sent during the same time period by Stern from his First Republic email account to Colonial Properties all were sent from the same IP Address."  P56.1 ¶ 155; accord McGowan Decl. ¶¶ 12, 19.  Based on its recovery and analysis of deleted emails and other forensic evidence, Stroz concluded that

---

SAFRIN and AVERY EGERT"); Allen Alevy January 4 Dep. at 59-60 (describing Stephen Friedman's representation that Safrin was involved in the Colonial deal).

> less than an hour after [Stephen] Friedman sent the . . . Signature Examples Email to Stern, someone using one of Stern's devices logged into the Wizzy Bizzy Yahoo webmail account, and prepared and sent an email to Steven Fleissig at Herrick Feinstein attaching the scanned Safrin Signature Pages . . . that Safrin maintains are forgeries."

P56.1 ¶ 159; accord McGowan Decl. ¶ 21.  Stroz also discovered that "the Wizzy Bizzy emails and emails from Stern to Colonial Properties were sent from the same IP address."  McGowan Decl. ¶ 23.  When asked whether he was "Wizzy Bizzy," or had opened the "Wizzy Bizzy" email account, Stern invoked his Fifth Amendment privilege.  Stern March 14 Dep. at 68-71.

As previously discussed, the Letter of Understanding between Stern and Amusement stated that Amusement would have a 50% equity ownership of the Colonial portfolio.  The evidence shows that this representation directly contradicted the loan agreement that Stern and FRG had entered into with Citigroup.  Compare Email from Steven Alevy to Stephen Friedman and Mark Stern, dated July 2, 2007 (attached to Stern March 15 Dep.), at ECF *94 with Citigroup Loan Application at 8-9, 17.  When Stern was questioned as to whether he was aware of this contradiction, he invoked his Fifth Amendment privilege.  Stern March 15 Dep. at 343-44.

The extensive and ongoing nature of both misrepresentations regarding Safrin and the 50% ownership, as well as the uncontroverted evidence of forgery, easily establishes that Stern held the requisite intent to defraud.

Stern makes various attacks on the credibility of witnesses offered by plaintiffs pointing, for example, to the "relationship(s) between the parties in this case," actions involving Allen Alevy in another matter, and a Bankruptcy Court finding that certain witnesses were not fully credible.  See Def. Mem. at 9-10, 14.  Case law is clear, however, that attacks on the credibility of witnesses are insufficient to create an issue of fact.  See, e.g., Crawford-El v. Britton, 523 U.S.

574, 600 (1998) (where a party has made a properly supported summary judgment motion, the

opposing party "may not respond simply with general attacks upon the [first party's] credibility,

but rather must identify affirmative evidence" that would create an issue of material fact)

(citation omitted); Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261

(2d Cir. 2005) ("[b]road, conclusory attacks on the credibility of a witness will not, by

themselves, present questions of material fact"); McCullough v. Wyandanch Union Free Sch.

Dist., 187 F.3d 272, 280 (2d Cir. 1999) (party "cannot defeat summary judgment . . . merely by

impugning [a witness's] honesty") (citation omitted).  In any event, there is copious

documentary evidence emanating from individual or entities other than Amusement that show

Stern's intent to defraud.

   Stern also argues that he "was not included in any of the emails relating to the release of

the funds being held in escrow."  Def. Mem. at 14.  This issue, however, is not relevant to the

question of whether Stern intended to defraud plaintiff when he falsely told it that Safrin was

involved in the deal and that plaintiff was obtaining 50% ownership in order to induce

Amusement to enter into the Colonial deal.

In sum, no reasonable jury could fail to conclude that Stern made the misrepresentations

with the intent to defraud Amusement.

2.    Reasonable Reliance

To succeed on a fraud claim under New York law, a plaintiff must show that it

reasonably relied on a false statement made by or caused to be made by the defendant.  See

Turtur, 26 F.3d at 310-11.  "The reliance requirement means that it is insufficient for a fraud

plaintiff to show merely that some chain of events beginning with a false statement by

defendants led to his injury."  Schuh v. Druckman & Sinel, LLP, 2008 WL 542504, at *10

(S.D.N.Y. Feb. 29, 2008).  In determining whether a plaintiff reasonably relied on the misrepresentations of a defendant, courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc., 343 F.3d 189, 195 (2d Cir. 2003).  Reasonable reliance does not require "due diligence," but only that plaintiff performed "minimal diligence" or care that "negat[es] its own recklessness."  Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997) (citations and internal quotation marks omitted); accord Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C., 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013).  Nevertheless, if "plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (citations and internal quotation marks omitted); accord De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 313 (S.D.N.Y. 2013); see also Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234-35 (2d Cir. 2006) (quoting Mallis v. Bankers Trust Co., 615 F.2d 68, 81 (2d Cir. 1980) ("[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts").

Here, a reasonable jury could conclude only that Amusement reasonably relied on the multiple representations that Safrin, an experienced and financially stable investor, was a co-sponsor of the Colonial Deal.  See Allen Alevy January 4 Dep. at 197-98 (Alevy affirms that "one of the reasons [he was] willing to put up the $13 million was because Mr. Safrin was putting equity into the deal.").  As discussed at length above, Stern, sometimes directly, and

22

sometimes through either Stephen Friedman or Robert Friedman, made numerous representations that Safrin was not only a major investor in the Colonial Deal, but also would be willing to sign carve out guarantees, providing added security for Amusement in the transaction. P56.1 ¶ 47; D56.1 ¶ 47; accord Allen Alevy January 4 Dep. at 48, 88-89; Email from Mark Stern to Robert Friedman, dated June 5, 2007 (attached to Stern March 15 Dep.), at ECF *104 (Stern represents that "Safri [sic] will be the co-sponsor and will be signing on carveouts."); Email from Mark Stern to Robert Friedman, dated June 7, 2007 (attached to Stern March 15 Dep.), at ECF *105 ("Most of the equity will come from Joshua Safrin and Avery Egert") (capitalization omitted). Although there is no evidence that Amusement ever attempted to contact Safrin directly or to otherwise confirm his involvement in the transaction, the evidence is uncontroverted that Stern, through Stephen Friedman, provided Amusement's attorney with documents containing Safrin's signatures. See, e.g., Email and attached Agreement and Assignment (annexed as Exs. 132-33 to Hofsaess Decl.). It would not be reasonable to expect that Amusement should have then conducted an investigation into whether these signatures were forgeries. Similarly, after receiving Friedman's proposal regarding Amusement's 50% purchase of the Colonial portfolio, see Allen Alevy January 4 Dep. at 25-26; Stern's agreement to the proposal, see Emails and Attachments (annexed as Ex. 72 to Hofsaess Decl.); and Safrin's purported agreement to the proposal, it would have been unreasonable to expect Amusement to then question Citigroup as to the legitimacy of the overall arrangement.

Indeed, Stern's brief has marshaled no evidence to dispute the issue of reasonable reliance, see Def. Mem. at 14-15, and when questioned regarding whether he made "false statements in order to induce Amusement to place its money into escrow," Stern invoked his Fifth Amendment privilege. See P56.1 ¶ 72; D56.1 ¶ 72; accord Stern March 15 Dep. at 407.

23

Thus, Amusement is entitled to summary judgment on the issue of reasonable reliance.

3.    Damages

The remaining disputed element of fraud is damages.  To prove this element, a plaintiff must show that "damage to the plaintiff [was] caused by reliance on the defendant's misrepresentations and omissions."  Martin Hilti Family Tr. v. Knoedler Gallery, LLC, 137 F. Supp. 3d 430, 483 (S.D.N.Y. 2015).  This aspect of proof is commonly referred to as "loss causation."  The loss causation requirement in a common law fraud claim is "the fundamental core of the common-law concept of proximate cause."  Laub v. Faessel, 297 A.D.2d 28, 31 (1st Dep't 2002); accord AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000) ("Loss causation is causation in the traditional 'proximate cause' sense–the allegedly unlawful conduct caused the economic harm.") (citation omitted).  To show loss causation, a plaintiff must show that the defendants' misrepresentation "directly and proximately caused" his losses. Laub, 297 A.D.2d at 31 (citations omitted); accord Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 777 (S.D.N.Y. 2011).  Here, after signing the LOU, Amusement deposited $13 million in an account with Frenkel's company, Land Title Associates, to fund the Colonial deal in accordance with the terms of the LOU.  P56.1 ¶ 90; D56.1 ¶ 90.  On July 12, 2007, unbeknownst to Amusement and without its approval, most of Amusement's funds were disbursed.  P56.1 ¶ 122.  By the end of July 13, 2007, less than $2.5 million of Amusement's initial $13 million remained in the escrow.  P56.1 ¶ 132; accord First Republic Group Corp C/O Land Title Associates Agency: Escrow Management Account, dated July 31, 2007 (annexed as Ex. 83 to Pl. Mem.).  Amusement's demands for the return of its money were not complied with. P56.1 ¶ 133; see also Deposition of Ephraim Frenkel, dated October 19, 2009 (annexed as Ex. 113 to Hofsaess Decl.) ("Frenkel October 19 Dep."), at 262-65; Fax from Allen Sragow to

24

Ephraim Frankel [sic], dated August 6, 2007 (annexed as Ex. 110 to Hofsaess Decl.); Allen

Alevy January 4 Dep. at 26.  Thus, Amusement has lost the entire $13 million.

On the question of causation, no jury could fail to find that the misrepresentations by

Stern that Safrin was participating in the deal and that Amusement would receive the 50%

interest promised in the LOU caused it to transfer the $13 million.  See Allen Alevy January 4

Dep. at 197-98, 453-54; Emails (annexed as Ex. 72 to Hofsaess Decl.).

For his part, Stern does not contest causation.  He argues only that it is his

"understanding that the Plaintiff has recovered $26,000,000.00."  Def. Mem. at 15.  He provides

no citation for this statement.  Thus, it cannot be used to controvert plaintiffs' proof on damages.

Accordingly, Amusement is entitled to summary judgment on its claim of fraud in the

amount of $13 million.

C.      Conversion

In order to state a claim for conversion under New York law, "a plaintiff must allege that

(1) the party charged has acted without authorization, (2) exercised dominion or a right of

ownership over property belonging to another, (3) the rightful owner makes a demand for the

property, and (4) the demand for the return is refused."  Polanco v. NCO Portfolio Mgmt., Inc.,

23 F. Supp. 3d 363, 370 (S.D.N.Y. 2014) (citations and internal punctuation omitted).  In

instances where the "'original possession [of the property] is lawful, a conversion does not occur

until the defendant refuses to return the property after demand or until he sooner disposes of the

property.'"  Id. (quoting Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir. 1993)).

Furthermore, a claim for conversion may still lie, even where the guilty party returns the

property in question.  Id. at 371; accord Slue v. New York Univ. Med. Ctr., 409 F. Supp. 2d 349,

364 (S.D.N.Y. 2006) (noting that "[a] claim for conversion will exist even when the deprivation

25

is partial or temporary.").

Stern's brief contains only one paragraph addressing this claim. It argues that Amusement "ratified" the transaction and thus cannot make a claim for conversion. Tellingly, Stern provides no explanation of how or why the doctrine of "ratification" applies to a claim for conversion. More importantly, Stern marshals no evidence to prove "ratification." His argument consists only of the following statement: "As Judge Glenn found, Amusement ratified the transaction, and proceeded as if it owned the malls." Def. Mem. at 16.

Stern is referring to a proceeding that took place during the bankruptcy of Stern's company, FRG, during which Bankruptcy Judge Martin Glenn denied Amusement's application for a preliminary injunction that would have prevented FRG from utilizing any of the funds traceable to Amusement's escrow deposit. See In re First Republic Grp. Realty, LLC, 421 B.R. 659 (Bankr. S.D.N.Y. 2009). In his opinion, Judge Glenn found that Amusement had not shown a "likelihood of success on the merits" that FRG misappropriated the funds because of Amusement's actions after the release of funds took place. Id. at 680. Specifically, Judge Glenn found that after the release of the escrow funds, Amusement ratified the transaction by filing suit against Stern and FRG "to enforce the transaction resulting from the ostensibly unauthorized release of funds." Id. at 684. Judge Glenn noted that "[i]n order [for a principal] to ratify a prior transaction . . . the principal must have knowledge of all the material facts involved in the transaction," id. (citing Breen Air Freight, Ltd. v. Air Cargo, Inc., 470 F.2d 767, 773 (2d Cir. 1972)), and thus, in finding that Amusement was capable of ratifying the transaction, Judge Glenn implicitly made a factual finding that Amusement held sufficient knowledge to perform the ratification.

Judge Glenn's decision is not admissible as evidence, however. Thus, the statements it

contains are not relevant to Stern's effort to oppose summary judgment.  Stern makes no

argument that Amusement would be collaterally estopped from presenting evidence contrary to

Judge Glenn's findings.  Thus, Stern has not disputed the elements of conversion.  Accordingly,

Amusement should be granted summary judgment on the question of whether Stern converted

his funds.

       D.      <u>Unjust Enrichment</u>

      Amusement also brings a claim of unjust enrichment based on the loss of the $13 million.

Under New York law, a claim for unjust enrichment requires a showing "1) that the defendant

benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require

restitution."  <u>Kaye v. Grossman</u>, 202 F.3d 611, 616 (2d Cir. 2000) (citation and internal

quotation marks omitted); <u>accord</u> <u>Paramount Film Distrib. Corp. v. State of N. Y.</u>, 30 N.Y.2d

415, 421 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is

whether it is against equity and good conscience to permit the defendant to retain what is sought

to be recovered.") (citations omitted).  The "essence" of an unjust enrichment claim is that "one

party has received money or a benefit at the expense of another."  <u>Kaye</u>, 202 F.3d at 616

(citation and internal quotation marks omitted); <u>accord</u> <u>Amusement Indus., Inc.</u>, 786 F. Supp. 2d

at 784.

      Stern makes essentially no argument to counter Amusement's evidence supporting its

claim of unjust enrichment.  <u>See</u> Def. Mem. at 15.  In any event, there is no doubt that the

elements of the claim are met.  Stern benefitted from Amusement's loss of the $13 million

inasmuch as he was able to direct where the $13 million was disbursed.[13]  The $13 million was

---

     [13] Amusement has provided detailed evidence regarding to whom its funds were
disbursed and how the recipients were either Stern or Stern-related entities.  <u>See</u> P56.1 ¶¶ 167-

Amusement's money and it is plainly equitable to require Stern to return this money.

Accordingly, Amusement is entitled to summary judgment on its claim of unjust enrichment.

    E.    <u>Conspiracy</u>

Finally, Amusement argues that "Stern and others conspired to defraud Amusement and convert its $13 million." Pl. Mem. at 46 (underline and capitalization omitted). Stern has failed to even mention this claim, let alone dispute it. <u>See</u> Def. Mem. Although a claim of civil conspiracy, by itself, is not an independent cause of action in New York, <u>Boone v. Codispoti & Assocs. P.C.</u>, 2015 WL 5853843, at *4 (S.D.N.Y. Oct. 7, 2015) (citations omitted), a plaintiff may recover damages for civil conspiracy if he "allege[s] a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." <u>Faulkner v. City of Yonkers</u>, 105 A.D.3d 899, 900 (2d Dep't 2013) (citations and internal quotation marks omitted). As discussed at length above, Amusement has shown that Stern and Stephen Friedman worked together to perpetrate the fraud on Amusement by misrepresenting the involvement of Safrin and the legitimacy of their proposed 50/50 equity split with Amusement. Having found Amusement entitled to summary judgment on the underlying fraud, Amusement is also entitled to summary judgment on its claim of conspiracy to commit fraud.

    F.    <u>Compensatory Damages</u>

Amusement has requested a compensatory damages award of $13 million, an amount equal to Amusement's deposit in Frenkel's escrow account. <u>See</u> Pl. Mem. at 47. Stern has not

---

77; Frenkel October 20 Dep. at 593-94 (Frenkel testifies that Stern instructed him on where to send Amusement's $13 million). Stern failed to provide any evidence to controvert the assertions presented by Amusement, beyond mere unsupported denials. Thus, these facts are deemed admitted.

disputed Amusement's damages calculation or offered any evidence to suggest its calculation was incorrect.  See Def. Mem. at 13-16.  Indeed, Stern did not dispute that Amusement wired $13 million to Land Title Associates in connection with the Colonial deal.  P56.1 ¶ 90; D56.1 ¶ 90.  Because Stern is liable for fraud, conversion, unjust enrichment, and conspiracy to commit fraud related to the deposit and subsequent disbursement of the entirety of these funds, and because there is no dispute regarding the extent of Amusement's loss, summary judgment on the issue of damages is also appropriate.  See, e.g., Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co., 979 F. Supp. 2d 385, 389-90 (S.D.N.Y. 2013) (awarding damages where their calculation was "readily ascertainable"); see also Anderson, 477 U.S. at 256 (to avoid summary judgment, the non-moving party must provide "concrete evidence from which a reasonable juror could return a verdict in his favor").  Accordingly, Amusement is entitled to an award of $13 million in damages.[14]

IV.    CONCLUSION

        For the reasons stated above, Amusement's motion for summary judgment against Moses Stern, a/k/a Mark Stern (Docket # 828), should be granted in its entirety in the amount of $13,000,000.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

        Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

---

[14] Amusement states that it plans to seek prejudgment interest by means of another filing. See Pl. Reply at 24.

(b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: August 10, 2016
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

30